UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
UNITED STATES OF AMERICA       :
                          :
         v.                :
                          :      Case No. S2 12 Cr. 934 (RA)
FENG LING LIU, a/k/a "Karen,"     :      MEMORANDUM
VANESSA BANDRICH, and        :
RUI YANG, a/k/a "Rachel," a/k/a "Sunny"  :
                          :
            Defendants.      :
--------------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR JUDGMENT OF ACQUITTAL OR FOR NEW TRIAL PURSUANT TO RULE 29 AND RULE 33

### First Ground: Prosecutorial misconduct severely prejudiced defendant and made it unjust to convict the defendant.

The case law governing the government's duty to disclose evidence: In United States v. Rittweger, 524 F.3d 171 (2d Cir. 2008), the Second Circuit has a nice summary of the law on government's disclosure duty as follows: The government has a duty to disclose evidence favorable to the accused that is material to guilt. Brady v. Maryland, 373 U.S. at 87. This disclosure obligation extends to information that "if suppressed, would deprive the defendant of a fair trial," United States v. Bagley 473 U.S. 667, 675 and such a deprivation occurs only where there is "reasonable probability" that the suppression "affect the outcome of the case", United States v. Coppa, 267 F.3d 132, 135 (2d Cir. 2001) or would have "put the whole case in such a different light as to undermine confidence in the verdict." Kyles v. Whitley, 514 U.S. 419, 435. The duty covers not only exculpatory material, but also information that could be used to impeach a key government witness. Coppa, Supra. The Second Circuit held that there is a three-component test for Brady violation: favorable evidence, failure to disclose, prejudice caused by such failure to disclose. See Rittweger, supra.

The case law governing the prosecutor's conduct during the trial, especially during the opening and summation: It is well established that prosecutors may not vouch for their witnesses' truthfulness. In other words, a prosecutor is prohibited from expressing his or her personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant. United States v. Modica, 663 F.2d 1173 (2d Cir. 1981), United States v. Carr, 424 F.3d 213 (2d Cir. 2005), United States v. Certified Environmental Services Inc., Docket No. 11-4872, decided by the Second Circuit on June 2,  2014.  In

United States v. Rosa, 17 F.3d 1531 (2d Cir. 1994), the Second Circuit held that it is improper conduct where the prosecutor mischaracterized evidence or referred to fact not in evidence. Prosecutor's improper statements during summation will result in a denial of due process rights if they cause the defendant substantial prejudice. *United States v. Rivera,* 22 F.3d 430, 437 (2d Cir.1994), United States v. Williams, Docket Number 11-676-cr., United States v. Sharee, 190 F.3d 71 (2d Cir. 1999). The Second Circuit held that a three-prong test is required to determine if substantial prejudice is caused to the defendant by the prosecutorial misconduct: the severity of the misconduct, the curative measures taken by the court, and the certainty of conviction absent the misconduct. United States v. Burns, 104 F.3d 529 (2d Cir. 1997), United States v. Elias, 285 F.3d 183 (2d Cir. 2002)

The case law governing the admission of coconspirator's out-of-court statements: Under Fed.R.Evid. 801(d)(2)(E), an out-of-court statement is non-hearsay if it was made by a coconspirator in furtherance of the conspiracy. In order to admit a statement under this Rule, the court must find (1) that there was a conspiracy, (2) that its members included the declarant and the party against whom the statement is offered, and (3) that the statement was made both (a) during the course of and (b) in furtherance of the conspiracy. See Bourjaily v. United States, 483 U.S. 171, 175, United States v. Tracy, 12 F.3d 1186, 1196 (2d Cir. 1993) Declarations of one member of a conspiracy are admissible against another member "only if made during the course of and in furtherance of the conspiracy". United States v. Mastropieri, 685 F.2d 776, 786 (2d Cir.). To be "in furtherance" of a conspiracy, the statements must in some way have designed to promote or facilitate achievement of the goals of that conspiracy, as by, for example, providing information or reassurance to a coconspirator, seeking assistance from a coconspirator, or by communicating with a coconspirators to achieve the conspiracy's goals. United States v. Rivera, 22 F.3d 430 (2d Cir. 1994), United States v. Tracy 12 F.3d 1196, United States v. Maldonado-Rivera, 922 F.2d 934 (2d Cir. 1990), United States v. Rahme, 813 F.2d 31 (2d Cir. 1987). The erroneous admission of hearsay testimony is subject to harmless error analysis if such error has no substantial influence on the jury. United States v. Rea, 958, F.2d 1206 (2d Cir. 1992), Kotteakos v. United States, 328 U.S. 750.

From the start of this investigation, to the opening statement, throughout the trial and all the way to the summation and rebuttal summation, the FBI and the prosecutors continuously engaged in prosecutorial misconduct and severely prejudiced the defendant.

1. Initiation of the investigation in bad faith

Prosecutorial misconduct started from the very beginning of the investigation of this case. From the discovery and the 3500 materials and the testimony of the witnesses, the prosecutors produced no evidence to show that any criminal activities of the Liu firm and Moslemi firm engaged in caused the FBI's attention and warranted their investigation in the first place. Nothing! Then why is there this investigation? The New York asylum office brought to the FBI's attention that someone was filing false asylum applications in Chinatown, such as Lin Chen's lawyer. FBI approached Lin Chen and caught her on October 2, 2009. After doing their homework and learning about the Chinese immigration field, they locked Fengling Liu ("Karen") as their target. Why? Because Karen is famous in this field and enjoys a good reputation in the Chinese community. By targeting Karen, they can accomplish two goals: to make their operation sensational and

to have a chilling effect on the Chinese community. Therefore, with this goal of convicting Karen, FBI then started to look for evidence and even create evidence to achieve that goal. They started the investigation in 2009 and tried hard and long to look for evidence against Karen ever since then. That was how they found Victor You and later Meng Fei Yu to cooperate with them. Victor and Meng Fei both engaged in filing false asylum applications after they left Moslemi firm. It is not clear when they two started their criminal activities. But FBI had little evidence against Victor and Meng Fei when they approached them. Fortunately to FBI it did not matter at all to Victor and Meng Fei because Victor and Meng Fei had prepared long ago and were actually looking forward to cooperation with FBI to accomplish their own goals by utilizing FBI's power, and FBI promised them what they wanted. Tr.610, Tr.688-689, Tr.1276 See Defendant Exhibit ("DX") 1. [Please note: all references to trial transcripts will be as DX1 arranged according to the page number.] Therefore, they reached the collusion in their first encounter, "immediately" as Victor testified. Tr.617 Neither Victor nor Meng Fei ever bothered to see the evidence against them before they decided to cooperate with FBI. Tr.658, Tr.1279, and 3503-123 at P287 as DX2.  FBI promised Victor that he will be naturalized as a reward for his cooperation and told him to file naturalization application when they clearly knew Victor would very likely to lie in his naturalization application in order to make himself eligible for naturalization. Regarding Victor's lies in his naturalization application, he testified as follows:

> Q. So that's another crime that the government told you, through Mr. Park, that you should commit, isn't it? Tr.804
> A. Yes. Tr.805
> …….
> Q. And you were not concerned about being arrested for perjury because government told you to do it, right? Tr.807
> A. I will not do that without counseling them before submitting the application.

Here Victor basically said that he got the permission from the FBI to lie on his naturalization application. It is also very likely that FBI promised Victor to be admitted to the New York Bar. FBI not only gave Meng Fei and her husband deferred action so that they both can work legally in the United States indefinitely without being deported, they also helped Meng Fei Yu get the travel document for her to travel to China to work while on probation but refused to let Karen travel with her family in the United States for a brief vacation and also refused to return the passport to another defendant to allow her to travel to California for a brief family vacation. And Meng Fei testified that her husband is going to attend graduate school here and they clearly do not expect to be deported anytime in the near future. Tr.1662 By delaying her sentencing which is clearly within the power of FBI/prosecutors, she can apply for any job here without having to disclose her conviction because technically before sentencing she has not been convicted as she herself testified. Tr.1645 She can even travel abroad to work as the evidence shows. Moreover, FBI may very well have promised Meng Fei green card for assisting the law enforcement, the S visa. Therefore, they have nothing to lose but everything to gain by cooperating with FBI. Both Victor and Meng Fei knew very well from the very beginning that they were just gun powders used by FBI to convict Karen and they were glad to be used this way because they also needed to utilize FBI power to accomplish their own goals. On the third day of Karen and other defendants' arrest, Meng Fei called Wenting

3

Zheng and persuaded her to cooperate with FBI and admitted that she, Wenting Zheng and Feng Li were all gun powders used by the FBI against Karen. See Tape 167, the recorded telephone conversation between Meng Fei and Wengting Zheng as DX3. So is Vanessa Bandrich. They are just also gun powders used by the FBI to convict Karen. On the day of Karen's arrest, three defense lawyers told Karen that Vanessa Bandrich would definitely cooperate with the prosecutors because she is an ideal witness: white, pretty and speaking good English. It turned out that she refused to be used by them. But she may have to pay a heavy price for refusing to be used as FBI's gun powder. Moslemi's name appeared as the firm's name for four years by the day of the FBI's raid and he had represented hundreds of clients in court on a daily basis in the past four years by that date, but he was not arrested because he is not white and not handsome and therefore not an ideal witness. The only reason that Victor and Meng Fei are willing to be used as gun powders is that they are also using the FBI to achieve their own goals. It is for their mutual benefits and it is a win-win deal for both sides. In return for these special favors of the FBI and in order to accomplish their own goals, both Victor and Meng Fei were zealously involved in the persecution of Karen and clearly had gone far beyond the normal duties as required by the cooperation agreement. This point will be discussed in great details in the ineffective assistance of counsel section regarding their motives for cooperation with FBI.

2. Prosecutor's misconduct in approaching defendants who were represented by counsel
As discussed above, Meng Fei, on behalf of FBI, called Feng Li three times on the second day and third day of his arrest. She called Wenting Zheng three days after her arrest. She also called two other Moslemi employees on the second and third day of the the FBI raid as shown in tape 167 header. At that time it was very clear that Feng Li and Wenting Zheng were represented by counsels and thus it is legally impermissible to do so. United States v. Hammand, 858 F.2d 834 (2d Cir. 1988).  Moreover, Meng Fei was clearly trying to persuade Wenting Zheng and Feng Li to cooperate with the government to testify against Karen. She told Wenting that "when you are given the opportunity to cooperate, you must grab it" as shown in DX3, and she hinted to Feng Li that by cooperating with the government, there will be no jail time and also told him not to call other defendants about the case, otherwise there will be trouble in the future when he testifies at trial.  She also tried to influence the Moslemi employee not to talk to Karen or do anything to help Karen. See tape 167, the recorded conversation with Feng Li and with Winnie as DX4.

3. Prosecutor's failure to disclose exculpatory evidence
Prosecutorial misconduct continued throughout the investigation of this case. During the investigation of this case, FBI interviewed a number of Moslemi firm clients long before Karen's arrest and continued after Karen's arrest. Apparently none of them admitted that their applications are false or agreed to cooperate with FBI. One of them is the bad case Meng Fei mentioned many times during her testimony. The FBI agents pretended to be asylum officers and tried to force the applicant to admit her story is fake and that she came to the United States on that same trip during which she was arrested in a Central American country, which would make her filing beyond the one year of arrival. They pressed her very hard and in the end she was forced to admit falsely that she came to the

U.S. on that same trip, which is not true. The truth is that she was put on a plane and was sent back to China the same day with her own passport. FBI never disclosed the fact or any interview notes where clients affirmed that their asylum applications were truthful. It is relevant evidence for the defense because it effectively rebuts the prosecutor's argument that the firm is a fraud mill and all asylum applications are false. This is strong evidence for the defense especially because FBI did succeed in getting a number of asylum applicants admit their fraud and cooperate with FBI in other defendants' cases. This further shows that FBI are just seeking to convict Karen and do not care about the truth or breaking the rules. Moreover, FBI agents approached Troy Moslemi two weeks before Karen's trial and in the interview, Mr. Moslemi denied any involvement in fraud or any awareness of fraud during his work in the Moslemi firm, but FBI never disclosed such interview notes to the defense.

### 4. FBI's order to forbid Victor and Meng Fei to sting Karen

Once you see the true purpose of FBI, i.e. to convict Karen regardless of whether she has committed a crime or not, it is not hard to understand why they forbade Victor to record Karen. According to Victor, he was pretty much free to call anyone except those on the FBI not to call list. And Karen happened to be the only one on that list. Tr.668 Although Victor said FBI decided who he should call, he lied. The truth is that Victor did not need FBI's permission to call and record anyone else except Karen. This can be seen from his call to Fulcrum who became the government informant even before Victor and recorded Victor many times and FBI would definitely not ask Victor to call and record him. But Victor called and recorded Fulcrum on September 8, 2012 as shown in tape 157. FBI did not arbitrarily forbid Victor to call Karen. Rather, it is FBI's deliberate decision after discussing with Victor because Victor must have told them that he was not sure of Karen's response because deep in his heart he knew that Karen never engaged in any fraud and of course would not admit any fraud in the recordings. For the same reason, FBI did not let Meng Fei record Karen. But they let her record all the other people, her coworkers, Ms. Bandrich and Feng Li. In the summer of 2012 she came to the Moslemi office several times and recorded other employees of the office. But she never made any attempt to record Karen. Rather, it was Karen who called her. See Government Exhibit ("GX") 154B, C, D, E and F as DX5-01. Being informed by the office coworker Winnie that Karen would call her to ask her to come back to work, Meng Fei was expecting Karen's call and thus got prepared. See GX 154A at P6 and P11 as DX5-02. In the first recording when Meng Fei asked Karen whether the applications prepared by the firm are still the same contents, Karen answered there is no significant change of law and everything is still the same. See GX 154B at P9 as DX5-03. Moreover, Karen told Meng Fei that she and other assistants should repeatedly warn clients to answer questions honestly in court and if they do not know the answer to a question, they should just answer honestly and should never lie. See GX 154B at P13-14 as DX5-04, Tr.1342-1343. Karen did not say anything to incriminate herself during this conversation. At the end of the conversation, Karen told her to call back after she discussed with her husband and knew what she wanted from this job. So she was well prepared for the next call in early September. But again, she did not make the call and it was Karen who called her when Meng Fei failed to call Karen as she promised. Meng Fei never called Karen again during the four months period from September to December even if all they have is one

recording with a deliberate vague message. Why? Because Meng Fei knew that Karen would not admit any fraud because Karen never engaged in any fraud. And FBI certainly did not want that kind of recording because that would ruin the whole purpose of their investigation. That is also why when Karen did call Meng Fei, they did not let Meng Fei say clearly that "I fabricated the story and I taught client how to say it". Rather FBI and Meng Fei discussed the situation together and Meng Fei told them the worries and fears that she,  Karen, Ms. Bandrich and Feng Li all had as immigration lawyers, i.e. clients would push all blame to their attorneys if they were caught lying in court. Then they decided that Meng Fei should say in the recording that "I kept thinking that the client would all of a sudden say, well, she fabricated this story, she taught me how to say it." Tr.1344 They knew Karen shared the same feelings and thus would not rebut Meng Fei. If the prosecutors really believe the firm is a fraud and Karen committed the fraud with Meng Fei as they have argued, why not let Meng Fei say it clearly to Karen? Instead, FBI first purposely produces this vague recording that seems to indicate fraud but if one looks closely it does not indicate fraud at all, and then the prosecutors argue before the jury that this is solid proof of Karen's admission of fraud by mischaracterizing the evidence and misleading the jury to achieve their purpose of convicting Karen.

5. FBI's creation of evidence by Meng Fei through recording of Ms. Bandrich
Moreover, in avoiding the situation where Karen would deny her involvement in fraud, thus ruining their goal of convicting Karen, FBI chose not to let Victor or Meng Fei to record Karen. But they need evidence. Therefore, FBI chose to create their own evidence through Meng Fei's recordings, of not Karen, which they dared not to do, but of other people. See GX 127 and 133. First, FBI let Meng Fei herself make incriminating statements against Karen instead of eliciting incriminating statement from Karen as it should be done and then the prosecutor let Meng Fei elaborate those incriminating statements she had purposely made in the recordings in whatever way she wanted. See Tr.1332-1339. These recordings are a product of Meng Fei's sting of Ms. Bandrich but the prosecutor presents the evidence solely to target Karen. This is clearly not legal investigation, nor legitimate collection of evidence but pure creation and misuse of evidence by FBI for the purpose of convicting Karen. FBI not only created this evidence, it also disguised it as a prior recorded statement, giving the jury the false impression that it was prior recorded statement and thus more credible. If a defendant tries to use the recorded statement for his/her defense, the prosecutor will surely argue that the person who has made the recording is lying and whatever she has said in the recording cannot be used as evidence for the defense because her sole purpose is to elicit incriminating statement from the other party in the conversation, and whatever she has said there is for that purpose only and cannot be taken as true. For the same reason, whatever Meng Fei has said in the recording should deserve little weight and should never be presented to the jury in the first place through her testimony because she is the one making the recording and she has deliberately made those incriminating statements against Karen to be used to convict Karen. In essence, it is evidence by her own deliberate creation. By no means should she be given the opportunity to elaborate on what she has said in the recordings because that means she is given the opportunity to create more evidence through her elaboration, not just eliciting evidence. But here she is given the opportunity to do both. Prior recorded statement is more credible but it only refers to statement of the person who

is unaware of the recording, not the one who does the recording and purposely navigates the conversation. Here, prior recorded statement lends her the air of being more credible and gives the jury the false impression that it is true when in fact she has purposely created this evidence.

Moreover, she is not only given the opportunity to elaborate what she has said in the recordings in whatever way she wants but also is allowed to speculate and repeat what she has testified before through the discussion of the recordings. For example, she testified that Feng Li and Ann told her that Karen wanted to close the firm for safety, and then she simply speculated on what she meant by safety of the firm, not what Feng Li or Ann meant by that term. Tr.1333.  First it is hearsay, out of court statement made not in furtherance of the conspiracy because she was told by one of them after she was no longer in the conspiracy. Therefore, it is made not during the course of the conspiracy, nor in furtherance of the conspiracy. Second, she was giving her own opinion.  Tr.1334 is a repeat of Tr.1266 and Tr.1268 about the same bad case and how Karen comforted her and Feng Li. She was also allowed to repeat her earlier testimony on how she made up stories for clients by saying she would never copy and paste. Tr.1335 Is she instructed to say so because the prosecutor has produced 453 asylum applications in the discovery and cannot find any evidence that the applications copied one another? She was also allowed to repeat her earlier testimony that all Christian claims follow the same pattern. Tr.1335

6. Differential treatment of different defendants arrested with the same FBI operation
The prosecutorial misconduct can also be seen by the differential treatment of the 26 defendants who were arrested in the same takedown. To all the other defendants except Karen and her family members, the prosecutors just gave them a reasonable deal and did not seek forfeiture except one defendant with a nominal number. Let's take John Wang as an example. He had submitted 1332 asylum applications from 2010 to 2012 according to the asylum office, much more than Moslemi firm even if Moslemi firm is three times larger in terms of number of employees and has been in business for many years longer than his. See 3504-20 at P3 as DX6. And evidence shows that John Wang's firm engaged in notorious fraud such as fabricating medical documents for clients' applications and sold to clients for money as shown in tape 123. See also GX 127 at P16 as DX7. Moreover, John Wang never stopped representing clients in the immigration court after his arrest and his guilty plea and only stopped when he was suspended to practice by the immigration court. John Wang has three properties in Manhattan and his office is owned by him and it alone is worth over one million dollars. But the prosecutor sought zero forfeiture. Most of the other defendants are owners and had been in this business for many years and profited a lot from the operation of filing false asylum applications, and have substantial assets. The prosecutors clearly know it. But all the non-lawyer defendants get 14 points by the sentencing guideline and no forfeiture is ever required of any of them. On the other hand, Karen and her family members got no deal from the prosecutors and faced the highest forfeitures. For example, Shufeng Xia only came to the United States in April 2010 and engaged in the illegal activities for only about a year and is not profited from the operation other than getting a meager salary. But the prosecutors asked for the highest enhancement simply because he is Karen's relative. Moreover, the FBI has found plenty of evidence of the other defendants' criminal activities and all of

them had fraud charge. On the other hand, even if the FBI targeted Karen from the very beginning they found little evidence about the criminal activities of Karen or other defendants in the firm. That is why none of the nine defendants in Moslemi and Bandrich firm has fraud charge in the initial indictment. FBI/Prosecutors just do not have the solid evidence to bring the fraud charge even if it is not a high standard by all means. Read the indictments closely for all the defendants, it is not hard to see the huge difference and strong contrast between the Moslemi indictment and the other indictments in details and specificity. It is especially telling given that the FBI has two insiders from the Moslemi firm and there is no insider for any of the other firms. It is clear that the prosecutors enforced the law selectively and discriminated Karen and her family members in the prosecution of the case.

7. Prosecutor's failure to produce four important tapes

The prosecutorial misconduct continued in the discovery stage and throughout the trial. The prosecutors failed to produce four tapes and their transcripts containing very important information to the defense. They were respectfully number 7, 11, 13 and 36. At the discovery stage, they did not include those tapes into the group to be given to the defense on their February 1, 2013 letter at P10. See the letter as DX8. Defendant was not entitled to get anything other than those designated by the prosecutors on that list of tapes. No information was listed with the above four tapes to indicate what they were about or whether they existed or not. The transcripts for those four tapes were produced for the first time in the 3500 materials, 10 days before the trial started. At that time, the tapes were still not produced. Moreover, when defense asked for the tapes, they were directed to contact Dupecorp to get them. But Dupecorp refused to produce them to the defense on the ground that Dupecorp was not authorized by the prosecutors to produce them to the defense. Thus defense never got the tapes before or during the trial. And the transcripts are clearly not reliable evidence because the evidence introduced during the trial shows very clearly the prosecutor's transcripts have millions of mistakes and the transcripts and translations are not accurate at all. One translator even committed a perjury in court and lied about his association with one of the parties in the recorded conversation. His close association with the key government witness cannot guarantee his impartiality in translation. Moreover, he had a strong bias against defendants and asylum applicants in general because he told the prosecutor that 90% of the asylum applications were fake. Prosecutors should not use such a translator to do the work because he is clearly biased and due to that bias his impartiality in translation cannot be ensured. Moreover, Prosecutor told the judge in court about this translator's comment, which is not relevant to the trial and not a proper thing to do because she was clearly trying to influence the court with that information.

8. Prosecutor's tempering of GX 48T/3502-48

During the initial discovery, the prosecutors only produced the transcript of tape 48 which shows 36 minutes recording. And the transcript is primarily summary in nature and only contains a small portion of word by word transcript as it has only five pages including the title page. See 3502-84 48T summary version as DX9-01. The transcript shows that the government informant Lin Chen first came to the Moslemi firm and later moved to another location and at that location an UF2 gave her the telephone number and

business card for the company in China which helps her make fake documents for her fake asylum application. But the prosecutor did not produce the tape. They still failed to produce the tape upon repeated request by the defense. Shortly before the trial, the prosecutors produced the final transcript of tape 48. The transcript has no beginning, nor ending and nor time mark. It is word by word transcript but only has five pages including the title page. Clearly it is not a complete transcript but only a tiny portion of the whole recording. The second transcript is totally different from the first transcript, talking about totally different things with different people involved, and it never talks about anyone giving the government informant Lin Chen the telephone number and business card for the company in China. See GX48T version two as DX9-02. The prosecutors never produced the tape to the defense. Defendant did not get the tape until after the trial through another defendant. The tape shows it only has 22 minutes and only has audio. See tape 48 as DX9-03. The government informant Lin Chen testified clearly that she always had both the video and audio device on for all her visits to the Moslemi firm. Tr.1031. So, there is only one explanation for the difference: the prosecutors cut the tape from 36 minutes to 22 minutes and removed the video from the tape. Why did the prosecutors do that? Because the complete tape would show someone else gave the telephone number and business card to Lin Chen, not Lilian as the prosecutors claimed. The prosecutor conceded that the only reason that tape 57 is not hearsay and thus can be admitted into evidence is that Lilian provided the contact information to Lin Chen so that she can make the call to get fake document for her application. Tr.517 After cutting the tape and removing the video, it concealed the truth as to who provided the contact information to the government informant Lin Chen, but it cannot support the prosecutor's argument that Lilian gave Lin Chen the telephone number and business card  and for the prosecutor's general argument that Moslemi employees directed clients how to get fake documents. Therefore, it could not be used by the prosecutors and thus it was not introduced into evidence during trial. The prosecutors thought of a way to find support for their argument in the absence of such recording. They first concealed the truth by tampering the evidence and then they let Lin Chen testify falsely that Lilian gave her the telephone number and business card. However, when Lin Chen testified that all her contacts with the Moslemi firm were recorded with both video and audio, recording should speak better than her words and her words alone without recording are not enough to prove the thing the prosecutors seek to prove. The defense failed to demand for the recording or raise the argument. The prosecutors not only did not have the recording, they also claimed that their agent lost the business card they claimed that Lilian gave to Lin Chen. Tr.523 At trial, defense first objected to GX 57, the evidence of Lin Chen's phone calls to China on the ground of no link to Moslemi firm and later withdrew that objection when the prosecutors disclosed some information on that business card which the prosecutors claimed their agent had lost. Defense never asked where and how they got that information after the card was lost. Despite the lack of evidence which the prosecutors clearly knew, one of the major arguments made by the prosecutors throughout the trial from the opening to the closing is that Moslemi firm directed clients to get fake documents to support their asylum applications.

9. Prosecutor's deliberate omission from their presentation of GX 302 package

The prosecutor first twisted the evidence package of GX 302 series by deliberately not presenting the two pieces of paper in 302K which show a client's name, date and the things he purchased and the money he paid. 302K has 14 pages in total and page 6 and 7 are not blank and have the contents just described. See GX302K as DX10. These two pages clearly show that this package belongs to this particular client Mr. Zhu and it was never used by him for his application. Of course it was never used by anyone else either, otherwise it would not be here any more. Through this twisting, the prosecutors were able to mischaracterize this package of evidence as blank documents and presented to the jury in that way, and completely distorted the nature of this evidence. The prosecutor let the search agent read everything in GX 300 and 301 and then presented through the same agent the whole GX 302A, whole GX 302B, and whole GX 302I but only the first blank page in GX 302K and deliberately omitted Page 6 and page 7 which have the name of the client, date, stuff purchased and money paid. Tr.431-437 Moreover, the prosecutor presented this package again to the jury through Victor. Tr.574-578 This time the prosecutor went even further and only let Victor presented 302J, 302I, 302B, 302A, 302G, 302F, 302H, 302D, 302E and did not present 302K at all as if it did not exist. Moreover, the prosecutor let Victor make straightforward speculations about this package even if Victor has no personal knowledge whatsoever about the package. Tr. 574-578 This is extremely misleading to the jury and prejudicial to the defendant. This is one of the major arguments made by the prosecutors to the jury from the opening to the closing that the firm used blank documents for clients' applications on a regular basis.

10. Prosecutorial misconduct in the admission of computer screen shot
A closer examination of the so-called computer screen shot is not computer screen shot in the strict sense. The literal meaning of the computer screen shot should be whatever on the computer screen at the time of the FBI raid, called the current active screen. The very purpose of taking all the photos is to preserve the crime scene. But here, the photographer opened all the windows of each computer and took all the photos of each window from the same computer. For example, GX 672, 674, 675 and 676 are photos taken of computer A1 with the photographer opened each window first and then took the photo. See DX11-01. GX 698, 699, 700, 701, 702 and 703 are photos taken of computer J1 in the same way. See DX11-02. GX 677, 678, 679, 680 and 681 are photos taken of computer H3 in the same way. See DX11-03. It is not clear at all which of the windows was open at the time of the FBI raid. Therefore GX 677, the draft letter, may very likely not be the current active screen of the computer H3 and may be obtained illegally or at least improperly and should not be admitted into evidence. But the prosecutors put a huge emphasis on GX 677 claiming they caught the defendants red handed in committing fraud. The photographer even turned on the power of the two computers in Room I but was unable to have access to the files because he did not have the password. Again the defense failed to discover and raise such issue at trial.

