E3oWliu2                    Opening - Mr. Egan

1   be from friends, family members, maybe even a boyfriend who had

2   gotten the person pregnant, just restating the lies they put in

3   the story but, this time, over someone's name just to make the

4   story seem legitimate.  All the applicant had to do was send

5   that letter back to China for a friend to recopy it and send it

6   back in an envelope with a Chinese postmark.  You'll even hear,

7   however, that these firms kept a supply of Chinese-sized paper

8   in the firm in case there was an emergency and someone needed

9   to have a friend here in the United States write a letter

10  pretending to be in China.

11          After these stories and the evidence letter were

12  written, they would be reviewed by Feng Ling Liu or one of the

13  other lawyers at the firm.  She had to make sure they were good

14  enough.  If the beating that was discussed in the story was not

15  severe enough, maybe she'd add a couple extra details, a couple

16  extra kicks, a black eye, a broken bone.  Maybe the length of

17  time that the story said the applicant had been in detention

18  wasn't quite long enough, so seven days became two weeks,

19  whatever it took, whatever little extra details they felt they

20  needed to push the story over the edge.  Then the defendants

21  submitted everything to the asylum office and started preparing

22  applicants for the next step, teaching the applicants to lie

23  and lie convincingly, both in their interviews and, if

24  necessary, in front of the immigration judge.  Coaches drilled

25  them on their stories and other things that they might be

E3vWliu4                    L. Chen - cross

1    Q.  Did anyone tell you that you have to pay taxes on the cash?

2    A.  No one told me that.

3    Q.  But you did tell someone from the government that you are

4    receiving cash, is that right?

5    A.  Yes.

6    Q.  And no one told you from the government that you have to

7    pay taxes on the cash?

8    A.  No one said that to me.

9    Q.  And you haven't paid taxes on the cash, isn't that correct?

10   A.  I have reported taxes for the checks.

11   Q.  But not the cash?

12   A.  Not for the cash.

13   Q.  Now, when you start cooperating with the FBI, they told you

14   how to use a recorder and a video camera, is that right?

15   A.  They did not teach me how to use it.  They just showed me

16   where I was to place them.

17   Q.  Let's take the Moslemi law firm.  You went there with an

18   agent?

19   A.  The agent did not go.  Only I myself went.

20   Q.  And who turned on the recorder?

21   A.  After they had placed the recorder and turned it on, then I

22   went up there.

23   Q.  And you had no opportunity to shut it off and put it on

24   again, isn't that right?

25   A.  I did not touch it whatsoever.  I just knew that after the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E3vWliu4                    L. Chen - cross

1    recording was over, I was to return it to them.

2    Q.  And that's what you did?

3    A.  Yes.

4    Q.  So every time you were at the Moslemi law firm, the

5    recorder was running, is that correct?

6    A.  Yes.

7    Q.  And that's the same thing with the video camera, isn't that

8    right?

9    A.  Yes.

10   Q.  And when you came back, they took it off you, right?

11   A.  Yes.

12   Q.  And eventually, you listened to those recordings?

13   A.  Yes.

14   Q.  And did you see all the videos also?

15   A.  Yes, I saw all of them.

16   Q.  Now, you've met with the government a number of times,

17   isn't that true?

18   A.  Yes.

19   Q.  You listened to the recordings and talked to them about the

20   recordings?

21   A.  When I listened to the recordings, I only listened to them

22   with my interpreter.

23   Q.  With your interpreter?

24   A.  Yes, the interpreter.

25   Q.  Had they been translated at that point?

E3vWliu4                    L. Chen - cross

1    A.  Can you please explain that question.

2    Q.  What did you do with the interpreter?  Can you explain that

3    to us, please.

4    A.  I listened to each of the CDs and verified every phrase

5    that was said.

6    Q.  Now, you told us that there were certain times when you did

7    not bring a video camera with you?

8    A.  The video recorder I always had on.  It was just that some

9    of the times, I did not bring the recording box.

10   Q.  Now, every time you were at the Moslemi law firm, you had

11   your recorder on, is that right?

12   A.  Yes.

13   Q.  So there are no instances, no times when you were there

14   that we don't have a recording, is that true?

15   A.  Yes.

16   Q.  And you listened to those recordings and you found that

17   they're all accurate, is that right?

18   A.  Yes.

19   Q.  I want to go back to your asylum application.  When you

20   filed it, you filed a false statement by yourself that was

21   given to you, is that correct?

22   A.  Counsel, may I ask you, this personal application, is that

23   the one that I submitted myself, or was that the one that I

24   submitted in the name of Yan Hong Chen?

25   Q.  This is the personal application that you submitted when

E3VJLIU5                    L. Chen - cross

1    firm, right?

2    A.  Yes.

3    Q.  And all of them were not given to the jury today.  There

4    are many that we -- there are some that we have not seen yet?

5    A.  Yes.

6    Q.  Now, all the times you were there, how many times there

7    were, you were trying to get to see my client, Ms. Liu, right?

8    A.  No.

9    Q.  You weren't trying to get to see her?

10   A.  Just the last time I had attempted directly to see the

11   Attorney Liu, but she wasn't there, so I just talked briefly

12   with David Miao.

13   Q.  But when you talked to David Miao, you told him that you

14   wanted to see Ms. Liu.  Isn't that right?

15   A.  Yes.

16   Q.  And you even lied about the fact that some interpreter told

17   you that you should see my client.  Isn't that correct?

18   A.  Can you please explain that question.

19   Q.  Yes.  Didn't you have a conversation with David, where you

20   insisted on seeing Attorney Liu, making up a story that some

21   interpreter told you to see Ms. Liu?

22   A.  All that was under the instruction of the agents who asked

23   me to say those things.

24   Q.  To what?  Agents to what?  I didn't get the last part of

25   the answer?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E3VJLIU5                    L. Chen - cross

1    given to me, then I will be able to remember the specific

2    times.

3    Q.  Okay.  Now I want to ask you this question again.  Please

4    answer it as best you can.  I think the answer is yes or no,

5    okay?

6    A.  Okay.

7    Q.  It is true, is it not, that how many times you were there,

8    over what period of time, you never saw or heard Feng Ling Liu

9    do anything criminal?

10   A.  (Pause)

11           MR. FISCHETTI:  Could you ask her is that statement

12   true?

13   A.  Yes.

14           MR. FISCHETTI:  I have nothing further -- I do have

15   one question.  It was handed to me.  I am sorry.

16   BY MR. FISCHETTI:

17   Q.  The time you saw David and talked to David, do you remember

18   if his office door was open or closed?

19   A.  It was closed.

20           MR. FISCHETTI:  Thank you.  I have nothing further.

21           THE COURT:  Is there going to be additional cross or

22   redirect?  If so, we'll take our break.

23           MR. GERMAN:  There will be some cross.

24           THE COURT:  Why don't we take our break now.  Keep an

25   open mind and don't discuss the case.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1202

E41Wliu3                    M. F. Yu

1    Q.  How long does a student visa last?

2    A.  Student visa actually is one year, but after that one year,

3    I can get another year optional practice time.

4    Q.  Does that go by the shorthand OPT?

5    A.  Yes.

6    Q.  And you said that lasts for how long?

7    A.  One year.

8    Q.  Did you get any other benefit from not declaring your

9    income during this period?

10   A.  No.

11   Q.  Did you apply for Medicaid or anything like that?

12   A.  No.

13   Q.  I'm going to need you to speak up a little bit.

14   A.  Okay.

15   Q.  When you started at the firm, how many people worked there,

16   approximately?

17   A.  More than ten people.  About ten.

18   Q.  Were there any other paralegals?

19   A.  Yes.

20   Q.  How many?

21   A.  Several.

22   Q.  Who were they?

23   A.  Victor You, Harry Liu, Mr. Huang, Vinny.

24   Q.  Winnie?

25   A.  Yeah.  Mr. Lee.

E41Wliu3                    M. F. Yu

 1    A.  At that time, it's another attorney, Bebe Xue.

 2    Q.  You said at that time.  Did she leave at some point?

 3    A.  Yes.

 4    Q.  When did she leave?

 5    A.  In about 2010.

 6    Q.  In about 2010?

 7    A.  Yes.

 8    Q.  Do you see a door in the center of the picture?

 9    A.  Yes.

10    Q.  What room is through there?

11    A.  It's Ms. Liu's office.

12    Q.  And during your time there, did she work in that office?

13    A.  Yes.

14    Q.  When you first started, how often was she at the office?

15    A.  I would say every day.

16    Q.  Did she work in there alone or with someone else?

17    A.  Most time she worked there alone.  Sometimes David would

18    stay there.

19    Q.  Is there any way, to your knowledge, to that office, into

20    that office except through that room that you sat in?

21    A.  That's the only door to the office.

22    Q.  When she would work in there, typically, was the door open

23    or closed?

24    A.  Open.

25    Q.  So I want to turn your attention to the work you did at the

E41Wliu3                    M. F. Yu

1    approximately how many asylum applications did you work on in

2    any of your capacities?

3    A.  Hundreds.

4    Q.  Hundreds?

5    A.  Yes.

6    Q.  Of those that you worked on at Feng Ling Liu's law firm,

7    how many would you say are real, meaning based on actual facts

8    involving persecution?

9    A.  Ten percent.

10   Q.  Ten percent?

11   A.  Yes.

12   Q.  And of those ten percent that were based on actual events,

13   in your experience at the firm, were the details of those

14   stories changed prior to submitting the applications?

15   A.  I'm sorry?  Can you repeat the question.

16   Q.  You said that about ten percent were based on actual

17   events, correct?

18   A.  Yes.

19        MR. MAHER:  I am going to object to the form of the

20   question.

21        THE COURT:  I'll allow it.

22   BY MR. EGAN:

23   Q.  Of the ten percent that were based on real events, were

24   applications prepared for those as well, asylum applications?

25   A.  Yes.

E41Wliu3                    M. F. Yu

1    Q.  And in your experience, would those asylum applications

2    contain false facts as well?

3    A.  Yes.

4    Q.  Why would they contain false facts?

5    A.  Because most of stories were written by paralegals.  Most

6    of clients didn't provide any useful information.

7    Q.  What about the stories that were based on real events?

8    A.  For the, for those real ones, when paralegal talking with

9    them, we can tell whether they actually have persecution or

10   not.  If they did suffer persecution, they can tell us their

11   story, we know that that's their true story or not.

12   Q.  And if it was a true story, were there ever circumstances

13   where details would still be changed?

14   A.  Yes.  Sometimes.

15   Q.  Under what circumstances?

16   A.  Even their stories true, but we want their story look

17   better, so we may add some details.

18   Q.  You want it to look better?

19   A.  Yes.  Such as we would describe how the client beat up.

20   Q.  How they were beat up?

21   A.  Yes.  By the Chinese government, I mean.  Maybe they were

22   not beat up that severely, but we say more seriously and maybe

23   they didn't get bruise all on their body, we would add such

24   scenarios.

25   Q.  I want to talk a little bit about the process.  To your

1208

E41Wliu3                    M. F. Yu

1   knowledge, did the firm advertise for clients while you worked

2   there?

3   A.  No.

4   Q.  How would clients typically find out about the firm?

5   A.  Really they were introduced by the friends or relatives.

6   Q.  How would these friends or relatives know about the firm?

7   A.  Most of them --

8           MR. FISCHETTI:  Objection.

9           THE COURT:  Sustained.

10  BY MR. EGAN:

11  Q.  Fair to say then that they were referrals, mostly?

12  A.  Yes.

13  Q.  When you started at the firm, let me ask you this.  What

14  was the first step in the process when someone arrived at the

15  firm?

16  A.  They always had initial meeting with a manager or Ms. Liu.

17  Q.  When you started at the firm, who was the person or who

18  were the people with whom this initial meeting would take

19  place?

20  A.  Most time, David did this job.  Sometimes Carey.

21  Q.  And you said sometimes Ms. Liu?

22  A.  Yes, sometimes Ms. Liu.

23  Q.  How was it determined who of that group the person would

24  meet with?

25  A.  I'm sorry.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1209

E41Wliu3                    M. F. Yu

1   Q.  How was it determined whether the person would meet with

2   David or Harry or Ms. Liu?

3   A.  Really when the new client came to our office, the

4   reception just show the client to David's office.  But sometime

5   the client insisted on meeting Ms. Liu, they would meet Ms.

6   Liu.

7   Q.  If they insisted on meeting Ms. Liu?

8   A.  Yes.

9   Q.  And why would a client insist on meeting Ms. Liu?

10            MR. GERMAN:  Objection, Judge.

11            THE COURT:  Sustained.

12  BY MR. EGAN:

13  Q.  I want to just quickly show you Government Exhibit 16

14  already in evidence.

15  A.  This is Harry Liu.

16  Q.  Who is Harry Liu?

17  A.  He is the younger brother of Ms. Liu.

18  Q.  And when you started, what was his role?

19  A.  He's a paralegal, but sometimes he conducting initial

20  meeting with our new clients.

21  Q.  And later on, you said initially, these meetings would

22  happen with Harry or David or Ms. Liu.  Later on in your time

23  there, was there anyone else who would do these initial

24  meetings?

25  A.  Yes.  Sometimes then Lucy and Lillian.

E41JLIU4                    Yu - direct

1        Please remember you're still under oath.

2        THE WITNESS:  Thank you.

3        MR. EGAN:  If I may, previously the witness had

4   testified about David Miao's name, Yuchang Miao.  We put a name

5   plate up there.  I move for its admission.

6        THE COURT:  Any objection?  It will be admitted.

7        MR. EGAN:  It is Government Exhibit 12-N.

8        THE COURT:  It will be admitted.

9        (Government's Exhibit 12-N received in evidence)

10  MENG FEI YU, resumes

11  DIRECTION EXAMINATION (Continued)

12  BY MR. EGAN:

13  Q.  Ms. Yu, before the break we were discussing the initial

14  meetings that happened with asylum applicants.

15        What sort of information would typically be discussed

16  at these meetings?

17  A.  I only heard a few times.  I heard David asked the client

18  when they arrived this country if they have any, do they have

19  any criminal history in this country, and their marriage

20  history and the case, then they would introduce some claim

21  which they think is better for the client.

22  Q.  So taking that back, you mentioned a number of different

23  records.  Why were those records important?

24  A.  You know, to apply for asylum, the applicant must arrive in

25  this country no more than one year after, no more than one year

E41JLIU4                       Yu - direct

1    after he came in this country.

2    Q.  In your experience at the firm, did they have asylum

3    applications for people who had been here for more than one

4    year?

5    A.  Yes.

6    Q.  What other records, in addition to criminal records, were

7    they looking for or asking about?

8    A.  We want to make sure that we asked do they have any record.

9    Q.  Record about the applicant?

10   A.  Yes, if they had a history of criminal long time ago, the

11   government has the records so we cannot lie about the client's

12   entry time.

13   Q.  Was anything about the client's background discussed?

14   A.  Background, yes, at occasion, marriage.

15   Q.  Just information like that?

16   A.  Yes.  They don't ask whether you have persecution in China.

17   Q.  So the background they would ask would just be education

18   and birth place?

19   A.  Life experience.

20   Q.  What about payment, was that ever discussed at these first

21   meetings?

22   A.  Yes.

23   Q.  What was the pay scale?

24           How much did it cost to file an asylum application

25   with the Bandrich law firm?

*Not Moslemi or Fengling Liu Law Firm*

E41JLIU4                     Yu - direct

 1   A.  Totally about 10,000 to 13,000.

 2   Q.  How was that paid?

 3   A.  The client would have paid 1,000 when we start preparing

 4   the case.  When they win the case, they pay the rest.  If the

 5   case lose, they will pay half.
*Contradict with Victor, if client lost they paid nothing. she is not cashier.*

 6   Q.  How was this money typically paid?

 7   A.  By cash.

 8   Q.  I think you testified earlier that persecution, someone's

 9   persecution typically was not discussed?

10   A.  No, no.

11   Q.  Was the claim they would pursue ever discussed?

12   A.  Yes.

13   Q.  In what context?

14   A.  Sometimes I heard that the client just asked Ms. Liu or

15   David which claim is easier to be granting.

16   Q.  Would Ms. Liu or David provide advice on that?

17   A.  Yes.

18   Q.  What advice would they provide?

19   A.  They would give advice based on their marriage or

20   avocation, background.  If, for example, if there was a female

21   single applicant, they would advise them to apply for family

22   planning.  The claim will be this female applicant suffered a

23   forced abortion because she got pregnant before marriage.

24   Q.  Why was that an appealing claim for a single female

25   applicant?

E41JLIU4                    Yu - direct

1   A.  Because this claim doesn't require a lot of evidence.  It

2   is very easy to prepare the story and the whole package.

3   Q.  What other types of claims did the office typically pursue?

4           MR. FISCHETTI:  Objection.  May we have a brief

5   sidebar?

6           THE COURT:  Okay.

7           (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E41JLIU4                       Yu - direct

1      (At sidebar)

2           MR. FISCHETTI:  Judge, I withheld my objections up

3    till now so we can get a full story.  I ask that the government

4    particularize who is saying what and not the office and not

5    they said, put David and my client together.  I think it should

6    be more pointed on who said what during this period of time.

7           THE COURT:  I agree with that.  Who said what, I agree

8    with that.  As to whether the abortion, had to do with types

9    of -- right, but I think it is okay to ask generally what types

10   of persecution the office would utilize, but I think in terms

11   of saying particular people said things or acted a certain way,

12   we should break down that.

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2     BY MR. EGAN:

3     Q.  I think the question that was before you was what other

4     types of claims would the office typically pursue?

5     A.  Okay.  For some single male applicants, they advised them

6     to pursue Christianity.

7     Q.  Why was that?

8     A.  Because they don't have kids, they're not married, so they

9     cannot apply based on family planning.  It is easy for them to

10    say some religion.  They went to some church in China, was

11    arrested and beat up.

12    Q.  Were there ever reasons -- let me ask this.

13          You described these meetings and advice that would be

14    given during them.  Who did you hear participating in those

15    meetings?

16    A.  Just sat outside Ms. Liu's office.  What I heard, though,

17    was David and Ms. Liu were there.

18    Q.  They were there having the conversations you just

19    described?

20    A.  Yes.

21    Q.  Did they ever discuss downsides to pursuing a particular

22    type of claim?

23    A.  I am sorry.  I don't remember.

24    Q.  Okay.  So after this initial meeting, how long would this

25    initial meeting typically last?

E41JLIU4                    Yu - direct

1   this form, including their age, address, avocation, kids, those

2   kind.

3   Q.  Why was address significant?

4   A.  If they want to apply for asylum in New York, they must

5   provide a New York address.

6   Q.  In your experience at the firm, were there ever people

7   applied who did not live in New York?

8   A.  Yes, many applicants actually lived in another state and

9   worked in other states.

10  Q.  How would you handle this?

11  A.  What do you mean?  I am sorry.

12  Q.  If someone came to you and said -- well, let me ask you

13  this way:  Did anyone ever come to you and say I don't live in

14  New York?

15  A.  Yes.

16  Q.  How would you handle that?

17  A.  I would tell them if you want asylum here, you should give

18  me an address in New York.

19  Q.  So you worked on filling out the form.  What other steps

20  would you take?

21  A.  They also need to sign an affidavit.

22  Q.  What is the affidavit?

23  A.  The affidavit, an affidavit the client claims they provide

24  all the truths to this firm and their stories are truth and

25  their stories are prepared by themselves.

E41JLIU4                    Yu - direct

1    Q.  I am going to show you what has been previously marked as

2    Government Exhibit 921.  Take a look at that.

3    A.  (Pause)

4    Q.  Do you recognize that?

5    A.  Yes.

6    Q.  What is that?

7    A.  This is an affidavit we ask the client to sign.

8    Q.  That is an affidavit you used at the firm?

9    A.  Yes.

10         MR. EGAN:  I offer Government Exhibit 921 into

11   evidence.

12         THE COURT:  Any objection?

13         THE COURT:  It will be admitted, hearing no objection.

14         (Government's Exhibit 921 received in evidence)

15   BY MR. EGAN:

16   Q.  If you can see where it says "No. 1" at the top?  If you

17   can read No. 1 and No. 2 -- sorry -- where it is actually

18   numbered one and two.  Starting at No. 1, if you can read that

19   and read No. 2 out loud.

20   A.  Before starting to prepare my asylum application, my

21   attorney's office has given me the following warnings regarding

22   asylum applications.  If you knowingly file frivolously

23   application for asylum, you will be barred from ever, from

24   receiving any benefits under the Immigration & Nationality Act.

25   A frivolous application for asylum is one which contains

E41JLIU4                         Yu – direct

1   statements or responses to questions that are originally

2   fabricated, not being grounded and signed knowing that your

3   application is frivolous.

4   Q.  What is a frivolous application for asylum?

5   A.  For me, it means fake asylum.

6   Q.  Did every client have to sign this?

7   A.  Yes.

8   Q.  Why?

9   A.  We give them the warning, they sign the affidavit so

10  someday if we have trouble, we can see they know they must have

11  tell us the truth so we won't take the responsibility for the

12  trouble.

13  Q.  Did any client ever ask you about having to sign this?

14  A.  A few people asked.  Many people don't care what they sign.

15  Q.  What explanation, if any, did you give them?

16  A.  I just explain to them -- there are Chinese translations.

17  Sometimes I ask them to read a Chinese translation.

18  Q.  Did they ever ask why they had to sign it?

19  A.  Few people do that.

20  Q.  Was this something that was required by the asylum office

21  or by the firm?

22  A.  Required by the firm.

23  Q.  Did anyone in particular at the firm tell you to have

24  applicants sign this?

25  A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E41JLIU4                    Yu - direct

1    Q.  Who was that?

2    A.  When I started working at this firm, Ms. Liu trained me and

3    showed me which documents I should ask the client to view or

4    sign.

5    Q.  So after they filled out -- you can take that down --

6    started to fill out the form, they've signed that affidavit,

7    what other information would you or what else would happen at

8    that meeting that you had with the client?

9    A.  I would tell them for their cases what kind of evidence

10   they need to provide us.  If we have time on that date, I will

11   prepare their story.

12   Q.  When you say prepare their story, what do you mean?

13   A.  When I started working at that firm, I don't know there so

14   many fraud cases, I would ask them what happened to you.  Later

15   on you found many people don't have real persecution.  So when

16   I know what kind of claim they pursue, then I just base it on

17   their life experience or background and made up a story for

18   them.

19   Q.  When you say their "background," what sort of information

20   would you get?

21   A.  Age, marriage, work, avocation.

22   Q.  How would you incorporate those into stories?

23   A.  You know, can I think about it?

24        I would just, for example, they start from the city of

25   Fuchin.  I would say that she was leaving there or working

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

E41JLIU4                    Yu - direct

1    there -- sorry -- she was working there and living there, she
2    met a boyfriend and blah, blah, just using that information and
3    made up a story.
4    Q.  You would use the information where they're from?
5    A.  Yes, and which school they graduated, which year they
6    started working and where they were working.
7    Q.  Would you typically in these meetings ever discuss the
8    facts of their persecution?
9    A.  No.
10   Q.  You mentioned at the beginning you used to ask them
11   questions?
12   A.  Yes.
13   Q.  What was your experience when you asked them questions like
14   like that?
15   A.  I would ask them tell me what happened to you, how you were
16   persecuted or how you were arrested, tell me something.  I
17   remember the first case, the new case David gave me, that is a
18   female applicant applying for asylum.  Her claim is family
19   planning.  She told me the story she had a boyfriend and she
20   got pregnant before marriage, the guy just gave, gave her a
21   forsed abortion, and I wrote what she told me.
22          Later on many people cannot tell me what happened, so
23   I know no there was no persecution to them, and I just, based
24   on my previous year's experience, I just made up the story for
25   them.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E41JLIU4                    Yu - direct

1    Q.  When you said they can't tell you what happened, what do

2    you mean?  What would they say if you asked them?

3    A.  Sometimes they just said I don't know how to write.  Ms.

4    Liu said you would help us.  I don't know about the asylum or

5    persecution, just tell me what I should do.

6    Q.  If they did not provide the details of the persecution, how

7    did you know what to write?

8    A.  When I started working, Ms. Liu asked me to look at old

9    files, and we had some samples in our computer.

10   Q.  Samples?

11   A.  Yes.

12   Q.  What do you mean by samples?

13   A.  The samples were created by some people in the office,

14   Harry or somebody else.  For each claim, each category of

15   asylum claim there was a sample story, like the first paragraph

16   introduction of this applicant and the second paragraph is what

17   happened to this applicant and where they were arrested, how

18   they left the country.

19   Q.  The item you're describing was a sort of model that was

20   available to you?

21   A.  Yes.

22   Q.  Would you ever base it on other stories that had already

23   been written for someone else?

24   A.  Yes, I read old cases in the office.

25   Q.  How closely in writing your own stories would you track

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E41JLIU4                    Yu - direct

1   those stories?

2   A.  Sorry?

3   Q.  How closely would you follow the language of the stories

4   that you were basing it on?

5   A.  I would use -- I never used the same language or sentence,

6   but I used the pattern, the logic of those stories.

7   Q.  You said the same pattern?

8   A.  Yes.

9   Q.  When you say a "pattern," what would be a typical pattern

10  for, say, a family planning claim?

11  A.  Family planning claims for female, forced abortion; for

12  male, their wife suffered a forced abortion and they want to

13  protect their wives, they say officers would detain them.  It

14  was always the same pattern.

15  Q.  What about for Christianity claim?

16  A.  They went to private church.  They don't allow private

17  church in China.  The church cracked down and they were

18  arrested and detained, beat up and they left the country to

19  pursue their freedom of religion.

20  Q.  You mentioned earlier you were trained by Ms. Liu.  How did

21  she train you?
*Contradict with her 3500. She said Victor train her, never said Liu train her*

22  A.  She showed me some -- on the first day I started working,

23  she handed me a bunch of old cases.  She said I need follow-up

24  evidence for those cases.

25  Q.  Follow-up evidence?

1237

E41JLIU4                    Yu - direct

1    A.  Yes.  Those packages were not completed.  We would ask the

2    client to provide more evidence for their cases.  Then she

3    explained to me a form we should ask the client to fill in and

4    sign with information, I should pay more attention, and she

5    asked me to read the stories, yes, that is how she trained me.

6    Q.  How long were you at the job before you realized that the

7    applications were you working on were fake?

8    A.  A few weeks later.

9    Q.  A few weeks later?

10   A.  Yes (if fraud is everywhere, she as a candidate lawyer need a few weeks
to find out by told Victor. so if Victor did tell her she will never find out
any. even so David or karen never gave her instruction go ahead make a fake one,
if so, she will find out at day one)

11   Q.  Was there a specific instance that caused you to find out?

12   A.  Actually, my co-worker told me, Victor told me.

13           MR. FISCHETTI:  Objection.

14           THE COURT:  Sustained.

15           MR. EGAN:  What is it?

16           THE COURT:  Who is the co-worker you mentioned?

17           THE WITNESS:  Victor.

18           THE COURT:  I am going to allow it.

19   BY MR. EGAN:

20   Q.  What did he tell you?

21   A.  He told me many cases are not true.  Then I got more and

22   more clients, when I asked them what they happened to them,

23   they cannot tell me the answer.  So I felt they never had

24   persecution.(She feel no persecution, maybe she is wrong. did David or
Karen has the same feeling. or any knowledge about is. Obvious David or Karen
never tell her go ahead make fake for him.)

25   Q.  Did that surprise you?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E41JLIU4                    Yu - direct

1   A.  Yes.

2            MR. FISCHETTI:  Objection.

3            THE COURT:  Overruled.  I will allow it.

4   BY MR. EGAN:

5   Q.  Other than Victor, did you in this initial point talk to

6   anyone else at the firm about that?

7   A.  Yes, later I talked to another attorney in my office, and

8   later on when we were closer, Ms. Feng Li and other co-workers,

9   I talked with them.

10  Q.  So while you wrote these stories, would the clients

11  typically be there?

12  A.  Yes.

13  Q.  What else?  I think you mentioned you worked on evidence at

14  this stage as well?

15  A.  Yes.

16  Q.  What sort of evidence would you be working on?

17  A.  I also needed to prepare attesting letters from their

18  families or friends.  In those letters their friends or family

19  should prove the persecution.

20  Q.  You mentioned one of the first steps was talking to a

21  client about what sort of evidence they would need for their

22  claim?

23  A.  Yes.

24  Q.  Did each claim require different kinds of evidence?

25  A.  Everybody must provide an ID, birth certificate.  If

                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

E41JLIU4                    Yu - direct

1    they're married, a marriage certificate or their case

2    certificate.  Each client should provide attesting letters from

3    their family or friends and one year evidence.

4    Q.  Starting with those certificates, while you're at the firm

5    did you ever know of an applicant to submit forged

6    certificates?

7    A.  I don't know. *(No fake certificate submit, as Victor tested. No contact with Chinese fake document producer either, otherwise she work there for 3 year should would know)*

8    Q.  With respect to the letters, the attesting letters, would

9    those be different depending on what type of claim?

10   A.  Yes.

11   Q.  For a Christianity claim, what sort of attesting letters

12   would an applicant need?

13   A.  For Christian claim, the only way, we prepare three

14   letters, one letter from the applicant's family, another from

15   their church friend, and a third one from their private church

16   in China.

17   Q.  Who would write these letters?

18   A.  Anybody can write them.  What do you mean?  I am sorry.

19   Q.  Who would actually draft them?

20   A.  Okay, the paralegal.

21   Q.  In your time at the firm, you wrote these letters?

22   A.  Yes.

23   Q.  How would you determine who they were from?

24   A.  You know, when I prepared those attesting claims, sometimes

25   I need to ask my friend tell me your church friend's name or

E41JLIU4                        Yu - direct

1    boyfriend's name.  At that moment they cannot tell me the name

2    because we also need those people's ID to attach to those

3    letters.  Sometimes the client doesn't know which person would

4    help them, I mean a copy of the letter and provide the ID.  So

5    we just leave their name blank, maybe a few days later we'll

6    have the client find the people who would like to help them,

7    tell us the name and we fill in the name.

8    Q.  Where would the content, the actual content from the

9    letters come from?

10   A.  The content?

11   Q.  What the letter said, what it described?

12   A.  Okay.  We just read again their stories.  For example, if

13   this is a Christianity case, and this letter from the

14   applicant's family, they would just say this applicant was in

15   China persecuted and sometime in -- it is almost a repeat of

16   their story.

17   Q.  In writing these letters, would you ever talk to witnesses?

18   A.  No.  When I wrote the letter, I would never do that.

19   Q.  Were these stories written on computer or by hand?

20   A.  Computer.

21   Q.  What about the evidence?

22   A.  Our evidence?

23   Q.  Well, the attesting letters?

24   A.  Yes, in computer.

25              (Continued on next page)

1241
E41Wliu5                        M. F. Yu - direct

1   BY MR. EGAN:

2   Q.  In the computer?

3   A.  Yes.

4           MR. EGAN:  Can I pull up Government Exhibit 677, and

5   can I zoom in on the screen itself.  Actually, zoom out for a

6   sec.  Sorry.  At the very top, in the blue, at the sort of

7   title bar there.

8   Q.  What does that say up there?

9   A.  Attesting letters.

10  Q.  Do you know what CN means?

11  A.  That means Chinese version.

12  Q.  Chinese version?

13  A.  Yes.

14          MR. EGAN:  Can we zoom in on the sort of top portion

15  there.

16  Q.  Take a moment to look at that.  What does that look like to

17  you?

18  A.  That's a draft of attesting letter.

19          MR. EGAN:  And can we actually put up the translation

20  side by side.

21  Q.  Do you see there are a couple places there where it says

22  XXX.  Starting with the date, why would XXXs be used in the

23  date?

24  A.  Based on my experience, when the paralegals preparing these

25  letter, the applicant didn't provide the name of the, of the

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

E41Wliu5                         M. F. Yu - direct

1    peoples so we just use XX to symbolize the name.

2    Q.  To be filled in later?

3    A.  Yes.

4    Q.  What about for the date?  Why would the date have Xs in it?

5    A.  We want to tell the client just to fill the date when your

6    friend copy this letter back hand, I mean, on the date.

7         MR. EGAN:  You can take those down.

8    Q.  After you were done typing up the story and the letters,

9    what would you do with it?

10   A.  I would print them out, hand them to our clients.  Then

11   they will send those letters back to China and ask their

12   families and friends to copy the drafts by hand, then mail

13   back.

14   Q.  Before that step, did your letters and stories have to be

15   reviewed by anybody?

16   A.  Yes.  Yes.  After I wrote a story and attesting letters,

17   Ms. Liu or other attorneys will review them.

18   Q.  When you first started at the firm, who did most of the

19   reviewing?

20   A.  Ms. Liu.

21   Q.  When did you start giving to other attorneys?

22   A.  In about 2009, Feng Li took over the job.  He reviewed my

23   stories and Victor's stories.

24   Q.  And in your experience, even after 2009, would Ms. Liu

25   still review letters and stories?

E41Wliu5                    M. F. Yu - direct

1   A.  Yes.

2   Q.  So what would she do with the letters and stories?

3   A.  She would review the logic and language.

4   Q.  The logic and language?

5   A.  Yes, yes.  And at an early stage of my early stage as a

6   paralegal, I don't have experience.  Sometimes logic of story

7   doesn't sound credible.

8   Q.  When you say the logic of the story, what do you mean?

9   A.  I mean I made up the story so sometimes it doesn't sound

10  like a real story.  So the logic is not sounds like a real

11  story.

12  Q.  When she reviewed that, would she indicate her comments

13  anywhere?

14          MR. FISCHETTI:  Objection.  Leading.

15          THE COURT:  I'll allow it.

16  A.  Yes.  Yes.  She, she would just make note, make notes on my

17  drafts.  Sometimes add and delete some sentence I wrote.

*(No evidence about the note, if any. she is attorney, she have link with James*
*Lin, if there any notes, she will offer with other evidence to the court)*

18  Q.  Say that again.  Add or --

19  A.  And delete the sentences I wrote, and change some scenarios

20  without confirming with the clients.

21  Q.  When you say change scenarios, what do you mean by that?

22  A.  I can, in that draft, I didn't mention the clients was beat

23  up so severely, but she would just add the sentence to describe

24  how or when and how the client was beat up.

25  Q.  Would she ever explain to you why she was making the

1244

E41Wliu5                    M. F. Yu - direct

1    changes she made?

2    A.  At first she explain sounds credible, sounds better.

3    Q.  And you said that when she made these changes, would she

4    talk to the client?

5    A.  No.

6    Q.  Were there any other details of the story she would change?

7    A.  Yes.  A few times, she change the claim completely.

8    Q.  What do you mean by that?

9    A.  I had a case that is a female applicant.  At first her

10   claim is family planning and I wrote a story.  Her, she did

11   gave, give birth to boy in government hospital in China.  I

12   just wrote the story based on her real life, just to add some

13   persecution part.  Then I handed the story to Ms. Liu.  But

14   since this woman already gave birth to baby in China, so it's

15   not easy to win the case, Ms. Liu just kept this case.  A few

16   months later, I met this applicant again.  I talked with her.

17   She said her claim changed to Christianity.  But those cases

18   didn't happen very often.

*(client complain you are lazy and made fake story for her, so she did like you,
she ask other paralegal help pursue her real claim)*

19   Q.  When Ms. Liu would make comments, how would she make

20   comments, orally or in writing?

21   A.  In writing.

22   Q.  And where would she make those comments?

23   A.  Just on my drafts.

24   Q.  After you got the comments, what would you do with that?

25   A.  Then I went back to my computer and change my copy based on

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E41Wliu5                    M. F. Yu - direct

1   her, just on her notes, then print the drafts out, let the

2   client copy by hand.

3   Q.  You said let the client copy by hand?

4   A.  Yes.

5   Q.  Why did the client copy by hand?

6   A.  So seems the story were written by themselves.

7   Q.  What about the letter, what would you do with the letters?

8   A.  The same thing.  After Ms. Liu or Feng Li review, I just

9   ask her clients to copy by hand.

10  Q.  And did you give them any instructions with respect to

11  those letters?

12  A.  I'm sorry?

13  Q.  Did you give them any instructions about what to do with

14  those letters?

15  A.  Yes.

16  Q.  What were those instructions?

17  A.  Sometimes we would suggest use different, different style

18  paper to copy the letters.  Don't use the same paper for, for

19  every letters.

20  Q.  And why not?

21  A.  If the same paper, the same, seem like fake.

22  Q.  And any other advice you would give them?

23  A.  Yes.  We want make sure they, the date on the letter are

24  different.

25  Q.  The dates on the letter?

E41Wliu5                    M. F. Yu - direct

 1    A.  Yes.

 2    Q.  Why was that important?

 3    A.  They use the same kind of paper and wrote the letter on the

 4    same date, seems too coincident, seems fake.

 5    Q.  I think you said earlier they would then send these letters

 6    back to China?

 7    A.  Yes.

 8    Q.  When they were sent back, were they sent back to the

 9    applicant or to the firm?

10    A.  To the firm.

11    Q.  So you've mentioned certificates and the letters.  You also

12    mentioned one-year evidence.  What is one-year evidence?

13    A.  One-year evidence, we required the client to prove

14    witnesses.  The witnesses must prove affidavit and the

15    affidavit shows the witness met the applicant in China within

16    one year before the applicants made the asylum application.

17    And also, if they can, we would ask them to provide some

18    shopping receipt or airline ticket to show they, that some of

19    their asylum application one year after they arrive in this

20    country.

21    Q.  In your experience at the firm, were there ever people who

22    had been in the country for more than a year?

23    A.  Many of them.

24    Q.  Dealing with specifically that first type of evidence, how

25    would they get a witness?

E41Wliu5                    M. F. Yu - direct

1    A.  Sometime they just ask their family or friends do a favor

2    and sometime they, they just use money to pay a witness to

3    testify for them.

4    Q.  Did you ever see, in your experience at the firm, someone

5    who testified as a one-year witness for more than one

6    applicant?

7    A.  Yes.

8    Q.  Were there ones who testified for several applicants?

9    A.  Yes.

10   Q.  You also mentioned getting receipts.  How would a client

11   get receipts showing they'd been in China within the last year

12   when they had not been?

13   A.  Some clients told me their families in China bought the

14   blank receipts and their families are filling the blank

15   receipts just to fill the products they bought in China and put

16   the date in the receipts.

17        THE COURT:  When you said receipts, did you say blank

18   receipts?

19        THE WITNESS:  Yes.

20   BY MR. EGAN:

21   Q.  Other than receipts, were there other types of evidence

22   along the lines of what you're describing?

23   A.  Sometime they, they can buy airline tickets.

24   Q.  An airline ticket?

25   A.  Yes.

1248

E41Wliu5                    M. F. Yu – direct

1   Q.  How would they get an airline ticket?

2   A.  Just they buy the ticket.  I don't know how they get them.

3   Q.  When you say buy the ticket, do you mean a real ticket or

4   fake ticket?

5   A.  Fake ticket.

6   Q.  Would they buy that in the United States or in China?

7   A.  In China.

8            MR. MAHER:  Judge, could we approach briefly.

9            THE COURT:  Yes.

10           (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1249

E41Wliu5                        M. F. Yu - direct

```
 1              (At the side bar)
 2              MR. MAHER:  Judge, I just wanted to reraise the
 3       objection we made earlier.  Almost every question is being
 4       framed as would, would you have met clients, what would
 5       Mrs. Liu or other lawyers have said, what would they have done,
 6       what would you have done.  There is absolutely no specificity
 7       at all, and I don't think it's proper.  I don't think it's
 8       proper testimony and not proper questions, and my concern as
 9       far as my client, Ms. Bandrich, is that it's going to spill
10       over, that the jurors will think there's just generalized
11       practice going on with no specificity at all.
12              MR. FISCHETTI:  Can I just join in that, please.  I
13       raised that before, Judge, and one of the problems with it is
14       that the questions are inherently leading, Would you, would
15       they, and really suggesting the answer.  And that dovetails to
16       what we're talking about.  The defense of this case, Judge,
17       basically is going to be, and I think the government knows and
18       may well be put forth by me, that there are a number of people
19       that worked for Feng Ling Liu in the firm that may have been
20       doing corrupt things, but she basically didn't know about it.
21       So every time he says the firm, it's Feng Ling Liu's firm and
22       it impacts my client, and I don't think he should use that
23       term.  Your Honor allowed it last time.
24              THE COURT:  Allowed what term?
25              MR. FISCHETTI:  The firm.  I objected to that and your
```

E41Wliu5                    M. F. Yu - direct

1   Honor overruled my objection and said they can say the firm.

2   What Mr. Egan is saying, he's making this a fraud factory.

3   That may be his argument, but he can't say the firm.  The

4   testimony that my client trained her is going to be tested by

5   me, and that's okay, if he wants to say that, but he can't keep

6   continually saying the firm would do this.

7             MR. EGAN:  I asked what she did.  I said in your

8   experience at the firm, what did you do when somebody --

9             MR. FISCHETTI:  I think you're saying what would they

10   do, what would the firm do.

11             THE COURT:  I thought I had actually sustained these

12   objections in the past and I think I've indicated once before

13   that the government should be careful to make sure they're

14   eliciting what particular people did, and I know you've been

15   asking what she did, but instead of using the word "would," and

16   I think I've said this before, ask what did happen, what did

17   you see, not what would happen, but what did you see.  And in

18   doing that also be sensitive not to lead, but focus more on

19   what actually happened and who did it and not what would happen

20   as a matter of course.

21             MR. MAHER:  Also what she did, what would she have

22   done.

23             MR. EGAN:  I apologize.  I don't believe I was asking

24   that.  If I was, I'll look back at it.  I'm trying to ask what

25   she did in the circumstances.  Obviously she worked there for

E41Wliu5                    M. F. Yu - direct

1    three years, and she is trying to provide examples.

2            THE COURT:  If she provides an example, I think you

3    can follow up and say when that happened, what did you do, as

4    opposed to what would you do.  Okay?

5            MR. EGAN:  All I'm trying to get at is, and it seems

6    to me completely permissible, you worked here and you dealt

7    with, and I try to preface it with you dealt with a lot of

8    situations, did you have people who had been here more than a

9    year, yes, many of them, how did you handle those situations.

10           THE COURT:  Again, that's fine.  Asking what she

11   actually did is fine.  I think the objection is to the words

12   "what would you do," and I think we have had this conversation

13   before, as opposed to, What did you do when you were

14   encountering X situation.  So let's focus more on what was done

15   and be sensitive to not grouping people together and not talk

16   about the firm, but who did what.  I think you have been

17   focusing on individuals.  Okay?

18           MR. MAHER:  Okay.

19           MR. FISCHETTI:  Thank you, Judge.

20           (Continued on next page)

21

22

23

24

25

1    (In open court)

2    BY MR. EGAN:

3    Q.  What documents were included in the initial submission that

4    you made to the asylum office?

5    A.  About the application, I did cover birth certificate,

6    marriage certificate, kid certificate.

7    Q.  What was that last one?

8    A.  Children's certificate.

9    Q.  Children's certificate?

10   A.  Yes.  And the 5A9 application form, their story and their

11   attesting letters and the affidavit from, from the one-year

12   witness.

13   Q.  When all those documents were assembled, who signed the

14   form at that point?

15   A.  Always attorneys sign at the firm.

16   Q.  Was there a particular attorney whose job that was, or

17   could any attorney sign?

18   A.  Could any attorney.  Ms. Liu assign the job which attorney

19   should sign the application.

20   Q.  And who, when you started, were the attorneys at the firm?

21   A.  Ms. Liu herself.

22   Q.  And who were the other attorneys?

23   A.  Then Feng Li sign the application form.  Then I sign and

24   Bebe Xue sign a few and Troy Moslemi sign.

25   Q.  When you signed those forms, would you ever review the

1253

E41Wliu5                      M. F. Yu - direct

1    documents?

2    A.  No.  My job is only to sign on the firm.  I don't have

3    authorization to review the application.

*As lawyer you just sign the paper and don't have right to review it? who will believe it.*

4    Q.  When you say your job is to review the form, who told you

5    that was your job?

6    A.  Ms. Liu said, she call me to sign those forms.

7    Q.  She called you?

8    A.  Yes.

9    Q.  What do you mean by that?

10   A.  Because in 2010, she didn't come to office very often, so

11   we really communicate through phone.  I remember one day she

12   call me, From now on please sign those application forms.

13   Q.  One second.  Let me hand you what's in evidence as

14   Government Exhibits 505, 507, 508, and 513, already in

15   evidence.  I just want to show you some examples.  Starting

16   with 505, if you can take a moment to look at that, do you

17   recognize that?

18   A.  Yes.  I prepared this application form, her story and her

19   attesting letters.  Her story is not true.

20   Q.  In what way is it not true?

21   A.  I wrote the story for her.  She didn't tell me her

22   persecution and even her relationship with her boyfriend I made

23   up.

24   Q.  Do you know whether she had a boyfriend?

25   A.  I don't know.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   Q.  What kind of claim was that?

2   A.  It's a family-planning claim, and in her story she claimed

3   she, the Chinese government gave her forced abortion because

4   she got pregnant before marriage.

5   Q.  And turning to Government Exhibit 507, you can take a

6   moment to just look at that.  Do you recognize that?

7   A.  Yes, I remember this male applicant.

8   Q.  You said male applicant?

9   A.  Yes.

10  Q.  What do you remember?

11  A.  I prepared his story.  He's a very quiet, quiet man.  He

12  didn't talk too much.  I just based on her -- his marriage and

13  when his children were born and made up the story.

14  Q.  So the details you described first, that's what the

15  information you had?

16  A.  Yes.

17  Q.  What kind of claim is it?

18  A.  Family planning.  In the story, he claim his wife suffered

19  a forced abortion and he, when he protected his wife, he was

20  detained by the family planning officers and beat up by the

21  family planning officers.

22  Q.  Now look at Government Exhibit 508.  Do you recognize that

23  one?

24  A.  Yes.

25  Q.  What do you remember about that application?

1    A.  I remember this girl.  I, I wrote this story.

2    Q.  What kind of story is it?

3    A.  Also family planning.

4    Q.  What's the nature of the persecution?

5    A.  She, she got pregnant before marriage and family planning

6    officers forced abortion on her baby.

7    Q.  Was that story real or fake?

8    A.  Fake.

9    Q.  What parts of it are fake?

10   A.  From her relationship with her boyfriend to her

11   persecution, all a fake.

12   Q.  All of that is fake?

13   A.  Yes.

14   Q.  Looking at Government Exhibit 513, do you recognize that

15   one?

16   A.  Yes.  It's a Christian case.

17   Q.  What do you remember about that case?  What was your role

18   in that application?

19   A.  I know this story.  I remember this applicant's face.  It's

20   a Christian case.  She -- he said he believed in Christian in

21   China, attending a private church in China, but he was arrested

22   and detained for a while.

23   Q.  Is that story real or fake?

24   A.  Fake.  I wrote it for him.  He didn't tell me.

25   Q.  What, if any, details in there are real?

1    A.  I used, when I, maybe I, when I wrote the story, I, I asked

2    him who provide you attesting letter, just to give me the

3    relationship, the people who provide you letter, maybe he tell

4    me his aunt would write a letter for him.  So I just wrote his

5    aunt introduced him to the church.

6    Q.  You can put that down.  Just to be clear, are the

7    applications you're looking at the only fake applications you

8    worked on?

9    A.  No.

10   Q.  After an application was submitted, did the firm have any

11   more interaction with the client?

12   A.  Yes.  We would prepare them for the asylum interview.

13   Q.  Whose job was it to prepare them?

14   A.  Several people did that job.  Harry, Lucy, Lillian, Victor,

15   Andy, Vivian.
     *David never prepare them, otherwise he will find out the fraud and stop it.*

16   Q.  Who is Andy?

17   A.  Andy, Andy is Ms. Liu's niece -- nephew.  I'm sorry.

18   Q.  And how long after the application was submitted would the

19   asylum interview take place?

20   A.  A few weeks.

21            MR. EGAN:  I don't know if we're taking an afternoon

22   recess.

23            THE COURT:  Why don't we take a break, but really keep

24   it to five minutes to use the restroom and come back.

25            (Recess)

E41Wliu5                        M. F. Yu - direct

1       THE COURT:  How are we doing on scheduling?  Same

2   expectation?

3       MS. MERMELSTEIN:  I think we are a little behind where

4   we thought we'd be today, but we still think we will rest this

5   week.

6       (Jury present)

7       THE COURT:  You may proceed.

8       MR. EGAN:  Thank you.

9   Q.  We were talking about preparation for the asylum interview

10  stage.  Did the firm maintain any materials to help with that

11  process?

12  A.  I'm sorry?  Can you repeat.

13  Q.  Did the firm maintain any materials to help with the

14  preparation for the asylum interview?

15  A.  Yes.

16  Q.  What sort of materials?

17  A.  We have some religion knowledge, Christianity knowledge,

18  falun gong knowledge, and the question the asylum officers will

19  ask.

20  Q.  When you say knowledge, what do you mean?

21  A.  We have some Q & A.

22  Q.  Q & A?

23  A.  Yes.  Like the question about the religion and we provide

24  the answer.  We would hand those documents to our client, ask

25  them to memorize those knowledge.

E41Wliu5                    M. F. Yu - direct

1    Q.  And you had these for things other than religion?

2    A.  Yes.  Also for falun gong.

3    Q.  In your experience, how often were clients granted asylum

4    at the asylum interview stage?

5    A.  No more than five percent.

6    Q.  Did the firm take any steps to try to increase the

7    percentage of applicants who were approved at this stage?

8    A.  Yes.

9                MR. FISCHETTI:  Objection.

10               THE COURT:  Sustained.

11   BY MR. EGAN:

12   Q.  Did anyone at the firm take steps to increase the approval

13   rate at this stage?

14   A.  Yes.

15   Q.  Who?

16   A.  Victor You.  In about 2010, Ms. Liu send Victor to asylum

17   office.  He, he worked there as interpreter there, and he

18   listened what the asylum officers would ask, and when he came

19   back to the office, he create a lot of documents, including the

20   Q & A, the asylum officer's question, and which asylum officer

21   is easier to grant the case.

22   Q.  Which asylum officer was easier to grant the case?

23   A.  Yes.

24   Q.  How would the firm, how would, would someone, how was that

25   information used?

1   A.  He create some documents to bring out and hold them on the
2   wall of the office and he also prepare the clients for the, for
3   asylum interview.  He also train other paralegals about the
4   preparation.
5   Q.  Who directed him to do this?
6   A.  Ms. Liu.
7   Q.  What happened if someone is not granted asylum at the
8   interview stage?
9   A.  They need to go to court.
10  Q.  To immigration court?
11  A.  Yes.
12  Q.  So after they get their denial, what's the next step?
13  A.  You mean at the asylum office?
14  Q.  So if they get denied at the asylum office, what's the next
15  step?
16  A.  They would try to schedule master hearing first.
17  Q.  What's a master hearing?
18  A.  The judge set up a meeting.
19  Q.  Set up a meeting, you said?
20  A.  Yes.  And the applicant should appear at the court and the
21  judge would ask the basic information about the, the case and
22  then schedule individual hearing.
23  Q.  What was the time period typically from rejection at the
24  asylum office to a master calendar hearing?
25  A.  I'm sorry.  From asylum office?

E41Wliu5                    M. F. Yu - direct

1    the handwriting there?

2    A.  Yes.  Vanessa's handwriting.

3    Q.  And what about Government Exhibit 402?

4    A.  Vanessa's handwriting, too.

5    Q.  You can put those down.

6        Among the lawyers at the firm, were there any that you

7    were close with or saw socially?

8    A.  Yes.  I was close with Betty, Bebe Xue, Victor, Feng Li,

9    and Vanessa.

10   Q.  What did you guys do together?

11   A.  Sometime we had lunch together and with some people we hang

12   out very often.

13   Q.  How frequently would you have lunch with those people?

14   A.  A few weeks, every few weeks.

15   Q.  Did you guys ever discuss what happened at the office?

16   A.  Yes.

17   Q.  What did you discuss?

18   A.  When we had lunch, we talked the cases we had, we had, and

19   mistakes of those cases and our concerns about the case and our

20   jobs.

21   Q.  When you say concerns about your case and your job, what do

22   you mean by that?

23   A.  You know, because a lot of cases are fake, when people

24   fabricate those documents, they're very easy to make mistakes,

25   so when we represent clients in court, so we have so many

E41Wliu5                      M. F. Yu - direct

1    mistakes, it's so embarrassed, and we know this job is illegal.

2    I, I expressed several times during the lunch and worry about

3    this job, I'm worried about getting into trouble, so I want to

4    quit the job.

5    Q.  Which individuals did you express those concerns to?

6    A.  I expressed to several people, Victor, Feng Li, Vanessa.

7    And other people.

8    Q.  What, if any, response did you get from Victor?

9    A.  Victor?  You mean Victor?  He raise, he quit the job

10   first -- no.  He was fired.

11   Q.  Do you remember ever raising these concerns with Vanessa

12   Bandrich?

13   A.  I'm sorry.  What's the question?

14   Q.  Do you ever remember raising these concerns at a lunch

15   where Vanessa Bandrich was?

16   A.  Her concern or my concern?

17   Q.  Your concerns.

18   A.  My concern.  Yes.  I talked about I'm afraid the office

19   have been targeted by the government because we had many bad

20   cases and before, in two, in the summer of 2011, the office had

21   a very bad case.  My signature in the form, I never reviewed.

22   The asylum officers found out that case.  The applicant just

23   admit everything were prepared by the office, not her, and my

24   signature was there, so I was very scared.  I expressed my

25   concerns many times.

1    A.  Yes.

2    Q.  In the immediate lead-up to your leaving?

3    A.  I'm sorry?

4    Q.  Immediately prior.  I know you discussed some other

5    conversations, but immediately prior to leaving, did you have

6    any discussions about concerns that you had?

7    A.  Yes.  I also had such conversation with Ms. Liu in person.

8    Q.  With Ms. Liu?

9    A.  Yes.  As I told, when that bad case happen, there are a lot

10   of rumors around the office, so I think everybody in the office

11   was scared.

12            MR. FISCHETTI:  Objection.  "I think everybody."

13            THE COURT:  Just say what particular people did, to

14   the extent you remember.  Don't kind of group them together and

15   say everyone did this.  Say who you remember doing what.  Okay?

16            THE WITNESS:  Okay.

17            THE COURT:  Thank you.

18   A.  Okay.  You know, one day, Ms. Liu came to the office.  She

19   had a private conversation with Feng Li first.  I sat at same

20   office with Feng Li.  I overheard what they were talking about,

21   and then she moved to my desk and she talked with me about that

22   case and she also said don't worry, if the government give the

23   trouble to this office, the government want her or David, it's

24   not me or Feng Li, so she try to comfort us.

25   Q.  Now, also, going back to sort of preparation, you mentioned

E41JLIU6                    Yu - direct

1    Q.  When attorneys prepared clients, would they use any of the
2    materials that you described that were used in preparing for
3    the asylum interview?
4    A.  I don't know.
5    Q.  Did you use --
6    A.  Yes, I used those documents.
7    Q.  I want to -- if we can pull up Government Exhibit 407 -- if
8    we can do 407 T as well.
9            Do you recognize that?
10   A.  Yes, that's the Christian knowledge I mentioned Q and A.
11   Q.  Did you use that while working at Feng Ling Liu law firm or
12   Moslemi Associates?
13   A.  Yes.  I often gave those knowledge to our clients before
14   the interview interview and the hearing.
15   Q.  If we can pull up Government Exhibit 408 and 408 T.  Do you
16   recognize this?
17   A.  Yes, it is another version of Christian knowledge.
18   Q.  Did you use this while you were working at Feng Ling Liu or
19   Moslemi?
20   A.  Yes.
21   Q.  How would you use it in your preparation?
22   A.  I would bring them out and hand them to the clients and ask
23   them to memorize every question in this paper.
24   Q.  Looking at Government Exhibit 410, do you recognize that?
25   A.  Yes, also Christian knowledge.

E41JLIU6                      Yu - direct

1    Q.  Now, you testified -- you can take that down -- that

2    shortly after you started working there, you realized that most

3    of the applications were fake.

4           Why did you stay?

5    A.  They cannot tell me what happened on them.

6    Q.  Why did you stay at the firm?

7    A.  Because it is a long story.  At first I wanted to take the

8    Bar exam.  Then my husband came to the United States, so we

9    needed a job because I needed status.  My husband got status, I

10   can transfer based on him, so I needed the job.

11   Q.  You testified previously about sharing your concerns with

12   people.  Was there ever a time that people at the firm took

13   steps to protect itself?

14   A.  Yes.

15   Q.  When was that?

16   A.  In early 2009 Ms. Liu changed the firm's name under choice,

17   Moslemi.  In 2011 she asked Harry to create a new firm.

18   Q.  She asked Harry to create a new firm?

19   A.  Yes.

20   Q.  Starting with the name change, did anyone ever tell you why

21   that was being done?

22   A.  Yes.

23   Q.  Who told you?

24   A.  Try and Victor told me.

25   Q.  What did they say?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E41JLIU6                      Yu - direct

1   A.  He said Ms. Liu doesn't want to attract the government's

2   attention because the firm is so big, they have so many cases.

3   Q.  What, if anything, happened around 2009 that led to some of

4   these changes?

5   A.  I am sorry?

6   Q.  What, if anything, happened in 2009 that led to some of

7   these changes?

8   A.  2009, they changed the name while I was preparing for my

9   Bar exam.  When I came back from my vacation, the name already

10  changed.

11  Q.  Was there ever a time where other changes were discussed or

12  implemented?

13  A.  Yes, yes.  In 2009 one day Troy came to our paralegal's

14  office and he said an immigration office in Boston was cracked

15  down by the government because they were doing the same thing

16  like we did.

17          He was scared and then he talked this issue of this

18  Harry.  I believe he also talked the business knew about this

19  case.  So later the office policy changed.  We tried to ask the

20  client to --

21  Q.  First, before you get into that, who communicated these

22  policy changes?

23  A.  I forgot the specific person.  Should be Ms. Liu.

24  Q.  Do you remember any specific --

25          MR. FISCHETTI:  I didn't hear that answer.

E41JLIU6                    Yu - direct

1     THE COURT:  Would you repeat the answer please.

2     MR. FISCHETTI:  Did you say should be?  I object and

3  move to strike.

4     THE COURT:  It is not the specific person should be,

5  Ms. Liu.  You can't say who somebody should be.  You have to

6  say what you remember actually happening.

7     THE WITNESS:  Okay.

8  BY MR. EGAN:

9  Q.  Do you remember any specific meeting or changes about a

10  conversation about these changes?

11  A.  Yes.

12  Q.  Describe that meeting.

13  A.  The meeting in our paralegal's office, we were notified,

14  asked the client to draft their story first.  We can change it

15  based on their drafts.

16  Q.  The first step, who called this meeting?

17  A.  I am sorry, I forgot the specific person.

18  Q.  One policy change you said that the clients were going to

19  draft the story first?

20  A.  Yes.

21  Q.  And what other steps?

22  A.  And the client drafted the attesting letter based on their

23  story.  Then we review their story and attesting letter and

24  make some changes.

25  Q.  If the stories weren't real, what did the clients base

1274

E41JLIU6                          Yu - direct

1    their stories on?

2    A.  You know, when I asked the client to write their stories,

3    many, many people don't know how to write.  So I always gave

4    them some samples.

5    Q.  Some samples?

6    A.  Yes.

7    Q.  Did this policy, this having clients write their stories

8    first, did that get implemented?

9    A.  Yes.

10   Q.  How long did it last?

11   A.  For me, I carried out that policy a few months, but I had

12   so many cases, a lot of the clients don't know how to write, so

13   sometimes I just gave up and I wrote for them.

*(David never allow you wrote for them, you just are lazy, don't have patient)*

14   Q.  You just went back to writing for them?

15   A.  Yes.

16   Q.  What other policy changes?

17   A.  Like we were told never talk sensitive, have any sensitive

18   conversations through phone, always ask the client to come to

19   the office.

20   Q.  Why was that?

21   A.  Because there is a rumor the government has already tapped

22   our phone.

23   Q.  Any other policy changes?

24   A.  Sorry, I forgot.

25   Q.  Those are the ones you remember?

E41JLIU6                    Yu - direct

1   A.  I am sorry?

2   Q.  When you would write a story and get comments back, what

3   would you do with the draft that had comments on it?

4           MR. GERMAN:  Objection.

5           THE COURT:  What did you do?

6   BY MR. EGAN:

7   Q.  What did you do with the draft that had comments on it?

8   A.  At first I don't know how to protect myself, so I just

9   delete the draft.

10  Q.  Did there come a time when that changed?

11  A.  Yes.  In the summer 2010 Ms. Liu asked to destroy the

12  drafts in every files.  She used several months to do this.

13  Q.  Who is Ann?

14  A.  Ann, Ann is another paralegal in the office, and she's a

15  sister of David.

16  Q.  When you say the "files," are those the hard copy files?

17  A.  Yes.

18  Q.  What, if anything, was done to the computer files, if you

19  know?

20  A.  In the computer I always saved the final version.  As I

21  know when Tom, who did the translation, translated the Chinese

22  story to English, he always deleted the Chinese version in our

23  computer.

24  Q.  After Ann was asked to destroy these, did that change your

25  practice?

E41JLIU6                    Yu - direct

1    A.  At that time I had already been working as an attorney.

2    Q.  So you weren't dealing with the stories any more?

3    A.  I didn't need to write the story.

4    Q.  Did you, in response to these concerns, did you take any

5    personal steps to protect yourself?

6    A.  Yes.

7    Q.  What did you do?

8    A.  Before I left the firm, I had some conversation with

9    Victor.  He said we were getting travel in the future so to

10   protect ourselves, get some documents from the office, maybe

11   someday we will use it to protect ourselves.

12   Q.  Again when did you end up leaving the firm?

13   A.  October 15, 2011.

14   Q.  Why did you leave on that date?

15   A.  My husband H-1 visa expired on October 1st.  I told Ms. Liu

16   I want to quit.

17   Q.  That day you told her?

18   A.  The first week of October, but she wanted me to stay one

19   more week, so I left on October 15th.

20   Q.  Where, if anywhere, did you work after that?

21   A.  From October 15th until I got --

22   Q.  Until you got what?

23   A.  -- deferred action.

24   Q.  What is deferred action?

25   A.  Deferred action is a different action of removal.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E41JLIU6                      Yu - direct

1    A.  Yes.

2    Q.  You would have been able to if you did not have that

3    document?

4    A.  No.

5    Q.  So you needed that document to be able to return?

6    A.  Yes.

7    Q.  You mentioned working with the FBI.  When did the FBI first

8    approach you?

9    A.  February 2012.

10   Q.  How long had you been gone from the firm at that point?

11   A.  Four months.

12   Q.  When they approached you, do you remember who approached

13   you?

14   A.  Yes.  FBI officer Dan Cruz and another officer, I forgot

15   what his name.

16   Q.  What, if anything, did they say to you?

17          MR. FISCHETTI:  Objection.

18          THE COURT:  Sustained.

19   BY MR. EGAN:

20   Q.  They spoke to you?

21   A.  Yes.

22   Q.  After that conversation, did you agree to cooperate with

23   the FBI?

24   A.  Yes.

25   Q.  I am showing you what is marked for identification as

E41JLIU6                    Yu - direct

1    A.  No.

2    Q.  Has the government or anyone else made any promises to you

3    that are not included in that agreement?

4    A.  No.

5    Q.  As part of your agreement, did you plead guilty to certain

6    crimes?

7    A.  Yes.

8    Q.  What crimes are those?

9    A.  Immigration fraud.

10   Q.  Do you remember how many different crimes you pled to?

11   A.  I am sorry?  I forgot.

12   Q.  Did you plead to a count of immigration fraud?

13   A.  Yes.

14   Q.  Did you plead to a count of conspiracy to commit

15   immigration fraud?

16   A.  Yes.

17   Q.  When did you --

18            MR. MAHER:  Is the witness reading the document?

19            THE COURT:  Just answer based on your memory.

20            THE WITNESS:  Yes.

21            THE COURT:  If you can't remember something, just say

22   you can't remember, okay?

23            THE WITNESS:  Okay.

24            THE COURT:  Don't look at a document or anything else.

25            THE WITNESS:  Okay.

E42Wliu1

1          MR. GERMAN:  Yes, your Honor.  It's a pretty

2     straightforward issue.  On potential Government Exhibit 112T,

3     there is approximately eight pages of recorded or transcribed

4     statements.  Essentially, so your Honor understands, the CI

5     goes to the Bandrich law firm and is given his personal

6     statement to review and write out in Chinese.  While he's doing

7     this, he's sitting at a table and the recorder continues to go.

8     The government has transcribed, I believe, six different

9     unidentified individuals in addition to Ms. Yang.  We don't

10    know the context of these conversations.  We don't know who is

11    speaking to whom.

12          First of all, it's hearsay.  We have no idea who these

13    individuals are, and so I approached the government a few days

14    ago.  This isn't a situation, your Honor, where we're just

15    trying to remove two sentences in the middle of a dialogue

16    between the confidential human source and Ms. Yang.  This is

17    straight dialogue for eight straight pages.  So what we're

18    talking about is just blocking out and redacting eight straight

19    pages and simply resuming once the confidential human source is

20    once again having a dialogue directly with Ms. Yang.

21          I think it's hearsay.  I think even if it's relevant,

22    it is very confusing.  We have these unidentified parties.  Who

23    are they?  What are they talking about?  There's

24    unintelligibles all over the place in this part of the

25    transcript.  And I thought we would be able to resolve it.  I

E42Wliu1

1            MR. EGAN:  I'd ask you to stop there.

2      Q.  Ms. Yu, first of all, the two voices that the jury heard

3      there, who were those two voices?

4      A.  Vanessa and me.

5      Q.  Had you ever heard while working at the firm Ms. Liu or

6      rumors that Ms. Liu wanted to close down the office?

7      A.  Yes.

8            MR. MAHER:  Judge, I'm going to object as far as

9      rumors.

10           THE COURT:  Sorry.  I didn't hear the basis of the

11     objection.  Oh, as far as rumors.

12           MR. MAHER:  Yes.

13           THE COURT:  Yes.  I think that's right.  Sustained.

14     BY MR. EGAN:

15     Q.  Had you ever heard that?  First of all, when you're

16     discussing Ms. Liu here, we've heard a number of Ms. Lius, who

17     do you mean?

18     A.  Feng Ling Liu.

19     Q.  Have you ever heard from anybody that she was considering

20     closing down the office?

21     A.  Yes.

22           MR. MAHER:  Objection to leading, your Honor.

23           THE COURT:  Please don't lead.  Just ask who she heard

24     something from, if she heard it.

25           MR. EGAN:  I was just trying to establish if she heard

1333

E42Wliu1

1    something like that.

2    Q.  Who did you hear that from?

3    A.  I heard it from Feng Li and Ann.

4    Q.  And Ann?

5    A.  Yes.

6    Q.  What did Feng Li tell you?

7    A.  Feng Li says Ms. Liu talked with him before and she

8    expressed her concern about safety of the firm and she said she

9    was thinking about to close the firm, but she also said her

10   husband, David, wants Feng Li to keep the business going.

11   That's --

12   Q.  What do you mean by the safety of the firm?

13           MR. FISCHETTI:  Objection.

14           MR. EGAN:  It's her statement.

15           MR. FISCHETTI:  What did she mean?

16           MR. EGAN:  No.  What did the witness mean when she

17   just testified about safety of the firm.

18           THE COURT:  Just tell us what you meant, not what you

19   think that someone else might have meant.  Okay?

20           THE WITNESS:  Okay.

21   A.  I mean the safety of the office.  I mean we're doing a lot

22   of illegal thing.  We filled a lot of fraud application, and we

23   were worried about the government target at us, our office.

24   Q.  Do you recall the incident that is described here where

25   Ms. Liu tried to comfort you?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1334

E42Wliu1

1   A.  Yes.

2   Q.  Describe the circumstances of that.

3   A.  In summer, in about July 2011, a female applicant failed a

4   fraud application and the asylum officers just found evidence

5   against her and she, when asked at interview she told asylum

6   officer our office prepared a story for her, prepared

7   everything for her.  So my signature was on that application.

8   That female applicant returned to our office after the asylum

9   interview.  She told what happened at the asylum office to

10  Ms. Liu and David.  Ms. Liu and David ask her to write

11  affidavit saying that it's her who wrote the statement, she

12  never told us she been living in this country more than one

13  year.  And they also ask her to hide it from the government,

14  and I was very worried about this case because my signature was

15  on the application form.  Li Feng also worry about and I also

16  talk with Ann, Lillian.  I express my concern to those people,

17  so one day --

18          MR. MAHER:  Objection at this point, Judge.  It's no

19  longer responsive.

20          THE COURT:  I'll let her finish her answer.

21  A.  One day, Ms. Liu came to our office.  She had talked to

22  Feng Li first about this case and about the worries and the

23  concerns around the office.  Then she came to my desk and she

24  said, Don't worry about that case, they will handle well, and

25  if the government wants give some trouble to this office they

E42Wliu1

1    want her and David, it's not me and Brandon.

2    Q.  I want to turn your attention in the transcript to page 16

3    where it begins, "So Ms. Liu."

4         MR. GERMAN:  Ms. Geier, can we play that.

5         (Audio recording played)

6    BY MR. EGAN:

7    Q.  Ms. Yu, while you were working at the firm, did you ever

8    cut and paste a story directly?

9    A.  I never done that.

10   Q.  Why not?

11   A.  Most time, I made up the story, but I would write a new one

12   based on, based on life experience of the applicants.

13   Q.  Why is it a problem to cut and paste?

14   A.  They will look very similar.

15   Q.  In terms of similarity, when you said, "Every time a

16   Christian story comes, same thing," what did you mean by that?

17   A.  I mean for every Christian story, we have the same story

18   logic, same story pattern.  First paragraph we would introduce

19   to applicant background where he come from, how he believe

20   Christianity.  And then second paragraph we would say where he

21   attended private church in China.  And the third paragraph we

22   would say how he was arrested, he was detained and beat up.

23   Then last we would say how he left the country.  Always the

24   same thing.

25   Q.  If I can ask you now to turn to 133T, what is this?  You

1336

E42Wliu1

1    said this was a transcript of another recording you made.  Who

2    was involved in this?

3    A.  Vanessa and me.

4    Q.  What were the circumstances?

5    A.  We had lunch at same cafeteria.

6    Q.  And when did this take place?

7    A.  June 2012.

8    Q.  I ask you to turn to page three.  About two-thirds of the

9    way down, it says, "Just like what I told you before."

10             MR. EGAN:  And, Ms. Geier, we can play that.

11             (Audio recording played)

12             (Continued on next page)

13

14
15
16
17
18
19
20
21
22
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
        E240liu2                    M.Yu - direct
 1   A.  If I can pause there for a second.

 2          The amendment to the application that are described,

 3   when you worked at the firm, did you ever have to do things

 4   like that?

 5   A.  Yes, many times.

 6   Q.  Under what circumstances?

 7   A.  When we prepared package, we, the paralegal often made

 8   mistakes in the stories or attesting letters, so to corrected

 9   those mistakes, we wrote something, an amendment.

10   Q.  What kind of mistakes?

11   A.  All kinds of mistakes.  Because the stories are not true.

12   It's made up by the paralegals.  It is not easy to make a

13   perfect line.  So they often made mistakes.  For example, the

14   date, the -- in the letter, in a statement, it was said the

15   applicant was detained for, for example, eight days.  But in

16   when preparing attesting letters, the paralegal carelessly

17   wrote six days, so such kind of mistakes.

18   Q.  When that happened, when those mistakes were made, what did

19   you do?

20          MR. MAHER:  Objection, formulation.

21          THE COURT:  What did you do?

22   A.  When I was working as a paralegal, I would have prepared

23   another attesting letter from the same person to explain why

24   they made a mistake in the last letter.

25          MR. EAGAN:  We can keep playing.
```

E240liu2                          M.Yu - direct

1            (Tape played)

2            MR. EAGAN:  Looking back, when you said, you know,

3     these things happen every day, what things are you referring

4     to?

5     A.  Refer several things.  First, lot of cases we found have a

6     lot of mistakes.  And many client have no idea about asylum.

7     So they just ask our office to do everything for them.

8            Sometimes they are very carefulized about our job.

9     And paralegals sometimes are very careful as to prepare the

10    evidence, to choose the evidence.

11           We also -- some ladies who are asylees, they get their

12    green card from asylum.

13    Q.  And towards the bottom of it, when you said, Yes, they

14    really don't deserve, who are you referring to, they?

15    A.  I mean the clients.

16    Q.  I want to -- and let me ask you this.  You also said:  I

17    don't think the government will ban this.

18           What did you mean by that?

19    A.  I mean I don't think the U.S. government will ban those

20    asylum in the future.

21    Q.  I want to -- if I can ask you to skip to 139.  You

22    testified yesterday that's a transcript of a conversation.

23           Who was involved in that conversation?

24    A.  Vanessa Foley and me.

25    Q.  And where did this take place?

E240liu2                        M.Yu - direct

1    A.   At the same cafeteria.

2    Q.   Say that again?

3    A.   The same cafeteria.

4    Q.   And approximately when was that?

5    A.   July 2012.

6    Q.   I just want to play a short part.  If we can go to page

7    four, towards the bottom, when it says: When I have to.

8             (Tape played)

9    BY MR. EAGAN:

10   Q.   Are you familiar with the case she is describing?

11   A.   I'm not very familiar with that.

12   Q.   Why is it a problem if someone had come to the country

13   previously and not asked for asylum?

14   A.   I'm sorry?

15   Q.   Why is it a problem, if someone had come to the country

16   previously and not asked for asylum?

17   A.   Oh.  If they suffer persecution, they know U.S. Government

18   accept asylum, why they wait so long to make their application,

19   that would be issue for the ground of the case.

20   Q.   Did you ever have cases like that?

21   A.   I -- I don't have such kind of case.

22   Q.   I want to, I want to -- we're skipping ahead to 154.  If

23   you can, you can see there are several parts of that

24   transcript.  But let me ask you, first, was there anybody else

25   that the FBI asked you to record conversations with?

```
E240liu2                        M.Yu - direct
```

1   A.  Yes.

2   Q.  And Liu is Feng Ling Liu?

3   A.  Yes.

4   Q.  I'm going to ask you, if you can, starting at the bottom of

5   12, to read the parts that are you, and Ms. Mermelstein will

6   read the parts of Feng Ling Liu.

7   A.  Okay.

8   Q.  So starts where it says:  What about the client.

9         Now.

10        "FENG LING LIU:  I said that there was a significant

11   level dependence.

12        "YU:  Oh.

13        "FENG LING LIU:  They do not want to think.  You tell

14   them one less thing, and that's where they leave live it.  That

15   is it, that is that.

16        "YU:  It used the be the case as well, the level of

17   the dependence used to be significant too.

18        "FENG LING LIU:  That's what I'm saying.  So it is

19   relatively more painful when you work on it. Hm.

20        "YU:  What I worry the mostly is that things are okay

21   in terms of discussion at the office, but they immediately

22   forget what they prepared as soon as they arrive in court.

23        "FENG LING LIU:  Yeah, so you need to repeatedly

24   emphasize with her, and that everyone needs to be taught these

25   things when they come in.  These, whatever you say in front of

E240liu2                    M.Yu - direct

1   me today, that's what you say, even if there is a knife on your
2   neck when you go to court.  If they pressure you about what
3   time on that day, what was the weather like that day, and so
4   on, and you have no idea, you cannot simply spit it out if they
5   ask you three times.  Some people make it up carelessly.  After
6   you make up the first sentence, you won't be able to make up
7   the next sentence, and they will be exposed in a short
8   amount of time.  So I think you need to emphasize repeatedly
9   for each case, and then the assistant needs to make it very
10  clear, when making preparations not, to think that you are
11  smart and you can deceive other people. Hm.

12              MR. EAGAN:  Stop right there.

13              And if we can -- go ahead to 154E-T.

14  Q.  So that was a call at the end of August.  Did you place

15  another call?

16  A.  Yes, in early September 2012.

17  Q.  And --

18              MR. FISCHETTI:  May I have a moment to find it,

19  please?

20              MR. EAGAN:  Okay.

21              MR. FISCHETTI:  Thank you.

22              Okay, got it.

23  BY MR. EAGAN:

24  Q.  So when did this next phone call happen?

25  A.  September.

1344

E240liu2                          M.Yu - direct

1    Q.   September?

2    A.   Yes.

3    Q.   And who was on the call?

4    A.   Ms. Liu and me.

5    Q.   And if I can have you turn to the bottom of page 2 where

6    you say: Attorney Liu.

7              At the very bottom.

8              "YU:  Attorney Liu, I wanted to tell you this.  I will

9    also talk it over with Shu Feng.  I want to go back to work, I

10   have been thinking for a long time.  Besides, I got along with

11   my co-workers.  However, when we talked about it, I was a

12   little bit worried.  The reason is that I quit a job because

13   the work was quite stressful and it was quite intense.  There

14   were many issues of the several cases around the time I left.

15             "FENG LING LIU:  (Clears throat)

16             "YU:  And then I was a bit worried every time when I

17   would stand in court, I feel very stressful.  I kept thinking

18   that the client would all of a sudden say, well, she fabricated

19   this story, she taught me how to say that.

20             And there was a lot of, during the period, later on,

21   he got documentation and he said when I look for another job,

22   so I quit.

23             I'm thinking is it possible that when I go back to

24   work, whatever type of work it will be, even one that is lower

25   paid, but I don't particularly want to go to court.  I'm

E240liu2                    M.Yu - direct

1    think -- I think that I can get that done well.

2             "FENG LING LIU:  Mm, mm, okay. (Clears throat) That,

3    unintelligible, keeps going.

4             "YU:  Primarily, I'm under quite a bit of

5    psychological pressure and particularly nervous when go to

6    court, and always afraid that client will blame everything on

7    me.  And then, later, the last several months I will feel very

8    stressed.  I read that somewhere one will say that we made up

9    the story.  I could not be sure of that, so I feel that I am

10   better off staying in the office.

11            "FENG LING LIU:  Mm, mm, mm, okay.

12            "YU:  And in terms of the --"

13            MR. EAGAN:  Stop there.

14            THE WITNESS:  Okay.

15   Q.  Ms. Yu, I want to return to, was that the last phone call

16   you had with her?

17   A.  Yes.

18   Q.  I want to return, briefly, to something you had referred to

19   yesterday.

20            Yesterday, you mentioned the firm getting a new name,

21   and the firm splitting apart, as to safety measures they had

22   taken.

23       When the firm changed names, what if anything changed about

24   how the firm was operated?

25   A.  Nothing changed.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E240liu2                    M.Yu - direct

1    Q.   After the firm changed names, who was your boss?

2    A.   Ms. Liu.

3    Q.   Do you remember when the second office opened?

4    A.   You mean Vanessa's office?

5    Q.   Correct.

6    A.   In about 2010; summer 2010.

7    Q.   Did you discuss, with anyone at the Feng Ling Liu firm, why

8    that happened?

9    A.   Yes, I talked with Feng Li and Vanessa and Rachel.

10   Q.   What did Vanessa say about the switch of the firm or

11   opening a new firm?

12   A.   She said Ms. Liu wanted her to open new firm under her

13   name.  She said she was not sure whether she would do that,

14   because there would be a lot of responsibility and the

15   pressure.  And, at first, she said she would think about it.

16   Q.   Did she express any other concerns about doing it?

17   A.   That's what she told me.  I talked to Mrs. Feng Li and

18   Victor.  Feng Li and Victor told me Ms. Liu wouldn't do that

19   because our office has so many cases, we have attracted a lot

20   of attention from the government.  Ms. Liu was worried about

21   that.  She even sent somebody to court to count how many cases

22   we had every day, compare other, the cases from other firms.

23   So she want to start a new office and separate the case to that

24   new one.

25              MR. EAGAN:   If I can have one moment, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E240liu2                    Yu - cross

1    Q.  The government basically asked you to be deceitful to her,

2    correct?

3    A.  It's not -- it's not a deceit.

4    Q.  That's not deceit?  So you were honest about it?

5    A.  The government asked me to do it.

6    Q.  I'm not asking you about what the government told you?

7    A.  Okay.

8    Q.  You were not being honest with Vanessa about the

9    circumstances of your sitting down and having lunch with her,

10   were you?

11   A.  Yes.

12   Q.  That was not just what you were doing, you were not just

13   having lunch with her, right?

14   A.  No.

15   Q.  You were trying to get her to say something incriminating

16   on a secret recording device on yourself, correct?

17   A.  Yes.

18   Q.  So would you agree with me that that type of behavior is a

19   form of deceit?

20   A.  I cannot agree with you.

21   Q.  You can't agree with me?

22   A.  I'm sorry.

23   Q.  We'll agree to disagree.  We'll move on.

24        You were contacted -- I'll use this word "contacted" -- by

25   the FBI in February of 2012?

                                                      1489
         E430liu1                    M. Yu - cross - Maher

1            Right?

2    A.  Yes.

3    Q.  And if -- we'll play it again and I want to see if you hear

4    these words.  Instead of I just heard a funny story, you also

5    say:  You know -- that's not a big deal, though.

6            So you say:  You know, Karen fired Shu.

7            Vanessa says:  Sorry.

8            You say:  Karen fired Shu, you don't know that.

9            Then some unidentified female yells:  Happy Mother's

10   Day.

11           And then Vanessa says:  Who is Karen?

12           And then you say:  Feng Ling Liu, Ms. Liu.

13           And Vanessa says:  Oh.

14           And you say:  Sorry.

15           And then Vanessa says:  She fired Shu?

16           And then you say:  You don't know that?

17               MR. MAHER:  So if we can go back to 1850, please.

18   Thank you.  We might need to switch back, please.  Thank you.

19               THE DEPUTY CLERK:  Right now?

20               MR. MAHER:  Thank you.

21               THE DEPUTY CLERK:  And this is for everybody?

22               MR. MAHER:  Yes, thank you.

23               (Audio recording played)

24               MR. MAHER:  Stop here, please.

25   Q.  Did you hear more words this time?

                        SOUTHERN DISTRICT REPORTERS, P.C.
                               (212) 805-0300

                                                      1529
          E430liu1                    M. Yu - cross - Maher

1    Q.  So James Lin actually invited you to his house for

2    Thanksgiving?

3    A.  Yes.

4    Q.  And did you attend?

5    A.  Yes.

6    Q.  And did you go with your husband?

7    A.  On that -- no, on that day, my husband was still in China.

8    He was not here.

9    Q.  Did James Lin ever tell you that he thought that the FBI

10   was investigating your law firm?

11   A.  He urged me to leave the office, he doesn't think this is a

12   good job for me.  He didn't say the FBI or the government is

13   actually investigating, but he said there is a possibility.

14   Q.  He told you to leave the law office?

15   A.  Yes.

16   Q.  When did he do that?

17   A.  Before I left the firm.

18   Q.  Before you left the law firm?

19   A.  Yes.

20   Q.  So, that would be before what date?

21   A.  Before August of 2011.

22             (Continued on next page)

23

24   BY MR. MAHER:

25   Q.  Before August of 2011?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

E43Wliu2                    M. F. Yu - cross

1      THE COURT:  Mr. Fischetti.

2   CROSS-EXAMINATION

3   BY MR. FISCHETTI:

4   Q.  Now, as you sit here today, testifying before this jury,

5   you are a convicted felon, are you not?

6   A.  Yes.

7   Q.  And according to you, everything you're telling this jury

8   is the truth, is that correct?

9   A.  Yes.

10  Q.  And you've told us, have you not, that the only person or

11  persons that can tell if you're telling the truth is the

12  government attorneys, is that right?

13  A.  Yes.

14  Q.  And if they believe you're telling the truth in this case,

15  then you'll get them to say to the judge give her substantial

16  assistance because she cooperated and take that into

17  consideration when you get sentenced, is that right?

18  A.  Yes.

19  Q.  And you told us you're facing 15 years, is that right?

20  A.  Yes.

21  Q.  And you told us that you hope you get zero.  Weren't those

22  your words?

23  A.  Yes.

24  Q.  And that's why you testified here, is that correct?

25  A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1594
E43Wliu2                    M. F. Yu - cross

1   Q.  Now, when you met with the prosecutors, you learned that

2   they wanted to get evidence against other people, did you not?

3   A.  Yes.

4   Q.  And one of those persons was my client, right?

5   A.  Yes.

6   Q.  So you were aware, were you not, that if you could get

7   evidence against her to tell to this jury, that would be

8   helpful to you with regard to your sentence?  Is that true?

9   A.  Yes.

10  Q.  So you told them a number of things about my client that

11  you said were crimes, right?

12  A.  Yes.

13  Q.  Crimes that you were, in fact, involved with?

14  A.  Yes.

15  Q.  And after they he interviewed you on a number of times,

16  they asked you to go out and try to get evidence to support

17  your testimony to them about your crimes, isn't that right?

18  A.  Yes.

19  Q.  And you tried to do that, isn't that correct?

20  A.  Yes.

21  Q.  And one of the ways you tried to do it is to get her on a

22  recording admitting that she committed these crimes, is that

23  true?

24  A.  Yes.

25  Q.  And that would have been very good for you, right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E43Wliu2                    M. F. Yu - cross

1    A.  Yes.

2    Q.  And that's what the government wanted you to do, is that

3    correct?

4    A.  Yes.

5    Q.  And you recorded her, I think, two or three times, with

6    basically the same conversation about going back to work,

7    right?

8    A.  Yes.

9    Q.  And, of course, that was a ruse; you really weren't going

10   to work there, right?

11   A.  I'm sorry?

12   Q.  That was a ploy, that wasn't the truth, you really didn't

13   want to go back to work there?

14   A.  I don't want to go back to work there.

15   Q.  You were just using that as an excuse to talk to her?

16   A.  Yes.

17   Q.  Saying that, you know, you came back from Chicago and you

18   really didn't want to go back to work for her and do certain

19   things, is that correct?

20   A.  Yes.

21   Q.  And that was your conversation with her, the recording that

22   we heard here, right?

23   A.  Yes.

24   Q.  And the purpose of that recording was to have her

25   incriminate herself and say that there were false stories,

E43Wliu2                    M. F. Yu - cross

1    isn't that right?

2    A.  Yes.

3    Q.  And to have her say that she had you make up these false

4    stories, is that correct?

5    A.  Yes.

6    Q.  And to have her say that you made up affidavits and had

7    people sign them that really weren't valid because they just

8    signed, isn't that right?

9    A.  Yes.

10   Q.  That was your purpose, okay?

11   A.  Yes.

12   Q.  And you recorded her on those conversations, I think, about

13   August 30, is that about right?  Does that seem right to you?

14   A.  The first was August 30 and the second one --

15   Q.  September 5?

16   A.  September 5, yes.

17   Q.  Those were the recordings, and in those recordings, you

18   were very friendly with her?

19   A.  Yes.

20   Q.  In fact, there were parts of the recording where she even

21   said to you, Let's go to lunch and chat, do you remember that?

22   A.  Yes.

23   Q.  And you could have had lunch with her, could you not?

24   A.  I could.  She refused my invitation.

25   Q.  The government refused to have you have lunch with her, is

1    that what you said?

2    A.  No, no, no.  I mean Ms. Liu refused my invitation for the

3    lunch.

4    Q.  Oh, okay.  Now, if you had lunch with her or talked to her,

5    you had learned to use a recording device, isn't that right?

6    A.  I don't know, because, you know, her husband call me before

7    and her husband ask my husband and me to go outside, have lunch

8    with him.  So I thought maybe I should, but later on he didn't

9    call me back.  So when I call Ms. Liu, I think maybe I should

10   bring up and invite them again.

11   Q.  Okay.

12   A.  Yeah.

13   Q.  My question was you learned how to use a recording device

14   that you could put on your person.  Isn't that correct?

15   A.  Yes.

16   Q.  Because when you spoke to my client, that was just a

17   telephone conversation, isn't that right?

18   A.  Yes.

19   Q.  You never met her in person after September 5, is that

20   correct?

21   A.  No.

22   Q.  And do you know the date when she was arrested in this

23   case?

24   A.  December 2012.

25   Q.  So that was four months after you made the recordings,

1    isn't that right?

2    A.  Yes.

3    Q.  And during those four months, you never went to see her,

4    isn't that right?

5    A.  No.

6    Q.  You never went to see her wearing a recording device, did

7    you?

8    A.  No.

9    Q.  You never called her on the telephone again, did you?

10   A.  No.

11   Q.  The FBI never said to you, Hey, we've got this recording,

12   but this isn't enough, you have to go see her again to get her

13   to admit the false stories, did they ever tell you that?

14   A.  No.

15   Q.  Did they ever tell you you should talk to her again on the

16   phone and have her try to admit that she made you write false

17   stories?  Did they ever say that to you?

18   A.  After that, no.

19   Q.  No?

20   A.  No.

21   Q.  And in that conversation with her, did she ever say to you,

22   You know, you don't have to come back and write false stories?

23   Did she ever say that to you?

24   A.  No.

25   Q.  Did she ever say to you, You can come back, but you don't

1599

E43Wliu2                          M. F. Yu - cross

1   have to do anything like you did before, writing false stories,

2   affidavits, or anything like that?

3   A.  No.

4   Q.  Did she say that to you?

5   A.  No.

6   Q.  Not at all.

7              MR. FISCHETTI:  Judge, I'm going to go into another

8   area, if that's okay.  You said quarter to, but I'll keep

9   going.

10             THE COURT:  Why don't we take our lunch break and

11  resume at 2:00.  Please keep an open mind and remember not to

12  discuss the case.

13             (Jury excused)

14             THE COURT:  Is there anything we need to discuss?

15  Have you resolved the issue with the transcript for purposes of

16  cross-examination?

17             MR. GERMAN:  The recordings.

18             THE COURT:  The recordings.  Okay.  See you at two.

19             (Luncheon recess)

20

21

22

23

24

25

1600

E430LIU3

```
 1                        AFTERNOON SESSION

 2                             2:00 p.m.

 3            THE COURT:  Is everyone ready for the jury?

 4            MR. MAHER:  Could we have two minutes, Judge.

 5            THE COURT:  Sure.

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

E430LIU3

```
 1            (In open court)

 2            (Jury present)

 3            (Witness resumes the stand)

 4            THE COURT:  You can be seated, Ms. Yu.

 5            MR. EGAN:  May I resume, your Honor?

 6            THE COURT:  Yes, of course.

 7            MR. EGAN:  Good afternoon, everybody.

 8   CROSS-EXAMINATION (Continued

 9   BY MR. FISCHETTI:

10   Q.  When we left, I asked you a question about was there some

11   arrangements for lunch -- and I'm going to call my client

12   Karen, is that okay?

13   A.  Okay.

14   Q.  Okay?

15   A.  Okay.

16   Q.  And Karen asked you to go to lunch, and you said I asked

17   her to go to lunch.  Do you recall that?

18   A.  Yes.

19   Q.  And you were correct.  Can you pull out for us, 154B in the

20   transcripts.  Do you have it, Ms. Yu?

21   A.  Yes.

22   Q.  Could you turn to page 4, half way down the page.  Are you

23   with me?

24   A.  Yes.

25   Q.  I want to read this part of it to you, which says: Well,
```

E430LIU3                    M. Yu - cross - Fischetti

1    let's do this.

2            Okay?

3    A.  Okay.

4    Q.  Basically what you are doing in that conversation is trying

5    to get some kind of meeting with Karen; is that right?

6    A.  Yes.

7    Q.  And you say:  Well, let's do this when I come back from

8    Chicago, let's get together for a meal in early July when I

9    asked David I was going the ask everyone to get together and

10   have a meal.  Later, when I called David, he said that you were

11   really busy and that you were probably sick, too.

12           Did you think she was ill?

13   A.  Who?

14   Q.  Did you think my client, Karen, was ill?

15   A.  Yes.  David told me.

16   Q.  Oh, okay.

17           And things never worked out.  How about we get

18   together for lunch or breakfast when I come back from Chicago.

19   Let's chat and decide when I should go back, would that work.

20   And then she asked you, going to Chicago, and you say this

21   weekend.

22           And can you turn the page and Karen says: I have been

23   quite busy lately.  Let me see, why don't you discuss it with

24   your husband.  And if you have ideas, give me a call and we

25   could talk about it.  There is no need to wait to get together

E430LIU3                    M. Yu - cross - Fischetti

1   until you come back.

2          Now, you were going to Chicago, right?

3   A.  Yes.

4   Q.  And she's saying to you, we don't even have to wait, right,

5   until you get back from Chicago, we could talk.

6          Isn't that what she's saying?

7   A.  Yes.

8   Q.  Okay.  Anyway just let me know what you think, I will, that

9   is if I am able to do it, I will try my best to do it, get it

10  done.  Let's make it clear and talk about everything before you

11  come back, so that there won't be anything awkward or

12  unpleasant in the future.

13         Did you read that?

14  A.  Yes.

15  Q.  And basically Karen was telling you that she was willing to

16  talk to you any time you wanted to; isn't that right?

17  A.  Yes.

18  Q.  And she was willing to meet with you any time you wanted to

19  meet?

20  A.  No.

21  Q.  Right?

22  A.  She said, no necessary to -- not necessary to meet, we can

23  talk on the phone.

24  Q.  Well, so it's your position, after reading all of these

25  transcripts, that my client was afraid to meet with you; is

E430LIU3                    M. Yu - cross - Fischetti

1   that your position?

2   A.  I don't mean she is afraid to meet with me, but at that

3   moment I think she meant it is not necessary to meet and

4   discuss things, we can talk on the phone.

5   Q.  I see.  Just talk about it on the phone about you coming

6   back to work?

7   A.  Yes.

8   Q.  She was not avoiding you, was she?

9   A.  I don't think.

10  Q.  She was willing to talk to you any time you wanted to talk

11  to her, isn't that right?

12  A.  Yes.

13  Q.  And basically she told you, also, that -- if you look

14  toward the bottom of page 5 -- that I have not been in the

15  office lately.

16          Do you recall --

17  A.  Yes.

18  Q.  -- her saying that?  Now, this is the conversation that you

19  testified about when you were on direct examination.  Do you

20  recall that?

21  A.  Yes.

22  Q.  And could you turn to page 1 and look at the conversation.

23  Back there in the middle, my client says to you:  How have you

24  been recently.

25          Do you remember that, do you see that?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    A.  Yes, I see it.

2    Q.  And you say:  I have been staying at home anyway.  The job

3    hunt has not been going smoothly.

4            And then -- and then she says:  And when you came

5    back, I was not here, been hanging around all summer long, so I

6    did not go to the office.  Anne told me about what you wanted

7    and I said that there were enough people right now, so I needed

8    to make arrangements.  Do you recall that?

9    A.  Yes.

10   Q.  And then on the next page talking about arrangements, if

11   you are looking about the third line down, she says:  Right now

12   there is basically -- there is an attorney who is about to

13   leave, therefore, there is a vacancy.

14            Is that correct?

15   A.  Yes.

16   Q.  And talking about a vacancy.  So that she would ask you to

17   come back to the firm to rehire you; is that right?

18   A.  Yes.

19   Q.  And on the next page, page 3, they talk about the fact, or

20   my client says there are a lot fewer cases before.

21            Do you remember that?

22   A.  Yes.

23   Q.  And then down below that she says: Sometimes five or six

24   cases.

25            Do you see that?

E430LIU3                    M. Yu - cross - Fischetti

1    A.  Yes.

2    Q.  There is nothing in there that indicates that she is saying

3    that there is less cases because there is an investigation

4    pending, is there?

5    A.  No.

6    Q.  There is nothing in there that says there is less cases

7    because people are believing that she is engaged in fraud, is

8    there?

9    A.  No.

10   Q.  Now, further on, if you look at page 7, at the top of the

11   page, you're speaking.  And you say:  Then I have another small

12   concern.  One of the reasons I did not particularly want to

13   stay on the job was that I was worried about this, this whole

14   signature thing.  Can I not just sign the 589s when I go back.

15           And what did you mean by that, when you said that to

16   her, what were you trying to get her to say?

17   A.  I'm sorry?

18   Q.  What was your purpose in saying that?

19   A.  Oh, I -- I just told her I don't want to sign on

20   application.  Because when we was doing attorney job at office,

21   I sign a lot of application without review those stuff.  And

22   I -- I know lot of the fraud application and when my name was

23   on the application, I should take the responsibility.

24   Q.  So that was your purpose in saying that, right?

25   A.  Yes.

E430LIU3                    M. Yu - cross - Fischetti

1    Q.  But you didn't say that did you?  I mean you didn't say I

2    don't want to sign the 589s because there is a lot of fraud

3    going on, did you?

4    A.  I didn't say that word.

5    Q.  You didn't say anything like that, did you?

6    A.  No.

7    Q.  You didn't say I don't want to sign them because they were

8    false, right?

9    A.  No.

10   Q.  You didn't say I didn't want to sign them because I knew

11   that was a crime, right?

12   A.  Yes.

13   Q.  You just said you didn't want to sign them, is that right?

14   A.  Yes.

15   Q.  And do you recall Karen saying to you that the 589s were

16   signed by Troy?  Further down.

17   A.  Yes.

18   Q.  And do you see where she says, further down when you say,

19   yes, yes, yes, and she says that:  I remember before you left,

20   I made the change, and had Troy sign.  Do you recall her saying

21   that?

22   A.  Yes.

23   Q.  And you said:  Oh, I forgot.

24            Right?

25   A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1608
E430LIU3                    M. Yu - cross - Fischetti

1   Q.  And then below that, she says: Troy signs all of the 589s

2   now.

3            Do you see that?

4   A.  Yes.

5   Q.  And in the middle, on the next page, you say:  All right

6   that's all right then.

7            And she says:  Okay.  I won't have you sign the 589s.

8   Troy always has been signing.

9            Do you see that conversation, do you see that?

10  A.  Yes, I see that.

11  Q.  Is there anything in those conversations, anything that

12  contains the fact that there was a crime going on?

13  A.  No.

14  Q.  Is there anything in that, in those facts, that indicates

15  that my client was committing a fraud with the 589s?

16  A.  No.

17  Q.  Is there anything in those conversations indicating that my

18  client knew about false applications being signed?

19  A.  No.

20  Q.  Let's turn to page 9.

21            Now, what we're doing, is we're going through

22  exhibit 1548T, which is a conversation between you and Karen,

23  is that right?

24  A.  Yes.

25  Q.  It is 31 pages.  If you look at the last part --

                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

1   A.  I'm sorry, which page?

2   Q.  Thirty-one pages?

3   A.  Okay.

4   Q.  And on direct examination, the attorney for the government

5   read some portions of this conversation to you and the jury,

6   isn't that right?

7   A.  Yes.

8   Q.  He didn't read these, though, did he?

9   A.  Didn't read what, I'm sorry?

10  Q.  He didn't read what we are just reading now, did he?

11  A.  No.

12  Q.  All right.  Let's look at page 9.

13      Karen says: Now, if you come back, you will still need

14  to write more briefs, you will be writing more.  At this point,

15  we'll lose fewer cases.  Approximately two to three briefs a

16  month.  In a week, in a week, would average, at the most brief

17  would about --

18      And then somewhat inaudible.

19      And you say:  It is probably the same as before, no

20  big change, is there.

21      And she says:  No, no, no, there is a lot less

22  business than it used to be.

23      Now, when you -- you have read that.  That's what it

24  says, isn't that right?

25  A.  Yes.

1  Q.  And when you said, No big change, is there, you were trying

2  to get her to say, No, there isn't, we're doing the

3  applications just the way we did before.

4          Isn't that what you wanted her to say?

5  A.  Yes.

6  Q.  Isn't what you wanted her to say some indication that she

7  knew that a fraud was going on, is that right?

8  A.  Yes.

9  Q.  I mean that was your purpose, wasn't it?

10 A.  Yes.

11 Q.  And she doesn't, does she?

12 A.  No.

13 Q.  Now going further down, it says you, saying to her -- well,

14 let me read the next couple, too, because I think it is

15 important.

16          She says:  It's less business.

17          And you say:  Oh.

18          And then she goes saying:  Our master, we have very

19 few individual cases.  Back then, usually 13 to 14 were normal.

20 But now there are many weeks where there are no more than 10.

21 There are a lot fewer cases than before.

22          And then, you say: What I was saying was that new

23 cases carry about the same contents as those in the past.  I

24 have not done it for a long time.

25          And what you were trying to get her to say is, yeah,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1611

E430LIU3                    M. Yu - cross - Fischetti

 1    the contents are the same, we still file false applications.

 2    That was what you were attempting to get her to do, isn't that

 3    right?

 4    A.  Yes.

 5    Q.  And that was your job, that was your purpose in being

 6    there, right?

 7    A.  Yes.

 8    Q.  And she answers:  Oh, about what you said, there are

 9    significant changes to the law.  Same set of things.

10         Right, isn't that what she says?

11    A.  Sorry, sir, I think there is a translation mistake here in

12    the Chinese.

13    Q.  Did I read it wrong?  I'm sorry, I didn't understand what

14    you said, Ms. Yu.

15    A.  There is a translation mistake, I believe, in Chinese.  It

16    says there is no significant change.  But in the English, it is

17    there are significant change to the law.
      *(a lot of the translation error in the government exhibit)*

18    Q.  So you're saying that this transcript that you have, and I

19    have --

20    A.  Yes.

21    Q.  -- is not accurate?

22    A.  Yes.  I just find out.

23    Q.  Well, how do you know that.  Did you -- this was in

24    Mandarin?

25    A.  I can read Mandarin Chinese.

```
                                                      1612
      E430LIU3               M. Yu - cross - Fischetti
```

1    Q.  Excuse me?

2    A.  I can read Mandarin Chinese.

3    Q.  Well, how do you know that -- let me get this straight now,

4    let's back up a little bit.

5            What it says in the transcript, is:  Oh, about what

6    you said, there are significant changes to the law, same set of

7    things.

8            That is what is written, right?

9    A.  Yes.

10   Q.  And you say it says:  About what you said, there are no

11   significant changes to the law.

12           Right?

13   A.  Yes.

14   Q.  And you just realized that now?

15   A.  Yes.

16           MR. EGAN:  Your Honor, may I have a sidebar for a

17   minute.

18           THE COURT:  Sure.

19           (Continued on next page)

20

21

22

23

24

25

1    (At the side bar)

2         MR. FISCHETTI:  I'm reading from a transcript that has

3    been -- that has been given to us, by the government, which we

4    have stipulated is an accurate transcript.  There is a -- to

5    use the word --

6         THE COURT:  Not a stipulation.

7         MR. FISCHETTI:  I withdraw it.

8         The stipulation has been given to us by the government

9    as an accurate transcript of the conversation.  There is a

10   significant, if I could use that word, difference between the

11   two words, okay.  And the only thing I can do with it -- and I

12   would like to do it and I want to do it outside the jury's

13   presence -- is to ask for an agreement by the government that

14   this transcript was given to us as an accurate transcript of

15   the conversation, and the transcript said A.

16        And I don't see how they can object to that, but I

17   would like to ask them first.

18        MR. EAGAN:  It is in evidence.  What are you --

19        MS. MERMELSTEIN:  They offered it as a government

20   exhibit.

21        MR. FISCHETTI:  But she's saying it is wrong.

22        THE COURT:  I know.

23        MR. FISCHETTI:  And they gave it to me, so how do I

24   correct that.  I'm not asking for advice.  The only way I can

25   correct them is have them say this is what they gave me and

E430LIU3                    M. Yu - cross - Fischetti

1    this is what I'm using, and they offered it in evidence as this

2    conversation, and now you're saying it is wrong.

3           THE COURT:  I think that's clear in the record,

4    number 1.  I think Mr. Maher has done a lot of

5    cross-examination about errors in the translation.  I think the

6    jury hears that.  I think your cross-examination and her

7    agreement that that was an error is also heard by the jury.

8           If you want to call your own translator, you're

9    welcome to do so.

10          MR. FISCHETTI:  I don't want to do that, I just want

11   the jury --

12          THE COURT:  I can't make them stipulate.

13          MR. FISCHETTI:  I'm not asking them to stipulate.  I'm

14   saying that I am going to say, I am letting them know, first,

15   that this transcript was given to me by the government as an

16   accurate transcript.

17          THE COURT:  I don't think you should say that, but you

18   can ask her did the government give this to you and ask you to

19   look it over, and it will be clear that it was in the

20   government's possession.

21          They have already put on their witness.

22          MR. FISCHETTI:  Good enough, okay.

23          (Continued on next page)

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

 1               (In open court)

 2     BY MR. FISCHETTI:

 3     Q.  Ms. Yu, this is not the first time you have seen this

 4     transcript; is that correct?

 5     A.  Yes.

 6     Q.  As a matter of fact, you saw these transcripts when they

 7     were given to you before you testified here, isn't that right?

 8     A.  Yes.

 9     Q.  And you reviewed those transcripts at that time, isn't that

10     correct?

11     A.  Yes.

12     Q.  And these transcripts were given to you by the government,

13     right?

14     A.  Yes.

15     Q.  And they told you, before you testified, here, to review

16     the transcripts to see if they were accurate, isn't that right?

17     A.  Yes.

18     Q.  And you read those transcripts and told them, before they

19     were admitted as evidence to the jury, that they were accurate;

20     is that correct?

21     A.  Yes.

22     Q.  And when did you discover, now, that that word is

23     different?  When did you learn that?

24     A.  I'm sorry?

25     Q.  When did you realize that that word, that you said is wrong

E430LIU3                    M. Yu - cross - Fischetti

1    in the transcript, is wrong?

2    A.  When you read the English part.  But I was reading the

3    Chinese version.

4    Q.  So you never read the English version, is that what you are

5    saying?

6    A.  No, I -- I read the English version, but maybe I didn't

7    read them very carefully.

8    Q.  And when you read this was wrong, did you run to the

9    government and say, look, the transcript that we gave the jury

10   as evidence is incorrect.  Did you tell them that?

11   A.  No.

12   Q.  But you are saying it now, right?

13   A.  Yes.

14   Q.  You are saying, now, that the transcripts that the jury

15   has, right now, that were given to them by the government, are

16   wrong.  Is that your testimony?

17   A.  Yes.

18   Q.  Okay.  Going on with that conversation, on the next page my

19   client says to you, There is no change in this regard, that

20   about the preparation for master calendar cases, I'm thinking

21   that after you come back, you will go to court, prepare

22   clients, followup on cases that need additional materials, the

23   cases that Judge asked for additional materials.  And then you

24   will write briefs on any case, probably one week, on average

25   this is what we have, at most.  Take that into your

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E430LIU3                    M. Yu - cross - Fischetti

1    consideration, I guess, because Rob also has to write briefs.
2    So it should be that this is part of the work.  But there is
3    not a lot of quantity.
4           Do you see that, there is not a lot of quantity?
5    A.  Yes.
6    Q.  I think in as far as preparation for going to the master
7    calendar, I will probably give you two or three cases, but I
8    might also give you three or four master cases to prepare.  I
9    think that some of my clients are dumb, and you need to start
10   from scratch.  Sometimes a lot of energy gets wasted and that's
11   annoying.
12          Do you read that?
13   A.  Yes.
14   Q.  She is basically telling you what you're going to have to
15   do when you come back to work, right?
16   A.  Yes.
17   Q.  And there is nothing in there, at all, indicating that she
18   wants you to write false stories, is there?
19   A.  No.
20   Q.  There is nothing in there indicating that you have to
21   change stories that are given to you by the applicants, is that
22   correct?
23   A.  Yes.
24   Q.  There is nothing in there that tells you that she is going
25   to prepare drafts of what you do, so that you can change

1    stories to fit the asylum process, is there?

2    A.  Yes.

3    Q.  This is just basically telling you what kind of job you are

4    going to have, right?

5    A.  Yes.

6    Q.  And, again, the reason why you are there is to try and find

7    my client, getting information from her, that she is involved

8    in a fraud that you committed; isn't that right?

9    A.  Yes.

10   Q.  I mean there is no question that you were involved in

11   fraud, is there?

12   A.  I'm sorry?

13   Q.  You.  That you were involved in preparing false

14   applications --

15   A.  Yes.

16   Q.  -- for asylum interviews.

17           That's what you pled to, right?

18   A.  Yes.

19   Q.  So there is no doubt that you did that.  But there is

20   nothing in these conversations that indicates that my client

21   told you to do it, is there?

22   A.  In Li's conversation, no.

23   Q.  Just a couple of more things.  When we get to page 15, you

24   say:  Why is there fewer cases lately.  We, before I left,

25   these cases were pretty good.  Each month there were 20 or 30.

E430LIU3                    M. Yu - cross - Fischetti

 1    And sometimes there were 30 and 40 new cases.

 2            And basically what you are trying to get her to say

 3    is, look, we have got fewer cases because we have knowledge of

 4    an investigation that's going on, so we had to cut down; right?

 5    A.  No.  That's not my purpose.  I just ask her why there were

 6    fewer cases recently.

 7    Q.  In other words, this was just a ordinary question.  This

 8    was not a question to try and get her to incriminate herself?

 9    A.  No.

10    Q.  No?  Okay.  And she answers the question, she says:  I

11    don't know, I think, you know, when did you leave, in November?

12            And then you go on after that.  And you told us that

13    is 31 pages.  But that was just one of the telephone calls that

14    you had, is that correct?

15    A.  Yes.

16            MR. FISCHETTI:  May I have a second?

17    Q.  All right, I would like you to look at government

18    exhibit 154T.  And this is the one September 5th.

19            THE COURT:  Does it have a letter after it, 154 --

20            MR. FISCHETTI:  Yeah, E.  I'm sorry, everybody.

21    Q.  So this was on September 5th, right?

22    A.  Yes.

23    Q.  And this is, again, a telephone conversation.

24    A.  Yes.

25    Q.  And I want to turn you to page 2, bottom of the page.  And

1   you say:  Attorney Liu, I wanted to tell you this.  I will talk

2   it over with --

3            And I can't pronounce that.  Is that your husband?

4   A.  Yes.

5   Q.  May I say your husband?

6   A.  Xiao Fei.

7   Q.  Xiao Fei?

8   A.  Yes.

9   Q.  Okay.  I wanted to go back.  I want to talk to my husband

10  Xiao Fei.  I want to go back to work.  I have been staying for

11  a long time.  Besides, getting along with my co-workers, when

12  we talked about it, I was a little worried.

13           You then say, the reason I quit was because the work

14  was stressful, was quite intense.  There was some issues with

15  several cases about the time I left.

16           Is that right?

17  A.  Yes.

18  Q.  My client, Karen, doesn't say anything.  Right?

19  A.  Yes.

20  Q.  The purpose of this is basically to have Karen say that she

21  knows about the stress you had, because she knows about your

22  work with the false applications, is that right?

23  A.  Yes.

24  Q.  Well, she doesn't say that, does she?

25  A.  No.

1   Q.  You then say:  I was a bit worried every time I would stand

2   in court.  I was very stressful.  I kept thinking that the

3   client would, all of a sudden, say, well, she fabricated this

4   story, she taught me how to say it.

5           Now, that's what you said to induce Karen to say to

6   you, well, don't worry about fabricating the story, we'll get

7   away with it or something like that indicating that she knew

8   that; isn't that right?

9   A.  Yes.

10  Q.  And then you say:  And there was a lot of, during the

11  period, later, on documentation.  And he said why not look for

12  another job, so I quit.

13          And that's, basically, your husband?

14  A.  Yes.

15  Q.  Right?

16  A.  Yes.

17  Q.  So isn't it fair to say, Ms. Yu, that when you said you

18  were afraid that this witness would say she fabricated the

19  story, she taught me how to say it, you're talking about an

20  asylum applicant who is before the Court that might say to the

21  judge, if he or she got caught with a false story, that he or

22  she made me do it?

23  A.  Yes.

24  Q.  And isn't that understood to mean that the client would get

25  caught, and lie that the client told you to do it, and that's

E430LIU3                    M. Yu - cross - Fischetti

1    what you were afraid of?

2    A.  No.

3    Q.  No?

4    A.  No.

5    Q.  That's not the proper interpretation you say, is that

6    correct?

7    A.  No, because I --

8    Q.  Okay, that's enough.  If you say that's not, that's not.

9           And these are the very -- these are the very parts of

10   the conversations that were read to you by the government, is

11   that right?

12   A.  I'm sorry?

13   Q.  This was read to you by the government, those pieces that I

14   just read to you, right?

15   A.  Yes.

16   Q.  Now, I want to go to the last one, which is September 5th,

17   again.  And that's 154FT.  And I want to just ask you a couple

18   of questions about that.  The government read some of this to

19   you.  You see, the government started reading:  Did you say

20   that you wouldn't want to go to court.

21          Yeah, I feel that actually going to court is actually

22   a pretty proceduralized process.  If the client has been

23   properly prepped, makes no difference who to take them to

24   court.  I feel we can train those in the office, as Andy and

25   Lillian, if we could train them to go to Court, I think we can

E430LIU3                    M. Yu - cross - Fischetti

1    get that done as well.

2            At this point, you were a lawyer, is that correct?

3    A.  Yes.

4    Q.  And you say here, If the client has been properly prepped.

5    Do you see that?

6    A.  Yes.

7    Q.  If you are going to court, isn't it a lawyer's duty to

8    prepare a client to go to court?

9    A.  Yes.

10   Q.  And don't we say, as lawyers, to prep a client.  Is that

11   right?

12   A.  I'm sorry?

13   Q.  Don't we use these words "to prep a client," before he goes

14   to court?

15   A.  Yes.

16   Q.  In fact, you were prepped just before you testified here,

17   is that correct?

18   A.  Yes.

19   Q.  Nothing wrong with that, is there?

20   A.  No.

21   Q.  And, again, you talked about being on psychological

22   pressure, about the client would blame everything on me.  Do

23   you see that?

24   A.  Yes.

25   Q.  You're not saying that the client would tell the Court that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   you did everything, and that he was involved with you.  You

2   just say he would blame everything on you, right?

3   A.  Yes.

4   Q.  Even if he did it himself, he would blame it on you, right?

5   A.  I not mean that, I'm sorry.

6   Q.  Okay, I'll move on.

7           Now you made these conversations on August 30th and

8   September 5th of 2012.

9   A.  Yes.

10  Q.  When did you start cooperating with the government?

11  A.  March 2012.

12  Q.  March 2nd, I think was your first interview; is that right?

13  A.  Yes, yes.

14  Q.  And you told us, as I recall your direct testimony, that

15  they told you that they wanted you to do certain things to help

16  them investigate a case so that you could gain a cooperation

17  agreement; is that right?

18  A.  Yes.

19  Q.  And one of those things you did was make secret recordings,

20  is that right?

21  A.  Yes.

22  Q.  And do you recall when the first recording was made?

23  A.  Probably April or May 2012.  I cannot remember the date.

24  Q.  Would you accept my representation that it was May 11th,

25  2012, having a lunch with Bandrich.  Does that sound about

1  right?

2  A.  Maybe.

3  Q.  And then June 14th, 2012, with Bandrich, do you recall

4  that?

5  A.  Yes.

6  Q.  And then on June 30th, you had phone calls with Moslemi and

7  spoke with David, do you recall that?

8  A.  Yes.

9  Q.  And on June 30, a phone call to Moslemi and spoke with

10  Lillian and Wen ting, do you recall that?

11  A.  Yes.

12  Q.  And none of those calls were with Karen, right?

13  A.  No.

14  Q.  And then we go to July 11.  And you had dinner with Feng

15  Li, right?

16  A.  Yes.

17  Q.  She's another attorney that was there at the firm, right?

18  A.  Yes.

19  Q.  And then you had dinner with him on July 11th?

20  A.  Right.

21  Q.  Yes.  And on July 15th, you recorded Feng Li again, right.

22  A.  Yes.

23  Q.  And then on July 16th, you had lunch with Feng Li and

24  Bandrich, and you recorded them; isn't that right?

25  A.  Yes.

1   Q.  And then you had a phone call with Moslemi and you spoke to
2   David and Wen Ting and you didn't speak to Karen, right?
3   A.  Yes.
4   Q.  August 7th, you actually went to the Moslemi firm?
5   A.  Yes.
6   Q.  And you spoke to Wen Ting Zheng and Lillian, is that right?
7   A.  Yes.
8   Q.  But not with Karen?
9   A.  No.
10  Q.  And August 29th, you had a phone call with Winnie Zheng; is
11  that correct?
12  A.  Yes.
13  Q.  So all during this time, the government never told you to
14  have any contact with Karen, isn't that right?
15  A.  No.  They want me contact with Karen, but I don't have
16  reasonable excuse.
17  Q.  Oh, so they told you please contact Karen.  And you said it
18  is not a good idea because I don't have a good excuse to do it,
19  is that your testimony?
20  A.  Yes.
21  Q.  And then you speak to her September 5th, and you had these
22  phone calls, is that right?
23  A.  Yes.
24  Q.  And then after September 5th, you never speak to her again,
25  at all, and she is arrested in December.  That's four months.

1627

E430LIU3                    M. Yu - cross - Fischetti

1    Is that right?

2    A.  Yes.

3    Q.  But during this telephone call, these telephone calls,

4    Karen asks you to call her again to speak to her about the job,

5    is that right?

6    A.  You mean during the last call?

7    Q.  Yeah, during the phone calls.

8    A.  I remember she said she will call me if -- if she wanted me

9    to go back.

10   Q.  The point is, during that time when you were cooperating --

11   A.  Uh-huh.

12   Q.  -- and you were speaking to Karen --

13   A.  Yes.

14   Q.  -- you were friendly, right?

15   A.  Yes.

16   Q.  You were friendly in your conversations with her, right?

17   A.  Yes.

18   Q.  You invited her to lunch, isn't that right?

19   A.  Yes.

20   Q.  She told you to call her back about your job, right?

21   A.  Yes.

22   Q.  There is no question that after September 5th you could

23   have called her again, isn't that right?

24   A.  I could, but I don't want, because I --

25   Q.  Just tell me if you could have --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E430LIU3                    M. Yu - cross - Fischetti

1    A.  Yes.

2    Q.  -- we'll get to why you didn't.

3    A.  Oh, okay.

4    Q.  You could have, right?

5    A.  Yes.

6    Q.  You could have picked up the phone and said have lunch, I

7    have got something to tell you, isn't that right?

8    A.  Yes.

9    Q.  You could have met with her and said, look, I don't want to

10   talk on the phone, because there could be a problem, but the

11   reason why I really don't want to come back is I don't want to

12   get involved with with false stories anymore, at a restaurant,

13   alone.  You could have done that, right?

14   A.  Yes.

15   Q.  But you didn't, right?

16   A.  No.

17   Q.  And the government never told you to do that, isn't that

18   correct?

19   A.  Yes.

20   Q.  I want to talk to you a little bit about what you told us,

21   and maybe you can explain this to me.  You said there was an

22   occasion where you found out about a bad case?

23   A.  Yes.

24   Q.  And it really concerned you, right?

25   A.  Yes.

1   you say:  Attorney Liu, I wanted to tell you this.  I will talk

2   it over with --

3           And I can't pronounce that.  Is that your husband?

4   A.  Yes.

5   Q.  May I say your husband?

6   A.  Xiao Fei.

7   Q.  Xiao Fei?

8   A.  Yes.

9   Q.  Okay.  I wanted to go back.  I want to talk to my husband

10  Xiao Fei.  I want to go back to work.  I have been staying for

11  a long time.  Besides, getting along with my co-workers, when

12  we talked about it, I was a little worried.

13          You then say, the reason I quit was because the work

14  was stressful, was quite intense.  There was some issues with

15  several cases about the time I left.

16          Is that right?

17  A.  Yes.

18  Q.  My client, Karen, doesn't say anything.  Right?

19  A.  Yes.

20  Q.  The purpose of this is basically to have Karen say that she

21  knows about the stress you had, because she knows about your

22  work with the false applications, is that right?

23  A.  Yes.

24  Q.  Well, she doesn't say that, does she?

25  A.  No.

E430LIU3                    M. Yu - cross - Fischetti

1   Q.  You then say:  I was a bit worried every time I would stand

2   in court.  I was very stressful.  I kept thinking that the

3   client would, all of a sudden, say, well, she fabricated this

4   story, she taught me how to say it.

5           Now, that's what you said to induce Karen to say to

6   you, well, don't worry about fabricating the story, we'll get

7   away with it or something like that indicating that she knew

8   that; isn't that right?

9   A.  Yes.

10  Q.  And then you say:  And there was a lot of, during the

11  period, later, on documentation.  And he said why not look for

12  another job, so I quit.

13          And that's, basically, your husband?

14  A.  Yes.

15  Q.  Right?

16  A.  Yes.

17  Q.  So isn't it fair to say, Ms. Yu, that when you said you

18  were afraid that this witness would say she fabricated the

19  story, she taught me how to say it, you're talking about an

20  asylum applicant who is before the Court that might say to the

21  judge, if he or she got caught with a false story, that he or

22  she made me do it?

23  A.  Yes.

24  Q.  And isn't that understood to mean that the client would get

25  caught, and lie that the client told you to do it, and that's

E430LIU3                    M. Yu - cross - Fischetti

1    what you were afraid of?

2    A.  No.

3    Q.  No?

4    A.  No.

5    Q.  That's not the proper interpretation you say, is that

6    correct?

7    A.  No, because I --

8    Q.  Okay, that's enough.  If you say that's not, that's not.

9         And these are the very -- these are the very parts of

10   the conversations that were read to you by the government, is

11   that right?

12   A.  I'm sorry?

13   Q.  This was read to you by the government, those pieces that I

14   just read to you, right?

15   A.  Yes.

16   Q.  Now, I want to go to the last one, which is September 5th,

17   again.  And that's 154FT.  And I want to just ask you a couple

18   of questions about that.  The government read some of this to

19   you.  You see, the government started reading:  Did you say

20   that you wouldn't want to go to court.

21        Yeah, I feel that actually going to court is actually

22   a pretty proceduralized process.  If the client has been

23   properly prepped, makes no difference who to take them to

24   court.  I feel we can train those in the office, as Andy and

25   Lillian, if we could train them to go to Court, I think we can

1623

E430LIU3                    M. Yu - cross - Fischetti

1    get that done as well.

2              At this point, you were a lawyer, is that correct?

3    A.  Yes.

4    Q.  And you say here, If the client has been properly prepped.

5    Do you see that?

6    A.  Yes.

7    Q.  If you are going to court, isn't it a lawyer's duty to

8    prepare a client to go to court?

9    A.  Yes.

10   Q.  And don't we say, as lawyers, to prep a client.  Is that

11   right?

12   A.  I'm sorry?

13   Q.  Don't we use these words "to prep a client," before he goes

14   to court?

15   A.  Yes.

16   Q.  In fact, you were prepped just before you testified here,

17   is that correct?

18   A.  Yes.

19   Q.  Nothing wrong with that, is there?

20   A.  No.

21   Q.  And, again, you talked about being on psychological

22   pressure, about the client would blame everything on me.  Do

23   you see that?

24   A.  Yes.

25   Q.  You're not saying that the client would tell the Court that

E430LIU3                    M. Yu - cross - Fischetti

1   you did everything, and that he was involved with you.  You

2   just say he would blame everything on you, right?

3   A.  Yes.

4   Q.  Even if he did it himself, he would blame it on you, right?

5   A.  I not mean that, I'm sorry.

6   Q.  Okay, I'll move on.

7           Now you made these conversations on August 30th and

8   September 5th of 2012.

9   A.  Yes.

10  Q.  When did you start cooperating with the government?

11  A.  March 2012.

12  Q.  March 2nd, I think was your first interview; is that right?

13  A.  Yes, yes.

14  Q.  And you told us, as I recall your direct testimony, that

15  they told you that they wanted you to do certain things to help

16  them investigate a case so that you could gain a cooperation

17  agreement; is that right?

18  A.  Yes.

19  Q.  And one of those things you did was make secret recordings,

20  is that right?

21  A.  Yes.

22  Q.  And do you recall when the first recording was made?

23  A.  Probably April or May 2012.  I cannot remember the date.

24  Q.  Would you accept my representation that it was May 11th,

25  2012, having a lunch with Bandrich.  Does that sound about

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

1   Q.  It concerned you because you had signed it, right?

2   A.  Yes.

3   Q.  And according to you, you would get in trouble for signing

4   it if anybody found out?

5   A.  Yes.

6   Q.  So you were nervous?

7   A.  Yes.

8   Q.  You were concerned?

9   A.  Yes.

10  Q.  You went to Karen and talked to her about it?

11  A.  I'm sorry, what are you saying?

12  Q.  You went to Karen and talked to her about it?

13  A.  Yes.

14  Q.  And she tried to comfort you, you said, right?

15  A.  Yes.

16  Q.  And you signed the case, you signed it, right?

17  A.  Yes.

18  Q.  And you told Karen about it --

19  A.  Yes.

20  Q.  -- isn't that right.

21      Can you tell me the name of the case?

22  A.  I don't remember the name.  It's a female applicant,

23  because when I sign on the application, I didn't review the

24  content.  And the first time I met that female applicant is on

25  the day she return from the asylum office.  And I never met her

1    and talk with her.

2    Q.  Okay, but you are telling the jury there exists a bad case,

3    right?

4    A.  Yes.

5    Q.  There exists a bad case in Feng Ling's office, right?  It

6    was from Feng Ling's office, the bad case, this asylum

7    application?

8    A.  Yes.

9    Q.  Okay.

10            And you were involved in it because you signed it,

11   right?

12   A.  I signed on it.  I'm sorry?

13   Q.  You didn't sign the application, and that's what you were

14   worried about?

15   A.  I signed it.

16   Q.  That's what I'm saying.  And you signed this bad case,

17   right?

18   A.  Yes.

19   Q.  And it concerns you, right?

20   A.  Yes.

21   Q.  And according to you, under oath, you're telling us that

22   this exists, this bad case; isn't that right?

23   A.  Yes.

24   Q.  And the government gave you a list of, a very list, of all

25   of the cases you signed; isn't that right?

1    A.  No, they didn't give me.

2    Q.  Did they give you that list?  No, they didn't?

3    A.  They didn't give me all of the cases I sign.  It gave me

4    part of the cases I signed.

5    Q.  Okay, so it gave you part of the cases you signed --

6    A.  Yes.

7    Q.  -- right?  Was that case on the list so I can check what

8    you are saying is true?

9    A.  Yes.

10   Q.  What is the name?

11   A.  If you can check on the government record, you check the

12   asylum interview record in about July --

13   Q.  July what?

14   A.  2011.

15   Q.  Okay.

16   A.  I believe the asylum officer tried to contact her again.

17   Q.  But I want to know the name of the case so I can find it.

18   A.  I don't have the name.

19   Q.  The name or the number of the case.

20   A.  I don't remember the name, because I sign a lot of cases.

21   Q.  You don't remember the name, but just let me see if I can

22   understand this.  I'll accept your answer --

23   A.  Okay.

24   Q.  -- okay, I'm not trying to trick you in any manner.

25            You signed the application, isn't that right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   A.  Yes.

2   Q.  You are saying it is a bad case, isn't that right?

3   A.  Yes.

4   Q.  You had to have looked at the name of the applicant, didn't

5   you?  Did you look at the name of the applicant when you knew

6   it was a bad case?

7   A.  Yes, I --

8   Q.  Did you know it was a bad case, then, when you saw the name

9   of the applicant?

10  A.  Yes.

11  Q.  And can you tell the jury, now, who that was?  The name.

12  Yes or no?

13  A.  I -- when I found that bad case, I -- I read her

14  application, and I -- at that time, I know -- I -- I knew her

15  name, but I forgot right now.

16  Q.  So you forgot her name right now?

17  A.  Yeah, I know her --

18  Q.  That was important to you, wasn't it.  I mean this was

19  something that was really, really troubling you.  You were

20  concerned that you could get arrested for this, right?  Weren't

21  you?

22  A.  Yes.

23  Q.  And as you sit here, now, talking about this bad case to

24  the jury, you don't remember her name, as you sit here now?

25  A.  Yes, I don't remember.

E430LIU3                        M. Yu - cross - Fischetti

1   Q.  You don't remember her name.  That's all I want to know.

2   A.  Okay.

3   Q.  If you remember it while we're talking, if you suddenly

4   remember it, just please tell me.

5   A.  Okay.

6   Q.  When you went to work for the Feng Ling law firm, you went

7   to work, according to you, that it was a legitimate firm, is

8   that right?

9   A.  Yes.

10  Q.  And, then, as you started to work, you realized that fraud

11  was going on, is that right?

12  A.  Yes.

13  Q.  And then, as you further went on, you realized that Karen,

14  the person who owned the firm, was participating in the fraud,

15  is that right?

16  A.  Yes.

17  Q.  And you learned that she was going to ask you to

18  participate in the fraud yourself, isn't that right?

19  A.  Yes.

20  Q.  And participate in the fraud by writing false applications,

21  is that correct?

22  A.  Yes.

23  Q.  False stories, right?

24  A.  Yes.

25  Q.  Find false documents, right?

1  A.  Yes.

2  Q.  Now, at that point, you were in the United States and you

3  wanted to become a lawyer; is that right?

4  A.  Yes.

5  Q.  So here you were, working for a firm that you thought was

6  legitimate, all of a sudden they said they wanted you to be

7  involved in criminal work; isn't that right?

8  A.  Can you repeat the question, I'm sorry.

9  Q.  I'm sorry.  All of a sudden you learned when you were

10  there, that to stay there, you would have to commit crimes,

11  isn't that right?

12  A.  Yes.

13  Q.  You didn't leave, did you?

14  A.  No.

15  Q.  You stayed, right?

16  A.  Yes.

17  Q.  For how long?

18  A.  I stay in that firm for three years.

19  Q.  Three years, you stayed, committing crimes.  Right?

20  A.  Yes.

21  Q.  And you never left?

22  A.  I tried to left.  And I left, finally.

23  Q.  I'm sorry?

24  A.  I always try to left, to leave the -- the firm.  If I can

25  find another job.  Another job will sponsored my status.  And I

 1    finally left the firm when I got my status.

 2    Q.  So let's get this straight.  You could have left and gotten

 3    a job as a waitress, isn't that right?  Because that's what you

 4    are doing now, right?

 5    A.  Yes.

 6    Q.  Are you saying that Karen forced you to stay?

 7    A.  I'm not saying that.

 8    Q.  Are you saying that she threatened you?

 9    A.  No.

10    Q.  If you would have left, she would have turned you in?

11    A.  No.

12    Q.  Are you saying that you could not leave, for any reason,

13    because you would lose your status and be deported, is that

14    what you are telling us?

15    A.  Yes.

16    Q.  Okay.  So you're telling us that because you thought that

17    you couldn't get another job with the same status, you would,

18    you, yourself, would stay there for three years committing

19    frauds, is that right?

20    A.  Yes.

21    Q.  And now, here, pursuant to your cooperation agreement, you

22    are telling us that Karen was the one who taught you how to do

23    this, right?

24    A.  That's truth.

25    Q.  Well my question is, are you saying that she is the one who

1   taught you to do it?

2   A.   Yes.

3   Q.   Okay.  And you are saying that you never left, you just

4   continued to commit all of those crimes; is that right?

5   A.   Yes.

6   Q.   Now, when you pled to your crimes for immigration fraud,

7   you realized that those crimes included deceit, lying, and

8   helping other people to lie; isn't that right?

9   A.   Yes.

10  Q.   Okay.  And you pled because you were facing 15 years in

11  jail; is that right?

12  A.   Yes.

13  Q.   And you're hoping that you will get zero if the

14  government --

15           The government, right?

16           -- believes you are not lying, right?

17  A.   Yes.

18  Q.   And, isn't it true that you believe that it's important to

19  you, and your sentencing, that this jury believe your testimony

20  and convicts my client?

21  A.   I don't think that is important, because I was told I just

22  do my best, I don't need to care about the result.

23  Q.   Okay.  So now I'm asking you what you believe.  I

24  understand what they told you.

25  A.   Uh-huh.

E430LIU3                    M. Yu - cross - Fischetti

1   Q.  But now I'm asking what you believe.

2        Do you believe it would be a good thing for you, when

3   you're sentenced and your lawyer can stand up before this judge

4   and talk about your substantial cooperation and say to the

5   judge she testified here and she convicted Karen, don't you

6   think that would be a good thing for you?

7   A.  I -- I don't --

8   Q.  Yes, or no --

9   A.  No.

10  Q.  -- or if you know.

11  A.  No, I have done my best to --

12  Q.  I understand.  I understand you did your best, that's a

13  different question.  Listen to my question and see if you can

14  answer yes or no, and I'll accept your answer.

15  A.  Okay.

16  Q.  I'm asking you, when you get sentenced, you know your

17  lawyer is going to speak for you; is that correct?

18  A.  Yes.

19  Q.  You have a lawyer; is that right?

20  A.  Yes.

21  Q.  That lawyer appeared with you on your proffer sessions?

22  A.  Yes.

23  Q.  On your cooperation, is that right?

24  A.  Yes.

25  Q.  He was here before the judge when you pled guilty, is that

1   correct?

2   A.  Yes.

3   Q.  And that judge, that lawyer, is gonna be standing before

4   you when you are sentenced; is that correct?

5   A.  Yes.

6   Q.  And you know that lawyer is going to make a statement, a

7   pitch to the judge, on why you shouldn't go to jail; isn't that

8   right?

9   A.  Yes.

10  Q.  And you want to get zero, right?

11  A.  Yes.

12  Q.  So my question, simply, is do you think it would be better

13  for you to have your lawyer stand up before this judge and say,

14  your Honor, she cooperated completely, the jury believed her,

15  and they convicted my client.  Do you think that would be a

16  good thing for you?  Or wouldn't it matter.

17          MR. EAGAN:  I think this has been asked.

18          MR. FISCHETTI:  It has not been answered.  Its been

19  asked.

20          THE COURT:  Let's have an answer and move on.

21          You can answer the question.

22          THE WITNESS:  Okay.

23  A.  Maybe.

24  Q.  The answer is maybe.

25  A.  Yes.

1  Q.  Okay, I'll accept maybe.

2          Now, after you left the firm, you got a job, isn't

3  that right?

4  A.  Yes.

5  Q.  And who did you go to work for?

6  A.  I worked for agent, it an employment agent.

7  Q.  And did they get you a job, the employment agency?

8  A.  I'm sorry?

9  Q.  Did they get you a job?

10  A.  Yes.

11  Q.  Where did they get you a job?

12  A.  Sent me to a law firm.  I work there as document reviewer.

13  Q.  And the law firm they sent you to was?

14  A.  Dorsey and Whitney.

15  Q.  Very large law firm?

16  A.  Yes.

17  Q.  Prominent law firm?

18  A.  Yes.

19  Q.  And you applied for that job?

20  A.  Yes.

21  Q.  And when you applied for that job, you were interviewed?

22  A.  I was interviewed by the agent.

23  Q.  And then you went on the job?

24  A.  Yes.

25  Q.  Did you tell the agency, before you were sent to this job

E430LIU3                    M. Yu - cross - Fischetti

1    at a law firm, that you were guilty of any number of frauds?

2    A.  No, I didn't tell them, because --

3    Q.  Did you -- did you tell them, yes or no.

4    A.  No.

5    Q.  And did you tell them that you were going to plead guilty

6    to the felonies?

7    A.  No.

8    Q.  You never told them that either?

9    A.  No.

10   Q.  When you got to Dorsey & Whitney, it was a law firm.  You

11   were a lawyer at that point, right?

12   A.  Yes, but --

13   Q.  You were a lawyer?

14   A.  I was hired as a paralegal.

15   Q.  I asked a simple question.  When you went to Dorsey &

16   Whitney to work, were you a lawyer?

17   A.  Yes.

18   Q.  And as I understand it, you left for a period of time to

19   study for the bar; is that right?

20   A.  Yes.

21   Q.  So you left the Moslemi firm to study for the bar, took it

22   once, failed, took it a second time, passed, okay?

23   A.  Yes.

24   Q.  I did the same thing, so.

25           So now you passed, you are a lawyer; is that right?

                   SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

E430LIU3                    M. Yu - cross - Fischetti

1    A.  Yes.

2    Q.  But before you actually become a lawyer, you have to pass a

3    character and fitness test; is that right?

4    A.  Yes.

5    Q.  And you have to see somebody, and sit down with this

6    person, and tell them that you are qualified, ethically, to be

7    a lawyer; isn't that right?

8    A.  Yes.

9    Q.  And you know what ethically means, don't you?

10   A.  Yes.

11   Q.  So did you have that interview?

12   A.  Yes.

13   Q.  Were you, in your mind, ethically competent to be a lawyer

14   at that point in your life?

15   A.  No, I -- what I was doing at that firm --

16   Q.  So, you knew that you shouldn't have been a lawyer at all,

17   isn't that right?

18   A.  Yes.

19   Q.  Now, you went to take the bar exam.  You took the bar exam.

20   You passed the bar exam.  You went to the character and fitness

21   interview.  Obviously you lied to them about whether or not you

22   were ethically competent to be a lawyer, right?

23   A.  Yes.

24   Q.  And then you didn't change anything.  You came back and

25   continued to commit frauds, isn't that right?

1  A.  Yes.

2  Q.  So now you leave the firm as a practicing lawyer, is that

3  right, able to practice anywhere in New York State; is that

4  right?

5  A.  Yes.

6  Q.  You are not a lawyer anymore, are you?

7  A.  No.

8  Q.  Did you resign from the bar?

9  A.  Yes.

10  Q.  Okay.  So when you go to Dorsey & Whitney and you are going

11  to work there as a lawyer, you don't tell them anything about

12  what your prior conduct was as a lawyer?

13  A.  No.  I work there, not as a lawyer.  I worked there not as

14  a lawyer --

15  Q.  I understand that.  You worked there as a paralegal to

16  translate documents, is that correct.  You didn't represent any

17  clients.

18  A.  Yeah, when they hire people, they advertise they wanted

19  people with legal background or paralegal.  It is not necessary

20  to be an attorney at that time.

21  Q.  Good.  I understand that.  But you never told them about

22  your prior criminal past, right?

23  A.  No.

24  Q.  And, in fact, when you went there and applied to Dorsey &

25  Whitney, you had already pled guilty; is that correct?

E430LIU3                    M. Yu - cross - Fischetti

 1   A.  Yes.

 2   Q.  It wasn't that you just were cooperating and telling the

 3   government that you committed crimes, you actually stood up

 4   before a judge, like this, and said I did commit these crimes,

 5   I pled guilty; is that right?

 6   A.  Yes.

 7   Q.  And now you are working in a law firm as a paralegal,

 8   right?

 9   A.  Yes.

10   Q.  Did you tell them, while you were working there as a

11   paralegal, that you were a convicted felon, didn't they ask you

12   to sign a confidentiality agreement, which basically asked you

13   if you had committed any crimes or had been involved in any

14   criminal conduct?

15   A.  I signed.  But the question only asked me whether you have

16   been convicted any criminal -- crime.

17   Q.  Right.

18   A.  I talk with my attorney and he said you are not convicted

19   yet, so I just answered the question no.  In the firm, they

20   didn't ask me whether you plead any guilty.

21   Q.  All right.  Let's take this slow, so I can understand it.

22        You stood before a judge, before you went to Dorsey &

23   Whitney, right?

24   A.  Yes.

25   Q.  Okay.  And this was a plea of guilty.  You told the judge

1    that you were guilty, right?

2    A.  Yes.

3    Q.  The judge asked you any number of questions, did you commit

4    this crime, you said yes.  The judge asked you did you do it

5    voluntarily, you said yes.  Asked you did anybody force you to

6    do it, you said yes.  They said are you pleading guilty of your

7    own volition, you said yes.  Right?

8    A.  Yes.

9    Q.  So you were convicted, then, when you told her that,

10   weren't you?

11   A.  I asked my attorney.  He told me I was not convicted at

12   that time.

13   Q.  Did you look at the sentencing -- did you look at the plea

14   that you gave, did he know you pled guilty?

15   A.  They don't know I plead guilty.

16   Q.  Excuse me?

17   A.  Who told me?

18   Q.  I'm sorry, I don't understand now.  You have to speak up.

19          I'm asking you, your lawyer, when he told you you were

20   not convicted, did he know you had pled guilty before the judge

21   to felonies, did he know that?

22   A.  Yes.

23   Q.  And he still said you were not convicted?

24   A.  Yes.

25   Q.  When the judge told you that you were eligible to be

1    sentenced for 15 years, your lawyer knew that, he was here,

2    right?

3    A.  Yes.

4    Q.  And now you say you go to this lawyer and you ask him if

5    you have been convicted.  Or he comes to you and says don't

6    worry about it, you have not been convicted.  How did it

7    happen?

8    A.  I talk with him about it, this job application.  And the

9    question they asked me, I worry about it.  I worry with apply

10   plead guilty thing.  And I told my attorney they only asked me

11   whether I have been convicted of any crime, and he said --

12   Q.  I'm sorry?

13   A.  -- technically you are not convicted yet.

14   Q.  Not convicted yet.

15   A.  Yes.

16   Q.  Did he say like it takes six months or a year after you

17   plead guilty to be convicted.  I mean is that the way it works

18   according to him?

19            MR. EAGAN:  Objection.

20            THE COURT:  Yeah, I'm going to sustain that.

21   Q.  Well, let me ask you this.  Before you signed the

22   confidentiality agreement, after you pled guilty to the

23   felonies, right, before you took the job, you asked your

24   attorney if you have been convicted, he said no.  Is that

25   right, am I right so far?

E430LIU3                    M. Yu - cross - Fischetti

1    A.  Yes.

2    Q.  Did you tell the government, did you check with the

3    prosecutors and ask them -- let me finish -- can I take this

4    job and sign this application and say I have not been

5    convicted.  Did you ask any of them?

6    A.  I told the government, because I was sent to Guangzhou to

7    do this job.  I talked to the government and I applied to the

8    judge.  They know what I -- I was doing for that job.  And

9    they -- they agree me to leave the country, they help me to

10   leave the country, they know what the job I was doing at that

11   time.

12   Q.  Okay.  We'll get to that.  But my question is, you signed a

13   document to get this job that says that have you been convicted

14   of a crime, and you said no, right?

15   A.  Yes.

16   Q.  Did you ask the prosecution, was that all right that I lied

17   on my application.  Did you ask them that?

18   A.  I didn't ask them.  I asked my attorney --

19   Q.  Okay.  If you didn't ask them, that's fine with me.

20        Now, there come a point when you are doing that job

21   and you're sent to China.  They want you to go to China, is

22   that right?

23   A.  Yes.

24   Q.  And you need permission to go the China because, well, I

25   don't want to say you're convicted, because you say you are not

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1647

E430LIU3                    M. Yu - cross - Fischetti

1    convicted, but you have got bail limits so that you can't

2    travel outside of the country; is that right?

3    A.  Yes.

4    Q.  Pretrial services, or someone, has your passport; is that

5    right?

6    A.  Yes.

7    Q.  And you can't travel without the judge's permission.

8    A.  Yes.

9    Q.  Isn't that right?

10   A.  Yes.

11   Q.  So you speak to your lawyer to try and go to China and do

12   this job that you are doing, is that right?

13   A.  Yes.

14   Q.  And isn't it a fact that the only way you could go to China

15   for this job, and leave the country with the passport, is if

16   the judge signs an order allowing you to go; isn't that right?

17   A.  Yes.

18              (Continued on next page)

19

20

21

22

23

24

25

E43Wliu4                    M. F. Yu - cross

 1   BY MR. FISCHETTI:
 2   Q.  And you do get the judge to sign the order allowing you to
 3   go, right?
 4   A.  Yes.
 5   Q.  But isn't it true that that order says specifically that
 6   you can only go there for purposes of work?
 7   A.  Yes.
 8   Q.  And you know that because you read it?
 9   A.  Yes.
10   Q.  Right?  Your attorney sent it to --
11            MR. FISCHETTI:  Your Honor, I offer Defendants'
12   Exhibit 6 in evidence.
13            THE COURT:  Is there any objection?
14            MR. EGAN:  I just want to see how he's going to use
15   it.
16            THE COURT:  I'm waiting for that as well.
17            MR. EGAN:  I'm sorry.
18            THE COURT:  Just lay a foundation.
19            MR. FISCHETTI:  Sure.  Okay.
20   Q.  You talked about your lawyer writing a letter to the judge
21   to get you permission, Ms. Yu.  Will you look at this document
22   and tell us if that looks like the letter the lawyer wrote?
23   A.  Yes.
24            MR. FISCHETTI:  Your Honor, I'd like to publish it to
25   the jury.

 1          THE COURT:  Is there any objection to the exhibit?

 2          MR. EGAN:  No.

 3          THE COURT:  It is admitted.

 4          (Defendants' Exhibit 6 received in evidence)

 5          MR. FISCHETTI:  The letter is on the letterhead of

 6     Patrick J. Joyce, Esq., with his address, and it's sent to the

 7     Honorable Robert P. Patterson, United States district judge,

 8     here, and it says, "Dear Judge Patterson, I am the attorney for

 9     the defendant Meng Fei Yu, the defendant in the

10     above-referenced case.  I'm writing this letter to request an

11     alteration in the bail conditions which were set in court on

12     August 21, 2012.  The conditions set by the Court restrict

13     Mrs. Yu's travel to the Eastern and Southern Districts of New

14     York and the District of New Jersey.  Ms. Yu would like to take

15     a one-month trip to China beginning July 19, 2013, and ending

16     on August 19, 2013.  This trip is work related and necessary

17     for her to keep her position as a document reviewer with the

18     law firm of Dorsey & Whitney.  I've conferred with Assistant

19     United States Attorney Brian Blais, and the government consents

20     to this request."  And then there's a signature of the judge

21     approving it.

22     Q.  So you got approval to go to China to work for a month, is

23     that right?

24     A.  Yes.

25     Q.  And during the time you were in China, Dorsey & Whitney

1   knew that, as they said, you were convicted of a felony, is

2   that right?

3   A.  Yes.

4   Q.  You didn't believe you were convicted of a felony because

5   your lawyer told you you hadn't been convicted, but that's what

6   they believed, is that right?

7   A.  Yes.

8   Q.  And when they found out, they immediately contacted you and

9   told you to come back immediately and stop working on the case,

10  isn't that right?

11  A.  Yes.

12  Q.  They sent you e-mails to come back, is that right?

13  A.  Yes.

14  Q.  They got you a ticket to come back, is that right?

15  A.  Yes.

16  Q.  But you didn't use the ticket, is that correct?

17  A.  Yes.

18  Q.  And you didn't use the ticket because you said I will stop

19  working on your project, but I can't come back now because I

20  have personal plans in China?

21  A.  Yes.

22  Q.  And you did have personal plans?

23  A.  Yes.

24  Q.  So your trip to China was not just work related?

25  A.  No.

E43Wliu4                    M. F. Yu - cross

1   Q.  It was for personal plans --

2   A.  No.

3   Q.  -- that you had in China?

4   A.  No.

5   Q.  Is that right?

6   A.  No.  The real reason --

7   Q.  Not correct?

8   A.  No.  Not correct.

9   Q.  All right.  Not correct, not correct.  But you did say you

10  couldn't come back because you had personal plans, is that

11  right?

12  A.  Yes.

13  Q.  Then eventually, of course, you did come back?

14  A.  I'm sorry?

15  Q.  You did come back, of course?

16  A.  Yes.

17  Q.  And you lost your job?

18  A.  Yes.

19  Q.  Now, these applications that we've talked about, that you

20  signed, each one of them that you signed says, "I declare that

21  I have prepared this application at the request of the person

22  named in part D, that the responses provided are based on all

23  information of which I have knowledge, and which was provided

24  to me by the applicant, and that the completed application was

25  read to the applicant in his or her native language, a language

E43Wliu4                    M. F. Yu - cross

1    Q.  What did you talk about?

2    A.  We talk about my husband school application and we chat a

3    little bit.

4    Q.  Excuse me?

5    A.  We talked a little bit.

6    Q.  Nothing about the case?

7    A.  No.

8    Q.  Nothing about him being an interpreter?

9    A.  No.

10   Q.  How often have you spoken to him, if you can recall, in the

11   last year?

12   A.  Spoke each other, you mean?

13   Q.  Excuse me?

14   A.  What's your question?  You mean spoke to each other or

15   contact each other?  What's your question?

16   Q.  How often have you spoken to him, first, and how often have

17   you contacted him?  Make it two questions.

18   A.  Okay.  We, we spoke to each other every, every one or two

19   months.  We often call each other, maybe one time every, every

20   few weeks.

21   Q.  So this is during the past year, one-year time?

22   A.  Yes.

23   Q.  You would speak to him every few weeks?

24   A.  Yes.

25   Q.  Would you call him or would he call you or it went back and

1669

E43Wliu4                      M. F. Yu - cross

1    Q.  Let me ask you this.

2    A.  Okay.

3    Q.  Last question.  Okay?  Do you remember saying or in the

4    conversation, whether you said it or it was said to you, that

5    if there was trouble, you can present files to try and clear

6    your name and push everything on --

7               MR. EGAN:  Your Honor --

8    Q.  -- everything on Karen, to shift the blame to Karen.  Do

9    you recall if somebody said that to you?

10   A.  I don't remember.

11              MR. EGAN:  Objection.

12              THE COURT:  She doesn't remember.

13              MR. FISCHETTI:  I'm going to refresh her recollection.

14              THE COURT:  But it's not her statement, right?

15              MR. FISCHETTI:  I'm asking if she or if a speaker told

16   her that.  I'm not asking what she said.

17              MR. EGAN:  That would be hearsay.

18              MR. FISCHETTI:  I'm asking if she heard the statements

19   spoken to her.

20              THE COURT:  Right.  That would be hearsay.

21              MR. FISCHETTI:  That would be hearsay?  Judge, can I

22   make a record of that.

23              THE COURT:  Sure.

24              (Continued on next page)

25

E43Wliu4                    M. F. Yu - cross

1          (At the side bar)

2          THE COURT:  Is this the coconspirator statement?

3          MR. FISCHETTI:  No, it's not.  It's not a big point,

4     and I'm finished.  I'm basically offering this statement not

5     for its truth but for the effect on the listener.  We have a

6     tape where it was actually said.

7          THE COURT:  And tell me the statement.

8          MR. FISCHETTI:  The three of them were talking.  It

9     was saying if we have any trouble, if Karen has any trouble, we

10    can all shift the blame to Karen.  That's what the statement

11    is.

12         MR. FRANZ:  The statement is to this witness and

13    another government witness, if you have a problem, you can push

14    everything on to Karen.  The government witness on tape

15    suggests this to this witness, that that would be something

16    that she could do.  And I think that goes to state of mind.

17         MR. EGAN:  The argument is what they did.  Of course

18    it's for the truth.

19         THE COURT:  I'm sorry?

20         MR. EGAN:  The argument is that's what they did, that

21    they pushed it all on Karen.

22         THE COURT:  But it's also the argument that it gave

23    her an idea as to what to do and how to do it, which is what

24    they're suggesting she's doing now.  Right?  So I'm going to

25    allow it.

E3oWliu4                    Caudill- Mirillo - cross

1   Q.  There are a number of reasons why somebody may not be able
2   to file within one year of arrival in the United States and
3   those are recognized exceptions, correct?
4   A.  Definitely, yes.
5   Q.  By the way, you worked in the Queens office, right,
6   Rosedale?
7   A.  Yes.
8   Q.  I think you listed about 12 counties that you supervise?
9   A.  Yes.  We have jurisdiction over those counties, yes.
10  Q.  If somebody files an application and it turns out they
11  didn't live in one of those counties, they're filing in the
12  wrong place, right?
13  A.  Yes.
14  Q.  But that application, that's not a fraud, it can just be
15  transferred to another jurisdiction?
16  A.  Yes.
17  Q.  And there are procedures in place for that, right?
18  A.  Yes.
19  Q.  Because that happens from time to time?
20  A.  Of course.
21  Q.  People make mistakes?
22  A.  Yes.
23  Q.  They file in the wrong courts?
24  A.  Yes.
25  Q.  They relocate and they move?

E3oWliu4                    Caudill- Mirillo - cross

1    A.  People lie for a variety of reasons.  If it's truly

2    irrelevant to the legal requirements under the law, then, no,

3    there's, it's disregarded.

4    Q.  So people lie for a variety of reasons?

5    A.  Yes, some of which could be nefarious and some of which

6    could be just embarrassment.  There's a lot of reasons people

7    may lie.

8    Q.  These applicants, according to you, some of them at least

9    lie to asylum officers, right?

10   A.  That's true.

11   Q.  They've lied to the government?

12   A.  That's true.

13   Q.  They've lied to paralegals and lawyers?

14   A.  I, I, I would presume people lie to a variety of

15   individuals.  I don't know.

16   Q.  They lie to get into this country, perhaps?

17   A.  Perhaps.

18   Q.  Let's just say they've been lying in order to pursue their

19   claim for asylum, some of them, right?

20   A.  Certainly some may, yes.

21   Q.  And they're desperate, right?

22   A.  Yes.

23   Q.  They're fleeing a country that they don't want to go back

24   to and they're willing to do whatever it takes to stay here,

25   right?

E3oWliu4                    Caudill- Mirillo - cross

1    A.  Yes.

2    Q.  And that's because they don't want to go back to China,

3    right?

4    A.  Yes.

5    Q.  But they swear an oath to tell the truth?

6    A.  Yes.

7    Q.  I think we're at six occasions, right?

8    A.  I think so, yes.

9    Q.  They subject themselves to going to prison, right?

10   A.  Yes.

11   Q.  But they still do it even though they're warned, right?

12   A.  Yes.

13   Q.  And they're told if we catch you, if it's fraudulent, if

14   you lie, if it's fake, you'll be barred from ever applying

15   again, right?

16   A.  Yes.

17   Q.  Lin Chen is a witness that may testify in this court that

18   you testified you reviewed her, you're aware of her status,

19   correct?

20   A.  I am aware of her status.

21   Q.  She's on fraud hold right now, right?

22   A.  Yes.

23   Q.  That's because she committed a fraud, right?

24   A.  It's because she's suspected.  She has not, in fact, come

25   to the immigration officials and acknowledged a fraud, but it,

E480liu5                    HAN - CROSS

1    writing and I will respond here in court or what I'll do is

2    send back testimony or evidence that is responsive to your

3    question.  So that's how that process will work.  But, right

4    now, we're going to turn to closing arguments.

5            And we'll hear first from the government.

6            MS. MERMELSTEIN:  Thank you, your Honor.

7            THE COURT:  I'm going to ask all of the lawyers to

8    speak into the microphones.  Thank you.

9            MS. MERMELSTEIN:  Huai Guo Wu, was a 19 year old high

10   school graduate when he came to America to try and earn money

11   for his family.  He took English classes.  He worked long hours

12   in a restaurant.  And in 2011, he walked into the Bandrich law

13   firm and asked for help getting a green card.

14           He walked out conveniently transformed into a

15   persecuted Christian who had been beaten, and interrogated, and

16   imprisoned because of his faith.

17           Now, real, real law firms take asylum applicants who

18   have real stories of persecution, and they help those people to

19   apply for the asylum that they are entitled to.  But the

20   Bandrich law firm created false asylum claims for anyone, who

21   had the $10,000, for anyone who walked in their door.  If you

22   had $10,000, they had a false asylum claim for you.  Because at

23   the Feng Ling Liu and the Bandrich law firms, a little thing

24   like the truth never stood in the way of a false asylum claim.

25           And that is why we are here today.  Because these

2058

E480liu5                    HAN - CROSS

1    defendants, Feng Ling Liu, and Vanessa, and Rachel Yang, they

2    participated in a brazen and efficient conspiracy to defraud

3    the entire asylum system.

4           These defendants, and the people with whom they

5    worked, filed nearly 2,000 asylum applications.  They took any

6    person who walked in the door and they made them a victim of

7    the Chinese government.  Christianity, family planning, falun

8    gong.  If you had $10,000, they had a claim for you.

9           Why?  For the money.  Over the nearly five years of

10   this conspiracy, these defendants, together, billed something

11   like $18 million; $10,000, $11,000, $13,000 an application, by

12   1800 or 2000 applications, and that is the math.  This firm was

13   wildly successful.  They took the hard-earned money of poor

14   farmers, and dishwashers, and restaurant workers, and they got

15   them asylum.

16          The evidence is now in.  And you know that the

17   evidence is simply overwhelming that the Feng Ling Liu and the

18   Bandrich law firms were running a massive immigration fraud.

19   You saw that from literally the very first moment that an

20   applicant walked in their door.

21          Remember that very first recording, when Lin Chen went

22   to the Moslemi law firm.  What were the very first questions

23   that she was asked?  Did they ask her about her personal

24   experiences in China, did they ask her about any persecution

25   that she might have suffered?  Was she asked anything at all

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

2059

E480liu5                    HAN - CROSS

1    about what had happened to her?  No.  Here's what she was

2    asked.  Have you been caught.  Have you been fingerprinted.  Do

3    they have your records.

4            And what happened when Lin Chen walked in the door at

5    the Bandrich law firm?  The very same thing.  She tells the

6    receptionist that she has been here for two years, and that she

7    arrived illegally.  And what does the receptionist say?  What

8    does the receptionist ask?  Have you opened a bank account.  Do

9    you have a credit card.  Have you applied for a tax ID.  Were

10   you caught in another country on your way here.

11           And Jason and Huai Guo Wu had that identical

12   experience.  This fraud was so open, it was so bold that they

13   didn't even pretend to ask if someone had a real claim.

14   They didn't ask about the asylum applicant's persecution.  The

15   only thing they cared about was whether there was evidence that

16   you had been in the country for more than one year.  And you

17   know why that one fact was so important?  Because you know that

18   asylum applicants have to apply for asylum within one year of

19   their arrival.  So if you opened a bank account, or you went to

20   the hospital, or you got caught coming in over the border, then

21   even the Feng Ling Liu and the Bandrich law firms, they

22   couldn't make that go away.  But so long as there was no record

23   of you being here, they didn't really care how long you had

24   been here.

25           Lin Chen told the receptionist she had been here for

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

2060
E480liu5                    HAN - CROSS

1   two years.  And that was no problem because the law firms were

2   perfectly happy to help you get one-year proof letters and

3   documents that suggested that you had only been here for less

4   than a year.

5           And where did these conversations take place?  Not in

6   a private office, not behind closed doors.  Take a look at the

7   reception area of the Feng Ling Liu and Bandrich law firms.

8   Should be coming up on your screens.  Look at the reception

9   area at the Bandrich law firm.  These blatantly openly

10  fraudulent conversations took place out in the open where

11  anyone could hear them.

12          So talking to the receptionist, that was step 1.  What

13  was step 2?  That was intake.  Applicants met Feng Ling Liu and

14  David Miao and Lillian Miao and Harry Liu and Rachel Yang.  And

15  what was discussed at that meeting?  Not the personal story.

16  Not the details of any actual persecution.  And where were

17  these conversations?  They were in people's offices with the

18  doors wide open.  What was discussed?  The office managers

19  would, again, ask people if there was any evidence that they

20  had been in the country for more than a year.  And the firm got

21  basic biographical information that they needed to assign a

22  client a fraudulent claim.

23          And the firm talked money.  Why were the office doors

24  left open?  Because this was not a secret.  Everyone knew that

25  this was a fraud.  It didn't have to be hidden from anyone who

E480liu5                    HAN - CROSS

1    worked at that law firm.  And you have recordings of these very

2    interactions.  Look at what Lillian Miao said in the intake

3    meetings.  Look at that very first meeting with Lin Chen.  It's

4    government exhibit 40.  Lillian asks: Are there any records

5    that you have been in the United States.  Are you married.  And

6    how old are you.  And that is it.  Lillian explains the fee

7    structure, that you can pay a thousand dollars up front and pay

8    $10,000 more when you win.  Or, you can pay $500 up front

9    that's refundable if you lose.  But, if you win, it's another

10   $13,000.  And, then, based on that bare information, Lillian

11   recommends a claim.  She says, You are a single woman?  For

12   you, we recommend a forced abortion.  But she says if that

13   makes you uncomfortable, you can also claim that you were

14   persecuted based on Christianity.  Not a single question about

15   the forced abortion.  Not a single question about whether or

16   not she believes in Christianity, whether she was ever

17   pregnant, whether she even had a boyfriend.  And that is

18   exactly the same thing as happened at the Bandrich law firm.

19          Lin Chen walks in, she says, I'm a single woman, I

20   have never been caught in the United States, and I'm not living

21   in New York.  She says that she left China via Hong Kong.  And

22   what does she get told?  Same fee structure.  The identical fee

23   structure at the two law firms.  And they tell her that it's

24   gonna be at least $10,000.  And you saw that that was money

25   that was paid in cash.  And you saw some of that cash that was

E480liu5                     HAN - CROSS

1    found in the law firm when the FBI searched it.

2            And what is the firm concerned about in this first

3    meeting?  They are concerned that the government will be able

4    to confirm when Lin Chen left China.  They tell her the record

5    of your departure from Hong Kong might be discovered by the

6    immigration authorities, based on our experience.  And you know

7    this is exactly the kind of thing that these law firms were

8    concerned about, because look at the notepad that was found in

9    the Moslemi law firm.  What does that say?  It says in

10   countries in South America and Central America, it is easy to

11   find out.  It may have found out, except for Venezuela and

12   Cuba.  In Argentina, it is not easy to find out.  What are they

13   talking about?  They are talking about which countries the

14   government can verify that you have gone through on your way

15   here.  And look at the photos of the law firms themselves.

16   Look at the walls.  Look at how many maps are on the walls of

17   that law firm.  Why?  So you could coach asylum applicants

18   about the routes they were going to say they had taken to come

19   into the United States.

20           And going back to the Lin Chen meeting at Bandrich,

21   what do they tell her?  Not you can't apply for asylum if you

22   have been here for more than a year, not you can't apply here

23   if you don't live in New York.  She doesn't get asked about her

24   experience in China.  Here's what they tell her.  Christianity

25   is really complicated if you don't live in New York because you

1    are going to have to start going to church.  And how are you

2    going to go to a church in New York if you don't live here.

3    Instead, they recommend family planning.  And so, now, the

4    applicant has a story assigned to them, a claim assigned.  What

5    is the next step?  It's the storywriting.  Storywriters, like

6    Meng Fei and Victor, would get a file.  And that file had three

7    things on it; the client's name, their telephone number, and

8    which claim they were assigned.

9            And did the storywriters interview the applicant, did

10   they ask them questions?  Not really.  They took basic

11   biographical information and then they used that basic

12   information to create a story.  They made it up.  And if the

13   storywriters were being pretty careful, they sometimes said no,

14   no you write the story first.  But you heard what happened.

15   Applicants didn't know how to make these stories up.  And so

16   even when they told the applicants to write these first drafts

17   themselves, you saw what happened.  Look at what happened with

18   Lin Chen.  She goes to Feng Ling Liu.  Look at Huai Guo Wu and

19   his experience at Bandrich.  The storywriters, the people like

20   Rachel Yang.  They just write the stories.  They give them the

21   whole story, and tell them to copy it over.  They don't

22   interview the asylum applicants before they add details to

23   their story.  They just add facts to the story about

24   persecution, about detention, about beatings.  And the

25   storywriters showed those stories to the lawyers.  Lawyers like

E480liu5                    HAN - CROSS

1    Feng Ling Liu and Vanessa.  And what did the lawyers do to

2    those stories?  They made changes.  They made a beating more

3    severe, they made the amount of time that a person had been in

4    detention a little shorter.  Because if you say you have been

5    detained for six weeks, it's gonna be a little strange when you

6    can't describe what the place looks like that you were detained

7    in.  And you have specific examples of this.  Look at

8    government exhibit 416.  Where Vanessa adds in information

9    about a person being detained for a month, and being

10   mistreated, even though that information appears nowhere in the

11   translated version that Vanessa is looking at.

12            And the law firms also help to gather proof, one-year

13   proof.  First, the applicants needed attesting letters, letters

14   from family and friends in China that would describe their

15   pretend persecution.  And you have heard there were a couple of

16   requirements for these letters.  First, they had to look like

17   they had really been written in China.  So it had to be on

18   right-sized paper, they had to use the right kind of ink and

19   you needed to have a postmarked envelope from China.

20            Second, the person writing the letter was supposed to

21   include a copy of their identification.  So here, you cannot

22   just make up a person's name, you need to have a real person

23   who is going to let you use their ID.  And that person has to

24   be more or less the right age and the right gender.  Because a

25   letter portending to be from a boyfriend in support of a

2065

E480liu5                    HAN - CROSS

1    girlfriend's asylum application, that has to be someone who is
2    more or less the same age.  But if you are getting a letter
3    from a fake pastor, it is a good idea to get that from someone
4    who is older, so it looks like the kind of person who really
5    might be a pastor.  And how do you know all of this?  Well, you
6    heard it directly from Meng Fei and from Victor.  They wrote
7    these attesting letters.  They drafted these fake stories.  And
8    they did that without ever asking any client for actual
9    details.

10          They followed the law firm's guidelines that in a
11   Christianity claim, you needed a letter from a friend, a letter
12   from a family member, and a letter from your pastor.  And that
13   you had to have an ID that fit more or less into the right age
14   bracket.  And the exact same thing was happening at Bandrich
15   law firm.  Because, remember, Rachel Yang told Huai Guo Wu, she
16   told him you need a letter from your mom, you need a letter
17   from a friend, and you need a letter from a pastor.  And she
18   specifically said you should get someone older to give you
19   their ID to be the pastor.  And that is all Rachel Yang told
20   him Before handing him three already typewritten letters to
21   have him send them to China to be recopied and mailed back.

22          Of course, Huai Guo Wu didn't have a pastor.  Huai Guo
23   Wu was never persecuted based on Christianity.  So what did he
24   do?  You heard what he did.  He asked his uncle, an older
25   person with a different last name, a person who was absolutely

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

2066

E480liu5                    HAN - CROSS

1    not a pastor.  And you even saw how those letters would be

2    written, with blanks for the name for the person who was going

3    to sign.  Because sometimes the applicant wouldn't know whose

4    identification they were going to use.

5           Look at the picture of the computer screen that was

6    taken during the search of the Moslemi law firm.  What is that.

7    That is a letter being written on the very day that the FBI

8    searched the law firm.  And even though the law firm is the one

9    writing the letter, they don't know the name of the person it's

10   coming from.  They have never talked to them.  They just put in

11   XXX so it can be filled in later.

12          In some cases, you heard the applicants didn't even

13   bother to mail these letters to China.  They just had people

14   copy them over inside the United States.

15          Lin Chen and Jason both told you that that is exactly

16   what happened with their letters.  And, in fact, you heard Lin

17   Chen say that she had other people sitting around the law firm

18   copying it over for her, so the handwriting on the different

19   letters would be different.

20          The letters needed to have different handwriting, they

21   needed to have different ink, and needed to have different

22   types of paper.  And what if you didn't have the right kind of

23   paper, what if you didn't have Chinese paper on hand, not a

24   problem.  The law firm kept it on hand for clients to use.

25   Look at what was found in both law firms.  Different kinds of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E480liu5                     HAN - CROSS

1    blank paper ready to be used to create these fake letters.

2           But the only fake documents here were not the stories,

3    they were not the attesting letters.  You also saw there was

4    all kinds of fake documents showing that people have been in

5    the United States for less than a year.  Remember in government

6    exhibit 44, Lin Chen is sitting around the law firm.  And just

7    sitting there, she hears Lillian Miao talking to some other

8    client right out in the middle of the law firm.  So no effort,

9    by anyone to hide what is going on.  And what does Lillian Miao

10   say?  She says you need to get a fake airline ticket.  And the

11   applicant says, I'm not exactly sure I know where to get fake

12   airline ticket.  And she says, it is no problem, everybody in

13   Fujian knows how the get a fake airline ticket.  Look at

14   government exhibit 57.  That is the phone call between Lin Chen

15   and China.  We didn't read that all of the way through in front

16   of you, but it's in evidence and you can look at it.

17          Look what happens.  Lin Chen calls this document

18   provider in China.  And he says he is already familiar with

19   what she needs.  He is already familiar with the Feng Ling Liu

20   law firm.  He can make boarding passes.  He can make medical

21   records.  He can make drivers licenses.  Whatever you need, he

22   can make it.  In fact, this practice was so common that when

23   Lin Chen goes to talk to David Miao and she tells him that her

24   one-year evidence worked, the asylum office thought her

25   one-year evidence looked pretty good.  What does he say.  He

E480liu5                    HAN - CROSS

1    says where did you get it from?  She says, oh, I used that guy,

2    the same person that Lillian told me to use.  And he asked,

3    well, what did you pay for this asylum application, fake

4    evidence.  And she tells him.  And what does he say in

5    response?  He says that was a pretty reasonable price.  You saw

6    that the firm helped make these fake documents.  You saw that

7    they had all kinds of blank paperwork ready to be filled out to

8    submit with fake asylum applications; blank church letterhead,

9    blank receipts, even blank medical records.

10           So what happened after an application was filed?  The

11   applicant was prepared for their asylum interview.  What kind

12   of materials did they use?  You saw some of those materials.

13   Remember, you saw question and answer forms for Christianity,

14   in both the Moslemi law firm and the Bandrich law firm.  And

15   these were not just similar question and answer forms.

16   Remember, Meng Fei Yu said that the very form she was used to

17   using in the Moslemi law firm, that same document was found in

18   the Bandrich law firm.  The firms were using the identical

19   preparation materials.

20           And what kinds of information were these questions and

21   answers answered?  They answered questions like what is the

22   Bible.  They answered questions like when was Jesus born.  For

23   falun gong, they answered questions like what is falun gong.

24   They told people applying, based on persecution under the

25   family planning policy, what the family planning policy was.

2069
E480liu5                    HAN - CROSS

1            And now you have to ask yourselves, what would a

2    legitimate law firm do with this kind of stuff?  You heard Ms.

3    Caudill-Mirillo testify.  She told you you don't have to be a

4    Christian scholar to apply for asylum.  You don't have to be an

5    expert practitioner in falun gong.  But use your common sense.

6    Are there people who are true believers in Christianity who do

7    not know what the Bible is?  Are there people who practice

8    falun gong, who don't know what falun gong is.  Are there

9    really women who have suffered forced abortions who are not

10   aware that China forbids pregnancy outside of marriage.  Of

11   course not.

12           The one and only reason for these kind of training

13   materials to be present in this law office was to coach people

14   whose claims were made up, who didn't know about Christianity,

15   who didn't know about family planning, who didn't know about

16   falun gong.  The only purpose that these materials had, was to

17   tell people how to lie.

18           And what could you tell from these coaching sessions.

19   What is crystal clear, is this.  Every single person involved

20   knows that this is a fraud.  Look at government exhibit 110,

21   where Lillian Miao is preparing Lin Chen.  It's a long

22   recording, and we didn't read the whole thing.  But what

23   happens in that prep session?  Lillian explains, in graphic

24   detail, the way that an abortion happens.  She talks about the

25   instruments that are used, she talks about the position that

E480liu5                    HAN - CROSS

1    you would have to be on in the operating table, she talks about

2    how long it takes.  And why is Lillian telling this to someone

3    who is filing an asylum claim based on forced abortion?

4    Because Lin Chen doesn't know what it is like to have an

5    abortion, she never had one.  And the only way that she is

6    getting this information is from law firm.

7            Look at the recording where Jason is prepared by Kevin

8    at the Bandrich law firm.  That is the exact same thing,

9    government exhibit 141.  Kevin literally asks, Have you read

10   your story before.  Kevin holds up materials and says I

11   recommend you read this to learn about falun gong.  Kevin is

12   concerned that Jason won't be able to describe, with accuracy,

13   what a police uniform looks like.  And so what does he tell

14   him?  He says, do you have your personal computer.  You could

15   find a TV drama, a drama called Police Chief.

16           Take a look at that TV drama, including how the public

17   security police officers look like, what uniforms they wear and

18   how they usually arrest people.  When they arrest people, how

19   the police vehicles look like.  All of these are in there,

20   including from how they interrogate people.  That is Kevin's

21   advice.  Don't know what to say, don't know how to lie, look it

22   up on the internet.

23           And, finally, let's look at this exchange.  Kevin says

24   what you need to do now is to make those immigration officers

25   believe you are a practitioner.

E480liu5                    HAN - CROSS

1          Jason says:  Um.  And Kevin says:  Just like an actor.
2     And Jason says:  Um.  And Kevin says: Play it well.  That is
3     Kevin's ultimate advice, being an actor.  Treat it like a play.
4     Memorize your lines.
5          Now let me say just a brief word about the recordings
6     in this case.  There has been a lot of fuss about the
7     recordings, about typographical errors, about the coincidence
8     of a translator knowing Meng Fei Yu.
9          Here is what you have not heard.  You have not heard a
10    single question about the substantive accuracy of the
11    recordings.  Phillip Hughes worked on every recording made by
12    Lin Chen.  He was asked not one question about whether or not
13    the recordings, themselves, and the translations, were right.
14    Yes Chen got asked a couple of questions, like is the word for
15    invoice the same as the word for receipt.  And he got asked
16    again, and again, and again, to define the phrase, mm-hmm,
17    mm-hmm, mm-hmm.  And Mr. Lin got asked a very lot of questions
18    about Meng Fei Yu.  But what didn't he get asked?  He did not
19    get asked a single question about whether the translations were
20    right.  There was not a single instance, not one, in which
21    defense counsel pointed to the recordings and to the
22    translations and said, wait, there is a whole part of the
23    recording that is not in the translation.  Or, wait a minute,
24    there is something here in the translation, and it is not on
25    the recording.  There was not a single time.  And you have the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    transcripts.  And you heard the testimony of the people who

2    actually made the recordings.  And they told you, we read the

3    transcripts to you, and the Chinese is right.  And they talked

4    to you about the kind of conversations they were having, and

5    they described those conversations, and it matches up to

6    exactly what is in the translations.

7            So why are defense counsel trying so hard to discredit

8    transcripts?  Because the recordings are such powerful

9    evidence.  Because you can't cross-examine a recording.  You

10   can't make a recording cry.  And these recordings are

11   devastating.  These are recordings, without any other evidence,

12   on which you could convict all of these defendants.

13           So the defense lawyers have to do something.  And they

14   have tried very hard to confuse the issue.  But at the end of

15   the day, there is simply no evidence that these transcripts are

16   anything other than accurate transcripts of the recordings.

17           You heard it from the translators, you heard it from

18   the witnesses, and it matches up to exactly what you heard was

19   going on at these law firms.

20           So let's go back to the process for a second.  If,

21   after all of this preparation, the applicants passed the asylum

22   interview, then that was it.  The law firm got their money and

23   the person got asylum, anywhere from $10,000 to $13,000 per

24   applicant.  But if they fail, they went to court.

25           Now as you have heard, it could literally take years

E480liu5                    HAN - CROSS

1    for asylum applicants to have their day in court.  And so you

2    don't have any recordings of applicants being prepared by the

3    lawyers themselves.  Because the FBI arrested everyone before

4    those court dates would have come up.  But you know what would

5    happen.  The client would be prepared again.  Often because so

6    much time had passed, the client would no longer remember their

7    fake story.  And what would happen when a client didn't

8    remember their story?  The lawyers would remind them.  They

9    would point to the written story and they would tell the

10   applicants to memorize it.  It is completely clear that these

11   law firms were shameless fraud mills.  They churned out lie

12   after lie after lie with tremendous efficiency.  And each and

13   every employee at the firm had their own role in helping that

14   to work.  From the receptionist who asked if you had been

15   caught, to the lawyer who prepped you for your court hearing.

16   Everyone plays their role in getting these fraudulent asylum

17   applications to succeed, because that is how the law firm got

18   paid.

19           So what were these defendants' roles and how do you

20   know that they knew exactly what was going on?  Let's talk,

21   first, about Feng Ling Liu.  She was the leader of the entire

22   operation.  It was her name on the door.  She hired people.

23   She fired people.  She gave out work assignments.  She issued

24   internal rules to keep anyone at the firm from getting caught.

25   And she raked in millions and millions of dollars.

E480liu5                    HAN - CROSS

1          So that's the first way you know, because she directly

2     participated in it.  Through her open office door, right next

3     to where Victor and Meng Fei Yu used to sit, they heard her

4     meeting with new clients.  They heard her get client background

5     information and age, and then assign them a claim without any

6     other discussion.

7          Feng Ling Liu reviewed stories and attesting letters

8     that were written by Victor and by Meng Fei Yu.  And she would

9     make changes to those stories without speaking to the clients

10    and without speaking to the storywriter.  In fact, you heard

11    that in one particular case, Feng Ling Liu rewrote an entire

12    story herself, story for David Miao's nephew.

13         How else do you know?  Because look at the atmosphere

14    in the law firm.  Look at who works there.  Next to Feng Ling

15    Liu, you have her husband, Dave Miao.  That is the very person

16    who conducted intake interviews and coached Lin Chen that under

17    no circumstances should she admit at an asylum interview that

18    she was lying.  Feng Ling Liu's brother, Harry Liu, an office

19    manager at the Feng Ling Liu law firm, who went on to open up

20    the Bandrich law firm.  Feng Ling Liu's sister-in-law Yolanda,

21    who trained Victor and moved to the Bandrich law firm where you

22    heard her talk to Lin Chen about what the best fraudulent

23    asylum application would be.

24         And Feng Ling Liu's sister, Lucy.  And Lucy's husband,
      Kevin.  That's the same Kevin who coached Jason how to lie.

25              (Continued on next page)

2075

1        And finally, David Miao sister Lillian, she's the one
2   who told Lin Chen exactly how to describe a fake abortion.
3        And what are people talking about in the open areas of
4   the law firm?  They are talking about fraud.  Look how often in
5   the recordings other clients are captured saying things that
6   are clearly part of the fraud.  Look at how an unidentified
7   male or unidentified female are asking about fake documents,
8   timing or their fake claim.  Was anyone trying to hide what
9   they were doing?  The opposite.  This was an open secret,
10  something that was hidden only from the government and from the
11  asylum office.  Clients discussed their cases, their false
12  stories, their fake documents with each other and with other
13  people who worked at the law firm.  So, Feng Ling Liu, just by
14  walking around the law firm every day, would have known exactly
15  what was going on.
16       And what about the efforts to hide the fraud?  You
17  heard that Feng Ling Liu changed the law firm name to Moslemi &
18  Associates.  You heard that after that change it wasn't a real
19  change, Feng Ling Liu was the boss, David Miao was the boss.
20  Nothing changed but the name on the front door.
21       And, in fact, while the firm name changed on English
22  language business cards and on signs that were in English, the
23  Chinese signs that were presented with Feng Ling Liu's name
24  inside the office and on the front door to the building, those
25  stayed exactly the same.

E487LIU6                      Summation - Ms. Mermelstein

1    in court.

2            At the beginning of this trial Mr. Egan asked you to

3    use your common sense.  What does your common sense tell you?

4    What would you do if you found out that your employees were

5    committing a fraud under your roof?  Would you respond with

6    outrage, with shock, with anger?  Would you just say um-hum?

7    Of course not.

8            So, why is Feng Ling Liu responding this way?  Because

9    she knows exactly what Meng Fei is talking about.  She is not

10   shocked.  But, as you heard, Feng Ling Liu was also very

11   careful.  She was concerned about talking on the phone about

12   the possibility that her calls could be intercepted.  And she

13   has a former colleague acknowledging the fraud on an open

14   telephone line.  And so she says the minimum, mmm.  That's it.

15           One final point about this call.  This call does not

16   just show you that Feng Ling Liu knew about and participated in

17   the fraud at the Feng Ling Liu and Moslemi law firms.  It shows

18   you that notwithstanding all of the nonsense about the name

19   changes, whether it was called Moslemi or Feng Ling Liu, this

20   firm always belonged to Feng Ling Liu, because here is what

21   this call tells you, that when it was made in September of 2012

22   Feng Ling Liu was still in charge.  She is in charge of hiring,

23   she is in charge of assigning who goes to court and who does

24   what jobs, and she is still monitoring the asylum application

25   process.  And when you take all of this together, it is clear

E3oWliu4                    Caudill- Mirillo - cross

1    A.  Again, we don't move on any case --

2    Q.  It's a yes or no.

3    A.  It's a no.  I think I explained why.  Thank you.

4    Q.  Now, with regard to the applicants that came in, they swore

5    the oath and they continued to lie and fool your officers,

6    right?

7    A.  Yes.  It's happened, yes.

8    Q.  And some of these people, as we said, are unsophisticated

9    and uneducated, and they still fooled your officers?

10   A.  Yes, it's possible.

11   Q.  And they did so because they didn't want to be deported?

12   A.  I would assume so, yes.

13   Q.  And they did so because they wanted to stay in America?

14   A.  Yes.

15   Q.  And they did so because they wanted to live free, correct?

16   A.  I don't know their motivation.

17          MR. BOONE:  Objection.

18          THE COURT:  Was there an objection?

19          MR. BOONE:  I'm not sure what he means by live free.

20          THE COURT:  Sustained.

21   BY MR. FRANZ:

22   Q.  They didn't want to go to prison, right?

23   A.  I don't know why they, why they didn't -- I don't

24   understand.  I guess I'm not understanding your question.

25   Q.  Well, one, people came in, according to you, and they lied

E3oWliu4                    Caudill- Mirillo - cross

1    to your officers, right?

2    A.  Yes.

3    Q.  If they went in and told your officer, Hey, my

4    application's a fraud, I lied to you, right, they could go to

5    prison for making that admission, right?

6    A.  Yes, they could.

7    Q.  So they continue with their lie to avoid making that

8    admission?

9    A.  Oh, yes.

10   Q.  So they don't want to go to prison, right?

11   A.  Yes.  I'm sorry.

12   Q.  They don't want to be deported.

13   A.  I thought you were speaking in China.  Sorry.  Yes.  That's

14   the case.  Yes.

15          MR. FRANZ:  Thank you.

16          THE COURT:  Is there any other cross-examination?

17          MR. MAHER:  Yes.  May I have a moment to set up.

18          THE COURT:  Yes.

19          MR. MAHER:  Thank you.

20          MR. FRANZ:  Your Honor, could I ask a couple of

21   follow-up real quick?

22          THE COURT:  Yes.

23   BY MR. FRANZ:

24   Q.  With regard to the database search with regard to the

25   number of applications that were filed --

2085

E487LIU6                    Summation - Ms. Mermelstein

1    gets said in the conversations.

2           First, you hear over and over and over that Feng Ling

3    Liu trusts Bandrich, that Feng Ling Liu only wants Bandrich to

4    handle her cases.  These are just a few cites:  If Feng Ling

5    Liu ever has to get someone to cover her office, she only wants

6    me to do it.  They really want me to take the case because

7    they've been so complicated.  And Meng Fei says they trust you.

8    And Vanessa Bandrich says, right, they do.  And Vanessa

9    Bandrich says, their office doesn't want anybody to play with

10   the file.  When they can't handle it, they want me to handle

11   it.

12          Ask yourselves this.  Feng Ling Liu builds a law firm,

13   she staffs it with family member after family member after

14   family member, and then they bring Vanessa Bandrich in; she is

15   their go-to person.  They don't want to trust anyone else.

16   Would Feng Ling Liu brought someone in who had no idea what was

17   going on, someone who if they discovered what was going on

18   might call the F.B.I., might tell the court, might get them in

19   trouble?  Of course not.  Remember what Victor told you, they

20   only hired people who were dirty.

21          Let's look at 133.  Vanessa Bandrich is complaining

22   that she has a case that she is worried is going to fail

23   because the applicant has traveled to the United States many,

24   many times and has never applied for asylum.  And, remember, if

25   there is a record that you have come in before, that's

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

2088

1   down.  You know, last year Ms. Liu talked to me and Brendan

2   privately.  I told you she would sometimes worry about --"  And

3   Vanessa Bandrich interrupts.  "About what?  Money?  Or getting

4   into trouble?"

5           Those were the two things that mattered to Feng Ling

6   Liu:  Getting asylum applications approved so they could get

7   their 10, 11 and $13,000 fees, and not getting caught.  And

8   Vanessa Bandrich knew that immediately.  She knew those were

9   the two things that Feng Ling Liu would have been worried

10  about.  And why would she be worried about getting caught,

11  about getting in trouble?  Because it was a fraud, because they

12  all knew it was a fraud, and nobody wanted to get caught.

13          And, finally, let's talk about Rachel Yang and what

14  she did and how you know that she knew.

15          First, remember Huai Guo Wu?  He shows up at the

16  Bandrich law firm.  He walks in for the first time, and no one

17  asks him if he has suffered persecution.  Rachel Yang tells him

18  you have to start going to church so the American government

19  will believe that you are really a Christian.  And he does

20  start going to church.  Rachel Yang told him what to put in his

21  asylum story, and then when it wasn't good enough, she rewrote

22  it so it would be stronger.  She told him to find a family

23  member, a friend, an older person to be the pastor and sign the

24  letters on his behalf.  And then Rachel Yang wrote those

25  letters without asking a single question.

1    knew there was a fraud.  That's not the response you give when

2    you know you're not running a fraudulent law firm.  That was

3    her husband on the phone.  That was her husband on that

4    recording.  You can take all these recordings back.  You have

5    the transcripts, you can read them for yourselves.

6           That was just one family member in that firm.  I can

7    keep going.  Kevin, married to one of her family members;

8    Harry, brother-in-law; Lillian, sister-in-law; Lucy, sister;

9    Ann, sister; Yolanda, sister-in-law.  Almost half a dozen

10   people in this firm were family members.  This isn't a big firm

11   we're talking about.  This isn't a Wall Street firm with

12   offices in Paris and London and Rome.  It's a firm in

13   Chinatown, got maybe 15 people.  To argue that she had no idea

14   that a fraud was going on in her own firm, that the majority of

15   her family members worked in, is beyond ridiculous.  We all

16   have families and we all know one of the hardest things in the

17   world to do is to keep a secret from a family member.  You

18   probably remember a time when you were young, maybe you had a

19   crush on someone in school, maybe you told your brother, told

20   your sister, and next thing you know, your mom's teasing you

21   about it, your dad's teasing you about it, maybe even grandma's

22   teasing you about it.  Families talk.  That's what they do.  So

23   the idea that no one in this firm informed her that there was a

24   fraud going on is completely ridiculous.

25           You know how prevalent the fraud was, too.  It was

1    done out in the open.  Many of these conversations were done in

2    area A, that's the main area.  There is no way you can't hear

3    what's going on in that area.  There's no secret room in the

4    firm where the family members run, conduct fraud really quick,

5    and then run out and say, Please, don't tell Feng Ling Liu we

6    just did some fraudulent stuff.  It's not possible.  You know

7    that's ridiculous.

8            Now, I want to now talk a little bit about Lin Chen.

9    Defense counsel made a point that Lin Chen went to the Feng

10   Ling Liu law office several times, I forget, 30, whatever it

11   was, however many times, and she never saw Feng Ling Liu, and

12   they said that because they actually thought it meant

13   something.  I'm going to tell you it means.  Absolutely

14   nothing.  The fact that she went to Feng Ling Liu law firm and

15   Moslemi & Associates and didn't see Feng Ling Liu is evidence

16   of nothing.

17           Think about your favorite restaurant.  Think about how

18   many times you go there.  You maybe go there 30 times in a

19   year.  How many times do you go to your favorite restaurant and

20   see the owner of the restaurant?  Probably very rarely, if at

21   all.  That's because there's a division of labor.  People have

22   different jobs.  There are people who stand out in the front.

23   There's a host who greets you when you come in.  When the host

24   gets done with you, they introduce you to the waiter.  The

25   waiter comes and gets your order and then they have a guy who

1     recordings.  The FBI was not listening to her phone calls 24

2     hours a day.  They had employees and they had asylum applicants

3     wearing recordings at specific time periods.

4             Second, you heard about the efforts she took to make

5     sure she didn't get caught.  You heard about the big meeting

6     she had where she gave some very strange and incriminating

7     instructions.  She told her employees, employees of a law firm,

8     don't talk to clients on the phone.  That was one of her

9     instructions.  But she gave an even stranger instruction:

10    Don't talk to strangers.  And you know in addition to that she

11    instructed them to shred documents and delete computer files.

12    But my point is she tried very hard not to get on the phone,

13    and the fact that we got one phone call is nothing short of a

14    miracle.

15            Now, the idea that one phone call is not important is

16    ridiculous.  One phone call could be extremely important and

17    one phone call can be extremely incriminating.  I want you to

18    think about this unfortunate scenario that some people may have

19    been through.  Imagine you've been working a long day.  You

20    come home, you're tired, and you see that you have a message on

21    your phone.  You play the message.  You know on the other end

22    of that message is your significant other, boyfriend,

23    girlfriend, and they're describing a trip to Jamaica, a weekend

24    getaway they planned.  They talk about how you're going to do

25    ZipLining, hang out on the beach, go snorkeling, and then at

2372
E4aWliu6                      Rebuttal - Mr. Boone

1    the end of the call, they mention someone else's name.  And you

2    realize that message wasn't for you, so you confront the person

3    and you say, Hey, I got your message, what was that about.  And

4    their response is you only have one call.  What would you say

5    in response to that?  You would say what difference does it

6    make?

7            What difference does it make you only have one call?

8    One call can be extremely important.  One call can be extremely

9    incriminating.  And pay attention to this call.  This call Mr.

10   Fischetti was talking about was a call involving Meng Fei Yu

11   talking about the fraud.  She's talking about how she's scared

12   to come back to the firm because she doesn't want to put

13   herself in the position where she may get caught by a judge or

14   by a client, confessing to a judge that the story isn't true.

15   And what does Feng Ling Liu say in response?  She doesn't say:

16   Back up.  What are you talking about.  Why would a client ever

17   say that?  That makes no sense.  Are you actually drafting

18   fraudulent applications?  Because that's against the law, Meng

19   Fei Yu.

20           No, she doesn't say that.  She says mm, mm, and she

21   says it several times and Meng Fei Yu goes into more detail

22   about the fraud and her response is the same, mm, mm.  Is that

23   the response of someone who doesn't know what she's talking

24   about?  Someone just accused your firm of perpetrating a fraud,

25   and your response is mm, mm?  And she goes a step further and

1          You may proceed.

2          MR. BOONE:  Now, the reason for that is law-abiding

3     citizens don't work in fraud mills.  They don't.  They choose

4     to work other places so they can't tell you about what happens

5     in a fraud mill.  To learn what happens in a fraud mill, you

6     need people who work in fraud mills.  And those people tend to

7     be criminals.  That's why we had those witnesses testify before

8     you, because they could tell you the intricacies of how the

9     firm worked, and they're the only ones that can tell you that

10    information.

11          Now, the idea that they simply came here to tell a lie

12    is ridiculous, and you know that.  Each witness went over their

13    cooperation agreement with you.  Those agreements are in

14    evidence.  You can review them if you want.  And they made it

15    clear that their understanding of the agreement is that if they

16    come here and lie, they will lose their agreement.  Period.

17    There are no ifs, ands, or buts about it.  If they get on the

18    witness stand and tell a lie, they lose their agreement.  They

19    have absolutely no incentive to come in here and tell a bunch

20    of lies.  They told you they've been working for the FBI for a

21    long time.  They've done a lot of recordings and had a lot of

22    meetings.  They have no incentive to throw away all the effort

23    they put in just to come tell a lie.  They have no incentive to

24    subject themselves to being on the witness stand, to exposing

25    themselves as cooperating witnesses for the government just to

2375

E4aWliu6                    Rebuttal - Mr. Boone

1   tell a lie.

2           And think about what they said when they got up there.

3   They named several people involved in the fraud, many names,

4   David, Lillian, Ann, Harry, Kevin.  They named several people,

5   and they told you exactly what they knew about each of those

6   people.  They didn't say I only know Feng Ling Liu or only know

7   Vanessa Bandrich or only know Rachel Yang.  They named all the

8   people they knew and they gave a measured account of what they

9   knew about them.  They didn't say any more, they didn't say any

10  less.

11          Now, on that same point, if what the defense wants you

12  to believe is true, which is that they came here to lie to you

13  and pin the blame on their clients, don't you think they could

14  have come up with a much better story than they came up with?

15  I mean, Victor You and Meng Fei Yu were professional liars,

16  right?  That was made very clear.  They lie all the time,

17  they're good at it.  They know how to make stories, that's what

18  they do, according to the defense.  Don't you think they could

19  have told a better lie?  What did they say about Feng Ling Liu?

20  They didn't say we saw her writing stories from sun up until

21  sundown, until her hand fell off.  She was always writing

22  stories, you couldn't stop that woman from writing stories.

23  They didn't say that.  They said she edited the stories, gave

24  comments, and they described what those comments were.  Think

25  about that.  If they really wanted to pin the blame on one of

E4aWliu6                    Rebuttal - Mr. Boone

1    that she told people on five such occasions you need to

2    memorize this story shows she knows they don't know their story

3    because it's not true; it didn't happen to them, because if

4    that happened to you, you would not forget that.  Your common

5    sense tells you that.

6             You're not going to forget the day you were forced to

7    have an abortion.  You're not going to forget the day you were

8    beaten in jail.  You're going to remember that day, and you

9    don't need anyone's help helping you remember that day.  That's

10   the first reason you know that she knew about the fraud and

11   that she was an active member in that fraud.

12            Now, continuing on this timeline, what happens next?

13   Some time passes.  A year, maybe a little less than a year, she

14   gets promoted.  She gets an opportunity to head her own firm.

15   Wow, great opportunity for someone who's been out of law school

16   or at least practicing law for a year.  What are the odds that

17   she would ascend so high so quickly?  Think about it.  Knowing

18   what you know about Feng Ling Liu and her family and how

19   protective they were of the fraud, do you think for one second

20   they would put someone in charge of an offshoot firm, their

21   second franchise, who they did not think was going to give them

22   assurances that nothing would happen, someone who was not

23   involved in the fraud?  That would be a crazy risk, a crazy

24   risk for a firm that told them don't talk on the phone, don't

25   talk to strangers, shred documents, to then put someone in

2381

E4aWliu6                    Rebuttal - Mr. Boone

1    charge of a firm that they send a hundred cases to.  And they

2    told you the purpose of opening up that firm was to perpetuate

3    the fraud.  They would never put someone in charge of that firm

4    who was not in on the conspiracy.  Because what if they paid

5    attention, what if they found out what was going on and they

6    said something, the whole fraud would be ruined.  That's why

7    she was put in charge.  Just like her friend Troy Moslemi's

8    name was used, it's the same reasoning, another piece of

9    evidence that shows she knew exactly what was going on and she

10   was complicit.

11        Now, I want to talk a little bit more about the fact

12   that she had no idea what was going on in the firm.  First of

13   all, her firm was much smaller than Moslemi's firm.  You heard

14   testimony maybe four or five people worked at that firm.  There

15   were actually fewer people at that firm than are sitting over

16   there, No. 1.  Not a big firm.

17        No. 2, fraud was rampant.  You heard testimony about

18   items that were seized from that firm, items that were clearly

19   fraudulent, asylum stories that were already written except for

20   the name of the applicant, asylum stories that were already

21   written except for the name of the loved one to be filled in

22   later.  Clearly fraudulent, and you also saw for yourself a

23   document that Vanessa Bandrich herself edited.

24        In fact, Ms. Geier, could we see Government Exhibit

25   416, please.

431

E3p0liu4                        Person - direct

1    through 302K.

2    A.  Okay.

3    Q.  Do you recognize those items?

4    A.  I do.

5    Q.  What are they?

6    A.  They are items that were seized at the location that day.

7    Q.  And how do you recognize them?

8    A.  Approximately 10 days ago, I met with one of the case

9    agents on this case, Christopher Degraff at the FBI offices

10   here in Manhattan.  And he presented me with two of the boxes

11   we seized that day.  I opened those boxes, removed these items,

12   and brought them over to the United States Attorney's Office

13   where I placed government exhibit stickers on them, which

14   included my initials, the item number, and the room number of

15   where the item was found.

16          MR. BOONE:  Your Honor, the government offers into

17   evidence government exhibits 300, 301, 302, and 302A-3302K.

18          THE COURT:  Any objection?

19          MR. FISCHETTI:  No.

20          THE COURT:  They will be admitted.

21          (Government's Exhibits 300,301,302,302A-3302K received

22   in evidence)

23          MR. BOONE:  I want to first start off by talking about

24   government exhibit 300.

25          And talking about that, Ms. Geier, if you could put

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

432

E3p0liu4                    Person - direct

1    up -- yes, thank you.  And Ms. Geier, if you could now put up

2    government exhibit 300T and zoom in a little bit.  And it might

3    be if we could actually just zoom in on the first five lines

4    there.

5    Q.  300T is a translation of government exhibit document 300.

6    If you could read what's been highlighted, so that's numbers

7    one through five.

8    A.   Title is Basic Knowledge about Christianity.

9            One, what is the Bible.  The Bible is the word of God,

10   a covenant between God and man.

11           Two, how many parts can the Bible be divided into.

12   Two parts, the Old Testament and New Testament.

13           Three, what are the first five books of the Old

14   Testament.  They are known as the Pentatuch, which consists of

15   Genesis, Exodus, Leviticus, Numbers, and Deuteronomy.

16           Four, what are the first four books of the New

17   Testament, and what is the last one.  They are called the

18   gospels.  The first book is known as the Gospel of Matthew,

19   followed by the Gospels of Mark, Luke, and John.  And the last

20   one, which is also the last book of the Bible, is the book of

21   Revelation.

22           Five, what are the differences between the Old and New

23   Testament.  The old testament describes things that happened

24   before Jesus was born, whereas the New Testament tells the

25   story of the life of Jesus.  The Old and New Testaments take

E3p0liu4                    Person - direct

1    the birth of Jesus as the dividing line.

2              MR. BOONE:  And, Ms. Geier, if you could, now, on that

3    same.  Exhibit 300T, focus on the lines that are numbered 14

4    through 16.

5              And could you read what those lines say, Agent Person?

6    A.  Fourteen.  What are the Christian holidays.  Christmas and

7    Easter.  Christmas is on December 25 of each year.  And it's to

8    celebrate the birth of Jesus.  There is not a determinant time

9    for Easter.  Generally, it is in March and April, but it is on

10   Sunday.  The holiday is to celebrate the resurrection of Jesus.

11   In 2009, Easter is on April 12.  Check what day it is this

12   year.

13             Fifteen, how many books does the Bible have, and how

14   many chapters.  The Bible has 66 books, which are divided

15   into the Old Testament and New Testament.  The Old Testament

16   has 39 books, and the New Testament has 27 books.  The total

17   number of chapters is 1,189.

18        Sixteen, how many authors wrote the Bible?  Over 40

19   including, prophets, kings, scholars, doctors, and fishermen,

20   et cetera.

21             MR. BOONE:  And Ms. Geier, lastly, if you could

22   highlight the lines numbered 24 through 26 on government

23   exhibit 300T.

24   Q.  And if you could read those, Agent Person.

25   A.  Twenty-four who is Moses?  He was a profit who wrote the

434
E3p0liu4                    Person - direct

1    five books of Moses.  He was the leader of Israelites and led

2    them out of Egypt.  He was a lawgiver.  Through him, God gave

3    the 10 commandments.  Moses lived 120 years.

4            Twenty-five, where were the 10 commandments written.

5    God wrote them on the stone tablets by hand.

6            Twenty six, what are The Ten Commandments?  They are

7    the laws given by Jehovah to the Israelites, including:  One,

8    you shall have no other gods before me; two, you shall not make

9    for yourself a graven image; three, you shall not take the name

10   of the Lord, your God, in vain;  Four, remember the sabbath day

11   to keep it holy;  Five, honor your father and your mother; six,

12   you shall not kill; seven, you shall not commit adultery; eight

13   you shall not steal; nine, you shall not bear false witness

14   against other people.

15   Q.  And now moving to, if you could look at government

16   exhibit 301.  And, Ms. Geier, if you could also publish

17   government exhibit 301T, and Agent Person, if you could read

18   301T.

19   A.  In countries in South America and Central America, it is

20   easy to find out, it may be found out.  Except for Venezuela

21   and Cuba and Argentina, it is not that easy to find out.

22   Q.  And if we can now look at government exhibit 302A.  And.

23   302A-T.

24           MR. BOONE:  And for 302A-T, Ms. Geier, if you could

25   show us the second page in that document.  Thank you.

435

E3p0liu4                        Person - direct

1   Q.  Agent Person if you could read the second page of 302A-T.

2   A.  Seal Fujian August 5, 2010.  15.  Fujian.

3   Delivery.  Three.  Printed by Fujian Province Post and

4   Telecommunication Printing Factory, telephone 0591-87316090,

5   GB/T1416-2003, DL printed in July 2009, 100,000 copies,

6   manufactured under the supervision vision of the Fujian

7   Province Postal Administration, Min Fujian Postal 2005,

8   Envelope Supervision Code 35-1001.

9   Q.  Thank you.  And if we can turn to government exhibit 302B.

10  And 302B-T, if you could read 302 B-T into the record, Agent

11  Person.

12  A.  Fujian Province, Lang Jang County, Twan Chi Christian

13  Church, telephone 26276330, Postal Code 350501, Fujian Province

14  Lang Jang County, Twan Chi Christianity church seal.

15  Q.  And if we can now look at government exhibit 302I, and.

16  302I-T.

17       MR. BOONE:  And Ms. Geier, if you could focus in on

18  the first box of 302I-T.  And Agent Person, if you could read

19  that box from 302I-T into the record, please.

20  A.  Cash receipt number 006-2385.  Attachment.  Pages.  Date.

21  Year.  Month.  Day.  Payer, entity, or individual.  Items paid

22  for.  Ren Mindy, amounting words, no.  Copy to receipt.  Pays

23  company seal.  Received by.  Paid by.  Seal.  Fu Shu.  Jing

24  Qiao Garden Properties Management Company, Limited.  Special

25  finance seal.

E3p0liu4                    Person - direct

1          MR. BOONE:  And, Ms. Geier, if you could now show us

2     all of 302I and all of 302I-T.  Go back to the first page.

3     Perfect.  If you could go back to the first page of 302I and

4     302I-T.

5     Q.  Agent Person, does 302 I appear to be filled out with any

6     information?

7     A.  It does not.

8     Q.  If we could look at 302J and 302J-T, okay.

9          MR. BOONE:  And Ms. Geier, if you could focus in on --

10    perfect.

11    Q.  If you could read, Agent Person, from 302J-T right up until

12    there is a long dashed line across the printed page.

13    A.  The Second People's Hospital of Fujian Province.  The

14    second affiliated hospital of Fujian University of traditional

15    Chinese medicine.  Outpatient medical records.  MM1052070.

16    Name, sex, date of birth, address, work location, occupation,

17    ethnicity, marital status, telephone number, name of child's

18    parents, records of drug allergies, 1, 2.  Category of payment.

19    Preventional health insurance, municipal health insurance,

20    other.

21    Q.  And if you could just read those two lines underneath that

22    dash.

23    A.  Address, 13 Branch Hudon Road, middle section of Woosy

24    Road, Fuzhou City, Fujian Province, 350003, website.

25    www.fjhospital.com.

E3p0liu4                        Person - direct

1    Q.  And lastly if we can look at government exhibit 302K and

2    302K-T.  And Agent Person, if you could just read the writing

3    on 302K-T, top of the page.

4    A.  Fuzhou Key Ming Food Trading Company.  Number 0001382

5    received by date, year, month, day.  Item.  Quantity.  Unit

6    price.  Amount.

7    Q.  And if you could just read below that grid, two lines

8    listed there.

9    A.  Where it says address?

10   Q.  Correct?

11   A.  Address, Building 14, Store number 42-43, Fuzhou My Way

12   Straight Acquatic Products Trading Center, telephone

13   0591-83659465.

14   Q.  Now, moving away from the documents.

15        Prior to participating in this search, had you had any

16   involvement in the investigation of the Moslemi law firm.

17   A.  No, I did not.

18   Q.  And after conducting the search, did you have any further

19   involvement in the investigation of the Moslemi law firm?

20   A.  No, I did not.

21        MR. BOONE:  No further questions, your Honor.

22        THE COURT:  Cross-examination?

23        MR. FRANZ:  Yes, your Honor.

24   CROSS-EXAMINATION

25   BY MR. FRANZ:

E3pWliu5                        T. You - direct

1              MR. FISCHETTI:  I didn't hear his answer.

2              THE COURT:  Can you repeat your answer, please.

3              THE WITNESS:  Can you say the question again.

4     BY MR. EGAN:

5     Q.  I asked whether it surprised you when you saw Julie working

6     on these false asylum applications.

7     A.  Yes, that was big surprise to me.

8     Q.  That was a big surprise to you?

9     A.  Yes, actually make me very uncomfortable.

10    Q.  To be clear, the asylum application you filed, was that a

11    real asylum application or a fake one?

12    A.  These are real.

13    Q.  When you applied for asylum, did you use an immigration

14    lawyer?

15    A.  I use a criminal lawyer with, who is not specialize in

16    immigration law.

17    Q.  Did you write out a personal statement?

18    A.  No.

19    Q.  Why not?

20    A.  Because my lawyer didn't know I should write personal

21    statement.  So basically just two sentence on page five of that

22    application, and he mentioned a lot about my parents.  He say

23    my parents got asylum, my young brother got asylum, so I didn't

24    have story.

25    Q.  So there was no story attached to your application?

E3pWliu5                         T. You - direct

1   A.  Just two sentence, like -- actually, that's my wife's

2   application.  I get, I was aborted and for violating

3   family-planning policy, as simple as that.

4   Q.  I'm sorry.  Can you say that one more time?

5   A.  I forget exact wording.  Just two sentence like I get

6   pregnant and I was forced to receive abortion for violating

7   family-planning policy.

8           THE COURT:  This is your wife's application or yours?

9           THE WITNESS:  My wife's because I don't have

10  individual claim.  I'm derivative asylum.

11          THE COURT:  Of your parents.

12          THE WITNESS:  No.  My wife.

13  BY MR. EGAN:

14  Q.  You said derivative asylum?

15  A.  Yes.  My wife was persecuted.  I was not.

16  Q.  So you applied as part of her application?

17  A.  Yes.

18  Q.  Did you tell anyone at Ken Giles's firm about your asylum

19  application?

20  A.  No.

21  Q.  Why did you leave, well, let me ask you this.  Did you ever

22  end up writing stories at Ken Giles?

23  A.  No, I didn't get a chance.

24  Q.  What do you mean you didn't get a chance?

25  A.  Those kind of privilege for Julie and Julie didn't want me

510

E3p0liu6                        You - direct

1    A.  Roughly, March 2010.

2    Q.  During your two years in the firm, approximately how many

3    asylum applications did you work on in any of those capacities?

4    A.  Hundreds.

5    Q.  Hundreds, you said?

6    A.  Hundreds.

7    Q.  Of those that you worked on at Feng Ling Liu's law firm,

8    how many would you say were real, meaning they stated a real

9    claim for asylum based on actual events?

10   A.  I believe less than 20.

11   Q.  Less than 20?

12   A.  Yes.

13   Q.  And of the ones that you worked on, of those 20 that were

14   based on actual events, did people at the firm change them in

15   any way?

16   A.  Yes.  Change the real case.

17   Q.  You would change the real ones, as well?

18   A.  Yes.

19   Q.  And why would you change the real ones?

20   A.  For many different reasons.

21        The first reason is sometime the client has real case,

22   but the persecution happens many years ago, 15 or 20 years ago.

23   And if they file political asylum to the immigration and

24   immigration will say, okay, happened a long time ago and you

25   didn't have any other things happen after persecution and the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

513

E3p0liu6                     You - direct

1     imagination.  But it is impossible for us to go through them

2     and delineate.  And I know the government doesn't plan on

3     reading the transcripts from end to end, but I think we should

4     know in advance.

5              THE COURT:  Are you asking about what is going to be

6     admitted.

7              MR. FRANZ:  Yes.

8              THE COURT:  Or what they are seeking to discuss?

9              MR. FRANZ:  Well, whatever they plan to admit.  If

10    they are going to admit the transcripts, if they are trying to

11    get the transcripts in as a whole, there is clearly statements

12    in there that are hearsay.  They shouldn't come in as a whole.

13    I think they should identify the portions that are relevant and

14    admissible, as opposed to the entirety of the transcript.

15             THE COURT:  This is something that should have been

16    raised in limine if you were seeking to, you know, if you are

17    seeking to redact some of the transcripts.

18             And what's the government's position?

19             MS. MERMELSTEIN:  The government is intending to offer

20    the entirety of the transcripts.  We are certainly not

21    intending to read the entire transcript to the jury.  But I

22    think the government's view is that virtually all of the

23    transcript is admissible statements of co-conspirators in

24    furtherance of the conspiracy.  There is absolutely

25    introductory conversations at various points, there is ordering

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

517

E3p0liu6                    You - direct

1    to arrange for false documents.  The provider in China, among

2    other things, expressed recognition of the Feng Ling Liu law

3    firm as having provided fake documents to many of their

4    clients.  And it is the government's view that, in light of the

5    provision of that person's information by a member of the

6    conspiracy, in furtherance of the conspiracy, to get fake

7    documents to further the false application, is part of the

8    conspiracy.

9            MR. GERMAN:  I was gonna make that --

10           MR. FISCHETTI:  You are talking about that

11   conversation with China.  I was going to make the same

12   objection, your Honor, on the basis that it's not a

13   co-conspirator statement.  He is not a co-conspirator.  And I

14   don't think there is going to be sufficient evidence that he is

15   a co-conspirator, the person in China.

16           I have looked at the conversation very, very

17   carefully.  And it appears to me, if your Honor sees the

18   conversation, that the person who was talking here -- and I

19   think that's Lin Chen, the person in China basically gives the

20   name of the law firm to this person.  And then this person

21   says -- and I'm just paraphrasing -- yeah, I'll send the

22   documents, the phony documents there.  I don't think there is

23   enough independent evidence to show that the person in China is

24   a member of the conspiracy.  And if he is not, then that can't

25   come in, because it's hearsay.

                      SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

E3p0liu6                        You - direct

1          MR. FISCHETTI:  I understand that.  But the point is,

2     I think that's evidence that they may not have given her that

3     number, which we contend, from speaking to our witnesses, that

4     we -- she never got the number from us.  She had the number

5     because she knew it.  She had cooperated on any number of

6     cases.  And now in attempting to cooperate in a greater extent,

7     she is calling them and saying she got the number from the

8     firm.  And we contest that, Judge.  And I know I can contest it

9     before the jury, and I will.  But I think it's an issue that

10    your Honor has to decide as to whether or not that person is a

11    member of the conspiracy by a preponderance of the evidence.

12    That she called.  So where is the card?

13          MS. MERMELSTEIN:  We don't have the card.  I think

14    that if defense counsel wants to cross-examine the witness on

15    the fact that the government doesn't have the card, that's

16    fine.  As I understand it, the card was lost after the witness

17    gave it to the FBI.  But it's not totally clear.  But I think

18    the point is the witness is going to say I got a card and I

19    called the number on it.

20          If you want to cross-examine her on where is the card,

21    I think that's completely fair.  But it is also completely fair

22    for the government to say you should rely on the witness saying

23    she called this number based on the conversations she had with

24    this defendant.

25          MR. FISCHETTI:  On the basis of the proffer, your

E3q0liu1a                    T. You - direct

1    Miao's.

2    A.  Yes.

3    Q.  And you also said Lucy, who is Lucy?

4    A.  Lucy is the young -- Lucy is the sister of Feng Ling Liu.

5    Q.  And who were some of the other people who they would have

6    this initial meeting with?

7    A.  Andy is also from Feng Ling Liu's family, but I don't know

8    the exact relationship between them.  And, yeah.

9    Q.  Would they ever meet with Feng Ling Liu?

10   A.  Yes.  I mentioned her name just now.

11   Q.  Say that again?

12   A.  I mentioned her just now.

13   Q.  Oh, I'm sorry.

14           How is it determined who, of those people, would meet

15   with the client?

16   A.  It usually depend on availabilities.

17   Q.  Depends on availability.

18   A.  Yes.

19   Q.  Where would those meetings typically take place.

20   A.  Take place in various place.  Depends on where they sit.

21   Typically.

22           MR. EGAN:  Ms. Geier, can we put up government

23   exhibit 600.

24   Q.  Okay.  So when David Miao had these meetings, where would

25   they typically take place?

541
E3q0liu1a                    T. You - direct

1    A.  If David Miao was in the office manager's room, so it was

2    E 1.  But sometimes David Miao is in Feng Ling Liu's room so it

3    is L.  And Feng Ling Liu would deal with client in her -- no,

4    I -- sorry, I --

5    Q.  So I just want to clarify.  So David Miao sometimes met in

6    E?

7    A.  E or I, yes.  And Feng Ling Liu would meet client in I.

8    And, Lucy, later on, take -- took place office manager's room,

9    so is also E.  And Andy, G 1.

10   Q.  At G 1?

11   A.  Yes.

12   Q.  In your time working there, were you able to hear any of

13   these meetings as they took place?

14   A.  Yes, because, later on, I -- I moved to G3, so I can

15   overheard the conversation between Andy and the clients.  And

16   when I was storywriter I can overheard the conversations

17   through the door in I.

18   Q.  Would those meetings typically be held, in I, with the door

19   open or closed.

20   A.  Most time open, I believe.

21   Q.  Most times open?

22   A.  Yes.

23   Q.  So how long were these meetings, typically?

24   A.  Not very long.  I think probably 15 minutes, or half hour,

25   at the most.

1    Q.  What sort of information was typically discussed?

2    A.  At first, we would ask them their background, such like

3    their age, their marital status, and their educational level,

4    this kind of thing.  And, then, we would ask them about the

5    one-year issue.

6    Q.  The one-year issue?

7    A.  Yes.

8    Q.  What do you mean they would ask about the one-year issue?

9    A.  Because one year, under asylum law, there is one-year

10   requirement.  You have to file it, asylum application, within a

11   year you, you came to United States.  After that, is very hard

12   for you to win the case, even though sometimes you have real

13   claim.  So, usually, we ask them, do you have any evidence to

14   prove you came from the United States within the year, or if

15   you have any evidence of proof that you are not in United

16   States within a year.

17   Q.  So dealing with the first one, you say if they have any

18   evidence that they have been here within a year, what kind of

19   evidence might that be?

20   A.  Those evidence would be a year, some clients they have real

21   passport, they have real visa issued by US Embassy or

22   Consulate.  Or sometime they have visa issued by other

23   countries, for Latin American countries, or south eastern Asia

24   countries.  To prove they have been to that country.  Or they

25   have stamp like date of entry, or date of leaving, this kind of

543

E3q0liu1a                    T. You - direct

1    evidence to prove they came to United States within a year.

2             If they don't have this kind of evidence, we ask them

3    do you have any evidence to prove they are not in United

4    States.  And like we will mention couple of things, like do you

5    have, for example, have you lived in hotel in China in last two

6    months period.  Live in hotel, or have you -- anything can

7    prove you that you are not in United States in the last two

8    months.  Or, also, we would ask them, do you have any records

9    in the United States.

10   Q.  When you say records in the United States, what sort of

11   records are you talking about?

12   A.  Because many of my clients, many of our clients, came to

13   United States more than a year.  Many of them are undocumented

14   aliens.  So we don't know when they came exactly.  But if they

15   have record, for example, they get arrested, they went to

16   hospital, they have baby, they get married, this kind of

17   evidence, we will prove they come here more than a year.

18   Q.  So let me ask you about the first scenario.

19            What if someone didn't have either of the first types

20   of evidence you are describing, either evidence that they have

21   been here for when they got here, or evidence showing they were

22   outside of the United States, but they didn't have any records

23   like you're talking about, a criminal record or stuff like

24   that, what would what would the office's response be at that

25   point?

544

E3q0liu1a                      T. You - direct

1            MR. FISCHETTI:  Objection.

2            MR. MAHER:  Objection.

3            MR. GERMAN:  Objection.

4            THE COURT:  Sustained.

5    BY MR. EGAN:

6    Q.  If someone had no records establishing that they had been

7    in the United States for more than a year, what would the

8    office do?

9            MR. FISCHETTI:  Objection.  As to "office."

10            THE COURT:  What office, which office?

11            MR. EGAN:  The Feng Ling Liu law firm.

12            THE COURT:  I'll allow it.

13            MR. FISCHETTI:  I object, too broad, Judge.  Many

14    people are in the office.

15            MR. MAHER:  Objection.

16            THE COURT:  You can answer, based on your experience.

17    If there was one normal response of the different people of the

18    office, why don't you talk more specifically about --

19            THE WITNESS:  Okay.

20            THE COURT:  -- who would do what.

21    A.  In this circumstances, the people who deal with the client

22    will also address them, you must provide evidence from China to

23    prove that you are not -- at that time you are in China in the

24    last two-months period.  And, also, you should find someone who

25    can, back to China in the last two months and meet you over

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E3q0liu1a                    T. You - direct

1    there.  That is called one year witness.

2    Q.  And this was advice given to clients who said they had been

3    here more than a year?

4    A.  Yes.

5    Q.  What other sort of things -- you mentioned basic

6    information, the one-year issue.  What other information was

7    discussed at this preliminary meeting?

8    A.  About a claim.

9    Q.  About their claim?

10   A.  About the asylum claim, what kind of asylum claim they

11   would pursue with us.

12   Q.  Who would initiate that conversation?

13   A.  It depends.  Sometime the client has already made up their

14   minds.  For example, they say, okay, I -- I have been to church

15   for a period of time, and my friend told me Christianity claim

16   is much easier, so I want to do a Christianity claim.

*friend suggest their claim. no David, Karen.*

17           Some of them say okay I working in other state far

18   away from here, impossible for me to come.

19   Q.  Can you say that last thing slower?

20   A.  Oh, sorry.

21           And some client say I living in another state, very

22   far from here, is impossible for me to go back to church very

23   often, so I would choose family planning.

24           And some client say, okay, I'm really uneducated, and

25   it's hard for me to understand all of those Christianity

*Client decided their claim by their own choice. not Karen or David*

E3q0liu1a                        T. You - direct

1    knowledge, so I would choose falun gong.  It's very -- and

2    sometime we will give them suggestions, based on their

3    background.

4    Q.  What sort of suggestions would be given?

5    A.  Based on their age, their marital status, and sometimes

6    based on case law, we will suggest them what kind of claim is

7    suitable for them.

8    Q.  Can you give an example of what might be suitable to

9    someone based on that information?

10   A.  Usually, for young people who receive high school

11   education, we will suggest them to go after the Christianity

12   claim, because they can read, they can understand, they can

13   learn those Christianity.

14           And for the people who are married, and we suggest

15   family planning.

16           And for uneducated people, we will suggest, probably,

17   falun gong.

18           And, just now I say case law, because for those male

19   applicants who want to apply, family planning change over

20   times, because the case law change all of the times.

21           When I was in the law firm at first, the male

22   applicant can say, okay, something happened to my wife and I

23   want to apply for asylum and they would grant asylum based on

24   their wife's persecution.  But later on, the immigration court

25   changed the case law, they say, okay, there is nothing happened

547

E3q0liu1a                    T. You - direct

1    to you, there is no physical harm to you.  And later on for

2    male applicant who want to apply for asylum on the ground of

3    family planning, and we will just wait to do so.  If they

4    really want to do so, we will add something in their story that

5    happens to the male applicant himself.  We'll say they struggle

6    with the family planning officer, they fight with them, they

7    escape from them, this kind of thing.  To prove they are

8    persecution or future fear.

9    Q.  That is an example of something that would be added, based

10   on case law?

11   A.  Yes.

12   Q.  Just quickly, you also mentioned that many of the clients

13   lived outside of New York.  Working at these firms, what is

14   your understanding about where you are supposed to file your

15   application?

16   A.  Basically, immigration law, you should file application

17   based on where you are living.  But the client usually choose

18   New York because New York Immigration Court has most liberal

19   judge and highest passing rate.  And, we are here and we don't

20   want to go to other state very often to represent clients.

21   Q.  When you say and "we are here," you mean the law firm is

22   here?

23   A.  Yeah, the law firm is here.

24   Q.  In your time at the law firm, did you ever deal with

25   clients who lived outside of New York?

548

E3q0liu1a                      T. You - direct

1   A.  Many of our clients living outside of New York.

2   Q.  When you say out of New York, what sort of places did your

3   clients come from?

4   A.  Virginia, North Carolina, Oklahoma, Chicago, Ohio.

5   Q.  And in circumstances when you were dealing with someone

6   from one of those states, what advice would you, the firm -- or

7   what would you give, what advice would you give them?

8   A.  I will tell them, give me your address from New York,
    *"I" not David or Karen.*

9   otherwise you cannot get into the court here.  And they will

10  find address from their friend or their family member who has

11  address in New York.  And our -- I also tell them to find a

12  stable address, because you will receive the immigration

13  court's or immigration bureau's notice to the address.  You

14  cannot find another address,  otherwise you will lose those

15  notifications and you will miss the court date.

16  Q.  So, in addition to the basic information and sort of what

17  claim to pursue, what other information was discussed, if any?

18  A.  Payment.

19  Q.  Payment.  What is -- how was -- how did clients at Feng

20  Ling Liu, what was the typical payment arrangement?

21  A.  We have three type of payment.  The first type is.

22  1,000/9,000 pay schedule.  The client will give us 1,000-dollar

23  non-refundable legal fee to initiate the case.  And if the

24  client win the case, at any level of the process, the client

25  will pay us another 9,000.

1    Q.  So that was one.  Now, you said that's nonrefundable?

2    A.  Yes.  Even the client lose the case, we would not return.

3    Q.  But, then, if they did win, they get 9,000 more?

4    A.  Yes.

5    Q.  And you mentioned two other kind?

6    A.  Another one is 5/13,000.  The client would give us 500

7    deposit to initiate a case.  And the -- if the client win the

8    case, and he will pay us 13,000 additional.  And if a client

9    lose, we will return the 500.

10          The last one is step-by-step.  Client pay us certain

11   amount of money to initiate the case.  And another portion

12   before the interview.  And another portion before the master

13   hearing.  Another portion before the individual hearing.

14   Q.  In your experience, which of those pay structures was the

15   most popular with clients?

16   A.  The first one, 1,000/9,000.

17   Q.  Which was the least popular?

18   A.  Last one.

19   Q.  You said the last one?

20   A.  Yes, the step-by-step schedule.

21   Q.  In your experience, how many people did the step-by-step?

22   A.  I barely remember, I don't.  Quite few, I guess.  I

23   usually, I don't ask what type schedule they choose, but I

24   don't remember anyone who choose that schedule.

*Don't ask, don't know, don't deal. not right to testify about it.*

25   Q.  Outside of the discussion of what claim they should pursue,

550

E3q0liu1a                      T. You - direct

1    based on your hearing of these meetings, were the details of

2    someone's persecution discussed at these meetings?

3    A.  No.

4    Q.  And, again, how long would this meeting typically take

5    place?

6    A.  Very briefly.  15 minutes, or to half hour.  Many client,

7    they made up their minds to choose us to represent them, so.  I

8    think.  But most of the time just money issue is the -- the

9    most important issue in the conversation, I guess.
     *don't know what the meeting about, just guess. where is the fraud.*
10   Q.  It was mostly just the money issue at the first meeting?
     *Can not ask Victor keep on guess.*
11   A.  Yes.

12   Q.  And these were meetings that the office managers had?

13   A.  Not always office manager, but it must be someone from

14   their families.

15   Q.  When you say from their family, who do you mean?

16   A.  From Feng Ling Liu's family, or David Miao's relative.

17   Q.  Including David Miao and Feng Ling Liu?

18   A.  Yes.

19   Q.  So you mentioned some advice.  Were there specific asylum

20   claims that the firm specialized in?

21   A.  I wouldn't say specialized.  In most of cases, we deal with

22   Christianity, family planning, and the falun gong.

23   Q.  So going with Christianity what would be a typical claim

24   based on Christianity that your firm would initiate?

25   A.  Someone joining underground church in China and discovered

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    by Chinese government and persecuted by Chinese police officer.

2    They escape, they went to United States, they went to the US

3    church, and they want to apply for asylum.

4    Q.   Okay.  And with respect to family planning, what would be a

5    typical family planning claim?

6    A.   There are various types of family planning.

7              For married couple, some of them they say, okay, I

8    have one child.  And I want more children, but under Chinese

9    family planning policy, you can only have one.  And they decide

10   to get abortion.  And the abortion was discovered.

11             And another type is, okay, they -- they don't have

12   marriage, but they have boyfriend or girlfriend and the

13   girlfriend get pregnant and was discovered because they are not

14   married, or if either they are under age, or this kind of

15   thing.

16   Q.   Okay.  And, again, I'm going to ask you again to remind you

17   to you speak a little more slowly.

18             Falun gong, what would be a typical falun gong claim.

19   A.   Falun gong claim is someone who has certain illness and is

20   very hard to cure by --

21   Q.   Did you say they have an illness?

22   A.   Yes.  That's usually the reason they practice falun gong in

23   first place.  They have illness.  And is very hard to cure by

24   medical ways.  And they, through some person to learn falun

25   gong.  Falun gong is kind of Chinese rendition of movements,

E3q0liu1a                    T. You - direct

1    like yoga.  And their health getting better.  But in China, the

2    falun gong is perceived as an evil cult, so they werer

3    discovered by Chinese government, they were punished, they

4    left, they came here, they file asylum.

5    Q.  Now, in your experience in the meetings that you overheard

6    of this type, did you typically hear applicants discuss whether

7    they had an actual claim?

8    A.  We do have certain -- we do have few clients who has real

9    claim.

10   Q.  And that would be discussed at these meetings?

11   A.  The client would mention, say, okay, I -- I really have

12   claim, I really get abortion, I really get sterilization, and

13   this kind of matter.  But I don't think they discussed detail,

14   because usually the client would discuss this kind of detail

15   with storywriter, the people who interview them.

16   Q.  You said you had some of these -- of the asylum

17   applications you worked on in the firm.

18           How many would you say were legitimate?

19   A.  The case I deal with, less than 20.

20   Q.  Less than 20 percent?  Or 20 total.

21   A.  Twenty cases.

22   Q.  Twenty cases.

23           Now, after this initial meeting, what was the -- where

24   would the applicant go?

25   A.  The applicant will be taken to us, to our storywriters.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E3qWliu2                         T. You - direct

1      A.  Yeah, basically like that.  One-page-long disclaimer.

2      Several paragraphs, both in Chinese and in English.

3      Q.  Given what you were doing, would any client ever ask you

4      about this?

5      A.  Yes.  Actually couple clients, they were confused because

6      they say, okay, I came here to ask you to write a fake story

7      for us and why you give us this kind of document to sign.

8      Q.  Can you slow down a little bit, please?

9      A.  Sure.  The client say I came to office to ask you to write

10     a fake story for me and you ask me to sign these kind of

11     documents to say I would not write a fake story, and usually

12     our storywriter would explain to them that's a requirement

13     imposed by immigration bureau and every law firm has to do

14     that.

15     Q.  Based on your knowledge, was that a requirement of the

16     immigration bureau?

17     A.  No.  That's our internal policy.

18     Q.  So after they signed the disclaimer and the G28, what other

19     forms, if any, would you have them sign?

20     A.  And there's also affidavit both in Chinese and English.

21     The client promise everything he said is true and whole truth,

22     nothing but truth, something like that, and he's aware of, he

23     would be punishable if he or she gave us a fake, fake statement

24     or fraudulent case.

25     Q.  After these forms were signed, what would happen next?

1    A.  And I will give them evidence list based on their claim.

2    We have evidence list for different kind of claims so if they

3    are falun gong, I would give them falun gong.  If they are

4    Christianity, I would give them Christianity evidence list.

5    And I would check the things I need on the list and tell them

6    what they need to provide to me, and --

7    Q.  We'll get to the evidence list in a second.  But you'd give

8    them the evidence list, they've signed the forms, what's the

9    next step?

10   A.  Next step, and I would begin writing story but usually not

11   at the same time unless the clients wrote it urgent.

12   Q.  Urgent?

13   A.  Yes.

14   Q.  So prior to writing the story, what details, if any, would

15   you get from them?

16   A.  In the beginning, I tried to make my story more truthful

17   and trustworthy.

*David and Karen never give you any instruction to make fake story.*

18   Q.  You said truthful and trustworthy?

19   A.  Yes.

20   Q.  So --

21   A.  I will ask.

22   Q.  I want to stop you there.  You said in the beginning I

23   would try to make my story more truthful and trustworthy.  In

24   the beginning of what?

25   A.  In the beginning of my employment.

557

E3qWliu2                    T. You - direct

1    Q.  When you first started at Feng Ling Liu law firm?

2    A.  Yes.  And I tried to incorporate some true things happen in

3    their life, in their story.

4    Q.  What sort of things?

5    A.  Like about their childhood and their parents, their school

6    life, what some terrible thing happened in their life.  Then I

7    would use that kind of thing as the reason why someone

8    converted to a Christian.

9    Q.  So you would use the thing from their real life to explain

10   why they converted to Christianity?

11   A.  Yes, but later on, my stories pretty too long and some of

12   my coworker complained, and they said okay, because too long,

13   spend a long time for translation and spend a long time for

14   preparation, in future, and the client would answer more

15   questions during the trial, during the immigration interview,

16   and then I just make them more brief, and we have samples and

17   then I use samples more often.

18   Q.  Going back, in this discussion, you would try to get some

19   personal details from them?

20   A.  Yes.

21   Q.  Would you ever discuss the facts of the persecution?

22   A.  Because most of time our client don't have persecution, so

23   I would skip that.

24   Q.  You would skip that?

25   A.  Yes.

558

E3qWliu2                          T. You - direct

1    Q.  Let me ask you this.  If you would skip that, where would

2    you get the information for the part of the story that dealt

3    with persecution?

4    A.  Because we have sample and we also have kind of

5    story-writing instruction prepared by Harry.

6    Q.  When you say Harry, who is Harry again?

7    A.  Harry Liu.  And I know I don't need to reference to sample

8    writing because I'm really fluent in writing those stories; I

9    just wrote it.

10   Q.  You mentioned that initially your stories were too long?

11   A.  Yes.

12   Q.  I think you mentioned coworkers complained.  Which of your

13   coworkers complained about them?

14   A.  I believe Feng Li complained a couple times.

15   Q.  Feng Li?

16   A.  Yes.

17   Q.  What was Feng Li's role at the firm?

18   A.  Attorney.

19   Q.  What was his complaint?

20   A.  He says I make things more complicated and you made client

21   answer more questions at trial in future.  So that's not good

22   for, that's not in the best benefit for our clients.

23   Q.  Now, did anybody else complain that you remember?

24   A.  I believe translator Tom also complain to me.  He said my

25   story too long and he has to spend more time on translating the

1    story written by me.

2    Q.  Now, you mentioned samples.  What were these samples?  What

3    do you mean by samples?

4    A.  Samples usually is the story of previous clients who had

5    similar background with the clients which I was working on.  So

6    I would reference to those old clients' stories sometimes.

7    Q.  Were you able to search in the firm's system by type of

8    claim?

9    A.  We are not categorized by type of claim.  We're categorized

10   by alphabetically, by their name.  But I can remember with at

11   least my clients who has similar story with this client, and I

12   will reference these old clients' story.

13   Q.  How closely would you track the samples?

14   A.  Could you rephrase that?

15   Q.  When you used a sample, would you adapt it, would you copy

16   it word for word, would you change it entirely?  How closely

17   did you follow the sample?

18   A.  Most of time story similar if they are in same category.

19   So I won't say copy and paste, but it's adapted.

20   Q.  When you first started at the firm, were you trained by

21   anybody?

22   A.  Yes.  I was trained by Yolanda Gao.

23   Q.  Yolanda who?

24   A.  Yolanda Gao.

25   Q.  Who was she?

560

1    A.  She was wife of Harry Liu.  At that time, she was

2    girlfriend, and she was leaving at that point.  But later on

3    she came back.

4    Q.  She was leaving?

5    A.  Yes.  She used to be storywriter.  I was taking place her

6    job.

7    Q.  Describe how she trained you.

8    A.  I remember on the first day she gave me around 50 cases and

9    she also provide a list and give me the current status of each

10   case.  Some cases, we haven't done anything.  Some cases, we

11   have done something.  Some cases, we have written story, but we

12   are still waiting for the evidence.  And some from the court

13   and the judge requires more evidence.  And at that time, I was

14   sitting in the storywriter's room and Yolanda sat next to me,

15   and when the client came to me and she would introduce client

16   to me and introduce me to the client and briefly let me know

17   what I should do with each client.  And while I was writing the

18   story, she would suggest to me which clients, which previous

19   client's story I should reference to.

20   Q.  She told you which previous client's story to look at?

21   A.  Yes.  Basically, yeah, that's the training.

22   Q.  Now, when you wrote these stories after getting this sort

23   of personal information, you said you started to write the

24   story, would the client typically be there while you were

25   writing the story?

561

E3qWliu2                          T. You - direct

1    A.  Usually they were not because they were on very tight

2    schedule.  Usually they just came to the office and tell us

3    their claim, and they have work to do.  And since they have no

4    claim, I can, my job is make them up.

5    Q.  Your job is to make them up?

6    A.  Yes.

7    Q.  What else would you work on at this stage?

8    A.  After I finish the story, I will also wrote a couple

9    attesting letters on behalf clients.

10   Q.  Attesting letters.

11   A.  Yes.  That's what we call it.

12   Q.  What is an attesting letter?

13   A.  Attesting letter is like telling the story from other

14   people's perspective.  From their parents, they say, okay,

15   that's what happened to my son, how he was taken by the police,

16   how I bail him out, how much money I spent.  This kind of

17   thing.  And sometime from the church members, they say I was

18   there, I was also taken, and that's what happened to me and I

19   believe some similar thing would happen to him.  And sometime

20   from pastor and say, okay, sometimes our church member, he come

21   to our church regularly, and he make offerings, he was devout

22   Christian, and I was there and I was arrested and I get more

23   punishment because I was pastor.  This kind of letter.  Or from

24   family planning, from the wife, from the girlfriend or

25   boyfriend, just retell story from another angle.

1   XXX."

2           THE COURT:  Slow down.

3   A.  "And I have been Zheng Yunyan's friend for many years.

4   Yunyan is a person who is dedicated to her family.  Since a

5   young age, she had been working outside to support the family

6   and had refrained from finding boyfriend.  Finally, in 2007,

7   she met XXX who liked Yunyan very much and took meticulous care

8   of her."

9   Q.  You can stop there.

10  A.  Okay.

11  Q.  At the beginning, it says "my name is XXX."  Did you ever

12  have occasion to write a letter like that?

13  A.  Yes.

14  Q.  Why would you use XXX there?

15  A.  Because usually the client, when the client first came to

16  me, that's in the daytime, so which means nighttime in China.

17  I ask the, ask them to provide couple names and they are unable

18  to because their family member, their friend was sleeping.  So

19  I would say, okay, next time call me and let me know those

20  names, I will leave them open until you give me names.

21  Q.  Is that the reason there are a couple places where there

22  are XXXs throughout?

23  A.  Yes.  The two people's name were blank.  The people who

24  write these letter and this applicant's boyfriend.

25          MR. EGAN:  We can take those down.

E3qWliu2                    T. You - direct

1   Q.  After the letters were written and the story was written,

2   what was the next step in the process?

3   A.  I will print them out and give them to Feng Liu or any

4   other Chinese supervising attorney.

5   Q.  And dealing specifically with Feng Ling Liu, what would she

6   do with the letters and the story?

7   A.  She would review them and make some change and give

8   comments and sometimes she would rearrange story.

9   Q.  Starting with the comments, what sort of comments would she

10  give on the story?

11  A.  I remember this example, I used to wrote, I used to write

12  Christianity claim, and I use Christian holiday Pentacost, and

13  then Feng Liu comment Pentacost is too hard for our client to

14  memorize.  We always use Christmas or Easter.

15  Q.  For what sort of day?

16  A.  For the Christian holiday in the story, because usually the

17  persecution happen on that day, they have to get together and

18  know they would get together and police came and arrest all of

19  them.  And Pentacost, if I use Pentacost which means client

20  know what's Pentacost, what do Christian people usually do on

21  Pentacost.  That would be additional burden for the clients.

22  Q.  So she would change the day that the event happened?

23  A.  Yes.

24  Q.  What other comments?

25  A.  In the beginning, when I wrote those family-planning cases

568

E3qWliu2                         T. You - direct

1    I was not quite familiar about abortion because I was not a

2    woman, and in our office, we have a colleague who used to be a

3    family-planner official, so they know about abortion more

4    detail than I, so they would make some change to make the

5    abortion part in the story more real.

6    Q.   And were there other types of details that she would

7    typically change?

8    A.   Sometimes, I was, she change about persecution.   Sometimes

9    I, the persecution I wrote is not high enough to meet a

10   standard for the client to get asylum.

11   Q.   I'm sorry to cut you off, when you say not high enough,

12   what do you mean by that?

13   A.   Because for asylum for the past persecution, you have to

14   prove you have physical harm and sometimes for them slap your

15   face or this kind of harm is not as serious, and that would

16   make the clients not like, not less likely to win their case,

17   if you just say police officer slap me couple times.   So makes

18   the persecution more serious.   And sometimes we would lower

19   down the persecution because I say, for example, we say client

20   locked up in jail for 30 days or couple months, that would be

21   very hard for the client to explain their jail time before

22   immigration judge, how they spent time over there, what's their

23   cell look like, what they eat every day, how their life was

24   spent every day.   So we would lower down to make a couple day,

25   two weeks.   Make client easier to answer the question in

E3qWliu2                        T. You - direct

1    future.

2    Q.  You mentioned a colleague who was a plan family-planning

3    official who would help with the details.  Who was that

4    colleague?

5    A.  Colleague told me is Lillian.

6    Q.  Lillian?

7    A.  Lillian Miao.

8    Q.  You also mentioned instances where Feng Ling Liu would

9    rewrite the whole story.  Under what circumstances would that

10   happen?

11   A.  I remember there's one case as David Miao's nephew called

12   Miao Xin.  At that time, they gave case to me and Miao Xin want

13   pursue Christianity claim.

14   Q.  Did you understand him to have a legitimate Christianity

15   claim?

16   A.  No.

17   Q.  So what did you do with this case?

18   A.  And I just wrote a regular Christianity claim, not too many

19   fancy things in the story.

20   Q.  Not too many fancy things?

21   A.  Yes, not too many fancy things, just like other clients'.

22   And then I give it to Feng Liu and apparently she was not very

23   satisfied with that story.  She said Miao Xin is very clever

24   and she can memorize those Christianity knowledge if necessary,

25   and she can, he can handle that.  And usually our client cannot

E3qWliu2                          T. You - direct

1    handle a lot of Christianity knowledge, but some people do.

2    And then he rewrote the story and I remember the big changes.

3    He said Miao Xin went to church since his childhood with his

4    mom.  Usually I will not write story like that.

5    Q.  Traveled with who?

6    A.  Miao Xin's mom.  Usually I will not write story in that way

7    because for the client who came to the church since childhood

8    and with his family members, the immigration officer and

9    immigration judge will assume the client know a lot about

10   Christian, Christianity knowledge.  They will ask all kinds of

11   Christian knowledge, about Bible, about Christian holiday,

12   about the Jesus, about Passion, all kind of thing.  Many client

13   cannot handle that many questions.  But Feng Liu changed to

14   that way means he has, she has a very confident, he has

15   confidence in Miao Xin's testimony.

16   Q.  Did Feng Ling Liu participate in any other way in the

17   preparation of that application?

18   A.  Yes.  Later on, Miao Xin told me Feng Liu called him couple

19   times.

20   Q.  Let me ask you this.  Would she or the other lawyers also

21   comment on the evidence letters?

22           MR. FISCHETTI:  I object to the form.

23           MR. EGAN:  Okay.

24   Q.  Did she comment on the evidence letters?

25   A.  Yes.

E3qWliu2                     T. You - direct

1   Q.  What sort of comments did she give?

2   A.  Just make change according to his change own story.  With

3   change story about persecution.  You should change the letter

4   about persecution in the same way.

5   Q.  Now, after you got those, first of all, would those

6   comments be given to you orally or in writing?

7   A.  She wrote them down.

8   Q.  By hand or on her computer?

9   A.  In writing.

10  Q.  Directly on the story?

11  A.  What?

12  Q.  Directly on the story?

13  A.  Yeah.  He wrote like crossing something out and add

14  something up in the margin.

15  Q.  So what would you do after you got the story and the

16  letters back from Feng Ling Liu?

17  A.  I get them back and I make change computer on the screen

18  and print them out and called the client.

19  Q.  You called the client?

20  A.  Yeah, called in client to come up to write them down.

21  Q.  Let me ask you this.  While she was making her comments,

22  was the client present in the office?

23  A.  Usually not.

24  Q.  Would she, in your experience, talk to the client before

25  making any of those changes?

E3qWliu2                    T. You - direct

1    A.  No. since miao xin are her relative. They could call each other. They should discuss their story without your present

2    Q.  When you called the client and the client came back, what

3    would happen next?

4    A.  The client will write story in their own handwriting on the

5    writing pad and, yeah, that's what they will do.  And they also

6    write down the letters and they will mail or fax their letters

7    back to their family and friends in China.

8    Q.  Would they do that from the office or from outside the

9    office?

10   A.  From outside.

11   Q.  Why would they copy the story over in their own

12   handwriting?

13   A.  That make their own story.  That's our office requirement.

14   But I don't know what exactly, why we do that.

15   Q.  After they had copied it, what would you do with the

16   commented-on draft?

17   A.  I shred.

18   Q.  You shred it?

19   A.  Yes.

20   Q.  So what would typically happen?  The person, you said, sent

21   or faxed the letters to China.  What would happen next?

22   A.  And the Chinese families or friends will write those

23   letters and mail back to us together with all other evidence.

24   Q.  Would that be sent back to the person directly or to the

25   firm?
Attesting person can change, by adding, deleting or modifying the letters. Or not sent back to us at all, if they choice. It is just suggesting statement.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E3qWliu2                          T. You - direct

1   sometime they would made up even airline tickets, left China,

2   flew one place to another.

3   Q.  You said airline tickets?

4   A.  Yeah.  Domestic airline tickets.

5   Q.  Domestic within China?

6   A.  Yeah, within China.

7   Q.  Now, the people you're submitting these on behalf of had,

8   in fact, been in the United States during that time period?

9   A.  Say that again.

10  Q.  The people whose applications you're submitting this

11  evidence from, they had, in fact, been in the United States for

12  more than a year, right?

13  A.  Yes, more than a year.

14  Q.  How would they get the type of evidence that you're

15  describing?

16  A.  Their family member in China would made up for them.

17  Q.  Make up for them?

18  A.  Yes.

19  Q.  Would that type of evidence ever be sent directly to the

20  firm?

21  A.  Yes.  Together with all evidence.

22  Q.  Together with all evidence?

23  A.  Yes.

24  Q.  I'm going to show you what's in evidence as Government

25  Exhibit 302, if I can.  If you can look inside that, first of

E3qWliu2                         T. You - direct

1    all, what does that appear to be on the outside?

2    A.  You mean on this?

3    Q.  Yes.

4    A.  That's Express Mail stamp.  They say arrival JFK.  The

5    place of origin.  CN means from China.

6    Q.  That's an Express Mail envelope from China?

7    A.  Yes, and the date.  September 10, 2009.

8    Q.  Okay.  The documents you have in your hand have each got

9    exhibit stickers on them.  If you can hold up an example for

10   the jury, just identify the number you're looking at and

11   describe what it is.

12   A.  Okay.  The first evidence is Government Exhibit 20 -- 302J.

13   Q.  302J?

14   A.  Yes.

15   Q.  Do you recognize what kind of document that is?

16   A.  That's a medical record.

17   Q.  A medical record?

18   A.  A blank medical record.

19   Q.  Is it a completed one or a blank one?

20   A.  Totally, totally empty one.

21   Q.  Is this evidence that might be submitted as one-year

22   evidence?

23   A.  Yes.  The client will write on when the client saw doctor

24   in China within the one-year time frame, what kind of illness

25   he has, what kind of prescription the doctor gave, and tell

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E3qWliu2                    T. You - direct

1    immigration judge, officer, okay, I have been to this hospital

2    on certain day and I have illness at that point, to prove

3    one-year issue.

4    Q.  You can hold up another.  Just put that to the side.

5    A.  And another one is --

6    Q.  What number is that?

7    A.  Government Exhibit 302I.  That's payment receipt issued by

8    Fujian Golden Bridge Garden Property Management Company.

9    Q.  Again, are those filled in or blank?

10   A.  They're all blank.

11   Q.  They're all blank?

12   A.  Yes.

13   Q.  What is that document?

14   A.  That's payment receipt, the client will put a date and his

15   name on that, say, okay, on certain date I paid my maintenance

16   to the property management.

17   Q.  His maintenance?

18   A.  Yes, maintenance.

19   Q.  So is that for a property?

20   A.  Yes, for property, to prove their one-year issue.

21   Q.  Again, you said for the one-year issue.

22   A.  Yes.

23   Q.  Looking at the other stuff --

24   A.  This is Government Exhibit 302B.

25   Q.  302B?

E3qWliu2                    T. You - direct

1   A.  A Chinese paper with letterhead Fujian Province, Lei Jin

2   County, Christian church at Chuanshi.  I think it's name of

3   place.  And telephone number 26276330, telephone number

4   26276330, postal code 35051, and stamp on that with the same

5   letterhead.

6   Q.  How would the firm use a document like this for evidence?

7   A.  Evidence we use for pastor's letter.  Someone would write

8   on this empty paper, say he was pastor of the client, and what

9   happened to the client.

10  Q.  And another document there --

11  A.  And this document is Government Exhibit 302A, that's empty

12  envelopes.

13  Q.  How would these be used?

14  A.  To contain the letters.  This has three empty letters, so I

15  assume this, based on the Chinese paper, I assume this client

16  is a Christianity claim, so he or she need three letters.  So

17  the client give us three envelopes and on back of envelope

18  there, stamp, there is date on that, August 3, 2010.

19  Q.  Okay.  Is there anything else in the envelope?

20  A.  No.

21  Q.  Not in the envelopes, not in the exhibit, but in the

22  Express Mail envelope, any other kind of documents?

23  A.  Oh, the Government Exhibits 302G and 302F and 302H, 30 --

24  Q.  You can just hold those up.

25  A.  302D.

E3qWliu2                         T. You - direct

1   Q.  Was that D?

2   A.  Yeah, D.  302E.

3   Q.  Mr. You, before you go on, what are all those exhibits?

4   A.  These are Chinese paper, different type Chinese paper.

5   Q.  How would the firm use those?

6   A.  These paper is for clients to write the stories, and

7   usually the client will give us the story -- no, not the story,

8   the letters.  Usually the letter was written down when they

9   mailed to us, but sometimes they, client's family will give us

10  empty, blank papers.  Some of our clients' parents, they are

11  illiterate and some of their parents are not available to write

12  or they don't have friends in China to help them to write, so

13  they would sent to us these empty papers and client will find a

14  friends or relative in United States to write these letters on

15  their behalf.

16  Q.  You can put that stuff back in 302.

17          You mentioned family members submitting stuff like

18  that to the firm?

19  A.  Yes.

20  Q.  What would the firm do with extras?

21  A.  We keep them.  For example, I keep a whole drawer of these

22  empty papers in case some of our clients who even don't have

23  empty papers, I can give them some.

24  Q.  You mentioned one-year evidence.  Did anyone ever use a

25  witness to help with the one-year issue?

1   A.  Yes.

2   Q.  Under what circumstances?

3   A.  They will find someone who went back to China in the last

4   12-months period.  The so-called witness will testify in

5   affidavit I knew this client.  I went back to China on certain

6   day.  I have been China for period of time.  I met this guy or

7   this girl in China.  During that period of time, we have

8   dinner, we have chat.  So I knew at that time he was in China,

9   not in United States, and when I come back, we met again in

10  Chinatown or elsewhere.

11  Q.  So this would be an affidavit that a one-year witness would

12  swear to?

13  A.  Yeah, he would swear to and notarize.

14  Q.  And what?

15  A.  Notarize.

16  Q.  And notarize the document?

17  A.  Yeah, notarize the document.

18  Q.  In your time working at the firm, did you ever see what you

19  believed to be a fraudulent one-year witness?

20  A.  Yes.

21  Q.  What made you think that it was a fraudulent one-year

22  witness?

23  A.  Many times, the clients and the one-year witness, they

24  don't know each other.  They look very unfamiliar and sometimes

25  the client will address the one-year witness, Mr. Some,

E3qWliu2                        T. You - direct

1    Mr. ABC.  Apparently, that's not friends they claim to be.

2    Q.  Did you ever see a person serve as a one-year witness for

3    more than one person?

4    A.  Yes.  There were some one-year witness show up many times

5    to testify for multiple clients.

6    Q.  Now, would these affidavits be submitted along with the

7    application, or would they come later?

8    A.  They would come later.  Usually we don't prepare them for

9    immigration interview and later on for the court.  When we

10   submit application, we don't attach visa evidence with the

11   evidence.  With application, we will use them in later time.

12   Q.  When you sent in the application, what would be included in

13   it?

14   A.  Three copy of application.  That's it.  And a story, and,

15   yeah, a story.

16   Q.  The story and the translation of the story?

17   A.  Yes.

18   Q.  And then the evidence was submitted after that?

19   A.  The evidence will also have three copy, and the client will

20   take three copy of the evidence to immigration interview and

21   give to front desk at immigration bureau.

22   Q.  The evidence would be?

23   A.  Yes.

24   Q.  And that would include some of the evidence you've

25   described here today?

E3qWliu2                    T. You - direct

1   A.  Yes.

2   Q.  Would it also include the one-year affidavit?

3   A.  Yes.

4   Q.  After everything is submitted, after everything is

5   finalized, I should say, where does it go in the firm next,

6   prior to being submitted?

7   A.  We would give to the junior attorney, the first, in the

8   beginning, and later on it's Meng Fei Yu to decide when to

9   submit those applications.

10  Q.  And was it always the junior attorney?

11  A.  Sometimes other attorney will make the decision, but that's

12  decision made by attorney.

13  Q.  And what would go into the decision in terms of when to

14  file?

15  A.  Usually it's about one-year issue.  If the client, the

16  one-year issue is close and we would submit as soon as we can.

17  Client's one-year issue still have couple months and we are not

18  in rush.

19  Q.  I'm going to hand you what is in evidence as Government

20  Exhibits 517, 518, and 519, just some examples of applications.

21  Take a moment just to take a look at those.  If you can, look

22  first at 517.

23  A.  Okay.

24  Q.  Do you recognize Government Exhibit 517?

25  A.  Yes.

E3qWliu2                    T. You - direct

1    Q.  What is that?

2    A.  That's asylum application with story and translation.

3    Q.  How do you recognize it?

4    A.  Because this application was prepared and, prepared by me

5    and the client was also coached by me as well.  Let me see.

6    Yes.

7    Q.  So that was a story you wrote?

8    A.  Yes.

9    Q.  What sort of claim is it?

10   A.  It's a family planning.  The client's a female.  The client

11   get pregnant before marriage and the pregnancy was terminated

12   by family-planning policy and she came to United States for

13   asylum.

14   Q.  Was that story real or fake?

15   A.  It's fake because the client doesn't have this type thing

16   happen to her.

17   Q.  She didn't have that type of thing happen to her?

18   A.  Yes.

19   Q.  I want you to look at Government Exhibit 518.

20   A.  Yes.

21   Q.  Do you recognize that application?

22   A.  Yes.

23   Q.  What do you recognize, what do you remember about that

24   application?

25   A.  I coach her for asylum interview.

E3qWliu2                    T. You - direct

1    Q.  You coached her for asylum interview?

2    A.  Yes.

3    Q.  And what kind of claim is it?

4    A.  It's also a family-planning claim and the clients also have

5    pregnancy before marriage and then terminated and --

6    Q.  How do the details of that story compare to the one in 517?

7    A.  Detail is similar.  They met a boyfriend.  They live

8    together.  They have, they have sexually intercourse and they

9    get, the client get pregnant, and then she discovered pregnancy

10   and they hide but discovered by family-planning policy and

11   then --

12   Q.  And you're saying those are details that are in both

13   stories?

14   A.  About this case, I know client's so-called boyfriend was

15   not her boyfriend.  It's her cousin.

16   Q.  When you say her so-called boyfriend, what do you mean?

17   A.  She used the cousin's name as her boyfriend's name because

18   he has, she has no such boyfriend.

19   Q.  So the applicant in 518, that's a fake application as well?

20   A.  Yes.

21   Q.  Looking at Government Exhibit 519, what do you remember

22   about that?

23   A.  519 is another client coached by me for asylum interview.

24   Q.  And what do you remember about that applicant?  First of

25   all, was that a real claim or a fake claim?

E3qWliu2                         T. You - direct

1    A.  A fake claim.

2    Q.  What do you remember about that?

3    A.  During the preparation, the client, this client quite

4    different from the others because this client receive a higher

5    education and they come here with valid visa and the client's

6    very demanding.  He, during the preparation, we discuss about

7    how to present case, how to tell immigration officer about his

8    persecution because in the story, there are not too many

9    details.  So the client say how about this or and how about

10   that and I say, okay, this is good, but this is not.  This is

11   kind of the discussion.

12   Q.  So you made up the story together?

13   A.  The story's prepared by someone else, but we, I made up, we

14   made up the, we made up the testimony before immigration

15   officer.

16           MR. EGAN:  I'll take those exhibits back.

17           MR. FISCHETTI:  May I know the number of that, please.

18   I'm sorry.

19           MR. EGAN:  517, 518, and 519.

20           MR. FRANZ:  The last one.

21           MR. EGAN:  519.

22   Q.  To be clear, those applications you looked at, were those

23   the only applications you worked on at the firm?

24   A.  No.

25   Q.  I want to ask you quickly in terms of your own story.  You

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

E3qWliu2                        T. You - direct

1    mentioned the term "derivative asylum"?

2    A.  Yes.

3    Q.  What is derivative asylum?

4    A.  Derivative asylum means usually that two applicants, one is

5    applicant, one applicant was persecuted, another one is the

6    spouse of the major, the applicant.

7    Q.  Did you ever know anybody at the Feng Ling Liu law firm to

8    manipulate the derivative asylum process?

9    A.  Yes.  There was one client called Lu Yan.  Last name Y-A-N;

10   first name L-U.  She is a highly educated woman.  She came here

11   with a visa from U.S. embassy, and she came to our office and,

12   and David Miao arranged for her to marriage to other previous

13   client who failed asylum, because we have, we have confidence

14   Lu Yan will pass interview, which means if she pass, she can

15   make petition our previous client her husband become legal

16   under immigration law.

17   Q.  And who worked on that case?

18   A.  I don't know who wrote story, but I coach Lu Yan and I help

19   Lu Yan get before immigration officer and help win the case at

20   asylum office level.  And during the preparation, I remember

21   David Miao and Feng Liu asked me couple times about the process

22   of the preparation and how good she is, how likely she will

23   win, which officer she met, this kind of question.  And after

24   she won case, I remember her husband's real wife, the woman who

25   have children with the husband, give me $30 as a tip for my

E3q0liu3

1    Q.  Were you given any other instructions about why you were

2    going there?

3    A.  Yes.  At that time, Feng Ling Liu told me --

4    Q.  You said Feng Ling Liu told you?

5    A.  Yes.  At that time she told me they need interpreter

6    because they are kind of short of hands.  They don't have -- we

7    have lot of clients have interview every day, and they don't

8    have many experienced interpreter.  And I used to act -- I used

9    to act as interpreter when I was working for Giles.  So she

10   knew that I can be an interpreter.  So she asked me to be

11   there.  And she also give me instructions, say I must figure

12   out who are those immigration officers, what's their preference

13   on each type of case, what kind of question they would ask,

14   what kind of answer they like, and the tricks other

15   interpreters would use.

16   Q.  The tricks other interpreters would use?

17   A.  Yes.  Because we will figure out the sequence of

18   immigration officer.  They would come out one after another.

19   And we have to figure out who would come first place, who would

20   come second, who would come third.

21   Q.  Why was the sequence the asylum officers were seeing people

22   important.

23   A.  Because each immigration officer have their own preference.

24   Some of them are good, and some of them are -- and good means

25   high passing rates, they are more likely to approve the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E3q0liu3

1    asked.  And I jot them down and then, gradually, I have a -- a

2    lot of questions from a lot of immigration officers.

3    Q.  A lot of impressions about a lot of immigration officers.

4    A.  A lot of questions.

5    Q.  A lot of questions?

6    A.  Yes.  And then I figure out what kind of question is the

7    mostly -- the frequent that he asked questions.  And then I

8    made a preparation material, actually multiple preparation

9    materials.  And I list those questions, and give the answers

10   underneath each questions, in detail.

11   Q.  You gave answers underneath each question?

12   A.  Yes.  I give answer to let our client know how to respond

13   to these kind of question.

14   Q.  So I want to -- so the preparation you are describing, that

15   happened after the application was submitted, or before the

16   application was submitted?

17   A.  After application was submitted.

18   Q.  Who would -- prior to being submitted, who would typically

19   sign the application?

20   A.  Attorneys.

21   Q.  Would that also be the junior attorney's role, or any

22   attorney?

23   A.  In the beginning, Feng Ling Liu signed those applications.

24   And later on Feng Li signed those applications.  And when our

25   name changes to Moslemi, Moslemi signed those applications.

594

E3q0liu3

1    And, later on, Meng Fei Yu become lawyer, and she began signing

2    those documents.  And Vanessa signed those documents.

3    Q.  And was it your experience that, prior to signing, the

4    lawyers would review the applications, or was their job just to

5    sign it?

6    A.  Their job just to sign it.

7              MR. FISCHETTI:  I didn't hear that answer.

8              THE COURT:  Repeat that, please.

9              THE WITNESS:  Their job is just to sign documents.

10   Q.  So the application is submitted.  You described some of the

11   materials you used in this preparation process.  What other

12   materials did you use?

13   A.  I also prepare Christianity knowledge questionnaire.  And

14   Bible story material.  Because immigration officer would often

15   ask what's your favorite Bible story.  And I gave a lot of

16   story from Bible, because in Chinese, Bible is, in terms of

17   traditional Chinese, it is really hard for our clients who are

18   undereducated to understand.  So I made them in more than

19   Chinese, to simplify them.  And also give the meaning behind

20   each story, and what is the point they must know of the story.

21             MR. EAGAN:  If I can, Ms. Geier, put up government

22   exhibit 300 and 300T.

23   Q.  Focusing on 300, do you see that?

24   A.  Yes.

25   Q.  What is that?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E3q0liu3

1    A.   That's a Christian knowledge questionnaire.   But that's not

2    prepared by me.   That is prepared by Feng Li, the attorney.

3    Q.   And what sort of -- how would this be used?

4    A.   In the beginning, in our industry, we have a Christian

5    knowledge questionnaire, 200 questions, we call it.   But that's

6    too many questions.   And later on, Feng Li made this question,

7    we have maybe 50 or 60 questions, because he said that's the

8    question immigration judge usually ask, so that's for the

9    trial.

10   Q.   That was Feng Li who --

11   A.   Yes, he told me he made that.   And later on, I -- when I

12   became a coach, I used this material in the first place, but I

13   figure out an asylum interview is quite different from

14   immigration trial.

15   Q.   How are they different?

16   A.   Asylum officer will ask more depth, more those questions in

17   depth, and broadly, and very hard.   And then I think, okay,

18   it's not as good as I expected, so I made my own Christianity

19   knowledge question.

20   Q.   So is it fair to say that the thing that Feng Li prepared,

21   you thought was sufficient for immigration court, but maybe not

22   for the asylum interview?

23   A.   Yes.

24   Q.   Did anyone ever instruct you to prepare different or better

25   material for the asylum interview stage?

596

E3q0liu3

1    A.  The reason I prepare this multiple material is under

2    direction from Feng Ling Liu.

3    Q.  Feng Ling Liu, or Feng Li?

4    A.  Feng Ling Liu.

5         Because she told me, at that time, immigration court

6    has very heavy calendar.  Every client would wait a couple of

7    years for their individual hearing to win their case, to get

8    status.  Which means we had to wait a couple of years to

9    collect our legal fee.  But if our client can win the case at

10   asylum office level, we can get money back sooner, much sooner.

11   So we have to pay a lot of attention, spend a lot of time on

12   coaching client for asylum interview.  And I did a better job

13   than Lillian.

14   Q.  Better job than Lillian?

15   A.  Yes.  I have been to the immigration bureau many times when

16   I was interpreter.  And I have contact from those other

17   interpreters, so it was better for me to prepare these

18   documents, and give to the office.

19   Q.  Other than sending you as a translator, would someone from

20   the office typically go with an applicant to the asylum

21   interview?

22   A.  Yes.  David Miao's younger brother, Larry Miao.

23   Q.  What would he do there?

24   A.  He was a driver, he will --

25   Q.  He was the driver, you said?

597

E3q0liu3

1    A.  Yes, he was driver.  He drove to Brooklyn or to Flushing to
2    pick up all of the clients, and drove them to immigration
3    bureau at Rosedale.  Near JFK.
4    Q.  And would he go into the room with them?
5    A.  No.  He was not allowed to get into the waiting room.  They
6    need me, because I don't know what happened to him.  He made
7    something wrong.  And immigration bureau prohibited him from
8    entering the immigration bureau anymore.
9    Q.  So the materials, that 300T, just like that, that is an
10   example of some of the materials.  You said you prepared, other
11   material?  The exhibit you just looked at, the basic questions.
12   A.  That's prepared by Feng Li, not me.
13   Q.  Right.  And then you prepared other documents to help
14   prepare?
15   A.  Yes, I prepared materials like the things you need to know
16   before you go to immigration interview, and preparation for
17   Christianity claim, and the Christian knowledge questions, and
18   the Bible stories, yes.  And during the preparation, I even
19   used very creative ways to coach them.  I give them Christian
20   movie to see.  That helped them to understand more easily.  I
21   give them to see Moses.  And even costume, like Egyptian
22   prince, for them to understand what happened in Bible.
23   Q.  And would other coaches coach in the same fashion?
24   A.  I don't really -- similarly.  For example, Lillian would
25   coach the same way, the story, the trip to US, the application.

E3q0liu3

1    But because she has never been to immigration bureau, so she

2    would not prepare right to the point, I guess.  And when I made

3    those preparation materials, I gave a copy to Lillian.  And

4    Lillian had that on the wall for our clients to review.  So

5    client can see those questions on the wall because, usually,

6    many clients, we cannot -- is waste of time to tell each client

7    the same thing.  We just put it on the wall so they can see by

8    themselves when we are preparing for others.

9    Q.  And with respect to the Xin Miao application, you talked

10   about before, did you do the coaching on that?

11   A.  Yes, many times.

12   Q.  Did anyone else participate in that coaching?

13   A.  Xin Miao told me Feng Ling Liu coached him, and Lillian

14   coach him, yeah.

15   Q.  In your experience, how many of the firm's clients were

16   granted asylum at the initial stage, at the asylum officer

17   stage?

18   A.  I began counting these things in, since 2010.  And 2010,

19   from January until November, until I was fired, we have five to

20   six hundred cases for interview.  And I forget how many get

21   approved.

22   Q.  As a percentage, was it high percentage, or a low

23   percentage, or a rough percentage?

24   A.  Five to ten, I guess.

25   Q.  5 to 10 percent?

599
E3q0liu3

```
 1    A.  Yes, a little bit higher than industry average, I guess.
 2    Q.  A little higher than the industry average?
 3    A.  Yes.
 4    Q.  For those that were rejected, what was the next stage?
 5    A.  If the case were rejected, the case will transfer to
 6    immigration court.
 7    Q.  And when would the next immigration -- what is the first
 8    step in immigration court?
 9    A.  We will have master hearing.  The client will meet their
10    immigration judge, submit their evidence again, and schedule
11    for individual hearing.
12    Q.  And how long would the master hearing be after the asylum
13    interview?
14    A.  It depends on judge calendar, three to six months.
15    Q.  And it's at that master hearing that you find out when your
16    individual hearing will be?
17    A.  Yes.
18    Q.  How long is the waiting period for an individual hearing?
19    A.  That varies greatly.  Sometimes a year or two.  Sometimes,
20    three years.  And I know there is -- there is client whose
21    judge was sick twice during the individual hearing, so he wait
22    many years.
23    Q.  Would the firm help clients prepare for the appearance in
24    front of the immigration judge, as well?
25    A.  Yes.
```

601

E3q0liu3

1    A.  Spring 2009.  I forget which month.

2    Q.  And let me ask you, what was your understanding of why the

3    name of the firm changed?

4    A.  In the end of 2008, or in the beginning of 2009 time, Feng

5    Li came to our office.  He said he read the news from ICE's

6    website, the Immigration And Custom Enforcement website, there

7    was an immigration office, law office in Houston was raided by

8    FBI and was charged by them on many counts, including asylum

9    fraud.  And the asylum fraud is also about Christianity and,

10   specifically, in that news, the ICE mentioned they used

11   Christian knowledge, 200 questions.  And Feng Li especially

12   told us there was a paralegal who escaped from the United

13   States, went to Hong Kong, but later on was taken back and he

14   asked us to be more cautious, be more careful.  And, later on,

15   he report this to Feng Ling Liu.

16   Q.  Feng Li reported this to Feng Ling Liu?

17   A.  Yes.  At that time, there were more of this kind of thing

18   happening around the country.  I remember there was Maryland or

19   Virginia also have this kind of law firm was indicted.  And

20   then we have kind of conference.  We have some, several new

21   matters.  For example, we could not talk with clients over the

22   phone about the case anymore.

23   Q.  Why couldn't you talk with clients about cases over the

24   phone?

25   A.  They said our phone was tapped by FBI.  And then we, if

602

E3q0liu3

1    some stranger calls, don't talk with them, let them come to

2    office in person.  And at that time, we began shredding those

3    stories.

4    Q.  Started shredding the stories, you said?

5    A.  Yes.

6    Q.  Which stories?

7    A.  The stories we made up for clients.  And we began deleting

8    the file in the -- the computer.  Those Chinese story we made

9    up, we save to the computer, and we began deleting them.

10   Q.  So how was the name change a part of that process, to your

11   understanding?

12   A.  In the beginning of 2009, we changed the name, they didn't

13   tell us why, but we figure out --

14            MR. FISCHETTI:  Objection.

15            THE COURT:  Yes.

16            MR. FISCHETTI:  Objection.  "We figure out."  Sorry.

17            THE COURT:  So, if you can just ask a different

18   question.  I don't know who the "we" is, so --

19            THE WITNESS:  Okay.

20   BY MR. EAGAN:

21   Q.  Well, when you said we figured out, who are you referring

22   to?

23   A.  Men Feng Li and I.  Because we are both storywriters and

24   have very good relationship.  And we are all, we both

25   uncomfortable with our job.  And we figure out the name change

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E3q0liu3

1    is for the safety issue.

2    Q.  When you say "the safety issue," what do you mean?

3    A.  Because Law Office of Feng Ling Liu is gone.  And the new

4    office, we have new office name.  And we believe it would take

5    some heat from us and, yeah, that's how we -- that's what we

6    figure out.

7    Q.  You said a lot of these instructions, directions, came at,

8    I think you said, at a meeting or a conference; is that right?

9    A.  Yeah, we had a kind of conference.

10   Q.  Who gave these instructions?

11   A.  Feng Ling Liu.

12   Q.  And when was the name change again?

13   A.  The beginning of 2009.

14   Q.  And when did Vanessa arrive?

15   A.  Spring 2009.

16   Q.  Did you -- did she ever participate in preparing clients

17   for asylum interviews -- I mean for immigration judge

18   proceedings?

19   A.  Yes.

20   Q.  Did you ever sit in on those preparations?

21   A.  Yes, I was acting as interpreter on quite a few occasions.

22   Q.  On quite few occasions?

23   A.  I believe between five to ten.

24   Q.  And did you ever translate for her on an application that

25   you had prepared?

E3q0liu3

1    A.  Yes.

2    Q.  On the ones that you helped with, were those applications

3    real or fake?

4    A.  Fake.

5    Q.  And in terms of -- how would she prepare a client for the

6    immigration judge proceeding?

7    A.  At first, she gave a client a list, kind of the things you

8    should not do at an immigration court about demeanor, and about

9    how to interact with interpreters at a trial, how you know to

10   show you're respectful to the judge and to the trial attorneys.

11   This kind of instruction.  And then prepare the case, just

12   prepare the application, the trip to the United States, and the

13   story, and go through the evidence.  Quite similar to asylum

14   interview preparation.

15   Q.  And during these preparations, that you sat in, did the

16   client ever indicate that their -- let me ask it this way.

17        Were the clients in those circumstances able to keep

18   the details of their story straight?

19   A.  No.  Because, at first, that's nothing happened to them, so

20   you -- they often forget what happened in the story.  And the

21   second is last time we prepare for their asylum interviews may

22   be a couple of years ago, so they forget what we prepare them

23   couple years ago.  So client made a lot of mistake during the

24   preparation with attorneys.  Many of them.

25   Q.  And would they ask questions about the persecution that

E3q0liu3

1    happened to them?

2    A.  Yes.  That's part of preparation.

3    Q.  Would this -- did this happen in any of the preparations

4    you participated in with Vanessa?

5    A.  Yes.

6    Q.  I want to turn back to some of the stuff you were talking

7    about, the concerns at the firm about what was going on.  You

8    mentioned some of the measures like changing the name.  Did

9    there ever come a time when another firm was opened up?

10   A.  Yes.

11   Q.  When did that happen?

12   A.  In April or May 2010.

13   Q.  And what happened, describe what happened in terms of the

14   firm's, the new firm?

15   A.  In the beginning of 2010, Harry and Yolanda told us they

16   were about to open the new firm, and they were looking for new

17   office.  At that time, they were in the same room as I was, so

18   we talk about this a couple of times.  And but in the

19   beginning, they didn't have the lawyer.  And later on, they

20   decided to use Vanessa.  And they found office at a building

21   just across the street and they moved in in -- probably in

22   April or May 2010.

23   Q.  And what was your understanding of why they were opening up

24   the new firm?

25   A.  Two reasons.  One reason is for safety.  Because opening a

609

E3q0liu3

1    Q.  I was referring to the times when you served as a

2    translator -- I'll go back.

3            When you served as a translator, were there times when

4    clients would get the details of their claim wrong?

5    A.  Yes, there were times the client cannot answer the details

6    of their story.

7    Q.  In those circumstances, typically, what would be her

8    response?

9            MR. MAHER:  Again, Judge, the form of the question.

10           THE COURT:  Do you remember any specific instances?

11           THE WITNESS:  No specific instance.

12           THE COURT:  All right.  Why don't you move on.

13           MR. EAGAN:  Okay.

14   BY MR. EAGAN:

15   Q.  Other than going back to when the name was changed, other

16   than when the name -- other than sort of the name on the door

17   or on that window, did anything else change in terms of how the

18   firm was run when Troy Moslemi came in?

19   A.  No.  Troy Moslemi is not our boss.  Our boss is still Feng

20   Ling Liu and David Miao, so we are basically same.

21   Q.  When did the second -- I'm sorry, you mentioned certain

22   steps that the firm took, I think you said on the safety issue.

23   Did you take any in personal steps around this time?

24   A.  Yes.  I talk with Meng Fei couple times about this.  And we

25   feel very unsafe.  And we don't believe our boss would protect

610

E3q0liu3

1    me if our firm was really raided by FBI.  So we decided to

2    protect ourselves.  We begin taking things out from the office.

3    I -- I took like disclaimer, affidavits, and the client data

4    bases used for asylum interview preparation, and the material

5    prepared by me and by other people.  And like the storywriting

6    instruction prepared by Harry.

7    Q.  You said prepared by Harry?

8    A.  Yes.

9    Q.  When you say storywriting instruction, what was that?

10   A.  That's kind of instruction, like what you should write in

11   the first paragraph, what you should write in second paragraph,

12   what you should write about persecution, and how you conclude

13   the story.

14   Q.  And why did you take these steps?

15   A.  I could use them as evidence if FBI approached me.

16   Q.  Around what time was this?

17   A.  From 2009, until I left, I taking these things from time to

18   time.

19   Q.  Did there come a time when you left the firm?

20   A.  Yes.

21   Q.  When was that?

22   A.  November 2010.

23   Q.  Why did you leave?

24   A.  I was fired.

25   Q.  You were fired?

E3q0liu3

1    Q.  And in that circumstances, who pays you?

2    A.  Big translator.

3    Q.  How much were you typically paid for translating?

4    A.  Between 80 to 100.

5    Q.  Per interview, per day, per?

6    A.  Per interview.

7    Q.  When you were doing, working as a translator, to your

8    knowledge, did you work on any fraudulent asylum claims?

9    A.  Yes.  Later on I met Julie Chen at asylum office.

10   Q.  And that's the person you knew from Ken Giles?

11   A.  Yes.  Probably in April 2011.  At that time, we have chat.

12   And she says she need help, because she has many cases she has

13   not done anything.  She said that Karen, legal assistant, could

14   not help her.  And she knew I more available because I have no

15   stable job, so invite me to come back and help her deal with

16   those cases.

17   Q.  What did you do for Julie?

18   A.  She gave me cases.  And I wrote the story, filled the

19   application, wrote the letters, and when the evidence mail from

20   the clients, I translate those evidence, and when they have

21   interview, I prepare for them, and sometimes I interpreted for

22   them.

23   Q.  How many applications would you say you worked on for

24   Julie?

25   A.  In total, 12.

617

E3q0liu3

```
 1   want to meet with me, and I should meet with them, that's in my
 2   benefit to see them.  And, actually, I met the agent before,
 3   but -- in July 2011.  At that time, he pretend he was
 4   immigration officer at immigration bureau.  He told me he was
 5   investigating sexual harassment issue between our interpreters.
 6   And he asked me to help them about it, his investigation.  And
 7   I met him in July.  But at that time, I didn't know he was FBI
 8   agent.  He left my telephone number, that's why he called me in
 9   November 2011.
10   Q.  So you met an FBI agent in July, but didn't realize it was
11   an FBI agent?
12   A.  He didn't tell me, he said he was immigration officer.
13   Q.  But in November of 2011, when you were approached by the
14   FBI, they identified themselves as FBI agents?
15   A.  They didn't identify over the phone.
16   Q.  But when you met with them?
17   A.  Yes.
18   Q.  Did there come a time when you started cooperating with the
19   FBI in this investigation?
20   A.  Yes, immediately.
21   Q.  And so that was in approximately November 2011?
22   A.  Yes.
23   Q.  I'm going to show you what has been marked for
24   identification as 3503-21.  If you can take a moment to look
25   through that.
```

E3qWliu4                         T. You - direct

1                (At the side bar)

2                MR. EGAN:  Your Honor, I just wanted to say again that

3        the question, I think it is permissible to ask him what Vanessa

4        Bandrich's reaction was typically, even if he doesn't have a

5        specific experience, since he said he translated five to ten

6        times.

7                THE COURT:  You can ask do you remember if she ever

8        had a reaction, which I think would encompass, even if he

9        doesn't remember the date or the time, would encompass what

10       reaction she had.  But you can say something like do you

11       remember her ever having a reaction and then follow up with

12       when that was.

13               MR. MAHER:  Judge, I object, and the government did a

14       lot of this asking as general impressions what happened, almost

15       every question "would," and I didn't object until this time

16       because it became important for my client.  But that's not a

17       proper question.  It does imply speculation, and this is

18       something that is very specific, ask a specific question, do

19       you remember a time, he says I recall no specific instances.

20       There is nothing else to follow up at this point.  He's just

21       trying to find a way to try to get in this information that

22       clearly the witness says he recalls no specific instances of

23       her giving any type of feedback in that situation.  I think

24       it's improper.

25               And part of it also, I just want to make a record

658

E3q0lliu5                    Yu - cross

1    Q.   And this was a secret recording device, so the person you

2    were talking to never knew he was being recorded; is that

3    right?

4    A.   Yes.

5    Q.   Now, you, yourself, had been recorded before you

6    cooperated; isn't that right?

7    A.   Yes.

8    Q.   And they showed you those transcripts of what you said when

9    you were recorded, and didn't know you were being recorded;

10   isn't that right?

11   A.   They didn't show the transcript to me at all.

12   Q.   Did they give you the conversations?

13   A.   No.

14   Q.   So you have no idea what you said before you cooperated?

15   A.   No.

16   Q.   None?

17   A.   No, I don't know.

18   Q.   Did they ever show you conversations that were recorded

19   with a person by the name of Lee Tan?

20   A.   No, they didn't.

21   Q.   You know Lee Tan; is that right?

22   A.   If you mean that's someone called Bruce Lee, yes.

23   Q.   If you -- what?

24   A.   I don't know the one called Lee Tan, but I know someone

25   whose English name is Bruce Lee.  Probably we're not talking

E3q0lliu5                    Yu - cross

1   A.  Yes.

2   Q.  And she could have spoken to you, right?

3   A.  Yes, she could.

4   Q.  And you were working for the government, at that time, to

5   try and get people who you say were getting criminal conduct

6   with you, and you called these 21 people in nine recordings,

7   isn't that right?

8   A.  Yes.

9   Q.  Did you ever record my client?

10  A.  No.

11  Q.  Did you ever try to record my client?

12  A.  I told you --

13  Q.  Did you ever try to record a conversation with my client,

14  after you were cooperating; yes or no?

15  A.  Not up to me.

16  Q.  Excuse me?

17  A.  That's not up to me.

18  Q.  They told you not to call her?

19  A.  They never say who I should call.

20  Q.  Oh, who you should call.  But you knew, you are telling

21  this jury that she was your boss, she was telling you what to

22  do, and you were engaged in criminal conduct with her.  Isn't

23  that what you are telling this jury?

24  A.  Yes, that what -- but I was fired by her, so.

25  Q.  Just answer my questions, the government will have an

668

E3q0lliu5                    Yu - cross

1    opportunity to explain --

2    A.  Okay.

3    Q.  -- if you want to.

4    A.  Okay.

5    Q.  She's the person you say that gets you involved in criminal

6    conduct; is that right?

7    A.  Yes.

8    Q.  You're trying to make a deal with the government to catch

9    everyone who involved you in this criminal conduct, isn't that

10   right?

11   A.  Yeah, everyone I can.

12   Q.  And they give you the authority to call anyone you want?

13   A.  No, they --

14   Q.  They told you, what?

15   A.  They tell me who you I should call.

16   Q.  Okay.  So they never told you to call her, is that your

17   testimony.  Do not call Feng Ling Liu, Victor.

18          Did they tell you that?

19   A.  They did not say do not call, they didn't -- they

20   just don't tell me that's the one they asked me to call.

21   Q.  So they never asked you to call her, right?

22   A.  To my best knowledge, I didn't remember they asked me to

23   call her.

24   Q.  They never asked you to call my client, right?

25   A.  Never.

E3qWliu6                     T. You - cross

1    Q.  Did you tell them you were doing this?

2    A.  FBI asked me to file application.  The first time I met

3    with them, I expressed my concern about deportation.  They

4    asked me are you a citizen or permanent resident.  I say

5    permanent resident, but I bound to be ineligible to become

6    citizen.  They say apply citizenship as soon as you can.

7    That's not the only time.  I told them more than three times,

8    and every time they say go for it, apply yourself.

9    Q.  They told you to file an application and lie under oath?

10   A.  They asked me to sign, they asked me to file application

11   for citizenship.

12   Q.  Yeah.  The application for citizenship says that you can't

13   assist or know about a crime or be involved in a crime under

14   oath, and these FBI agents said that's okay, file it, sign it?

15   A.  They asked me to file application but didn't ask me to lie

16   on application.

17   Q.  So did you think you'd have a chance if you filed the

18   application and said yes, I'm involved in crimes?  Would you

19   have filed that application?

20   A.  If I knew eventually they would ask me to withdraw

21   application, I would not file it in the first place.

22   Q.  But they told you to file it, right?

23   A.  Yes, they told me to file it.

24   Q.  And they told you to file it any number of times, right?

25   A.  Three or four times, yes.

E3qWliu6                         T. You - cross

1   another fraud, is that right?

2   A.  He didn't.

3   Q.  Was there any argument between the FBI and the U.S.

4   Attorney's office about whether or not you should withdraw it?

5   A.  What?  Say again.

6   Q.  Was there any argument between them?

7   A.  I don't know.

8   Q.  Isn't it a fact that you said to the U.S. Attorney's office

9   and others, Why do I have to withdraw my application, the FBI

10  told me I should file it?

11  A.  I told my lawyer about that and I let my lawyer deal with

12  this matter, with that.

13  Q.  Did you tell your lawyer, too, Why did the FBI tell me to

14  file this false application, that it cost me $600 to do it?

15  A.  Yes, and I asked my lawyer, if they allow me to do so, I

16  have to waste $600.

17  Q.  Did the FBI ever pay you back the 600?

18  A.  No.  No.

19  Q.  Did you ever discuss with anyone before and after you were

20  cooperating about a plan you had if you ever got caught, what

21  you would do?

22  A.  Yes.  With Meng Fei Yu.  She was my friend and she used to

23  be a storywriter and later become lawyer in our law firm.

24  Q.  Didn't you tell people that if you ever got caught, you

25  would blame my client?

685

E3qWliu6                         T. You - cross

1    A.  I don't think we talk in that way.  At that time, I

2    remember, she asked me if FBI agent, if FBI approach us, what

3    we should do.  I said I would tell them everything, including

4    you.  And she said, and I let her know if they approach you, do

5    the same thing with me.  I won't blame you.  That's what I,

6    that's what we talk about.

7    Q.  Okay.  Let me ask you about a conversation that you had

8    with Lin Tan saying, where Lin Tan tells you or tells you what

9    to do, is that if you ever get caught, you'll push my client

10   into a corner and blame her.  Do you remember that

11   conversation?

12   A.  I still don't know who is Lin Tan.

13   Q.  Well, give me a name that you think it is.

14   A.  You mean --

15        MR. FISCHETTI:  Could I have that conversation.

16   Q.  I want to show you 3503-91.  Take a look at it and see if

17   it refreshes your recollection who I'm referring to as Li Tan,

18   and I think it may be Bruce Lee, but take a look.

19   A.  I just want to make sure.

20   Q.  Sure, sure, sure.  Please take a look.

21   A.  Which page?

22   Q.  Oh, I just want you to tell me who you're talking to there,

23   who the person is.

24   A.  That's the same conversation.

25   Q.  Into the microphone, please.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E3qWliu6                    T. You - cross

1    A.  I don't -- which --

2    Q.  Just generally, is this Bruce Lee that you're talking to?

3    A.  I don't -- is this page you're talking?

4    Q.  No.  I'm talking the whole conversation.

5    A.  There are many people in this conversation.

6    Q.  Okay.  Then I'll just show you the person I'm talking

7    about.  Do you know a person named Bruce Lee?

8    A.  I know someone called Bruce Lee.

9    Q.  Someone called Bruce Lee.  Okay.  What I want to ask you

10   generally, without reading anything to you, do you recall

11   having a conversation with this person, saying basically that

12   if I get caught or forced, I'll blame it on Feng Ling Liu?  Do

13   you remember that?

14   A.  I think I need to read whole conversation to make sure

15   that's what I said.

16   Q.  You mean every page?

17   A.  No, not every page.  At least with this person.

18   Q.  Sure, of course.  That's what I'm talking about.  But if

19   you want to read the whole conversation, be my guest.

20        MR. FISCHETTI:  May I just look at the first page for

21   the government, please.  I want a number here.  3503-91.

22   Q.  What page are you on there, Victor?

23   A.  15.

24        MR. FISCHETTI:  Page 15, I'm told.

25   A.  That's conversation, I believe that person is Bruce Lee,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E3qWliu6                        T. You - cross

1     but that's the conversation between, between him and Meng Fei

2     Yu, I guess, not with me.

3     Q.  Not with you?

4     A.  Not with me.

5     Q.  Okay.  Thank you.  Do you remember having a conversation

6     with Mr. Zhang when you were recording him?

7     A.  You mean her?

8     Q.  Her.  I apologize.

9     A.  Actually, I barely know her.  She's a newcomer after I left

10    and Meng Fei introduced me to her.

11    Q.  I'm asking did you have a conversation --

12    A.  Yes.

13    Q.  -- where you recorded her and you were talking about

14    getting together and forming a firm.

15    A.  You mean Ms. Tan?

16    Q.  Yes.

17    A.  No, I didn't.  I never talk with her about forming a firm.

18    Q.  Do you remember saying to her, Zhang, if you and her formed

19    a firm, that they should protect themselves and they could

20    present files as evidence to clear their names?

21    A.  Oh, okay.  I know who you are talking.  We have

22    misunderstanding just now.

23    Q.  Okay.

24    A.  You are talking about Tom Zhang, right?

25    Q.  Yes.

688

E3qWliu6                        T. You - cross

1    A.   Yes.

2    Q.   So you recorded a conversation with him, right?

3    A.   Yes.

4    Q.   And you were talking to him about what you would do if you

5    get caught, isn't that right?

6    A.   Yes.

7    Q.   And what you told him, what you would do if you got caught,

8    was you could protect yourself and you could present files as

9    evidence to clear their names in case ICE investigates, they

10   can push everything on Liu and that's what you, Victor, would

11   do.  Didn't you say that?

12   A.   I don't remember I talk with Tom about that.

13   Q.   Then I'll show it to you, and you tell me.  Is it a fact as

14   to whether or not you said that?  I'm showing you 3503-59, and

15   I'm asking you if you say this is what you would do if you were

16   caught, push everything on Liu.  Take a look at it.  There's a

17   whole paragraph there.

18   A.   Okay.  Just now I made mistake.  This is not conversation

19   between me and Tom Zhang.  This is a party host by Bruce Lee

20   for him, I, Meng Fei Yu and Adrianna Qi, and that's what he

21   said, not what I said.

22   Q.   You didn't say you could protect yourself because you can

23   push everything on Liu?

24   A.   He said, at that time, we told him we kept a lot of file

25   from law office.

689

E3qWliu6                    T. You - cross

1    Q.  Yeah, you stole a lot of files from there, too, didn't you,
2    when you left?
3    A.  Not when I left.  From time to time.
4    Q.  From time to time, you stole files so you could use them
5    and start another office, is that right?
6    A.  Not for our office.  At first I use for our protection.
7    Q.  Oh, for protection.  So do you have the files that you
8    stole?
9    A.  You mean right now?
10   Q.  Yeah.
11   A.  No, I don't have.  Later on, I --
12   Q.  Did you give them to the government?
13   A.  Yes, I gave them to the government.
14   Q.  All files that you had stored, you gave to the government?
15   A.  All files, yes.
16   Q.  Okay.  So it says here -- well, I'm sorry.  Did you read
17   it?  Would you agree that in that conversation, it says what
18   they can do to protect themselves in case Liu has legal
19   trouble, they can present files as evidence to clear their own
20   names?
21   A.  Yeah.
22   Q.  Do you agree that that's what that says?
23   A.  Yes, that's our purpose, to --
24   Q.  That's what it says, okay.  And does it also say they can
25   push everything on Liu and that's what they would do?  Is that

E3qWliu6                      T. You - cross

1   Q.  You think you told them in November 2011?

2   A.  Yes.  At that time, they --

3   Q.  It's a yes-no question.

4   A.  Yes, I told them.

5   Q.  Okay.  At any time that you've met with the FBI or the U.S.

6   Attorney's office, have any of those government officials ever

7   asked you to write down what you know about Vanessa Bandrich?

8   A.  They ask me to --

9   Q.  Just think before you answer.  I'm asking a very specific

10  question, and again, as you know, you're under oath.

11  A.  Yes.

12  Q.  Okay?

13  A.  Mm-hmm.

14  Q.  Did they ever ask you to write down in your own words what

15  you knew about Vanessa Bandrich?

16  A.  I did that voluntarily.

17  Q.  Excuse me?

18  A.  I did that voluntarily without they asking me.

19  Q.  You're saying you did that voluntarily without them asking

20  you?

21  A.  Yes.

22  Q.  How many times did you write something down about Vanessa

23  Bandrich?

24  A.  I guess two.

25  Q.  Two times.  When did you do that?

E3qWliu6                          T. You - cross

1    A.  The first I met them, they ask me --

2    Q.  I'm not asking for what anyone asked, what anyone said.

3    I'm asking you, you just said that there are two times that you

4    wrote in your own handwriting, right, or typed up in your own

5    words what you knew about Vanessa Bandrich.  I'm asking you

6    what are the dates.

7    A.  Okay.

8    Q.  First time.

9    A.  First.

10   Q.  When was the first time?

11   A.  November 2011.

12   Q.  November 2011.  And you gave that statement to who?

13   A.  To Agent Daniel Park and Chris DeGraff.

14   Q.  Okay.  Second time, when did you do it?

15   A.  The second meeting.

16   Q.  Second meeting, which would have been when?

17   A.  After Thanksgiving, 2011.

18           MR. MAHER:  I'm going to ask just to be displayed to

19   the witness and counsel 3503-20, and if it doesn't pop up,

20   please let us know.

21   Q.  Can you see a document displayed on the monitor in front of

22   you?

23   A.  Yes.  That's my handwriting.

24   Q.  Okay.  I didn't ask you a question except whether you can

25   see a document in front of you.

E3qWliu6                    T. You - cross

1    A.  But that's --

2    Q.  Really, this is very important.  Can you just look at me a

3    second?  Look at me a second.  Okay?

4    A.  Okay.

5    Q.  You really, please, need to listen to the question and

6    answer the question.  I asked you whether you see a document.

7    A.  Yes.

8    Q.  Do you see a document?

9    A.  Yes.

10   Q.  Okay.  That's all I asked.  Okay?  Now, do you recognize

11   that document?

12   A.  Yes.

13   Q.  Is that a document that you wrote?

14   A.  Yes.

15   Q.  Is this one of the documents that you just referred to?

16   A.  Yes.

17         MR. MAHER:  Can we go to page 20, please.  I'm sorry.

18   Page ten.

19   Q.  Do you recognize this document?

20   A.  I don't recognize this document.  No.  That's not --

21   Q.  I'm just asking whether you recognize this document.  Let

22   me ask you this.

23         MR. MAHER:  Can you go back one page at a time for a

24   few pages, please.

25   A.  Okay.  That's a translation of one documents I prepared for

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

714

E3qWliu6                         T. You - cross

1    the --

2    Q.  Is this one of the documents you provided to the

3    government?

4    A.  That's the translation of the document I provide to them.

5    Q.  And the translation, is that a translation of a document

6    that you drafted yourself?

7    A.  Yes.

8    Q.  So the document that you're seeing right now is your words

9    as have been translated by the government, correct?

10   A.  Yes.

11            MR. MAHER:  Could we go back to page ten now, please.

12   Q.  Isn't it true that as far as your references to Vanessa

13   Bandrich in this document --

14   A.  Yes.

15   Q.  -- you said that "in the latter half of 2009, Dennis left,

16   Troy referred his friend --"

17            MR. EGAN:  Objection, your Honor.  Again, this is not

18   in evidence.

19            MR. MAHER:  It doesn't have to be.  This is

20   impeachment.

21            THE COURT:  Why don't we meet at the side bar.

22            (Continued on next page)

23

24

25

E3oWliu2                    Opening - Mr. Egan

1    dollars over the course of the fraud, all for helping

2    immigrants file a form that doesn't cost a dime to file.

3            They were so successful, as a matter of fact, that you

4    will hear that they started to worry that people might get

5    curious, people like the FBI.  After all, if the government was

6    going to investigate this, they were likely going to start with

7    the biggest players.  You'll hear that as word trickled out

8    about law firms around the country who had been arrested for

9    precisely this sort of fraud, the defendants kicked into

10   action.  Feng Ling Liu tried to cover her tracks.  She warned

11   employees, don't talk on the phone, in case they're tapped.

12   You'll hear she said not to have clients bring any of the

13   materials outside of the firm.  She then went and changed the

14   firm name.  Feng Ling Liu's name came off the door.  You'll

15   hear Troy Moslemi's name went right back up.  Then Feng Ling

16   Liu helped her brother open another firm right across the

17   street, this time with Vanessa Bandrich's name on the door.

18   And they brought on Rachel Yang to help the applicants through

19   the fraudulent process.  And while they pretended to be

20   separate firms, you'll hear, the evidence will show, that in

21   many ways it remained one firm.  Same business, same factory,

22   same fraud.  That's what the evidence will show.

23           Let's talk about the kinds of evidence you'll see and

24   hear in this case.  First you're going to hear live testimony

25   from a number of witnesses.  You're going to hear from a couple

1    of storywriters who worked at this firm.  As people who did

2    this for a living, they'll be able to tell you exactly how the

3    fraud worked at these firms and the roles of each of the

4    participants in the fraud.  You'll also hear from an asylum

5    applicant who actually used the firm to file a fraudulent

6    asylum application.  He'll describe how they moved him through

7    the process, how they helped him gather fraudulent evidence,

8    how they helped create a fake story for him.

9            You'll also see a couple different types of

10   documentary evidence at the trial.  First, you'll see some

11   examples of the fraudulent applications that were filed by the

12   firm, and you'll hear the lies that they contain and you'll

13   hear how the firms manufactured them.  Then you'll see evidence

14   that was taken right off the desks and out of the drawers of

15   these firms and you'll hear how that evidence was used to

16   manufacture false asylum claims.

17           But you won't just hear witnesses' descriptions of how

18   it worked or see documents that they used to corroborate what

19   they said.  You will hear the actual words of the defendants

20   themselves as they guided applicants through this process.  You

21   see, several of the witnesses you will hear from, including two

22   of the witnesses who went to these firms to file applications,

23   were working for the FBI.  As part of that cooperation, they

24   agreed to wear recording devices that captured each of these

25   defendants discussing the fraud.  You'll see translations of

E3oWliu2                    Opening - Mr. Egan

1    these recordings, and you'll hear how the applicants were given

2    asylum claims, coached to be more believable, and how they were

3    taught to get fraudulent evidence.  In short, how to lie.

4    These recordings will make it clear that everyone at these

5    firms knew exactly how this game was played.

6              To be clear, many of the witnesses I just described

7    committed a crime.  The applicants submitted applications with

8    lies in them.  The storywriters will testify that they prepared

9    false asylum applications for people.  That's asylum fraud in

10   both cases.  Now, the government has agreed not to prosecute

11   the applicants who will testify at this trial for immigration

12   fraud.  The storywriters, on the other hand, have already pled

13   guilty for their involvement in the scheme and are testifying

14   here in hopes of getting leniency at their sentencing.  When

15   you consider their testimony, you should also consider how that

16   testimony is corroborated by other evidence in the case, by

17   documents and by the recordings.  You will see that these

18   witnesses are able to take you inside this process like no

19   other witness can.  In short, you will hear and see many

20   different kinds of evidence in this trial, and that will

21   confirm that the defendants are guilty of conspiracy to commit

22   immigration fraud as charged in the indictment.

23             Once you've heard all the evidence in this case and

24   used your common sense, the same common sense that you use in

25   your everyday lives as New Yorkers, you will reach the only

E3rWliu1                    T. You - cross

1    A.  Yes.

2    Q.  And the Miao family's related by blood?

3    A.  Related by blood.

4    Q.  The Liu family, there were blood relatives in the firm?

5    A.  Yes.

6    Q.  Yes?

7    A.  Yes.

8    Q.  And at least two people were married together, correct?

9    A.  Yes, David and Feng Liu.

10   Q.  You also conceded that you claimed a benefit for Medicaid

11   that was improper, right?

12   A.  Yes.

13   Q.  And by improper, we mean illegal, right?

14   A.  Yes.

15   Q.  You broke the law by doing that?

16   A.  Yes.

17   Q.  You broke the law by, again, submitting false documents to

18   a different U.S. Government agency?

19   A.  That's New York State government agency.

20   Q.  Oh.  I'm sorry.  To a different government agency.

21   A.  Yes.

22   Q.  The State of New York?

23   A.  Yes.

24           MR. MAHER:  Nothing further, Judge.

25           THE COURT:  Mr. German.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

771

E3r0liu2                    T. You - cross

1   Melody Shen, you met with FBI Intelligence Analyst Matthew

2   Johnston, Assistant United States Attorney Harris Fischman, you

3   met with your own attorney present, Julia Gatto.

4          Do you remember attending meetings with all of those

5   individuals?

6   A.  Yes.

7   Q.  And didn't you tell them, in that meeting, that you never

8   intended on attending the University of California?

9          MR. EAGAN:  Objection.

10          THE COURT:  He can answer the question.

11   A.  I said at that time, I didn't explain myself --

12   Q.  The question is, did you tell them that you never intended

13   on attending the University of California.

14   A.  Because my basic purpose was for travel.

15   Q.  Sir, did you tell them that you never intended on attending

16   the University of California program?

17   A.  Actually, I forget.

18   Q.  Now, you arrived to the United States on July 18, 2005;

19   correct?

20   A.  Yes.

21   Q.  This is approximately six months after your girlfriend had

22   been forced to endure the abortion, correct?

23   A.  Yes.

24   Q.  You testified two days ago, on direct examination, that

25   when you arrived in New York, within a few weeks your wife,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E3r0liu2                    T. You - recross

1    A.  Yes.  I talked to FBI agent Dan Park a couple of time about

2    this, and he told me to do so.

3    Q.  You told me about that yesterday.  But I want to get this

4    straight.  Did Special Agent Park, according to you, tell you

5    to file this immigration form to become a citizen before you

6    filed it?

7    A.  Yes.

8    Q.  Okay.  So, now, you filed it in May.  When did he tell you

9    to do that?

10   A.  The first time was November 2011, the first meeting.

11   Q.  At the very first meeting?

12   A.  Yes.  I expressed my concern about deportation.

13   Q.  But you told them, then, that you had committed immigration

14   fraud, isn't that right.

15   A.  Yes.

16   Q.  And you knew that, right?

17   A.  Yes.

18   Q.  And he still told you to file an application to become a

19   citizen, right; yes or no?

20   A.  Yes.

21   Q.  He told you that, right?  And in response to what the

22   government told you, that's why you filed it, right?

23   A.  Yes.

24   Q.  So that's another crime that the government told you,

25   through Mr. Park, that you should commit, isn't it?

805

E3r0liu2                    T. You - recross

1   A.  Yes.

2   Q.  Let me show you F3.  It is not your application, but it's

3   the one that you dealt with.  It's in evidence.  I've got to

4   get my page numbers.

5       Now, I'm showing you page 18 of 21, all right, part 12.

6           Would you look with me and see if I'm reading it

7   correctly, Mr. You.  It says, does it not: I certify under

8   penalties of perjury, under the laws of the United States of

9   America, that this application and the evidence submitted with

10  it are true and correct.

11          I authorize the release of any information, to

12  immigration, needs to determine my eligibility for

13  naturalization.

14          And then it has a signature.

15          Have I read it correctly?

16  A.  Yes.

17  Q.  And that's what you signed?

18  A.  Yes.

19  Q.  And that was a lie?

20  A.  Yes, I lie on all of the questions.

21  Q.  So you committed perjury?

22  A.  Yes.

23  Q.  Have they charged you with perjury?

24  A.  No.

25  Q.  They tell you why not?

E3r0liu2                    T. You - recross

1   Q.  Excuse me?

2   A.  No.

3   Q.  Wasn't true.  So that was the perjury that you committed,

4   right?

5   A.  Yes.

6   Q.  And you were not concerned about being arrested for

7   perjury, because the government told you to do it, right?

8   A.  I will not do that without counseling them before

9   submitting the application.

10  Q.  Of course you wouldn't.  And the counsel you got was from

11  Special Agent Park, right?

12  A.  Yes.

13  Q.  And you told us, as I understand, he told you several

14  times, is that right?

15  A.  At least three times, I remember.

16          THE COURT:  Let me know when it is a good time to take

17  a break.

18          MR. FISCHETTI:  Yes, your Honor.

19          THE COURT:  Is this a good time?

20          MR. FISCHETTI:  Yes, your Honor, thank you.

21          THE COURT:  Why don't we take our morning break.

22  Please remember to keep an open mind and don't discuss the

23  case.

24          THE DEPUTY CLERK:  All rise.

25      (Jury excused)

951
E3vWliu2                    L. Chen - direct

1    A.  At the office of the Moslemi law firm.

2              MS. MERMELSTEIN:  Can we pull up for everyone what's

3    in evidence as Government Exhibit 783, please.

4    Q.  Ms. Chen, do you recognize Government Exhibit 783?

5    A.  I recognize it.

6    Q.  What is that?

7    A.  It is the exterior view of the building where Moslemi &

8    Associates is located.

9    Q.  Do you see the firm's sign for the law firm in that

10   picture?

11   A.  Yes.

12   Q.  Can you describe for the jury where in that picture the

13   sign is, please.

14   A.  I can.

15   Q.  Go ahead.

16   A.  It is the upper middle sign on top of the entrance that is

17   gild.  That is the law firm's sign.

18   Q.  When you say gild, do you mean that gold sign that's above

19   the door?

20   A.  Yes.  Yes, like that there.

21   Q.  What does that sign say?

22   A.  On the sign, in black, in Chinese, it says Feng Ling Liu

23   law firm, sixth floor.

24   Q.  And was the law firm, in fact, located on the sixth floor?

25   A.  Yes.

953

E3vWliu2                         L. Chen - direct

1    BY MS. MERMELSTEIN:

2    Q.  What instructions did the agents give you before you made

3    recordings of the Moslemi employees?

4    A.  The, generally, the agents will tell me what I was to do at

5    that, at that recording.

6    Q.  What was the layout like of the Moslemi law office?

7    A.  As soon as the elevator door opens, there is a large space.

8    And on both the left and right sides of the large space were

9    two reception desks and surrounding that large space were six

10   offices.

11   Q.  What generally was happening in the law office when you

12   made the recordings?

13   A.  Every time I went, there were many people there.  There

14   were those who had already gone to court and there were those

15   who were getting information about going to court.

16   Q.  Which Moslemi employees have you made recordings of?

17   A.  All together, I recorded four people.  One was Lillian Miao

18   and one was Wen Ting Zheng and Mr. Wu and also David Miao.

19   Q.  I'm showing you what's in evidence as Government Exhibit 12

20   in front of you.  Do you recognize that?

21   A.  I do.

22   Q.  Who is that?

23   A.  Well, this is David Miao.

24   Q.  And looking at Government Exhibit 13 in evidence, do you

25   recognize that?

971
E3vWliu2                          L. Chen - direct

1    within one year.

2    Q.  And why did they want to verify, or what was the

3    significance of how long you had been in the U.S.?

4    A.  Only for people who have been in the U.S. within a year

5    qualify, are eligible to apply for political asylum.

6            MS. MERMELSTEIN:  Let's return to the transcript,

7    about halfway down the page, starting with, "Are you looking to

8    have a consultation?"

9            MR. EGAN:  "Lillian Miao:  Are you looking to have a

10   consultation?"

11           MS. MERMELSTEIN:  "Correct."

12           MR. EGAN:  "Oh, in that case, you, I'm not going to

13   discuss it with you.  Look, I will go find you when I have some

14   time.  If I don't have time, then you --

15           MS. GEIER:  "Unidentified male:  Unintelligible."

16           MR. EGAN:  "Take time to read it.  Take time to

17   understand it.  First, memorize the route and memorize the

18   story.  Take a seat over here.

19   BY MS. MERMELSTEIN:

20   Q.  Ms. Chen, who was Lillian Miao speaking to when she told

21   someone to memorize the story and memorize the route?

22   A.  She was talking to an unknown male client at her law

23   office.

24   Q.  Did you have an understanding of why she was telling that

25   person to memorize a story and memorize a route?

E3VJLIU3                       L. Chen - direct

1    problem.  It is still okay to issue a declaration.  Yesterday a

2    client of ours could not get a statement from the priest until

3    he gave the priest $1,000.  If you do not want to appear and

4    testify in court, just give him 100 or 200 and ask him to write

5    a statement, not much is required.  Humm.  Then you have to

6    give it to us as soon as possible.  If your court date is July

7    5th, then the early July -- you mean July 10th.  It says the

8    5th.  It is not the 10th.  I almost got confused.  The 5th.

9    The 5th, I remember that.  Doesn't it say July 5th here?  You

10   said July 10th.  What are the chances of me winning?  Your

11   judge is very nice.  Brenna is a very nice judge.  You might

12   not have the problem one year whether you're arrested at the

13   airport.  Yes.

14           Now is the time for you to resubmit evidence with a

15   priest or someone in charge or other church members.  Get some

16   pictures of activities, three, four pictures with clothes of

17   different colors and hand them in along with the statement from

18   the church.

19   BY MS. MERMELSTEIN:

20   Q.  Let's stop there.  Ms. Chen, who is speaking in this

21   portion of the conversation?

22   A.  It's Lillian and unidentified male client.

23   Q.  Were you a part of that conversation?

24   A.  No, I did not participate in it.

25   Q.  How was it captured on the recording?

988

E3VJLIU3                         L. Chen - direct

1   A.  I was standing next to them so it was recorded as a result.

2            MS. MERMELSTEIN:  Let's turn to Page 19, please, and

3   read briefly at the top.

4            So today I need to make the deposit.  Anything else

5   afterward?  Lillian Miao, we will make arrangement, give it to

6   the assistant and ask him to write up a story for you.

7            Oh, besides the deposit, what materials do I need to

8   give you?  If necessary, and you have them, give them to us.

9   If you don't, it is okay that you bring them over next time,

10  passport, notarized certificates and ID card.

11           MS. MERMELSTEIN:  Let's move to Page 32, please.  If

12  we can start reading in the first big paragraph with Lillian

13  Miao.

14           Lillian Miao.  Your church got destroyed April 6th,

15  2008, right?  See how many days you have been detained?  You

16  see on April 6th, 2008 everything was just as usual and you

17  were there at the Sunday worship singing the holy songs and

18  praying.  That evidence if we wanted to be save has to be for

19  between January and March, but not for May.  In May you were

20  getting ready to leave your home.  What were done on May 3 and

21  4 could only be done on May 1 and 2.  Unidentified male 5.  The

22  first and second.  Yes, May 1 and 2.  You went shopping.  You

23  departed from Beijing.

24           If you want to get the airline ticket prepared, ask

25  your family to get airline ticket prepared.  It must be for May

1    4th, 2009.  That would have flown from Foochow to Beijing.  Do

2    you understand what I mean?  An airline ticket just like that

3    if you get get it prepared, go ahead.  You departed from China

4    on the 5th.  You would have bought an airline ticket from

5    Foochow to Beijing.  This is evidence.

6            You departed from Beijing to France, changing planes

7    in Mexico.  Get it prepared now.  Tell them to leave it there

8    and wait a while before you mail it so that it can be aged a

9    bit.  Tell your family to get it prepared as soon as possible,

10   buy it now.  Go buy it now.  How can I now buy an airline

11   ticket for 2009?  You are so smart.  How come you don't know

12   how to get it?  Who of those people from Foochow has real

13   airline ticket.  I really don't know.  I never had a plane

14   ticket prepared like that.  You have not done that, but don't

15   you know how to get it now?  The date can be changed like that?

16   They will know what to do.

17   BY MS. MERMELSTEIN:

18   Q.  Ms. Chen, did there come a time when you acquired one year

19   evidence?

20   A.  Yes.

21   Q.  What, if anything, did Lillian Miao do to assist you in

22   obtaining that evidence?

23   A.  She gave me a telephone number, telephone number of a

24   company in China.

25   Q.  Did you call that number?

E3vWliu4                    L. Chen - cross

1   Q.  Did anyone tell you that you have to pay taxes on the cash?

2   A.  No one told me that.

3   Q.  But you did tell someone from the government that you are

4   receiving cash, is that right?

5   A.  Yes.

6   Q.  And no one told you from the government that you have to

7   pay taxes on the cash?

8   A.  No one said that to me.

9   Q.  And you haven't paid taxes on the cash, isn't that correct?

10  A.  I have reported taxes for the checks.

11  Q.  But not the cash?

12  A.  Not for the cash.

13  Q.  Now, when you start cooperating with the FBI, they told you

14  how to use a recorder and a video camera, is that right?

15  A.  They did not teach me how to use it.  They just showed me

16  where I was to place them.

17  Q.  Let's take the Moslemi law firm.  You went there with an

18  agent?

19  A.  The agent did not go.  Only I myself went.

20  Q.  And who turned on the recorder?

21  A.  After they had placed the recorder and turned it on, then I

22  went up there.

23  Q.  And you had no opportunity to shut it off and put it on

24  again, isn't that right?

25  A.  I did not touch it whatsoever.  I just knew that after the

E3vWliu4                    L. Chen - cross

1    recording was over, I was to return it to them.

2    Q.  And that's what you did?

3    A.  Yes.

4    Q.  So every time you were at the Moslemi law firm, the

5    recorder was running, is that correct?

6    A.  Yes.

7    Q.  And that's the same thing with the video camera, isn't that

8    right?

9    A.  Yes.

10   Q.  And when you came back, they took it off you, right?

11   A.  Yes.

12   Q.  And eventually, you listened to those recordings?

13   A.  Yes.

14   Q.  And did you see all the videos also?

15   A.  Yes, I saw all of them.

16   Q.  Now, you've met with the government a number of times,

17   isn't that true?

18   A.  Yes.

19   Q.  You listened to the recordings and talked to them about the

20   recordings?

21   A.  When I listened to the recordings, I only listened to them

22   with my interpreter.

23   Q.  With your interpreter?

24   A.  Yes, the interpreter.

25   Q.  Had they been translated at that point?

E3vWliu4                    L. Chen - cross

1   A.  Can you please explain that question.

2   Q.  What did you do with the interpreter?  Can you explain that

3   to us, please.

4   A.  I listened to each of the CDs and verified every phrase

5   that was said.

6   Q.  Now, you told us that there were certain times when you did

7   not bring a video camera with you?

8   A.  The video recorder I always had on.  It was just that some

9   of the times, I did not bring the recording box.

10  Q.  Now, every time you were at the Moslemi law firm, you had

11  your recorder on, is that right?

12  A.  Yes.

13  Q.  So there are no instances, no times when you were there

14  that we don't have a recording, is that true?

15  A.  Yes.

16  Q.  And you listened to those recordings and you found that

17  they're all accurate, is that right?

18  A.  Yes.

19  Q.  I want to go back to your asylum application.  When you

20  filed it, you filed a false statement by yourself that was

21  given to you, is that correct?

22  A.  Counsel, may I ask you, this personal application, is that

23  the one that I submitted myself, or was that the one that I

24  submitted in the name of Yan Hong Chen?

25  Q.  This is the personal application that you submitted when

1    firm, right?

2    A.  Yes.

3    Q.  And all of them were not given to the jury today.  There

4    are many that we -- there are some that we have not seen yet?

5    A.  Yes.

6    Q.  Now, all the times you were there, how many times there

7    were, you were trying to get to see my client, Ms. Liu, right?

8    A.  No.

9    Q.  You weren't trying to get to see her?

10   A.  Just the last time I had attempted directly to see the

11   Attorney Liu, but she wasn't there, so I just talked briefly

12   with David Miao.

13   Q.  But when you talked to David Miao, you told him that you

14   wanted to see Ms. Liu.  Isn't that right?

15   A.  Yes.

16   Q.  And you even lied about the fact that some interpreter told

17   you that you should see my client.  Isn't that correct?

18   A.  Can you please explain that question.

19   Q.  Yes.  Didn't you have a conversation with David, where you

20   insisted on seeing Attorney Liu, making up a story that some

21   interpreter told you to see Ms. Liu?

22   A.  All that was under the instruction of the agents who asked

23   me to say those things.

24   Q.  To what?  Agents to what?  I didn't get the last part of

25   the answer?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1044

E3VJLIU5                          L. Chen - cross

1    given to me, then I will be able to remember the specific

2    times.

3    Q.  Okay.  Now I want to ask you this question again.  Please

4    answer it as best you can.  I think the answer is yes or no,

5    okay?

6    A.  Okay.

7    Q.  It is true, is it not, that how many times you were there,

8    over what period of time, you never saw or heard Feng Ling Liu

9    do anything criminal?

10   A.  (Pause)

11           MR. FISCHETTI:  Could you ask her is that statement

12   true?

13   A.  Yes.

14           MR. FISCHETTI:  I have nothing further -- I do have

15   one question.  It was handed to me.  I am sorry.

16   BY MR. FISCHETTI:

17   Q.  The time you saw David and talked to David, do you remember

18   if his office door was open or closed?

19   A.  It was closed.

20           MR. FISCHETTI:  Thank you.  I have nothing further.

21           THE COURT:  Is there going to be additional cross or

22   redirect?  If so, we'll take our break.

23           MR. GERMAN:  There will be some cross.

24           THE COURT:  Why don't we take our break now.  Keep an

25   open mind and don't discuss the case.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1202

E41Wliu3                    M. F. Yu

1   Q.  How long does a student visa last?

2   A.  Student visa actually is one year, but after that one year,

3   I can get another year optional practice time.

4   Q.  Does that go by the shorthand OPT?

5   A.  Yes.

6   Q.  And you said that lasts for how long?

7   A.  One year.

8   Q.  Did you get any other benefit from not declaring your

9   income during this period?

10  A.  No.

11  Q.  Did you apply for Medicaid or anything like that?

12  A.  No.

13  Q.  I'm going to need you to speak up a little bit.

14  A.  Okay.

15  Q.  When you started at the firm, how many people worked there,

16  approximately?

17  A.  More than ten people.  About ten.

18  Q.  Were there any other paralegals?

19  A.  Yes.

20  Q.  How many?

21  A.  Several.

22  Q.  Who were they?

23  A.  Victor You, Harry Liu, Mr. Huang, Vinny.

24  Q.  Winnie?

25  A.  Yeah.  Mr. Lee.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    A.  At that time, it's another attorney, Bebe Xue.

2    Q.  You said at that time.  Did she leave at some point?

3    A.  Yes.

4    Q.  When did she leave?

5    A.  In about 2010.

6    Q.  In about 2010?

7    A.  Yes.

8    Q.  Do you see a door in the center of the picture?

9    A.  Yes.

10   Q.  What room is through there?

11   A.  It's Ms. Liu's office.

12   Q.  And during your time there, did she work in that office?

13   A.  Yes.

14   Q.  When you first started, how often was she at the office?

15   A.  I would say every day.

16   Q.  Did she work in there alone or with someone else?

17   A.  Most time she worked there alone.  Sometimes David would

18   stay there.

19   Q.  Is there any way, to your knowledge, to that office, into

20   that office except through that room that you sat in?

21   A.  That's the only door to the office.

22   Q.  When she would work in there, typically, was the door open

23   or closed?

24   A.  Open.

25   Q.  So I want to turn your attention to the work you did at the

E41Wliu3                          M. F. Yu

 1   approximately how many asylum applications did you work on in

 2   any of your capacities?

 3   A.  Hundreds.

 4   Q.  Hundreds?

 5   A.  Yes.

 6   Q.  Of those that you worked on at Feng Ling Liu's law firm,

 7   how many would you say are real, meaning based on actual facts

 8   involving persecution?

 9   A.  Ten percent.

10   Q.  Ten percent?

11   A.  Yes.

12   Q.  And of those ten percent that were based on actual events,

13   in your experience at the firm, were the details of those

14   stories changed prior to submitting the applications?

15   A.  I'm sorry?  Can you repeat the question.

16   Q.  You said that about ten percent were based on actual

17   events, correct?

18   A.  Yes.

19           MR. MAHER:  I am going to object to the form of the

20   question.

21           THE COURT:  I'll allow it.

22   BY MR. EGAN:

23   Q.  Of the ten percent that were based on real events, were

24   applications prepared for those as well, asylum applications?

25   A.  Yes.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

E41Wliu3                    M. F. Yu

1   Q.  And in your experience, would those asylum applications

2   contain false facts as well?

3   A.  Yes.

4   Q.  Why would they contain false facts?

5   A.  Because most of stories were written by paralegals.  Most

6   of clients didn't provide any useful information.

7   Q.  What about the stories that were based on real events?

8   A.  For the, for those real ones, when paralegal talking with

9   them, we can tell whether they actually have persecution or

10  not.  If they did suffer persecution, they can tell us their

11  story, we know that that's their true story or not.

12  Q.  And if it was a true story, were there ever circumstances

13  where details would still be changed?

14  A.  Yes.  Sometimes.

15  Q.  Under what circumstances?

16  A.  Even their stories true, but we want their story look

17  better, so we may add some details.

18  Q.  You want it to look better?

19  A.  Yes.  Such as we would describe how the client beat up.

20  Q.  How they were beat up?

21  A.  Yes.  By the Chinese government, I mean.  Maybe they were

22  not beat up that severely, but we say more seriously and maybe

23  they didn't get bruise all on their body, we would add such

24  scenarios.

25  Q.  I want to talk a little bit about the process.  To your

E41Wliu3                    M. F. Yu

1    knowledge, did the firm advertise for clients while you worked

2    there?

3    A.  No.

4    Q.  How would clients typically find out about the firm?

5    A.  Really they were introduced by the friends or relatives.

6    Q.  How would these friends or relatives know about the firm?

7    A.  Most of them --

8              MR. FISCHETTI:  Objection.

9              THE COURT:  Sustained.

10   BY MR. EGAN:

11   Q.  Fair to say then that they were referrals, mostly?

12   A.  Yes.

13   Q.  When you started at the firm, let me ask you this.  What

14   was the first step in the process when someone arrived at the

15   firm?

16   A.  They always had initial meeting with a manager or Ms. Liu.

17   Q.  When you started at the firm, who was the person or who

18   were the people with whom this initial meeting would take

19   place?

20   A.  Most time, David did this job.  Sometimes Carey.

21   Q.  And you said sometimes Ms. Liu?

22   A.  Yes, sometimes Ms. Liu.

23   Q.  How was it determined who of that group the person would

24   meet with?

25   A.  I'm sorry.

1209

E41Wliu3                    M. F. Yu

1    Q.  How was it determined whether the person would meet with
2    David or Harry or Ms. Liu?
3    A.  Really when the new client came to our office, the
4    reception just show the client to David's office.  But sometime
5    the client insisted on meeting Ms. Liu, they would meet Ms.
6    Liu.
7    Q.  If they insisted on meeting Ms. Liu?
8    A.  Yes.
9    Q.  And why would a client insist on meeting Ms. Liu?
10          MR. GERMAN:  Objection, Judge.
11          THE COURT:  Sustained.
12   BY MR. EGAN:
13   Q.  I want to just quickly show you Government Exhibit 16
14   already in evidence.
15   A.  This is Harry Liu.
16   Q.  Who is Harry Liu?
17   A.  He is the younger brother of Ms. Liu.
18   Q.  And when you started, what was his role?
19   A.  He's a paralegal, but sometimes he conducting initial
20   meeting with our new clients.
21   Q.  And later on, you said initially, these meetings would
22   happen with Harry or David or Ms. Liu.  Later on in your time
23   there, was there anyone else who would do these initial
24   meetings?
25   A.  Yes.  Sometimes then Lucy and Lillian.

1    Please remember you're still under oath.

2         THE WITNESS:  Thank you.

3         MR. EGAN:  If I may, previously the witness had

4    testified about David Miao's name, Yuchang Miao.  We put a name

5    plate up there.  I move for its admission.

6         THE COURT:  Any objection?  It will be admitted.

7         MR. EGAN:  It is Government Exhibit 12-N.

8         THE COURT:  It will be admitted.

9         (Government's Exhibit 12-N received in evidence)

10   MENG FEI YU, resumes

11   DIRECTION EXAMINATION (Continued)

12   BY MR. EGAN:

13   Q.  Ms. Yu, before the break we were discussing the initial

14   meetings that happened with asylum applicants.

15        What sort of information would typically be discussed

16   at these meetings?

17   A.  I only heard a few times.  I heard David asked the client

18   when they arrived this country if they have any, do they have

19   any criminal history in this country, and their marriage

20   history and the case, then they would introduce some claim

21   which they think is better for the client.

22   Q.  So taking that back, you mentioned a number of different

23   records.  Why were those records important?

24   A.  You know, to apply for asylum, the applicant must arrive in

25   this country no more than one year after, no more than one year

1224

E41JLIU4                        Yu - direct

1   after he came in this country.

2   Q.  In your experience at the firm, did they have asylum

3   applications for people who had been here for more than one

4   year?

5   A.  Yes.

6   Q.  What other records, in addition to criminal records, were

7   they looking for or asking about?

8   A.  We want to make sure that we asked do they have any record.

9   Q.  Record about the applicant?

10  A.  Yes, if they had a history of criminal long time ago, the

11  government has the records so we cannot lie about the client's

12  entry time.

13  Q.  Was anything about the client's background discussed?

14  A.  Background, yes, at occasion, marriage.

15  Q.  Just information like that?

16  A.  Yes.  They don't ask whether you have persecution in China.

17  Q.  So the background they would ask would just be education

18  and birth place?

19  A.  Life experience.

20  Q.  What about payment, was that ever discussed at these first

21  meetings?

22  A.  Yes.

23  Q.  What was the pay scale?

24          How much did it cost to file an asylum application

25  with the Bandrich law firm?

*Not Moslemi or Fengling Liu Law Firm*
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

1225

E41JLIU4                    Yu - direct

1    A.  Totally about 10,000 to 13,000.

2    Q.  How was that paid?

3    A.  The client would have paid 1,000 when we start preparing

4    the case.  When they win the case, they pay the rest.  If the

5    case lose, they will pay half.

*Contradict with Victor, if client lost they paid nothing. she is not cashier.*

6    Q.  How was this money typically paid?

7    A.  By cash.

8    Q.  I think you testified earlier that persecution, someone's

9    persecution typically was not discussed?

10   A.  No, no.

11   Q.  Was the claim they would pursue ever discussed?

12   A.  Yes.

13   Q.  In what context?

14   A.  Sometimes I heard that the client just asked Ms. Liu or

15   David which claim is easier to be granting.

16   Q.  Would Ms. Liu or David provide advice on that?

17   A.  Yes.

18   Q.  What advice would they provide?

19   A.  They would give advice based on their marriage or

20   avocation, background.  If, for example, if there was a female

21   single applicant, they would advise them to apply for family

22   planning.  The claim will be this female applicant suffered a

23   forced abortion because she got pregnant before marriage.

24   Q.  Why was that an appealing claim for a single female

25   applicant?

E41JLIU4                    Yu - direct

1   A.  Because this claim doesn't require a lot of evidence.  It

2   is very easy to prepare the story and the whole package.

3   Q.  What other types of claims did the office typically pursue?

4            MR. FISCHETTI:  Objection.  May we have a brief

5   sidebar?

6            THE COURT:  Okay.

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E41JLIU4                        Yu - direct

1      (At sidebar)

2          MR. FISCHETTI:  Judge, I withheld my objections up

3   till now so we can get a full story.  I ask that the government

4   particularize who is saying what and not the office and not

5   they said, put David and my client together.  I think it should

6   be more pointed on who said what during this period of time.

7          THE COURT:  I agree with that.  Who said what, I agree

8   with that.  As to whether the abortion, had to do with types

9   of -- right, but I think it is okay to ask generally what types

10  of persecution the office would utilize, but I think in terms

11  of saying particular people said things or acted a certain way,

12  we should break down that.

13         (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

 1           (In open court)

 2   BY MR. EGAN:

 3   Q.  I think the question that was before you was what other

 4   types of claims would the office typically pursue?

 5   A.  Okay.  For some single male applicants, they advised them

 6   to pursue Christianity.

 7   Q.  Why was that?

 8   A.  Because they don't have kids, they're not married, so they

 9   cannot apply based on family planning.  It is easy for them to

10   say some religion.  They went to some church in China, was

11   arrested and beat up.

12   Q.  Were there ever reasons -- let me ask this.

13           You described these meetings and advice that would be

14   given during them.  Who did you hear participating in those

15   meetings?

16   A.  Just sat outside Ms. Liu's office.  What I heard, though,

17   was David and Ms. Liu were there.

18   Q.  They were there having the conversations you just

19   described?

20   A.  Yes.

21   Q.  Did they ever discuss downsides to pursuing a particular

22   type of claim?

23   A.  I am sorry.  I don't remember.

24   Q.  Okay.  So after this initial meeting, how long would this

25   initial meeting typically last?

E41JLIU4                     Yu - direct

1   this form, including their age, address, avocation, kids, those

2   kind.

3   Q.  Why was address significant?

4   A.  If they want to apply for asylum in New York, they must

5   provide a New York address.

6   Q.  In your experience at the firm, were there ever people

7   applied who did not live in New York?

8   A.  Yes, many applicants actually lived in another state and

9   worked in other states.

10  Q.  How would you handle this?

11  A.  What do you mean?  I am sorry.

12  Q.  If someone came to you and said -- well, let me ask you

13  this way:  Did anyone ever come to you and say I don't live in

14  New York?

15  A.  Yes.

16  Q.  How would you handle that?

17  A.  I would tell them if you want asylum here, you should give

18  me an address in New York.

19  Q.  So you worked on filling out the form.  What other steps

20  would you take?

21  A.  They also need to sign an affidavit.

22  Q.  What is the affidavit?

23  A.  The affidavit, an affidavit the client claims they provide

24  all the truths to this firm and their stories are truth and

25  their stories are prepared by themselves.

1  Q.  I am going to show you what has been previously marked as

2  Government Exhibit 921.  Take a look at that.

3  A.  (Pause)

4  Q.  Do you recognize that?

5  A.  Yes.

6  Q.  What is that?

7  A.  This is an affidavit we ask the client to sign.

8  Q.  That is an affidavit you used at the firm?

9  A.  Yes.

10         MR. EGAN:  I offer Government Exhibit 921 into

11  evidence.

12         THE COURT:  Any objection?

13         THE COURT:  It will be admitted, hearing no objection.

14         (Government's Exhibit 921 received in evidence)

15  BY MR. EGAN:

16  Q.  If you can see where it says "No. 1" at the top?  If you

17  can read No. 1 and No. 2 -- sorry -- where it is actually

18  numbered one and two.  Starting at No. 1, if you can read that

19  and read No. 2 out loud.

20  A.  Before starting to prepare my asylum application, my

21  attorney's office has given me the following warnings regarding

22  asylum applications.  If you knowingly file frivolously

23  application for asylum, you will be barred from ever, from

24  receiving any benefits under the Immigration & Nationality Act.

25  A frivolous application for asylum is one which contains

E41JLIU4                    Yu - direct

1   statements or responses to questions that are originally

2   fabricated, not being grounded and signed knowing that your

3   application is frivolous.

4   Q.  What is a frivolous application for asylum?

5   A.  For me, it means fake asylum.

6   Q.  Did every client have to sign this?

7   A.  Yes.

8   Q.  Why?

9   A.  We give them the warning, they sign the affidavit so

10  someday if we have trouble, we can see they know they must have

11  tell us the truth so we won't take the responsibility for the

12  trouble.

13  Q.  Did any client ever ask you about having to sign this?

14  A.  A few people asked.  Many people don't care what they sign.

15  Q.  What explanation, if any, did you give them?

16  A.  I just explain to them -- there are Chinese translations.

17  Sometimes I ask them to read a Chinese translation.

18  Q.  Did they ever ask why they had to sign it?

19  A.  Few people do that.

20  Q.  Was this something that was required by the asylum office

21  or by the firm?

22  A.  Required by the firm.

23  Q.  Did anyone in particular at the firm tell you to have

24  applicants sign this?

25  A.  Yes.

E41JLIU4                    Yu - direct

1    Q.  Who was that?

2    A.  When I started working at this firm, Ms. Liu trained me and

3    showed me which documents I should ask the client to view or

4    sign.

5    Q.  So after they filled out -- you can take that down --

6    started to fill out the form, they've signed that affidavit,

7    what other information would you or what else would happen at

8    that meeting that you had with the client?

9    A.  I would tell them for their cases what kind of evidence

10   they need to provide us.  If we have time on that date, I will

11   prepare their story.

12   Q.  When you say prepare their story, what do you mean?

13   A.  When I started working at that firm, I don't know there so

14   many fraud cases, I would ask them what happened to you.  Later

15   on you found many people don't have real persecution.  So when

16   I know what kind of claim they pursue, then I just base it on

17   their life experience or background and made up a story for

18   them.

19   Q.  When you say their "background," what sort of information

20   would you get?

21   A.  Age, marriage, work, avocation.

22   Q.  How would you incorporate those into stories?

23   A.  You know, can I think about it?

24           I would just, for example, they start from the city of

25   Fuchin.  I would say that she was leaving there or working

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E41JLIU4                    Yu - direct

1   there -- sorry -- she was working there and living there, she

2   met a boyfriend and blah, blah, just using that information and

3   made up a story.

4   Q.  You would use the information where they're from?

5   A.  Yes, and which school they graduated, which year they

6   started working and where they were working.

7   Q.  Would you typically in these meetings ever discuss the

8   facts of their persecution?

9   A.  No.

10  Q.  You mentioned at the beginning you used to ask them

11  questions?

12  A.  Yes.

13  Q.  What was your experience when you asked them questions like

14  like that?

15  A.  I would ask them tell me what happened to you, how you were

16  persecuted or how you were arrested, tell me something.  I

17  remember the first case, the new case David gave me, that is a

18  female applicant applying for asylum.  Her claim is family

19  planning.  She told me the story she had a boyfriend and she

20  got pregnant before marriage, the guy just gave, gave her a

21  forsed abortion, and I wrote what she told me.

22          Later on many people cannot tell me what happened, so

23  I know no there was no persecution to them, and I just, based

24  on my previous year's experience, I just made up the story for

25  them.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  Q.  When you said they can't tell you what happened, what do

2  you mean?  What would they say if you asked them?

3  A.  Sometimes they just said I don't know how to write.  Ms.

4  Liu said you would help us.  I don't know about the asylum or

5  persecution, just tell me what I should do.

6  Q.  If they did not provide the details of the persecution, how

7  did you know what to write?

8  A.  When I started working, Ms. Liu asked me to look at old

9  files, and we had some samples in our computer.

10 Q.  Samples?

11 A.  Yes.

12 Q.  What do you mean by samples?

13 A.  The samples were created by some people in the office,

14 Harry or somebody else.  For each claim, each category of

15 asylum claim there was a sample story, like the first paragraph

16 introduction of this applicant and the second paragraph is what

17 happened to this applicant and where they were arrested, how

18 they left the country.

19 Q.  The item you're describing was a sort of model that was

20 available to you?

21 A.  Yes.

22 Q.  Would you ever base it on other stories that had already

23 been written for someone else?

24 A.  Yes, I read old cases in the office.

25 Q.  How closely in writing your own stories would you track

1   those stories?

2   A.  Sorry?

3   Q.  How closely would you follow the language of the stories

4   that you were basing it on?

5   A.  I would use -- I never used the same language or sentence,

6   but I used the pattern, the logic of those stories.

7   Q.  You said the same pattern?

8   A.  Yes.

9   Q.  When you say a "pattern," what would be a typical pattern

10  for, say, a family planning claim?

11  A.  Family planning claims for female, forced abortion; for

12  male, their wife suffered a forced abortion and they want to

13  protect their wives, they say officers would detain them.  It

14  was always the same pattern.

15  Q.  What about for Christianity claim?

16  A.  They went to private church.  They don't allow private

17  church in China.  The church cracked down and they were

18  arrested and detained, beat up and they left the country to

19  pursue their freedom of religion.

20  Q.  You mentioned earlier you were trained by Ms. Liu.  How did

21  she train you?

*Contradict with her 3500. She said Victor train her, never said Liu train her*

22  A.  She showed me some -- on the first day I started working,

23  she handed me a bunch of old cases.  She said I need follow-up

24  evidence for those cases.

25  Q.  Follow-up evidence?

1237

E41JLIU4                    Yu - direct

1    A.  Yes.  Those packages were not completed.  We would ask the

2    client to provide more evidence for their cases.  Then she

3    explained to me a form we should ask the client to fill in and

4    sign with information, I should pay more attention, and she

5    asked me to read the stories, yes, that is how she trained me.

6    Q.  How long were you at the job before you realized that the

7    applications were you working on were fake?

8    A.  A few weeks later.

9    Q.  A few weeks later?

10   A.  Yes (*if fraud is everywhere, she as a candidate lawyer need a few weeks
to find out by told Victor. so if Victor did tell her she will never find out
any. even so David or karen never gave her instruction go ahead make a fake one,
if so, she will find out at day one*)

11   Q.  Was there a specific instance that caused you to find out?

12   A.  Actually, my co-worker told me, Victor told me.

13            MR. FISCHETTI:  Objection.

14            THE COURT:  Sustained.

15            MR. EGAN:  What is it?

16            THE COURT:  Who is the co-worker you mentioned?

17            THE WITNESS:  Victor.

18            THE COURT:  I am going to allow it.

19   BY MR. EGAN:

20   Q.  What did he tell you?

21   A.  He told me many cases are not true.  Then I got more and

22   more clients, when I asked them what they happened to them,

23   they cannot tell me the answer.  So I felt they never had

24   persecution.(*She feel no persecution, maybe she is wrong. did David or
Karen has the same feeling. or any knowledge about is. Obvious David or Karen
never tell her go ahead make fake for him.*)

25   Q.  Did that surprise you?

E41JLIU4                    Yu - direct

1   A.  Yes.

2         MR. FISCHETTI:  Objection.

3         THE COURT:  Overruled.  I will allow it.

4   BY MR. EGAN:

5   Q.  Other than Victor, did you in this initial point talk to

6   anyone else at the firm about that?

7   A.  Yes, later I talked to another attorney in my office, and

8   later on when we were closer, Ms. Feng Li and other co-workers,

9   I talked with them.

10  Q.  So while you wrote these stories, would the clients

11  typically be there?

12  A.  Yes.

13  Q.  What else?  I think you mentioned you worked on evidence at

14  this stage as well?

15  A.  Yes.

16  Q.  What sort of evidence would you be working on?

17  A.  I also needed to prepare attesting letters from their

18  families or friends.  In those letters their friends or family

19  should prove the persecution.

20  Q.  You mentioned one of the first steps was talking to a

21  client about what sort of evidence they would need for their

22  claim?

23  A.  Yes.

24  Q.  Did each claim require different kinds of evidence?

25  A.  Everybody must provide an ID, birth certificate.  If

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

1239

E41JLIU4                        Yu - direct

1   they're married, a marriage certificate or their case

2   certificate.  Each client should provide attesting letters from

3   their family or friends and one year evidence.

4   Q.  Starting with those certificates, while you're at the firm

5   did you ever know of an applicant to submit forged

6   certificates?

7   A.  I don't know.  *(No fake certificate submit, as Victor tested.  No contact with Chinese fake document producer either, otherwise she work there for 3 year should would know)*

8   Q.  With respect to the letters, the attesting letters, would

9   those be different depending on what type of claim?

10  A.  Yes.

11  Q.  For a Christianity claim, what sort of attesting letters

12  would an applicant need?

13  A.  For Christian claim, the only way, we prepare three

14  letters, one letter from the applicant's family, another from

15  their church friend, and a third one from their private church

16  in China.

17  Q.  Who would write these letters?

18  A.  Anybody can write them.  What do you mean?  I am sorry.

19  Q.  Who would actually draft them?

20  A.  Okay, the paralegal.

21  Q.  In your time at the firm, you wrote these letters?

22  A.  Yes.

23  Q.  How would you determine who they were from?

24  A.  You know, when I prepared those attesting claims, sometimes

25  I need to ask my friend tell me your church friend's name or

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E41JLIU4                    Yu - direct

1   boyfriend's name.  At that moment they cannot tell me the name

2   because we also need those people's ID to attach to those

3   letters.  Sometimes the client doesn't know which person would

4   help them, I mean a copy of the letter and provide the ID.  So

5   we just leave their name blank, maybe a few days later we'll

6   have the client find the people who would like to help them,

7   tell us the name and we fill in the name.

8   Q.  Where would the content, the actual content from the

9   letters come from?

10  A.  The content?

11  Q.  What the letter said, what it described?

12  A.  Okay.  We just read again their stories.  For example, if

13  this is a Christianity case, and this letter from the

14  applicant's family, they would just say this applicant was in

15  China persecuted and sometime in -- it is almost a repeat of

16  their story.

17  Q.  In writing these letters, would you ever talk to witnesses?

18  A.  No.  When I wrote the letter, I would never do that.

19  Q.  Were these stories written on computer or by hand?

20  A.  Computer.

21  Q.  What about the evidence?

22  A.  Our evidence?

23  Q.  Well, the attesting letters?

24  A.  Yes, in computer.

25              (Continued on next page)

1241
E41Wliu5                     M. F. Yu - direct

1   BY MR. EGAN:

2   Q.  In the computer?

3   A.  Yes.

4           MR. EGAN:  Can I pull up Government Exhibit 677, and

5   can I zoom in on the screen itself.  Actually, zoom out for a

6   sec.  Sorry.  At the very top, in the blue, at the sort of

7   title bar there.

8   Q.  What does that say up there?

9   A.  Attesting letters.

10  Q.  Do you know what CN means?

11  A.  That means Chinese version.

12  Q.  Chinese version?

13  A.  Yes.

14          MR. EGAN:  Can we zoom in on the sort of top portion

15  there.

16  Q.  Take a moment to look at that.  What does that look like to

17  you?

18  A.  That's a draft of attesting letter.

19          MR. EGAN:  And can we actually put up the translation

20  side by side.

21  Q.  Do you see there are a couple places there where it says

22  XXX.  Starting with the date, why would XXXs be used in the

23  date?

24  A.  Based on my experience, when the paralegals preparing these

25  letter, the applicant didn't provide the name of the, of the

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

E41Wliu5                      M. F. Yu - direct

1    peoples so we just use XX to symbolize the name.

2    Q.  To be filled in later?

3    A.  Yes.

4    Q.  What about for the date?  Why would the date have Xs in it?

5    A.  We want to tell the client just to fill the date when your

6    friend copy this letter back hand, I mean, on the date.

7              MR. EGAN:  You can take those down.

8    Q.  After you were done typing up the story and the letters,

9    what would you do with it?

10   A.  I would print them out, hand them to our clients.  Then

11   they will send those letters back to China and ask their

12   families and friends to copy the drafts by hand, then mail

13   back.

14   Q.  Before that step, did your letters and stories have to be

15   reviewed by anybody?

16   A.  Yes.  Yes.  After I wrote a story and attesting letters,

17   Ms. Liu or other attorneys will review them.

18   Q.  When you first started at the firm, who did most of the

19   reviewing?

20   A.  Ms. Liu.

21   Q.  When did you start giving to other attorneys?

22   A.  In about 2009, Feng Li took over the job.  He reviewed my

23   stories and Victor's stories.

24   Q.  And in your experience, even after 2009, would Ms. Liu

25   still review letters and stories?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E41Wliu5                    M. F. Yu - direct

1   A.  Yes.

2   Q.  So what would she do with the letters and stories?

3   A.  She would review the logic and language.

4   Q.  The logic and language?

5   A.  Yes, yes.  And at an early stage of my early stage as a

6   paralegal, I don't have experience.  Sometimes logic of story

7   doesn't sound credible.

8   Q.  When you say the logic of the story, what do you mean?

9   A.  I mean I made up the story so sometimes it doesn't sound

10  like a real story.  So the logic is not sounds like a real

11  story.

12  Q.  When she reviewed that, would she indicate her comments

13  anywhere?

14          MR. FISCHETTI:  Objection.  Leading.

15          THE COURT:  I'll allow it.

16  A.  Yes.  Yes.  She, she would just make note, make notes on my

17  drafts.  Sometimes add and delete some sentence I wrote.
    *(No evidence about the note, if any. she is attorney, she have link with James
    Lin, if there any notes, she will offer with other evidence to the court)*

18  Q.  Say that again.  Add or --

19  A.  And delete the sentences I wrote, and change some scenarios

20  without confirming with the clients.

21  Q.  When you say change scenarios, what do you mean by that?

22  A.  I can, in that draft, I didn't mention the clients was beat

23  up so severely, but she would just add the sentence to describe

24  how or when and how the client was beat up.

25  Q.  Would she ever explain to you why she was making the

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

1244
E41Wliu5                        M. F. Yu - direct

1   changes she made?

2   A.  At first she explain sounds credible, sounds better.

3   Q.  And you said that when she made these changes, would she

4   talk to the client?

5   A.  No.

6   Q.  Were there any other details of the story she would change?

7   A.  Yes.  A few times, she change the claim completely.

8   Q.  What do you mean by that?

9   A.  I had a case that is a female applicant.  At first her

10  claim is family planning and I wrote a story.  Her, she did

11  gave, give birth to boy in government hospital in China.  I

12  just wrote the story based on her real life, just to add some

13  persecution part.  Then I handed the story to Ms. Liu.  But

14  since this woman already gave birth to baby in China, so it's

15  not easy to win the case, Ms. Liu just kept this case.  A few

16  months later, I met this applicant again.  I talked with her.

17  <mark>She said her claim changed to Christianity.  But those cases</mark>

18  <mark>didn't happen very often.</mark>
*(client complain you are lazy and made fake story for her, so she did like you,*
*she ask other paralegal help pursue her real claim)*

19  Q.  When Ms. Liu would make comments, how would she make

20  comments, orally or in writing?

21  A.  In writing.

22  Q.  And where would she make those comments?

23  A.  Just on my drafts.

24  Q.  After you got the comments, what would you do with that?

25  A.  Then I went back to my computer and change my copy based on

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    her, just on her notes, then print the drafts out, let the

2    client copy by hand.

3    Q.  You said let the client copy by hand?

4    A.  Yes.

5    Q.  Why did the client copy by hand?

6    A.  So seems the story were written by themselves.

7    Q.  What about the letter, what would you do with the letters?

8    A.  The same thing.  After Ms. Liu or Feng Li review, I just

9    ask her clients to copy by hand.

10   Q.  And did you give them any instructions with respect to

11   those letters?

12   A.  I'm sorry?

13   Q.  Did you give them any instructions about what to do with

14   those letters?

15   A.  Yes.

16   Q.  What were those instructions?

17   A.  Sometimes we would suggest use different, different style

18   paper to copy the letters.  Don't use the same paper for, for

19   every letters.

20   Q.  And why not?

21   A.  If the same paper, the same, seem like fake.

22   Q.  And any other advice you would give them?

23   A.  Yes.  We want make sure they, the date on the letter are

24   different.

25   Q.  The dates on the letter?

E41Wliu5                    M. F. Yu - direct

1    A.  Yes.

2    Q.  Why was that important?

3    A.  They use the same kind of paper and wrote the letter on the

4    same date, seems too coincident, seems fake.

5    Q.  I think you said earlier they would then send these letters

6    back to China?

7    A.  Yes.

8    Q.  When they were sent back, were they sent back to the

9    applicant or to the firm?

10   A.  To the firm.

11   Q.  So you've mentioned certificates and the letters.  You also

12   mentioned one-year evidence.  What is one-year evidence?

13   A.  One-year evidence, we required the client to prove

14   witnesses.  The witnesses must prove affidavit and the

15   affidavit shows the witness met the applicant in China within

16   one year before the applicants made the asylum application.

17   And also, if they can, we would ask them to provide some

18   shopping receipt or airline ticket to show they, that some of

19   their asylum application one year after they arrive in this

20   country.

21   Q.  In your experience at the firm, were there ever people who

22   had been in the country for more than a year?

23   A.  Many of them.

24   Q.  Dealing with specifically that first type of evidence, how

25   would they get a witness?

1   A.  Sometime they just ask their family or friends do a favor

2   and sometime they, they just use money to pay a witness to

3   testify for them.

4   Q.  Did you ever see, in your experience at the firm, someone

5   who testified as a one-year witness for more than one

6   applicant?

7   A.  Yes.

8   Q.  Were there ones who testified for several applicants?

9   A.  Yes.

10  Q.  You also mentioned getting receipts.  How would a client

11  get receipts showing they'd been in China within the last year

12  when they had not been?

13  A.  Some clients told me their families in China bought the

14  blank receipts and their families are filling the blank

15  receipts just to fill the products they bought in China and put

16  the date in the receipts.

17          THE COURT:  When you said receipts, did you say blank

18  receipts?

19          THE WITNESS:  Yes.

20  BY MR. EGAN:

21  Q.  Other than receipts, were there other types of evidence

22  along the lines of what you're describing?

23  A.  Sometime they, they can buy airline tickets.

24  Q.  An airline ticket?

25  A.  Yes.

E41Wliu5                      M. F. Yu – direct

1   Q.  How would they get an airline ticket?

2   A.  Just they buy the ticket.  I don't know how they get them.

3   Q.  When you say buy the ticket, do you mean a real ticket or

4   fake ticket?

5   A.  Fake ticket.

6   Q.  Would they buy that in the United States or in China?

7   A.  In China.

8          MR. MAHER:  Judge, could we approach briefly.

9          THE COURT:  Yes.

10         (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E41Wliu5                      M. F. Yu - direct

 1          (At the side bar)

 2              MR. MAHER:  Judge, I just wanted to reraise the

 3      objection we made earlier.  Almost every question is being

 4      framed as would, would you have met clients, what would

 5      Mrs. Liu or other lawyers have said, what would they have done,

 6      what would you have done.  There is absolutely no specificity

 7      at all, and I don't think it's proper.  I don't think it's

 8      proper testimony and not proper questions, and my concern as

 9      far as my client, Ms. Bandrich, is that it's going to spill

10      over, that the jurors will think there's just generalized

11      practice going on with no specificity at all.

12              MR. FISCHETTI:  Can I just join in that, please.  I

13      raised that before, Judge, and one of the problems with it is

14      that the questions are inherently leading, Would you, would

15      they, and really suggesting the answer.  And that dovetails to

16      what we're talking about.  The defense of this case, Judge,

17      basically is going to be, and I think the government knows and

18      may well be put forth by me, that there are a number of people

19      that worked for Feng Ling Liu in the firm that may have been

20      doing corrupt things, but she basically didn't know about it.

21      So every time he says the firm, it's Feng Ling Liu's firm and

22      it impacts my client, and I don't think he should use that

23      term.  Your Honor allowed it last time.

24              THE COURT:  Allowed what term?

25              MR. FISCHETTI:  The firm.  I objected to that and your

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   Honor overruled my objection and said they can say the firm.

2   What Mr. Egan is saying, he's making this a fraud factory.

3   That may be his argument, but he can't say the firm.  The

4   testimony that my client trained her is going to be tested by

5   me, and that's okay, if he wants to say that, but he can't keep

6   continually saying the firm would do this.

7            MR. EGAN:  I asked what she did.  I said in your

8   experience at the firm, what did you do when somebody --

9            MR. FISCHETTI:  I think you're saying what would they

10  do, what would the firm do.

11           THE COURT:  I thought I had actually sustained these

12  objections in the past and I think I've indicated once before

13  that the government should be careful to make sure they're

14  eliciting what particular people did, and I know you've been

15  asking what she did, but instead of using the word "would," and

16  I think I've said this before, ask what did happen, what did

17  you see, not what would happen, but what did you see.  And in

18  doing that also be sensitive not to lead, but focus more on

19  what actually happened and who did it and not what would happen

20  as a matter of course.

21           MR. MAHER:  Also what she did, what would she have

22  done.

23           MR. EGAN:  I apologize.  I don't believe I was asking

24  that.  If I was, I'll look back at it.  I'm trying to ask what

25  she did in the circumstances.  Obviously she worked there for

E41Wliu5                        M. F. Yu - direct

 1    three years, and she is trying to provide examples.

 2              THE COURT:  If she provides an example, I think you

 3    can follow up and say when that happened, what did you do, as

 4    opposed to what would you do.  Okay?

 5              MR. EGAN:  All I'm trying to get at is, and it seems

 6    to me completely permissible, you worked here and you dealt

 7    with, and I try to preface it with you dealt with a lot of

 8    situations, did you have people who had been here more than a

 9    year, yes, many of them, how did you handle those situations.

10              THE COURT:  Again, that's fine.  Asking what she

11    actually did is fine.  I think the objection is to the words

12    "what would you do," and I think we have had this conversation

13    before, as opposed to, What did you do when you were

14    encountering X situation.  So let's focus more on what was done

15    and be sensitive to not grouping people together and not talk

16    about the firm, but who did what.  I think you have been

17    focusing on individuals.  Okay?

18              MR. MAHER:  Okay.

19              MR. FISCHETTI:  Thank you, Judge.

20              (Continued on next page)

21

22

23

24

25

E41Wliu5                    M. F. Yu - direct

1          (In open court)

2    BY MR. EGAN:

3    Q.  What documents were included in the initial submission that

4    you made to the asylum office?

5    A.  About the application, I did cover birth certificate,

6    marriage certificate, kid certificate.

7    Q.  What was that last one?

8    A.  Children's certificate.

9    Q.  Children's certificate?

10   A.  Yes.  And the 5A9 application form, their story and their

11   attesting letters and the affidavit from, from the one-year

12   witness.

13   Q.  When all those documents were assembled, who signed the

14   form at that point?

15   A.  Always attorneys sign at the firm.

16   Q.  Was there a particular attorney whose job that was, or

17   could any attorney sign?

18   A.  Could any attorney.  Ms. Liu assign the job which attorney

19   should sign the application.

20   Q.  And who, when you started, were the attorneys at the firm?

21   A.  Ms. Liu herself.

22   Q.  And who were the other attorneys?

23   A.  Then Feng Li sign the application form.  Then I sign and

24   Bebe Xue sign a few and Troy Moslemi sign.

25   Q.  When you signed those forms, would you ever review the

1253

E41Wliu5                        M. F. Yu - direct

1    documents?

2    A.  No.  My job is only to sign on the firm.  I don't have

3    authorization to review the application.

*As lawyer you just sign the paper and don't have right to review it? who will believe it.*

4    Q.  When you say your job is to review the form, who told you

5    that was your job?

6    A.  Ms. Liu said, she call me to sign those forms.

7    Q.  She called you?

8    A.  Yes.

9    Q.  What do you mean by that?

10   A.  Because in 2010, she didn't come to office very often, so

11   we really communicate through phone.  I remember one day she

12   call me, From now on please sign those application forms.

13   Q.  One second.  Let me hand you what's in evidence as

14   Government Exhibits 505, 507, 508, and 513, already in

15   evidence.  I just want to show you some examples.  Starting

16   with 505, if you can take a moment to look at that, do you

17   recognize that?

18   A.  Yes.  I prepared this application form, her story and her

19   attesting letters.  Her story is not true.

20   Q.  In what way is it not true?

21   A.  I wrote the story for her.  She didn't tell me her

22   persecution and even her relationship with her boyfriend I made

23   up.

24   Q.  Do you know whether she had a boyfriend?

25   A.  I don't know.

E41Wliu5                    M. F. Yu - direct

1   Q.  What kind of claim was that?

2   A.  It's a family-planning claim, and in her story she claimed

3   she, the Chinese government gave her forced abortion because

4   she got pregnant before marriage.

5   Q.  And turning to Government Exhibit 507, you can take a

6   moment to just look at that.  Do you recognize that?

7   A.  Yes, I remember this male applicant.

8   Q.  You said male applicant?

9   A.  Yes.

10  Q.  What do you remember?

11  A.  I prepared his story.  He's a very quiet, quiet man.  He

12  didn't talk too much.  I just based on her -- his marriage and

13  when his children were born and made up the story.

14  Q.  So the details you described first, that's what the

15  information you had?

16  A.  Yes.

17  Q.  What kind of claim is it?

18  A.  Family planning.  In the story, he claim his wife suffered

19  a forced abortion and he, when he protected his wife, he was

20  detained by the family planning officers and beat up by the

21  family planning officers.

22  Q.  Now look at Government Exhibit 508.  Do you recognize that

23  one?

24  A.  Yes.

25  Q.  What do you remember about that application?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E41Wliu5                     M. F. Yu - direct

1   A.  I remember this girl.  I, I wrote this story.

2   Q.  What kind of story is it?

3   A.  Also family planning.

4   Q.  What's the nature of the persecution?

5   A.  She, she got pregnant before marriage and family planning

6   officers forced abortion on her baby.

7   Q.  Was that story real or fake?

8   A.  Fake.

9   Q.  What parts of it are fake?

10  A.  From her relationship with her boyfriend to her

11  persecution, all a fake.

12  Q.  All of that is fake?

13  A.  Yes.

14  Q.  Looking at Government Exhibit 513, do you recognize that

15  one?

16  A.  Yes.  It's a Christian case.

17  Q.  What do you remember about that case?  What was your role

18  in that application?

19  A.  I know this story.  I remember this applicant's face.  It's

20  a Christian case.  She -- he said he believed in Christian in

21  China, attending a private church in China, but he was arrested

22  and detained for a while.

23  Q.  Is that story real or fake?

24  A.  Fake.  I wrote it for him.  He didn't tell me.

25  Q.  What, if any, details in there are real?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E41Wliu5                    M. F. Yu - direct

1    A.  I used, when I, maybe I, when I wrote the story, I, I asked

2    him who provide you attesting letter, just to give me the

3    relationship, the people who provide you letter, maybe he tell

4    me his aunt would write a letter for him.  So I just wrote his

5    aunt introduced him to the church.

6    Q.  You can put that down.  Just to be clear, are the

7    applications you're looking at the only fake applications you

8    worked on?

9    A.  No.

10   Q.  After an application was submitted, did the firm have any

11   more interaction with the client?

12   A.  Yes.  We would prepare them for the asylum interview.

13   Q.  Whose job was it to prepare them?

14   A.  Several people did that job.  Harry, Lucy, Lillian, Victor,

15   Andy, Vivian.

*David never prepare them, otherwise he will find out the fraud and stop it.*

16   Q.  Who is Andy?

17   A.  Andy, Andy is Ms. Liu's niece -- nephew.  I'm sorry.

18   Q.  And how long after the application was submitted would the

19   asylum interview take place?

20   A.  A few weeks.

21          MR. EGAN:  I don't know if we're taking an afternoon

22   recess.

23          THE COURT:  Why don't we take a break, but really keep

24   it to five minutes to use the restroom and come back.

25          (Recess)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1     THE COURT:  How are we doing on scheduling?  Same

2   expectation?

3     MS. MERMELSTEIN:  I think we are a little behind where

4   we thought we'd be today, but we still think we will rest this

5   week.

6     (Jury present)

7     THE COURT:  You may proceed.

8     MR. EGAN:  Thank you.

9   Q.  We were talking about preparation for the asylum interview

10  stage.  Did the firm maintain any materials to help with that

11  process?

12  A.  I'm sorry?  Can you repeat.

13  Q.  Did the firm maintain any materials to help with the

14  preparation for the asylum interview?

15  A.  Yes.

16  Q.  What sort of materials?

17  A.  We have some religion knowledge, Christianity knowledge,

18  falun gong knowledge, and the question the asylum officers will

19  ask.

20  Q.  When you say knowledge, what do you mean?

21  A.  We have some Q & A.

22  Q.  Q & A?

23  A.  Yes.  Like the question about the religion and we provide

24  the answer.  We would hand those documents to our client, ask

25  them to memorize those knowledge.

1258
E41Wliu5                        M. F. Yu - direct

1   Q.  And you had these for things other than religion?

2   A.  Yes.  Also for falun gong.

3   Q.  In your experience, how often were clients granted asylum

4   at the asylum interview stage?

5   A.  No more than five percent.

6   Q.  Did the firm take any steps to try to increase the

7   percentage of applicants who were approved at this stage?

8   A.  Yes.

9           MR. FISCHETTI:  Objection.

10          THE COURT:  Sustained.

11  BY MR. EGAN:

12  Q.  Did anyone at the firm take steps to increase the approval

13  rate at this stage?

14  A.  Yes.

15  Q.  Who?

16  A.  Victor You.  In about 2010, Ms. Liu send Victor to asylum

17  office.  He, he worked there as interpreter there, and he

18  listened what the asylum officers would ask, and when he came

19  back to the office, he create a lot of documents, including the

20  Q & A, the asylum officer's question, and which asylum officer

21  is easier to grant the case.

22  Q.  Which asylum officer was easier to grant the case?

23  A.  Yes.

24  Q.  How would the firm, how would, would someone, how was that

25  information used?

1   A.  He create some documents to bring out and hold them on the

2   wall of the office and he also prepare the clients for the, for

3   asylum interview.  He also train other paralegals about the

4   preparation.

5   Q.  Who directed him to do this?

6   A.  Ms. Liu.

7   Q.  What happened if someone is not granted asylum at the

8   interview stage?

9   A.  They need to go to court.

10  Q.  To immigration court?

11  A.  Yes.

12  Q.  So after they get their denial, what's the next step?

13  A.  You mean at the asylum office?

14  Q.  So if they get denied at the asylum office, what's the next

15  step?

16  A.  They would try to schedule master hearing first.

17  Q.  What's a master hearing?

18  A.  The judge set up a meeting.

19  Q.  Set up a meeting, you said?

20  A.  Yes.  And the applicant should appear at the court and the

21  judge would ask the basic information about the, the case and

22  then schedule individual hearing.

23  Q.  What was the time period typically from rejection at the

24  asylum office to a master calendar hearing?

25  A.  I'm sorry.  From asylum office?

E41Wliu5                    M. F. Yu - direct

1   the handwriting there?

2   A.  Yes.  Vanessa's handwriting.

3   Q.  And what about Government Exhibit 402?

4   A.  Vanessa's handwriting, too.

5   Q.  You can put those down.

6           Among the lawyers at the firm, were there any that you

7   were close with or saw socially?

8   A.  Yes.  I was close with Betty, Bebe Xue, Victor, Feng Li,

9   and Vanessa.

10  Q.  What did you guys do together?

11  A.  Sometime we had lunch together and with some people we hang

12  out very often.

13  Q.  How frequently would you have lunch with those people?

14  A.  A few weeks, every few weeks.

15  Q.  Did you guys ever discuss what happened at the office?

16  A.  Yes.

17  Q.  What did you discuss?

18  A.  When we had lunch, we talked the cases we had, we had, and

19  mistakes of those cases and our concerns about the case and our

20  jobs.

21  Q.  When you say concerns about your case and your job, what do

22  you mean by that?

23  A.  You know, because a lot of cases are fake, when people

24  fabricate those documents, they're very easy to make mistakes,

25  so when we represent clients in court, so we have so many

E41Wliu5                          M. F. Yu - direct

1  mistakes, it's so embarrassed, and we know this job is illegal.

2  I, I expressed several times during the lunch and worry about

3  this job, I'm worried about getting into trouble, so I want to

4  quit the job.

5  Q.  Which individuals did you express those concerns to?

6  A.  I expressed to several people, Victor, Feng Li, Vanessa.

7  And other people.

8  Q.  What, if any, response did you get from Victor?

9  A.  Victor?  You mean Victor?  He raise, he quit the job

10  first -- no.  He was fired.

11  Q.  Do you remember ever raising these concerns with Vanessa

12  Bandrich?

13  A.  I'm sorry.  What's the question?

14  Q.  Do you ever remember raising these concerns at a lunch

15  where Vanessa Bandrich was?

16  A.  Her concern or my concern?

17  Q.  Your concerns.

18  A.  My concern.  Yes.  I talked about I'm afraid the office

19  have been targeted by the government because we had many bad

20  cases and before, in two, in the summer of 2011, the office had

21  a very bad case.  My signature in the form, I never reviewed.

22  The asylum officers found out that case.  The applicant just

23  admit everything were prepared by the office, not her, and my

24  signature was there, so I was very scared.  I expressed my

25  concerns many times.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    A.  Yes.

2    Q.  In the immediate lead-up to your leaving?

3    A.  I'm sorry?

4    Q.  Immediately prior.  I know you discussed some other

5    conversations, but immediately prior to leaving, did you have

6    any discussions about concerns that you had?

7    A.  Yes.  I also had such conversation with Ms. Liu in person.

8    Q.  With Ms. Liu?

9    A.  Yes.  As I told, when that bad case happen, there are a lot

10   of rumors around the office, so I think everybody in the office

11   was scared.

12              MR. FISCHETTI:  Objection.  "I think everybody."

13              THE COURT:  Just say what particular people did, to

14   the extent you remember.  Don't kind of group them together and

15   say everyone did this.  Say who you remember doing what.  Okay?

16              THE WITNESS:  Okay.

17              THE COURT:  Thank you.

18   A.  Okay.  You know, one day, Ms. Liu came to the office.  She

19   had a private conversation with Feng Li first.  I sat at same

20   office with Feng Li.  I overheard what they were talking about,

21   and then she moved to my desk and she talked with me about that

22   case and she also said don't worry, if the government give the

23   trouble to this office, the government want her or David, it's

24   not me or Feng Li, so she try to comfort us.

25   Q.  Now, also, going back to sort of preparation, you mentioned

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E41JLIU6                      Yu - direct

1    Q.  When attorneys prepared clients, would they use any of the

2    materials that you described that were used in preparing for

3    the asylum interview?

4    A.  I don't know.

5    Q.  Did you use --

6    A.  Yes, I used those documents.

7    Q.  I want to -- if we can pull up Government Exhibit 407 -- if

8    we can do 407 T as well.

9            Do you recognize that?

10   A.  Yes, that's the Christian knowledge I mentioned Q and A.

11   Q.  Did you use that while working at Feng Ling Liu law firm or

12   Moslemi Associates?

13   A.  Yes.  I often gave those knowledge to our clients before

14   the interview interview and the hearing.

15   Q.  If we can pull up Government Exhibit 408 and 408 T.  Do you

16   recognize this?

17   A.  Yes, it is another version of Christian knowledge.

18   Q.  Did you use this while you were working at Feng Ling Liu or

19   Moslemi?

20   A.  Yes.

21   Q.  How would you use it in your preparation?

22   A.  I would bring them out and hand them to the clients and ask

23   them to memorize every question in this paper.

24   Q.  Looking at Government Exhibit 410, do you recognize that?

25   A.  Yes, also Christian knowledge.

1   Q.  Now, you testified -- you can take that down -- that

2   shortly after you started working there, you realized that most

3   of the applications were fake.

4           Why did you stay?

5   A.  They cannot tell me what happened on them.

6   Q.  Why did you stay at the firm?

7   A.  Because it is a long story.  At first I wanted to take the

8   Bar exam.  Then my husband came to the United States, so we

9   needed a job because I needed status.  My husband got status, I

10  can transfer based on him, so I needed the job.

11  Q.  You testified previously about sharing your concerns with

12  people.  Was there ever a time that people at the firm took

13  steps to protect itself?

14  A.  Yes.

15  Q.  When was that?

16  A.  In early 2009 Ms. Liu changed the firm's name under choice,

17  Moslemi.  In 2011 she asked Harry to create a new firm.

18  Q.  She asked Harry to create a new firm?

19  A.  Yes.

20  Q.  Starting with the name change, did anyone ever tell you why

21  that was being done?

22  A.  Yes.

23  Q.  Who told you?

24  A.  Try and Victor told me.

25  Q.  What did they say?

1272
E41JLIU6                    Yu - direct

1   A.  He said Ms. Liu doesn't want to attract the government's

2   attention because the firm is so big, they have so many cases.

3   Q.  What, if anything, happened around 2009 that led to some of

4   these changes?

5   A.  I am sorry?

6   Q.  What, if anything, happened in 2009 that led to some of

7   these changes?

8   A.  2009, they changed the name while I was preparing for my

9   Bar exam.  When I came back from my vacation, the name already

10  changed.

11  Q.  Was there ever a time where other changes were discussed or

12  implemented?

13  A.  Yes, yes.  In 2009 one day Troy came to our paralegal's

14  office and he said an immigration office in Boston was cracked

15  down by the government because they were doing the same thing

16  like we did.

17          He was scared and then he talked this issue of this

18  Harry.  I believe he also talked the business knew about this

19  case.  So later the office policy changed.  We tried to ask the

20  client to --

21  Q.  First, before you get into that, who communicated these

22  policy changes?

23  A.  I forgot the specific person.  Should be Ms. Liu.

24  Q.  Do you remember any specific --

25          MR. FISCHETTI:  I didn't hear that answer.

 1              THE COURT:  Would you repeat the answer please.

 2              MR. FISCHETTI:  Did you say should be?  I object and

 3     move to strike.

 4              THE COURT:  It is not the specific person should be,

 5     Ms. Liu.  You can't say who somebody should be.  You have to

 6     say what you remember actually happening.

 7              THE WITNESS:  Okay.

 8     BY MR. EGAN:

 9     Q.  Do you remember any specific meeting or changes about a

10     conversation about these changes?

11     A.  Yes.

12     Q.  Describe that meeting.

13     A.  The meeting in our paralegal's office, we were notified,

14     asked the client to draft their story first.  We can change it

15     based on their drafts.

16     Q.  The first step, who called this meeting?

17     A.  I am sorry, I forgot the specific person.

18     Q.  One policy change you said that the clients were going to

19     draft the story first?

20     A.  Yes.

21     Q.  And what other steps?

22     A.  And the client drafted the attesting letter based on their

23     story.  Then we review their story and attesting letter and

24     make some changes.

25     Q.  If the stories weren't real, what did the clients base

1274

E41JLIU6                           Yu - direct

1    their stories on?

2    A.  You know, when I asked the client to write their stories,

3    many, many people don't know how to write.  So I always gave

4    them some samples.

5    Q.  Some samples?

6    A.  Yes.

7    Q.  Did this policy, this having clients write their stories

8    first, did that get implemented?

9    A.  Yes.

10   Q.  How long did it last?

11   A.  For me, I carried out that policy a few months, but I had

12   so many cases, a lot of the clients don't know how to write, so

13   sometimes I just gave up and I wrote for them.
     *(David never allow you wrote for them, you just are lazy, don't have patient)*

14   Q.  You just went back to writing for them?

15   A.  Yes.

16   Q.  What other policy changes?

17   A.  Like we were told never talk sensitive, have any sensitive

18   conversations through phone, always ask the client to come to

19   the office.

20   Q.  Why was that?

21   A.  Because there is a rumor the government has already tapped

22   our phone.

23   Q.  Any other policy changes?

24   A.  Sorry, I forgot.

25   Q.  Those are the ones you remember?

E41JLIU6                    Yu - direct

 1    A.  I am sorry?

 2    Q.  When you would write a story and get comments back, what

 3    would you do with the draft that had comments on it?

 4          MR. GERMAN:  Objection.

 5          THE COURT:  What did you do?

 6    BY MR. EGAN:

 7    Q.  What did you do with the draft that had comments on it?

 8    A.  At first I don't know how to protect myself, so I just

 9    delete the draft.

10    Q.  Did there come a time when that changed?

11    A.  Yes.  In the summer 2010 Ms. Liu asked to destroy the

12    drafts in every files.  She used several months to do this.

13    Q.  Who is Ann?

14    A.  Ann, Ann is another paralegal in the office, and she's a

15    sister of David.

16    Q.  When you say the "files," are those the hard copy files?

17    A.  Yes.

18    Q.  What, if anything, was done to the computer files, if you

19    know?

20    A.  In the computer I always saved the final version.  As I

21    know when Tom, who did the translation, translated the Chinese

22    story to English, he always deleted the Chinese version in our

23    computer.

24    Q.  After Ann was asked to destroy these, did that change your

25    practice?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

E41JLIU6                        Yu - direct

1   A.  At that time I had already been working as an attorney.

2   Q.  So you weren't dealing with the stories any more?

3   A.  I didn't need to write the story.

4   Q.  Did you, in response to these concerns, did you take any

5   personal steps to protect yourself?

6   A.  Yes.

7   Q.  What did you do?

8   A.  Before I left the firm, I had some conversation with

9   Victor.  He said we were getting travel in the future so to

10  protect ourselves, get some documents from the office, maybe

11  someday we will use it to protect ourselves.

12  Q.  Again when did you end up leaving the firm?

13  A.  October 15, 2011.

14  Q.  Why did you leave on that date?

15  A.  My husband H-1 visa expired on October 1st.  I told Ms. Liu

16  I want to quit.

17  Q.  That day you told her?

18  A.  The first week of October, but she wanted me to stay one

19  more week, so I left on October 15th.

20  Q.  Where, if anywhere, did you work after that?

21  A.  From October 15th until I got --

22  Q.  Until you got what?

23  A.  -- deferred action.

24  Q.  What is deferred action?

25  A.  Deferred action is a different action of removal.

1279

E41JLIU6                        Yu - direct

1   A.  Yes.

2   Q.  You would have been able to if you did not have that

3   document?

4   A.  No.

5   Q.  So you needed that document to be able to return?

6   A.  Yes.

7   Q.  You mentioned working with the FBI.  When did the FBI first

8   approach you?

9   A.  February 2012.

10  Q.  How long had you been gone from the firm at that point?

11  A.  Four months.

12  Q.  When they approached you, do you remember who approached

13  you?

14  A.  Yes.  FBI officer Dan Cruz and another officer, I forgot

15  what his name.

16  Q.  What, if anything, did they say to you?

17           MR. FISCHETTI:  Objection.

18           THE COURT:  Sustained.

19  BY MR. EGAN:

20  Q.  They spoke to you?

21  A.  Yes.

22  Q.  After that conversation, did you agree to cooperate with

23  the FBI?

24  A.  Yes.

25  Q.  I am showing you what is marked for identification as

1281

E41JLIU6                    Yu - direct

1    A.  No.

2    Q.  Has the government or anyone else made any promises to you

3    that are not included in that agreement?

4    A.  No.

5    Q.  As part of your agreement, did you plead guilty to certain

6    crimes?

7    A.  Yes.

8    Q.  What crimes are those?

9    A.  Immigration fraud.

10   Q.  Do you remember how many different crimes you pled to?

11   A.  I am sorry?  I forgot.

12   Q.  Did you plead to a count of immigration fraud?

13   A.  Yes.

14   Q.  Did you plead to a count of conspiracy to commit

15   immigration fraud?

16   A.  Yes.

17   Q.  When did you --

18              MR. MAHER:  Is the witness reading the document?

19              THE COURT:  Just answer based on your memory.

20              THE WITNESS:  Yes.

21              THE COURT:  If you can't remember something, just say

22   you can't remember, okay?

23              THE WITNESS:  Okay.

24              THE COURT:  Don't look at a document or anything else.

25              THE WITNESS:  Okay.

1316

E42Wliu1

1          MR. GERMAN:  Yes, your Honor.  It's a pretty

2    straightforward issue.  On potential Government Exhibit 112T,

3    there is approximately eight pages of recorded or transcribed

4    statements.  Essentially, so your Honor understands, the CI

5    goes to the Bandrich law firm and is given his personal

6    statement to review and write out in Chinese.  While he's doing

7    this, he's sitting at a table and the recorder continues to go.

8    The government has transcribed, I believe, six different

9    unidentified individuals in addition to Ms. Yang.  We don't

10   know the context of these conversations.  We don't know who is

11   speaking to whom.

12          First of all, it's hearsay.  We have no idea who these

13   individuals are, and so I approached the government a few days

14   ago.  This isn't a situation, your Honor, where we're just

15   trying to remove two sentences in the middle of a dialogue

16   between the confidential human source and Ms. Yang.  This is

17   straight dialogue for eight straight pages.  So what we're

18   talking about is just blocking out and redacting eight straight

19   pages and simply resuming once the confidential human source is

20   once again having a dialogue directly with Ms. Yang.

21          I think it's hearsay.  I think even if it's relevant,

22   it is very confusing.  We have these unidentified parties.  Who

23   are they?  What are they talking about?  There's

24   unintelligibles all over the place in this part of the

25   transcript.  And I thought we would be able to resolve it.  I

E42Wliu1

1        MR. EGAN:  I'd ask you to stop there.

2   Q.  Ms. Yu, first of all, the two voices that the jury heard

3   there, who were those two voices?

4   A.  Vanessa and me.

5   Q.  Had you ever heard while working at the firm Ms. Liu or

6   rumors that Ms. Liu wanted to close down the office?

7   A.  Yes.

8        MR. MAHER:  Judge, I'm going to object as far as

9   rumors.

10       THE COURT:  Sorry.  I didn't hear the basis of the

11  objection.  Oh, as far as rumors.

12       MR. MAHER:  Yes.

13       THE COURT:  Yes.  I think that's right.  Sustained.

14  BY MR. EGAN:

15  Q.  Had you ever heard that?  First of all, when you're

16  discussing Ms. Liu here, we've heard a number of Ms. Lius, who

17  do you mean?

18  A.  Feng Ling Liu.

19  Q.  Have you ever heard from anybody that she was considering

20  closing down the office?

21  A.  Yes.

22       MR. MAHER:  Objection to leading, your Honor.

23       THE COURT:  Please don't lead.  Just ask who she heard

24  something from, if she heard it.

25       MR. EGAN:  I was just trying to establish if she heard

E42Wliu1

1     something like that.

2     Q.  Who did you hear that from?

3     A.  I heard it from Feng Li and Ann.

4     Q.  And Ann?

5     A.  Yes.

6     Q.  What did Feng Li tell you?

7     A.  Feng Li says Ms. Liu talked with him before and she

8     expressed her concern about safety of the firm and she said she

9     was thinking about to close the firm, but she also said her

10    husband, David, wants Feng Li to keep the business going.

11    That's --

12    Q.  What do you mean by the safety of the firm?

13              MR. FISCHETTI:  Objection.

14              MR. EGAN:  It's her statement.

15              MR. FISCHETTI:  What did she mean?

16              MR. EGAN:  No.  What did the witness mean when she

17    just testified about safety of the firm.

18              THE COURT:  Just tell us what you meant, not what you

19    think that someone else might have meant.  Okay?

20              THE WITNESS:  Okay.

21    A.  I mean the safety of the office.  I mean we're doing a lot

22    of illegal thing.  We filled a lot of fraud application, and we

23    were worried about the government target at us, our office.

24    Q.  Do you recall the incident that is described here where

25    Ms. Liu tried to comfort you?

E42Wliu1

1  A.  Yes.

2  Q.  Describe the circumstances of that.

3  A.  In summer, in about July 2011, a female applicant failed a

4  fraud application and the asylum officers just found evidence

5  against her and she, when asked at interview she told asylum

6  officer our office prepared a story for her, prepared

7  everything for her.  So my signature was on that application.

8  That female applicant returned to our office after the asylum

9  interview.  She told what happened at the asylum office to

10  Ms. Liu and David.  Ms. Liu and David ask her to write

11  affidavit saying that it's her who wrote the statement, she

12  never told us she been living in this country more than one

13  year.  And they also ask her to hide it from the government,

14  and I was very worried about this case because my signature was

15  on the application form.  Li Feng also worry about and I also

16  talk with Ann, Lillian.  I express my concern to those people,

17  so one day --

18          MR. MAHER:  Objection at this point, Judge.  It's no

19  longer responsive.

20          THE COURT:  I'll let her finish her answer.

21  A.  One day, Ms. Liu came to our office.  She had talked to

22  Feng Li first about this case and about the worries and the

23  concerns around the office.  Then she came to my desk and she

24  said, Don't worry about that case, they will handle well, and

25  if the government wants give some trouble to this office they

E42Wliu1

1   want her and David, it's not me and Brandon.

2   Q.  I want to turn your attention in the transcript to page 16

3   where it begins, "So Ms. Liu."

4          MR. GERMAN:  Ms. Geier, can we play that.

5          (Audio recording played)

6   BY MR. EGAN:

7   Q.  Ms. Yu, while you were working at the firm, did you ever

8   cut and paste a story directly?

9   A.  I never done that.

10  Q.  Why not?

11  A.  Most time, I made up the story, but I would write a new one

12  based on, based on life experience of the applicants.

13  Q.  Why is it a problem to cut and paste?

14  A.  They will look very similar.

15  Q.  In terms of similarity, when you said, "Every time a

16  Christian story comes, same thing," what did you mean by that?

17  A.  I mean for every Christian story, we have the same story

18  logic, same story pattern.  First paragraph we would introduce

19  to applicant background where he come from, how he believe

20  Christianity.  And then second paragraph we would say where he

21  attended private church in China.  And the third paragraph we

22  would say how he was arrested, he was detained and beat up.

23  Then last we would say how he left the country.  Always the

24  same thing.

25  Q.  If I can ask you now to turn to 133T, what is this?  You

E42Wliu1

1    said this was a transcript of another recording you made.  Who

2    was involved in this?

3    A.  Vanessa and me.

4    Q.  What were the circumstances?

5    A.  We had lunch at same cafeteria.

6    Q.  And when did this take place?

7    A.  June 2012.

8    Q.  I ask you to turn to page three.  About two-thirds of the

9    way down, it says, "Just like what I told you before."

10             MR. EGAN:  And, Ms. Geier, we can play that.

11             (Audio recording played)

12             (Continued on next page)

13

14
15
16
17
18
19
20
21
22
23
24
25

E240liu2                    M.Yu - direct

1   A.  If I can pause there for a second.

2        The amendment to the application that are described,

3   when you worked at the firm, did you ever have to do things

4   like that?

5   A.  Yes, many times.

6   Q.  Under what circumstances?

7   A.  When we prepared package, we, the paralegal often made

8   mistakes in the stories or attesting letters, so to corrected

9   those mistakes, we wrote something, an amendment.

10  Q.  What kind of mistakes?

11  A.  All kinds of mistakes.  Because the stories are not true.

12  It's made up by the paralegals.  It is not easy to make a

13  perfect line.  So they often made mistakes.  For example, the

14  date, the -- in the letter, in a statement, it was said the

15  applicant was detained for, for example, eight days.  But in

16  when preparing attesting letters, the paralegal carelessly

17  wrote six days, so such kind of mistakes.

18  Q.  When that happened, when those mistakes were made, what did

19  you do?

20        MR. MAHER:  Objection, formulation.

21        THE COURT:  What did you do?

22  A.  When I was working as a paralegal, I would have prepared

23  another attesting letter from the same person to explain why

24  they made a mistake in the last letter.

25        MR. EAGAN:  We can keep playing.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1338

E240liu2                          M.Yu - direct
1              (Tape played)

2              MR. EAGAN:  Looking back, when you said, you know,

3      these things happen every day, what things are you referring

4      to?

5      A.  Refer several things.  First, lot of cases we found have a

6      lot of mistakes.  And many client have no idea about asylum.

7      So they just ask our office to do everything for them.

8              Sometimes they are very carefulized about our job.

9      And paralegals sometimes are very careful as to prepare the

10     evidence, to choose the evidence.

11             We also -- some ladies who are asylees, they get their

12     green card from asylum.

13     Q.  And towards the bottom of it, when you said, Yes, they

14     really don't deserve, who are you referring to, they?

15     A.  I mean the clients.

16     Q.  I want to -- and let me ask you this.  You also said:  I

17     don't think the government will ban this.

18             What did you mean by that?

19     A.  I mean I don't think the U.S. government will ban those

20     asylum in the future.

21     Q.  I want to -- if I can ask you to skip to 139.  You

22     testified yesterday that's a transcript of a conversation.

23             Who was involved in that conversation?

24     A.  Vanessa Foley and me.

25     Q.  And where did this take place?

E240liu2                    M.Yu - direct

1    A.   At the same cafeteria.

2    Q.   Say that again?

3    A.   The same cafeteria.

4    Q.   And approximately when was that?

5    A.   July 2012.

6    Q.   I just want to play a short part.  If we can go to page

7    four, towards the bottom, when it says: When I have to.

8              (Tape played)

9    BY MR. EAGAN:

10   Q.   Are you familiar with the case she is describing?

11   A.   I'm not very familiar with that.

12   Q.   Why is it a problem if someone had come to the country

13   previously and not asked for asylum?

14   A.   I'm sorry?

15   Q.   Why is it a problem, if someone had come to the country

16   previously and not asked for asylum?

17   A.   Oh.  If they suffer persecution, they know U.S. Government

18   accept asylum, why they wait so long to make their application,

19   that would be issue for the ground of the case.

20   Q.   Did you ever have cases like that?

21   A.   I -- I don't have such kind of case.

22   Q.   I want to, I want to -- we're skipping ahead to 154.  If

23   you can, you can see there are several parts of that

24   transcript.  But let me ask you, first, was there anybody else

25   that the FBI asked you to record conversations with?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E240liu2                        M.Yu - direct

1   A.  Yes.

2   Q.  And Liu is Feng Ling Liu?

3   A.  Yes.

4   Q.  I'm going to ask you, if you can, starting at the bottom of

5   12, to read the parts that are you, and Ms. Mermelstein will

6   read the parts of Feng Ling Liu.

7   A.  Okay.

8   Q.  So starts where it says:  What about the client.

9           Now.

10          "FENG LING LIU: I said that there was a significant

11   level dependence.

12          "YU:  Oh.

13          "FENG LING LIU:  They do not want to think.  You tell

14   them one less thing, and that's where they leave live it.  That

15   is it, that is that.

16          "YU:  It used the be the case as well, the level of

17   the dependence used to be significant too.

18          "FENG LING LIU:  That's what I'm saying.  So it is

19   relatively more painful when you work on it. Hm.

20          "YU:  What I worry the mostly is that things are okay

21   in terms of discussion at the office, but they immediately

22   forget what they prepared as soon as they arrive in court.

23          "FENG LING LIU:  Yeah, so you need to repeatedly

24   emphasize with her, and that everyone needs to be taught these

25   things when they come in.  These, whatever you say in front of

E240liu2                        M.Yu - direct

1    me today, that's what you say, even if there is a knife on your

2    neck when you go to court.  If they pressure you about what

3    time on that day, what was the weather like that day, and so

4    on, and you have no idea, you cannot simply spit it out if they

5    ask you three times.  Some people make it up carelessly.  After

6    you make up the first sentence, you won't be able to make up

7    the next sentence, and they will be exposed in a short

8    amount of time.  So I think you need to emphasize repeatedly

9    for each case, and then the assistant needs to make it very

10   clear, when making preparations not, to think that you are

11   smart and you can deceive other people. Hm.

12              MR. EAGAN:  Stop right there.

13              And if we can -- go ahead to 154E-T.

14   Q.  So that was a call at the end of August.  Did you place

15   another call?

16   A.  Yes, in early September 2012.

17   Q.  And --

18              MR. FISCHETTI:  May I have a moment to find it,

19   please?

20              MR. EAGAN:  Okay.

21              MR. FISCHETTI:  Thank you.

22              Okay, got it.

23   BY MR. EAGAN:

24   Q.  So when did this next phone call happen?

25   A.  September.

E240liu2                          M.Yu - direct

1   Q.  September?

2   A.  Yes.

3   Q.  And who was on the call?

4   A.  Ms. Liu and me.

5   Q.  And if I can have you turn to the bottom of page 2 where

6   you say: Attorney Liu.

7          At the very bottom.

8          "YU:  Attorney Liu, I wanted to tell you this.  I will

9   also talk it over with Shu Feng.  I want to go back to work, I

10  have been thinking for a long time.  Besides, I got along with

11  my co-workers.  However, when we talked about it, I was a

12  little bit worried.  The reason is that I quit a job because

13  the work was quite stressful and it was quite intense.  There

14  were many issues of the several cases around the time I left.

15         "FENG LING LIU:  (Clears throat)

16         "YU:  And then I was a bit worried every time when I

17  would stand in court, I feel very stressful.  I kept thinking

18  that the client would all of a sudden say, well, she fabricated

19  this story, she taught me how to say that.

20         And there was a lot of, during the period, later on,

21  he got documentation and he said when I look for another job,

22  so I quit.

23         I'm thinking is it possible that when I go back to

24  work, whatever type of work it will be, even one that is lower

25  paid, but I don't particularly want to go to court.  I'm

E240liu2                          M.Yu - direct

1    think -- I think that I can get that done well.

2         "FENG LING LIU:  Mm, mm, okay. (Clears throat) That,

3    unintelligible, keeps going.

4         "YU:  Primarily, I'm under quite a bit of

5    psychological pressure and particularly nervous when go to

6    court, and always afraid that client will blame everything on

7    me.  And then, later, the last several months I will feel very

8    stressed.  I read that somewhere one will say that we made up

9    the story.  I could not be sure of that, so I feel that I am

10   better off staying in the office.

11        "FENG LING LIU:  Mm, mm, mm, okay.

12        "YU:  And in terms of the --"

13        MR. EAGAN:  Stop there.

14        THE WITNESS:  Okay.

15   Q.  Ms. Yu, I want to return to, was that the last phone call

16   you had with her?

17   A.  Yes.

18   Q.  I want to return, briefly, to something you had referred to

19   yesterday.

20        Yesterday, you mentioned the firm getting a new name,

21   and the firm splitting apart, as to safety measures they had

22   taken.

23        When the firm changed names, what if anything changed about

24   how the firm was operated?

25   A.  Nothing changed.

1347

E240liu2                    M.Yu - direct

1    Q.  After the firm changed names, who was your boss?

2    A.  Ms. Liu.

3    Q.  Do you remember when the second office opened?

4    A.  You mean Vanessa's office?

5    Q.  Correct.

6    A.  In about 2010; summer 2010.

7    Q.  Did you discuss, with anyone at the Feng Ling Liu firm, why

8    that happened?

9    A.  Yes, I talked with Feng Li and Vanessa and Rachel.

10   Q.  What did Vanessa say about the switch of the firm or

11   opening a new firm?

12   A.  She said Ms. Liu wanted her to open new firm under her

13   name.  She said she was not sure whether she would do that,

14   because there would be a lot of responsibility and the

15   pressure.  And, at first, she said she would think about it.

16   Q.  Did she express any other concerns about doing it?

17   A.  That's what she told me.  I talked to Mrs. Feng Li and

18   Victor.  Feng Li and Victor told me Ms. Liu wouldn't do that

19   because our office has so many cases, we have attracted a lot

20   of attention from the government.  Ms. Liu was worried about

21   that.  She even sent somebody to court to count how many cases

22   we had every day, compare other, the cases from other firms.

23   So she want to start a new office and separate the case to that

24   new one.

25           MR. EAGAN:  If I can have one moment, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1367

E240liu2                    Yu - cross

1   Q.  The government basically asked you to be deceitful to her,

2   correct?

3   A.  It's not -- it's not a deceit.

4   Q.  That's not deceit?  So you were honest about it?

5   A.  The government asked me to do it.

6   Q.  I'm not asking you about what the government told you?

7   A.  Okay.

8   Q.  You were not being honest with Vanessa about the

9   circumstances of your sitting down and having lunch with her,

10  were you?

11  A.  Yes.

12  Q.  That was not just what you were doing, you were not just

13  having lunch with her, right?

14  A.  No.

15  Q.  You were trying to get her to say something incriminating

16  on a secret recording device on yourself, correct?

17  A.  Yes.

18  Q.  So would you agree with me that that type of behavior is a

19  form of deceit?

20  A.  I cannot agree with you.

21  Q.  You can't agree with me?

22  A.  I'm sorry.

23  Q.  We'll agree to disagree.  We'll move on.

24      You were contacted -- I'll use this word "contacted" -- by

25  the FBI in February of 2012?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1489

E430liu1                      M. Yu - cross - Maher

1              Right?

2    A.  Yes.

3    Q.  And if -- we'll play it again and I want to see if you hear

4    these words.  Instead of I just heard a funny story, you also

5    say:  You know -- that's not a big deal, though.

6              So you say:  You know, Karen fired Shu.

7              Vanessa says:  Sorry.

8              You say:  Karen fired Shu, you don't know that.

9              Then some unidentified female yells:  Happy Mother's

10   Day.

11             And then Vanessa says:  Who is Karen?

12             And then you say:  Feng Ling Liu, Ms. Liu.

13             And Vanessa says:  Oh.

14             And you say:  Sorry.

15             And then Vanessa says:  She fired Shu?

16             And then you say:  You don't know that?

17             MR. MAHER:  So if we can go back to 1850, please.

18   Thank you.  We might need to switch back, please.  Thank you.

19             THE DEPUTY CLERK:  Right now?

20             MR. MAHER:  Thank you.

21             THE DEPUTY CLERK:  And this is for everybody?

22             MR. MAHER:  Yes, thank you.

23             (Audio recording played)

24             MR. MAHER:  Stop here, please.

25   Q.  Did you hear more words this time?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1529

E430liu1                    M. Yu - cross - Maher

1   Q.  So James Lin actually invited you to his house for

2   Thanksgiving?

3   A.  Yes.

4   Q.  And did you attend?

5   A.  Yes.

6   Q.  And did you go with your husband?

7   A.  On that -- no, on that day, my husband was still in China.

8   He was not here.

9   Q.  Did James Lin ever tell you that he thought that the FBI

10  was investigating your law firm?

11  A.  He urged me to leave the office, he doesn't think this is a

12  good job for me.  He didn't say the FBI or the government is

13  actually investigating, but he said there is a possibility.

14  Q.  He told you to leave the law office?

15  A.  Yes.

16  Q.  When did he do that?

17  A.  Before I left the firm.

18  Q.  Before you left the law firm?

19  A.  Yes.

20  Q.  So, that would be before what date?

21  A.  Before August of 2011.

22              (Continued on next page)

23

24  BY MR. MAHER:

25  Q.  Before August of 2011?

E43Wliu2                     M. F. Yu - cross

1    THE COURT:  Mr. Fischetti.

2    CROSS-EXAMINATION

3    BY MR. FISCHETTI:

4    Q.  Now, as you sit here today, testifying before this jury,

5    you are a convicted felon, are you not?

6    A.  Yes.

7    Q.  And according to you, everything you're telling this jury

8    is the truth, is that correct?

9    A.  Yes.

10   Q.  And you've told us, have you not, that the only person or

11   persons that can tell if you're telling the truth is the

12   government attorneys, is that right?

13   A.  Yes.

14   Q.  And if they believe you're telling the truth in this case,

15   then you'll get them to say to the judge give her substantial

16   assistance because she cooperated and take that into

17   consideration when you get sentenced, is that right?

18   A.  Yes.

19   Q.  And you told us you're facing 15 years, is that right?

20   A.  Yes.

21   Q.  And you told us that you hope you get zero.  Weren't those

22   your words?

23   A.  Yes.

24   Q.  And that's why you testified here, is that correct?

25   A.  Yes.

1   Q.  Now, when you met with the prosecutors, you learned that

2   they wanted to get evidence against other people, did you not?

3   A.  Yes.

4   Q.  And one of those persons was my client, right?

5   A.  Yes.

6   Q.  So you were aware, were you not, that if you could get

7   evidence against her to tell to this jury, that would be

8   helpful to you with regard to your sentence?  Is that true?

9   A.  Yes.

10  Q.  So you told them a number of things about my client that

11  you said were crimes, right?

12  A.  Yes.

13  Q.  Crimes that you were, in fact, involved with?

14  A.  Yes.

15  Q.  And after they he interviewed you on a number of times,

16  they asked you to go out and try to get evidence to support

17  your testimony to them about your crimes, isn't that right?

18  A.  Yes.

19  Q.  And you tried to do that, isn't that correct?

20  A.  Yes.

21  Q.  And one of the ways you tried to do it is to get her on a

22  recording admitting that she committed these crimes, is that

23  true?

24  A.  Yes.

25  Q.  And that would have been very good for you, right?

1   A.  Yes.

2   Q.  And that's what the government wanted you to do, is that

3   correct?

4   A.  Yes.

5   Q.  And you recorded her, I think, two or three times, with

6   basically the same conversation about going back to work,

7   right?

8   A.  Yes.

9   Q.  And, of course, that was a ruse; you really weren't going

10  to work there, right?

11  A.  I'm sorry?

12  Q.  That was a ploy, that wasn't the truth, you really didn't

13  want to go back to work there?

14  A.  I don't want to go back to work there.

15  Q.  You were just using that as an excuse to talk to her?

16  A.  Yes.

17  Q.  Saying that, you know, you came back from Chicago and you

18  really didn't want to go back to work for her and do certain

19  things, is that correct?

20  A.  Yes.

21  Q.  And that was your conversation with her, the recording that

22  we heard here, right?

23  A.  Yes.

24  Q.  And the purpose of that recording was to have her

25  incriminate herself and say that there were false stories,

E43Wliu2                    M. F. Yu - cross

1    isn't that right?

2    A.  Yes.

3    Q.  And to have her say that she had you make up these false

4    stories, is that correct?

5    A.  Yes.

6    Q.  And to have her say that you made up affidavits and had

7    people sign them that really weren't valid because they just

8    signed, isn't that right?

9    A.  Yes.

10   Q.  That was your purpose, okay?

11   A.  Yes.

12   Q.  And you recorded her on those conversations, I think, about

13   August 30, is that about right?  Does that seem right to you?

14   A.  The first was August 30 and the second one --

15   Q.  September 5?

16   A.  September 5, yes.

17   Q.  Those were the recordings, and in those recordings, you

18   were very friendly with her?

19   A.  Yes.

20   Q.  In fact, there were parts of the recording where she even

21   said to you, Let's go to lunch and chat, do you remember that?

22   A.  Yes.

23   Q.  And you could have had lunch with her, could you not?

24   A.  I could.  She refused my invitation.

25   Q.  The government refused to have you have lunch with her, is

E43Wliu2                    M. F. Yu - cross

1   that what you said?

2   A.  No, no, no.  I mean Ms. Liu refused my invitation for the

3   lunch.

4   Q.  Oh, okay.  Now, if you had lunch with her or talked to her,

5   you had learned to use a recording device, isn't that right?

6   A.  I don't know, because, you know, her husband call me before

7   and her husband ask my husband and me to go outside, have lunch

8   with him.  So I thought maybe I should, but later on he didn't

9   call me back.  So when I call Ms. Liu, I think maybe I should

10  bring up and invite them again.

11  Q.  Okay.

12  A.  Yeah.

13  Q.  My question was you learned how to use a recording device

14  that you could put on your person.  Isn't that correct?

15  A.  Yes.

16  Q.  Because when you spoke to my client, that was just a

17  telephone conversation, isn't that right?

18  A.  Yes.

19  Q.  You never met her in person after September 5, is that

20  correct?

21  A.  No.

22  Q.  And do you know the date when she was arrested in this

23  case?

24  A.  December 2012.

25  Q.  So that was four months after you made the recordings,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   isn't that right?

2   A.  Yes.

3   Q.  And during those four months, you never went to see her,

4   isn't that right?

5   A.  No.

6   Q.  You never went to see her wearing a recording device, did

7   you?

8   A.  No.

9   Q.  You never called her on the telephone again, did you?

10   A.  No.

11   Q.  The FBI never said to you, Hey, we've got this recording,

12   but this isn't enough, you have to go see her again to get her

13   to admit the false stories, did they ever tell you that?

14   A.  No.

15   Q.  Did they ever tell you you should talk to her again on the

16   phone and have her try to admit that she made you write false

17   stories?  Did they ever say that to you?

18   A.  After that, no.

19   Q.  No?

20   A.  No.

21   Q.  And in that conversation with her, did she ever say to you,

22   You know, you don't have to come back and write false stories?

23   Did she ever say that to you?

24   A.  No.

25   Q.  Did she ever say to you, You can come back, but you don't

1   have to do anything like you did before, writing false stories,

2   affidavits, or anything like that?

3   A.  No.

4   Q.  Did she say that to you?

5   A.  No.

6   Q.  Not at all.

7           MR. FISCHETTI:  Judge, I'm going to go into another

8   area, if that's okay.  You said quarter to, but I'll keep

9   going.

10          THE COURT:  Why don't we take our lunch break and

11  resume at 2:00.  Please keep an open mind and remember not to

12  discuss the case.

13          (Jury excused)

14          THE COURT:  Is there anything we need to discuss?

15  Have you resolved the issue with the transcript for purposes of

16  cross-examination?

17          MR. GERMAN:  The recordings.

18          THE COURT:  The recordings.  Okay.  See you at two.

19          (Luncheon recess)

20

21

22

23

24

25

E430LIU3

```
 1                          AFTERNOON SESSION

 2                               2:00 p.m.

 3              THE COURT:  Is everyone ready for the jury?

 4              MR. MAHER:  Could we have two minutes, Judge.

 5              THE COURT:  Sure.

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

E430LIU3

1       (In open court)

2       (Jury present)

3       (Witness resumes the stand)

4       THE COURT:  You can be seated, Ms. Yu.

5       MR. EGAN:  May I resume, your Honor?

6       THE COURT:  Yes, of course.

7       MR. EGAN:  Good afternoon, everybody.

8    CROSS-EXAMINATION (Continued

9    BY MR. FISCHETTI:

10   Q.  When we left, I asked you a question about was there some

11   arrangements for lunch -- and I'm going to call my client

12   Karen, is that okay?

13   A.  Okay.

14   Q.  Okay?

15   A.  Okay.

16   Q.  And Karen asked you to go to lunch, and you said I asked

17   her to go to lunch.  Do you recall that?

18   A.  Yes.

19   Q.  And you were correct.  Can you pull out for us, 154B in the

20   transcripts.  Do you have it, Ms. Yu?

21   A.  Yes.

22   Q.  Could you turn to page 4, half way down the page.  Are you

23   with me?

24   A.  Yes.

25   Q.  I want to read this part of it to you, which says: Well,

 1   let's do this.

 2          Okay?

 3   A.  Okay.

 4   Q.  Basically what you are doing in that conversation is trying

 5   to get some kind of meeting with Karen; is that right?

 6   A.  Yes.

 7   Q.  And you say:  Well, let's do this when I come back from

 8   Chicago, let's get together for a meal in early July when I

 9   asked David I was going the ask everyone to get together and

10   have a meal.  Later, when I called David, he said that you were

11   really busy and that you were probably sick, too.

12          Did you think she was ill?

13   A.  Who?

14   Q.  Did you think my client, Karen, was ill?

15   A.  Yes.  David told me.

16   Q.  Oh, okay.

17          And things never worked out.  How about we get

18   together for lunch or breakfast when I come back from Chicago.

19   Let's chat and decide when I should go back, would that work.

20   And then she asked you, going to Chicago, and you say this

21   weekend.

22          And can you turn the page and Karen says: I have been

23   quite busy lately.  Let me see, why don't you discuss it with

24   your husband.  And if you have ideas, give me a call and we

25   could talk about it.  There is no need to wait to get together

1603
E430LIU3                    M. Yu - cross - Fischetti

 1   until you come back.

 2          Now, you were going to Chicago, right?

 3   A.  Yes.

 4   Q.  And she's saying to you, we don't even have to wait, right,

 5   until you get back from Chicago, we could talk.

 6          Isn't that what she's saying?

 7   A.  Yes.

 8   Q.  Okay.  Anyway just let me know what you think, I will, that

 9   is if I am able to do it, I will try my best to do it, get it

10   done.  Let's make it clear and talk about everything before you

11   come back, so that there won't be anything awkward or

12   unpleasant in the future.

13          Did you read that?

14   A.  Yes.

15   Q.  And basically Karen was telling you that she was willing to

16   talk to you any time you wanted to; isn't that right?

17   A.  Yes.

18   Q.  And she was willing to meet with you any time you wanted to

19   meet?

20   A.  No.

21   Q.  Right?

22   A.  She said, no necessary to -- not necessary to meet, we can

23   talk on the phone.

24   Q.  Well, so it's your position, after reading all of these

25   transcripts, that my client was afraid to meet with you; is

                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

1   that your position?

2   A.  I don't mean she is afraid to meet with me, but at that

3   moment I think she meant it is not necessary to meet and

4   discuss things, we can talk on the phone.

5   Q.  I see.  Just talk about it on the phone about you coming

6   back to work?

7   A.  Yes.

8   Q.  She was not avoiding you, was she?

9   A.  I don't think.

10  Q.  She was willing to talk to you any time you wanted to talk

11  to her, isn't that right?

12  A.  Yes.

13  Q.  And basically she told you, also, that -- if you look

14  toward the bottom of page 5 -- that I have not been in the

15  office lately.

16          Do you recall --

17  A.  Yes.

18  Q.  -- her saying that?  Now, this is the conversation that you

19  testified about when you were on direct examination.  Do you

20  recall that?

21  A.  Yes.

22  Q.  And could you turn to page 1 and look at the conversation.

23  Back there in the middle, my client says to you:  How have you

24  been recently.

25          Do you remember that, do you see that?

1   A.  Yes, I see it.

2   Q.  And you say:  I have been staying at home anyway.  The job

3   hunt has not been going smoothly.

4           And then -- and then she says:  And when you came

5   back, I was not here, been hanging around all summer long, so I

6   did not go to the office.  Anne told me about what you wanted

7   and I said that there were enough people right now, so I needed

8   to make arrangements.  Do you recall that?

9   A.  Yes.

10  Q.  And then on the next page talking about arrangements, if

11  you are looking about the third line down, she says:  Right now

12  there is basically -- there is an attorney who is about to

13  leave, therefore, there is a vacancy.

14          Is that correct?

15  A.  Yes.

16  Q.  And talking about a vacancy.  So that she would ask you to

17  come back to the firm to rehire you; is that right?

18  A.  Yes.

19  Q.  And on the next page, page 3, they talk about the fact, or

20  my client says there are a lot fewer cases before.

21          Do you remember that?

22  A.  Yes.

23  Q.  And then down below that she says: Sometimes five or six

24  cases.

25          Do you see that?

1   A.  Yes.

2   Q.  There is nothing in there that indicates that she is saying

3   that there is less cases because there is an investigation

4   pending, is there?

5   A.  No.

6   Q.  There is nothing in there that says there is less cases

7   because people are believing that she is engaged in fraud, is

8   there?

9   A.  No.

10  Q.  Now, further on, if you look at page 7, at the top of the

11  page, you're speaking.  And you say:  Then I have another small

12  concern.  One of the reasons I did not particularly want to

13  stay on the job was that I was worried about this, this whole

14  signature thing.  Can I not just sign the 589s when I go back.

15          And what did you mean by that, when you said that to

16  her, what were you trying to get her to say?

17  A.  I'm sorry?

18  Q.  What was your purpose in saying that?

19  A.  Oh, I -- I just told her I don't want to sign on

20  application.  Because when we was doing attorney job at office,

21  I sign a lot of application without review those stuff.  And

22  I -- I know lot of the fraud application and when my name was

23  on the application, I should take the responsibility.

24  Q.  So that was your purpose in saying that, right?

25  A.  Yes.

1   Q.  But you didn't say that did you?  I mean you didn't say I

2   don't want to sign the 589s because there is a lot of fraud

3   going on, did you?

4   A.  I didn't say that word.

5   Q.  You didn't say anything like that, did you?

6   A.  No.

7   Q.  You didn't say I don't want to sign them because they were

8   false, right?

9   A.  No.

10  Q.  You didn't say I didn't want to sign them because I knew

11  that was a crime, right?

12  A.  Yes.

13  Q.  You just said you didn't want to sign them, is that right?

14  A.  Yes.

15  Q.  And do you recall Karen saying to you that the 589s were

16  signed by Troy?  Further down.

17  A.  Yes.

18  Q.  And do you see where she says, further down when you say,

19  yes, yes, yes, and she says that:  I remember before you left,

20  I made the change, and had Troy sign.  Do you recall her saying

21  that?

22  A.  Yes.

23  Q.  And you said:  Oh, I forgot.

24          Right?

25  A.  Yes.

1608

E430LIU3                    M. Yu - cross - Fischetti

1   Q.  And then below that, she says: Troy signs all of the 589s

2   now.

3          Do you see that?

4   A.  Yes.

5   Q.  And in the middle, on the next page, you say:  All right

6   that's all right then.

7          And she says:  Okay.  I won't have you sign the 589s.

8   Troy always has been signing.

9          Do you see that conversation, do you see that?

10  A.  Yes, I see that.

11  Q.  Is there anything in those conversations, anything that

12  contains the fact that there was a crime going on?

13  A.  No.

14  Q.  Is there anything in that, in those facts, that indicates

15  that my client was committing a fraud with the 589s?

16  A.  No.

17  Q.  Is there anything in those conversations indicating that my

18  client knew about false applications being signed?

19  A.  No.

20  Q.  Let's turn to page 9.

21          Now, what we're doing, is we're going through

22  exhibit 1548T, which is a conversation between you and Karen,

23  is that right?

24  A.  Yes.

25  Q.  It is 31 pages.  If you look at the last part --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E430LIU3                    M. Yu - cross - Fischetti

1    A.  I'm sorry, which page?

2    Q.  Thirty-one pages?

3    A.  Okay.

4    Q.  And on direct examination, the attorney for the government

5    read some portions of this conversation to you and the jury,

6    isn't that right?

7    A.  Yes.

8    Q.  He didn't read these, though, did he?

9    A.  Didn't read what, I'm sorry?

10   Q.  He didn't read what we are just reading now, did he?

11   A.  No.

12   Q.  All right.  Let's look at page 9.

13          Karen says: Now, if you come back, you will still need

14   to write more briefs, you will be writing more.  At this point,

15   we'll lose fewer cases.  Approximately two to three briefs a

16   month.  In a week, in a week, would average, at the most brief

17   would about --

18          And then somewhat inaudible.

19          And you say:  It is probably the same as before, no

20   big change, is there.

21          And she says:  No, no, no, there is a lot less

22   business than it used to be.

23          Now, when you -- you have read that.  That's what it

24   says, isn't that right?

25   A.  Yes.

                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

1   Q.  And when you said, No big change, is there, you were trying

2   to get her to say, No, there isn't, we're doing the

3   applications just the way we did before.

4          Isn't that what you wanted her to say?

5   A.  Yes.

6   Q.  Isn't what you wanted her to say some indication that she

7   knew that a fraud was going on, is that right?

8   A.  Yes.

9   Q.  I mean that was your purpose, wasn't it?

10  A.  Yes.

11  Q.  And she doesn't, does she?

12  A.  No.

13  Q.  Now going further down, it says you, saying to her -- well,

14  let me read the next couple, too, because I think it is

15  important.

16         She says:  It's less business.

17         And you say:  Oh.

18         And then she goes saying:  Our master, we have very

19  few individual cases.  Back then, usually 13 to 14 were normal.

20  But now there are many weeks where there are no more than 10.

21  There are a lot fewer cases than before.

22         And then, you say: What I was saying was that new

23  cases carry about the same contents as those in the past.  I

24  have not done it for a long time.

25         And what you were trying to get her to say is, yeah,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1611

E430LIU3                        M. Yu - cross - Fischetti

1    the contents are the same, we still file false applications.

2    That was what you were attempting to get her to do, isn't that

3    right?

4    A.  Yes.

5    Q.  And that was your job, that was your purpose in being

6    there, right?

7    A.  Yes.

8    Q.  And she answers:  Oh, about what you said, there are

9    significant changes to the law.  Same set of things.

10              Right, isn't that what she says?

11   A.  Sorry, sir, I think there is a translation mistake here in

12   the Chinese.

13   Q.  Did I read it wrong?  I'm sorry, I didn't understand what

14   you said, Ms. Yu.

15   A.  There is a translation mistake, I believe, in Chinese.  It

16   says there is no significant change.  But in the English, it is

17   there are significant change to the law.

*(a lot of the translation error in the government exhibit)*

18   Q.  So you're saying that this transcript that you have, and I

19   have --

20   A.  Yes.

21   Q.  -- is not accurate?

22   A.  Yes.  I just find out.

23   Q.  Well, how do you know that.  Did you -- this was in

24   Mandarin?

25   A.  I can read Mandarin Chinese.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E430LIU3                    M. Yu - cross - Fischetti

1    Q.  Excuse me?

2    A.  I can read Mandarin Chinese.

3    Q.  Well, how do you know that -- let me get this straight now,

4    let's back up a little bit.

5            What it says in the transcript, is:  Oh, about what

6    you said, there are significant changes to the law, same set of

7    things.

8            That is what is written, right?

9    A.  Yes.

10   Q.  And you say it says:  About what you said, there are no

11   significant changes to the law.

12           Right?

13   A.  Yes.

14   Q.  And you just realized that now?

15   A.  Yes.

16           MR. EGAN:  Your Honor, may I have a sidebar for a

17   minute.

18           THE COURT:  Sure.

19           (Continued on next page)

20

21

22

23

24

25

E430LIU3                        M. Yu - cross - Fischetti

1           (At the side bar)

2           MR. FISCHETTI:  I'm reading from a transcript that has

3    been -- that has been given to us, by the government, which we

4    have stipulated is an accurate transcript.  There is a -- to

5    use the word --

6           THE COURT:  Not a stipulation.

7           MR. FISCHETTI:  I withdraw it.

8           The stipulation has been given to us by the government

9    as an accurate transcript of the conversation.  There is a

10   significant, if I could use that word, difference between the

11   two words, okay.  And the only thing I can do with it -- and I

12   would like to do it and I want to do it outside the jury's

13   presence -- is to ask for an agreement by the government that

14   this transcript was given to us as an accurate transcript of

15   the conversation, and the transcript said A.

16          And I don't see how they can object to that, but I

17   would like to ask them first.

18          MR. EAGAN:  It is in evidence.  What are you --

19          MS. MERMELSTEIN:  They offered it as a government

20   exhibit.

21          MR. FISCHETTI:  But she's saying it is wrong.

22          THE COURT:  I know.

23          MR. FISCHETTI:  And they gave it to me, so how do I

24   correct that.  I'm not asking for advice.  The only way I can

25   correct them is have them say this is what they gave me and

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

E430LIU3                      M. Yu - cross - Fischetti

1      this is what I'm using, and they offered it in evidence as this

2      conversation, and now you're saying it is wrong.

3            THE COURT:  I think that's clear in the record,

4      number 1.  I think Mr. Maher has done a lot of

5      cross-examination about errors in the translation.  I think the

6      jury hears that.  I think your cross-examination and her

7      agreement that that was an error is also heard by the jury.

8            If you want to call your own translator, you're

9      welcome to do so.

10           MR. FISCHETTI:  I don't want to do that, I just want

11     the jury --

12           THE COURT:  I can't make them stipulate.

13           MR. FISCHETTI:  I'm not asking them to stipulate.  I'm

14     saying that I am going to say, I am letting them know, first,

15     that this transcript was given to me by the government as an

16     accurate transcript.

17           THE COURT:  I don't think you should say that, but you

18     can ask her did the government give this to you and ask you to

19     look it over, and it will be clear that it was in the

20     government's possession.

21           They have already put on their witness.

22           MR. FISCHETTI:  Good enough, okay.

23           (Continued on next page)

24

25

 1          (In open court)

 2    BY MR. FISCHETTI:

 3    Q.  Ms. Yu, this is not the first time you have seen this

 4    transcript; is that correct?

 5    A.  Yes.

 6    Q.  As a matter of fact, you saw these transcripts when they

 7    were given to you before you testified here, isn't that right?

 8    A.  Yes.

 9    Q.  And you reviewed those transcripts at that time, isn't that

10    correct?

11    A.  Yes.

12    Q.  And these transcripts were given to you by the government,

13    right?

14    A.  Yes.

15    Q.  And they told you, before you testified, here, to review

16    the transcripts to see if they were accurate, isn't that right?

17    A.  Yes.

18    Q.  And you read those transcripts and told them, before they

19    were admitted as evidence to the jury, that they were accurate;

20    is that correct?

21    A.  Yes.

22    Q.  And when did you discover, now, that that word is

23    different?  When did you learn that?

24    A.  I'm sorry?

25    Q.  When did you realize that that word, that you said is wrong

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

E430LIU3                    M. Yu - cross - Fischetti

1   in the transcript, is wrong?

2   A.  When you read the English part.  But I was reading the

3   Chinese version.

4   Q.  So you never read the English version, is that what you are

5   saying?

6   A.  No, I -- I read the English version, but maybe I didn't

7   read them very carefully.

8   Q.  And when you read this was wrong, did you run to the

9   government and say, look, the transcript that we gave the jury

10  as evidence is incorrect.  Did you tell them that?

11  A.  No.

12  Q.  But you are saying it now, right?

13  A.  Yes.

14  Q.  You are saying, now, that the transcripts that the jury

15  has, right now, that were given to them by the government, are

16  wrong.  Is that your testimony?

17  A.  Yes.

18  Q.  Okay.  Going on with that conversation, on the next page my

19  client says to you, There is no change in this regard, that

20  about the preparation for master calendar cases, I'm thinking

21  that after you come back, you will go to court, prepare

22  clients, followup on cases that need additional materials, the

23  cases that Judge asked for additional materials.  And then you

24  will write briefs on any case, probably one week, on average

25  this is what we have, at most.  Take that into your

1   consideration, I guess, because Rob also has to write briefs.

2   So it should be that this is part of the work.  But there is

3   not a lot of quantity.

4          Do you see that, there is not a lot of quantity?

5   A.  Yes.

6   Q.  I think in as far as preparation for going to the master

7   calendar, I will probably give you two or three cases, but I

8   might also give you three or four master cases to prepare.  I

9   think that some of my clients are dumb, and you need to start

10  from scratch.  Sometimes a lot of energy gets wasted and that's

11  annoying.

12          Do you read that?

13  A.  Yes.

14  Q.  She is basically telling you what you're going to have to

15  do when you come back to work, right?

16  A.  Yes.

17  Q.  And there is nothing in there, at all, indicating that she

18  wants you to write false stories, is there?

19  A.  No.

20  Q.  There is nothing in there indicating that you have to

21  change stories that are given to you by the applicants, is that

22  correct?

23  A.  Yes.

24  Q.  There is nothing in there that tells you that she is going

25  to prepare drafts of what you do, so that you can change

E430LIU3                    M. Yu - cross - Fischetti

1    stories to fit the asylum process, is there?

2    A.  Yes.

3    Q.  This is just basically telling you what kind of job you are

4    going to have, right?

5    A.  Yes.

6    Q.  And, again, the reason why you are there is to try and find

7    my client, getting information from her, that she is involved

8    in a fraud that you committed; isn't that right?

9    A.  Yes.

10   Q.  I mean there is no question that you were involved in

11   fraud, is there?

12   A.  I'm sorry?

13   Q.  You.  That you were involved in preparing false

14   applications --

15   A.  Yes.

16   Q.  -- for asylum interviews.

17          That's what you pled to, right?

18   A.  Yes.

19   Q.  So there is no doubt that you did that.  But there is

20   nothing in these conversations that indicates that my client

21   told you to do it, is there?

22   A.  In Li's conversation, no.

23   Q.  Just a couple of more things.  When we get to page 15, you

24   say:  Why is there fewer cases lately.  We, before I left,

25   these cases were pretty good.  Each month there were 20 or 30.

1619

E430LIU3                    M. Yu - cross - Fischetti

1    And sometimes there were 30 and 40 new cases.

2            And basically what you are trying to get her to say

3    is, look, we have got fewer cases because we have knowledge of

4    an investigation that's going on, so we had to cut down; right?

5    A.  No.  That's not my purpose.  I just ask her why there were

6    fewer cases recently.

7    Q.  In other words, this was just a ordinary question.  This

8    was not a question to try and get her to incriminate herself?

9    A.  No.

10   Q.  No?  Okay.  And she answers the question, she says:  I

11   don't know, I think, you know, when did you leave, in November?

12           And then you go on after that.  And you told us that

13   is 31 pages.  But that was just one of the telephone calls that

14   you had, is that correct?

15   A.  Yes.

16           MR. FISCHETTI:  May I have a second?

17   Q.  All right, I would like you to look at government

18   exhibit 154T.  And this is the one September 5th.

19           THE COURT:  Does it have a letter after it, 154 --

20           MR. FISCHETTI:  Yeah, E.  I'm sorry, everybody.

21   Q.  So this was on September 5th, right?

22   A.  Yes.

23   Q.  And this is, again, a telephone conversation.

24   A.  Yes.

25   Q.  And I want to turn you to page 2, bottom of the page.  And

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

1   you say:  Attorney Liu, I wanted to tell you this.  I will talk

2   it over with --

3            And I can't pronounce that.  Is that your husband?

4   A.  Yes.

5   Q.  May I say your husband?

6   A.  Xiao Fei.

7   Q.  Xiao Fei?

8   A.  Yes.

9   Q.  Okay.  I wanted to go back.  I want to talk to my husband

10  Xiao Fei.  I want to go back to work.  I have been staying for

11  a long time.  Besides, getting along with my co-workers, when

12  we talked about it, I was a little worried.

13           You then say, the reason I quit was because the work

14  was stressful, was quite intense.  There was some issues with

15  several cases about the time I left.

16           Is that right?

17  A.  Yes.

18  Q.  My client, Karen, doesn't say anything.  Right?

19  A.  Yes.

20  Q.  The purpose of this is basically to have Karen say that she

21  knows about the stress you had, because she knows about your

22  work with the false applications, is that right?

23  A.  Yes.

24  Q.  Well, she doesn't say that, does she?

25  A.  No.

1621

E430LIU3                    M. Yu - cross - Fischetti

1   Q.  You then say:  I was a bit worried every time I would stand

2   in court.  I was very stressful.  I kept thinking that the

3   client would, all of a sudden, say, well, she fabricated this

4   story, she taught me how to say it.

5          Now, that's what you said to induce Karen to say to

6   you, well, don't worry about fabricating the story, we'll get

7   away with it or something like that indicating that she knew

8   that; isn't that right?

9   A.  Yes.

10  Q.  And then you say:  And there was a lot of, during the

11  period, later, on documentation.  And he said why not look for

12  another job, so I quit.

13         And that's, basically, your husband?

14  A.  Yes.

15  Q.  Right?

16  A.  Yes.

17  Q.  So isn't it fair to say, Ms. Yu, that when you said you

18  were afraid that this witness would say she fabricated the

19  story, she taught me how to say it, you're talking about an

20  asylum applicant who is before the Court that might say to the

21  judge, if he or she got caught with a false story, that he or

22  she made me do it?

23  A.  Yes.

24  Q.  And isn't that understood to mean that the client would get

25  caught, and lie that the client told you to do it, and that's

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1622

E430LIU3                    M. Yu - cross - Fischetti

1    what you were afraid of?

2    A.  No.

3    Q.  No?

4    A.  No.

5    Q.  That's not the proper interpretation you say, is that

6    correct?

7    A.  No, because I --

8    Q.  Okay, that's enough.  If you say that's not, that's not.

9         And these are the very -- these are the very parts of

10   the conversations that were read to you by the government, is

11   that right?

12   A.  I'm sorry?

13   Q.  This was read to you by the government, those pieces that I

14   just read to you, right?

15   A.  Yes.

16   Q.  Now, I want to go to the last one, which is September 5th,

17   again.  And that's 154FT.  And I want to just ask you a couple

18   of questions about that.  The government read some of this to

19   you.  You see, the government started reading:  Did you say

20   that you wouldn't want to go to court.

21        Yeah, I feel that actually going to court is actually

22   a pretty proceduralized process.  If the client has been

23   properly prepped, makes no difference who to take them to

24   court.  I feel we can train those in the office, as Andy and

25   Lillian, if we could train them to go to Court, I think we can

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1623
E430LIU3                    M. Yu - cross - Fischetti

1   get that done as well.

2        At this point, you were a lawyer, is that correct?

3   A.  Yes.

4   Q.  And you say here, If the client has been properly prepped.

5   Do you see that?

6   A.  Yes.

7   Q.  If you are going to court, isn't it a lawyer's duty to

8   prepare a client to go to court?

9   A.  Yes.

10  Q.  And don't we say, as lawyers, to prep a client.  Is that

11  right?

12  A.  I'm sorry?

13  Q.  Don't we use these words "to prep a client," before he goes

14  to court?

15  A.  Yes.

16  Q.  In fact, you were prepped just before you testified here,

17  is that correct?

18  A.  Yes.

19  Q.  Nothing wrong with that, is there?

20  A.  No.

21  Q.  And, again, you talked about being on psychological

22  pressure, about the client would blame everything on me.  Do

23  you see that?

24  A.  Yes.

25  Q.  You're not saying that the client would tell the Court that

1   you did everything, and that he was involved with you.  You

2   just say he would blame everything on you, right?

3   A.  Yes.

4   Q.  Even if he did it himself, he would blame it on you, right?

5   A.  I not mean that, I'm sorry.

6   Q.  Okay, I'll move on.

7         Now you made these conversations on August 30th and

8   September 5th of 2012.

9   A.  Yes.

10  Q.  When did you start cooperating with the government?

11  A.  March 2012.

12  Q.  March 2nd, I think was your first interview; is that right?

13  A.  Yes, yes.

14  Q.  And you told us, as I recall your direct testimony, that

15  they told you that they wanted you to do certain things to help

16  them investigate a case so that you could gain a cooperation

17  agreement; is that right?

18  A.  Yes.

19  Q.  And one of those things you did was make secret recordings,

20  is that right?

21  A.  Yes.

22  Q.  And do you recall when the first recording was made?

23  A.  Probably April or May 2012.  I cannot remember the date.

24  Q.  Would you accept my representation that it was May 11th,

25  2012, having a lunch with Bandrich.  Does that sound about

1  right?

2  A.  Maybe.

3  Q.  And then June 14th, 2012, with Bandrich, do you recall

4  that?

5  A.  Yes.

6  Q.  And then on June 30th, you had phone calls with Moslemi and

7  spoke with David, do you recall that?

8  A.  Yes.

9  Q.  And on June 30, a phone call to Moslemi and spoke with

10  Lillian and Wen ting, do you recall that?

11  A.  Yes.

12  Q.  And none of those calls were with Karen, right?

13  A.  No.

14  Q.  And then we go to July 11.  And you had dinner with Feng

15  Li, right?

16  A.  Yes.

17  Q.  She's another attorney that was there at the firm, right?

18  A.  Yes.

19  Q.  And then you had dinner with him on July 11th?

20  A.  Right.

21  Q.  Yes.  And on July 15th, you recorded Feng Li again, right.

22  A.  Yes.

23  Q.  And then on July 16th, you had lunch with Feng Li and

24  Bandrich, and you recorded them; isn't that right?

25  A.  Yes.

1   Q.  And then you had a phone call with Moslemi and you spoke to

2   David and Wen Ting and you didn't speak to Karen, right?

3   A.  Yes.

4   Q.  August 7th, you actually went to the Moslemi firm?

5   A.  Yes.

6   Q.  And you spoke to Wen Ting Zheng and Lillian, is that right?

7   A.  Yes.

8   Q.  But not with Karen?

9   A.  No.

10  Q.  And August 29th, you had a phone call with Winnie Zheng; is

11  that correct?

12  A.  Yes.

13  Q.  So all during this time, the government never told you to

14  have any contact with Karen, isn't that right?

15  A.  No.  They want me contact with Karen, but I don't have

16  reasonable excuse.

17  Q.  Oh, so they told you please contact Karen.  And you said it

18  is not a good idea because I don't have a good excuse to do it,

19  is that your testimony?

20  A.  Yes.

21  Q.  And then you speak to her September 5th, and you had these

22  phone calls, is that right?

23  A.  Yes.

24  Q.  And then after September 5th, you never speak to her again,

25  at all, and she is arrested in December.  That's four months.

1   Is that right?

2   A.  Yes.

3   Q.  But during this telephone call, these telephone calls,

4   Karen asks you to call her again to speak to her about the job,

5   is that right?

6   A.  You mean during the last call?

7   Q.  Yeah, during the phone calls.

8   A.  I remember she said she will call me if -- if she wanted me

9   to go back.

10  Q.  The point is, during that time when you were cooperating --

11  A.  Uh-huh.

12  Q.  -- and you were speaking to Karen --

13  A.  Yes.

14  Q.  -- you were friendly, right?

15  A.  Yes.

16  Q.  You were friendly in your conversations with her, right?

17  A.  Yes.

18  Q.  You invited her to lunch, isn't that right?

19  A.  Yes.

20  Q.  She told you to call her back about your job, right?

21  A.  Yes.

22  Q.  There is no question that after September 5th you could

23  have called her again, isn't that right?

24  A.  I could, but I don't want, because I --

25  Q.  Just tell me if you could have --

1628

E430LIU3                    M. Yu - cross - Fischetti

1   A.  Yes.

2   Q.  -- we'll get to why you didn't.

3   A.  Oh, okay.

4   Q.  You could have, right?

5   A.  Yes.

6   Q.  You could have picked up the phone and said have lunch, I

7   have got something to tell you, isn't that right?

8   A.  Yes.

9   Q.  You could have met with her and said, look, I don't want to

10  talk on the phone, because there could be a problem, but the

11  reason why I really don't want to come back is I don't want to

12  get involved with with false stories anymore, at a restaurant,

13  alone.  You could have done that, right?

14  A.  Yes.

15  Q.  But you didn't, right?

16  A.  No.

17  Q.  And the government never told you to do that, isn't that

18  correct?

19  A.  Yes.

20  Q.  I want to talk to you a little bit about what you told us,

21  and maybe you can explain this to me.  You said there was an

22  occasion where you found out about a bad case?

23  A.  Yes.

24  Q.  And it really concerned you, right?

25  A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   you say:  Attorney Liu, I wanted to tell you this.  I will talk

2   it over with --

3           And I can't pronounce that.  Is that your husband?

4   A.  Yes.

5   Q.  May I say your husband?

6   A.  Xiao Fei.

7   Q.  Xiao Fei?

8   A.  Yes.

9   Q.  Okay.  I wanted to go back.  I want to talk to my husband

10  Xiao Fei.  I want to go back to work.  I have been staying for

11  a long time.  Besides, getting along with my co-workers, when

12  we talked about it, I was a little worried.

13          You then say, the reason I quit was because the work

14  was stressful, was quite intense.  There was some issues with

15  several cases about the time I left.

16          Is that right?

17  A.  Yes.

18  Q.  My client, Karen, doesn't say anything.  Right?

19  A.  Yes.

20  Q.  The purpose of this is basically to have Karen say that she

21  knows about the stress you had, because she knows about your

22  work with the false applications, is that right?

23  A.  Yes.

24  Q.  Well, she doesn't say that, does she?

25  A.  No.

1   Q.  You then say:  I was a bit worried every time I would stand

2   in court.  I was very stressful.  I kept thinking that the

3   client would, all of a sudden, say, well, she fabricated this

4   story, she taught me how to say it.

5           Now, that's what you said to induce Karen to say to

6   you, well, don't worry about fabricating the story, we'll get

7   away with it or something like that indicating that she knew

8   that; isn't that right?

9   A.  Yes.

10  Q.  And then you say:  And there was a lot of, during the

11  period, later, on documentation.  And he said why not look for

12  another job, so I quit.

13          And that's, basically, your husband?

14  A.  Yes.

15  Q.  Right?

16  A.  Yes.

17  Q.  So isn't it fair to say, Ms. Yu, that when you said you

18  were afraid that this witness would say she fabricated the

19  story, she taught me how to say it, you're talking about an

20  asylum applicant who is before the Court that might say to the

21  judge, if he or she got caught with a false story, that he or

22  she made me do it?

23  A.  Yes.

24  Q.  And isn't that understood to mean that the client would get

25  caught, and lie that the client told you to do it, and that's

E430LIU3                    M. Yu - cross - Fischetti

1   what you were afraid of?

2   A.  No.

3   Q.  No?

4   A.  No.

5   Q.  That's not the proper interpretation you say, is that

6   correct?

7   A.  No, because I --

8   Q.  Okay, that's enough.  If you say that's not, that's not.

9            And these are the very -- these are the very parts of

10  the conversations that were read to you by the government, is

11  that right?

12  A.  I'm sorry?

13  Q.  This was read to you by the government, those pieces that I

14  just read to you, right?

15  A.  Yes.

16  Q.  Now, I want to go to the last one, which is September 5th,

17  again.  And that's 154FT.  And I want to just ask you a couple

18  of questions about that.  The government read some of this to

19  you.  You see, the government started reading:  Did you say

20  that you wouldn't want to go to court.

21           Yeah, I feel that actually going to court is actually

22  a pretty proceduralized process.  If the client has been

23  properly prepped, makes no difference who to take them to

24  court.  I feel we can train those in the office, as Andy and

25  Lillian, if we could train them to go to Court, I think we can

E430LIU3                    M. Yu - cross - Fischetti

 1   get that done as well.

 2               At this point, you were a lawyer, is that correct?

 3   A.  Yes.

 4   Q.  And you say here, If the client has been properly prepped.

 5   Do you see that?

 6   A.  Yes.

 7   Q.  If you are going to court, isn't it a lawyer's duty to

 8   prepare a client to go to court?

 9   A.  Yes.

10   Q.  And don't we say, as lawyers, to prep a client.  Is that

11   right?

12   A.  I'm sorry?

13   Q.  Don't we use these words "to prep a client," before he goes

14   to court?

15   A.  Yes.

16   Q.  In fact, you were prepped just before you testified here,

17   is that correct?

18   A.  Yes.

19   Q.  Nothing wrong with that, is there?

20   A.  No.

21   Q.  And, again, you talked about being on psychological

22   pressure, about the client would blame everything on me.  Do

23   you see that?

24   A.  Yes.

25   Q.  You're not saying that the client would tell the Court that

1624

E430LIU3                    M. Yu - cross - Fischetti

1    you did everything, and that he was involved with you.  You

2    just say he would blame everything on you, right?

3    A.  Yes.

4    Q.  Even if he did it himself, he would blame it on you, right?

5    A.  I not mean that, I'm sorry.

6    Q.  Okay, I'll move on.

7         Now you made these conversations on August 30th and

8    September 5th of 2012.

9    A.  Yes.

10   Q.  When did you start cooperating with the government?

11   A.  March 2012.

12   Q.  March 2nd, I think was your first interview; is that right?

13   A.  Yes, yes.

14   Q.  And you told us, as I recall your direct testimony, that

15   they told you that they wanted you to do certain things to help

16   them investigate a case so that you could gain a cooperation

17   agreement; is that right?

18   A.  Yes.

19   Q.  And one of those things you did was make secret recordings,

20   is that right?

21   A.  Yes.

22   Q.  And do you recall when the first recording was made?

23   A.  Probably April or May 2012.  I cannot remember the date.

24   Q.  Would you accept my representation that it was May 11th,

25   2012, having a lunch with Bandrich.  Does that sound about

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    Q.  It concerned you because you had signed it, right?

2    A.  Yes.

3    Q.  And according to you, you would get in trouble for signing

4    it if anybody found out?

5    A.  Yes.

6    Q.  So you were nervous?

7    A.  Yes.

8    Q.  You were concerned?

9    A.  Yes.

10   Q.  You went to Karen and talked to her about it?

11   A.  I'm sorry, what are you saying?

12   Q.  You went to Karen and talked to her about it?

13   A.  Yes.

14   Q.  And she tried to comfort you, you said, right?

15   A.  Yes.

16   Q.  And you signed the case, you signed it, right?

17   A.  Yes.

18   Q.  And you told Karen about it --

19   A.  Yes.

20   Q.  -- isn't that right.

21          Can you tell me the name of the case?

22   A.  I don't remember the name.  It's a female applicant,

23   because when I sign on the application, I didn't review the

24   content.  And the first time I met that female applicant is on

25   the day she return from the asylum office.  And I never met her

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1630
E430LIU3                    M. Yu - cross - Fischetti

1    and talk with her.

2    Q.  Okay, but you are telling the jury there exists a bad case,

3    right?

4    A.  Yes.

5    Q.  There exists a bad case in Feng Ling's office, right?  It

6    was from Feng Ling's office, the bad case, this asylum

7    application?

8    A.  Yes.

9    Q.  Okay.

10            And you were involved in it because you signed it,

11   right?

12   A.  I signed on it.  I'm sorry?

13   Q.  You didn't sign the application, and that's what you were

14   worried about?

15   A.  I signed it.

16   Q.  That's what I'm saying.  And you signed this bad case,

17   right?

18   A.  Yes.

19   Q.  And it concerns you, right?

20   A.  Yes.

21   Q.  And according to you, under oath, you're telling us that

22   this exists, this bad case; isn't that right?

23   A.  Yes.

24   Q.  And the government gave you a list of, a very list, of all

25   of the cases you signed; isn't that right?

 1   A.  No, they didn't give me.

 2   Q.  Did they give you that list?  No, they didn't?

 3   A.  They didn't give me all of the cases I sign.  It gave me

 4   part of the cases I signed.

 5   Q.  Okay, so it gave you part of the cases you signed --

 6   A.  Yes.

 7   Q.  -- right?  Was that case on the list so I can check what

 8   you are saying is true?

 9   A.  Yes.

10   Q.  What is the name?

11   A.  If you can check on the government record, you check the

12   asylum interview record in about July --

13   Q.  July what?

14   A.  2011.

15   Q.  Okay.

16   A.  I believe the asylum officer tried to contact her again.

17   Q.  But I want to know the name of the case so I can find it.

18   A.  I don't have the name.

19   Q.  The name or the number of the case.

20   A.  I don't remember the name, because I sign a lot of cases.

21   Q.  You don't remember the name, but just let me see if I can

22   understand this.  I'll accept your answer --

23   A.  Okay.

24   Q.  -- okay, I'm not trying to trick you in any manner.

25           You signed the application, isn't that right?

1632

E430LIU3                    M. Yu - cross - Fischetti

 1   A.  Yes.

 2   Q.  You are saying it is a bad case, isn't that right?

 3   A.  Yes.

 4   Q.  You had to have looked at the name of the applicant, didn't

 5   you?  Did you look at the name of the applicant when you knew

 6   it was a bad case?

 7   A.  Yes, I --

 8   Q.  Did you know it was a bad case, then, when you saw the name

 9   of the applicant?

10   A.  Yes.

11   Q.  And can you tell the jury, now, who that was?  The name.

12   Yes or no?

13   A.  I -- when I found that bad case, I -- I read her

14   application, and I -- at that time, I know -- I -- I knew her

15   name, but I forgot right now.

16   Q.  So you forgot her name right now?

17   A.  Yeah, I know her --

18   Q.  That was important to you, wasn't it.  I mean this was

19   something that was really, really troubling you.  You were

20   concerned that you could get arrested for this, right?  Weren't

21   you?

22   A.  Yes.

23   Q.  And as you sit here, now, talking about this bad case to

24   the jury, you don't remember her name, as you sit here now?

25   A.  Yes, I don't remember.

E430LIU3                    M. Yu - cross - Fischetti

1    Q.  You don't remember her name.  That's all I want to know.

2    A.  Okay.

3    Q.  If you remember it while we're talking, if you suddenly

4    remember it, just please tell me.

5    A.  Okay.

6    Q.  When you went to work for the Feng Ling law firm, you went

7    to work, according to you, that it was a legitimate firm, is

8    that right?

9    A.  Yes.

10   Q.  And, then, as you started to work, you realized that fraud

11   was going on, is that right?

12   A.  Yes.

13   Q.  And then, as you further went on, you realized that Karen,

14   the person who owned the firm, was participating in the fraud,

15   is that right?

16   A.  Yes.

17   Q.  And you learned that she was going to ask you to

18   participate in the fraud yourself, isn't that right?

19   A.  Yes.

20   Q.  And participate in the fraud by writing false applications,

21   is that correct?

22   A.  Yes.

23   Q.  False stories, right?

24   A.  Yes.

25   Q.  Find false documents, right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E430LIU3                    M. Yu - cross - Fischetti

1   A.  Yes.

2   Q.  Now, at that point, you were in the United States and you

3   wanted to become a lawyer; is that right?

4   A.  Yes.

5   Q.  So here you were, working for a firm that you thought was

6   legitimate, all of a sudden they said they wanted you to be

7   involved in criminal work; isn't that right?

8   A.  Can you repeat the question, I'm sorry.

9   Q.  I'm sorry.  All of a sudden you learned when you were

10  there, that to stay there, you would have to commit crimes,

11  isn't that right?

12  A.  Yes.

13  Q.  You didn't leave, did you?

14  A.  No.

15  Q.  You stayed, right?

16  A.  Yes.

17  Q.  For how long?

18  A.  I stay in that firm for three years.

19  Q.  Three years, you stayed, committing crimes.  Right?

20  A.  Yes.

21  Q.  And you never left?

22  A.  I tried to left.  And I left, finally.

23  Q.  I'm sorry?

24  A.  I always try to left, to leave the -- the firm.  If I can

25  find another job.  Another job will sponsored my status.  And I

 1   finally left the firm when I got my status.

 2   Q.  So let's get this straight.  You could have left and gotten

 3   a job as a waitress, isn't that right?  Because that's what you

 4   are doing now, right?

 5   A.  Yes.

 6   Q.  Are you saying that Karen forced you to stay?

 7   A.  I'm not saying that.

 8   Q.  Are you saying that she threatened you?

 9   A.  No.

10   Q.  If you would have left, she would have turned you in?

11   A.  No.

12   Q.  Are you saying that you could not leave, for any reason,

13   because you would lose your status and be deported, is that

14   what you are telling us?

15   A.  Yes.

16   Q.  Okay.  So you're telling us that because you thought that

17   you couldn't get another job with the same status, you would,

18   you, yourself, would stay there for three years committing

19   frauds, is that right?

20   A.  Yes.

21   Q.  And now, here, pursuant to your cooperation agreement, you

22   are telling us that Karen was the one who taught you how to do

23   this, right?

24   A.  That's truth.

25   Q.  Well my question is, are you saying that she is the one who

E430LIU3                        M. Yu - cross - Fischetti

1    taught you to do it?

2    A.  Yes.

3    Q.  Okay.  And you are saying that you never left, you just

4    continued to commit all of those crimes; is that right?

5    A.  Yes.

6    Q.  Now, when you pled to your crimes for immigration fraud,

7    you realized that those crimes included deceit, lying, and

8    helping other people to lie; isn't that right?

9    A.  Yes.

10   Q.  Okay.  And you pled because you were facing 15 years in

11   jail; is that right?

12   A.  Yes.

13   Q.  And you're hoping that you will get zero if the

14   government --

15            The government, right?

16            -- believes you are not lying, right?

17   A.  Yes.

18   Q.  And, isn't it true that you believe that it's important to

19   you, and your sentencing, that this jury believe your testimony

20   and convicts my client?

21   A.  I don't think that is important, because I was told I just

22   do my best, I don't need to care about the result.

23   Q.  Okay.  So now I'm asking you what you believe.  I

24   understand what they told you.

25   A.  Uh-huh.

1   Q.  But now I'm asking what you believe.

2         Do you believe it would be a good thing for you, when

3   you're sentenced and your lawyer can stand up before this judge

4   and talk about your substantial cooperation and say to the

5   judge she testified here and she convicted Karen, don't you

6   think that would be a good thing for you?

7   A.  I -- I don't --

8   Q.  Yes, or no --

9   A.  No.

10  Q.  -- or if you know.

11  A.  No, I have done my best to --

12  Q.  I understand.  I understand you did your best, that's a

13  different question.  Listen to my question and see if you can

14  answer yes or no, and I'll accept your answer.

15  A.  Okay.

16  Q.  I'm asking you, when you get sentenced, you know your

17  lawyer is going to speak for you; is that correct?

18  A.  Yes.

19  Q.  You have a lawyer; is that right?

20  A.  Yes.

21  Q.  That lawyer appeared with you on your proffer sessions?

22  A.  Yes.

23  Q.  On your cooperation, is that right?

24  A.  Yes.

25  Q.  He was here before the judge when you pled guilty, is that

1638
E430LIU3                    M. Yu - cross - Fischetti

1   correct?

2   A.  Yes.

3   Q.  And that judge, that lawyer, is gonna be standing before

4   you when you are sentenced; is that correct?

5   A.  Yes.

6   Q.  And you know that lawyer is going to make a statement, a

7   pitch to the judge, on why you shouldn't go to jail; isn't that

8   right?

9   A.  Yes.

10  Q.  And you want to get zero, right?

11  A.  Yes.

12  Q.  So my question, simply, is do you think it would be better

13  for you to have your lawyer stand up before this judge and say,

14  your Honor, she cooperated completely, the jury believed her,

15  and they convicted my client.  Do you think that would be a

16  good thing for you?  Or wouldn't it matter.

17          MR. EAGAN:  I think this has been asked.

18          MR. FISCHETTI:  It has not been answered.  Its been

19  asked.

20          THE COURT:  Let's have an answer and move on.

21          You can answer the question.

22          THE WITNESS:  Okay.

23  A.  Maybe.

24  Q.  The answer is maybe.

25  A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  Q.  Okay, I'll accept maybe.

2          Now, after you left the firm, you got a job, isn't

3  that right?

4  A.  Yes.

5  Q.  And who did you go to work for?

6  A.  I worked for agent, it an employment agent.

7  Q.  And did they get you a job, the employment agency?

8  A.  I'm sorry?

9  Q.  Did they get you a job?

10  A.  Yes.

11  Q.  Where did they get you a job?

12  A.  Sent me to a law firm.  I work there as document reviewer.

13  Q.  And the law firm they sent you to was?

14  A.  Dorsey and Whitney.

15  Q.  Very large law firm?

16  A.  Yes.

17  Q.  Prominent law firm?

18  A.  Yes.

19  Q.  And you applied for that job?

20  A.  Yes.

21  Q.  And when you applied for that job, you were interviewed?

22  A.  I was interviewed by the agent.

23  Q.  And then you went on the job?

24  A.  Yes.

25  Q.  Did you tell the agency, before you were sent to this job

E430LIU3                    M. Yu - cross - Fischetti

1    at a law firm, that you were guilty of any number of frauds?

2    A.  No, I didn't tell them, because --

3    Q.  Did you -- did you tell them, yes or no.

4    A.  No.

5    Q.  And did you tell them that you were going to plead guilty

6    to the felonies?

7    A.  No.

8    Q.  You never told them that either?

9    A.  No.

10   Q.  When you got to Dorsey & Whitney, it was a law firm.  You

11   were a lawyer at that point, right?

12   A.  Yes, but --

13   Q.  You were a lawyer?

14   A.  I was hired as a paralegal.

15   Q.  I asked a simple question.  When you went to Dorsey &

16   Whitney to work, were you a lawyer?

17   A.  Yes.

18   Q.  And as I understand it, you left for a period of time to

19   study for the bar; is that right?

20   A.  Yes.

21   Q.  So you left the Moslemi firm to study for the bar, took it

22   once, failed, took it a second time, passed, okay?

23   A.  Yes.

24   Q.  I did the same thing, so.

25           So now you passed, you are a lawyer; is that right?

E430LIU3                    M. Yu - cross - Fischetti

1    A.  Yes.

2    Q.  But before you actually become a lawyer, you have to pass a

3    character and fitness test; is that right?

4    A.  Yes.

5    Q.  And you have to see somebody, and sit down with this

6    person, and tell them that you are qualified, ethically, to be

7    a lawyer; isn't that right?

8    A.  Yes.

9    Q.  And you know what ethically means, don't you?

10   A.  Yes.

11   Q.  So did you have that interview?

12   A.  Yes.

13   Q.  Were you, in your mind, ethically competent to be a lawyer

14   at that point in your life?

15   A.  No, I -- what I was doing at that firm --

16   Q.  So, you knew that you shouldn't have been a lawyer at all,

17   isn't that right?

18   A.  Yes.

19   Q.  Now, you went to take the bar exam.  You took the bar exam.

20   You passed the bar exam.  You went to the character and fitness

21   interview.  Obviously you lied to them about whether or not you

22   were ethically competent to be a lawyer, right?

23   A.  Yes.

24   Q.  And then you didn't change anything.  You came back and

25   continued to commit frauds, isn't that right?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

1    A.  Yes.

2    Q.  So now you leave the firm as a practicing lawyer, is that

3    right, able to practice anywhere in New York State; is that

4    right?

5    A.  Yes.

6    Q.  You are not a lawyer anymore, are you?

7    A.  No.

8    Q.  Did you resign from the bar?

9    A.  Yes.

10   Q.  Okay.  So when you go to Dorsey & Whitney and you are going

11   to work there as a lawyer, you don't tell them anything about

12   what your prior conduct was as a lawyer?

13   A.  No.  I work there, not as a lawyer.  I worked there not as

14   a lawyer --

15   Q.  I understand that.  You worked there as a paralegal to

16   translate documents, is that correct.  You didn't represent any

17   clients.

18   A.  Yeah, when they hire people, they advertise they wanted

19   people with legal background or paralegal.  It is not necessary

20   to be an attorney at that time.

21   Q.  Good.  I understand that.  But you never told them about

22   your prior criminal past, right?

23   A.  No.

24   Q.  And, in fact, when you went there and applied to Dorsey &

25   Whitney, you had already pled guilty; is that correct?

E430LIU3                    M. Yu - cross - Fischetti

1    A.  Yes.

2    Q.  It wasn't that you just were cooperating and telling the

3    government that you committed crimes, you actually stood up

4    before a judge, like this, and said I did commit these crimes,

5    I pled guilty; is that right?

6    A.  Yes.

7    Q.  And now you are working in a law firm as a paralegal,

8    right?

9    A.  Yes.

10   Q.  Did you tell them, while you were working there as a

11   paralegal, that you were a convicted felon, didn't they ask you

12   to sign a confidentiality agreement, which basically asked you

13   if you had committed any crimes or had been involved in any

14   criminal conduct?

15   A.  I signed.  But the question only asked me whether you have

16   been convicted any criminal -- crime.

17   Q.  Right.

18   A.  I talk with my attorney and he said you are not convicted

19   yet, so I just answered the question no.  In the firm, they

20   didn't ask me whether you plead any guilty.

21   Q.  All right.  Let's take this slow, so I can understand it.

22        You stood before a judge, before you went to Dorsey &

23   Whitney, right?

24   A.  Yes.

25   Q.  Okay.  And this was a plea of guilty.  You told the judge

E430LIU3                    M. Yu - cross - Fischetti

1    that you were guilty, right?

2    A.  Yes.

3    Q.  The judge asked you any number of questions, did you commit

4    this crime, you said yes.  The judge asked you did you do it

5    voluntarily, you said yes.  Asked you did anybody force you to

6    do it, you said yes.  They said are you pleading guilty of your

7    own volition, you said yes.  Right?

8    A.  Yes.

9    Q.  So you were convicted, then, when you told her that,

10   weren't you?

11   A.  I asked my attorney.  He told me I was not convicted at

12   that time.

13   Q.  Did you look at the sentencing -- did you look at the plea

14   that you gave, did he know you pled guilty?

15   A.  They don't know I plead guilty.

16   Q.  Excuse me?

17   A.  Who told me?

18   Q.  I'm sorry, I don't understand now.  You have to speak up.

19           I'm asking you, your lawyer, when he told you you were

20   not convicted, did he know you had pled guilty before the judge

21   to felonies, did he know that?

22   A.  Yes.

23   Q.  And he still said you were not convicted?

24   A.  Yes.

25   Q.  When the judge told you that you were eligible to be

1645

E430LIU3                    M. Yu - cross - Fischetti

1  sentenced for 15 years, your lawyer knew that, he was here,

2  right?

3  A.  Yes.

4  Q.  And now you say you go to this lawyer and you ask him if

5  you have been convicted.  Or he comes to you and says don't

6  worry about it, you have not been convicted.  How did it

7  happen?

8  A.  I talk with him about it, this job application.  And the

9  question they asked me, I worry about it.  I worry with apply

10  plead guilty thing.  And I told my attorney they only asked me

11  whether I have been convicted of any crime, and he said --

12  Q.  I'm sorry?

13  A.  -- technically you are not convicted yet.

14  Q.  Not convicted yet.

15  A.  Yes.

16  Q.  Did he say like it takes six months or a year after you

17  plead guilty to be convicted.  I mean is that the way it works

18  according to him?

19          MR. EAGAN:  Objection.

20          THE COURT:  Yeah, I'm going to sustain that.

21  Q.  Well, let me ask you this.  Before you signed the

22  confidentiality agreement, after you pled guilty to the

23  felonies, right, before you took the job, you asked your

24  attorney if you have been convicted, he said no.  Is that

25  right, am I right so far?

E430LIU3                    M. Yu - cross - Fischetti

1   A.  Yes.

2   Q.  Did you tell the government, did you check with the

3   prosecutors and ask them -- let me finish -- can I take this

4   job and sign this application and say I have not been

5   convicted.  Did you ask any of them?

6   A.  I told the government, because I was sent to Guangzhou to

7   do this job.  I talked to the government and I applied to the

8   judge.  They know what I -- I was doing for that job.  And

9   they -- they agree me to leave the country, they help me to

10  leave the country, they know what the job I was doing at that

11  time.

12  Q.  Okay.  We'll get to that.  But my question is, you signed a

13  document to get this job that says that have you been convicted

14  of a crime, and you said no, right?

15  A.  Yes.

16  Q.  Did you ask the prosecution, was that all right that I lied

17  on my application.  Did you ask them that?

18  A.  I didn't ask them.  I asked my attorney --

19  Q.  Okay.  If you didn't ask them, that's fine with me.

20      Now, there come a point when you are doing that job

21  and you're sent to China.  They want you to go to China, is

22  that right?

23  A.  Yes.

24  Q.  And you need permission to go the China because, well, I

25  don't want to say you're convicted, because you say you are not

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

E430LIU3                    M. Yu - cross - Fischetti

1   convicted, but you have got bail limits so that you can't

2   travel outside of the country; is that right?

3   A.  Yes.

4   Q.  Pretrial services, or someone, has your passport; is that

5   right?

6   A.  Yes.

7   Q.  And you can't travel without the judge's permission.

8   A.  Yes.

9   Q.  Isn't that right?

10  A.  Yes.

11  Q.  So you speak to your lawyer to try and go to China and do

12  this job that you are doing, is that right?

13  A.  Yes.

14  Q.  And isn't it a fact that the only way you could go to China

15  for this job, and leave the country with the passport, is if

16  the judge signs an order allowing you to go; isn't that right?

17  A.  Yes.

18          (Continued on next page)

19

20

21

22

23

24

25

E43Wliu4                    M. F. Yu - cross

1   BY MR. FISCHETTI:

2   Q.  And you do get the judge to sign the order allowing you to

3   go, right?

4   A.  Yes.

5   Q.  But isn't it true that that order says specifically that

6   you can only go there for purposes of work?

7   A.  Yes.

8   Q.  And you know that because you read it?

9   A.  Yes.

10  Q.  Right?  Your attorney sent it to --

11          MR. FISCHETTI:  Your Honor, I offer Defendants'

12  Exhibit 6 in evidence.

13          THE COURT:  Is there any objection?

14          MR. EGAN:  I just want to see how he's going to use

15  it.

16          THE COURT:  I'm waiting for that as well.

17          MR. EGAN:  I'm sorry.

18          THE COURT:  Just lay a foundation.

19          MR. FISCHETTI:  Sure.  Okay.

20  Q.  You talked about your lawyer writing a letter to the judge

21  to get you permission, Ms. Yu.  Will you look at this document

22  and tell us if that looks like the letter the lawyer wrote?

23  A.  Yes.

24          MR. FISCHETTI:  Your Honor, I'd like to publish it to

25  the jury.

1649

E43Wliu4                    M. F. Yu - cross

1    THE COURT:  Is there any objection to the exhibit?

2    MR. EGAN:  No.

3    THE COURT:  It is admitted.

4    (Defendants' Exhibit 6 received in evidence)

5    MR. FISCHETTI:  The letter is on the letterhead of

6  Patrick J. Joyce, Esq., with his address, and it's sent to the

7  Honorable Robert P. Patterson, United States district judge,

8  here, and it says, "Dear Judge Patterson, I am the attorney for

9  the defendant Meng Fei Yu, the defendant in the

10  above-referenced case.  I'm writing this letter to request an

11  alteration in the bail conditions which were set in court on

12  August 21, 2012.  The conditions set by the Court restrict

13  Mrs. Yu's travel to the Eastern and Southern Districts of New

14  York and the District of New Jersey.  Ms. Yu would like to take

15  a one-month trip to China beginning July 19, 2013, and ending

16  on August 19, 2013.  This trip is work related and necessary

17  for her to keep her position as a document reviewer with the

18  law firm of Dorsey & Whitney.  I've conferred with Assistant

19  United States Attorney Brian Blais, and the government consents

20  to this request."  And then there's a signature of the judge

21  approving it.

22  Q.  So you got approval to go to China to work for a month, is

23  that right?

24  A.  Yes.

25  Q.  And during the time you were in China, Dorsey & Whitney

1  knew that, as they said, you were convicted of a felony, is

2  that right?

3  A.  Yes.

4  Q.  You didn't believe you were convicted of a felony because

5  your lawyer told you you hadn't been convicted, but that's what

6  they believed, is that right?

7  A.  Yes.

8  Q.  And when they found out, they immediately contacted you and

9  told you to come back immediately and stop working on the case,

10  isn't that right?

11  A.  Yes.

12  Q.  They sent you e-mails to come back, is that right?

13  A.  Yes.

14  Q.  They got you a ticket to come back, is that right?

15  A.  Yes.

16  Q.  But you didn't use the ticket, is that correct?

17  A.  Yes.

18  Q.  And you didn't use the ticket because you said I will stop

19  working on your project, but I can't come back now because I

20  have personal plans in China?

21  A.  Yes.

22  Q.  And you did have personal plans?

23  A.  Yes.

24  Q.  So your trip to China was not just work related?

25  A.  No.

1651

E43Wliu4                    M. F. Yu - cross

1   Q.  It was for personal plans --

2   A.  No.

3   Q.  -- that you had in China?

4   A.  No.

5   Q.  Is that right?

6   A.  No.  The real reason --

7   Q.  Not correct?

8   A.  No.  Not correct.

9   Q.  All right.  Not correct, not correct.  But you did say you

10  couldn't come back because you had personal plans, is that

11  right?

12  A.  Yes.

13  Q.  Then eventually, of course, you did come back?

14  A.  I'm sorry?

15  Q.  You did come back, of course?

16  A.  Yes.

17  Q.  And you lost your job?

18  A.  Yes.

19  Q.  Now, these applications that we've talked about, that you

20  signed, each one of them that you signed says, "I declare that

21  I have prepared this application at the request of the person

22  named in part D, that the responses provided are based on all

23  information of which I have knowledge, and which was provided

24  to me by the applicant, and that the completed application was

25  read to the applicant in his or her native language, a language

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E43Wliu4                    M. F. Yu - cross

1   Q.  What did you talk about?

2   A.  We talk about my husband school application and we chat a

3   little bit.

4   Q.  Excuse me?

5   A.  We talked a little bit.

6   Q.  Nothing about the case?

7   A.  No.

8   Q.  Nothing about him being an interpreter?

9   A.  No.

10  Q.  How often have you spoken to him, if you can recall, in the

11  last year?

12  A.  Spoke each other, you mean?

13  Q.  Excuse me?

14  A.  What's your question?  You mean spoke to each other or

15  contact each other?  What's your question?

16  Q.  How often have you spoken to him, first, and how often have

17  you contacted him?  Make it two questions.

18  A.  Okay.  We, we spoke to each other every, every one or two

19  months.  We often call each other, maybe one time every, every

20  few weeks.

21  Q.  So this is during the past year, one-year time?

22  A.  Yes.

23  Q.  You would speak to him every few weeks?

24  A.  Yes.

25  Q.  Would you call him or would he call you or it went back and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E43Wliu4                    M. F. Yu - cross

1    Q.  Let me ask you this.

2    A.  Okay.

3    Q.  Last question.  Okay?  Do you remember saying or in the

4    conversation, whether you said it or it was said to you, that

5    if there was trouble, you can present files to try and clear

6    your name and push everything on --

7              MR. EGAN:  Your Honor --

8    Q.  -- everything on Karen, to shift the blame to Karen.  Do

9    you recall if somebody said that to you?

10   A.  I don't remember.

11             MR. EGAN:  Objection.

12             THE COURT:  She doesn't remember.

13             MR. FISCHETTI:  I'm going to refresh her recollection.

14             THE COURT:  But it's not her statement, right?

15             MR. FISCHETTI:  I'm asking if she or if a speaker told

16   her that.  I'm not asking what she said.

17             MR. EGAN:  That would be hearsay.

18             MR. FISCHETTI:  I'm asking if she heard the statements

19   spoken to her.

20             THE COURT:  Right.  That would be hearsay.

21             MR. FISCHETTI:  That would be hearsay?  Judge, can I

22   make a record of that.

23             THE COURT:  Sure.

24             (Continued on next page)

25

E43Wliu4                    M. F. Yu - cross

1       (At the side bar)

2       THE COURT:  Is this the coconspirator statement?

3       MR. FISCHETTI:  No, it's not.  It's not a big point,

4  and I'm finished.  I'm basically offering this statement not

5  for its truth but for the effect on the listener.  We have a

6  tape where it was actually said.

7       THE COURT:  And tell me the statement.

8       MR. FISCHETTI:  The three of them were talking.  It

9  was saying if we have any trouble, if Karen has any trouble, we

10  can all shift the blame to Karen.  That's what the statement

11  is.

12      MR. FRANZ:  The statement is to this witness and

13  another government witness, if you have a problem, you can push

14  everything on to Karen.  The government witness on tape

15  suggests this to this witness, that that would be something

16  that she could do.  And I think that goes to state of mind.

17      MR. EGAN:  The argument is what they did.  Of course

18  it's for the truth.

19      THE COURT:  I'm sorry?

20      MR. EGAN:  The argument is that's what they did, that

21  they pushed it all on Karen.

22      THE COURT:  But it's also the argument that it gave

23  her an idea as to what to do and how to do it, which is what

24  they're suggesting she's doing now.  Right?  So I'm going to

25  allow it.

2057
E480liu5                    HAN - CROSS

1     writing and I will respond here in court or what I'll do is
2     send back testimony or evidence that is responsive to your
3     question.  So that's how that process will work.  But, right
4     now, we're going to turn to closing arguments.
5             And we'll hear first from the government.
6             MS. MERMELSTEIN:  Thank you, your Honor.
7             THE COURT:  I'm going to ask all of the lawyers to
8     speak into the microphones.  Thank you.
9             MS. MERMELSTEIN:  Huai Guo Wu, was a 19 year old high
10    school graduate when he came to America to try and earn money
11    for his family.  He took English classes.  He worked long hours
12    in a restaurant.  And in 2011, he walked into the Bandrich law
13    firm and asked for help getting a green card.
14            He walked out conveniently transformed into a
15    persecuted Christian who had been beaten, and interrogated, and
16    imprisoned because of his faith.
17            Now, real, real law firms take asylum applicants who
18    have real stories of persecution, and they help those people to
19    apply for the asylum that they are entitled to.  But the
20    Bandrich law firm created false asylum claims for anyone, who
21    had the $10,000, for anyone who walked in their door.  If you
22    had $10,000, they had a false asylum claim for you.  Because at
23    the Feng Ling Liu and the Bandrich law firms, a little thing
24    like the truth never stood in the way of a false asylum claim.
25            And that is why we are here today.  Because these

E480liu5                   HAN - CROSS

1   defendants, Feng Ling Liu, and Vanessa, and Rachel Yang, they

2   participated in a brazen and efficient conspiracy to defraud

3   the entire asylum system.

4          These defendants, and the people with whom they

5   worked, filed nearly 2,000 asylum applications.  They took any

6   person who walked in the door and they made them a victim of

7   the Chinese government.  Christianity, family planning, falun

8   gong.  If you had $10,000, they had a claim for you.

9          Why?  For the money.  Over the nearly five years of

10  this conspiracy, these defendants, together, billed something

11  like $18 million; $10,000, $11,000, $13,000 an application, by

12  1800 or 2000 applications, and that is the math.  This firm was

13  wildly successful.  They took the hard-earned money of poor

14  farmers, and dishwashers, and restaurant workers, and they got

15  them asylum.

16         The evidence is now in.  And you know that the

17  evidence is simply overwhelming that the Feng Ling Liu and the

18  Bandrich law firms were running a massive immigration fraud.

19  You saw that from literally the very first moment that an

20  applicant walked in their door.

21         Remember that very first recording, when Lin Chen went

22  to the Moslemi law firm.  What were the very first questions

23  that she was asked?  Did they ask her about her personal

24  experiences in China, did they ask her about any persecution

25  that she might have suffered?  Was she asked anything at all

E480liu5                    HAN - CROSS

1    about what had happened to her?  No.  Here's what she was

2    asked.  Have you been caught.  Have you been fingerprinted.  Do

3    they have your records.

4           And what happened when Lin Chen walked in the door at

5    the Bandrich law firm?  The very same thing.  She tells the

6    receptionist that she has been here for two years, and that she

7    arrived illegally.  And what does the receptionist say?  What

8    does the receptionist ask?  Have you opened a bank account.  Do

9    you have a credit card.  Have you applied for a tax ID.  Were

10   you caught in another country on your way here.

11          And Jason and Huai Guo Wu had that identical

12   experience.  This fraud was so open, it was so bold that they

13   didn't even pretend to ask if someone had a real claim.

14   They didn't ask about the asylum applicant's persecution.  The

15   only thing they cared about was whether there was evidence that

16   you had been in the country for more than one year.  And you

17   know why that one fact was so important?  Because you know that

18   asylum applicants have to apply for asylum within one year of

19   their arrival.  So if you opened a bank account, or you went to

20   the hospital, or you got caught coming in over the border, then

21   even the Feng Ling Liu and the Bandrich law firms, they

22   couldn't make that go away.  But so long as there was no record

23   of you being here, they didn't really care how long you had

24   been here.

25          Lin Chen told the receptionist she had been here for

E480liu5                    HAN - CROSS

1    two years.  And that was no problem because the law firms were

2    perfectly happy to help you get one-year proof letters and

3    documents that suggested that you had only been here for less

4    than a year.

5         And where did these conversations take place?  Not in

6    a private office, not behind closed doors.  Take a look at the

7    reception area of the Feng Ling Liu and Bandrich law firms.

8    Should be coming up on your screens.  Look at the reception

9    area at the Bandrich law firm.  These blatantly openly

10   fraudulent conversations took place out in the open where

11   anyone could hear them.

12        So talking to the receptionist, that was step 1.  What

13   was step 2?  That was intake.  Applicants met Feng Ling Liu and

14   David Miao and Lillian Miao and Harry Liu and Rachel Yang.  And

15   what was discussed at that meeting?  Not the personal story.

16   Not the details of any actual persecution.  And where were

17   these conversations?  They were in people's offices with the

18   doors wide open.  What was discussed?  The office managers

19   would, again, ask people if there was any evidence that they

20   had been in the country for more than a year.  And the firm got

21   basic biographical information that they needed to assign a

22   client a fraudulent claim.

23        And the firm talked money.  Why were the office doors

24   left open?  Because this was not a secret.  Everyone knew that

25   this was a fraud.  It didn't have to be hidden from anyone who

E480liu5                    HAN - CROSS

```
 1    worked at that law firm.  And you have recordings of these very
 2    interactions.  Look at what Lillian Miao said in the intake
 3    meetings.  Look at that very first meeting with Lin Chen.  It's
 4    government exhibit 40.  Lillian asks: Are there any records
 5    that you have been in the United States.  Are you married.  And
 6    how old are you.  And that is it.  Lillian explains the fee
 7    structure, that you can pay a thousand dollars up front and pay
 8    $10,000 more when you win.  Or, you can pay $500 up front
 9    that's refundable if you lose.  But, if you win, it's another
10    $13,000.  And, then, based on that bare information, Lillian
11    recommends a claim.  She says, You are a single woman?  For
12    you, we recommend a forced abortion.  But she says if that
13    makes you uncomfortable, you can also claim that you were
14    persecuted based on Christianity.  Not a single question about
15    the forced abortion.  Not a single question about whether or
16    not she believes in Christianity, whether she was ever
17    pregnant, whether she even had a boyfriend.  And that is
18    exactly the same thing as happened at the Bandrich law firm.
19            Lin Chen walks in, she says, I'm a single woman, I
20    have never been caught in the United States, and I'm not living
21    in New York.  She says that she left China via Hong Kong.  And
22    what does she get told?  Same fee structure.  The identical fee
23    structure at the two law firms.  And they tell her that it's
24    gonna be at least $10,000.  And you saw that that was money
25    that was paid in cash.  And you saw some of that cash that was
```

E480liu5                    HAN - CROSS

1    found in the law firm when the FBI searched it.

2           And what is the firm concerned about in this first

3    meeting?  They are concerned that the government will be able

4    to confirm when Lin Chen left China.  They tell her the record

5    of your departure from Hong Kong might be discovered by the

6    immigration authorities, based on our experience.  And you know

7    this is exactly the kind of thing that these law firms were

8    concerned about, because look at the notepad that was found in

9    the Moslemi law firm.  What does that say?  It says in

10   countries in South America and Central America, it is easy to

11   find out.  It may have found out, except for Venezuela and

12   Cuba.  In Argentina, it is not easy to find out.  What are they

13   talking about?  They are talking about which countries the

14   government can verify that you have gone through on your way

15   here.  And look at the photos of the law firms themselves.

16   Look at the walls.  Look at how many maps are on the walls of

17   that law firm.  Why?  So you could coach asylum applicants

18   about the routes they were going to say they had taken to come

19   into the United States.

20          And going back to the Lin Chen meeting at Bandrich,

21   what do they tell her?  Not you can't apply for asylum if you

22   have been here for more than a year, not you can't apply here

23   if you don't live in New York.  She doesn't get asked about her

24   experience in China.  Here's what they tell her.  Christianity

25   is really complicated if you don't live in New York because you

1    are going to have to start going to church.  And how are you

2    going to go to a church in New York if you don't live here.

3    Instead, they recommend family planning.  And so, now, the

4    applicant has a story assigned to them, a claim assigned.  What

5    is the next step?  It's the storywriting.  Storywriters, like

6    Meng Fei and Victor, would get a file.  And that file had three

7    things on it; the client's name, their telephone number, and

8    which claim they were assigned.

9         And did the storywriters interview the applicant, did

10   they ask them questions?  Not really.  They took basic

11   biographical information and then they used that basic

12   information to create a story.  They made it up.  And if the

13   storywriters were being pretty careful, they sometimes said no,

14   no you write the story first.  But you heard what happened.

15   Applicants didn't know how to make these stories up.  And so

16   even when they told the applicants to write these first drafts

17   themselves, you saw what happened.  Look at what happened with

18   Lin Chen.  She goes to Feng Ling Liu.  Look at Huai Guo Wu and

19   his experience at Bandrich.  The storywriters, the people like

20   Rachel Yang.  They just write the stories.  They give them the

21   whole story, and tell them to copy it over.  They don't

22   interview the asylum applicants before they add details to

23   their story.  They just add facts to the story about

24   persecution, about detention, about beatings.  And the

25   storywriters showed those stories to the lawyers.  Lawyers like

2064

E480liu5                          HAN - CROSS

1    Feng Ling Liu and Vanessa.  And what did the lawyers do to

2    those stories?  They made changes.  They made a beating more

3    severe, they made the amount of time that a person had been in

4    detention a little shorter.  Because if you say you have been

5    detained for six weeks, it's gonna be a little strange when you

6    can't describe what the place looks like that you were detained

7    in.  And you have specific examples of this.  Look at

8    government exhibit 416.  Where Vanessa adds in information

9    about a person being detained for a month, and being

10   mistreated, even though that information appears nowhere in the

11   translated version that Vanessa is looking at.

12            And the law firms also help to gather proof, one-year

13   proof.  First, the applicants needed attesting letters, letters

14   from family and friends in China that would describe their

15   pretend persecution.  And you have heard there were a couple of

16   requirements for these letters.  First, they had to look like

17   they had really been written in China.  So it had to be on

18   right-sized paper, they had to use the right kind of ink and

19   you needed to have a postmarked envelope from China.

20            Second, the person writing the letter was supposed to

21   include a copy of their identification.  So here, you cannot

22   just make up a person's name, you need to have a real person

23   who is going to let you use their ID.  And that person has to

24   be more or less the right age and the right gender.  Because a

25   letter portending to be from a boyfriend in support of a

E480liu5                    HAN - CROSS

1    girlfriend's asylum application, that has to be someone who is

2    more or less the same age.  But if you are getting a letter

3    from a fake pastor, it is a good idea to get that from someone

4    who is older, so it looks like the kind of person who really

5    might be a pastor.  And how do you know all of this?  Well, you

6    heard it directly from Meng Fei and from Victor.  They wrote

7    these attesting letters.  They drafted these fake stories.  And

8    they did that without ever asking any client for actual

9    details.

10          They followed the law firm's guidelines that in a

11    Christianity claim, you needed a letter from a friend, a letter

12    from a family member, and a letter from your pastor.  And that

13    you had to have an ID that fit more or less into the right age

14    bracket.  And the exact same thing was happening at Bandrich

15    law firm.  Because, remember, Rachel Yang told Huai Guo Wu, she

16    told him you need a letter from your mom, you need a letter

17    from a friend, and you need a letter from a pastor.  And she

18    specifically said you should get someone older to give you

19    their ID to be the pastor.  And that is all Rachel Yang told

20    him Before handing him three already typewritten letters to

21    have him send them to China to be recopied and mailed back.

22          Of course, Huai Guo Wu didn't have a pastor.  Huai Guo

23    Wu was never persecuted based on Christianity.  So what did he

24    do?  You heard what he did.  He asked his uncle, an older

25    person with a different last name, a person who was absolutely

E480liu5                      HAN - CROSS

1   not a pastor.  And you even saw how those letters would be

2   written, with blanks for the name for the person who was going

3   to sign.  Because sometimes the applicant wouldn't know whose

4   identification they were going to use.

5           Look at the picture of the computer screen that was

6   taken during the search of the Moslemi law firm.  What is that.

7   That is a letter being written on the very day that the FBI

8   searched the law firm.  And even though the law firm is the one

9   writing the letter, they don't know the name of the person it's

10  coming from.  They have never talked to them.  They just put in

11  XXX so it can be filled in later.

12          In some cases, you heard the applicants didn't even

13  bother to mail these letters to China.  They just had people

14  copy them over inside the United States.

15          Lin Chen and Jason both told you that that is exactly

16  what happened with their letters.  And, in fact, you heard Lin

17  Chen say that she had other people sitting around the law firm

18  copying it over for her, so the handwriting on the different

19  letters would be different.

20          The letters needed to have different handwriting, they

21  needed to have different ink, and needed to have different

22  types of paper.  And what if you didn't have the right kind of

23  paper, what if you didn't have Chinese paper on hand, not a

24  problem.  The law firm kept it on hand for clients to use.

25  Look at what was found in both law firms.  Different kinds of

E480liu5                    HAN - CROSS

1    blank paper ready to be used to create these fake letters.

2            But the only fake documents here were not the stories,

3    they were not the attesting letters.  You also saw there was

4    all kinds of fake documents showing that people have been in

5    the United States for less than a year.  Remember in government

6    exhibit 44, Lin Chen is sitting around the law firm.  And just

7    sitting there, she hears Lillian Miao talking to some other

8    client right out in the middle of the law firm.  So no effort,

9    by anyone to hide what is going on.  And what does Lillian Miao

10   say?  She says you need to get a fake airline ticket.  And the

11   applicant says, I'm not exactly sure I know where to get fake

12   airline ticket.  And she says, it is no problem, everybody in

13   Fujian knows how the get a fake airline ticket.  Look at

14   government exhibit 57.  That is the phone call between Lin Chen

15   and China.  We didn't read that all of the way through in front

16   of you, but it's in evidence and you can look at it.

17          Look what happens.  Lin Chen calls this document

18   provider in China.  And he says he is already familiar with

19   what she needs.  He is already familiar with the Feng Ling Liu

20   law firm.  He can make boarding passes.  He can make medical

21   records.  He can make drivers licenses.  Whatever you need, he

22   can make it.  In fact, this practice was so common that when

23   Lin Chen goes to talk to David Miao and she tells him that her

24   one-year evidence worked, the asylum office thought her

25   one-year evidence looked pretty good.  What does he say.  He

1    says where did you get it from?  She says, oh, I used that guy,

2    the same person that Lillian told me to use.  And he asked,

3    well, what did you pay for this asylum application, fake

4    evidence.  And she tells him.  And what does he say in

5    response?  He says that was a pretty reasonable price.  You saw

6    that the firm helped make these fake documents.  You saw that

7    they had all kinds of blank paperwork ready to be filled out to

8    submit with fake asylum applications; blank church letterhead,

9    blank receipts, even blank medical records.

10          So what happened after an application was filed?  The

11   applicant was prepared for their asylum interview.  What kind

12   of materials did they use?  You saw some of those materials.

13   Remember, you saw question and answer forms for Christianity,

14   in both the Moslemi law firm and the Bandrich law firm.  And

15   these were not just similar question and answer forms.

16   Remember, Meng Fei Yu said that the very form she was used to

17   using in the Moslemi law firm, that same document was found in

18   the Bandrich law firm.  The firms were using the identical

19   preparation materials.

20          And what kinds of information were these questions and

21   answers answered?  They answered questions like what is the

22   Bible.  They answered questions like when was Jesus born.  For

23   falun gong, they answered questions like what is falun gong.

24   They told people applying, based on persecution under the

25   family planning policy, what the family planning policy was.

E480liu5                    HAN - CROSS

 1          And now you have to ask yourselves, what would a

 2     legitimate law firm do with this kind of stuff?  You heard Ms.

 3     Caudill-Mirillo testify.  She told you you don't have to be a

 4     Christian scholar to apply for asylum.  You don't have to be an

 5     expert practitioner in falun gong.  But use your common sense.

 6     Are there people who are true believers in Christianity who do

 7     not know what the Bible is?  Are there people who practice

 8     falun gong, who don't know what falun gong is.  Are there

 9     really women who have suffered forced abortions who are not

10     aware that China forbids pregnancy outside of marriage.  Of

11     course not.

12          The one and only reason for these kind of training

13     materials to be present in this law office was to coach people

14     whose claims were made up, who didn't know about Christianity,

15     who didn't know about family planning, who didn't know about

16     falun gong.  The only purpose that these materials had, was to

17     tell people how to lie.

18          And what could you tell from these coaching sessions.

19     What is crystal clear, is this.  Every single person involved

20     knows that this is a fraud.  Look at government exhibit 110,

21     where Lillian Miao is preparing Lin Chen.  It's a long

22     recording, and we didn't read the whole thing.  But what

23     happens in that prep session?  Lillian explains, in graphic

24     detail, the way that an abortion happens.  She talks about the

25     instruments that are used, she talks about the position that

E480liu5                    HAN - CROSS

1    you would have to be on in the operating table, she talks about

2    how long it takes.  And why is Lillian telling this to someone

3    who is filing an asylum claim based on forced abortion?

4    Because Lin Chen doesn't know what it is like to have an

5    abortion, she never had one.  And the only way that she is

6    getting this information is from law firm.

7            Look at the recording where Jason is prepared by Kevin

8    at the Bandrich law firm.  That is the exact same thing,

9    government exhibit 141.  Kevin literally asks, Have you read

10   your story before.  Kevin holds up materials and says I

11   recommend you read this to learn about falun gong.  Kevin is

12   concerned that Jason won't be able to describe, with accuracy,

13   what a police uniform looks like.  And so what does he tell

14   him?  He says, do you have your personal computer.  You could

15   find a TV drama, a drama called Police Chief.

16           Take a look at that TV drama, including how the public

17   security police officers look like, what uniforms they wear and

18   how they usually arrest people.  When they arrest people, how

19   the police vehicles look like.  All of these are in there,

20   including from how they interrogate people.  That is Kevin's

21   advice.  Don't know what to say, don't know how to lie, look it

22   up on the internet.

23           And, finally, let's look at this exchange.  Kevin says

24   what you need to do now is to make those immigration officers

25   believe you are a practitioner.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

2071

E480liu5                         HAN - CROSS

1        Jason says:  Um.  And Kevin says:  Just like an actor.

2    And Jason says:  Um.  And Kevin says: Play it well.  That is

3    Kevin's ultimate advice, being an actor.  Treat it like a play.

4    Memorize your lines.

5        Now let me say just a brief word about the recordings

6    in this case.  There has been a lot of fuss about the

7    recordings, about typographical errors, about the coincidence

8    of a translator knowing Meng Fei Yu.

9        Here is what you have not heard.  You have not heard a

10   single question about the substantive accuracy of the

11   recordings.  Phillip Hughes worked on every recording made by

12   Lin Chen.  He was asked not one question about whether or not

13   the recordings, themselves, and the translations, were right.

14   Yes Chen got asked a couple of questions, like is the word for

15   invoice the same as the word for receipt.  And he got asked

16   again, and again, and again, to define the phrase, mm-hmm,

17   mm-hmm, mm-hmm.  And Mr. Lin got asked a very lot of questions

18   about Meng Fei Yu.  But what didn't he get asked?  He did not

19   get asked a single question about whether the translations were

20   right.  There was not a single instance, not one, in which

21   defense counsel pointed to the recordings and to the

22   translations and said, wait, there is a whole part of the

23   recording that is not in the translation.  Or, wait a minute,

24   there is something here in the translation, and it is not on

25   the recording.  There was not a single time.  And you have the

E480liu5                    HAN - CROSS

1    transcripts.  And you heard the testimony of the people who

2    actually made the recordings.  And they told you, we read the

3    transcripts to you, and the Chinese is right.  And they talked

4    to you about the kind of conversations they were having, and

5    they described those conversations, and it matches up to

6    exactly what is in the translations.

7            So why are defense counsel trying so hard to discredit

8    transcripts?  Because the recordings are such powerful

9    evidence.  Because you can't cross-examine a recording.  You

10   can't make a recording cry.  And these recordings are

11   devastating.  These are recordings, without any other evidence,

12   on which you could convict all of these defendants.

13           So the defense lawyers have to do something.  And they

14   have tried very hard to confuse the issue.  But at the end of

15   the day, there is simply no evidence that these transcripts are

16   anything other than accurate transcripts of the recordings.

17           You heard it from the translators, you heard it from

18   the witnesses, and it matches up to exactly what you heard was

19   going on at these law firms.

20           So let's go back to the process for a second.  If,

21   after all of this preparation, the applicants passed the asylum

22   interview, then that was it.  The law firm got their money and

23   the person got asylum, anywhere from $10,000 to $13,000 per

24   applicant.  But if they fail, they went to court.

25           Now as you have heard, it could literally take years

E480liu5                    HAN - CROSS

1    for asylum applicants to have their day in court.  And so you

2    don't have any recordings of applicants being prepared by the

3    lawyers themselves.  Because the FBI arrested everyone before

4    those court dates would have come up.  But you know what would

5    happen.  The client would be prepared again.  Often because so

6    much time had passed, the client would no longer remember their

7    fake story.  And what would happen when a client didn't

8    remember their story?  The lawyers would remind them.  They

9    would point to the written story and they would tell the

10   applicants to memorize it.  It is completely clear that these

11   law firms were shameless fraud mills.  They churned out lie

12   after lie after lie with tremendous efficiency.  And each and

13   every employee at the firm had their own role in helping that

14   to work.  From the receptionist who asked if you had been

15   caught, to the lawyer who prepped you for your court hearing.

16   Everyone plays their role in getting these fraudulent asylum

17   applications to succeed, because that is how the law firm got

18   paid.

19           So what were these defendants' roles and how do you

20   know that they knew exactly what was going on?  Let's talk,

21   first, about Feng Ling Liu.  She was the leader of the entire

22   operation.  It was her name on the door.  She hired people.

23   She fired people.  She gave out work assignments.  She issued

24   internal rules to keep anyone at the firm from getting caught.

25   And she raked in millions and millions of dollars.

E480liu5                    HAN - CROSS

1          So that's the first way you know, because she directly

2     participated in it.  Through her open office door, right next

3     to where Victor and Meng Fei Yu used to sit, they heard her

4     meeting with new clients.  They heard her get client background

5     information and age, and then assign them a claim without any

6     other discussion.

7          Feng Ling Liu reviewed stories and attesting letters

8     that were written by Victor and by Meng Fei Yu.  And she would

9     make changes to those stories without speaking to the clients

10    and without speaking to the storywriter.  In fact, you heard

11    that in one particular case, Feng Ling Liu rewrote an entire

12    story herself, story for David Miao's nephew.

13         How else do you know?  Because look at the atmosphere

14    in the law firm.  Look at who works there.  Next to Feng Ling

15    Liu, you have her husband, Dave Miao.  That is the very person

16    who conducted intake interviews and coached Lin Chen that under

17    no circumstances should she admit at an asylum interview that

18    she was lying.  Feng Ling Liu's brother, Harry Liu, an office

19    manager at the Feng Ling Liu law firm, who went on to open up

20    the Bandrich law firm.  Feng Ling Liu's sister-in-law Yolanda,

21    who trained Victor and moved to the Bandrich law firm where you

22    heard her talk to Lin Chen about what the best fraudulent

23    asylum application would be.

24         And Feng Ling Liu's sister, Lucy.  And Lucy's husband,
      Kevin.  That's the same Kevin who coached Jason how to lie.
25              (Continued on next page)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

2075

E487LIU6                    Summation - Ms. Mermelstein

1           And finally, David Miao sister Lillian, she's the one

2      who told Lin Chen exactly how to describe a fake abortion.

3           And what are people talking about in the open areas of

4      the law firm?  They are talking about fraud.  Look how often in

5      the recordings other clients are captured saying things that

6      are clearly part of the fraud.  Look at how an unidentified

7      male or unidentified female are asking about fake documents,

8      timing or their fake claim.  Was anyone trying to hide what

9      they were doing?  The opposite.  This was an open secret,

10     something that was hidden only from the government and from the

11     asylum office.  Clients discussed their cases, their false

12     stories, their fake documents with each other and with other

13     people who worked at the law firm.  So, Feng Ling Liu, just by

14     walking around the law firm every day, would have known exactly

15     what was going on.

16          And what about the efforts to hide the fraud?  You

17     heard that Feng Ling Liu changed the law firm name to Moslemi &

18     Associates.  You heard that after that change it wasn't a real

19     change, Feng Ling Liu was the boss, David Miao was the boss.

20     Nothing changed but the name on the front door.

21          And, in fact, while the firm name changed on English

22     language business cards and on signs that were in English, the

23     Chinese signs that were presented with Feng Ling Liu's name

24     inside the office and on the front door to the building, those

25     stayed exactly the same.

E487LIU6                      Summation - Ms. Mermelstein

1    in court.
2           At the beginning of this trial Mr. Egan asked you to
3    use your common sense.  What does your common sense tell you?
4    What would you do if you found out that your employees were
5    committing a fraud under your roof?  Would you respond with
6    outrage, with shock, with anger?  Would you just say um-hum?
7    Of course not.
8           So, why is Feng Ling Liu responding this way?  Because
9    she knows exactly what Meng Fei is talking about.  She is not
10   shocked.  But, as you heard, Feng Ling Liu was also very
11   careful.  She was concerned about talking on the phone about
12   the possibility that her calls could be intercepted.  And she
13   has a former colleague acknowledging the fraud on an open
14   telephone line.  And so she says the minimum, mmm.  That's it.
15          One final point about this call.  This call does not
16   just show you that Feng Ling Liu knew about and participated in
17   the fraud at the Feng Ling Liu and Moslemi law firms.  It shows
18   you that notwithstanding all of the nonsense about the name
19   changes, whether it was called Moslemi or Feng Ling Liu, this
20   firm always belonged to Feng Ling Liu, because here is what
21   this call tells you, that when it was made in September of 2012
22   Feng Ling Liu was still in charge.  She is in charge of hiring,
23   she is in charge of assigning who goes to court and who does
24   what jobs, and she is still monitoring the asylum application
25   process.  And when you take all of this together, it is clear

E487LIU6                    Summation - Ms. Mermelstein

1    gets said in the conversations.

2            First, you hear over and over and over that Feng Ling

3    Liu trusts Bandrich, that Feng Ling Liu only wants Bandrich to

4    handle her cases.  These are just a few cites:  If Feng Ling

5    Liu ever has to get someone to cover her office, she only wants

6    me to do it.  They really want me to take the case because

7    they've been so complicated.  And Meng Fei says they trust you.

8    And Vanessa Bandrich says, right, they do.  And Vanessa

9    Bandrich says, their office doesn't want anybody to play with

10   the file.  When they can't handle it, they want me to handle

11   it.

12           Ask yourselves this.  Feng Ling Liu builds a law firm,

13   she staffs it with family member after family member after

14   family member, and then they bring Vanessa Bandrich in; she is

15   their go-to person.  They don't want to trust anyone else.

16   Would Feng Ling Liu brought someone in who had no idea what was

17   going on, someone who if they discovered what was going on

18   might call the F.B.I., might tell the court, might get them in

19   trouble?  Of course not.  Remember what Victor told you, they

20   only hired people who were dirty.

21           Let's look at 133.  Vanessa Bandrich is complaining

22   that she has a case that she is worried is going to fail

23   because the applicant has traveled to the United States many,

24   many times and has never applied for asylum.  And, remember, if

25   there is a record that you have come in before, that's

1    down.  You know, last year Ms. Liu talked to me and Brendan

2    privately.  I told you she would sometimes worry about --"  And

3    Vanessa Bandrich interrupts.  "About what?  Money?  Or getting

4    into trouble?"

5            Those were the two things that mattered to Feng Ling

6    Liu:  Getting asylum applications approved so they could get

7    their 10, 11 and $13,000 fees, and not getting caught.  And

8    Vanessa Bandrich knew that immediately.  She knew those were

9    the two things that Feng Ling Liu would have been worried

10   about.  And why would she be worried about getting caught,

11   about getting in trouble?  Because it was a fraud, because they

12   all knew it was a fraud, and nobody wanted to get caught.

13           And, finally, let's talk about Rachel Yang and what

14   she did and how you know that she knew.

15           First, remember Huai Guo Wu?  He shows up at the

16   Bandrich law firm.  He walks in for the first time, and no one

17   asks him if he has suffered persecution.  Rachel Yang tells him

18   you have to start going to church so the American government

19   will believe that you are really a Christian.  And he does

20   start going to church.  Rachel Yang told him what to put in his

21   asylum story, and then when it wasn't good enough, she rewrote

22   it so it would be stronger.  She told him to find a family

23   member, a friend, an older person to be the pastor and sign the

24   letters on his behalf.  And then Rachel Yang wrote those

25   letters without asking a single question.

1   knew there was a fraud.  That's not the response you give when

2   you know you're not running a fraudulent law firm.  That was

3   her husband on the phone.  That was her husband on that

4   recording.  You can take all these recordings back.  You have

5   the transcripts, you can read them for yourselves.

6          That was just one family member in that firm.  I can

7   keep going.  Kevin, married to one of her family members;

8   Harry, brother-in-law; Lillian, sister-in-law; Lucy, sister;

9   Ann, sister; Yolanda, sister-in-law.  Almost half a dozen

10  people in this firm were family members.  This isn't a big firm

11  we're talking about.  This isn't a Wall Street firm with

12  offices in Paris and London and Rome.  It's a firm in

13  Chinatown, got maybe 15 people.  To argue that she had no idea

14  that a fraud was going on in her own firm, that the majority of

15  her family members worked in, is beyond ridiculous.  We all

16  have families and we all know one of the hardest things in the

17  world to do is to keep a secret from a family member.  You

18  probably remember a time when you were young, maybe you had a

19  crush on someone in school, maybe you told your brother, told

20  your sister, and next thing you know, your mom's teasing you

21  about it, your dad's teasing you about it, maybe even grandma's

22  teasing you about it.  Families talk.  That's what they do.  So

23  the idea that no one in this firm informed her that there was a

24  fraud going on is completely ridiculous.

25         You know how prevalent the fraud was, too.  It was

1    done out in the open.  Many of these conversations were done in

2    area A, that's the main area.  There is no way you can't hear

3    what's going on in that area.  There's no secret room in the

4    firm where the family members run, conduct fraud really quick,

5    and then run out and say, Please, don't tell Feng Ling Liu we

6    just did some fraudulent stuff.  It's not possible.  You know

7    that's ridiculous.

8            Now, I want to now talk a little bit about Lin Chen.

9    Defense counsel made a point that Lin Chen went to the Feng

10   Ling Liu law office several times, I forget, 30, whatever it

11   was, however many times, and she never saw Feng Ling Liu, and

12   they said that because they actually thought it meant

13   something.  I'm going to tell you it means.  Absolutely

14   nothing.  The fact that she went to Feng Ling Liu law firm and

15   Moslemi & Associates and didn't see Feng Ling Liu is evidence

16   of nothing.

17           Think about your favorite restaurant.  Think about how

18   many times you go there.  You maybe go there 30 times in a

19   year.  How many times do you go to your favorite restaurant and

20   see the owner of the restaurant?  Probably very rarely, if at

21   all.  That's because there's a division of labor.  People have

22   different jobs.  There are people who stand out in the front.

23   There's a host who greets you when you come in.  When the host

24   gets done with you, they introduce you to the waiter.  The

25   waiter comes and gets your order and then they have a guy who

1    recordings.  The FBI was not listening to her phone calls 24

2    hours a day.  They had employees and they had asylum applicants

3    wearing recordings at specific time periods.

4             Second, you heard about the efforts she took to make

5    sure she didn't get caught.  You heard about the big meeting

6    she had where she gave some very strange and incriminating

7    instructions.  She told her employees, employees of a law firm,

8    don't talk to clients on the phone.  That was one of her

9    instructions.  But she gave an even stranger instruction:

10   Don't talk to strangers.  And you know in addition to that she

11   instructed them to shred documents and delete computer files.

12   But my point is she tried very hard not to get on the phone,

13   and the fact that we got one phone call is nothing short of a

14   miracle.

15            Now, the idea that one phone call is not important is

16   ridiculous.  One phone call could be extremely important and

17   one phone call can be extremely incriminating.  I want you to

18   think about this unfortunate scenario that some people may have

19   been through.  Imagine you've been working a long day.  You

20   come home, you're tired, and you see that you have a message on

21   your phone.  You play the message.  You know on the other end

22   of that message is your significant other, boyfriend,

23   girlfriend, and they're describing a trip to Jamaica, a weekend

24   getaway they planned.  They talk about how you're going to do

25   ZipLining, hang out on the beach, go snorkeling, and then at

E4aWliu6                        Rebuttal - Mr. Boone

1    the end of the call, they mention someone else's name.  And you

2    realize that message wasn't for you, so you confront the person

3    and you say, Hey, I got your message, what was that about.  And

4    their response is you only have one call.  What would you say

5    in response to that?  You would say what difference does it

6    make?

7            What difference does it make you only have one call?

8    One call can be extremely important.  One call can be extremely

9    incriminating.  And pay attention to this call.  This call Mr.

10   Fischetti was talking about was a call involving Meng Fei Yu

11   talking about the fraud.  She's talking about how she's scared

12   to come back to the firm because she doesn't want to put

13   herself in the position where she may get caught by a judge or

14   by a client, confessing to a judge that the story isn't true.

15   And what does Feng Ling Liu say in response?  She doesn't say:

16   Back up.  What are you talking about.  Why would a client ever

17   say that?  That makes no sense.  Are you actually drafting

18   fraudulent applications?  Because that's against the law, Meng

19   Fei Yu.

20           No, she doesn't say that.  She says mm, mm, and she

21   says it several times and Meng Fei Yu goes into more detail

22   about the fraud and her response is the same, mm, mm.  Is that

23   the response of someone who doesn't know what she's talking

24   about?  Someone just accused your firm of perpetrating a fraud,

25   and your response is mm, mm?  And she goes a step further and

E4aWliu6                    Rebuttal - Mr. Boone

1          You may proceed.

2          MR. BOONE:  Now, the reason for that is law-abiding

3     citizens don't work in fraud mills.  They don't.  They choose

4     to work other places so they can't tell you about what happens

5     in a fraud mill.  To learn what happens in a fraud mill, you

6     need people who work in fraud mills.  And those people tend to

7     be criminals.  That's why we had those witnesses testify before

8     you, because they could tell you the intricacies of how the

9     firm worked, and they're the only ones that can tell you that

10    information.

11         Now, the idea that they simply came here to tell a lie

12    is ridiculous, and you know that.  Each witness went over their

13    cooperation agreement with you.  Those agreements are in

14    evidence.  You can review them if you want.  And they made it

15    clear that their understanding of the agreement is that if they

16    come here and lie, they will lose their agreement.  Period.

17    There are no ifs, ands, or buts about it.  If they get on the

18    witness stand and tell a lie, they lose their agreement.  They

19    have absolutely no incentive to come in here and tell a bunch

20    of lies.  They told you they've been working for the FBI for a

21    long time.  They've done a lot of recordings and had a lot of

22    meetings.  They have no incentive to throw away all the effort

23    they put in just to come tell a lie.  They have no incentive to

24    subject themselves to being on the witness stand, to exposing

25    themselves as cooperating witnesses for the government just to

1   tell a lie.

2          And think about what they said when they got up there.

3   They named several people involved in the fraud, many names,

4   David, Lillian, Ann, Harry, Kevin.  They named several people,

5   and they told you exactly what they knew about each of those

6   people.  They didn't say I only know Feng Ling Liu or only know

7   Vanessa Bandrich or only know Rachel Yang.  They named all the

8   people they knew and they gave a measured account of what they

9   knew about them.  They didn't say any more, they didn't say any

10  less.

11          Now, on that same point, if what the defense wants you

12  to believe is true, which is that they came here to lie to you

13  and pin the blame on their clients, don't you think they could

14  have come up with a much better story than they came up with?

15  I mean, Victor You and Meng Fei Yu were professional liars,

16  right?  That was made very clear.  They lie all the time,

17  they're good at it.  They know how to make stories, that's what

18  they do, according to the defense.  Don't you think they could

19  have told a better lie?  What did they say about Feng Ling Liu?

20  They didn't say we saw her writing stories from sun up until

21  sundown, until her hand fell off.  She was always writing

22  stories, you couldn't stop that woman from writing stories.

23  They didn't say that.  They said she edited the stories, gave

24  comments, and they described what those comments were.  Think

25  about that.  If they really wanted to pin the blame on one of

E4aWliu6                    Rebuttal - Mr. Boone

1    that she told people on five such occasions you need to

2    memorize this story shows she knows they don't know their story

3    because it's not true; it didn't happen to them, because if

4    that happened to you, you would not forget that.  Your common

5    sense tells you that.

6            You're not going to forget the day you were forced to

7    have an abortion.  You're not going to forget the day you were

8    beaten in jail.  You're going to remember that day, and you

9    don't need anyone's help helping you remember that day.  That's

10   the first reason you know that she knew about the fraud and

11   that she was an active member in that fraud.

12           Now, continuing on this timeline, what happens next?

13   Some time passes.  A year, maybe a little less than a year, she

14   gets promoted.  She gets an opportunity to head her own firm.

15   Wow, great opportunity for someone who's been out of law school

16   or at least practicing law for a year.  What are the odds that

17   she would ascend so high so quickly?  Think about it.  Knowing

18   what you know about Feng Ling Liu and her family and how

19   protective they were of the fraud, do you think for one second

20   they would put someone in charge of an offshoot firm, their

21   second franchise, who they did not think was going to give them

22   assurances that nothing would happen, someone who was not

23   involved in the fraud?  That would be a crazy risk, a crazy

24   risk for a firm that told them don't talk on the phone, don't

25   talk to strangers, shred documents, to then put someone in

E4aWliu6                    Rebuttal - Mr. Boone

1    charge of a firm that they send a hundred cases to.  And they

2    told you the purpose of opening up that firm was to perpetuate

3    the fraud.  They would never put someone in charge of that firm

4    who was not in on the conspiracy.  Because what if they paid

5    attention, what if they found out what was going on and they

6    said something, the whole fraud would be ruined.  That's why

7    she was put in charge.  Just like her friend Troy Moslemi's

8    name was used, it's the same reasoning, another piece of

9    evidence that shows she knew exactly what was going on and she

10   was complicit.

11         Now, I want to talk a little bit more about the fact

12   that she had no idea what was going on in the firm.  First of

13   all, her firm was much smaller than Moslemi's firm.  You heard

14   testimony maybe four or five people worked at that firm.  There

15   were actually fewer people at that firm than are sitting over

16   there, No. 1.  Not a big firm.

17         No. 2, fraud was rampant.  You heard testimony about

18   items that were seized from that firm, items that were clearly

19   fraudulent, asylum stories that were already written except for

20   the name of the applicant, asylum stories that were already

21   written except for the name of the loved one to be filled in

22   later.  Clearly fraudulent, and you also saw for yourself a

23   document that Vanessa Bandrich herself edited.

24         In fact, Ms. Geier, could we see Government Exhibit

25   416, please.