

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*United States Courthouse*
*1 St. Andrews Plaza*
*New York, New York 10006*

October 31, 2014

**BY EMAIL AND ECF**

The Honorable Ronnie Abrams
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10006

      Re:     **United States v. Feng Ling Liu, a/k/a "Karen"**
                  12 Cr. 934 (RA)

Dear Judge Abrams:

      The Government respectfully submits this letter in connection with the sentencing of defendant Feng Ling Liu, a/k/a "Karen," which is scheduled for November 7, 2014 at 12:00 p.m., and in response to the defendant's letter dated October 24, 2014. ("Def. Ltr"). For the reasons set forth below, the Government respectfully submits that a Guidelines sentence of 60 months' imprisonment is necessary to serve the legitimate purposes of sentencing.

I.      **Background and Offense Conduct**

      As the Court is by now well aware, this defendant was the leader of a longstanding scheme designed to trick immigration officials into granting asylum to people based on lies. The defendant herself founded the Feng Ling Liu law firm, which bore her name for a period of years. Thereafter, and in an effort to hide the fraud and her involvement in it, the defendant changed the name of the firm to Moslemi and Associates. The defendant also arranged for her brother, Harry Liu to open a spin off law firm, Bandrich and Associates, in order to further hide the scheme from immigration officials. Together, the two related firms filed thousands of false asylum applications on behalf of their clients, resulting in revenues of many millions of dollars. The firms' assistance included crafting false stories of persecution for clients, obtaining false documentation, preparing clients to lie to immigration officials and judges about their false stories, and representing the clients in court proceedings. Law firm employees served a variety of different roles – some conducted intake interviews, some wrote false stories of persecution, some "coached" clients for interviews, and some went to court. At the head of all of them, directing the activities of the firm and reaping the vast majority of the financial rewards, was this defendant.

Hon. Ronnie Abrams
October 31, 2014
Page 2 of 11

      The evidence at trial clearly established that the defendant was involved in all aspects of the fraud.  Liu was responsible for hiring law firm employees.  (Tr. 491, 1196).  She conducted initial client meetings at which she would confirm whether there was any evidence that a client had been in the country for more than a year and would, without inquiry, assign the client an asylum claim.  (Tr. 540, 542-546).  Feng Ling Liu reviewed false persecution stories and attestation letters written by the paralegals and would give comments and make changes.  (Tr. 567-568, 570).  She would alter stories to make them easier for clients to remember, would add details to make claims sound more authentic, and would change stories to make the claimed persecution sound worse.  (Tr. 567-569, 571).  Feng Ling Liu did not meet with clients prior to making any such changes.  (Tr. 571-572).  On at least one occasion, Feng Ling Liu simply completely rewrote a persecution story.  (Tr. 569).  Feng Ling Liu initially signed asylum applications herself, but subsequently directed that other law firm employees sign the applications.  (Tr. 593).

      Feng Ling Liu oversaw efforts by the law firm to obtain intelligence about the workings of the asylum office so that the conspirators could better effectuate the fraud.  (Tr. 591-593).  Feng Ling Liu also directed firm employees to prepare materials, such as lists of sample questions about Christianity, that would assist clients in preparing to lie in their asylum interviews.  (Tr. 595-596).  Finally, Feng Ling Liu directed that steps be taken to hide the fraud.  Feng Ling Liu changed the name of the firm, directed employees not to speak on the phone, began shredding the drafts of the fraudulent stories, and had the Bandrich law firm opened, (Tr. 602-603, 1347).

## II.    <u>Guidelines Analysis</u>

      The applicable Guidelines manual is the November 1, 2013 Guidelines manual. (PSR ¶ 63).

    1.   Pursuant to U.S.S.G. § 2L2.1(a), the base offense level for Count One is 11. (PSR ¶ 64).

    2.   Pursuant to U.S.S.G. § 2L2.1(b)(2)(C), there is a 9-level increase because the offense involved 100 or more immigration documents. (PSR ¶ 65).

    3.   Pursuant to U.S.S.G. § 3B1.1(a), there is a 4-level increase because the defendant was an organizer or leader and the criminal activity involved five or more participants or was otherwise extensive. (PSR ¶ 67).