11. Admission of a lot of hearsay evidence through the recordings
In order to convict Karen, the prosecutors did not care about the evidence rules and introduced into evidence of tapes 40, 44, 57, 110 and 134 in its entirety with a lot of hearsays. Regarding tapes 40 and 44, half of the contents of each tape are hearsays with

each involving more than a dozen different unknown males and females who are clearly not co-conspirators. Defense failed to raise objections.

12. Admission of a lot of evidence not relevant to defendant

There is no evidence to show that the Moslemi and Bandrich firm are one firm and even in the indictment the prosecutors treated the two firms as separate by saying that Bandrich firm took several cases away from Moslemi firm when it just started and the two firms shared the profit of those cases. However, throughout the trial, the prosecutors argued that the two firms are one firm and made arguments against defendants on trial by using the evidence in both firms as if they were one, especially in the opening and closing arguments, knowing there is no such evidence in the record to support such argument. Moreover, in order to convict Karen, the prosecutors introduced a lot of evidence during trial about other people's fraud and never established any connection or relevance to Karen. They do not care about the relevance of the evidence and simply want to overwhelm the jury with the evidence of fraud so that the jury would get so mad about the widespread fraud that they would convict Karen as the scapegoat because the persons who were engaged in the fraud are not before them. They used the same strategy in their opening statement and summation by emphasizing other people's fraud and ignoring the lack of evidence to connect Karen to the fraud. They used the same strategy throughout the trial by emphasizing the family relationship of Karen's various relatives and every time they introduced Karen's relatives they always used the label "Feng Ling Liu's so and so" and repeated that label every time they mentioned each relative and clearly managed to associate those people's criminal conduct to Karen and divert jury's attention away from the missing link. They went so far in this direction that they did not even spare a driver who has nothing to do with the law firm simply because he is Karen's relative. Tr.596-597 It is clearly designed to mislead the jury and it is extremely prejudicial to Karen. Meanwhile, the prosecutors offered no evidence whatsoever to even show that it is Karen's decision to hire the relatives or to supervise their work. The family relationship of other defendants to Karen should not be admitted into evidence in the first place because it has no probative value and all it calls for is jury's prejudice. However, the prosecutors not only introduced the family relationship into evidence emphatically throughout the trial but also called for jury prejudice in the summation and rebuttal summation. They made the naked claim that since Karen's relatives engaged in fraud, Karen must have known.

13. Prosecutorial misconduct in the opening statement

In the opening, the prosecutor claimed that the firm is a fraud factory and has made "hundreds and hundreds and hundreds" of false asylum applications and has made millions of dollars from them. They never intended to prove and never proved the number of false applications or the money figure during the trial. The prosecutor argued that the firms remain one firm in many ways but never produced any evidence to prove it during the trial. By treating the two firms as one, the prosecutors were able to amplify the number of fraudulent cases the defendants had filed and the amount of money they made. These numbers alone are inflammatory and will cause the jury's prejudice. The prosecutor also used very inflammatory language such as accusing defendants of making up details of persecution like "a black eye, a broken bone" to describe what lies the

defendants have made in the false applications and what changes Karen made to the stories which they never intended to prove and never proved during the trial. Tr.69 The prosecutor claimed that Karen "helped the applicants come up with fake stories and helped them gather fake evidence" when the evidence elicited from Victor and Meng Fei during trial only shows that Karen edited stories written by Victor and Meng Fei for a few months period. Regarding Karen's review of the attesting letters, the evidence is so weak that it could not prove the claim at all as discussed in more details later. The prosecutor claimed that defendant was engaged in the false applications from the beginning to the end but during the trial they only introduced evidence to show that Karen was only involved in the early stage of the application process. The prosecutor claimed that defendants manipulated the process at every single step along the way but the evidence during trial only shows that Karen was involved in meeting new clients and reviewing the asylum applications. Moreover, regarding Karen's involvement in advising clients for a claim the evidence is so little and weak that it can be ignored as discussed in more details later. Prosecutor claims that at the initial meeting with clients, managers did not ask clients about their experiences and simply told them how they were persecuted. This contradicts the evidence introduced at trial. At trial, Meng Fei testified that she only overheard "a few times" and persecution was not discussed at the meetings and Victor testified that persecution was discussed at these meetings but not in detail, and neither of them said that managers told clients at the initial meeting how they were persecuted. Then the prosecutor went into details as to what kind of claim is assigned to what type of applicants. The evidence at trial indicates that Victor and Meng Fei were talking about their own experience, not what they overheard of Karen or other managers. The prosecutor claimed that defendants submitted the asylum applications when completed and started to train the applicants for asylum interview and court hearings with some training materials. No evidence is ever introduced during trial to show Karen was involved in any of these things. Then the prosecutor claimed that in order to conceal her fraud, Karen changed the firm's name to Moslemi and later helped her brother opened the Bandrich firm and "in many ways it remained one firm". Tr.71 During trial, the prosecutor failed to introduce any reliable evidence other than witnesses' speculation to support this argument. Then the prosecutor continued to describe the evidence they have: "a couple of storywriters" who will testify---actually only two storywriters, "an asylum applicant of the firm"---actually only an asylum applicant of the Bandrich firm and he had nothing to do with Moslemi firm, "documentary evidence"---actually a few asylum applications prepared by Victor and Meng Fei which have nothing to do with Karen and are not relevant at all for the trial, documentary evidence seized from the firm which "was used to manufacture false asylum claims"---actually a very old package of documents belonging to a specific client which was never used for any fraudulent purpose, and no evidence is ever introduced to show that this package has anything to do with Karen and thus is not relevant at all. Then the prosecutor told the jury there would be recordings "that captured each of these defendants discussing the fraud". Tr.72 No recording is ever introduced during trial to show it "captured" Karen "discussing the fraud". Then the prosecutor summed up by saying that "you will hear and see many different kinds of evidence in this trial, and that will confirm that the defendants are guilty…." Tr.73 But during trial the only evidence relevant to Karen is the two

12

cooperating witnesses' testimony and one recording which indicates nothing about Karen's guilt.

14. Prosecutorial misconduct during the trial

In addition to introducing a lot of hearsay evidence through the recordings, the prosecutor kept asking for hearsay evidence throughout the trial. However, the prosecutor argued that the recorded conversation between the government informant and Meng Fei about pushing all blame to Karen is hearsay. Tr.1669-1670. So they clearly know what they were asking are hearsays but kept doing it throughout the trial. Throughout the trial, the prosecutor never asked Victor or Meng Fei to testify about the specific facts such as what they heard, what they saw, etc. but rather consistently used the word "would" even in the situation where it only happened a few times. This is clearly improper and calling for speculations. And defense never objected to this. Ms. Bandrich's lawyer objected twice with no effect. Tr.623, Tr.1249 During the trial, in the direct of the prosecutor's key witnesses, the prosecutor repeatedly asked leading questions, asked questions without foundations and asked the same questions again and again until he got the answer he wanted. The prosecutor often gave testimony himself in the disguise of a question or repeated the witness' testimony to emphasize it and mischaracterized the witness' testimony. Lots of the times, the prosecutor's questions asked for speculations, not personal knowledge, nor hearsay, just straightforward speculations. At least on a few occasions, the prosecutor asked the witness' opinion rather than personal knowledge. The following are just examples to illustrate some of the above points:

14.1. Direct examination of Victor:

From Tr.540 to Tr.552, the prosecutor is asking Victor about the initial meeting with new clients. On Tr.540 and Tr.541, the questions are about who were involved and where the meetings were held and how long the meetings were, and whether Victor could overhear some of the meetings. Starting from Tr.542, the prosecutor asked Victor questions about what was discussed during the meetings. Neither the questions nor the answers show that they are about what Victor overheard, let alone whose conversations Victor overheard, David's, Karen's, or Andy's since Victor said he had the chance to overhear three of them. The very first question is this:

     Q. What sort of information was typically discussed? Tr.542

There is really no foundation for this question. "typically discussed" indicates the generalization of things and only when he overheard many times was he able to generalize them. Even if Victor said that he could overhear the conversations in Room I and Room G and at least three people were involved, it is not clear at all that how many conversations he overheard from any of them, and each time how much he was able to overhear. Is it the whole conversation or only a portion of it? How often could he overhear the conversation? And the question does not specifically call for what Victor actually overheard. It could be understood as calling for Victor's general knowledge not necessarily based on specifically what he overheard from David, Karen, or Andy. It could be the general knowledge he gained by working in this industry, such as his experience of watching Julie meeting clients in the Giles office, his own experience of meeting clients. Victor's answer as shown in the following certainly does not show it is what he overheard.

A: At first, we would ask them their background, such like their age, their marital status, and their educational level, this kind of thing. And, then, we would ask them about the one-year issue. Tr.542

Here, Victor did not say I overheard David, Karen, or Andy often asked clients such and such information. But rather Victor said "we would ask them".

Q: The one-year issue? Tr.542

A. Yes.

Q. What do you mean they would ask about the one-year issue? Tr.542

Here, the questions are clearly not asking what Victor overheard but rather his own knowledge about the topic. Also, the prosecutor tries to mischaracterize Victor's testimony by tying them to Karen and David with the word "they" when Victor used the word "we". As discussed above, it is clear that Victor's answer is not what he overheard.

A. Because one year, under asylum law, there is one-year requirement. You have to file it, asylum application, within a year you, you came to United States. After that, is very hard for you to win the case, even though sometimes you have real claim. So, usually, we ask them, do you have any evidence to prove you came [to] the United States within the year, or if you have any evidence of proof that you are not in United States within a year. Tr.542

Here, Victor is clearly explaining the issue based on his own general knowledge about this topic, not about what he overheard others talking. He used the words "we ask them", not David or Karen asked them.

Q. So dealing with the first one, you say if they have any evidence that they have been here within a year, what kind of evidence might that be? Tr.542

This question clearly calls for Victor's general knowledge not what he overheard others. Victor gave a long answer to explain the variety of possible one-year evidence to prove that the applicant came to the United States for less than a year at the time of filing the asylum application. And Victor used the words "we ask them" and "we will mention couple of things". Tr.543

Q. When you say records in the United States, what sort of records are you talking about? Tr.543

This question asks Victor to explain the records based on his general knowledge, not what he overheard.

A. Because many of my clients, many of our clients, came to United States more than a year. Many of them are undocumented aliens. So we don't know when they came exactly. But if they have record, for example, they get arrested, this kind of evidence, we will prove they come here more than a year. Tr.543

Here Victor first used "my clients" and then used "our clients", and then used "we don't know" and "we will prove". He is talking about his own experience based on his general knowledge, not what he overheard.

Q. Let me ask you about the first scenario. Tr.543

Then a scenario is given. It is not asking whether Victor ever overheard this scenario but "what would be the office's response be?" Tr.543

Q. If someone had no records establishing that they had been in the United States for more than a year, what would the office do? Tr.544

Here the question does not ask about what Victor overheard but about his general knowledge on this topic.

14

> A. In this circumstances, the people who deal with the client will also address them, you must provide evidence from China to prove that you are not---at that time you are in China in the last [twelve] months period. And, also, you should find someone who can, back to China in the last [twelve] months and meet you over there. This is called one year witness. Tr.544

Here, Victor is again talking about his general knowledge, not what he overheard. This time he used "the people who deal with the client" instead of "we" because the defense objected to the vague testimony and the court instructed Victor to say specifically "who would do what". Tr.544. Because Victor is talking about a general scenario here he could not be specific. "the people" refers to whoever deal with such clients at any stage. We can even argue Victor was not really talking about the Liu firm or Moslemi firm, but just his own experience in general.

> Q. And this was advice given to clients who said they had been here more than a year? Tr.545

This is clearly a mischaracterization of Victor's testimony and the prosecutor is engaged in giving testimony in the disguise of a leading question. Nowhere in the witness' answer did he say or even indicate that "this was advice given to clients who said they had been here more than a year". And the prosecutor used the words "this is advice given to clients" to hint that it is the meeting Victor overheard and the prosecutor's intent is shown more clearly in the next question asked.

> Q. What other sort of things --- you mentioned basic information, the one-year issue. What other information was discussed at this preliminary meeting? Tr.545

As discussed above, the questions and the answers so far are about Victor's general knowledge on the topic, not about what he overheard others talking. But this question mischaracterizes all Victor's answers so far as "information" which "was discussed at this preliminary meeting", misleading the jury to believe they are all Victor overheard.

> Q. Who would initiate that conversation [about a claim]? Tr.545

Victor gave a very long answer covering a variety of situations where clients already know what claims they want to pursue and why. It does not sound like what he overheard but more like his general knowledge. Then he said "sometimes we will give them suggestions based on their background". Tr.546

> Q. What sort of suggestions would be given? Tr.546

This question on its face could be understood as asking about Victor's general knowledge, not necessarily calling for what he overheard.

> A. Based on their age, their marital status, and sometimes based on case law, we will suggest them what kind of claim is suitable for them. Tr.546

Here, Victor is talking about his general knowledge, not what he overheard.

> Q. Can you give an example of what might be suitable to someone based on that information? Tr.546

This question clearly calls for Victor's general knowledge, not what he overheard. And Victor gave a long answer listing a variety of situations and the suitable claim for each situation and he even talked about the case law change. It is clear that he was talking about his general knowledge. In the last part of Victor's long answer, he said the following:

> A. ….And later on for male applicant who want to apply for asylum on the ground of family planning, and we will just wait to do so. If they really want to do

so, we will add something in their story that happens to the male applicant himself…. To prove [there] are persecution or future fear. Tr.547

Q. That is an example of something that would be added, based on case law? Tr.547

Here again, the prosecutor is engaged in giving testimony in the disguise of a leading question.

Q. Just quickly, you also mentioned that many of the clients lived outside of New York….. Tr.547

The above question is a mischaracterization of the witness' testimony because the witness never said "many" and the only thing the witness testified is "some client say I living in another state, very far from here…" Tr.545.

Q. When you say and "we are here" you mean the law firm is here? Tr.547

Here again, the prosecutor is engaged in giving testimony in the disguise of a leading question. Witness may very well be talking about his own experience in dealing with his own clients when he took business on the side or when he worked for the other firm after he was fired. But the prosecutor through his own testimony tied it to the defendant's firm.

Then the prosecutor asked Victor how he would handle the situation where client lived in other states and about the fee structure of the firm. Tr.548-549 Then the prosecutor asked the following question:

Q. Outside of the discussion of what claim they should pursue, based on your hearing of these meetings, were the details of someone's persecution discussed at these meetings? Tr.549-550

This is another attempt of the prosecutor to mischaracterize Victor's testimony so far as something he overheard when we know clearly that it is Victor's general knowledge as discussed above. Such mischaracterization will definitely work in misleading the jury. Then more questions about the meetings such as how long the meeting was and who were involved, etc. The purpose is to reinforce the false impression of the jury that what they have heard so far is what Victor overheard from the meetings. Then the prosecutor asked what is a typical claim of Christianity, family planning and Falun Gong, asking for Victor's general knowledge and Victor answered based on his general knowledge. Tr.550-552. Then the prosecutor asked the following question:

Q. Now, in your experience in the meetings that you overheard of this type, did you typically hear applicants discuss whether they had an actual claim? Tr.552

Here, the prosecutor mischaracterized Victor's testimony so far as "your experience in the meetings that you overheard of this type" when it is not even close to what Victor overheard. It is not clear what he meant by "this type".

A. We do have certain --- we do have few clients who has real claim.

Victor did not answer "I do hear a few clients who said they have a real claim". It is more like he was talking about his general knowledge.

Q. And that would be discussed at these meetings? Tr.552

A. The client would mention, say, okay, I --- I really have claim, I really get abortion, I really get sterilization, and this kind of matter. But I don't think they

discussed detail, because usually the client would discuss this kind of details with storywriter, the people who interview them.

Here, it is not clear it is what Victor overheard or it is his general knowledge. But it is more like Victor was talking about his general knowledge because he said "I don't think" rather than "I don't hear" and he used the word "usually".

Q. You said you had some of these – of the asylum applications you worked on in the firm. How many would you say were legitimate?

A. The case I deal with, less than 20.

Q. Less than 20 percent? Or 20 total.

A. Twenty cases.

Q. Twenty cases. Now, after this initial meeting, what was the – where would the applicant go? Tr.552

Here, the prosecutor repeated the same question he asked earlier and got the same answer as he got earlier. See the following exact question and answer as appeared earlier on Tr.510:

Q. Of those that you worked on at Feng Ling Liu's law firm, how many would you say were real, meaning they stated a real claim for asylum based on actual events?

A. I believe less than 20.

Q. Less than 20?

A. Yes.

Q. And of the ones that you worked on, of those 20 that were based on actual events, did people at the firm change them in any way?

Exact questions and answers are given before. The prosecutor also repeated Victor's answer there as he did here. And the last question is a leading question and a question without a foundation because it suggests an answer to the witness and there is no foundation so far to show changes are made to the actual claim. The prosecutor not only asked the same question twice but repeated the answer on both occasions. He simply wanted to make sure the jury got the message. Then he mentioned "after this initial meeting" as if what has been talked so far is all about the initial meeting when in fact it is about so many things as his questions show.

Then the prosecutor continued with more leading questions as follows:

Q. …would any client ever ask you about this? Tr.555 [leading and no foundation]

Q. …was that a requirement of the immigration bureau? Tr.555

Q. …what other forms, if any, would you have them sign? Tr.555

Q. So prior to writing the story, what details, if any, would you get from them? Tr.556

Q. So you would use the thing from their real life to explain why they converted to Christianity? Tr.557

Here prosecutor again gives testimony in the disguise of a leading question.

Q. Going back, in this discussion, you would try to get some personal details from them? Tr.557

This is a leading question and asks the witness to repeat his earlier testimony.

Q. Would you ever discuss the facts of the persecution? Tr.557

More leading questions followed.

17

Victor testified that in writing a Christian story, "I use Christian holiday Pentacost, and then Feng Liu comment Pentacost is too hard for our client to memorize. We always use Christmas or Easter." Tr.567. It is not clear from the testimony that Karen made the comment to him in person or on his draft. It is not clear either whether Karen changed the religious holiday for that story. Victor did not say Karen made the comment and changed the date. He only said Karen made the comment. Mr. Egan followed up with a question: "So she would change the day that the event happened?" Tr.567 The prosecutor again gives testimony in the disguise of a leading question. The witness did not say that Karen would change the day of the event but simply said Karen commented on that. This question has no foundation because Victor never said Karen made the change and simply said Karen made the comment. Victor specifically said Karen did three separate things when reviewing his story: "She would review them and make some change and give comments and sometimes she would rearrange story." Tr.567. And here he was talking about giving comments. The question is leading because it suggests the answer.

> Q. You also mentioned instances where Feng Ling Liu would rewrite the whole story. Under what circumstances would that happen? Tr.569

This is a leading question and a mischaracterization of witness' earlier testimony because witness testified that "sometimes she would rearrange story". Tr.567 "rearrange story" is mischaracterized as "rewrite the whole story".

> Q. Did she comment on the evidence letters [of Xin Miao]? Tr.570

This is a question without a foundation because Victor clearly said he drafted the story and then gave it to Karen for review and never said he also drafted letters for Xin Miao. Tr.569.

> A. Yes.
> Q. What sort of comment did she give?
> A. Just make change according to his change on story. With change on story about persecution, you should change the letter about persecution in the same way. Tr.571.

Here, even with prosecutor's guiding and leading, Victor's answer still focused on the logic "should" rather than what Karen actually did in this case. If Victor testified about his first hand knowledge, he would naturally testify to the things he saw or heard, not just "you should" or "we would" as he testified here and in many other places.

> Q. The people whose applications you're submitting this evidence from, they had, in fact, been in the United States for more than a year, right? Tr.574

Prosecutor again gives testimony in the disguise of a leading question. Witness only testified that the evidence is fake evidence and no where did he say that "the people came to the United States for more than a year".

> Q. How would they get the type of evidence that you're describing?
> A. Their family member in China would made up for them. Tr.574

Prosecutor is calling for speculation and the witness speculated about it. He did not say how he knew about it and it is nothing but his own guess.

> A. A blank medical record. Tr.575
> Q. Is it a completed one or a blank one? [clearly a repeat of the testimony]

A. Totally, totally empty one.

Q. Is this evidence that might be submitted as one-year evidence? [leading question calling for speculation]

A. Yes, the client will write on when the client saw doctor in China within the one-year time frame…..

The witness clearly speculates because he knows nothing about this package but he speaks in a very affirmative tone and totally ignores the fact that the package is over three years old as he testified himself a few lines above that it was mailed out from China on September 10, 2009. The prosecutor basically asks the witness to speculate on every single piece of the blank documents in the same way, conveniently omitting the two pieces of documents that have a particular client's name and other information on them. Tr.576-578.

Q. What would the firm do with extras? Tr.578

This is a question without foundation because the witness never testified there are any extras.

Q. You mentioned one-year evidence. Did anyone ever use a witness to help with the one-year issue? Tr.578 [leading question]

Q. In your time working at the firm, did you ever see what you believed to be a fraudulent one-year witness? Tr.579 [leading question and calling for opinion]

Q. What made you think that it was a fraudulent one-year witness? Tr.579 [asking for opinion of the witness, not his personal knowledge]

Q. Did you ever see a person serve as a one-year witness for more than one person? Tr.581 [This is a leading question without a foundation.]

Then the prosecutor asked the witness to identify government exhibits 517, 518, 519, three asylum applications the witness was involved in. Testimony is elicited to show each one of them is fake and the prosecutor even asked the witness about his opinion on the similarity of two of these applications. But no evidence is ever introduced to show how Karen was involved in any way in the three applications and how they are relevant to prove Karen's guilt. Tr.581-584

Q. Did you ever know anybody at the Feng Ling Liu law firm to manipulate the derivative asylum process? Tr.585

This is a leading question without a foundation because it suggests an answer and there is nothing in the testimony so far to indicate that issue.

Q. Were you given any other instructions about why you were going there? Tr.591

This is a leading question without foundation because witness only said "Feng Ling Liu sent me to immigration" and he never said he was given any instructions.

Q. Prior to being submitted, who would typically sign the application? Tr.593

This is a leading question without foundation because witness never testified that anyone signed the applications.

Q. And was it your experience that, prior to signing, the lawyers would review the applications, or was their job just to sign it? Tr.594

This is a leading question without foundation and calls for speculation because Victor did not have personal knowledge on this issue.

Q. So the application is submitted. You described some of the materials you used in this preparation process. What other materials did you use? Tr.594

19

This is a leading question without a foundation because it suggests to the witness he used other materials and the witness never said he used other materials.

> Q. Did anyone ever instruct you to prepare different or better material for the asylum interview stage? Tr.595

This is a leading question without a foundation and a question that witness already answered. It is leading because it suggests an answer to the witness. It has no foundation because witness never testified that he was instructed to prepare the material. It is a question that witness already answered because reading the testimony from page 591 to 598, one can see clearly that the witness was basically talking about his own experience at the asylum office and how he collected the information and how he used that information to prepare materials to be used in preparing clients for asylum interviews. It is clear that he was very actively involved and he was very devoted to it and he was very proud of himself. He even said it is "trade secret" when he testified in Liying Lin's trial. He said, "I even used very creative ways to coach them. I give them Christian movie to see". Tr.597 He clearly gave the reason why he prepared certain materials as he testified that the materials prepared by others are not suitable for his purpose and "I simplify them" and "so I made my own Christianity knowledge question". Tr.594, Tr.595

> Q. Other than sending you as a translator, would someone from the office typically go with an applicant to the asylum interview? Tr.596

This is a leading question without a foundation because the prosecutor suggests something that the witness never testified before. The witness is not responsive to the question because he talked about a driver who picked up clients from their home and sent them to the asylum office. The witness specifically said that for some unknown reason the driver was not even allowed to enter the asylum office. The driver is not "someone from the office" and the only reason he was mentioned here is because he is related to Karen. Because the prosecutor has so little evidence against Karen, they make up this deficiency by associating Karen with all the other people as much as they can, especially her relatives. They put huge emphasis on the relationship and they never mention a name without putting the label "Feng Ling Liu's so and so". But they have never proved that those people ever worked for the Liu firm or it is Karen who hired them or Karen supervised their work in any way. The prosecutor clearly tries to use the magic label to attribute whatever the relatives have done to Karen simply because they are her relatives. They continued this strategy all the way to the summation and rebuttal summation and put huge emphasis on the relatives and the relationship. They certainly succeeded in misleading the jury and in diverting the jury's attention away from the relevant issue, i.e. the missing link to Karen.

> Q. Did you do the coaching on that? Tr.598 [leading question]
> Q. Did anyone else participate in that coaching? Tr.598 [leading question]
> Q. Would the firm help clients prepare for the appearance in front of the immigration judge, as well? Tr.599 [leading question]
> Q. And let me ask you, what was your understanding of why the name of the firm changed? Tr.601

This is a question calling for speculation. Either the witness knows or he does not know. There should not be such a thing as "his understanding".

Q. So how was the name change a part of that process, to your understanding? Tr.602

The prosecutor gives testimony through this leading question and calls for speculation because he does not ask for witness' knowledge but his 'understanding'.

Q. You said a lot of these instructions, directions, came at, I think you said, at a meeting or conference, is that right? Tr.603

A. Yes, we had a kind of conference.

Q. Who gave these instructions?

The prosecutor first gives testimony through the leading question and mischaracterizes the witness' testimony because witness only testified that "we have some, several new matters" and never said "instructions, directions". Tr.601 And the witness in his answer did not confirm the prosecutor's testimony about the instructions and directions and he only confirmed they had a "conference". But the prosecutor continued with another leading question about who gave the instructions when witness did not confirm the existence of the instructions.

Q. Were the clients in those circumstances able to keep the details of their story straight? Tr.604 [leading question and a question without a foundation]

Q. And would they ask questions about the persecution that happened to them? Tr.605 [leading question]

Q. …. Did there ever come a time when another firm was opened up? Tr.605 [leading question]

Q. And what was your understanding of why they were opening up the new firm? Tr.605

The prosecutor again asks for the witness' 'understanding' and clearly calls for speculations because if he asks, "did you know why they were opening up the new firm?" which calls for the witness' personal knowledge and his answer would be "no".

In addition to the prosecutorial misconduct in taking the computer screen shot as discussed earlier, the prosecutor asked for Victor's straightforward speculation about GX 677, the computer screen shot. Tr.566 He had no personal knowledge of it whatsoever because it was created around December 2012 and he left the firm in November 2010. He did not know who created that document and how it was created such as whether it was made up by an employee of the firm or it was emailed to the firm by the author of the letter. What Victor testified regarding the screen shot is nothing but his own speculation. Defense should object to this whole line of questions. Moreover, this screen shot shows nothing to connect Karen even assuming it is evidence of fraud. On that day when the screen shot was taken, Karen was on her way to New York Life Insurance Company to work and she was arrested near their building. Therefore, it is not relevant to Karen's case at all. Regarding GX 302 series, the prosecutor not only did not present the evidence in its entirety to the jury and the omission caused severe distortion of the evidence as discussed earlier, they also let Victor speculate on how the package was used fraudulently by the firm. Tr. 574-578 It is also straightforward speculations because Victor has no personal knowledge about it. He did not know who sent that package to the firm and when and for what purpose. All he could do is to speculate that this package would be used to create fake documents by clients with the direction of the firm to support their false asylum applications. And his testimony is rebutted by the very existence of this

package still lying in this office. If it had been used for the purpose as Victor testified, it would not be in the office anymore and it would have been submitted to the immigration service or the court. As Victor testified, the package of documents is complete and still intact. It meant that none of the documents in the package had ever been used by any client. Second, as Victor testified some of the documents had postmarks and dates and they were out of date due to the requirement of filing within one year of applicant's arrival. The dates on the documents are 2009 and 2010 respectively and the date it was seized by FBI was December 18, 2012, more than two years after the documents were created and therefore it could no longer be used by the clients. Again, the prosecutor failed to produce any evidence to show how Karen was involved in that package and how it could prove Karen's guilt.