    4.   Pursuant to U.S.S.G. § 3B1.3, an increase of 2 levels is warranted because the defendant abused a position of public or private trust. (PSR ¶ 68).[1]

---

[1] The PSR seeks imposition of an enhancement under this section on the alternate theory that the defendant used a special skill to perpetrate the fraud.  The PSR is factually correct that the defendant did use special skills to perpetrate this fraud.  However, because there is an enhancement for the defendant's aggravated role, an enhancement may not also be applied on the basis of the defendant's use of a special skill.

Hon. Ronnie Abrams
October 31, 2014
Page 3 of 11

In accordance with the foregoing calculations, the applicable offense level is 26. (PSR ¶ 73).

B.      Criminal History Category

The defendant has no history points, and is in Criminal History Category I. (PSR ¶ 74-76).

C.      Guidelines Calculation

Based upon the calculations set forth above, the defendant's Guidelines range is 63 to 78 months' imprisonment.   (PSR ¶ 117).   Because, however the statutory maximum term of imprisonment for violations of Title 18, United States Code, Section 371 is 60 months', the Guidelines dictate a sentence of 60 months' imprisonment. (PSR ¶ 117).    In addition, after determining the defendant's ability to pay, the Court may impose a fine pursuant to U.S.S.G. § 5E1.2. At Guidelines level 26, the applicable fine range is $12,500 to $125,000. (PSR ¶¶ 122, 124).

III.    **Defendant's Objections**

a.    **Objections to the factual portions PSR[2]**

The defendant objects to paragraphs 20 through 39, 40 through 56 (except 49 and 50), and 57 to 60 (except 59) of the PSR.  In other words, the defendant objects to virtually the entirety of the PSR's factual description of the offense.[3]  The content of these paragraphs however, is consistent with the allegations contained in the indictment and was clearly established at trial. The defendant's bald claim that these paragraphs contain "conclusions with no evidence introduced to support them" is itself wholly without support.  (Def. Ltr. at 2).

b.    **Objections to the Government and the PSR's Guidelines Calculations**

The defendant argues that the Government has offered insufficient proof to demonstrate that (i) she should receive a 9 level enhancement for her involvement in more than 100 false documents; (ii) a 4 level enhancement for her leadership role; and (iii) a 2 level enhancement for abuse of trust.  The defendant is wrong.

*100 Documents*

As the Court has already noted, there was ample evidence at trial that the Feng Ling Liu/Moslemi and Bandrich law firms filed far greater than 100 fraudulent asylum applications.

---

[2] The Government objects to the PSR's indication that "[t]he case agent indicated that Liu stopped formally working for her law firm in February 2009." The case agent indicated that Liu stopped working as regularly, but in no way suggested that Liu had ceased working at the firm.

[3] Oddly, the defendant does not object to the description of co-defendant Rachel Yang's role in the offense or to the statement that no role adjustment was appropriate for certain co-defendants.

Hon. Ronnie Abrams
October 31, 2014
Page 4 of 11

Because, however, the Government now has even more detailed information about the number of applications in which this defendant was involved, and because such information is necessary for the forfeiture discussion below, we wish to provide additional information about the Government's current understanding of the number of applications involved in this fraud.

As the Court is aware, at trial, Ashley Caudill-Murilo testified about the number of applications filed by the Feng Ling Liu/Moslemi and Bandrich law firms between 2007 and 2012. (Tr. 153-156). The numbers were obtained by compiling the number of applications filed by lawyers working at the firms. (Tr. 332). Based on that initial review, Ashley Caudill-Murillo testified that together the firms had filed at least 1,800 applications. (Tr. 154-155). After trial, and in connection with forfeiture arguments, the Government began gathering data on the total number of <u>granted</u> applications (as opposed to the number of filed applications). A preliminary review indicated that there were at least 1,610 granted applications between 2007 and 2012.[4]

Since that time, the Government has conducted a more exhaustive review of the number of granted applications and has sought information from two different sources. First, for the expanded time period 2006 to 2012, we have compiled a list of all applicants who were granted asylum at the asylum office level and who were represented by an attorney employed at Feng Ling Liu/Moslemi or Bandrich. That review reveals that between 2006 and 2012 a total of 281 clients of the law firms were granted asylum, including 71 clients whose attorney of record was Feng Ling Liu herself.[5] An anonymized spreadsheet reflecting those applications is attached hereto as Exhibit A.