14.2. Direct examination of Meng Fei:

> Q. And of those ten percent that were based on actual events, in your experience at the firm, were the details of those stories changed prior to submitting the applications? Tr.1206 [leading question without a foundation]
> A. I'm sorry? Can you repeat the question?
> Q. And in your experience, would those asylum applications contain false facts as well? Tr.1207 [asking the leading question the second time]
> A. Yes.
> Q. Why would they contain false facts?
> A. Because most of stories were written by paralegals. Most of clients didn't provide any useful information. [not responsive to the question asked]
> Q. What about the stories that were based on real events? [asking the same leading question the third time]
> A. For me, for those real ones, when paralegal talking with them, we can tell whether they actually have persecution or not. If they did suffer persecution, they can tell us their story, we know that that's their true story or not. [not responsive to the question asked]
> Q. And if it was a true story, were there ever circumstances where details would still be changed? Tr.1207 [asking the same leading question the fourth time]
> A. Yes. Sometimes. [finally remembering the script]

This is how Meng Fei's direct examination was conducted from the beginning to the end. They have a script and because the script is not based on her real life experience, she often forgets the script even if she is often reminded the answer by the leading question. Then what the prosecutor does is to keep repeating the same leading question again and again until Meng Fei remembers the script. Considering Meng Fei's background as an experienced immigration lawyer who has prepared clients for asylum hearings and appeared for asylum hearings before the immigration judges for hundreds of times, testifying before this court is nothing new to her. If she was testifying based on her own real life experience, why is it so difficult for her and requires the same leading question repeated four times before she can give the correct answer?

> Q. In your experience at the firm, did they have asylum applications for people who had been here for more than one year? Tr.1224 [leading question without foundation]

Q. What other records, in addition to criminal records, were they looking for or asking about? [leading question]

Q. Was anything about the client's background discussed? [leading question]

Q. What about payment, was that ever discussed at these first meetings? [leading question]

On this page Tr.1224, all the questions are either leading questions or questions repeating Meng Fei's answers in an attempt to guide her.

Q. Was the claim they would pursue ever discussed? Tr.1225 [leading question]

Q. Would Ms. Liu or David provide advice on that? Tr.1225

The prosecutor not only asks a leading question but also uses the word "would" making it sound like such things happened on a regular basis or he was simply asking for an answer based on Meng Fei's general knowledge rather than what she overheard. In fact, in the very beginning when they got to this line of questions, Meng Fei testified that "I only heard a few times." Tr.1223 Why could the prosecutor not ask Meng Fei of the "few times" she overheard, how many times the client asked such question and how Karen answered each time and how David answered each time?

A. They would give advice based on their marriage or education, background. If, for example, if there was a female single applicant, they would advise them to apply for family planning. The claim will be this female applicant suffered a forced abortion because she got pregnant before marriage.

Q. Why was that an appealing claim for a single female applicant?

A. Because this claim doesn't require a lot of evidence. It is very easy to prepare the story and the whole package. Tr.1226

Q. What other types of claims did the office typically pursue? Tr.1226

Meng Fei answered the question in the same style "would", making it clear that she was talking about her general knowledge not what she overheard. The example she gave is showing how things would go generally, further proving that she was talking based on her general knowledge. Nowhere did she indicate this is something she actually overheard and it does not sound like something she overheard. The prosecutor's next question of "why" clearly calls for Meng Fei's general knowledge, not what she overheard and her answer clearly shows it. In the context of Meng Fei's overhearing David or Karen talking to new clients, the prosecutor asks questions general in nature such as "why" and "what" as shown in the above two questions, not "did you hear why or what". This will let Meng Fei talk about her own general knowledge on this issue meanwhile giving the jury the false impression that she is still talking about what she overheard. Reading through page Tr.1228 as shown in the following, one will see that is exactly the intention of the prosecutor.

Q. I think the question that was before you was what other types of claims would the office typically pursue? [On its face this question is a general question and does not ask Meng Fei what she overheard David or Karen.]

A. Okay. For some single male applicants, they advised them to pursue Christianity. [This sounds like it is generally the case, not what Meng Fei overheard. Otherwise, her testimony would be specific rather than so general in nature.]

Q. Why was that? [Again, this question is general in nature, not about what she overheard, but rather her own understanding.]

23

A. Because they don't have kids, they're not married, so they cannot apply based on family planning. It is easy for them to say some religion. They went to some church in China, was arrested and beat up. [Clearly Meng Fei is talking about her own understanding, not what she overheard David or Karen.]

Q. You described these meetings and advice that would be given during them. Who did you hear participating in those meetings?

The prosecutor gives testimony through this question and mischaracterizes Meng Fei's testimony so far based on her own general knowledge as a description of "these meetings and advice that would be given during them" to mislead the jury to believe that the testimony they have just heard so far is what Meng Fei overheard, not just her own general knowledge.

A. Just sat outside Ms. Liu's office. What I heard, though, was David and Ms. Liu were there.

Q. They were there having the conversations you just described?

A. Yes.

First, the prosecutor's question along with Meng Fei's answer gives the jury the false impression that what she has testified above is what she overheard David or Karen when she was actually testifying about her own general knowledge. Second, please note that the prosecutor gives testimony very often throughout his direct as he did here, trying to add new things that are missing from Meng Fei's testimony to emphasize and supplement the message delivered to the jury. He often gives his own testimony in the disguise of a question. Thirdly, please note here that Meng Fei always said David and Karen. But she also testified earlier that "most time" Karen alone sat in Room I and David sat in Room E and only sometimes David would come to Room I, and she never said David came to Room I when he met new clients. Tr.1204 She also said that most of the time David met new clients and the front desk person would bring new clients to David's room and Karen only met clients when they insisted to see her. Tr.1208-1209 By no means David and Karen needed to see new clients together. Only after Karen left the firm, David moved to Room I. Therefore, she could not overhear both talking to new clients at the same time. Why did Meng Fei always overhear David and Karen meeting new clients together in Room I as she testified? At first, Meng Fei testified that what she overheard is David or Karen. Tr.1225 Then defense objected to the vagueness and specifically demanded Meng Fei to be specific in her testimony as to who was involved in what. Then Meng Fei changed her testimony by saying that she overheard David and Karen talking to clients. Why did she tie them together in her testimony when in reality it is not the case? The only reason is that she only overheard David as she said in her prior statements but since David is not on trial and only Karen is on trial she had to tie Karen to it. See 3507-01 at P2, 3507-20 at P2 as DX12. And the easiest way to do it is to add Karen's name every time she mentioned David's name.

Q. Did they ever discuss downsides to pursuing a particular type of claim? Tr.1228

A. I am sorry. I don't remember.

This is another leading question and Meng Fei's answer is more like I don't remember what's on the script. Otherwise, she would not say "I am sorry."

Q. Why was address significant? Tr.1230 [a question without foundation because Meng Fei never said address is significant.]

Q. In your experience at the firm, were there ever people applied who did not live in New York? [leading question]

Q. Did any client ever ask you about having to sign this? Tr.1232 [leading question]

Q. Did they ever ask why they had to sign it? [asking the same leading question the second time]

Q. Was this something that was required by the asylum office or by the firm? [leading question]

Q. Did anyone in particular at the firm tell you to have applicants sign this? Tr.1233 [leading question]

Q. You would use the information where they're from? Tr.1234 [repeat Meng Fei's testimony in an attempt to guide her]

Q. Would you typically in these meetings ever discuss the facts of their persecution? [leading question]

Q. The item you're describing was a sort of model that was available to you? Tr.1235 [The prosecutor is giving testimony in the disguise of a leading question.]

Q. Would you ever base it on other stories that had already been written for someone else?

This is a leading question without a foundation because so far Meng Fei never mentioned anything about her use of "other stories" "written for someone else".

Q. How closely in writing your own stories would you track those stories? Tr.1236

A. Sorry?

Q. How closely would you follow the language of the stories that you were basing it on?

A. I would use --- I never used the same language or sentence, but I used the pattern, the logic of those stories.

Q. You said the same pattern? Tr.1236

The first question is leading and when Meng Fei did not understand the question, the prosecutor repeated the leading question with more details to guide her. A standard non-leading question should be: How do you use those samples? Why could the prosecutor not do that rather than suggesting the answer to Meng Fei through the leading question? Then the prosecutor mischaracterized Meng Fei's testimony as "you said the same pattern" when Meng Fei only said "I used the pattern".

Q. Was there a specific instance that caused you to find out? Tr.1237 [leading question, the question could simply be: how did you find out?]

Q. Did that surprise you? Tr.1237 [leading and asking for feeling not fact]

Q. Other than Victor, did you in this initial point talk to anyone else at the firm about that? Tr.1238 [leading question]

Q. So while you wrote these stories, would the clients typically be there? [leading question]

A. Yes.

Q. What else? I think you mentioned you worked on evidence at this stage as well?

This is a mischaracterization of Meng Fei's earlier testimony because Meng Fei only testified earlier that "I would tell them for their cases what kind of evidence they need to provide us" on Tr.1233. It is different from "you worked on evidence".

> Q. What sort of evidence would you be working on? [leading question]

More leading questions followed. To the few non-leading questions, Meng Fei gets lost and goes off the script. Look at the following questions, for example:

> Q. Who would write these letters? Tr.1239
>
> A. Anybody can write them. What do you mean? I am sorry. [She forgot to say she drafted the letters as the script says.]
>
> Q. After you were done typing up the story and the letters, what would you do with it?
>
> A. I would print them out, hand them to our clients. Then they will send those letters back to China and ask their families and friends to copy the drafts by hand, then mail back. Tr.1242. [She forgot to say that the letters would first be reviewed by lawyers as the script says.]

Then the prosecutor let Meng Fei speculate about GX 677 the computer screen shot the same way as Victor did. Tr.1241 More leading questions followed, sometimes with non-responsive answers. Tr.1243-1248 From Page 1253 to 1256, the prosecutor asked Meng Fei about four asylum applications she claimed she helped clients prepared and were fake. As in Victor's case, the prosecutor failed to introduce any evidence to show Karen was involved in any way in any of these applications and how they are relevant to prove Karen's guilt.

> Q. We are talking about preparation for the asylum interview stage. Did the firm maintain any materials to help with that process? Tr.1257 [leading question without foundation]
>
> A. I'm sorry? Can you repeat.
>
> Q. Did the firm maintain any materials to help with the preparation for the asylum interview? Tr.1257 [asking the same leading question the second time]
>
> Q. Did the firm take any steps to try to increase the percentage of applicants who were approved at this stage? Tr.1258 [leading question]
>
> Q. Did anyone at the firm take steps to increase the approval rate at this stage? [leading question]
>
> Q. Who directed him to do this? Tr.1259 [a question without a foundation]

From Tr.1271 to 1276, the prosecutor asked a lot of leading questions and questions without foundation and asked the same leading question again and again because Meng Fei was often non-responsive, as shown in the following.

> Q. Was there ever a time that people at the firm took steps to protect itself? Tr.1271
>
> Q. Starting with the name change, did anyone ever tell you why that was being done?
>
> …….
>
> Q. What, if anything, happened around 2009 that led to some of these changes? Tr.1272
>
> A. I am sorry?
>
> Q. What, if anything, happened in 2009 that led to some of these changes?

A. 2009, they changed the name while I was preparing for my bar exam. When I came back from my vacation, the name already changed. [not responsive to the question]

Q. Was there ever a time where other changes were discussed or implemented? Tr.1272

Q. Do you remember any specific meeting or changes about a conversation about these changes? Tr.1273 [leading question]

……..

Q. What other policy changes? Tr.1274

……..

Q. Any other policy changes? Tr.1274

A. Sorry, I forgot.

Q. Those are the ones you remember?

A. I am sorry? Tr.1275

Here, Meng Fei did not say, "That's all I remember" rather she said "Sorry, I forgot". She is not forgetting any other policy changes as she was asked here, but rather she is forgetting what is on the script and that is why she said sorry. The prosecutor wants to cover up for her by saying "Those are the ones you remember?" and Meng Fei did not answer, "Yes, those are the ones I remember" but rather she responded with "I am sorry?" This is one of the many examples to show that Meng Fei is not testifying about her own experience but according to a script crafted by the prosecutor.

15. Prosecutor's summation not based on evidence in the record

An important strategy used by the prosecutor is to introduce a lot of evidence on the fraud committed by other defendants in the two firms and then put a huge emphasis on that evidence with the sole purpose of overwhelming the jury with the evidence of other defendants' fraud and diverting jury's attention away from the crucial issue: how is this evidence relevant to prove Karen's guilt and how is Karen involved in this? The prosecutor spent a large portion of her closing, about the first half of it, on the fraud committed by others in the two firms with a great degree of emphasis and elaboration. Tr.2057-2073 But they are not on trial and strictly speaking evidence regarding their fraud is not relevant to the three defendants who are on trial. The prosecutor not only emphasized the evidence of other defendants' fraud but also exaggerated that evidence by claiming that everyone in the firm was involved in fraud when there is no evidence whatsoever in the record to support such argument. Tr.2060, Tr.2069 The jury was so overwhelmed with the rampant fraud in these two firms as depicted by the prosecutors that they got so angry about the massive fraud that they were willing to find the defendants as scapegoat and ignore the missing link that connects this evidence of fraud to the defendants. They will jump at the prosecutor's speculations that the defendant must be in the fraud simply because they are so angry for the open and rampant fraud as depicted by the prosecutor. The rebuttal summation used two "ridiculous" to describe defendant's any denial of knowledge of the fraud because the fraud is so open and rampant in the firm. Tr.2368-2369 By this strategy, the prosecutor successfully made the jury ignore the crucial missing links in their case: the evidence of the fraud they were talking about happened since mid 2011 which was two and a half years after Karen left the firm and no evidence is produced to show that she went to the office at all during that

period and Lin Chen's recordings prove that Karen did not go to the office and did not get involved in the asylum applications during that period. In the summation, the prosecutor often blatantly engaged in speculations and made lots of argument based on no evidence whatsoever in the record, and sometimes the prosecutor even deliberately mischaracterized the evidence to mislead the jury, as shown in the following.

The prosecutor claimed repeatedly that the defendants "filed nearly 2000 asylum applications" and "billed something like $18 million". Tr.2058, Tr.2072 But the prosecutor never proved the number of fraudulent asylum applications or the money made from these applications. These are very inflammatory and devastating arguments against defendants because these numbers alone can win over the jury. Therefore, they are extremely prejudicial to the defendants. No evidence is ever introduced regarding the notepad and the maps on the office wall such as who did it, when it was created and why it was created and how it was used. But the prosecutor speculated that they are used to coach the applicants about their travel to the United States. Tr.2062 In fact, the map shown to the jury during the summation is posted on the wall in Troy Moslemi's room and he is not indicted. Every applicant traveled to the United States one way or the other. That is their real experience. Ashley Caudill-Merillo testified that how they came to the United States does not affect their eligibility to apply for asylum. Therefore, all they needed is to tell truthfully how they traveled to the United States. Why did the firm need to coach them on that? Even assuming they committed fraud and changed their entry date to make them eligible for asylum, they did not need to change their traveling route. Therefore, the speculation on the firm's use of the maps on the wall does not make sense. The jury's job is to evaluate the evidence including making inference from the evidence, but it must be reliable inference. Most judges give the dripping umbrella example to infer it was raining heavily outside. Making loose inference is the same thing as speculation and it is not allowed. Here, the prosecutor was asking the jury to accept her speculation as evidence. Regarding GX 677, the computer screen shot, which was obtained improperly as explained before. The prosecutor introduced no evidence regarding who created it, when it was created and how it was created but nevertheless speculated that it was proof of fraud. Tr.2066 The prosecutor did the same thing with the GX 302 package, which was twisted deliberately during the trial as explained before. Tr.2068 They speculated about the package and asked the jury to accept their speculation as evidence when they clearly knew it is not true. For if the firm really engaged in such practice on a regular basis, how come the FBI failed to get any current such packages except this one which is three years old and clearly outdated and could not be used for any purpose by anyone? Moslemi firm had a busy practice and on the day of the FBI's raid the business was on going and at least one hundred asylum applications were in the middle of preparation. If the prosecutor's argument is true, there definitely should be more such packages to be seized by FBI, not just this old package which could not be used for any purpose for being outdated and had been there for more than three years. Moreover, cooperating witness Meng Fei had worked for the firm for about three years out of the five years covered by the indictment and she said both in her prior statement and during the trial that she was not aware that clients had ever submitted any fake certificates. Tr.1239, and also see 3507-02 at P11 as DX13-01. Moreover, in the prior statement, she stated more affirmatively that she is not aware the firm would direct clients where to get fake

evidence for their application and the firm never helped client to prepare evidence. Another cooperating witness Victor said in a recording of him by another government informant Fulcrum that the firm never helped clients get fake documents. See 3503-86 Session 3 at P17 as DX13-02. But finding the truth is not the prosecutors' concern and their only purpose is to convict Karen by all means. Therefore, the prosecutors not only ignored all the evidence in the record and the lack of evidence for their argument but also distorted this package of evidence to support their argument that the firm directed clients to fill in the blank documents and then submitted them for their asylum applications. They clearly knew that this argument is not true. And this is one of the major arguments made by the prosecutors throughout the trial. Moreover the prosecutors never offered anything to show how Karen was involved in all this alleged fraud.

The prosecutors only submitted the GX 300 the Christian Knowledge into evidence out of the nine boxes of documents and two boxes of computer hard drives seized from the Moslemi firm after a thorough search by fifteen FBI agents for more than ten hours. But the prosecutor argued in the summation that the firm used Christian materials, Falun Gong materials and family planning materials to prepare clients for the asylum interviews and hearings. The only evidence introduced at trial is Meng Fei's testimony. Meng Fei only mentioned that the firm has Christian materials and Falun Gong materials and never said anything about family planning materials and never got into any details about these materials. Tr.1257 But the prosecutor argued in the closing that the firm used these materials to teach clients about the basic knowledge such as what is Falun Gong and what is family planning policy. Tr.2068-2069. There is no evidence in the record to support such argument. Also, the evidence in the record clearly shows that the Christian material was prepared by Feng Li after Karen left and no evidence was ever introduced to show Karen was involved in any way in the creation or use of the materials and how that evidence is relevant to prove Karen's guilt. Moreover, the prosecutor asked Meng Fei about GX 407, 408 and 410, three different kinds of Christian knowledge materials seized by the FBI from the Bandrich firm which have nothing to do with Moslemi firm, and Meng Fei answered that she also used them to prepare the Moslemi clients for court hearings. Tr.1270 Here, this whole line of questions is not proper since the prosecutor failed to produce any such evidence from the Moslemi firm after their thorough search of the office. Meng Fei's testimony should not be given any weight in the absence of corroboration, which is crucial under this circumstance. However, the prosecutor in her summation not only relied on Meng Fei's testimony but also went further to argue that the two firms were using "identical preparation materials" and she later argued that it is one of the proof that the two firms are one and the same. Tr.2068.

The prosecutor argued that the recordings are reliable evidence despite the various challenges by the defense counsels to the accuracy of the transcripts. "These are recordings, without any other evidence, on which you could convict all of these defendants." Tr.2072 How did the prosecutor find support for her argument? By misinterpreting the recordings. Meng Fei said, "I kept thinking that the clients would all of a sudden say, well, she fabricated this story, she told me how to say it." Tr.1344 The prosecutor misinterpret Meng Fei's words as: "your employees were committing a fraud under your roof", "and she has a former colleague acknowledging the fraud on an open

telephone line". Tr.2078 Reading Meng Fei's words honestly, most people would agree that what Meng Fei said is not an acknowledgement of her committing a fraud, contrary to what the prosecutor argued here, and there is no evidence to support the prosecutor's argument. Contrary to the prosecutor's argument, Karen not only did not admit fraud anywhere in the recordings but also told Meng Fei to warn clients not to lie in court and if they did not know the answer to a question, they should just say so honestly. Tr.1342-1343 Then the prosecutor made more argument not based on the evidence in the record regarding this recording. She argued that the recordings show Karen was still in charge of the office at that time and Karen was in charge of hiring, assigning jobs and monitoring the asylum application process, but failed to cite any evidence to support her argument except that the recorded conversation was about hiring Meng Fei back. Tr.2078 When a lawyer left, there was a vacancy and Karen called Meng Fei to hire her back as a lawyer. That is all this recording is about. There is no evidence whatsoever to show Karen was still in charge of assigning jobs to the employees and monitoring the asylum application process. On the contrary, Karen told Meng Fei that she spent the whole summer somewhere else and did not go to the office at all.  Not only there is no evidence to support the prosecutor's such argument, there is also evidence to prove the opposite, i.e. Karen was not involved in assigning jobs to employees nor monitoring the asylum process. Lin Chen's recording is such a strong piece of evidence. She came to the Moslemi firm for thirteen months from May 2011 to June 2012 and made thirteen video and audio recordings in the Moslemi firm and made many recorded telephone calls with the Moslemi firm employees. Karen did not appear anywhere in these recordings directly or indirectly even if Lin Chen repeatedly asked to see Karen.

Regarding Karen's role in the conspiracy, there is no evidence to support the prosecutor's argument that Karen was the leader of the entire operation. First of all, there is no evidence whatsoever to show that Karen was involved in the Bandrich firm in any way. On the contrary, lots of evidence showed that Karen was never involved in the Bandrich firm. The recorded conversation between Ms. Bandrich and Meng Fei shows that Ms. Bandrich did not even know Karen's English name and she only saw Karen once since the birth of her daughter which was about eight months ago and Karen never went to her office. Tr.1489, and also see GX127 at P4 and P11 as DX14. As discussed above, there were only very limited evidence to show Karen was trying to hire Meng Fei back in GX 154; there is no evidence to show that Karen "gave out work assignments" or "monitoring the asylum application process". There is no evidence to show that Karen "issued internal rules to keep anyone at the firm from getting caught" as the prosecutor argued. Tr.2073 Meng Fei was asked twice and twice she answered that she did not remember who made the policy changes. Tr.1272, Tr.1273 Moreover, in her prior statement, Meng Fei said that the policy change happened while she was on the long leave to prepare for her bar exam. So she had no personal knowledge on this matter. See 3507-01 at P3 as DX15. Victor only testified that "and then we have kind of conference. We have some, several new matters." The new matters include not to talk to clients about the substance of their case over the phone, not to talk to strangers over the phone. Victor said, "and at that time we began shredding those stories" and to delete the Chinese version from the computer. Tr.602 Only when being asked who gave the instructions, Victor answered Feng Ling Liu. Victor's testimony is partially contradicted by his prior

testimony that he shredded draft stories before the conference happened. Tr.572. In all his twenty prior meetings with FBI and the prosecutors, Victor never mentioned any of the new matters. Moreover, Victor's testimony was contradicted by Meng Fei who said that the translator always deleted the Chinese version of the story after he finished the translation, not a new policy implemented in early 2009. Tr.1275 Meng Fei further contradicted Victor's testimony by saying that the primary policy change is that clients are asked to write the first draft of their stories, and in the summer of 2010 Karen asked Ann to destroy the draft stories in the files, not at the same time of other changes in early 2009. Tr.1275 Even assuming what Victor said is credible, it is still not equivalent to "issuing internal rules to keep anyone at the firm from getting caught".  The prosecutor never introduced any evidence to support her argument that Karen "raked in millions and millions of dollars". It is not based on any evidence in the record.

There is no evidence in the record to support the prosecutor's argument that Karen met new clients and assigned a fake claim to them. Tr.2074. Victor testified that many clients already knew what claims they would pursue before they met Karen or David and he never said that David or Karen assigned a fake claim to clients. Tr.545 Meng Fei said she only overheard the conversation "a few times" and she said she overhead client ask David or Karen what kind of claim is easier to win and she never said that Karen assigned a fake claim to clients. Tr.1223

The prosecutor made a big fuss about all the family members working for the firm, and said that David worked next to Karen and listed all the other family members. Tr.2075 The prosecutor introduced no evidence whatsoever to show Karen committed fraud together with these family members or even worked with them. There is no evidence to show that Karen hired these family members or Karen even agreed to have all these family members hired to work for Moslemi firm. However, the prosecutor asked the jury to ignore the lack of evidence and simply to speculate that since Karen's family members committed fraud Karen must have known the fraud. The prosecutor went even further later by arguing that Karen staffed the firm with her family members and did not trust or use others unless they were part of the fraud, in order to avoid the detection of the fraud. Tr.2085 They wanted the jury to make all these speculations even if there is no evidence whatsoever in the record to support such argument. The prosecutor argued that the fraud was committed openly in the office and "clients discussed their cases, their false stories, their fake documents with each other and with other people who worked at the law firm. So, Feng Ling Liu, just by walking around the law firm every day, would have known exactly what was going on." Tr.2075 Lin Chen's recordings indeed show the existence of fraud but the prosecutor clearly exaggerated the degree of the fraud. In Lin Chen's recordings, there are no clients talking to each other about their false stories or fake documents as claimed by the prosecutor. Most importantly, Lin Chen's recordings started in May 2011 and ended in June 2012. But Karen left the office in early 2009, two and a half years before that and there is plenty of evidence showing that Karen rarely went to the office since early 2009. Lin Chen's recording is one of such evidence showing Karen was completely absent from the daily operation of the firm. Clearly, Karen not only did not "walk around the office every day" but did not walk around the office at all during the period when the fraud was committed.

There is no evidence to support the prosecutor's argument that the change of the firm's name to Moslemi and the opening of Bandrich firm are Karen's efforts to conceal her fraud. Both Victor and Meng Fei never testified about any personal knowledge about these matters and they only offered their own speculations. Moreover, there is no corroboration whatsoever to support the prosecutor's arguments, such as the Houston case because there is no such evidence at all at that time. The prosecutor conveniently ignored that Natalie Galvin also opened her own firm across the street after leaving Moslemi firm and took away two Moslemi employees with her and took away many Moslemi cases. The prosecutor made the most nonsense argument that Karen only trusted Ms. Bandrich as shown by the fact that Karen asked Ms. Bandrich to open another firm and asked her to cover cases for Moslemi firm because Ms. Bandrich knew the fraud and was thus safe to use, again conveniently ignoring the fact that Troy Moslemi's name was used for the Moslemi firm for about five years and he was not faced with fraud charge, and the Moslemi firm also had other associates and they were not faced with fraud charge and no evidence shows that they are involved in the fraud in any way. Why did the use of Ms. Bandrich's service shows the existence of fraud and her knowledge of fraud while the same use of other lawyers' service not? The prosecutor is knowingly making a false argument because the facts known to them prove otherwise.

In the recording, when Meng Fei said "I told you she would sometimes worry about----" Ms. Bandrich interrupted, "about what? Money? Or getting into trouble?" Tr.2088 The prosecutor again ignored the lack of evidence in the record and ignored the evidence rules and asked the jury to accept her speculation that Ms. Bandrich knew the fraud and knew that Karen only worried about two things: money or getting caught for the fraud, deliberately ignoring all the other troubles such as being sued by a former employee and complaints from clients and disciplinary actions from the bar. Moreover, the recorded conversation by Ms. Bandrich is not admissible evidence against Karen because it is hearsay as it is made not in furtherance of the conspiracy. But the prosecutor ignored this rule and used this hearsay evidence against Karen and made speculations from it.

The prosecutor also showed dishonesty and lack of integrity in her closing. For example, the prosecutor argued that Karen is a careful person and takes various means to conceal her crime, and talked with Meng Fei in the recorded telephone conversation very carefully; on the other hand, the prosecutor also argued that Karen was a bold person in committing the crimes and didn't even bother to make any efforts to conceal her criminal conduct, such as inviting Victor, then a complete stranger, to join the conspiracy and keeping her office door open when she met new clients and advised them a fake claim so every one could hear her.

The prosecutor further argued nothing changed after the change of the firm's name. First, it is a mischaracterization of the evidence. Victor answered no in reply to the question: Did anything else change in terms of how the firm was run when Troy Moslemi came in? Tr.609 Meng Fei answered "nothing changed" in response to the question: When the firm changed names, what if anything changed about how the firm was operated? Tr.1346 Clearly the questions asked about anything changed in terms of the operation of the firm.