We have also obtained records from the Executive Office for Immigration Review ("EOIR") which maintains records concerning asylum applications granted by an Immigration Judge ("IJ") or the Board of Immigration Appeals ("BIA"). Those records reflect that between 2006 and 2012, approximately 3,000 individuals represented by a Feng Ling Liu/Moslemi or Bandrich lawyer were granted asylum, including approximately 900 individuals on whose cases Feng Ling Liu personally appeared.[6] Anonymized charts reflecting those applications is attached hereto as Exhibit B.

The record is thus clear that the defendant was <u>personally</u> involved in hundreds of applications and supervised the submission of thousands more. Given the overwhelming evidence at trial that virtually all of the applications were fraudulent, the Government has more than met its burden of showing, by a preponderance of the evidence, that this defendant was involved in more than 100 applications.

---

[4] This number was based only on applications for which the listed attorney was Troy Moslemi, Feng Li, or Meng Fei Yu.

[5] Feng Ling Liu also had at least 29 applicants granted asylum in the asylum office stage prior to 2006.

[6] The increase in this number relative to the 1,800 applications about which Ms. Caudill-Murillo testified appears to be attributable to a number of factors, including, among others: (i) the increased number of years included in the analysis; (ii) the inclusion of applicants who were represented by the law firms only in the court process, but not in the asylum office (either because the applicants were not represented in the asylum phase or because the applicants used other counsel); and (iii) the inclusion of individuals who received derivative status through the grant of asylum to a spouse or parent.

Hon. Ronnie Abrams
October 31, 2014
Page 5 of 11

The defendant argues that (i) she left the firm in 2009, and thus should not be held responsible for any of the firm's activities after that date; and (ii) that pursuant to the Second Circuit's decision in Walker, the Government has failed to offer sufficient specific evidence to meet its burden. 191 f. 3d 326, 339 (2d Cir. 1999). The defendant is wrong on both counts. First, although there is evidence that the defendant had less day to day responsibilities in the firm as time went on, the evidence is clear that the firm continued to belong to her and that she exercised ultimate control over decision making. For example, Feng Ling Liu's conversation with Meng Fei Yu in Government Exhibit 154, demonstrates that as late as 2012 Feng Ling Liu still retained the authority to hire employees and to assign them work. Similarly, in 2012, David Miao told law firm clients that Moslemi and Feng Ling Liu were partners. (GX 134T at 11). In addition, a review of certain of the defendant's bank records[7] demonstrate that she was still collecting what appear to be client payments and was still using the law firm address. (See excerpts of bank records, attached hereto as Exhibit C).[8]

Second, the defendant's reliance on Walker is unavailing in two respects. In Walker, the Second Circuit remanded a case for resentencing where the district court had held an interpreter accountable for the entirety of fraudulent applications filed by the law firm because the Circuit found that there was an insufficiently specific factual basis to hold the interpret accountable for every application filed by the firm. 191 F. 3d at 339. In doing so, the Circuit explicitly held that the interpreter, "unlike [the attorney] . . . does not bear responsibility for every application that left the office." Id. (emphasis added). Because the defendant was the attorney running the Feng Ling Liu/Moslemi law firm, Walker – as applied to her particular circumstances – stands for the proposition that she should be held accountable for the entirety of the firms' applications. In any event, the evidence is clear that even leaving aside the fraudulent applications filed by the defendant's co-conspirators, she herself personally filed hundreds of applications.

### *Leadership Role*

Section 3B1.1(a) of the Sentencing Guidelines requires the sentencing court to increase a defendant's offense level by four levels "[i]f the defendant was an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B.1(a). The application notes define "participant" as "a person who is criminally responsible for the commission of the offense, but need not have been convicted." Id., app. note 1. Moreover, a defendant can "be included as a participant when determining whether the criminal activity 'involved five or more participants' for purposes of a leadership role enhancement." United States v. Paccione, 202 F.3d 622, 625 (2d Cir. 2000).

---

[7] The asylum fraud business was primarily a cash business, and it is thus impossible to document the proceeds of the law firm through bank records. Deposits of checks in the amount of $1,000, often written by individuals with Chinese names, suggests that some law firm clients did make payment by cash. The large sums of money flowing through certain accounts, coupled with the significant assets owned by Liu and Miao, confirm that vast amounts of money the law firm earned over the years.