After the name change, the firm is still an immigration law firm and still operates the same way. There is nothing strange about that. In fact, many immigration firms may operate the same way. That does not mean they are all involved in fraud. Moreover, the prosecutor clearly ignored evidence in the record in arguing nothing changed because the evidence shows that after the firm's name change, Moslemi was invited to join the firm and Karen left the firm and Feng Li took over Karen's job to review and revise the applications prepared by Meng Fei and Victor and signed all the asylum applications filed by the Moslemi firm. Tr.1242

The prosecutor argued the two firms are one with no evidence in the record to support such argument. The reasons given for such argument: Same people who used to work for Moslemi firm went to work for Bandrich firm, and same fee structure and same way to run the firm and using the same materials to prepare clients. Ms. Galvin opened her own firm across the street along with two employees of the Moslemi firm and they charged clients the same fee structure and they ran the firm the same way as Moslemi. In fact all the firms in Chinatown used the same fee structure and ran the firm the same way as Victor acknowledged in tape 7. As to the materials used to prepare clients, there is no evidence to show other firms in Chinatown did not use such materials and moreover there is no evidence to show Moslemi firm used these materials because the prosecutor failed to produce any such materials and Meng Fei's testimony alone is not sufficient without such corroboration.

15.1. The rebuttal summation
The prosecutor's rebuttal summation is mainly a repeat of the summation but is more problematic in several aspects. The prosecutor goes against all the well established rules and repeated warnings of the higher court and vouches for the truthfulness of the government witnesses and interjects his personal views into the summation as shown by the word "ridiculous" he used twice in describing defense argument. Tr.2374, 2368, 2371. The prosecutor makes more blatant speculations not based on any evidence in the record. The prosecutor again speculates that simply because so many family members worked for the firm and family members share secrets it is ridiculous for Karen to deny her knowledge of fraud in the firm. Tr.2368 The prosecutor not only interjects his own belief, calls for straightforward speculations but also misleads the jury with his examples. He gave an example to show no secret exists among family members when we were young. That is the misleading part. Young siblings acted very differently from middle aged siblings. Middle aged siblings no longer share the same living space together or eat meals together or stayed together most of the time. Rather, they lived their own lives far away from each other and definitely did not talk as often as when they were young kids living together under the same roof. They may rarely talk to each other. When the in-laws are involved, things get more complicated. Not everyone enjoys a very close relationship with their in-laws. It is hard to believe that all in-laws are close and share all secrets. Regarding the spouse, if he was doing something against his wife's wish and repeated warning, and may face the consequence of being forced to close down the firm if his wife found out the fraud, why did he have the incentive to tell his wife what was going on in the firm?

The prosecutor completely ignores the evidence in the record and repeats that the fraud was so open that it would be impossible for Karen not to notice when the evidence in the record shows that Karen did not go to the office during the whole period when the fraud happened in the open. The prosecutor repeats the same argument that the recordings of Karen shows that she incriminated herself because she did not respond to "Meng Fei's talking about a fraud". Tr.2372 The prosecutor mischaracterizes the recording by saying that Meng Fei talked about fraud when in fact what she really said is that she was worried that clients would push all blame to her if caught lying. About Lin Chen's failure to meet Karen during her many visits over a lengthy period of time, the prosecutor made a specious argument, again clearly intending to mislead the jury. The prosecutor argued that you may have gone to a favorite restaurant 30 times but never met the owner. That is different from Lin Chen's case. In the restaurant example, the customer only sat in the eating area and of course he did not have the chance to see the cook or others back in the kitchen. Maybe the owner is in the back. Maybe he is not in the restaurant at all. But if the customer decides to see everyone who is involved directly or indirectly in preparing for his food, he will see the owner unless the owner is not involved in the day to day operation of the restaurant at all. In Lin Chen's case, unlike the customer who is only sitting in the eating area, she has personally gone through the whole process of the preparation of her asylum application, and she is more like the customer who decides to tour the whole restaurant to meet everyone involved directly and indirectly in preparing his food. Her failure to meet Karen shows that Karen was not involved in the day to day operation of the firm. Karen not only did not meet Lin Chen even upon her demand to see Karen, but also never instructed any employees how to handle her case, or any other client's case. The prosecutor argued that Lin Chen captured a lot of fraudulent conversations of clients and employees while she was at the firm recording people around. It is not supported by the record. Moreover, not even once did Lin Chen record Karen in any way, such as calling in to employees or any employees calling Karen for instructions or even any employees mentioning Karen's name such as Karen told me to do this way or I needed to report to Karen and ask her how to handle this. Lin Chen's recordings help us walk through her whole case from the beginning to the end, specifically, from the initial meeting to the filling in of the application forms, the writing of her story, the writing of the letters, the collection of documents, the preparation for the interview and post-interview meeting. During this lengthy and detailed process, Karen's name was not even mentioned once relating to the preparation of her case. Lin Chen's recording is conclusive evidence to show that Karen was completely out of the picture of the firm's operation.

Regarding the lack of evidence, especially only one recording out of 60 is about Karen, the prosecutor argued that it is a miracle for the FBI to even manage to get such one recording because Karen was extremely cautious and "tried very hard not to get on the phone". Here, the prosecutor again is expressing his own personal views on the matter. And his argument also is completely in disregard to the evidence in the record. Tr.2371 The recordings show that every time it is Karen who called Meng Fei and Karen was completely open to Meng Fei in the conversation and Karen especially told Meng Fei to call her any time. DX5-01 In the blatant attempt to mislead the jury, the lay people, the prosecutor made the specious convincing argument that Victor and Meng Fei must be

telling the truth because if they lied they could focus on Karen and Bandrich only rather than talking about every one involved, and they could make better lies than the testimony they have given, such as saying Karen wrote stories all day "from sun up until sun down, until her hand fell off" and "you couldn't stop that woman from writing stories". Tr.2375 Every litigation lawyer knows that the key to a witness is his credibility. A good liar is someone who can fool others with his lies and make himself credible to the audience even if he is lying. That is exactly what Victor and Meng Fei are trying to do here. How? Rule number one is, don't go to extreme and sound very reasonable in order to sell the lies. What the prosecutor suggested as "better lies" are actually worst lies and could not be sold to anyone. Meng Fei and Victor are professional liars and they are not that stupid. The prosecutor, as experienced litigation lawyer, also knows it better than anyone else and he made this argument simply to mislead the jury, the lay people because only the lay people buy such argument.

Regarding prosecutor's failure to produce even a single client from Moslemi firm to testify for them, the prosecutor argued that clients cannot be located and they don't want to admit fraud because they would lose the asylum, maybe green card and citizenship. Tr.2377 These facts referred to by the prosecutor are never introduced into evidence and the prosecutor's introducing these new facts in his rebuttal summation severely prejudiced the defendant because defense has no chance to point out to the jury that the FBI did manage to catch applicants from other firms who agreed to testify for the prosecutor and there are many Moslemi clients whose applications are still pending and who do not have the asylum, green card and citizenship and thus do not need to worry about losing them. The prosecutor repeats the same argument that Karen asked Ms. Bandrich to open the Bandrich firm because Ms. Bandrich is part of the conspiracy and thus has Karen's trust and outsiders pose potential risks: they may find out the fraud and they may report to FBI. Tr.2380-2381 In making this argument, the prosecutors conveniently ignored Moslemi, and all the other associates working for the Moslemi firm and one of the associates who opened her own firm across the street. These are all in the recordings of GX 127 and 133 which are in evidence. The prosecutor is knowingly making a false argument because the facts known to them prove otherwise.

The cumulative effect of the prosecutorial misconduct is so severe that it has caused substantial prejudice to the defendant and has deprived the defendant of a fair trial and warrants the set aside of the verdict.


## Second Ground: Severe inadequate legal representation by defense counsel has a huge impact on the defense case and causes defendant to be wrongfully convicted. Injustice will be done if the verdict is not set aside on this ground alone.

Note: Defendant understands that the proper forum for the ineffective assistance of counsel claim should be Section 2255 hearing on this issue affording the defense counsel the opportunity to respond to the allegations made by the defendant. The ineffective

assistance of counsel claim in this motion only focuses on the evidence in the record for the purpose of this motion. If the court feels it is sufficient to resolve this claim one way or the other based on the evidence on the record, it is fine. Otherwise a Section 2255 hearing can be scheduled at a later time to resolve this issue.

The law governing ineffective assistance of counsel claim: In order to sustain a claim of ineffective assistance of trial counsel, it must be shown that (1) counsel's performance was deficient, "fell below an objective standard of reasonableness" and (2) the deficient performance prejudiced the defense. Strictland v. Washington, 466 U.S. 668 (1984) at 688. To establish prejudice "the defendant must show that there is a reasonable probability that but for counsel's unprofessional errors the result of the proceedings might be different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id at 694. The Second Circuit applied this standard in a number of cases and found that counsel's performance is deficient and the deficient performance prejudiced the defendant. Mayo v. Henderson, 13, F.3d 529 (2d Cir. 1994), Bunkley v. Meachum, 68 F.3d 1518 (2d Cir. 1995), Mason v. Scully, 16 F.3d 38 (2d Cir. 1994), Lindstadt v. Keane, 239 F.3d 191 (2d Cir. 2001), Pavel v. Hollins, 261 F.3d 210 (2d Cir. 2001).

The defense (collectively referring to Mr. Fischetti and his team) clearly shows a lack of diligence in the defense of this case throughout the trial. First, it does not have a theory of defense. There is no analysis of this case in any way, let alone in-depth analysis before the trial. It failed to make very important motions in limine on very important issues. Tr.513  No defense theory is articulated in the opening statement and as a result the jury is not given a story from the defense side to guide them through the trial. Defense failed to detect the prosecutor's deliberate omission in presenting GX302 to the jury and failed to detect the problems with the computer screen shot. The waiver of the photographer is clearly wrong, giving up a very important opportunity to elicit crucial evidence for the defense. The cross examination of the prosecutor witnesses is severely inadequate, failing to elicit a lot of crucial evidence for the defense. The cross examination failed to show a theme and sometimes it is random and contradictory and people did not know where it is leading to. Throughout the trial, defense failed to vigilantly watch the prosecutors in their presentation of the case, allowing them to cross the line on many occasions. Defense failed to call witness for the defense. Defense also failed to submit a lot of crucial documents and recordings to support the defense. In the closing argument, defense failed to sum up the case from the defendant's perspective and failed to respond to the prosecutor's summation.

1. The defense has no defense theory
This can be seen from the opening statement, the inadequate cross of Ashley Caudill-Merillo, Victor You, Lin Chen and Meng Fei Yu and Agent Person, the failure to call the photographer, the failure to call the FBI agent who arrested Karen, the failure to submit various very important documents and recordings for defense, the failure to call defense witness and the poor closing argument. Due to the lack of defense theory, the whole defense work is very superficial, passive, random and piecemeal in nature and has missed a lot of crucial things throughout the trial.

Karen told the defense and also communicated by email to the defense all the truth about her case from the very beginning and throughout the preparation stage and during the trial. But the defense clearly never considered Karen's opinion. Instead, the defense responded mockingly, "The truth is what happened in court." Knowing nothing about criminal trial, Karen was misled to believe that the defense would make a miracle in the trial. Throughout the legal representation, the defense never sat down to learn the case from defendant, let alone systematically discussed with her or analyzed her case. They did not know her life, her work and the details of her case. They never felt that they needed to know them in order to defend her.  One minute before the opening, the defense asked Karen the very basic things such as when Karen left the firm and how old she was when she came to America, to be used in the opening statement.

Karen told them that she worked with Victor from August 2008 to February 11, 2009 and with Meng Fei from August 2008 to mid December 2008. She was absent on vacation in the last week of August and two weeks around Christmas. For the period when Karen worked with them, she closely supervised their work and there was no fraud. At least there was no fraud brought to her attention. They both were engaged in fraud but that was sometime after Karen left the firm. Karen told the defense why she left the firm in early 2009 and after that she was only involved in hiring for the Moslemi firm.

For an effective defense, the following questions are crucial and must be answered to the jury's satisfaction:
1. Did Karen commit fraud with Victor and Meng Fei?
2. What are the motives for Victor and Meng Fei to lie against Karen?
3. Why did Karen leave the practice in early 2009 and transfer the firm to Moslemi?
4. What is Karen's involvement in the Moslemi firm?
5. What is Karen's role in the opening of Bandrich firm?

2. Random opening statement that fails to tell the jury the story of the defendant
In the opening statement, the defense should give the jury a story of the defendant on what had happened, providing a guide to the jury for the trial. Because defense did not have a defense theory, just like an article with no theme, the opening statement failed to tell the jury a story of the defendant. It is random and superficial. The defense failed to give a reason why Karen left the firm and transferred the business to Moslemi when the prosecutors insisted in the indictment and in the opening that Karen's motive is to conceal her fraud. Defense failed to state clearly about Karen's role in Moslemi firm when the prosecutors insisted that Karen was still running the firm. Defense failed to state the two cooperating witnesses' strong motive to lie and failed to state clearly how the cooperating witnesses would lie against Karen. Victor's motive is to wipe out all potential competitors and clear up the way for his future practice of law by using the FBI power. Meng Fei's motive is to stay here permanently through cooperation with FBI and use FBI's power to send Karen to jail for revenge, jealousy and hatred. It is a lie when they say that Karen committed the fraud with them. Karen did not deny that the two cooperating witnesses indeed committed immigration fraud by preparing false asylum

applications, but it happened after Karen left the firm, not when they were working with Karen.

For an effective defense, the opening statement should cover the following:
Defense should tell the jury that Karen worked with Victor from August 2008 to early February 2009 and with Meng Fei from August 2008 to mid December 2008, and during that period, Karen closely supervised Victor and Meng Fei and during that period there was no fraud, at least no fraud was brought to Karen's attention. Evidence can be elicited from Victor and Meng Fei , and can also be adduced from documentary evidence and the recordings.

Defense should tell the jury that Victor and Meng Fei had a strong motive to lie not only to save themselves but also to accomplish their own goals in addition to taking revenge against Karen due to jealousy and hatred. The evidence will show that they both are very eager to cooperate with FBI and they have been waiting for that day for a long time. Evidence will show that they are repeated liars and whatever they testify against Karen on the stand will be more lies.

Defense should tell the jury that Karen left the firm in early 2009 due to a variety of reasons: family reasons, the Second Circuit disciplinary action, health reasons and other reasons. Most of these can be elicited from Victor and Meng Fei and adduced from the documentary evidence and the recordings.

Defense should tell the jury that Karen's only involvement in the Moslemi firm is to help with the hiring out of her obligation to her old clients whose cases were still pending. Evidence can be elicited from the witness, and adduced from the recordings and the documentary evidence.

Defense should point out to the jury that FBI has conducted a lengthy and intensive investigation against Karen since 2009 but the only evidence against Karen is the testimony of two cooperating witnesses Victor and Meng Fei and one recording. FBI located all the telephone record, both business and personal for all these past number of years. FBI got all the bank record of Karen's personal and business accounts for all these years. FBI located hundreds of the asylum applications filed by the firm and they talked to a number of the firm's clients but failed to find a single fraudulent application. But they did manage to find fraudulent applications filed by other firms such as the applications of Lin Chen, Huai Guo Wu, Zhen Yi Li, Tao Bai, Dian Nian and Zai Fu Li. And those applicants did stand up to testify in other cases. The FBI searched Karen upon her arrest and found voluminous papers and documents she carried on that day. They also seized her iphone upon her arrest and the iphone has access to all her emails, text messages, notes, etc. for a lengthy period of time. FBI searched the office and took away nine boxes of fifteen different types of documentary materials and two boxes of all the computer hard drives and record on the printing and copy machine. FBI took away cases as old as back in 2005. FBI took away the office surveillance camera which had recorded the activities of every room and space of the office for a few weeks. Not a single piece of

evidence is produced against Karen from all these sources. This lack of evidence is very telling of Karen's innocence.

Defense should point out to the jury that not only FBI failed to get a single client to admit fraud and to stand up to testify against Karen after repeated efforts, the jury should also know that most of Moslemi firm's clients moved their cases out after the FBI raid and hired new attorneys to represent them. Their new attorneys were required by the immigration court to go over the asylum applications with them to verify the contents to make sure they are accurate, complete and true. But none of them retracted their asylum applications as fraudulent. And the immigration judges applied a heightened standard to the Moslemi applications due to the firm's involvement in fraud. By far 341 of the cases are granted by the immigration judges and 41 of the cases are denied and none was found to be fraudulent. Documentary evidence is available to prove this. See DX16.

Defense should point out to the jury that Troy Moslemi, in whose name the firm has been operating since early 2009, has worked for the firm full-time since early 2009 and has extensive contact with the firm's clients and has signed hundreds of asylum applications, but he does not face any criminal charge. Defense should also point out to the jury that besides Moslemi, Denise Lekosky had worked first for the Liu firm and then for the Moslemi firm for a year from June 2008 to May 2009, and Robert Valane had worked for the Moslemi firm for about a year from February 2012 to January 2013 and Natalie Galvin had worked for the firm from February 2012 to August 2012, and Ji Shu Zhang (Jerry) worked here from October 2011 to January 2012, and none of these attorneys had any criminal charge against them. Moreover, there is evidence to show that they had intensive contact with clients on a daily basis during their work here. The evidence about this can be elicited from the cooperating witnesses and adduced from the recordings and the documentary evidence.

Evidence will also show that Moslemi was investigated by the Florida Bar after FBI raid of the firm and the conclusion is that he was not aware of any fraud in the firm and had not committed any fraud while working at the firm. Evidence also shows that Mr. Valane is an extremely cautious person who was freak out when he discovered that the package of documents submitted to immigration court which was signed by him contained careless errors. To such a cautious person, he would be the first to flee the scene if he knew there is fraud going on in the firm. But he continued to work in the firm for another month even after FBI raid. Evidence will show that Meng Fei told FBI that Ji Shu Zhang (Jerry) left the firm to become an asylum officer in the New York Asylum Office. Evidence will also show that after leaving Moslemi firm, Ms. Galvin set up her own firm across the street and took hundreds of Moslemi clients away both before the FBI raid and especially after the FBI raid. These will be effective counter argument to the prosecutor's fraud mill argument. For the prosecutors will have to make a big stretch to argue that all the other lawyers that handled the Moslemi cases and all the lawyers who worked for the Moslemi firm are all engaged in fraud, and all the immigration judges and government attorneys failed to do their job diligently. If the prosecutors make such argument they have to explain why Karen is selected by the law enforcement out of these so many lawyers who are engaged in immigration fraud.

Defense should point out to the jury that all the outrageous evidence of fraud to be introduced by the prosecutors happened since mid 2011, more than two years after Karen left the firm and there is no connection whatsoever to Karen. Defense should point out that the prosecutors' intention is that by introducing this evidence, the prosecutors clearly want to overwhelm the jury with the fraud so that they will blame anyone remotely associated with this fraud, especially Karen. On the contrary, the salient feature of that evidence is that Karen is completely missing from the picture, as shown by Lin Chen's recordings.

Defense should point out to the jury that there is no evidence to show the Bandrich firm was opened to avoid attention of the law enforcement. Evidence can be gathered from the cooperating witness, the recordings and documentary evidence to prove the opposite.

Karen told her lawyer in the very beginning that this is a hard case and defense needs to do its best in order to win, including taking all necessary risks. Clearly the defense did not listen to her. The defense kept saying both in the opening and closing that the defense did not have to do anything because the burden is on the prosecutors to prove Karen's guilt. It looks like before the defense had convinced the jury, it certainly first convinced itself that defense really did not have to do anything and just lay back to watch the prosecutors present their case.

3. Defense's failure to make motions in limine to exclude the hearsay evidence

Defense failed to make the motion in limine before trial started to exclude the lots of hearsay evidence in the recordings, especially in Lin Chen's recordings. In GX 40, 44, 110 and 134, there are many unknown males and females being recorded, especially in the first three exhibits, where there are as many as twelve unknown people being recorded in each recording and their recordings take about half of the total contents of the recordings. There is no evidence that the random conversations of these unknown people recorded by Lin Chen are co-conspirators' in furtherance of the conspiracy. Moreover, defense failed to object when the prosecutors read the hearsays to the jury. Tr.971, Tr.987, Tr.988-989. Defense further failed to request redaction during the trial like what Rachael Yang's lawyer did. Tr.1316

4. Defense's failure to insist on its objection to the admission of GX57

Defense failed to make a similar motion to exclude Lin Chen's phone calls to China which is GX 57. First, there is no evidence to prove the person in China is a co-conspirator. Second, there is no evidence to show that Lilian provided the contact information to Lin Chen other than Lin Chen's word. Generally her testimony may be sufficient to establish this fact. But in this case she said she always came to the Moslemi firm with both the video and audio recording device but there is no video or audio recording to show Lilian or any other employee of the firm provided her the contact number to the company in China. Tr.1031. This is even more suspicious considering she had her family members purchased a fake work certificate to support her own fraudulent asylum application filed by another firm as far back as in 2009, and she was stinging five to eight different firms during that same period while she was stinging Moslemi firm. The

defense should have insisted on its objection to the admission of GX57 in the absence of any video and audio proof. And the defense should insist on asking for the proof.

5. Defense's failure to detect prosecutor's omission in presenting GX302 to jury
Prosecutor's omission completely changed the nature of the evidence and that is exactly their goal for doing so. Had defense known the package well, they would have detected the omission and could have stopped the prosecutor and avoided the extreme prejudice to the defendant.

6. Cross Examination of Asylum Officer Ashley Caudill-Merillo
Defense in the cross repeatedly hinted that applicants desperately wanted to stay in this country and could lie to asylum officers and to their lawyers. Tr.202-203, Tr.208-209. But Karen's defense is that all the asylum applications she was involved in are genuine and there is no fraud in her office as far as she knew. It does not help her case to say that her clients might have lied to her. Again, this shows the random nature of the defense and the lack of a defense theory.

6.1. Defense failed to cover the following areas in the cross examination:
Regarding the increase of the number of asylum applications in the New York asylum office over the past seven years since 2006 to 2012, could it be caused by the increase of the number of people coming to the United States over the years? Could it also be caused by the more concentration of Chinese applicants in New York area? Does she have any data on these issues? Is she aware of any misconduct and abuse of power by the asylum officers in her office such as treating applicants rudely and asking improper questions such as very difficult questions about applicant's religious knowledge? Applicant's failure to answer difficult religious questions such as what is the features of his/her denomination will affect the outcome of the case or not? This is relevant to show why the firm needs to prepare clients on religious knowledge and it is simply to avoid an unjustified denial of the application. It is also a reason why Victor is sent to the asylum office to find out the existence of the possible abuse reported by firm's clients. Ashley Caudill-Merillo said that similarity between cases should not be a ground for denial due to the similar experiences of the applicants from a certain area. This is the policy of her office. See 3504-02 at P1 as DX17. Questions should be asked about the similarity issue because Meng Fei in the recordings kept saying pattern and that all applications are the same indicating similarity means fraud. Questions should also be asked about how the cases were assigned to asylum officers and whether it is possible for anyone to manipulate the process or to pick and choose a particular asylum officer, because Victor said he could do it. Questions should also be asked about the confidentiality policy of the asylum applications received by her office. Ashley Caudill-Merillo said based on the law she could not talk about the asylum applications or even acknowledge the existence of them without the waiver from the applicants. See 3504-08 at P1 and 3504-13 at P2 as DX18.  For the GX 500 to 519, how were they obtained and whether it breached the confidentiality policy when she identified them in court? Ashley Caudill-Merillo testified in some detail at Liying Lin's trial about the status of several asylum applicants who agreed to cooperate with FBI after being approached by FBI. They are Tao Bai, Dai Nian, and Zhen Yi Li. And their applications were prepared by other law firms and one by

Victor. See 3504-19 at P78-83 as DX19. Both Tao Bai and Dai Nian testified in another trial and admitted to their fraud after being approached by FBI in the asylum office while the FBI pretended to be asylum officers. Same thing happened to Huai Guo Wu and Lin Chen. Lin Chen was approached by FBI on October 2, 2009 in the asylum office. See 3502-09 at P1 as DX20. This shows FBI started to approach applicants through the asylum office at least in the summer of 2009 if not earlier. Defense should elicit this information and ask Ashley Caudill-Merillo when and how FBI investigation started and how her office had cooperated with FBI and how many of Liu/Moslemi clients were interviewed by FBI. This shows that FBI did manage to catch applicants who admitted their fraud and more importantly it shows that FBI used repeated efforts to get clients from Moslemi firm but failed. This may very well prove the Moslemi clients are genuine asylum applicants. Ashley Caudill-Merillo wrote a letter to a Judge Patterson stating that John Wang's firm had filed the most applications to her office, i.e. 1332 asylum applications from 2010 to 2012.  See 3504-20 as DX6. For the same period, Moslemi firm only filed about one thousand applications. Defense should elicit this information and compared it with Moslemi firm. Defense should also ask her about the thousands of applications on fraud hold. Ashley Caudill-Merillo said when a case is on fraud hold or on hold for security or other reasons, the applicants and their legal representatives will be notified that their cases are under review. Defense should ask Ashley Caudill-Merillo why there are these thousands of cases on hold and how many involve Moslemi firm or the Liu firm. If her answer is positive, let her provide the documentation for it. Defense should also ask Ashley Caudill-Merillo since Lin Chen already admitted her fraud in the federal court, whether she thinks Lin Chen has filed a frivolous asylum application as defined by the asylum law and is thus not eligible for any immigration benefit for life according to the law? If yes, why did she said in 3504-14 Page 2 that Lin Chen may be eligible for a legitimate claim and her office would still need to adjudicate that claim? For Tao Bai, Dai Nian and Zhen Yi Li, their cooperation is over and the defendant they testified against will be sentenced very soon. When will her office start to review their applications and refer them to court for final removal order? Especially for Zhen Yi Li whose asylum application was granted by her office and who also filed her green card application as indicated in 3504-18, an email correspondence between FBI agent and her, when will her office plan to revoke Li's asylum status since she already admitted in federal court that her application was fake? These questions will show the benefits given to the cooperating witnesses by the FBI and may cast a doubt on their motive to cooperate and will also show with the favors done to them by FBI they may not face the consequence of fraud at all.

7. Cross Examination of FBI agent Person about the search

The defense asked some questions not very relevant to the defense such as the questions on the issue that the FBI search caused great disruption and inconvenience to the law firm's normal operation of the business. At least jury is not clear how that affects Karen's guilt or innocence. The defense failed to elicit detailed evidence to show the extensive and intensive nature of the search. Defense failed to cover the following areas:

Defense should focus on both the intensive nature and the extensive nature of the search to show to the jury that how wide and how deep and thorough the search was conducted.

42

Fifteen agents searched every corner of the office for about 10 hours including the garbage can, the file cabinets and any locked containers. They seized fifteen different types of materials which filled up 9 boxes in addition to two boxes of computer hard drives of all the computers in the office. They even copied the record from the printer and copy machine. They also took away the surveillance camera of the office which covers every room of the office for at least the past few weeks prior to that day. In terms of time frame, they seized files as old as in the year 2005. The defense should introduce into evidence all the search recording logs and inventory made by the FBI search team. The defense should first point out that GX 302 series is one of the very few items seized during the search that was introduced into evidence for this trial. The defense should focus on GX 302 series to elicit as much evidence as possible regarding that package. The defense should go over each piece of paper in that package especially the two pieces with contents to show to the jury that this package belongs to a specific client Mr. Zhu and is never used for any asylum application and is already out of date to be used for any false applications. Had the defense done its work properly, the prosecutor would not have another opportunity later through Victor's testimony to present the evidence to the jury with the deliberate omission of the two crucial pieces from this package which are not blank and to deliberately mischaracterize the package as blank documents. Through questioning this agent, the defense can also show to the jury that this package is the only one of its kind found and seized by the FBI, and no current ones were found in the firm and it is clearly a rare case rather than the normal state of affairs as the prosecutors argued.