[8] Because the bank records contain personal information concerning the defendant and others, we are submitting Exhibit C in hard copy but are not filing on ECF.

Hon. Ronnie Abrams
October 31, 2014
Page 6 of 11

Among the factors bearing on whether a defendant is a "leader" are the "degree of his participation in planning or organizing the offense, and the degree of control and authority exercised over the other members of the conspiracy." United States v. Beaulieau, 959 F.2d 375, 379-80 (2d Cir. 1992); see also U.S.S.G. § 3B1.1, comment. (n.4) (instructing that in determining whether a defendant is a leader or organizer, as opposed to a manager or supervisor, "[f]actors the court should consider include the exercise of decision making authority, the nature of participant in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others").

"[I]n assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive." U.S.S.G. § 3B1.1, comment. (n.3). In United States v. Carrozzella, 105 F.3d 796 (2d Cir. 1997), this Court held that in "determining whether a criminal activity is 'otherwise extensive' as the functional equivalent of one involving five or more knowing participants," the relevant factors are (1) the number of knowing participants; (2) the number of unknowing participants whose activities were organized or led by the defendant with specific criminal intent; and (3) the extent to which the services of the unknowing participants were peculiar and necessary to the criminal scheme. United States v. Carrozzella, 105 F.3d at 803-04, abrogated in part on other grounds by United States v. Kennedy, 233 F.3d 157, 160-61 (2d Cir. 2000); see also United States v. Patasnik, 89 F.3d 63, 69 (2d Cir. 1996) (upholding the district court's determination that the scheme was "otherwise extensive" where the only two participants in the scheme used "the services of at least five other individuals-including their lawyer and their accountant-to help them execute the scheme, as well as various loan brokers."); United States v. Napoli, 179 F.3d 1, 15 (2d Cir. 1999) (upholding the district court's finding that the scheme was "otherwise extensive" where defendant used casino and casino personnel to cash and launder checks).

In the present case, there can be no question that the defendant was a leader of an extensive conspiracy involving more than five participants. In addition to the nine individuals charged in the Indictment, trial testimony established that numerous other co-conspirators worked at the Feng Ling Liu/Moslemi and Bandrich firms. (See, e.g., Tr. 506 ("Dave" and "Bebe Xue" worked at the firm); Tr. 539 (Lucy Liu and "Andy" conducted client intake); Tr. 559 ("Yolanda Gao trained Victor You")). Moreover, as this Court found during the sentencing of co-defendant Harry Liu, each of the fraudulent asylum applicants can also be considered a participant in the conspiracy. (Harry Liu Sentencing Tr. at 40). Thus, it is clear that the scheme involved hundreds, if not thousands of participants, and certainly involved far more than five.

It is also crystal clear that Feng Ling Liu and her husband David Miao were the leaders of this conspiracy.[9] Feng Ling Liu recruited participants to the conspiracy through her hiring

---

[9] Indeed, in sentencing several of the co-defendants, this Court has already noted Feng Ling Liu's leadership role. Thus, for example, in sentencing Harry Liu, the Court noted that certain testimony by Meng Fei Yu established Feng Ling Liu's leadership role. (Harry Liu Sentencing at 43).

Hon. Ronnie Abrams
October 31, 2014
Page 7 of 11

authority at the firm. Trial testimony established that potential employees interviewed with Feng Ling Liu and her husband, David Miao. (Tr. 491, 1196). Multiple law firm employees specifically described Feng Ling Liu as the boss and testified that Feng Ling Liu directed their work. For example, Victor You specifically described Feng Ling Liu as his "boss." (Tr. 492). Trial testimony established that Feng Ling Liu reviewed the work of other employees, including drafts of fraudulent persecution stories, and made changes. (Tr. 567; 1242). Feng Ling Liu directed Victor You to prepare Christianity questions for use in client preparation. (Tr. 596). Feng Ling Liu also sent Victor to the immigration office in order to act as a translator and to investigate questions being asked, immigration officer preferences, and the order in which immigration officers took cases. (Tr. 590-591; 1258-1259). Feng Ling Liu similarly directed the work of Meng Fei Yu. For example, Feng Ling Liu instructed Meng Fei Yu that Yu would be responsible for signing the actual asylum applications. (Tr. 1253). Feng Ling Liu even told Meng Fei Yu not to worry, that if anyone got in trouble, it would be Feng Ling Liu or David Miao. (Tr. 1268; GX 154). The original law firm bore Feng Ling Liu's name, and it was her decision to open a second law firm to cover up the fraud. (Tr. 605). Finally, it is clear that Feng Ling Liu and David Miao received the vast majority of the proceeds of the crime. While other defendant's earned small salaries, Feng Ling Liu and her husband lived in a million dollar apartment, sent their daughters to private school, and put more than $2 million in a family trust. (PSR ¶¶ 109, 112, 114).