8. Defense's Improper Waiver of Calling the Photographer

Defense should cross examine the photographer on the layout of the office, especially the distance of the desks of Victor and Meng Fei's to the two desks in room I. This is crucial to the overhearing issue. Defense should elicit evidence about each of the computer screen shots to show that computers in room I were actually in a shut down state and the photographer turned on the power and then took the photos, and he was unable to have access to the files in the computer because he did not have the password, and most importantly to show that the photographer did not just take photos of the computer screen of each computer, rather he opened each of the windows and took photos of each of them. For example, he took five different photos of the computer screen of H3 and GX677 is only one of them. As FBI's photographer, his duty is to preserve the crime scene by taking photos to show everything as it is at that moment, not to touch anything and even move them before taking the photos. Defense failed to find out about this. It is also relevant to show to the jury the computer screen shot of all the employees to show what every employee was doing when the FBI raided the office to rebut the prosecutor's fraud mill argument. No one was engaged in fraud contrary to the prosecutor's claim. Defense should especially focus on GX 677 which is a draft of the attesting letter to show that it may very well not be the current active computer screen of H3 and he has no personal knowledge on who wrote the letter, when it was written and whether it was from the author of the letter or was created by the paralegal, and to show it was a recent creation and has nothing to do with Karen.

9. Cross Examination of Lin Chen

43

Compared with other witness, Lin Chen's cross is not that important because her credibility is not crucial and the recordings speak for themselves. But even for this easy witness, the defense failed to cover some very crucial areas as shown in the following.

Defense should ask her about her status, her plan to get green card and her deal with FBI. These questions are relevant to show her motive for cooperation and FBI's possible abuse of their power in giving her the benefit not allowed by the law. The defense should ask Lin Chen about her marriage fraud, about her family members helping her obtain a fake document for her own asylum application and how she or her family members found out where to get the fake document, which is crucial to the defense. Defense should also ask her about all the other firms she had recorded during the same time period when she recorded the Moslemi firm to show she may get the contact information for the company in China from other firms, especially when tape 48 shows she moved to another location in the middle of that visit, and it could be the firm upstairs which she was also recording during that time. Defense should ask Lin Chen about the missing of the recording showing Moslemi employee gave her the contact information for the company in China as she claimed. Considering the fact that Lin Chen always came to the Moslemi firm with both the video and audio recording device, the missing of that recording is crucial to the defense case. Tr.1031. Without this link, GX57, the call to China should be excluded as hearsay. The defense first failed to make a motion in limine to exclude the calls to China as hearsay evidence and then failed again in trial during the cross to elicit the crucial information.

The defense should ask Lin Chen about the details of her contact with the Moslemi firm, from the beginning to the end, to show the length of the time, the intensity of the contact, who was involved and whether Karen appeared anywhere in the course of the preparation of her asylum application at any stage either directly or indirectly. On redirect Lin Chen said she only asked to see Karen at her last visit. Tr.1037. Defense failed to elicit the evidence to show that Lin Chen asked to see Karen in her very first visit, and in her second visit, and Lin Chen discussed with FBI before her last visit and they decided she "demanded" to see Karen and made an appointment to see Karen before her last visit which was thirteen months later since her first visit but Karen still refused to see her. Karen just did not get involved in any way, period. See GX 40 at P3, GX 44 at P3, and GX 134 at P6-7, 3502-62 as DX21. The defense should walk the jury through Lin Chen's whole recordings from her very first visit to the last one to show that Karen was not only physically absent from the office, she also did not remotely control the office in any way in the whole process of the preparation of the asylum applications, from the meeting of new clients, the taking of the case, the preparation of the application, the preparation of the client for the asylum interview, to the preparation of the client for the court hearings. The evidence tells much more than that Lin Chen never saw that Karen was involved in any fraud or directed any employee of the firm to engage in any fraud as the defense argued. It shows much more: it clearly shows Karen's complete absence from the operation of the firm and she was simply not involved.

Defense should also ask her about the office environment. She did say in direct examination that there are always many people in the office every time she visited.

Tr.953. The recordings will show that the office is always noisy and crowded. This is very important to impeach Victor and Meng Fei on the overhearing issue. The defense should ask her about the contract and all the papers she signed with the Moslemi firm and Karen's name did not appear anywhere in the papers. She knew clearly that she was dealing with Moslemi firm. The defense should also follow up on her testimony about the firm's reputation. The defense should also follow up on her testimony regarding GX 783 as DX22. The prosecutor wanted to show to the jury that even if Karen claimed that she left the firm, the sign with her firm's name is still hanging on the entrance of the building. Tr.951. But the same picture also shows that the sixth floor which is the old address of the Liu firm and later Moslemi firm is for rent. This picture shows it was taken after both the Liu firm and Moslemi firm moved out of the building and the building owner just does not want to spend the money to remove the sign.

## 10. Cross Examination of Victor

Defense's cross examination of Victor is relevant but far from enough because it leaves most of his testimony untouched and uses very little of the 3500 materials to impeach him. Defense only crossed Victor on his application to law school, his application to various intern positions, his application for citizenship, briefly on how he started the cooperation, his recording of people as part of his cooperation and the instructions he got from FBI, the talking with Meng Fei about cooperation with FBI and the taking of files and materials from the law firm for the purpose of self protection and handing over to FBI after cooperation. The only things from the 3500 materials used by defense are the mentioning of the 9 recordings of 21 people made by Victor which is clearly summary in nature and 3503-16, the tricks Victor played at the asylum office. The only effect of the cross examination is to show to the jury that he lied on several occasions not related to this trial and he recorded a lot of people but not Karen. In the cross examination of Victor, the defense missed all the following important areas which are crucial to the defendant.

## 10.1. The possible visa fraud as shown in his 3500 materials

Defense is completely silent on this issue even if there are a lot of materials in the 3500 materials indicating a visa fraud and it is a very good place to impeach Victor's credibility, showing his long history of fraud which started even before he came to the U.S. Victor said he never intended to attend the university and just began to work in New York City after he arrived. See 3503-03 at P1 as DX23-01. Victor said the snakehead arranged for the student visa and that he never had any intention to go to school in California. See 3503-72 P1 as DX23-02. In all his prior interviews, Victor never mentioned his wife's illness caused by pregnancy as a reason for not attending the University. Questions should also be asked about his visa application to show the possible misrepresentation such as omitting his parents and brother as living in the U.S., and about his wife's medical record to prove the abortion and miscarriage.

## 10.2. Victor's own asylum application which is likely to be fraudulent

Defense is completely silent on this issue even if there are a lot of materials in the 3500 and it is a very good place to impeach his credibility. Victor filed his asylum application six months after his arrival in the U.S. at a time when he no longer had a fear to go back to China since his wife had already suffered a miscarriage. He said because his lawyer is

not specialized in immigration law, his asylum application is very bare bone and has only two sentences about his wife's persecution in China. But his lawyer also represented his mother in her asylum application in the year 2000 and the list of documents filed by his lawyer for his application showed very clearly that his lawyer is very familiar with this field. See 3503-71 as DX24-01. Also, the asylum application asks what persecution the applicant has suffered in plain language. It does not require legal training or experience in asylum law to understand that question and to answer it. Both Victor and his wife are fluent in English and he testified that he is good at writing and enjoys writing articles. Why did he submit an application with only two sentences about their persecution? If he cannot write a statement to support his asylum application, how can he expect the firm's clients to be able to do it who have very limited education and do not know English? Questions should also be asked about his mother's asylum applications and his mother's filing of petition for him and his brother in 2002 which was denied. See 3503-71 as DX24-02. About his own asylum application, he made the following many different representations according to his 3500 materials: Victor would tell coworkers and clients that his true asylum case was fake. See 3503-01 at P2 as DX25-01. Victor said he would like to tell clients and coworkers about his true asylum application saying that he made up the story despite the fact that it was true. He said he did this to make the clients more comfortable with the asylum process and trust that the firm could get asylum with fake stories of persecution. See 3503-04 at P1 as DX25-02. Victor said that he told his boss and coworkers that his asylum application was fake because he wanted to win their trust. See 3503-38 at P1 as DX25-03. Victor told his boss and another co-worker that his asylum was fake because no one would have believed him if he told the truth and he wanted to tell them something that would make them trust him as a fellow criminal. See 3503-122 at P2 as DX25-04. At Liying Lin's trial, Victor said he told bosses and coworkers that his true asylum application is fake because he wanted to get the job and "he wanted to work longer at the law firm because law firm is an organized way of committing a crime and these law firms don't welcome outsiders unless you have dirty hands." See 3503-123 at P146-147 as DX25-05. Lots of questions should be asked to probe this issue to show Victor is lying and possibly to show that his own asylum application is fraudulent. He basically said all his coworkers are crooks. He should be crossed on where his knowledge comes from and any proof for it and to show to the jury that none of them has ever filed fake asylum application for themselves even if they worked in a firm that helps others file false asylum applications, a fraud mill according to the prosecutors, and also to show, unlike him, none of them was charged with a crime.

10.3. Victor's job interview at the Liu Firm and his position at the firm
Defense is completely silent on this issue even if Victor's testimony is very damaging to Karen. Victor said he was told at his job interview that his position is storywriter which is an industry term, meaning to write fake stories. But in Liying Lin's trial, he said his position at the Liu/Moslemi firm is "legal assistant". See 3503-123 at P141 as DX26-01. In his own citizenship applications he stated that his job title at the Liu/Moslemi firm is "paralegal", not a storywriter and coach as he testified in court. See 3503-71 as DX26-02. Victor further testified that he was just told that the position was storywriter and was not given any further information about this position. Victor said storywriter is an industry term and he learned it from other interpreters at the asylum office. But he only interpreted

at the asylum office for five to six times by the time he had the job interview with Karen and he may not have the opportunity to associate with other interpreters to learn this term by then. See 3503-39 at P1 as DX26-03. Storywriter does not cover the full range of the job duties involved as a paralegal who helps clients prepare asylum applications. It involves a lot more than just helping the client write a narrative statement. Victor also testified that Karen is a very cautious person and was very much concerned about the safety of the firm but she would tell a stranger to join her conspiracy. The defense should point this out to the jury and ask Victor for explanation. Defense should point out in crossing Meng Fei or at closing that Meng Fei was interviewed and hired two weeks after Victor and she contradicted Victor by saying she was told at the job interview that her position was paralegal and she and Victor both did exactly the same work. Meng Fei further testified that at the job interview she was told about the job duties, contradicting Victor. Impeaching Victor on this issue is important because it shows Victor lied on the witness stand.

Defense should also ask Victor on the following issue: At the time when Victor looked for a job at the Liu firm, he had come to the U.S. for three years and had got asylum status and was expected to get his green card soon and he did get his green card in mid August 2008. See 3503-71 as DX27-01. His wife was working as an accountant. His parents came here for nine years and were running a profitable business in Manhattan. He and his wife had already signed a contract to buy an apartment and they did purchase an apartment in Forest Hill in mid August 2008, just around the time he started to work for the Liu firm. See the deed of his apartment as DX27-02.  He was not under a financial pressure to join the criminal group for survival. He learned about the crime even before he started the job. He had the option to go back to the Giles firm. The fact that they used his service again in April 2011 shows they needed him. Tr.613 He also said that he never wanted to stay in America when he first came and he had great career potential in China. With a green card he was in a better position than before and certainly had the option to go back to China to find a good job there as testified by him and travel back and forth freely. Why did he decide to join a criminal group in July 2008?  Victor knew very well about the firm's clients. He had many contacts with them and knew about their lives. Defense should point out to jury through Victor that the firm's clients had very limited education, did not know English, had no legal status, and had huge smuggling debts which were often borrowed from loan sharks with high interest. But they did not choose to take the shortcut to make quick money by committing crimes. Instead, they worked hard in the Chinese restaurants for 16 hours a day, six days a week to earn hard money to pay the debt. Why did Victor choose to join the criminal organization when he had so many options available to him? Is it because he did not care to be a criminal or because the law firm is not a criminal organization as he testified? The truth is there was no crime going on in the firm and he was not required to commit any fraud from the beginning and during the period when Karen worked in the office and supervised his work closely. There is no dispute that Victor did commit many crimes but it happened at a much later date, way after Karen left the firm and stopped supervising his work. Victor decided to stay and commit the fraud because by then he wanted to open his own firm with Meng Fei and make big money. He said that during his work for the Liu/Moslemi firm for over

47

two years, he and Meng Fei spent at least two years to plan to open their own firm, as shown in the recordings. See tape 15 as DX28.

10.4. Victor's motive to cooperate with FBI

Defense was very superficial in cross on Victor's motive, and merely showed that Victor has the same motive as that of any other cooperating witness and failed to show the additional motive that was unique to Victor and played a more important role in his decision to cooperate with FBI.

Victor committed visa fraud, health care fraud and perjury in his citizenship application, but he was not charged with any of these crimes. Tr.760, Tr.771 Through cooperation with the government, he expected to get zero time in jail. He testified in Liying Lin's trial that pleading guilty before the district judge is nothing but formality and all one needs to say is yes. See 3503-123 at P234-236 as DX29-01. He never bothered to find out what was the evidence against him before he decided to plead guilty before the judge. Tr.658, and see also 3503-123 at P287 as DX29-02. Moreover, the overt acts listed in his information are the ones he had performed while working in the Giles firm in 2007. But by his own testimony, they are not accurate because he said he was only a translator at that firm. Even if he claimed he had committed hundreds of fraud while working for the Liu/Moslemi firm, he could not name a single one to put in his information. How come he can remember things that happened earlier but not later? Is his casual attitude toward pleading coming from the same belief that he won't be in any trouble no matter what he did as long as he has cooperated with the FBI? Victor said that he did not know that his interview in July 2011 was with FBI agents. But Meng Fei said Victor tipped her that FBI approached him two months before she quit the Moslemi firm, which was around August 2011. See 3507-16 as DX30. The FBI agent said Victor "was advised of their identity and the nature of the interview". See 3503-39 as DX26-03. Therefore, Victor either knew or guessed that the persons interviewed him in July 2011 were FBI agents. He decided to go to the interview with the FBI agents in November 2011, very likely knowing they were FBI. His cooperation with the FBI was planned a long time ago and was a very calculated one, in the sense that he was well prepared for this and he had a lot of goals to accomplish through this cooperation. He took files from the office since early 2009 to prove Karen's guilt. Tr.610, Tr.689. He talked to Meng Fei to cooperate with FBI if they were ever approached. Tr.685 He bargained with FBI to make sure his own interest would not be affected by the guilty plea. First, he made sure that he could apply for citizenship when he became eligible so that he would not be deported. Tr.680 On the one hand he testified vehemently that he had a great future in China and he never intended to stay here; on the other hand he wanted to make sure he would not be deported. He must also have bargained with FBI about his admission to the New York Bar after his graduation from law school. Otherwise, it would not make any sense to continue his law school knowing he could not become a lawyer in the future. FBI must have given him the promise that his interest would not be affected in any way by cooperating with the prosecutors. He decided to cooperate "immediately" as in his own word after he made sure that he had nothing to lose but everything to gain by cooperating with FBI. Tr.617. He is not naïve to believe FBI because we all know FBI is very powerful and can help get what they have promised to him. The only reason that he cannot apply for citizenship and

New York Bar now is the existence of this pending case. It is just temporarily on hold pending this case. Once this case is over, FBI will help him get both. Very likely because of the collusion between Victor and the FBI agents during the November 2011 interview, the prosecutors decided not to offer the interview notes. The prosecutors did offer the previous interview notes that happened in July 2011. See 3503-39 as DX26-03. Moreover, Victor said that he also made a written statement for the November 2011 interview and gave to FBI. Tr.711-712 The defense should ask Victor about all this evidence to show Victor's unusual eagerness to cooperate with FBI.

Victor started to take files and materials from the firm shortly after the firm's name change, which is in early 2009, until he was fired in November 2010, for the purpose of protecting himself if the firm got into trouble with FBI. What he actually meant is that he wanted to use these materials to prove Karen's guilt, thus earning himself the opportunity to cooperate with FBI. Tr.610. He also told Meng Fei to do the same and told Meng Fei to cooperate with FBI if they were ever approached by FBI. They did hand in to FBI all the files and materials they took from the firm. Tr.684-689 This shows his cooperation is a well prepared and well calculated one. Why is he so willing and eager to cooperate with FBI, almost looking forward to it? He had a lot of goals to achieve through the cooperation. It can be summarized in one sentence: he wants to use the FBI's power to wipe out all his potential competitors so as to clear the way for himself, to catch "everyone I can". Tr.668. Proof can be found from his activities after his cooperation. He decided to cooperate shortly before Thanksgiving of 2011. He started to record Ken Giles and Julie in December 2011. Considering he was attending law school and needed to prepare for finals in December, it was almost immediately after he finished his finals he started the recording. Then he recorded his coworkers at Moslemi firm at the New Year's eve party at Feng Li's home. He made sure that everyone who might be involved in the fraud was invited, including Wenting Zheng whom he did not even know. Then in early April 2012, he invited all the interpreters who helped applicants interpret at the asylum office for a party. He testified that his goal was to invite all the interpreters. See 3503-123 at P322 as DX31. Whether all of them have committed a crime is not a factor for him to consider. He must be very disappointed that not many interpreters were arrested and indicted in the end. He testified that he voluntarily wrote a lot of materials for FBI. And 3503-20 is one of the materials he wrote for FBI voluntarily. Tr.711-714. He worked even harder than FBI in the investigation against Karen and others as shown by the fact that he on his own initiative printed Karen's, David's, Giles' and another person's Linkedins from the internet and brought to FBI. See 3503-18 as DX32. This clearly goes beyond the scope of his duties listed in the cooperation agreement.

Even if Victor had admitted that he had committed hundreds of fraud, he was only charged with two counts of fraud. He knew clearly that it does not matter whether he had admitted two counts of fraud or 200 counts of fraud. If by lying about more frauds for a longer period of time can make Victor a useful witness for the prosecutors and can earn him the opportunity to cooperate with the prosecutors, he will not hesitate one bit. That was the deal Victor had been looking forward to for a number of years. He said he had great liberty in talking with the people he recorded as long as he could elicit the incriminating statement from them. He also had the great liberty to record anyone he

wanted as long as that person was not on the FBI's not to call list. This can be seen from tape 157, his call to Fulcrum on September 8, 2012. He called and recorded Fulcrum clearly on his own initiative because Fulcrum had cooperated with FBI since 2009 and recorded Victor many times before Victor recorded him. Therefore, it does not make any sense that FBI directed him to call Fulcrum. Defense should point out that Victor lied on the stand when he said that FBI decides who he should call. Victor recorded a total of 21 people during his cooperation.

Victor's motive can also be seen from the prior recordings. He had been planning to open his own firm for a long time and he was actively planning to get the market share that would be vacated by the FBI raid of the Moslemi firm. See DX28 and Tape 152 as DX33.

10.5. Victor's testimony on Karen's leaving the firm and transfer to Moslemi
This issue is crucial to the defense because the prosecutors claimed that this is only Karen's effort to conceal her fraud and jury must be very curious to know why Karen decided to leave the practice which is rather unusual. There is evidence in the recordings to show that Karen's leave is caused by the illness and death of her brother, her own health, the disciplinary action of the Bar and other reasons. The defense just failed to present any of these. The defense should also try to show to the jury that there is no simply evidence to show the transfer to Moslemi is Karen's effort to conceal her fraud. But defense chose to be completely silent on this issue in its defense.

Regarding the change of the firm's name, Victor testified that at the end of 2008 or the beginning of 2009, one day Feng Li came to the paralegal's room H and told them he read the news from ICE website about a Houston law firm being charged with asylum fraud, and it mentioned that they gave clients the materials of the 200 Christian Questions and Answers and one paralegal was taken back from Hong Kong. Victor said that Feng Li asked them to be cautious and Feng Li later reported to Karen. Victor said that at that time, firms in Maryland and Virginia were also indicted. See Tr.601. He said later a conference was called and several new matters were implemented such as not to talk to clients over the phone about the cases, and they began to shred stories and delete statements from the computers. In the beginning of 2009 the firm name was changed, and they did not tell him why but he figured out with Meng Fei that the firm's name change is for safety reason. Tr.602 The defense should point out that first there is no such a Houston law firm arrest in early 2009. The Houston law firm arrest happened in 2007 and conviction was in early 2010. See Houston firm case as DX34. It does not match the date given by Victor. There is no law firm arrest in Maryland or Virginia around that time either. Defense should also point out that in the materials Victor voluntarily wrote for FBI he clearly stated that the firm's name was changed in early 2009 and "in February 2009 Feng Li told them about the Houston case and warned them to be careful". See 3503-20 at P9-10 as DX35-01. Defense should also point out that Victor himself said in a recording by the FBI informant Fulcrum that Houston firm arrest happened in early 2010. See 3503-86 002 at P26 as DX35-02.  Also, clearly Victor did not have personal knowledge on why there is the change of the firm's name and he admitted that he was speculating that it was for safety reason. It was also clear that Karen was not in the office when Feng Li talked about the case with them in the paralegal's room. Otherwise, Feng

Li did not have to report to Karen later. Also, it was impossible that Karen would not join them when they had a meeting right outside her office. Clearly this meeting happened after the name change and after Karen left the firm and when Feng Li was running the office.

Victor met the prosecutors for more than 20 times throughout the cooperation and he never mentioned about the conference Karen called and the warnings given to them by Karen. Victor testified that he shredded the draft after he finalized changes in the computer. See Tr.572. He did not say he only started to shred the draft after the conference which happened after the Houston firm arrest. Defense should point out through questioning Victor that the firm always had the policy not to talk to clients over the phone about the substance of their case; it did not start after the Houston or Boston firm arrest as claimed by Victor and Meng Fei. It is there for a reason: contents of client's asylum application, especially the details, are highly sensitive and often very emotional. You don't expect client to discuss them in front of strangers or simply in the presence of others. Very often clients worked in the kitchen where it is chaotic and fast paced. It would cause great inconvenience to the clients and could also easily cause confusion and misunderstanding. Karen did not trust the paralegals can handle this properly and therefore just simply tell them not to talk to client about the substance of the case over the phone. Defense failed to point out that it is the general practice of many law firms and even the prosecutors did the same thing. They did not talk to Meng Fei or Victor about the very important and complicated issues about their cooperation over the phone and rather asked them to come to their office and talked to them in person every time.

Victor and Meng Fei both testified that nothing changed after the change of the firm's name in terms of the firm's operation and the firm was still operated the same way and Karen and David were still the boss. Tr.609 The defense should point out to the jury that the question is asking about the operation of the firm, and it is not surprising that the firm still operated the same way after the name change, and this by itself proves nothing about "the nonsense of the name change" as claimed by the prosecutor. Tr.2078 Probably most small immigration law firms are operated more or less the same way. The defense should ask Victor and Meng Fei the basis for claiming Karen is still the boss. After the change of the firm's name, Troy Moslemi joined the firm and Karen stopped coming to the office regularly and Karen's work was transferred to Feng Li and Feng Li started to review all the stories written by Victor and Meng Fei. Tr.1242, and see also 3507-01 at P3, 3507-02 P4 and 3507-20 P1 as DX36.

10.6. Victor's testimony on the opening of Bandrich firm
The defense was completely silent on this issue when the prosecutors were claiming it is Karen's another big effort to conceal her fraud.

Victor clearly testified that Harry and Yolanda were looking for office space and looking for lawyers to open their own law firm. Tr.605. He told FBI on many occasions that Harry and Yolanda were the owners of the Bandrich firm. See 3503-01 at P6 and 3503-07 at P2 as DX37. When he was asked the reason for the opening of the Bandrich firm, he speculated that the reason is for safety and to file more applications under a different firm.

He testified that the new firm took away over 100 cases from Moslemi firm. Questions should be asked to show it is Harry's idea to set up his own firm with Ms. Bandrich. The defense should object to prosecutor's question regarding the reason for opening the Bandrich firm. First, Victor already gave the reason, i.e. Harry and Yolanda wanted to open their own firm; second, the question clearly calls for speculation. Moreover, defense should point out that the prosecutors never produced any evidence to corroborate Victor's testimony regarding the number of cases taken away by Bandrich firm, and the defense should produce the list of all the cases taken away by Bandrich firm, and it is only about twenty some cases that Harry and Yolanda worked on at that time, not over 100 cases as testified by Victor. Defense should also ask Victor how that could accomplish the purpose of filing more applications if the new firm only took away over 100 cases when Bandrich firm was first opened and it was a one time deal. No evidence shows that the two firms shared any more cases after that and the prosecutors did not even make such an argument. In fact, both Victor and Meng Fei admitted the two firms are completely separate and did not share cases except the cases taken away in the beginning. Defense should also ask Victor whether it is normal for people to take away some cases they worked on when they leave and open their own firm, like in the case of Natalie Galvin. The prosecutors certainly did not claim that her firm is a branch of Moslemi firm.

10.7. Victor's testimony about his overhearing of David and Karen
The defense was completely silent on this issue in the cross when the prosecutors claimed that Karen was involved in the fraud from the very beginning. Also, as discussed in the prosecutorial misconduct section, the prosecutors manipulated the process to mislead the jury to believe that all the testimony is what the witness overheard when in fact it is only the witness' general knowledge.

The defense should ask Victor why the door of room I was left open usually? How about when Karen or David was meeting clients? Did it make more sense to close the door for privacy or simply to close out the noise and interruption? GX 134 shows the door was closed when David was meeting with Lin Chen and Lin Chen testified so too. Tr.1044 Defense should ask Victor about the distance between his desk to the desks in Room I and when he sat in room H, when he sat in room G and when he sat in room K. It is a busy office and clients tended to come in crowds in a narrow time span due to their same work schedule. They usually came between 12pm to 4pm. Lin Chen said there were always many people in the office every time she came. Tr.953. Defense should ask Victor about the office environment and should introduce Lin Chen and Meng Fei's recordings to show that the office was often very noisy and crowded like a market place. Defense should ask Victor how his working environment was like usually. Did he need to meet and talk to clients while David or Karen was meeting clients? Were other paralegals meeting and talking to clients at the same time in Room H? Were other people in the room also talking to each other or talking on the phone at the same time? At that time did he know he needed to listen to the conversations in Room I very carefully and memorize them for today's testimony? With about 5 meters in distance and a desk and a paralegal and often many people in between, in a very crowded and noisy environment, with many people talking, with him talking to his client at the same time, with no interest or intention to hear what Karen or David was talking to clients at that time, how much could

Victor overhear Karen or David? Defense should also point out in the closing that Meng Fei sat right outside the Room I near the door, much closer than Victor, but she admitted she only overheard "a few times", how could Victor overhear more often and more clearly? Very often clients retained the firm after several meetings and naturally at each meeting different things were discussed. How could Victor be sure that what information is discussed and what information is not discussed at the meetings with a particular client? Defense should also ask Victor why he never mentioned before that he overheard David and Karen talking to clients during his over twenty meetings with FBI and the prosecutors with the sole purpose of reporting Karen's crimes. Victor talked about a whole category of people becoming ineligible to apply for asylum due to a change of law and he said we put the case on hold to wait. He said if some clients really wanted to go ahead, we added something to show persecution or future fear. Tr.547. Defense should point out that from the answers Victor gave it is clear that he is talking about his own experience not what he overheard. Moreover, in Liying Lin's trial, Victor said he usually suggested Christian claim for clients who are young and had a high school education. See 3503-123 at P144 as DX38. Victor said in a prior statement that the firm declined a whole category of cases due to a change of law making them ineligible to apply for asylum. See 3503-20 P2 as DX39. He never said the firm added something to make them eligible as he testified here. If all or almost all cases are fraudulent as claimed by the prosecutors, why did the firm care about eligibility or put case on hold to wait for the law to change? They can just make up a claim that was eligible based on the existing law. Victor later said the meeting of new clients is brief and mostly about money issue. So even according to his own words, it is less likely to talk with clients about the various reasons for suggesting a certain claim and the change of case law. Tr.550. Victor admitted that paralegals did discuss persecution details with clients, contradicting his later testimony that persecutions were not discussed with clients by paralegals.