### Abuse of Trust

Section 3B1.3 of the Guidelines mandates a two-level enhancement of a defendant's offense level "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. Application Note 1 to Section 3B1.3 provides:

> "Public or private trust" refers to a position of public or private trust characterized by professional or managerial discretion (*i.e.*, substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature. For this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (*e.g*., by making the detection of the offense or the defendant's responsibility for the offense more difficult).

U.S.S.G. § 3B1.3, comment. (n.1).

The application of U.S.S.G. § 3B1.3 under an "abuse of trust" theory "requires satisfaction of two requirements: first, that [the defendant] occupied a "position of trust," and second, that [the defendant] abused that position of trust to commit or conceal his crimes." United States v. Nuzzo, 385 F.3d 109, 115 (2d Cir. 2004). Positions of public or private trust invariably include some element of professional or managerial discretion, and persons occupying

Hon. Ronnie Abrams
October 31, 2014
Page 8 of 11

such positions are generally subject to less supervision than individuals in non-discretionary positions. The Second Circuit generally requires some showing of a "fiduciary-like relationship that goes beyond 'simply the reliance of the victim on the misleading statements or conduct of the defendant.'" United States v. Ntshona, 156 F.3d 318, 320 (2d Cir. 1998) (quoting United States v. Jolly, 102 F.3d 46, 49 (2d Cir. 1996)); see also United States v. Nuzzo, 385 F.3d at 116 ("[T]he defendant must have "enjoyed a 'superior' position, relative to other potential perpetrators, as a result of a trust relationship."). The crux of the determination, however, is "the extent to which the [defendant's] position provides the freedom to commit a difficult-to-detect wrong." United States v. Barrett, 178 F.3d 643, 646 (2d Cir. 1999). (internal quotations omitted). The enhancement may be applied in the case of misuse of a professional status, even where the professional did not misuse that status vis-à-vis actual clients. See United States v. Ntshona, 156 F.3d at 319, 321. For example, in Ntshona, the defendant, a physician, committed Medicare fraud by signing fraudulent reimbursement claims for "patients" she never examined. Id. at 319. Where Ntshona's actions allowed her to profit at the expense of the Government and of the individuals who wound up liable for a 20% share of the cost of medical equipment they never ordered, this Court held that a relationship existed between the physician and the defrauded parties sufficient to support an abuse of trust enhancement. Id. at 321.

In the present case, the defendant used her position of trust as an attorney practicing in immigration court to perpetuate the fraud. In doing so, she took advantage both of (i) the trust courts place in the attorneys, as officers of the court, to make honest representations to the Court; and (ii) of the trust clients place in their attorneys.  This enhancement is thus clearly applicable.

IV.    A Guidelines Sentence is Necessary in This Case

The defendant's sole argument in favor a below Guidelines sentence, is that other defendants convicted of asylum fraud have received sentences below 5 years.  As the defendant herself concedes, however, "most of them have a much lower sentencing guideline range than the defendant."  (Def. Ltr. at 11).  The defendant further claims that the "depth of involvement in the crime and culpability" of these other defendants, "is no different from [this] defendant" and that these other defendants obtained a "lower sentencing guideline range solely because the prosecutors chose to give them the lower range."  (Def. Ltr. at 11).  The defendant is wrong.

This defendant was the founder, owner and leader of the most prolific asylum fraud mill identified in this investigation, and she ran the Feng Ling Liu law firm for more than a decade. On this basis alone, the defendant is significantly differently situated than every other defendant in this and related Indictments.