10.8. No Advertisement and the Referrals
Victor testified that the firm had no advertisement and clients came through referrals. He further claims that a colleague told him that this is for safety reasons. First it is hearsay. Second he was engaged in speculation here. The fact that the firm had no advertisement could have a number of reasons other than safety concerns. It could be the firm already had enough business and does not need to do more promotion. It could also be because the advertisement is not effective and referral is more effective. It could be simply because the manager is too lazy to renew the advertisement. Victor is also speculating that referral is safer than advertisement. Also, he contradicted his earlier testimony that Karen is very bold by openly inviting him to join the conspiracy when he was a complete stranger to her.

10.9. Number of Fraudulent Cases
In Liying Lin's trial, Victor said most of the cases he did were fraudulent. See 3503-123 at P140 as DX40. Now he said all cases except 20 had no actual claim and were completely fraudulent. About the 20 that had an actual claim of persecution, he said that he added false information to them and thus were also false. Victor never gave a single name of the clients for whom he prepared the fake applications except Xin Miao, not even the 20 clients Victor admitted they had an actual claim. He did testify about GX 517,

518 and 519 but none of them involved Karen. Victor said he did not ask clients about their persecution because they do not have any and he just made up a story for them. Defense should also ask Victor about the fake cases he did on his own after leaving the Moslemi firm and the fake cases he did for the Giles firm to show the fraud he was testifying about was based on those experiences. Tr.613 The defense should ask Victor how GX 517, 518 and 519 were identified by him and how many asylum applications the prosecutors had shown him.

The defense should impeach Victor in a number of aspects based on his own writing: He testified that he did not know his mother filed for asylum before he arrived in the United States and he did not plan to apply for asylum until he discovered his girlfriend's pregnancy after he arrived in the United States in July 2005. He also said that people have some degree of freedom and not a single Christian case he worked on is genuine. But in his own writing which seems to be used by him for his application to law school he described China as "the whole nation kidnapped by the Party" and he had problems with the Chinese government due to his "fighting against the Party and advocating the democracy" and his girlfriend's forced abortion is "the last straw that triggered my self-exile from our hometown where two generations of my family were persecuted by the same political entity". Clearly, he came here to seek asylum contradicting his testimony in court. He stated that "from my work [at the law firms], I gradually realize how vastly my fellow countrymen suffer from the despotism of the Communist regime." He further stated: "working with hundreds of clients from every corner of the world, my own country in particular, I am exposed to the suffering of ordinary people whose day-to-day struggles guide me to the social justice. Therefore, I profoundly believe I should be an activist rather than an advocate, especially when China is emerging as a global superpower that may be dangerous and destructive as its ideological predecessor. The only viable solution to help those victims from the largest human rights violator is stretching out our hands to them and telling them they are not alone. Unlike other politically standoff Chinese students who evade the uncomfortable truth in our home country, my conscience asks me thousands of times to do something for those left-behinds. I thus believe it's the time I shall move forward to a law school where I look to build my practice of law upon the pillars of compassion and humanity." See Victor's own writing as DX41. Here he clearly said that through his work at the law firm he met many "victims" who "suffer from the despotism of the Communist regime" and China is "the largest human rights violator", contrary to his testimony that virtually all applications are fake and few suffered persecutions in China.

10.10. Grounds for asylum for Chinese nationals
Defense should point out through Victor that there are only four grounds for asylum for Chinese nationals according to the asylum law. They are family planning, falun gong, religion and political opinion. People with other claims are not eligible for asylum. Victor said in a prior recording by government informant Fulcrum that the firm did not take China Democracy Party claims. See 3503-86 002 at P22-23 as DX42. Defense should ask him why. The reason is that the firm used to take cases where clients' claims were based on their participation in activities in the U.S. to advocate democracy in China but later found out their primary purpose was to get asylum and thus stopped taking such cases.

This will be a rebut to the prosecutor's fraud mill argument. Regarding Victor's testimony about the typical claim of each type of case, defense should point out there is nothing to indicate they are false and it simply states the main elements in each typical claim. The defense should also ask Victor to show that his mother and wife's applications are the same as these typical claims he described here.

Mr. Egan tried to put into Victor's mouth the words that Karen or David took cases where the persons came here for more than a year and advised them to provide documents or witness to prove they came here within a year. Victor did not say so but only vaguely said people in the office advised clients to provide one year proof. Tr.544 In 3503-20, Victor said the firm was very selective in taking clients and the firm never took clients who came here more than one year but less than ten years. For people who came here for ten years or more, they can apply for cancellation of removal, a special type of green card. See 3503-20 at P1, P3 as DX43.

10.11. Preparation of the Asylum Applications
In tape 152 recorded by Victor in August 2012, Victor said that Karen was completely out of the operation of the firm, not just now, but from the later days when he still worked for the firm, and he said that at that time the firm absolutely did not get involved in one year evidence and always let clients provide them on their own, and the firm let clients write their stories by themselves and the firm would not get involved. See DX33. In tape 15 recorded by Fulcrum on December 10, 2010 Victor said that Karen stopped going to court in 2008 and her job was mainly "to watch us".  Victor also said that Karen did not come to the office for a long time. Victor also said, "Now very few clients are able to see Attorney Liu. Clients have come to us for several months and they are still unable to see Attorney Liu."  See DX28. Defense should ask Victor about these recordings to show there is no fraud when Karen worked in the office and supervised Victor and after the name change in early 2009, Karen rarely went to the office and did not get involved in the operation of the firm.

Victor testified that the first step is to let client sign some papers such as the one-page disclaimer and the affidavit and he would also give clients the evidence list. Defense should ask Victor to produce the disclaimer and the affidavit and the evidence list and other documents he needed to let clients to sign or show them to Victor to verify and introduce them into evidence. See the disclaimer and affidavit and other forms as DX44, document list and client's information form as DX45. Defense should also ask Victor if he was given any written instructions to follow in preparing the asylum applications and if he was required to give clients written instructions on how to write the attesting letters by the family members and friends. See asylum preparation checklist and instructions to clients on how to write attesting letters as DX46. Defense should present such documents to Victor to see whether he acknowledged them or not. If he acknowledged them, ask follow up questions about each of them. All these various documents should be introduced into evidence through Victor. Defense should also go over the disclaimer and the affidavit and the evidence list and ask Victor to show that the disclaimer is actually called frivolous warning and it is actually part of the asylum application form. Defense should ask Victor if he knew that some immigration judges require the lawyers to let the

applicant sign a separate warning, i.e. the disclaimer and attach it to the completed asylum application. Victor testified that some clients did not want to sign the disclaimer and he simply told them it is a requirement of the immigration authorities. Defense should ask Victor when he had problems such as when clients were unwilling to sign the disclaimer or when he found out clients lived out of state, why he simply solved the problems by himself rather than went to ask his supervisor what to do. The truth is that either these things never happened and he just made them up or these things happened when Feng Li supervised him. Feng Li was very harsh to the paralegals and very lay back and gave them minimum supervision and let them handle most situations by themselves. Another reason is that Victor is a person of pride and did not like to report a problem to Feng Li who is of similar age to him. Therefore, Victor would rather solve the problems by himself than go to ask Feng Li. Defense should also ask Victor the names of the clients who were not willing to sign the disclaimer to expose his lie.

Victor testified that he was trained by Yolanda Gao. He said Yolanda gave him about 50 cases and told him the status of each case, and when he was writing a story, she would suggest to Victor which old client's story he should handle reference to. Defense should ask Victor whether this is training or more like a transfer of work since Yolanda was leaving as Victor testified. Tr.560 Usually most firms would not let a leaving employee do the training but every leaving employee is usually asked to do a transfer of the work on hand. Defense should ask Victor how long it took for Yolanda to transfer the work to him. Defense should also ask Victor questions to show that the training by Yolanda as Victor called it had nothing illegal or criminal. Reference to samples is a good way in learning new things. It happens all the time. When a new lawyer is going to write a brief for the appeal court, old lawyers may tell him/her to refer to a brief on a similar case he has written before as a sample. This by no means indicates fraud. Defense should also ask Victor if he had received any other training from anyone and whether he was given written instructions about how to prepare an asylum application and other written instructions for clients. This is another chance for the defense to introduce the documents it wants to introduce into evidence through Victor. Defense should also ask Victor who supervised his work and how they supervised his work to show to the jury that Karen only supervised his work and signed the applications up to early 2009.

Victor said "in the beginning, I tried to make my story more truthful and trustworthy." He specifically clarified that it was "in the beginning of my employment". Tr.556 "I tried to incorporate some true things happen in their life, in their story. "but later on, my stories pretty too long and some of my coworker complained". Tr.557 Victor said he did not ask clients about their persecutions because they did not have any, and he got the details for his stories from the samples and story-writing instructions prepared by Harry. Victor further said that he did not really need those samples because "I am really fluent in writing those stories." Tr.558 In answering a leading question, Victor said samples are previous clients' stories and he further said that "I can remember with at least my clients who has similar story with this client and I will reference these old clients' stories." Tr.559

There are millions of problems about this short testimony. First, Victor clearly said that by January 2006 he had no idea on how to write his own story for his own asylum application and it only has two sentences. Tr.487 He also said that Julie at the Giles firm did not teach him how to write stories. Tr.488 How could he suddenly become "fluent" in writing stories?  It must be some time after he was employed by the Liu firm. Moreover, he also said he has samples and the story writing instructions prepared by Harry to help him get the details for his stories. Harry's story writing instructions were prepared in 2009 after the change of the firm's name at a time when Karen stopped supervising Victor's work and Feng Li already took over. See Harry's story writing instructions as DX47. Defense should introduce Harry's story writing instructions into evidence through Victor and the computer record will show the document was created in 2009 after Karen left the firm. Meng Fei also clearly said that Harry's story writing instructions were created in early 2009 after the policy change. See 3507-01 at P3 and 3507-07 at P7 and 3507-05 at P4 as DX48. This is crucial to Karen's defense and supports her defense that Victor only started to write fake stories after Karen left the firm. Moreover, Harry's story writing instructions will show to the jury that they have nothing illegal or fraudulent in them. Victor also said he would reference to the similar stories of his own previous clients at the Liu/Moslemi firm. This is even more clear that it happened sometime after his employment with the Liu firm because he could not have his previous clients' stories to reference to in the beginning of his employment. It is further corroborated by Victor's testimony that Feng Li and Tom complained to him that his stories were too long. When Karen was his supervisor, Karen reviewed his stories and had the final say on his stories. At that time, Feng Li was not involved in any way in the preparation of the asylum applications before the court hearing stage, which was usually two or three years later. How did it come to Feng Li's attention that his stories were too long? Why did Feng Li and Tom complain to Victor but not to Karen? The only explanation is that Karen must have left the office by then and Feng Li was supervising his work and reviewing his stories.

Victor testified that clients just came to tell "us" their claims and then left. "Since they had no claim, I just made them up." Tr.561. Defense should ask Victor about his contact with clients after he was assigned the case. If the claim was already written on the file folder as he testified, why did the client have to come again to tell him the claim? He said that he did not ask clients whether they had persecution because they had none. How did he know they had no persecution if he "skip that" and never asked them? Tr.557

Victor also testified that he also wrote attesting letters in the name of the family members and friends and gave clients instructions on how to get them done properly. Defense should ask Victor why he never mentioned this in his prior 20 interviews and contacts with FBI. Defense should also ask Victor whether this is good evidence to give to FBI and why he failed to produce any of the draft letters since he started to take materials out from the firm since early 2009 as evidence for FBI to prove Karen's guilt. About GX 677/677T, the computer screen shot, defense should ask Victor whether he had any personal knowledge about this. Defense should point out to jury through questions that Victor did not know who wrote this draft and when it was written and anything he said about this evidence is pure speculation. In the direct, Mr. Egan kept saying "stories and

letters" in his questions about Karen making changes to his drafts, but Victor only talked about stories and never talked about letters and completely left the letters out of the picture. Tr.567-568. Questions should also be asked about other storywriters because Victor said other storywriters did the same and the only other storywriter in the same room with Victor is Meng Fei.

Victor specifically said Karen did three separate things when reviewing his story: "She would review them and make some change and give comments and sometimes she would rearrange story." Tr.567 Victor gave an example, that when he wrote a story, "I use Christian holiday Pentacost, and then Feng Liu comment Pentacost is too hard for our client to memorize. We always use Christmas or Easter." Tr.567. Defense should ask Victor details surrounding this issue and the name of the client. Only by asking detailed questions surrounding this alleged case can defense have a chance to expose his lie. Any worry about possible backfire is misplaced because things cannot be any worse than it already is. In answering the leading question "what other comments?" Victor was not really responsive and answered that "In the beginning, when I wrote those family planning cases I was not quite familiar about abortion because I was not a woman, and in our office, we have a colleague who used to be a family planning official, so they know about abortion more detail than I, so they would make some change to make the abortion part in the story more real." Tr.568. Victor then said the colleague is Lilian Miao. Tr.569. The question asks for "other comments" but Victor talked about changes made to his stories. Most importantly, Victor was talking about "in the beginning". If it is in the beginning when he started to work for the Liu firm, which was in July or August 2008, he was working under Karen's supervision and Lilian had not come to the United States yet. Karen left the firm in early 2009 and transferred all her work to Feng Li, and Lilian came to the U.S. on May 19, 2009. How could Lilian make the abortion part in his draft more real "in the beginning" of his employment with the Liu firm? Either Victor was lying and such things never happened or this happened "in the beginning" of his starting to write fake stories, which happened some time after Karen stopped supervising his work and Lilian came to work for the office. Either way, it did not happen when he worked under Karen's supervision. Defense should also point out that it is unreasonable that Victor did not know the abortion process since his girlfriend suffered a forced abortion according to him. In answering a leading question about "other type of details she would change", Victor answered Karen would change about persecution when the persecution he wrote was not severe enough. Tr.568 Defense should ask Victor more details about this answer such as what specific changes Karen made to which cases, etc. to seek the opportunity to expose his lie. Victor explained that "sometimes we lower down the persecution because I say, for example, we say client locked up in jail for 30 days or couple months, that could be very hard for the client to explain their jail time before immigration judge, how they spent time there, what's their cell look like, what they eat every day, how their life was spent every day. So we lower down to make a couple day, two weeks. Make client easier to answer the question in future." Tr.568 Here Victor used "we" did this and that rather than "Karen" did this and that and Victor failed to give clear fact of what actually had happened such as "I wrote this way and Karen changed to that way". One reads this testimony and is still not clear whether he actually wrote that client was locked up for 30 days or couple months. It is very hypothetical in nature. In contrast to Victor's failure to

give clear fact, he gave very detailed explanation on why we should not write this way and why we should change it to that way. This is more like he is showing people how to write the correct story and what factors one should consider. It is more like that he was talking about his own thinking for writing this way rather than that way. No where did he say Karen made this change and told me such and such reasons for making this change. Victor always feels very good about his writing skills and he bragged it on many occasions. See 3503-50 at P5-6 as DX49 and also see DX33. He especially likes to use every opportunity to show people the skills he has on how to write a good story. He gave a long explanation on why he usually wrote simple stories for his clients and which factors should be avoided. See Tr.569-570. Defense should point out these things to jury through questioning him. Moreover, the reasons given by Victor for shortening the detention time is very idiosyncratic. It is only his own belief and it does not make much sense. Regarding those questions to be asked by the immigration court about the conditions during detention, being detained there for two weeks makes no difference from being detained there for two months in terms of the applicant's ability to answer those questions. Victor is clearly talking about his own experience of writing and revising stories he wrote for his own clients because he focused on the reason for the change and gave detailed explanation for why the change should be made that way. If he testified about what changes Karen made to his stories, he would naturally focus on the changes, not on why such changes were made. Victor said Karen made the changes on his stories in writings on his draft. Tr. 571. So it is not very likely that Karen gave so detailed reasons for why she made the change on his draft and the reasons Victor testified are most likely from Victor himself. Victor claimed that Karen rewrote the whole story for Xin Miao's case. Defense should ask Victor as many questions as possible to expose his lie and should also ask him why he failed to produce the drafts since it will be the best evidence to prove Karen's guilt. Defense should also point out that Victor failed to produce anything to prove even the existence of Xin Miao's case. It certainly is not a difficult thing to do since the prosecutors did produce a number of asylum applications of other applicants.

Both Victor and Meng Fei testified that when Karen made the changes to the story, she did not talk to client to get the information. This issue is crucial to Karen's defense because reviewing and revising their drafts is not a fraud by itself and it is only a fraud when Karen did not get the information from clients and made them up instead. Defense should ask them questions about this to show they could not have personal knowledge about it and their testimony is nothing but their bare assertion. First, they never mentioned this in their prior interviews with the prosecutors. Second, they did not even know when Karen made the review after handing the draft stories for her to review. And they did not overhear all Karen's meetings with clients. So how did they know for sure that Karen never met this client before in the initial meeting, and how did they know for sure that Karen did not talk to clients over the phone or called clients in to have a face to face talk when she reviewed the story? It is true that clients needed to come to Karen's room through their room. But they were busy with their own work, and their job and interest were not to monitor Karen's contact with clients and memorize them because they did not know at that time that they would testify about this five and a half years later. Karen met clients in the initial meetings, talked to clients over the phone and sometimes

59

called in clients to interview them again. How could they know for sure that Karen did not talk to clients when she made the changes?

## 10.12. Shredding of documents

Defense should also ask Victor about the shredding of the draft stories because it has a legitimate reason. To keep them in the file sometimes caused confusion and mistakes because it happened before that the draft version was submitted by mistake rather than the final version. And the draft contained client's private and sensitive information and you did not want to just throw them in the garbage can directly. Defense should point out that it is a common practice for many companies, not just the law firms, and law firms have a stronger reason to shred the documents before they throw them away. Defense should also point out that the first time Victor said he shredded the draft stories he did not say he only started to do this after the Houston law firm case and after directions were given by Karen, contradicting his later testimony. Tr.572, Tr.602 Defense should also ask Victor about his claim that a lot of one year evidence is fake. Defense should point out that he has no personal knowledge about it and he contradicted himself in the prior statements where he stated that the firm never took clients who came here for more than a year but less than ten years. See 3503-20 as DX43.

## 10.13. GX302 Package

Regarding GX 302 series, defense did a terrible job. Had it asked the search agent about the package thoroughly, the prosecutors would not have the opportunity to distort it and mischaracterize it again through Victor. The prosecutor let Victor present the incomplete package to the jury and speculate on how this package was used by the firm. Tr.574-578 Defense should discover the prosecutor's omission and make sure that jury was presented the complete package of GX302 and shown the true nature of this package. Defense should point out to the jury through questioning Victor that this 302 package is sent by a family from China for a specific client Mr. Zhu on September 10, 2009. This package has never been used for Mr. Zhu's case and that is why it is still in the office when FBI raided the firm. Defense should also point out to the jury through questioning Victor that there is a timing issue in filing asylum applications and some of these documents are out of date and could never be used for any case since they were more than three years old by the date they were seized by FBI in December 2012. Defense should also point out to jury through questioning Victor that the three small envelopes in the package only have postmarks but no stamps and thus they could not really be used as proof that letters were sent from China using these envelopes. Defense should point out to jury through questioning Victor that these small envelopes are not really necessary because the big EMS envelope is sufficient to show where this package of documents comes from and the firm showed to the immigration all the time that the letters also came through the EMS envelop along with other documents, as shown by GX 923. Defense should also ask Victor why this is the only package that was seized by the FBI if it is a common practice as he claimed that the firm let clients fill in blank documents to support their cases, and why the FBI failed to seize any such documents which are current and is going to be used by clients. Victor would admit that the firm certainly had a busy practice and many applications were in the middle of preparation on the day of the FBI raid, is it strange that the FBI in their raid could not find even a single package which is current and is going to

60

be used to commit the fraud? Defense should also ask Victor that in a prior recording he himself admitted that the firm never helped clients prepare fake documents. See DX13-02.

## 10.14. One year witnesses

Victor testified that the one year witnesses were fake because the relationships between the witness and the applicant are not close as he observed. Defense should object to Victor's testimony as opinion and question him on the validity of his testimony. Tr.579 Clearly client or the witness did not tell him that the witness is a fake witness and it is only his speculation. If the story was made up by Victor including the date of entry, did Victor and client both know the witness is fake and why did Victor need to rely on his observation to guess it is a fake witness and why did the client not simply tell Victor the witness is fake? If he did not know the witness is fake as indicated here, it means that the case is not fake at least in regard to the date of entry. Victor also testified that some one year witnesses showed up many times to testify for multiple clients. First, does this necessarily indicate fake witness? Second, defense should question Victor about the details such as the names of the witnesses and the clients who used them. He also handled this as part of the asylum preparation and he had no reason not to remember the witnesses' names if they appeared many times for multiple clients. Defense should also ask Victor where is the documentary proof since he took many from the office starting from early 2009 and handed all of them to FBI.

## 10.15. Three Asylum applications identified by Victor

About GX 517, 518 and 519, Victor testified that they were fake applications. Tr.581-584 Defense should first object to this evidence as not relevant to prove Karen's guilt because there is no evidence to connect Karen to any of these applications. Defense should also point out that the prosecutor failed to produce any of these applicants to testify and Victor's testimony was not corroborated at all. Defense failed to question Victor on these applications to try to expose his lie. Defense also failed to point out that GX 517 was prepared by the immigration law firm Kuzmin and Associates when the applicant moved her case out to that firm after the FBI raid of the Moslemi firm, and the applicant verified with her new lawyer that everything is true in her application. See GX 517 as DX50. Defense should also point out to the jury that these three cases are selected out of the hundreds that were shown to Victor by the prosecutors. Defense should also object to the prosecutor's question that GX517 and GX518 are very similar, calling for Victor's opinion rather than personal knowledge. Defense should also point out to the jury that similarity is okay according to the law due to applicants' similar experience of persecution from a certain area, as acknowledged by Ashley Caudill-Merillo. Defense should also point out that Victor's wife's asylum application is also similar to GX517 and GX518. Regarding GX519, Victor said he coached the applicant for the asylum interview and they made up the details together for the interview. First, Victor's testimony is not corroborated in any way and he may be lying. Second, the fact that the applicant did not know details does not necessarily indicate fraud. It really depends on how much detail you are demanding him to go into. Even for the extremely important things in your life, you can still forget the extreme details after a while. For example, many mothers may not remember the exact birth time such as the hour and minute of their children after many years even if they may often be reminded at their child's every birthday. Human beings'

memory has a limit and different people at different age are also different. Here, it is not clear how much detail Victor was demanding of the applicant. Victor and his wife could not give details of their own persecution either at their asylum interview even if they are well educated and articulate people, and he claimed that his asylum application is true despite his and his wife's inability to give details. See 3503-71 as DX51.

10.16. Alleged Fake marriage and training of Kevin

Victor testified that David arranged fake marriage for a client named Lu Yan. Defense should ask Victor about details to show he has no personal officer knowledge and it is his pure assertion. Victor clearly made up testimony as he said that "during the preparation, I remember David Miao and Feng Liu asked me couple times about the process of the preparation and how good she is, how likely she will win, which officer she met, this kind of question. " Tr.585 Since his job for a long time is to prepare clients for asylum interviews and as interpreter for the interviews, it is easy for Victor to make up some testimony like this. But lie is a lie as shown by the phrase "which officer she met". He is clearly talking about "during the preparation" and how could David or Karen ask him "which officer she met"? No one would know which officer she would meet before the interview because it is randomly assigned and even with Victor's tricks he could not control this matter. Defense should ask Victor on whether it is Karen who sent him to the asylum office and the reasons for sending him there and whether he was told to do anything fraudulent. Victor testified that he prepared a lot of coaching materials to be used to coach clients for the asylum interview. Defense should point out to the jury through questioning Victor that he prepared these coaching materials after Karen left the firm and it is clear from his testimony that he did it on his own initiative. For example, he said Feng Li prepared a religious one and he first used that material and then found out that it was inadequate for asylum interview, so he prepared his own materials for the asylum interview. Tr.594-595 Also, he was bragging that he was really creative and directed clients to watch the related Christian movies. Tr.597 Also, in Liying Lin's trial, he was asked in direct why he prepared these materials he answered the purpose is to improve efficiency. He never said Karen directed him to do it. Tr.596  Only in answering a leading question and a question without a foundation, "did anyone ever instruct you to prepare different or better material for the asylum interview stage?" Victor said Karen directed him to do it. He is clearly lying. Reading his testimony from Tr.591 to Tr.597, one would clearly see that Victor was doing all the things related to his asylum office translation on his own initiative, not under Karen's direction. Defense should point out that no corroboration was produced to show the materials he prepared. Defense should also ask Victor questions to show he did not have personal knowledge about how attorneys' prepare clients for court hearings and also to show that Karen was not involved in any way in the client's preparation for asylum interviews and for court hearings. Victor testified that Kevin was first trained as a coach by Lilian and Lucy and then in May or June 2010 Harry and Yolanda called Victor to come to Bandrich firm to train Kevin a couple of times because Kevin is still inexperienced then. Defense should point out to jury that Kevin came to the U.S. in April 2010 and then went to work in a Chinese restaurant in upstate New York and did not start to work for Bandrich until 2011.

11. Cross Examination of Meng Fei Yu

11.1 Deficiencies in the areas covered in the cross

For both Victor and Meng Fei, defense acknowledges that they have committed fraud. The only issue for the defense is to show that they had committed the fraud, not when they worked with Karen but at a later time after Karen left the office and no longer supervised their work. Defense started with Meng Fei's cooperation and her recordings of Karen and pointed out that FBI did not direct her to do more recordings after that. Defense went into great details about the recordings to show a small point: Karen was not avoiding Meng Fei and was willing to talk to her and Karen did not incriminate herself when Meng Fei asked whether the applications were still the same. Defense failed to point out that Karen told Meng Fei to make sure clients would not lie in court and should always be honest, and if they do not know the answer to a question, they should just say so. Defense failed to cross Meng Fei effectively on the most crucial part where the prosecutors later argued that Karen admitted the fraud. Tr.1620-1624. Defense simply asked Meng Fei whether she meant that if client got caught, the client would lie and push blame on her. Of course Meng Fei said no. Defense should ask her whether what she said here can perfectly be interpreted to mean when getting caught for lying client would push blame on her and it does not necessarily mean Meng Fei indeed helped clients file false applications. If Karen knew she was engaged in fraud in the firm and her worries and stress were caused by her involvement in fraud in the firm, would Karen feel strange when Meng Fei said she was willing to do any kind of work in the office such as preparing clients for hearings and working on applications rather than going to court? Would that mean she would be engaged in more fraud and thus cause her more worries and stress? As the defense correctly pointed out, why did the FBI not let Meng Fei say to Karen clearly the following: since we have made up the story and we coached the client what to say, I am worried that client will suddenly tell it to the judge in court? Since Meng Fei had already told them Karen worked together with her in preparing false asylum applications, Karen had nothing to hide from Meng Fei about this matter. Defense should also provide some background on this issue such as the worries, concerns and embarrassment she talked about in direct when representing clients in court where the applications have many mistakes. Tr.1265. Defense should also point out that Ms. Bandrich showed the same worries and fears when representing clients in court where there are lots of mistakes in the applications, as shown in the conversations between Ms. Bandrich and Meng Fei. See GX133 at P5-7 as DX52. It has nothing to do with attorney's involvement in fraud. Judges are harsh and paralegals and clients are careless and mistakes are often made. Attorneys are the ones to bear the consequence of the mistakes in court. Moreover, clients often blame attorneys for anything that goes wrong. As attorneys, they usually take the false blame for their clients rather than disputing it before the judge which may very likely cause the clients to lose the case. They may be scolded by the judge or even be reported by the judge for disciplinary actions. How about clients falsely accusing their attorneys of making false applications for them when the client was caught in court lying in his/her asylum application? It has never happened to the Liu/Moslemi firm but it is possible and it is the nightmare of every immigration lawyer. Karen shared the same feelings with Meng Fei and Ms. Bandrich and that was why she did not respond. Meng Fei knew that Karen shared the same feelings and that was why she talked about this in the recorded conversation. There is not much the lawyer can do about it other than letting clients sign some papers. Attorneys have to live with it

63

or don't go to court at all as decided by Meng Fei here. Defense should also point out that this recording does not show that Karen was running the office, let alone being engaged in any fraud activity of the office. In the recording, Karen basically said she rarely went to the office. All one needs is one glance at the office database to know the general work flow of the office. Hiring her back and telling her about her job duties indicate nothing about Karen's involvement in the daily operation or the asylum application process. Defense then revisited the issue why Meng Fei did not make more recordings of Karen when she had plenty of time and opportunity to do so. From Tr.1593 to Tr.1628, defense used about 35 pages of the total 80 pages to achieve very little in impeaching Meng Fei's credibility or in eliciting any evidence to support the defense theory. Then defense talked about the bad case and asked for the name of the client. Defense used four pages to talk about the bad case Meng Fei signed and said that client admitted to the asylum office that everything was prepared by the office and was false. Tr.1629-1632. Defense failed to do two things here: impeach her credibility for her failure to remember the name of this case by pointing out to the jury that her memory is not reliable on other things she testified such as the conversation she overheard, the changes made by Karen on her stories. If she could not even remember the name of one client that caused all her panic for a long time and she met this client and she read her applications after she learned the trouble in the summer of 2011, why should we trust her on her recollection of things that happened more than five years ago and which she really did not pay attention to at all when they were happening? Defense should also show her the bad case to impeach her testimony. There is such a case but the situation is totally different from what she said, to further impeach her credibility and to show to the jury no fraud in that case. Defense then talked about Meng Fei's decision to stay after realizing fraud in the firm. Tr.1633-1638. The defense completely failed to achieve any purpose other than repeating Meng Fei's testimony on the direct to reinforce it. Defense failed to impeach Meng Fei by using the variety of evidence available in the 3500 materials to show to jury that her decision to stay shows that there was no fraud when she first worked for the Liu firm. Then, from Tr.1639 to Tr.1651 defense asked Meng Fei about her employment in a law firm and whether she lied in her application for that job and whether she lied in her bail modification to allow her to go back to China to work. Defense also pointed out that she lied in her bar application. Defense should ask Meng Fei this question when it asked her decision to stay to commit the fraud to show that it is very irrational and thus unlikely for her to stay to commit crime to ruin her future as a lawyer. Then, defense asked Meng Fei about her signing the asylum applications and committing perjury by signing them. Defense should point out through document and recording that she was required to review before she signed them and she chose not to review them before signing them. This issue will be discussed in more details later. Then, defense asked Meng Fei briefly about the inconsistency between her testimony and the prior statement 3507-01 where she said clients wrote their own stories. Then defense briefly asked Meng Fei about her contact with James Lin, the translator. Then defense asked Meng Fei about the recorded conversation between her and Feng Li talking about whether Karen taught them how to write stories and both said in the recording that Karen did not teach them. Then, defense briefly talked about a recording where Meng Fei was engaged in a conversation with others and it was said that all blames should be pushed to Karen if the firm ever got into trouble. In sum, compared with the full range that should be covered in the direct, the

defense only covered a very small portion of Meng Fei's testimony in a random, superficial and piecemeal fashion. The cross failed to impeach Meng Fei's credibility and failed to elicit useful evidence to support the defense theory. Defense failed to cover and should have covered the following areas in its cross examination.