Indeed, this defendant is plainly deserving of a 60 month sentence. The defendant has shown a total failure to accept responsibility for her actions, and even after the jury's guilty verdict, has continued to attempt to shift the blame to others. For example, just after the verdict, the defendant spoke with members of the Mandarin speaking press.  The defendant told the press that "the political asylum cases [her firm] process[es] are authentic" and that her firm received so many referrals because "they are conscientious and responsible."  See, translated newspaper articles, attached hereto as Exhibit D.  The defendant claimed that she was innocent and had been "dragged into this mess" by the Government's cooperators who had lied.  Id.  She

Hon. Ronnie Abrams
October 31, 2014
Page 9 of 11

characterized the cooperators as a "selfish ingrate" and "intrinsically evil." Id.  Liu also
attempted to suggest that if there was any fraud at the law firm, it was unknown to her, and was
the fault of the relatives to whom she turned over the business.  Id.

        Liu's disingenuous attempt to blame her relatives is ironic because the defendant's
treatment of her relatives, if anything, supports a significant sentence.  The defendant's relatives
who worked for her – Harry Liu, Lillian Miao, Shu Feng Xue ("Kevin"), Yolanda Gao, etc. – did
so with full knowledge of the fraud. They did so willingly, over the course of a long period of
time, and they are fully responsible for their own actions.  But it is also clear given Feng Ling
Liu's control of the firm, including hiring, that the defendant chose to employ her relatives and
chose to involve them in fraud.  (Lillian Sent Tr. at 41) ("she's a person who by circumstance,
was involved in this matter, by circumstance of family, quite frankly"). While the defendant
lived in a million dollar apartment, paid full tuition for her children to attend prestigious private
high schools and colleges, put millions of dollars in a trust, and made significant real estate
investments, her relatives (with the exception of Harry Liu) were paid minimal wages and lived
modest lifestyles.[10]

        As the Probation Department notes in recommending a sentence of 60 months,' the
defendant was "clearly the mastermind behind the conspiracy," whose claim to have simply
wished to assist others is "greatly undermined by the profits she gained as a result of the offense
conduct." (PSR at 28).   Based on the defendant's role in the offense, her longstanding
involvement in the fraud, and her "questionable financial activities," the defendant poses "a
moderate risk of recidivism."  (PSR at 28).   In particular, the probation departments notes that
the defendant's representation in tax returns for 2008 to 2012 that she and her husband together
earned less than $125,000 each year is impossible to square with evidence about the income from
the fraud or her significant assets.  The defendant's claim to have acquired undocumented loans
from various family members is an obvious attempt to "minimize the defendant's net worth."
The veracity of these loans is further called into question by the fact that the defendant claims to
have obtained a loan from co-defendant Harry Liu, but Harry Liu disclosed no such loan to the
Probation Department.

        Finally, a significant sentence is necessary to offer general deterrence to others who
might commit a similar crime. The arrests in this case, and related matters, have been heavily
reported in and closely followed by the Chinese language press and, indeed, by the English-
language press as well.  As discussed above, the defendant has made multiple public statements
professing her innocence, blaming the Government for targeting her, and blaming others for her
own criminal conduct.  The sentencings of some of her co-defendants have received coverage in
the Mandarin press.  Incarceratory, Guidelines sentences are necessary in this case to send the
message that asylum fraud will not be tolerated and will be dealt with harshly.  That is especially
true of this defendant who was perhaps the best known asylum attorney in the Chinatown area
and whose arrest and conviction have received heightened press attention.

---

[10] Shu Feng Xia earned approximately $350 a week and lived in the basement of a Queens two family home owned
by Harry Liu.  Lillian Miao earned $600 a month and lived with her family in a rented apartment shared with other
tenants.

Hon. Ronnie Abrams
October 31, 2014
Page 10 of 11

The harms caused by asylum fraud are real.  USCIS has advised the Government that the number of asylum applications filed by Chinese nationals with the New York asylum office increased from 1,189 in 2006 to 7,008 in 2012.  In 2012, cases from Chinese nationals comprised 63% of the total number of cases filed in the office.  The number of asylum officers during that time period has increased from 19 to 56.  Despite that increase, the New York asylum office has a more than 5,000 case backlog and has had to move to a larger facility in order to accommodate the staffing increase.  Fraudulent asylum cases have increased the costs of processing asylum applications and generated a backlog that makes it more time-consuming for cases to wend their way through the system.  Fraudulent asylum applications undermine the integrity of the asylum process and make it more difficult to properly adjudge the claims of legitimate asylum seekers.  Indeed, Alejandro N. Mayorkas, the Deputy Secretary of the Department of Homeland Security, -- the second-ranking officer in that department – has provided the Government with a letter for transmission to the Court describing the deleterious impact of the defendant's conduct on the nation's asylum program.  That letter is attached as Exhibit E hereto.