11.2. Meng Fei's Motive to Cooperate with FBI

Defense should ask Meng Fei about her family background and life history to show that she grew up in a well-to-do family, to establish the fact that she had no financial pressure by also showing to the jury her family payment of her tuition bills as high as $60,000 and all her travels across America, to show to the jury that she came from a different world from the firm's clients and she did not know them and did not want to know them and did not want to help them. She did not enjoy working with these clients and on March 21, 2012 in her meeting with FBI agents Shen, Park and DeGraff, she said that "most clients were Fujian Chinese who were rude and uneducated". This will explain her lack of sympathy and care for the firm's clients and her impatience in dealing with them. She did not want to spend the time and energy to dig out client's experience of persecution.

Defense should ask Meng Fei why she decided to stay here to commit crime after she realized fraud in the office not long after she started to work here as she claimed. As discussed above, she certainly did not stay here out of her love for the job. She did not work here for money as she stated in 3507-02 at P13 as DX56, nor did she work here for legal status since she had one year valid visa. Tr.1202 Even if she wanted to work in the U.S., she had a whole year time to look for another job. Moreover, at that time she had no long term plan to stay in the U.S. See DX28. Also she said that her classmates returned to China after graduation and did very well in China. See GX 154B at P22-23 as DX53. She had many options available to her and there is no reason to explain why she had to stay in the Liu firm to commit crime to ruin her whole future, especially her salary was very low in the beginning. She studied criminal law and was seeking to become a lawyer at that time. She knew it is a crime to file false applications. She said she worked here to prepare for the bar exam. In fact she took two months off to prepare for the bar exam. So her explanation did not make any sense. She also said that she needed to work here to maintain her legal status because later her husband joined her here, but her husband came to join her here two and a half years later in February 2011. Firm's clients, whom she thought "rude and uneducated", did not choose to commit crimes to earn easy money to pay their heavy smuggling debts even if they were in a much worse position than her. Why did she choose to stay here to commit a crime for no apparent reason? Is it because she did not care at all about committing crimes or there was no crime at all in the Liu firm at that time? The only possible conclusion is that there was no fraud going on in the firm during that time. Things went wrong at a much later time after Karen left and Meng Fei committed the crime at a later date after Karen left for which she was charged. By then she not only did not want to leave the field she also wanted to dive into it to open her own firm. See tape 15 as DX28, and 3507-08 at P3 as DX54. In the same recording she said that the market for asylum is huge and so many firms do asylum cases and they all have business. She also said that some clients refer new clients to her for a side business and the record shows that she did file a number of asylum applications on her own even during her work in the Moslemi firm. After she got caught, she lied by claiming that she

committed the fraud along with Karen in order to get herself the deal with the prosecutors so as to get herself off the hook to avoid first the jail time and then deportation and to achieve her other more important goals.

She claimed that her job is to prepare false asylum applications for firm's clients. But she never filed an asylum application for herself. If she dared to break the law to file false asylum applications for clients for the meager salary she earned and risked to go to jail, why did she not file false asylum applications for herself? The only explanation is that in the earlier stage when she worked here, there was no fraud and it did not occur to her to file a false asylum application for herself. Later when she was involved in preparing false asylum applications for clients, it was too late to file for herself because her name was well known in the asylum office with her signing many asylum applications for the firm's clients. That is why she was seriously thinking to file asylum application for her husband, but for some unknown reasons she never filed for him. See 3503-87 Session 4 at P7 as DX55 and also DX28.

Defense should ask her about her discussion with Victor about getting prepared to cooperate with FBI long before FBI approached her and the preparations she made for the cooperation. Defense should also ask her about her first meeting with FBI to show she was ready and very willing to cooperate and she was really looking forward to it and did not even bother to look into the evidence against her before she decided to cooperate. Tr.1279

Defense should ask her why she cried when defense counsel Mr. Maher described to her how the jail cell looks like and the possibility of her going to jail. Did she cry because she was scared by the picture depicted by Mr. Maher? She could choose to stay in China and not return. She had broken the law so many times, who in the world will believe that she chose to come back because she made a promise to the court to come back? She clearly had some other stronger reasons to come back such as the desire to stay in America and making sure the defendants all go to jail. See 3507-04 at P13 as DX56.

Defense should show to jury that Meng Fei grew up and attended college in China and attended graduate school in another city in the U.S. and came to the U.S. only for a few years by the time she cooperated with FBI. Defense should show to jury that her coworkers at Moslemi firm are her major social circle and close friends in New York and show the jury how they socialized with each other in the evening and during the weekends and holidays as shown in the recordings. Defense should go over all her sting operation with all of her coworkers to show that immediately after her cooperation she was actively stinging all her coworkers and she did not even spare the ones who had already left the office, and FBI probably did not even know who they are and where they are. It is clearly all her own idea. It happened soon after her former coworkers Winnie and Wenting held a birthday party for her. See 3507-03 at P1 as DX57. Ms. Bandrich trained her for court hearings and invited her to meet her family in Miami, bought her dinner because she was not working then. But Meng Fei knew very well that Ms. Bandrich is in a much worse financial situation than her: she needed to pay student loan, to support her family and her husband did not have a job. Meng Fei should appreciate the

kindness and the strong emotional ties Ms. Bandrich showed to her. What did she do in return? She still sat there and recorded her and kept probing her trying very hard to elicit incriminating statement from her even after Ms. Bandrich repeatedly said things that clearly showed she had never involved in any fraud. Moreover, she did not have any guilty feeling because she was simply doing it under FBI's instruction and thus she did not think it is a deceit. Tr.1367 Defense should show to the jury her betrayal of Feng Li. They were very close. They had dinner together, party together, watched movie together and played poker together very often as shown by tape 98 and other recordings. Feng Li treated her as one of his closest friends, if not the closest friend as shown by tape 167. Feng Li left for China in February 2012 and came back in July 2012 for a short visit to meet his residency requirement for being a green card holder. Meng Fei would not miss the opportunity and reported to FBI about Feng Li's visit and recorded him three times (tapes 137, 138 and 139) during his two weeks short visit. See 3507-14 at P1 as DX58 Even if Meng Fei failed to get any incriminating statement from Feng Li during those recordings, she still did not stop her effort to get him.  By December 2012, Feng Li had already found a very good job in Shanghai and was considering to switch to an American law firm in China. Meng Fei found out about his schedule to come back for a short visit and reported to FBI about Feng Li's trip. Meng Fei not only reported to FBI about Feng Li's visit she also assisted FBI to arrest Feng Li by making a false appointment with Feng Li on the day of his arrest asking him to wait outside his apartment building for FBI to pick him up and called FBI to confirm that Feng Li was arrested as shown in Tape 167 in her recorded conversation with Wenting Zheng. See DX59. On the same day when Feng Li was released on bail, he went to see Meng Fei to seek her help for his bail as shown in Tape 167. In all of Meng Fei's efforts to incriminate him, she never succeeded even once as the tapes show. But that does not matter to Meng Fei at all. She is determined to send Feng Li to jail. Meng Fei does not care whether Feng Li has committed a crime or intended to commit a crime. It is not the thing that matters to her. Meng Fei did the same thing to Wenting Zheng, who is another close friend to Meng Fei. In addition to the parties, dinners and hanging out, she and Wenting went shopping together, did hair together and did a lot of other things as intimate friends would usually do together and all these are shown in tape 124. However, Meng Fei did not feel the least qualms when she recorded Wenting. By the time Meng Fei cooperated with FBI, Wenting just started to prepare the false asylum applications and Wenting was working part-time and was thinking to quit. Meng Fei did not have to tell Wenting about the FBI investigation but she could tell Wenting to stop doing any illegal things, and not to break the law. After all, the whole purpose for this investigation is to stop the crime, not to encourage people to commit crimes. But she did nothing like that. Now, Wenting will be deported and can never come back but her husband refuses to go back with her because his business and career is here. Wenting and her husband are fighting for a divorce and the custody of their son. A family will be broken and their one year old son will be doomed to grow up either with no mother or no father around. She recorded telephone conversations with Feng Li a few days before the arrest and every day for three days after his arrest, and she called Winnie on the next day and third day of the FBI raid and she called Wenting Zheng on the third day of her arrest as shown in tape 167. In those recorded telephone conversations, she asked why Moslemi, William, Lucy and Ann were not arrested and was very disappointed about it. It may be a noble thing to cooperate with the law

enforcement to catch criminals. It is a totally different thing to go around stinging all one's best friends in a fishing expedition hoping to get incriminating statement from them and never thought to stop even if she failed again and again. She was actively involved in incriminating all her close friends and put in great efforts to send them all in jail. Meng Fei's activities clearly show that she has gone far beyond merely performing her duties under the cooperation agreement, just like Victor. Fear for going to jail alone definitely cannot explain why she is so actively involved. What really motivates her is that she was trying to sell all her good friends for a good price, such as a S visa to allow her to stay here permanently. Moreover, her hatred and morbid jealousy for others also played a very important role. She cannot tolerate the idea that her friends like Feng Li and Vanessa are doing better than her and will be doing much better than her especially after she is charged with felony. The only way to bring down all of them is through the hands of FBI. Meng Fei can betray all her close friends with no guilty conscience at all. Of course she will have no difficulty at all to testify against Karen, her prior boss, with all the lies as long as she can send Karen to jail. Her desire to live in the United States and her desire to send everyone to jail explains why she decided to come back from China, not that she is a noble person keeping her promise as the prosecutor wants the jury to believe.

More support for the above argument can be found from Meng Fei's attitude to the plea. During the direct, when Meng Fei was asked about the charges she had pled to, she did not remember. Tr.1281 Considering the fact that she is a lawyer, it is even harder to understand. This shows she did not care about the charges she had pled to because of two reasons: she knew she wouldn't go to jail by cooperating with the government and she knew that using the government's power secured through her cooperation was the only way to get her a green card and to bring down all her friends and enemies.  Because there is no action of fraud during the early stage she worked for the firm, she just randomly made up two overt acts in her information containing the charges. It said that she prepared false applications in January 2009 when she actually was on leave to prepare for her bar exam, and that she coached clients for court hearings in January 2010 when she was barely admitted to the bar and was still preparing asylum applications.

More support can be found by the number of crimes she was charged as compared to the number of crimes she admitted. She was only charged with one count of fraud when she admitted she had committed hundreds. And she expected zero jail time. She knows clearly that it really does not matter at all how many frauds she has committed for how long a period of time. Therefore, if admitting more frauds for a longer period of time than it really is can make her a useful witness for the prosecutors and thus enable her to get the deal with the prosecutors to save herself from jail and deportation and to get herself a green card and meanwhile to bring down her former boss, she will jump at the deal and she does jump at the deal as the fact shows her eager and willing she is to cooperate with the FBI/prosecutors. By cooperating with the FBI/prosecutors, she gets the immediate benefit of staying and working here indefinitely and traveling abroad freely and probably getting green card someday by the category S visa for working with the law enforcement. She clearly enjoys a greater right than the green card holders like Feng Li who, with a felony conviction, cannot travel abroad and return. Prosecutors refused to permit Karen to have a vacation with her family in the U.S. and refused to return Wenting's passport to let

her have a brief vacation with her family in California but went through all the trouble to get some kind of travel document for Meng Fei so that she could go all the way to China to work there while on probation. Why is there this huge difference in treatment? Because prosecutors know how willing, eager and strongly motivated Meng Fei is in helping them prosecute the defendants with her lies and thus making herself extremely useful to them. They have colluded together. They know for sure that she will come back. They did similar favors for Victor. If Meng Fei told FBI honestly that she did not commit the fraud while working with Karen, she would be of no use to the prosecutors and could not get the cooperation agreement and all the benefits that go with it and all the goals she wants to accomplish through the cooperation will not be achieved. In light of her betrayal of all her close friends with no guilty conscience at all as she testified, will she care a dime to send Karen to jail with her lies? Of course not.

All these facts lead to one and only one conclusion: Meng Fei did not commit the fraud while she was working under Karen's supervision and she committed the crime some time later after Karen left. But in order to get the deal to cooperate with the prosecutors, she had to lie about committing fraud with Karen to save herself and to bring down all her friends and enemies through the hands of FBI.

## 11.3. Meng Fei's Immigration Court Experience

Defense should, through questioning Meng Fei, point out to the jury that the firm provided a full range of immigration service and other legal services in addition to asylum. Defense should also point out to the jury that the adjudication of asylum applications relies heavily on the applicant's testimony as compared with other types of immigration petitions which are usually adjudicated by reviewing the documents submitted. Defense should also point out to the jury that lawyers only played a very limited role in the adjudication of the asylum applications. Evidence shows that in the firm, lawyers never got involved in the asylum interviews. Defense should ask Meng Fei about the job duties, the qualifications, the diligence and the great power of the immigration judges and government attorneys, who are always vigilant in detecting fraud and have great latitude in probing for the truth and often question the applicants rigorously. The Immigration Judges watch the applicants closely in court including whether they are responsive to questions and their demeanors. Defense should point out to jury that Judge Rohan mentioned by Ms. Bandrich in the recording, is a highly respected judge in the immigration field and she had been a judge for over forty years and is known for being strict and fair. Defense should point out the different roles played by the judges and government attorneys to accomplish the same goal: to safeguard the integrity of the asylum law and to give protection to those applicants who have a genuine claim and are eligible for asylum, and make sure no asylum is granted to those who are not eligible and to detect and punish those whose applications are fraudulent. Defense should show to jury through questioning that in the immigration court the burden is on the applicants to prove they deserve protection and it is very difficult to win asylum even for those who have a genuine claim. In immigration court, lawyers really cannot do much for their clients. All the lawyers can do is to guard for procedural fairness. Lawyers cannot ask leading questions, nor can they ask questions without foundation. They cannot ask the same questions again and again. Clients really play the most crucial role in getting

asylum. They take the witness stand and testify about their persecution and answer all the questions. Moreover, clients do not know English, have very limited education and while preparing for the hearing, still work 16 hours a day in a restaurant under terrible working conditions and face huge financial pressure and psychological pressure for fear to screw up and to be deported back to the miserable world they have fled from. Compared with our clients, Meng Fei is in a much more advantageous position than them. She is well educated, knows English well, has millions of experience in the adversarial system, has no financial pressure, no psychological pressure because if she screws up her testimony, she does not have to worry about any severe consequence as long as the prosecutors believe she does her best. Defense should ask Meng Fei to see how many times she has been prepared, how many times she has been asked leading questions, how many times she is not responsive, how many times she has gone off the script. Defense should ask her how well she has done as compared with her clients. The conclusion is: It is nonsense for the prosecutors to claim that the firm duped the asylum officers, the government attorneys and the immigration judges in helping the firm's clients get asylum with a fake claim. Defense should point out to jury that because of the extreme importance of the client's performance in winning asylum, the absence of clients from the whole trial shows the severe deficiency of the Prosecutor's case.

11.4. Family Members Working at the Firm
Defense should ask Meng Fei about family members working at the firm to show to the jury that when she started to work here only David and Harry worked here and both are very qualified for the work they were doing, to show also that all the other family members never worked for the Liu firm and they came to work for Moslemi firm after Karen left and it is David's idea to let them work here and he did this upon Karen's objection. See 3507-08 at P5 as DX60. And the reason is that he grew up in extreme poverty and the whole family worked together for mere survival and they shared the same clothes and the same bowl of rice. Moreover, he is the oldest sibling and the only one to attend college. So David felt that he had to take care of them including offering a job for them.

11.5. All the Cases Prepared by Meng Fei
Defense should first ask her about the office database she mentioned in 3507-20. Every case is imputed into the database. It has recorded everything about a case, including the paralegal assigned to the case. Defense should ask her how many asylum applications she prepared in total and how many of them Karen reviewed, and ask her all the cases she prepared. Defense should ask Meng Fei all the real cases and ask her to point out which ones are completely real and which ones had false details added and what details she added to which cases. Defense should ask her about all the cases she made up for clients and how Karen reviewed and revised each of them. Defense should ask her whether she remember a few specific cases which are really special to her and she should have remembered. Defense should ask her why she could not remember things that happened very recently about this case after her cooperation with the prosecutors since she said "I don't remember" many times during the cross. Defense should ask Meng Fei about 3507-23 about the cases she remembered and all the cases she did not remember at all to show two things: she admitted that she knew nothing about the cases not prepared by her, and

in the many cases shown to her by the prosecutors she pointed out who were involved in writing the stories and who were involved in reviewing and revising them and never said that Karen was involved in any of them. See 3507-23 as DX61. Defense should also ask Meng Fei about her signing all the asylum applications to show as early as in 2010 Karen often did not come to the office and only gave her the general level instructions, few and in far between over the phone, and to show she showed a very irresponsible attitude as compared with other lawyers in the firm in terms of putting their signature to something. Tr.1253

11.6. The Change of the Firm's Name and Related Issues
There is no evidence elicited here to show that the change of firm's name is Karen's efforts to conceal fraud and Meng Fei testified that the name change happened prior to Boston case, contradicting Victor's testimony that it is a Houston firm and the name change happened due to the Houston case. Nor is there evidence to show that Karen implemented the new policy. Moreover, Victor never testified about any new policy in 2009 after the name change. See the following details regarding this issue.

> Q: Was there ever a time that people at the firm took steps to protect itself? Tr.1271. [A leading question]
> A. In early 2009 Ms. Liu changed the firm's name under Moslemi. In 2011 she asked Harry to create a new firm. Tr.1271.

She is not really responding to the question. Concern here is caused by the bad case in 2011 but Meng Fei responded to the name change happened in 2009. And how did she know these are the steps taken "to protect itself"?

> Q. Anyone ever told you about the name change? [Another leading question]
> A. Feng Li and Victor.
> Q. What did they say?
> A. He said Ms. Liu doesn't want to attract the government's attention because the firm is so big, they have so many cases.

Who is talking, Victor or Feng Li? Victor said he and Meng Fei figured out by themselves, i.e. they guessed together and had no personal knowledge on this matter. How did Feng Li know? He also guessed? He certainly did not say Ms. Liu told me. Assuming it is true, does this necessarily indicate fraud? Whoever said it simply said "have so many cases", not "have so many fake cases". Also this is hearsay and it is statement not made in furtherance of the conspiracy, more like a gossip.

> Q. What if anything, happened around 2009 that led to some of these changes? Tr.1272 [another leading question, and Mr. Egan wanted her to talk about the Boston arrest.]
> A. I came back from the bar exam and the firm name was already changed. [not responding to the question]
> Q. Was there ever a time where other changes were discussed or implemented? [another leading question]
> A. Yes, yes. [very excited for remembering the script] In 2009 one day Feng Li came to our paralegal's office and he said an immigration office in Boston was cracked down by the government because they were doing the same thing like we

71

did. He was scared and then he talked this issue to Harry. I believe he also talked
to Ms. Liu about this case. So later the office policy changed. Tr.1272

Defense should clarify with Meng Fei that the name change happened before the Boston
firm arrest as shown by the above testimony and 3507-02 at P7 where Meng Fei stated
clearly that the name change happened prior to the Boston case. See 3507-02 at P7 as
DX62.  Defense should also ask Meng Fei why Victor said Feng Li talked to them in the
paralegal room about a Houston case, not Boston case. Defense should also ask Meng Fei
why she did not produce the Boston case to corroborate her testimony as she said in
3507-02 at P7 that she "later googled it and found Li's information was correct". See
DX62. Moreover, defense should point out to the jury there is no such Boston case
around this time and there is a Houston case but it happened in 2010 and should produce
this case as impeachment. Defense should also clarify with Meng Fei on when Feng Li
talked to the paralegals in room H, clearly Karen was not in the office because clearly
Karen was not present at this meeting. Karen came to the office every day before the
name change as Meng Fei testified earlier. So this confirmed that this meeting happened
after the name change because Karen stopped coming to the office regularly after the
name change.

Defense should also ask Victor and Meng Fei regarding the requirement of hand copying
by clients of the finalized statement and point out through questioning them that the
reason is to force the applicant to review the final statement closely to see if there are any
mistakes or inaccuracy, contrary to Meng Fei's testimony. Meng Fei first said that Karen
asked Ann to delete the materials from the files in 2009 "shortly after the policy change",
when Ann was still in China at that time, and Ann came into the U.S. on May 19, 2009
and started to work for Moslemi in 2010. See 3507-01 at P4 as DX63. Later Meng Fei
changed the time to the summer of 2010, a year and a half later after the policy change.
Tr.1275. It is also questionable how she got the knowledge since by then she became an
attorney and moved to the attorney room F and there is no overlap between her work and
Ann's work. Defense should point out to jury both in crossing Meng Fei and in the
closing that Victor and Meng Fei's testimony are contradictory to each other in several
crucial aspects: Houston firm v. Boston firm, whether firm's name change happened
before or after the Houston/Boston firm case, any policy change after the firm's name
change. Defense should also ask Victor and Meng Fei that since they started to take
documents out from the office to protect themselves and as evidence to prove Karen's
guilt as early as 2009, and they later handed those documents to the prosecutors,
where are those documents now and why there are no such draft stories and letters or
computer printout of the clients' stories and letters produced for jury. Tr.609, Tr.684-689,
Tr.1276.

Meng Fei said she did not remember who implemented the policy change about letting
clients write their own stories and not talk to clients over the phone about their cases.
Tr.1273. Meng Fei also testified that the translator always deleted the story from the
computer after he finished translation. Tr.1275, and see also 3507-20 at P6 as DX64. She
did not say it only happened after the Boston firm case as claimed by Victor. Defense
should point out that it does not make sense to delete the statement from the computer

because the hand copied version and the computer version are exactly the same and there is nothing to hide even assuming there is a fraud.

11.7. The Opening of Bandrich Firm

Q. Do you remember when the second office opened? Tr.1347.

A. You mean Vanessa's office? [Meng Fei did not understand "the second office" because it is known to everyone that it is just Bandrich office, not the second office of Moslemi.]

Q. Did you discuss with anyone at the Fengling Liu law firm why that happened?

A. Talked to Feng Li and Vanessa. Vanessa said Ms. Liu asked her to open the firm and she is hesitated due to pressure and stress. Feng Li said we had too many cases, attract lot of attention of the government. Liu even sent someone to court to see how many cases we had every day in comparison to other firms. So we want to start a new office and separate the case to that new one. Tr.1347.

Defense should ask Meng Fei about all her prior statements regarding the relationship of the two firms. In her prior statements, Meng Fei said on many occasions that: Harry is the owner and he left his sister's firm to form his own. At the beginning, Karen would send many cases to Harry's firm because many clients trusted Harry while Harry was the receptionist at Moslemi firm. Later, the two firms were completely separate since Karen had to pay Bandrich extra money when she asked Bandrich to help with her firm's cases. Harry also secretly stole some of firm's clients. They are completely separate now. See 3507-01 at P5, 3507-02 at P18, 3507-09 at P7-1, 3507-17 at P2 as DX65. She stated the same in the various recordings such as Tape 15, GX 127 and 133. Defense should point out that since Feng Li left the Moslemi firm when Bandrich firm was opened and what he said regarding the opening of the Bandrich firm is hearsay because it was not said in the course of or in furtherance of the conspiracy. Defense should also point out that no evidence is ever introduced to show that Karen opened Bandrich firm to conceal the fraud and how that purpose can be accomplished since the two firms are completely separate and do not share cases except in the very beginning as the evidence shows.

11.8. The Preparation of the Asylum Applications
(1) Training received by Meng Fei

A. When I started working at this firm, Ms. Liu trained me and showed me which documents I should ask the client to view or sign. Tr.1233.

……..

Q. You mentioned earlier you were trained by Ms. Liu. How did she train you?

A. She showed me some – on the first day I started working, she handed me a bunch of old cases. She said I need follow-up evidence for those cases.

Q. Follow-up evidence?

A. Yes. Those packages were not completed. We would ask the client to provide more evidence for their cases. Then she explained to me a form we should ask the client to fill in and sign with information, I should pay more attention, and she asked me to read the stories, yes, that is how she trained me. Tr.1236-1237

Defense should ask Meng Fei about details of the training process and whether Karen asked her to read only the stories or the whole files and why Karen asked her to do so to show to jury that to learn the big picture and to review a few good whole files is a good way to start to learn a new field and there is nothing illegal about it. Defense should also use this opportunity to ask her about the forms she was showed to ask clients to sign and introduce those into evidence for defense. Defense should also ask Meng Fei whether she was given any written instructions and any specific procedures for her to follow in preparing the asylum applications by showing her the document. Defense should point out to jury that Karen had never taught Meng Fei to do fraudulent asylum applications but rather to require her to follow a strict procedure to make sure she get complete and accurate facts for the case. Meng Fei herself acknowledges this in the recordings. See tape 15 as DX28.