In short, a Guidelines sentence of 60 months' imprisonment is the minimum necessary sentence for this defendant.  Such a sentence would punish her longstanding and blatant criminal conduct and would send a strong message that the rampant asylum fraud that has too-long been a reality, will not be tolerated.

IV. Forfeiture

The defendant argues that the forfeiture sought by the Government is unsupported by evidence and unjust because; (i) the Government did not seek similar amounts of forfeiture in other asylum cases; (ii) the Government's proof regarding the pervasiveness of the fraud relied on untrustworthy cooperators; (iii) many of the firm's clients hired new lawyers after the arrests in this case so the firm was likely not paid for those applications; and (iv) the Government has not established the number of granted applications.   The defendant's first two arguments are simply a repeat of arguments she has previously made in her motion for a new trial and should be denied for the reasons set forth in the Government's previous opposition brief.

While the defendant is correct that many of the firm's clients sought new counsel after the defendants' arrest, that fact has no impact on the forfeiture calculation.  The numbers of granted applications referenced above include only those clients whose applications were granted by 2012.  Applicants whose applications were granted after that date are not included in the calculation.  Accordingly, clients who filed fraudulent applications through the Feng Ling Liu/Moslemi or Bandrich firm, but whose applications were not granted until they had retained new counsel in 2013 or 2014 are not included in the above numbers. Nor does the fact that clients were able to retain new counsel or to (in some cases) successfully obtain asylum, demonstrate that these client's claims were not fraudulent.  Given the methods used by the law firms to train the clients to lie, it is more likely that some clients have been able to successfully lie to their new lawyers as well as to the immigration courts.

Hon. Ronnie Abrams
October 31, 2014
Page 11 of 11

      For forfeiture purposes, it is clear that this defendant is responsible for more than 3,000[11] fraudulent applications filed by the Feng Ling Liu/Moslemi law firm and the Bandrich law firm between 2006 and 2012.[12]   Under the methodology previously employed by the Court that yields a forfeiture amount of $13.5 million.  More specifically, the Court reduced the number of applications by 10 percent to account for the possibility that some applications were legitimate. That yields 2,700 applications.   Assuming that all applicants chose the cheapest payment plan of $10,000, the Court then reduced this by 50% to account for the possibility that many applicants failed to pay their bills.[13]   Under that rubric, the defendant is liable for forfeiture in the amount of $13.5 million.

## Conclusion

      For the foregoing reasons, the Government respectfully requests that the Court impose a Guidelines sentence of 60 months', as such a sentence is necessary serve the legitimate purposes of sentencing.

Respectfully submitted,

PREET BHARARA
United States Attorney


By: _____/s_____
    Rebecca Mermelstein
    Robert Boone
    Patrick Egan
    Assistant United States Attorneys
    Southern District of New York
    (212) 637-2360/2208/2345

cc: Feng Ling Liu

---

[11] For simplicity, we have used the round number 3,000 as the jumping off point for the forfeiture calculation.

[12] The actual number of false applications is, of course, much higher, as Feng Ling Liu's first opened her law firm in approximately 2000.

[13] We note our ongoing objection to the assumption that 50% of the applicants failed to pay their bills.  As previously discussed, the methodology described above is already very conservative.  Testimony at trial established that more than 90% of the applications were fraudulent as even those few applicants with legitimate claims had their applications embellished with false information.  Thus, a 10% "haircut" to account for the possibility of any legitimate applications, is quite conservative.  Similarly, while the most popular payment plan was $10,000, (i) some applicants chose more expensive plans; and (ii) under the $10,000 scheme, applicants paid a nonrefundable $1,000 upfront.  Thus, the $10,000 figure is also conservative.  Given this already conservative estimate, the Government does not believe that a further 50% reduction is appropriate to account for the possibility of unpaid bills.  Nor does the Government believe that it is reasonable to assume that anywhere close to 50% of client made no payment to the law firm.  It is simply unrealistic to believe that the firm would have continued permitting client to pay the bulk of their fee at the completion of the case if so few clients had actually paid.