(2) Overhearing David and Karen

Meng Fei said "I only heard a few times." Tr.1223 Defense should question her on this issue to show to the jury that in a noisy and crowded environment while herself working and talking with clients at the same time, it is not likely that she could overhear much or overhear most of the conversation,  let alone the whole conversation. Meng Fei also said most of the time it was David who met new clients. Karen met clients only when clients insisted to see her. Tr.1208-1209 If Karen did not meet clients often, how many times she could overhear her out of the total of "a few times"? In two of her multiple prior statements, Meng Fei mentioned overhearing David but never mentioned overhearing Karen. She only added Karen at the trial prep. See 3507-01 at P2, 3507-20 at P2 as DX12. Moreover, Meng Fei said on two occasions that Karen only reviewed application forms and statements. See 3507-08 and 3507-14 as DX66. Defense should point out that for the first half year of Meng Fei's work for the Liu firm David sat in Room E and Karen was in Room I and only after Karen left the office did David moved to Room I. So if she indeed overheard Karen, she should overhear Karen first and then David. That is the chronologically order. But here she said she overheard David and only at the trial prep she suddenly added Karen. Defense should also ask Meng Fei why Karen only met clients when they insisted to see her and what Karen did with her time since she worked in the office everyday and reviewing and revising paralegals' drafts would not take all her time. Hopefully Meng Fei could not deny that Karen met clients on a regular basis when she worked in the office, and during the first year or so after Karen left the office, she would come to see a new client once in a while when the new client was brought in by Karen's friends or by old clients who became Karen's friends and they insisted to see Karen. When Karen came back to meet new clients by appointment in this way, she shared Room I with David on those occasions.  Defense should point out that the prosecutors wanted to maintain a hard balance here: on the one hand, they want to say that Karen participated in the fraud from the very first step---giving false consultation to new clients and assign a false claim; on the other hand, they want to say that Karen made substantial edits of the stories without getting information from clients. The solution they have found is that Karen meets clients occasionally and persecutions are never discussed during the meetings.

The whole overhearing thing is a fabrication of Meng Fei and Victor at the suggestion of the prosecutors. Neither Victor nor Meng Fei could overhear a whole meeting. Maybe on some rare occasions they could overhear a sentence here and there. By no means could they overhear the whole conversation from the beginning to the end. Even assuming they could overhear the whole conversation for one meeting, it is completely impossible that they could overhear all the meetings with the same client every time. Very often, clients may come for consultation several times before they finally retained the firm. Definitely not the same things were repeated every time. How could she know for sure that persecution was never discussed? How could she know that David and Karen just assigned a claim to clients without determining their eligibility first? Many people came for consultation but never retained the firm. How could she know for sure that David or Karen took those cases where the clients came here for more than a year? Defense should make these points clear to the jury through cross.

Defense should press for specifics regarding exactly what was said and by whom at each meeting she overhead since it is "only a few times". It does not make sense to talk in "would". It does not make sense to ask the witness "why" such advice was given by David or Karen. The only possible testimony can only be that she either overheard David or Karen to explain "why" or she did not overhear. She should testify about the things she heard. If she did not, she should just say she did not. The "why" question is very improper here, calling for witness' speculation to mislead the jury. Tr.1225 When Meng Fei was asked to clarify who was giving the advice to new clients, she answered it was David and Karen. Tr.1228. Defense should question her on the details of these meetings and why David was in Karen's room and whether they two gave client consultation together or she was talking about separate occasions when they gave client consultation separately. Defense should introduce the intake sheet with Karen's handwriting to impeach her on her testimony that persecution was not discussed. See the intake sheet as DX67. Moreover, defense should point out that she was contradicted by Victor who said persecution was discussed at the initial meetings but not in details.

(3) The Preparation of the Asylum Applications
Regarding client's address, Meng Fei said many clients lived out of state and she simply asked them to provide a New York address. Defense should point out no evidence shows that David or Karen was involved in this in any way. Defense should also ask her what would happen if the immigration officer or judge found out they did not live in New York. The case would be transferred to the place where the client actually resided. It is not a fraud. Ashley Caudill-Mirillo admitted this. Tr.200 Victor also said so in the recordings. See 3503-86 003 at P19-20 as DX68.

Regarding GX 921, defense should point out through questioning Meng Fei that some immigration judges ask the law firm to document the warning it has given to its clients before they sign the asylum applications. See GX 921 as DX69. This affidavit is for this purpose among other things. Defense should also point out that Meng Fei speculated on the reason why the firm asks clients to sign it and should try to elicit the real reason for doing so. One of the concerns is to protect the law firm in case some clients would push

all blame to the firm when they were caught lying in their applications in court or filed false complaint against their lawyers after they lost their cases for whatever reason.

Regarding preparing the applications, Meng Fei testified that when she started working at the firm, she asked clients questions about their persecutions. Later on when clients could not tell her about their persecution, she jumped to the conclusion that they did not have real persecution so she just found out what claim they would pursue and made up a story for them. She stopped asking them about their persecutions. In making up the story, she said she would consider their life experience and background. By background she means age, marriage, work and education. She failed to explain what she meant by life experience. Tr.1233 When asked how she incorporated the background and life experience into the story, she answered: "you know, can I think about it? Tr.1233. After a pause, she answered: "I would just, for example, they start from the city of Fuchin. I would say that she was leaving there or working there --- sorry --- she was working there and living there, she met a boyfriend and blah, blah, just using that information and made up a story." Tr.1233-1234 Defense should point out through questioning that if she wrote fake stories on a daily basis for hundreds of cases as she testified, why did she need time to think how she wrote a fake story? Defense should also point out that her answer is really very vague and not coherent. Defense should also ask her whether she agrees that details are extremely important in determining credibility of the testimony and that is how she required her clients to do in immigration court and her testimony here failed that requirement.

> Q. Would you typically in these meetings ever discuss the facts of their persecution? Tr.1234
> A. No.
> Q. You mentioned at the beginning you used to ask them questions?
> A. Yes.
> Q. What was your experience when you asked them questions like that?
> A. I would ask them tell me what happened to you, how you were persecuted or how you were arrested, tell me something. I remember the first case, the new case David gave me, that is a female applicant applying for asylum. Her claim is family planning. She told me the story she had a boyfriend and she got pregnant before marriage, the guy just give, gave her a forced abortion, and I wrote what she told me. Later on many people cannot tell me what happened, so I know there was no persecution to them, and I just, based on my previous year's experience, I just made up the story for them. Tr.1234
> Q. When you said they can't tell you what happened, what do you mean? What would they say if you asked them? Tr.1235
> A. Sometimes they just said I don't know how to write. Ms. Liu said you would help us. I don't know about the asylum or persecution, just tell me what I should do. Tr.1235

Here Meng Fei testified that she used to ask clients questions about their persecution and she prepared application based on what they told her. Things changed later when many people could not tell her what happened. Defense should ask her "later on" is how long

after she worked here. Could it be after Karen left the firm and stopped reviewing her work? Since it is "many people", it must be after a while since she started to work here, otherwise she could not have encountered many people who could not tell her what happened to them. Again, it related to when this happened. Moreover, defense should point out that at no place did Meng Fei say that clients told her they had no persecution. It was just that they could not tell her what happened and she concluded that they had no persecution and stopped asking them and just made up stories for them. Defense should point out that simply because clients could not tell her about their persecution it does not necessarily mean they had no persecution. There may be other plausible explanations for that inability. Defense should point out through questing Meng Fei that both asylum and persecution are complicated legal terms and there is a whole body of case law to explain what persecution is. So it is not surprising at all if client did not understand those terms. Client was puzzled and asked her: "just tell me what I should do", not "I have no persecution, and just make up a story for me."  Defense should also point out that when clients hired you as their lawyer, you have the obligation to present the case in the best way you can. That by no means means you break the law by writing a false story for client. If you do not work diligently to ensure the quality of work, the client may file a complaint against you and even the immigration judge may scold you for the sloppy work. In fact, the immigration judge may even report you to the disciplinary committee. That never means the judge is asking for fake asylum applications. You need to put in a lot of efforts and time, patience and care in order to prepare a good asylum application. You give client five minutes and throw to him complicated legal terms coldly, showing no patience or care. Before he can digest what you have said, you have already jumped to the conclusion: you have no persecution. I will take the short cut and make up a story for you.

Meng Fei said she just made up a story for client. How?  "I just based on my previous year's experience." Again, this related to when her fraud happened. Defense should point out to jury that this is her first job and her "previous year's experience" in writing stories can only refer to her experience in this firm. Therefore, it must have happened some time after she started working for the Liu firm. Karen only worked with her a little over four months from August 2008 to mid December 2008 because Meng Fei took a long leave to prepare for the bar exam and left in early January 2009 and came back in early March 2009, and Karen left for vacation around mid December 2008. Very clearly she was talking about the year 2009 or sometime  after that. And she did testify that in 2009 Feng Li started to supervise her work. Tr.1242 She gave even more details regarding when Karen left and when Feng Li took over in her prior statements. See 3507-01 at P3, 3507-02 at P4, and 3507-20 at P1 as DX70.

> Q. If they did not provide the details of the persecution, how did you know what to write? Tr.1235
> A. When I started working, Ms. Liu asked me to look at old files, and we had some samples in our computer.
> Q. Samples?
> A. Yes.
> Q. What do you mean by samples?

A. The samples were created by some people in the office, Harry or somebody else. For each claim, each category of asylum claim there was a sample story, like the first paragraph introduction of this applicant and the second paragraph is what happened to this applicant and where they were arrested, how they left the country.
Q. The item you're describing was a sort of model that was available to you?
A. Yes.  Tr.1235

Here Meng Fei talked about samples prepared by Harry. Victor called it story writing instructions, which is more accurate. Defense should point out that it was created in 2009 after the name change and after Karen left the office. Meng Fei stated clearly in her prior statement that the samples were created by Harry after the policy change which was in 2009. See 3507-01 at P3 and 3507-07 at P7 as DX48.  It was the time when Feng Li was supervising her work and reviewing the stories prepared by her and Victor. Clearly she was not talking about the time when she worked with Karen.

Q. How closely would you follow the language of the stories that you were basing it on? Tr.1236
A. I would use – I never used the same language or sentence, but I used the pattern, the logic of those stories.
Q. You said the same pattern?
A. Yes.
Q. When you say a pattern, what would be a typical pattern for, say, a family planning claim?
A. Family planning claims for females, forced abortion; for male, their wife suffered a forced abortion and they want to protect their wives, they say officers would detain them. It was always the same pattern.
Q. What about for Christianity claim?
A. They went to private church. They don't allow private church in China. The church cracked down and they were arrested and detained, beat up and they left the country to pursue their freedom of religion. Tr.1236

Here Meng Fei clearly means the format of the samples when she said "pattern". Defense should point out it is the same as when a lawyer refers to a sample brief before writing one for the first time such as a brief for the Second Circuit. There is nothing illegal here. Her answer about what is a typical pattern of a family planning story and a Christian story further illustrates that she simply used the samples as a format to help her learn the structure and components that needed to be included in the story. Again, there is nothing illegal here. The only thing that makes it illegal is when the story is not based on what has happened to the applicant but is made up by her.

Meng Fei said she realized that the applications were fake a few weeks after she worked there and when being asked the specific instance that caused her to find out, she answered that Victor told her. "He told me many cases are not true. Then I got more and more clients, when I asked them what happened to them, they cannot tell me the answer. So I felt they never had persecution." Tr.1237

If she really gets no facts from clients and simply made up stories for them, how could she not know they were fake? Why did she need Victor to tell her that? The only explanation is that she did not make up the story for clients, at least not at the time when Victor told her. This is corroborated by her testimony that first Victor told her and then she had "more and more clients" and when they could not tell her their persecutions, she "felt" they never had persecution. "more and more clients" clearly indicates time, meaning as time goes on. It refers to some time later. Again, clients never told her they had no persecution, and she just guessed. In her prior statement, she clearly said that clients wrote their own drafts and she said that "most of the stories are ok" and she "would ask clients questions to fill out the details". See 3507-03 at P10 as DX71.

Regarding letters, Meng Fei first said applicant's family and friends need to write the letters to support the application.
> Q: Who would write these letters? Tr.1239
> A. Anybody can write them. What do you mean? I am sorry. Tr.1239

This is Meng Fei's first response. Only after Mr. Egan suggested the answer by a leading question, did she change her answer and say that she drafted them.

> Q. After you were done typing up the story and the letters, what would you do with it? Tr.1242
> A. I would print them out, hand them to our clients. Then they will send those letters back to China and ask their families and friends to copy the drafts by hand, then mail back. [She is clearly only talking about the letters.]
> Q. Before that step, did your letters and stories have to be reviewed by anybody? [leading question]
> A. Yes, Yes. After I wrote a story and attesting letters, Ms. Liu or other attorneys will review them. [She said two "yes" to show her excitement for remembering the script. She just copied the answer suggested by the government.]
> Q. When you first started at the firm, who did most of the reviewing?
> A. Ms. Liu.
> Q. When did you start giving to other attorneys?
> A. In about 2009, Feng Li took over the job. He reviewed my stories and Victor's stories. Tr.1242. [That happened after the name change. The exact time is February 11, 2009. Please note that Meng Fei only mentioned "stories", not letters.]

In all her prior statements Meng Fei never mentioned that the letters were reviewed by the lawyers. Every time she talked about the review by attorneys, she only talked about the stories. She said after the name change, Karen stopped coming to office on a regular basis and delegated story review responsibility to Feng Li. See DX70. Meng Fei clearly said during the time frame from early 2009 to about May 2010, Feng Li reviewed all the stories written by Meng Fei and Victor. See 3507-20 at P1 as DX36. And later when Meng Fei talked about the mistakes often made by paralegals, she gave an example of mistakes in the letters where the letter said that the applicant was detained for 6 days whereas the story said 8 days. She said such mistake was made because the paralegal was careless. She never said lawyers were careless in reviewing the letters and failed to detect

the mistake. Tr.1337   The above testimony also shows something did change after the firm's name change. For one thing, her supervisor changed. Another obvious change is Moslemi joined the firm.

> Q. And in your experience, even after 2009, would Ms. Liu still review letters and stories? Tr.1242-1243 [leading question]
> A. Yes.

Meng Fei didn't even bother to repeat the suggested answer, let alone to elaborate. As shown by the testimony few lines above this, Meng Fei said Feng Li took over the review job and reviewed all the stories drafted by her and Victor until May 2010. By then, Meng Fei became a lawyer and no longer wrote stories and moved to Room F. If Karen did continue to review the stories and letters, when? And how did she know? Moreover, in her prior statement, she said Lilian reviewed the stories and never said Karen did. See 3507-20 at P5 as DX72. In her another prior statement, she was shown a long list of asylum applications and she pointed out who were involved in the review and never mentioned Karen in a single application out of the long list. See 3507-23 as DX61. Defense should really question her to expose her lie since this question is so crucial to the defendant and no matter what she would say will not make things worse.

> Q. So what would she do with the letters and stories? Tr.1243
> A. She would review the logic and language.
> Q. The logic and language?
> A. Yes, yes. And at an early stage of my early stage as a paralegal, I don't have experience. Sometimes logic of story doesn't sound credible.
> Q. When you say the logic of the story, what do you mean?
> A. I mean I made up the story so sometimes it doesn't sound like a real story. So the logic is not sounds like a real story. Tr.1243.

First, please note again that even if Mr. Egan kept including "letters" in his question, Meng Fei just ignored them in her answer. She only talked about the review by Karen of the stories.

When new paralegals first started to help clients prepare the statements, the most common mistake is they would leave many questions unanswered and fail to put in the relevant information and include a lot of irrelevant information in the statement. Here, Meng Fei really did not explain clearly how "the logic of story doesn't sound credible" and how Karen changed "the logic and language" to make it sound credible. It is very vague testimony. When she was asked to elaborate on her answer, she simply said "I didn't mention the clients was beat up so severely, but she would just add the sentence to describe how or when and how the client was beat up." Tr.1243. Here she basically said Karen added details about the beating which has nothing to do with the change of the "logic and language" of her story. She still failed to explain how Karen changed the "logic and language" to make it "sounds credible, sounds better". Tr.1244 She also failed to give the name of the client or other specifics about the case. Defense should ask her questions to get more details and her lie would surely be exposed.

Q. Were there any other details of the story she would change?
A. Yes. A few times, she change the claim completely. Tr.1244.

Here, Meng Fei is not really responsive to the question because the question asked for "other details", but her answer is clearly not about details Karen changed. Meng Fei here gives an example where Karen changed the claim from family planning to Christianity. One thing strange about her testimony is that Karen never told her why the claim needed to be changed and why Karen did not let her do it. Rather Meng Fei found out from the client accidentally a few months later. Just a few lines above she said Karen told her the changes she made on her story is to make the story "sounds credible, sounds better", showing Karen did not hide the fraud from her but rather committed the fraud with her, then why did Karen not let her continue with the case when the claim was changed? The only plausible explanation is: such a thing has never happened. And she failed to give specifics about the case such as the name of the client. Moreover, assuming what she said indeed happened for argument's sake, she clearly did not have personal knowledge about what actually had happened to that case and she was simply speculating. She said this kind of thing did not happen very often. So she should have a deeper impression of it and at least remember the client's name. Defense should really question her to expose her lies.

Meng Fei testified that during her work at the firm she did not know any applicant who had submitted forged certificates. Tr.1239 She stated the same in her prior statement. See 3507-02 P11 as DX73. But she later contradicted herself by saying that the one year evidence such as receipts and airline tickets are obtained by clients' family members in China and they are fake. Tr.1247 It is not clear how she knew it, told by clients or just her guessing? She also said the firm took many cases where clients came here for more than a year and they found witnesses to prove they came here less than a year, and some witness testified for several clients. Defense should ask her where her knowledge came from and ask for specifics such as the names of the clients or the names of the witnesses, at least the one or ones who testified for several clients to examine the validity of her testimony. Defense should impeach with her prior statement 3507-01 at p7 where she said "clients all wrote down they had been in the U.S. for less than a year". Defense should also point out that there is no evidence to show that Karen knew there was document fraud or witness fraud going on in the firm even assuming what Meng Fei testified is true.

Meng Fei also testified that she was told over the phone by Karen to sign the asylum applications and she was not authorized to review those applications. Therefore, she knew nothing about those applications she signed. She also said that in 2010 Karen did not come to the office very often so they communicated over the phone. Tr.1253 Defense should question her on the signing of asylum applications without reviewing them because she said that she was not authorized to review them. Does it make sense? Why is that? Did she ever try to find out why? Did she feel comfortable putting her signature on a very serious document without reviewing it? As an attorney, she should know that whenever she put her signature on something, she should first make sure what it is. Even a lay person knows that whenever he or she put the signature on something, he or she is basically saying he or she is responsible for it. That is exactly how the other attorneys in the firm such as Robert Valane acted. He freaked out when he found out the package of

documents submitted to court he reviewed and signed contained mistakes. See 3507-14 at P1, and GX 139 at P16 as DX74. Defense should also use this opportunity to elicit more evidence regarding Karen's level of involvement in the firm and show to the jury that as early as in the year 2010 Karen was not physically in the office and did not manage the day to day operation, and only gave the employees general level instructions few and in far between through the phone. Defense should further point out to the jury that even if the prosecutors located the complete phone record of the firm, they failed to submit any evidence of telephone record to show how often Karen communicated with the office.

Meng Fei testified about the four asylum applications shown to her by the prosecutor and she testified all of them were made up by her and were fake. Her testimony is very general in nature and vague. Defense should point out to jury through questioning Meng Fei that Karen was not involved in any way in any of these asylum applications and they cannot use them to prove anything about Karen's guilt. Defense should further point out that Meng Fei was either lying or remembered wrong at least about GX513, one of the four cases, by pointing out that it was not prepared by her at all and show the documentary evidence to impeach her. Moreover, she was wrong in testifying on Tr. 1255-1256 that the applicant told her that his aunt would write a letter for him so she wrote his aunt introduced him to the church. The applicant's statement (GX513) shows his maternal grandmother introduced him to the church and his aunt was not a Christian and did not go to church with him. Defense should also ask her how many cases she was showed by the prosecutors and why only these few were identified by her as fake. Defense should ask her about her prior statement where she pointed out who were involved in which case and she never said Karen was involved in any of the long list of cases showed to her by the prosecutor. See 3507-23 as DX61.

When being asked twice with leading questions, Meng Fei answered that the firm had some materials to prepare the clients for asylum interviews. She mentioned Falun Gong materials and religious materials prepared by Victor. Defense should also question her about her identification of all client preparation materials where she identified them as prepared respectively by Feng Li, Victor and Harry. All of them were prepared after Karen left the office and none of them was prepared by Karen, and she did not say that any of them was prepared under Karen's direction either. There is no evidence even to show that Karen knows the existence of such materials. See 3507-05 at P4 as DX75.

Meng Fei talked about preparation of clients for asylum interviews and for court hearings. Defense should ask her that the prosecutors probably spent more time to prepare her than the time she spent to prepare the firm's clients to show it is really part of the normal process for court hearings. Defense should also ask her about other attorneys working in the firm and how closely they have worked with clients to show to the jury the very fact that other attorneys are not charged with any crime and are still practicing in the immigration field is a rebut to the prosecutor's claim that the firm is a fraud mill. Defense should also ask her about the bad case and present the file to her to show to the jury what Meng Fei said is not true. The defense should point out to the jury that the FBI has investigated the firm through the New York asylum office for a number of years and had the full cooperation of the asylum office, and this client is just one of the many

unsuccessful attempts made by the FBI against Moslemi firm. If there was indeed such a client who admitted to the asylum office that her application was fraudulent, asylum office would definitely notify the FBI and refer the case to them. Meng Fei testified twice that one day Karen came to the office and talked to Feng Li and her and comforted them trying to calm them down after the bad case happened in 2011. Tr.1268, 1334, Defense should point out that she was contradicted by her prior statement where she said this comforting talk happened after the Boston case in 2009. See 3507-03 at P3 as DX76.

About Meng Fei's testimony on GX 407, 408 and 410, which are materials seized from the Bandrich firm, defense should object to this line of questions for lack of corroboration when the prosecutor should produce but failed to produce such corroboration.

11.9. The Direct Examination on GX 127 and 133

Defense should object to the prosecutor's questions regarding what Meng Fei said and what she meant in the recordings GX127 and 133 because it amounts to creation of evidence by her, as argued earlier. Defense should object to prosecutor's questions calling for speculations and allowing her to repeat her earlier testimony. Defense should also use this opportunity to ask Meng Fei regarding Karen's intention to close the firm and why Karen left the firm. Ms. Bandrich expressed very strong fears and worries on page 5 to 7 of GX133 about appearing before the immigration judge when the case has various problems. See DX53. Defense should use this opportunity to question Meng Fei about the strong worries and fears expressed by Ms. Bandrich to show to the jury that she, Ms. Bandrich, Karen and most other immigration lawyers all have worries and fears when representing clients in court due to the various mistakes in the applications and those fears and worries have nothing to do with fraud. This is very relevant to explain Karen's understanding of the worries and stress expressed by Meng Fei in the recorded conversation of GX 154.

Meng Fei testified that she worked for the firm to maintain her status and she left the firm soon after her husband got the status. Defense should point out that she left the firm after she was tipped by two people Victor and James Lin. She testified that in August 2011 Lin warned her there was the possibility that the firm was targeted by the government and urged her to leave. Tr.1529 In her prior statement she also said that Victor tipped her about FBI's investigation of the Moslemi firm in about August 2011. See 3507-16 at P9 as DX30-01

Meng Fei repeated her earlier testimony by claiming that all Christian stories are the same and was further given the opportunity to elaborate it. What she really meant is that they all have the same pattern and same structure. Defense should ask her whether it is true that lots of legal documents follow the same pattern and format, such as a brief. That by itself does not make it fraudulent. Defense should also ask her what a real Christian story looks like and whether they follow the same pattern.

Regarding amendment to fix the mistakes the paralegals made, Meng Fei said mistakes were made all the time because these cases were fake and paralegals easily made mistakes. Defense should point out that is only her opinion and should ask her whether

paralegals also easily made mistakes when preparing real asylum applications. Defense should point out that in the recording she simply said that mistakes are made very often and she said nothing in the recording to indicate it is due to fraud as she testified in court.

Regarding the fraudulent photo case Meng Fei mentioned in the recording, Defense should point out that she did not have personal knowledge and just heard from an interpreter, and there are other possible explanations other than fraud and the firm did not even know the matter as she said in the recording. Moreover, the defense should point out that it is hearsay not admissible against Karen because the interpreter is not coconspirator.

12. Defense' very poor and ineffective closing

Defense also failed to make a cogent closing argument and failed to respond to the government's closing argument. Defense should first point out that there is a severe lack of evidence in this case. The only evidence against Karen is Victor and Meng Fei's testimony and the recording GX154. The prosecutors failed to produce a single piece of documentary evidence to prove Karen's guilt even if the FBI had a lengthy investigation of about five years, a thorough search of the office and the seizure of many boxes of materials, detailed search of Karen, all her emails, text messages and notes on her iphone, all the telephone records and bank records, all the materials taken by Victor and Meng Fei from the office since early 2009 with the specific purpose to prove Karen's guilt. The prosecutors failed to produce a single applicant to testify even if the prosecutors claimed that the firm has 2000 such applicants and even if the FBI used repeated efforts to try to get those applicants to testify. Defense should also point out the complete lack of corroboration by the prosecutors when the corroboration is readily available and should be provided, such as the Houston case. In several instances, the lack of corroboration invalidated the testimony completely as discussed in this motion, such as Lin Chen's recording to show Moslemi employee gave her the contact information for the company in China. Defense should point out that most of the variety of evidence introduced by the prosecutors during trial is not relevant to Karen at all and no connection was ever established to Karen. Defense should go over the testimony to show Victor and Meng Fei's motive to lie and point out that they lied about Karen advising false claims to new clients, and her working with them in preparing false asylum applications. Defense should point out that Victor and Meng Fei's testimony was very vague and was completely devoid of specificity and details. Victor never produced any client's name except Xin Miao and nothing is produced to prove there is even the existence of such a case, let alone Karen's connection to it. Meng Fei never produced a single name of the clients she worked on. Defense should point out to jury that both Victor and Meng Fei engaged in making fraudulent asylum applications but they did that not with Karen but after Karen left the office. Therefore, their testimony could be very truthful on how they made fraudulent asylum applications but they lied about committing the fraud with Karen. Defense should tell the jury to pay special attention to the part of their testimony connecting Karen. Defense should go over the testimony to show that the part about their own fraud is detailed in contrast to the part connecting Karen which is very vague, devoid of any details or specificity. For example, Victor's testimony on overhearing Karen, on how Karen reviewed and revised his stories, on his activities in the asylum office, are all focused on his own thinking, his own experience and his own activities. Defense should

also point out that their testimony on many issues is either speculation or bare assertion with no personal knowledge. Defense should go over the testimony to show that no evidence showed Karen transferred the firm to Moslemi as an effort to conceal her fraud, nor evidence showing that Bandrich firm was opened by Karen to avoid attention of the law enforcement. Defense should also point out to jury that Karen was basically not physically present in the office since early 2009 and was not involved in the office operation other than helped the office with hiring, which only happened a few times. Defense should point out that Lin Chen's recordings are a perfect proof of Karen's complete absence from the day to day operation of the firm. Defense should respond to the government's summation thoroughly.

In sum, comparing what the defense has done with what the defense has failed to do in this trial, one can see that the defense has only done 20% of the work it is supposed to do at the maximum, and clearly the defense work is extremely deficient and severely prejudiced the defendant. It is very likely that the jury would render a different verdict had the defense done its job properly.

## Third Ground: The verdict should be set aside due to severe jury misconduct.

Evidence shows that one juror published all the information related to this case on her twitter at 1:33pm on April 14, 2014 when the jury was still doing the deliberation because the verdict was reached at 2pm. This juror also lied to the judge during the middle of the trial when the judge called every juror in to ask if he or she commented the case on social media. She clearly did but she lied to the judge. She also lied to the court in the voir dire when she said she had no FBI friends but in her twitter she mentioned two close FBI friends by their first name and suggested that they should resign and open their own business. She is a writer and she clearly has a big influence on the other jurors as she mentioned in her tweeter that some of the jurors read her books. Defendant will join the other two co-defendants in their motion based on this ground.

Respectfully submitted on this September 3, 2014

Fengling Liu, Pro Se
5 East Broadway, Suite 401
New York, NY 10038
Karen10038@yahoo.com
(917) 596-3756