USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 11/14/2014

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-against-

FENG LING LIU a/k/a/ "Karen,"
VANESSA BANDRICH, and
RUI YANG A/K/A "Rachel," a/k/a "Sunny"

Defendants.

No. 12-CR-934 (RA)

OPINION AND ORDER

RONNIE ABRAMS, United States District Judge:

On April 14, 2014, a jury convicted Rui Yang and her co-defendants, Feng Ling Liu and Vanessa Bandrich (collectively "Defendants"), of one count of conspiracy to commit immigration fraud pursuant to 18 U.S.C. § 371. The evidence at trial established that Defendants, each of whom worked at one of two law firms in New York's Chinatown, conspired over a multi-year period to submit approximately 1,800 fraudulent asylum applications to federal immigration authorities. Ms. Yang, joined by her co-defendants, now moves for a new trial under Fed. R. Crim. P. 33 based on alleged juror misconduct. They contend that one of the jurors in this matter lied about the fact that she had been routinely posting about her jury service on the social media service Twitter—or "tweeting"—during the trial. Defendants further argue that the juror disobeyed the Court's instructions by tweeting and that the tweets reveal the juror's bias against them. All this, they claim, deprived them of their Sixth Amendment right to a trial by an impartial jury. As the Court stated at Defendant Yang's sentencing, and for the reasons that follow, the Court concludes otherwise. Defendants' motion is therefore DENIED.

## I. BACKGROUND

Defendants' present challenge focuses on the conduct of the individual who served as Juror 2 and who, as it happens, was not the only juror to tweet in this case. Trial began on March 19, 2014, with jury selection. In the course of those proceedings, Juror 2 indicated during *voir dire* that she was a self-employed crime fiction writer. (Voir Dire Tr. 255.) She noted that she "watch[es] pretty much every crime show on TV." (Id. at 257.) In response to a question about her Internet habits, Juror 2 mentioned that she uses Twitter "for social stuff."[1] (Id.) She also disclosed, among other things, that her uncle is a sitting federal judge in this District, that her "father came [to the United States] seeking asylum," and that, "[l]ike everybody in New York, [she had] been a victim of theft." (Id. at 176–76; 255–56; 357–58.) No party made any for-cause challenge to Juror 2.

Prior to dismissing the jury on March 20, the Court instructed its newly seated members—including Juror 2—as follows, in pertinent part:

> Now, a few words about your conduct as jurors. First, during the trial you are not to discuss the case with anyone, nor are you to permit anyone to discuss it with you. Until you retire to the jury room at the end of the case to deliberate, you're simply not to talk about the case. Do not even discuss the case with each other until your actual deliberations begin at the end of the trial....
>
> Second, if anyone should try to talk to you about the case, please bring it to the attention of Ms. Cavale, my courtroom deputy, and she'll bring it to my attention…. *Do not talk or read about the facts or circumstances of this case on social networking sites such as Facebook or MySpace. Don't tweet about your experience here on*

---

[1] For the unfamiliar, "Twitter is a social networking and micro-blogging service that invites its users to answer the question: 'What are you doing?' Twitter's users can send and read electronic messages known as 'tweets.' A tweet is a short text post (up to 140 characters) delivered through Internet or phone-based text systems to the author's subscribers. Users can send and receive tweets in several ways, including via the Twitter website." United States v. Shelnutt, 4:09-CR-14-CDL, 2009 WL 3681827, at *1 n. 1 (M.D. Ga. Nov. 2, 2009). Unless the author changes her privacy settings, her tweets can be seen by anyone with access to the web, even if they do not specifically subscribe to that author's Twitter feed.

> *Twitter*, and don't try and find any information about this case or any similar case, whatsoever.
>
> Third, you're instructed not to read, listen to, or watch media reports on television, in the newspaper, on radio or internet about the case, if there even [are] any. You must not be influenced by anything you might see or hear outside of the courtroom. If you inadvertently come across a news report relating to this case, immediately stop reading, listening, or watching. You should then tell Ms. Cavale that, no one else, again, including your fellow jurors about that fact.
>
> Fourth, do not do any research or investigation about the case, or anything touching upon the case. Again, don't go on the internet, do any searches about the case or these kinds of cases. And I apologize for be repetitive. This is very important….
>
> It is important to keep an open mind throughout the trial and reserve judgment until after all of the evidence is in. Until you have heard all the evidence, the closing arguments and my instructions on the law, you're really not in a position to reach any conclusions in this case. And, therefore, you have to keep an open mind….
>
> Now I'm going to excuse you for the weekend. Thank you. Again, remember, keep an open mind. Don't talk about this. Don't research it, and I look forward to seeing you all promptly on Monday morning.

(Tr. 40–42, 45 (emphasis and paragraph breaks edited).) Opening statements began the following Monday, March 24. The direction to not discuss the case and to keep an open mind was reiterated with some frequency during the trial. (Tr. 156, 234, 353, 407, 462, 511, 586, 637, 691, 745, 807, 849, 924, 958, 1010, 1044, 1082, 1162, 1211, 1292, 1449, 1599, 1677, 1782, 1824, 2035, 2103, 2182, 2238.)

Shortly after midnight on April 9, as the trial neared its end, counsel on both sides received an anonymous email from an individual purporting to do "research on juror misconduct" and advising that one of the jurors in this case—Juror 10—was tweeting about the trial. (Ex. 7.) Juror 10's tweets, spanning from March 20 through April 7 and amounting to about one tweet a day, included the following:

3

> Add in just one song & dance number, and this federal case would rival anything I've seen on #broadway #juryduty rocks
>
> But for my ADD, I'd want to be an ADA. Thanks DAD.
>
> Can't help wondering who would win if the #prosecutors played the #defense attorneys in #colorwar #juryduty
>
> #Courtside seats! #juryduty
>
> The first rule of #juryduty is you do not talk about #juryduty
>
> That awesomely awkward moment the lawyer's cell rings from his pocket during cross, and he tries to blame it on his paralegal. #juryduty
>
> Only commonality between the #prosecution and #defense seems to be the propensity for @RicolaUSA #Eventhejudgeissick #juryduty

(Ex. 8.) After the email was brought to the Court's attention the next morning, defense counsel sought the removal of the juror with the Government's consent. (Tr. 2112.)

The Court then informed Juror 10 that she had "ignored my direction not to talk about the case on social media and that [she had] been tweeting about [her] jury service." (Id. at 2125.) The juror acknowledged that she had, in fact, tweeted about her jury service. (Id.) But she also expressed confusion at being reprimanded for doing so: "I mean I made a point to not to write anything about what—whatever needs to happen, I completely understand, but I mean I just made a point to not reference anything, just that this is what I'm doing, still on jury duty, still on jury duty." (Id. at 2126.) Indeed, in the course of that colloquy, the Court acknowledged that Juror 10 seemed "surprised" about the confrontation. (Id. at 2125.) Nevertheless, because the tweet about "want[ing] to be an ADA," in particular, "could potentially show some bias," the Court informed

4

Juror 10 that she would be dismissed. (Id. at 2125, 2129.) When asked whether she had communicated about the case with other jurors, Juror 10 replied: "Absolutely not." (Id. at 2125.) She also "completely apologize[d]" for her actions. (Id. at 2130.)

After Juror 10 had been dismissed, in speaking with counsel, the Court confirmed that the tweeting had been "improper." (Id. at 2130.) The Court also agreed with defense counsel that the reference to the prosecutors and defense attorneys engaging in a game of Color War was "undoubtedly inappropriate." (Id. at 2131.) The Court then added:

> [T]hat being said, I do think part of my initial instructions said if you have a family member, you can say you are on jury duty, you are just not allowed to talk about the substance of it. And it doesn't appear she has actually talked about the substance.

(Id. at 2130–31.) Finally, the Court noted that "as a precaution we should speak with each of the jurors" to determine whether they had any improper communication with Juror 10. (Id. at 2131.) As evident from discussions with counsel concerning what questions should be asked of the other jurors, these inquiries were focused on improper communications among the jurors, in particular. (See id. at 2119–20.)

In the course of those subsequent discussions, Juror 2—the juror around whom this motion centers—answered as follows:

> THE COURT: Come on in. So, I'm asking this of all the different jurors just to confirm. Have you spoken or communicated about this case in any way with any of the other jurors?
>
> JUROR 2: No.
>
> THE COURT: Either in person or on social media?
>
> JUROR 2: No.
>
> THE COURT: In particular, have you communicated at all with Juror 10, [name omitted,] about the case?

5

> JUROR 2: I don't know which one she is.
>
> THE COURT: Oh, she is [name omitted].
>
> JUROR 2: Which one is she? She looks like what?
>
> LAW CLERK: She has the short hair.
>
> THE COURT: Dark hair, petite, stylish.
>
> JUROR 2: Oh. No. I'm like I don't know. I know them by like the actress and vegetarian.
>
> THE COURT: Have you talked to anyone about the case, putting aside who she is?
>
> JUROR 2: No, aside from things like, oh, my God, I hope it's over tomorrow and things like that.
>
> THE COURT: Have you followed this at all on the Internet or on social media?
>
> JUROR 2: No.
>
> THE COURT: OK. And I think that's it. Please don't talk to the other jurors even about what I asked you.
>
> JUROR 2: OK, no problem.

(Id. at 2133–34 (emphasis added).) Neither the prosecution nor defense counsel requested any additional inquiry of Juror 2, either generally or with specific reference to the statements—"things like, oh, my God, I hope it's over tomorrow and things like that"—that she acknowledged making. Nor did either side seek to have Juror 2 dismissed.

On September 5, 2014, Defendant Yang filed the instant motion, bringing Juror 2's activities on Twitter to the Court's attention for the first time. Based on the materials provided by counsel, Juror 2's tweets appear to have begun on March 23, the day before opening statements,

and to have concluded on April 14, the day the verdict was announced. The entire transcript made available by defense counsel is part of the record. See Affirmation of Stanislao A. Germán in Support of Rui Yang's Motion for a New Trial, Ex. A ("Def. Aff.") at 2–15. (Dkt. 292.)

Juror 2's early tweets evidenced both of what would become two recurring themes in her posts. The first was frustration about the commitment required to sit on a long jury trial. On March 23, when asked, "How are you doing?" she responded: "Eh. Sitting on a jury for the next three weeks. May be interesting, but I don't really have three weeks to put my life on hold. Plus it's Fed court, so it means my jury day goes 7:15am to 6:45pm with the commute :-/."[2] Her interlocutor replied, "That is BRUTAL," and then added: "Can I at least hope you're getting some good material for another book?" Juror 2 replied: "I don't know. Maybe. You never know what will happen :D I'll tell you once the trial's over :> But I am keeping an eye out." This comment about potential ideas for future writing projects was another recurring theme in her tweets. The remaining tweets described various aspects of life as a juror, such as the temperature in the courtroom and whether the jury box chairs were comfortable, as well as whether it would be appropriate to speak with various trial participants at the conclusion of the trial.

On March 26, several days into trial, Juror 2 queried: "I suppose it's inappropriate to ask judges, prosecutors & witnesses to talk to your MWA [Mystery Writers of America] chapter after the trial ends?" The same day, another user asked, "How is jury duty going? That is, if you can tell me!!" Juror 2 replied, again reiterating the difficulties of her commute: "it's okay. The bloody courtroom is FREEZING and the days are long because I have [a] 2hour [sic] commute on each end." Juror 2 then mentioned that while "they said the trial would be three weeks," having "seen

---

[2] Because of Twitter's limit of 140 characters per tweet, Juror 10's response to the question appears to have been split between two separate tweets. This occurs two more times in the conversations that have been provided by defense counsel.

the witness list now, … I am betting it goes longer." In the subsequent back-and-forth about how long she would be occupied with jury duty, Juror 2 mentioned that she obviously "can't crochet in the courtroom," that her "hands shake pretty badly at this point from the back," and that "[f]ederal court jury is comfy chairs."

The next day, on March 27, Juror 2 again mentioned that the trial "makes [for] a LONG FREAKING DAY" and that "[i]t's [a] 2 hour commute each way. :(." And she again mentioned her writing career. In response to a question about whether she was getting any book ideas, she said: "Oh, plenty!!" On April 1, her writing came up again when she remarked, "I really like our judge…she's the kind of person I would be interested in talking to." She also observed that she was "thinking about it," when asked whether she would invite the judge to speak at a Mystery Writers of America or Sisters in Crime event once her juror service was over. On April 2, Juror 2 again expressed frustration with how long the trial was lasting: "Waiting for the trial to be over so I can have [a] realistic schedule again." When asked whether it was "Boring or fun? Or tedious?" she replied: "Whenever they're doing something new, it's really interesting. But it's incredibly repetitive." Her interlocutor replied in agreement: "Nothing like TV. LOL." Juror 2 agreed in her reply: "No, and without saying anything a/b [about] the actual proceedings, 3 separate defendants, so every witness gets questioned a LOT."

Four days later, on April 6, the tweeting recommenced. One user told Juror 2: "You're almost done with the trial! YOU CAN DO IT!!" She replied: "And then I can have surgery... YAY." The writing theme came up yet again when the user asked: "you've got a lot of good research and plot bunnies, right?" Juror 2 replied: "Oh, tons. And I am still trying to figure out how to ask the FBI guys, judge, and AUSAs if any of them will talk to my... ." (The balance of

the tweet has not been provided.) Later the same day, Juror 2 mentioned her writing again, observing that "I write romantic suspense, so it helps that the criminal aspects interest me. On a civil case, I'd be nuts."

On April 14, several hours after the verdict was announced and the jury was excused with instructions that it was now free to discuss the case (Tr. 2497), Juror 2 provided her Twitter followers with additional details about the trial: "Okay, for all my tweeps who've been waiting to find out about the jury I've been on forever, this was the case: [Link to FBI press release]." She went on: "I now know far more about immigration than I ever wanted to and have parsed the legal definition of conspiracy seven ways from Sunday." Juror 2 further described the trial, noting: "We had three [defendants:] two lawyers and an office worker. It was really hard and we spent days deliberating." In the course of a back-and-forth with multiple users, she twice described the trial as "unreal" and that the trial had "definitely [provided] book fodder." She also commented on "[t]he sheer numbers of clients these guys were doing in a year …holy moly. And at 10k to 13k per win."[3] She further stated that "one of the defense [attorneys] had the balls in his summation to say that his client was just trying to help poor refugees from rural communities who didn't have the education to get asylum on their own. At $11k a pop." Finally, Juror 2 remarked that "these people prey on the fear and relative ignorance of applicants. It's horrible."

## II. LEGAL STANDARD

Rule 33 provides that upon a defendant's motion "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. This rule, the Second Circuit has explained, affords a trial judge "broad discretion … to set aside a jury verdict and order

---

[3] This comment presumably refers to the evidence at trial establishing that the Moslemi and Bandrich firms charged between $10,000 and $13,500 for each successful asylum application. (See Tr. 548–49, 1225.)

9

a new trial to avert a perceived miscarriage of justice." United States v. Sanchez, 969 F.2d 1409, 1413 (2d Cir. 1992); see also United States v. Robinson, 430 F.3d 537, 543 (2d Cir. 2005). "It is well-settled," however, "that motions for new trials are not favored and should be granted only with great caution." United States v. Costello, 255 F.2d 876, 879 (2d Cir. 1958); accord United States v. Stewart, 433 F.3d 273, 296 (2d Cir. 2006). "The ultimate test is whether letting a guilty verdict stand would be a manifest injustice." United States v. Aguiar, 737 F.3d 251, 264 (2d Cir. 2013) (quoting United States v. Ferguson, 246 F.3d 129, 134 (2d Cir. 2001)) (internal quotation marks and edits omitted). In other words, "there must be a real concern that an innocent person may have been convicted." Id. (internal quotation marks and edits omitted).

Concerns about the finality of a criminal judgment are particularly acute when a challenge is based on allegations of juror misconduct. "Post-trial jury scrutiny is disfavored because of its potential to undermine 'full and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople.'" Stewart, 433 F.3d at 302 (quoting Tanner v. United States, 483 U.S. 107, 120–21 (1987)). For that reason, "[a] new trial will be granted only if the juror's ability to perform her duty impartially has been adversely affected and the defendant has been substantially prejudiced as a result." United States v. Ganias, 755 F.3d 125, 132 (2d Cir. 2014) (internal quotation marks and citations omitted). Given the "delicate and complex" nature of investigating juror misconduct, a district court is permitted "broad flexibility in such matters, especially when the alleged prejudice results from statements by the jurors themselves." United States v. Peterson, 385 F.3d 127, 134 (2d Cir. 2004) (quoting United States v. Cox, 324 F.3d 77, 86 (2d Cir. 2003)).

"Juror misconduct" is a term that has been used to describe a wide assortment of wrong-doing, including a juror's searching for legal definitions on Wikipedia, United States v. Lawson,

677 F.3d 629 (4th Cir. 2012), a juror's conducting independent experiments concerning the evidence at trial, Doan v. Brigano, 237 F.3d 722 (6th Cir. 2001), overruled on other grounds by Wiggins v. Smith, 539 U.S. 510 (2003), the inappropriate exchange of gifts between jurors and the judge, Wellons v. Hall, 558 U.S. 220 (2010), as well as a juror's being half asleep during the bulk of a trial, People v. Jones, 369 Ill. App. 3d 452 (2006). Regardless of the particular allegation at issue, "[t]he critical element in shaping the proper response to juror misconduct is the court's assessment of its likely prejudicial impact, regardless of whether the misconduct is revealed during or after trial." LaFave *et al.*, 6 Criminal Procedure § 24.9(f) (3d ed. 2007).

### III. DISCUSSION

The Sixth Amendment guarantees defendants the right to a trial "by an impartial jury." U.S. Const. amend. VI. "A juror … who posts comments about the trial on [social media], may, in certain circumstances, threaten [that right]." Ganias, 755 F.3d at 132. The question here is whether the Juror 2's actions did so. Defendants advance three related arguments. First, they argue that Juror 2 failed to honestly answer a material question following the discovery of Juror 10's tweets such that, had she answered honestly, Defendants would have had a valid basis to seek her removal. Second, Defendants assert that the juror ignored the Court's express instructions not to post about the trial on social media. Finally, building on the first two claims, Defendants assert that Juror 2's tweets reveal her bias against them.[4] None of these arguments is persuasive.

---

[4] The Government contends that Defendants may have waived their arguments either by failing to raise them earlier or by failing to exercise reasonable diligence in discovering Juror 2's tweets. (Opp. at 18–20.) For the purposes of this motion, the Court assumes that Defendants' arguments have not been waived or otherwise forfeited and thus proceeds to the merits.

11

## A. Juror 2's Alleged Failure to Answer the Court's Questions Honestly

Defendants rely on <u>McDonough Power Equip., Inc. v. Greenwood</u>, 464 U.S. 548 (1984) (<u>See</u> Reply at 1), pursuant to which they must make a two-part showing to receive a new trial based on juror misstatements or nondisclosure. First, Defendants must "demonstrate that a juror failed to answer honestly a material question on *voir dire*," and, second, "that a correct response would have provided a valid basis for a challenge for cause." <u>Id</u>. at 556. Both of these elements must be satisfied because defendants are not entitled to a new trial "based simply on whether a … juror had lied, without respect to whether the dishonesty had a bearing on her impartiality." <u>United States v. Langford</u>, 990 F.2d 65, 69 (2d Cir. 1993).

Defendants' argument fails at step one. First, they assert that Juror 2 "repeatedly denied during questioning that she had communicated about this case on the internet or social media." (Mem. at 10.) The record establishes otherwise. Indeed, Juror 2 was never asked specifically whether she had discussed the case with anyone on Twitter or other social media. Rather, the Court's questions—which were formulated after discussion with counsel for both sides—queried (1) whether Juror 2 had "communicated about this case in any way with any of the other jurors … [e]ither in person or on social media"; (2) whether she had "talked to anyone about the case, putting aside who she is"; and (3) whether she had "followed this [case] at all on the Internet or on social media." (Tr. 2133–34.)

When asked if she had "talked to anyone about the case, putting aside who she is," Juror 2 expressly acknowledged that she had spoken about "things like, oh, my God, I hope it's over tomorrow and things like that." (Tr. 2133–34.) Although in the context of that colloquy she was likely referring to discussions with fellow jurors, to the extent that "talk[ing]" includes tweeting, a review of Juror 2's tweets reveals the same concern over the length of the trial. On March 23, Juror 2 tweeted about not "really hav[ing] three weeks to put my life on hold." (Def. Aff. at 2.)

12

On March 26, she bemoaned that "the days are long because I have [a] 2hour [sic] commute on each end." (Id. at 5.) On March 27, she reiterated that the trial "makes [for] a LONG FREAKING DAY" and that "[i]t's [a] 2 hour commute each way." (Id. at 7.) And on April 2, she spoke of "[w]aiting for the trial to be over so I can have [a] realistic schedule again." (Id. at 10.)

Although some of Juror 2's comments did go further than discussing the duration of the trial, none of those comments strayed outside her explicit acknowledgement of discussing other "things like that." These additional comments fall into three categories. The first included miscellaneous banter about the courtroom, such as the "FREEZING" temperature, not being able to "crochet in the courtroom," and the "comfy chairs" in the jury box. (Id. at 5–6.) The second category included comments about whether the trial was providing ideas for future writing projects (Id. at 3, 7, 11), and the third category concerned whether it would be appropriate to speak with the FBI agents, judge, and prosecutors at the conclusion of the trial (Id. at 4, 11). None of these comments evidence a discussion of "the case" one way or another.[5]

Nor do any other of Juror 2's answers betray any dishonesty. She was first asked whether she had "spoken or communicated about this case in any way *with any of the other jurors*." (Tr. 2133.) She responded that she had not. There is nothing to suggest that this answer was anything but true. She was next asked whether there had been any communications *with other jurors* "[e]ither in person or on social media." Again, her response was no, and again, there is nothing to suggest this answer was untruthful. The same is true for the subsequent questions concerning any contacts with Juror 10. Her final answer does not suggest dishonesty either. When asked whether

---

[5] The closest statement Juror 2 made about the case itself was in response to a question about whether the trial was "[b]oring," "fun," or "[t]edious," to which she responded: "Whenever they're doing something new, it's really interesting. But it's incredibly repetitive." (Def. Aff. at 10) The very next sentence reveals, however, that she took to heart the Court's instructions concerning discussion of the substance of the case: "*without saying anything a/b [about] the actual proceedings*, 3 separate defendants, so every witness gets questioned a LOT." (Id. (emphasis added).)

13

she had "followed this [case] at all on the Internet or on social media," Juror 2 answered in the negative. As the Government rightly observes (Opp. at 14), there is no evidence to suggest this answer was untrue because there is a relevant distinction between *posting* something and *reading* it. Juror 2's impugned activities were entirely within the former category and Defendants have not claimed otherwise. Furthermore, as noted above, the tweets she did post cannot fairly be characterized as being about "the case." Accordingly, there is nothing in the record to suggest that Juror 2 was anything but honest in responding to the Court's questions on April 9.

In any event, Juror 2's tweets do not evidence bias such that the second prong of McDonough has been established. It is well settled that a juror may be dismissed for "actual bias, implied bias, or inferable bias." United States v. Greer, 285 F.3d 158, 171 (2d Cir. 2002); see also United States v. Sampson, 820 F. Supp. 2d 151, 162–67 (D. Mass. 2011) (discussing in depth each form of bias). Here, Defendants appear to make a claim of actual bias, but there is no basis to find bias of any kind on these facts. Defendants point, in particular, to the March 26 tweet, where Juror 2 spoke of inviting "judges, prosecutors & witnesses" to speak to her local chapter of Mystery Writers of America, and the tweet of April 6, where she says "still trying to figure out how to ask the FBI guys, judge, and AUSAs if any of them will talk to my [writers group.]" (Def. Aff. at 4, 11.) Defendants argue that the fact that they and their counsel are not mentioned in these tweets is proof of Juror 2's bias against them. The Court disagrees.

The mere fact that a juror is interested in communicating with individuals associated with one party in a case does not, without more, establish bias or permit an inference of bias. Indeed, at least one other Court has recognized as much. In Crowley v. L.L. Bean, Inc., 303 F.3d 387 (1st Cir. 2002), a sex discrimination case by a female employee where defendants lost at trial, the defendant employer sought to challenge a juror's impartiality on the basis of, among other things, a letter she wrote to the trial judge after the verdict. In her letter, the juror asked to speak to

14

plaintiff's counsel—with no mention of defense counsel—because she "found the case to be most interesting, in particular because of my training as a psychologist and my interest as a research scientist." Id. at 407. The challenge did not succeed because, among other things, the claim that the juror's "interest in women's issues naturally correlates to" bias against employers and male defendants was "unfounded." Id. (internal quotation marks omitted). That logic applies here with equal force. Juror 2 is a writer of crime fiction—as all parties were well aware from the outset of this case—and it is hardly surprising that she should be curious to speak with the FBI, prosecutors, and the judge for any number of reasons, just as it would not be surprising had she expressed a desire to speak to defense counsel and the judge, or some other combination of trial participants. To find bias in these circumstances, without more, requires crediting speculation over facts.

**B.      Juror 2's Alleged Failure to Follow the Court's Instructions**

Defendants' second argument—that Juror 2 engaged in misconduct by failing to follow the Court's order not to "[t]weet about your experience here" (Tr. 40)—also fails. While it is true that Juror 2 did indeed tweet about her experience, as a preliminary matter, it is clear that the Court's instruction, when read in context, was concerned with comments concerning "*the facts or circumstances* of this case." (Id. (emphasis added).) That much was confirmed when, shortly after Juror 10 was dismissed for her actions, the Court observed to counsel that a juror "can say [on social media that] you are on jury duty, *you are just not allowed to talk about the substance of it*." (Tr. 2131 (emphasis added).) Indeed, Juror 2's tweets show that that is precisely how she understood the admonition.[6] On March 23, in response to a question about what she was learning at the trial, she tweeted: "I'll tell you *once the trial's over*." (Def. Aff. at 3 (emphasis added).) Similarly, on April 6, she agreed with another user that the trial was nothing like television shows but added:

---

[6] And, as mentioned above, so did Juror 10. See supra, at 4.

15

"*without saying anything a/b [about] the actual proceedings*, 3 separate defendants, so every witness gets questioned a LOT." (Id. at 10 (emphasis added).) Finally, on her personal blog, an excerpt of which has been provided by the Government, she provided her understanding of the Court's rules in these terms in a post from March 24:

> I am curious about how many of my friends have served on juries and what their experiences were. I am currently serving on a federal jury which—because the federal courthouse is far from close to my house—is making for very long days. The nice thing about the federal courthouse in NY is that it is right at the edge of Chinatown, so every day on our one hour lunch I get to go try a different restaurant. *Of course I cannot yet say anything about the trial. Those are the rules.* But even jury selection itself gave me ideas for new books, and I am anxious to share some of the cool stuff I've learned with you all. Have you served on a jury?

(Opp., Ex. A (emphasis added).) Thus, although Juror 2 did tweet about her experience as a juror, contrary to the literal language of the Court's admonition, it would not be fair to conclude that she violated its spirit.[7]

Nonetheless, Defendants argue that because "[t]he commentary by Juror Number Two on twitter is nearly identical in nature to the tweets of the disqualified juror in terms of substance, style and bias … no credible argument could be put forth to suggest that had the parties become aware of Juror Number Two's tweets during the April 9th, 2014, voir dire that she would not have been removed For Cause." (Mem. at 11.) The record establishes otherwise. Although it is true that Juror 10 similarly "ignored [the Court's] direction not to talk about the case on social media" and "tweet[] about [her] jury service" (Tr. 2125), as noted at the time she was dismissed, Juror 10's comment that she "want[ed] to be an ADA," "potentially show[ed] some bias" (Id. at 2125),

---

[7] Defendants' reliance on United States v. Juror No. One, 866 F. Supp. 2d 442 (E.D. Pa. 2011), is misplaced. In that case—a criminal matter against a dismissed juror who emailed other jurors during deliberations about her view of the defendant's guilt—the trial judge found that "[t]he clear language of both orders prohibiting any type of discussion via any medium until the conclusion of the case does not permit much leeway for plausible though mistaken understandings of the orders." Id. at 448–49.

making her dismissal and substitution by an alternate juror—with the consent of all parties—appropriate in the circumstances.[8]  For the reasons discussed above, the potential for bias—let alone an actual showing or reasonable inference of bias—is wholly absent from Juror 2's tweets.  Moreover, "[a] mistrial or other remedial measure is required only if juror misconduct *and actual prejudice* are found." Cox, 324 F.3d at 86 (emphasis added); accord Ganias, 755 F.3d at 132.  Just as there has been no showing of bias, there has been none of prejudice either.  Relief under Rule 33 in these circumstances is thus inappropriate.

Finally, Defendants rely on the tweets of March 27 and April 6, where Juror 2 states that she is getting "tons" of ideas for her writing to further bolster the claim of juror misconduct.  On the basis of these tweets, Defendants argue that Juror 2 "seems more focused on obtaining information for a future book rather than someone attentive to the matter at hand." (Mem. at 12.)  Not only can the Court attest to Juror 2's attentiveness at trial, her tweets themselves prove as much.  On April 2, she described the trial as "really interesting." (Def. Aff. at 10.)  Again, on April 6, she tweeted, "I write romantic suspense, *so it helps that the criminal aspects [of the trial] interest me*." (Id. at 12 (emphasis added).)  And after the verdict was reached, on April 12, she tweeted a link to the FBI's press release concerning the case and demonstrated a command of the relevant law and facts, including having "parsed the legal definition of conspiracy seven ways from Sunday." (Id.

---

[8] Indeed, those circumstances include the fact that the substitution of an alternate juror during trial is governed by a different legal standard.  See United States v. Thompson, 528 F.3d 110, 121 (2d Cir. 2008), as amended (July 1, 2008) ("district courts have broad discretion … to replace a juror at any time before the jury retires if there is reasonable cause to do so") (internal quotation marks and citations omitted); United States v. Fazio, ___ F.3d ___, 2014 WL 5351463, at *8 (2d Cir. Oct. 22, 2014) ("Removal of a juror is the prerogative of the court and does not require the consent of any party.") (internal quotation marks and citations omitted).  "Reasonable cause" has been found not only to encompass concerns of bias discovered during trial, but other reasons such as a juror's health, see, e.g., United States v. Ellenbogen, 365 F.2d 982, 989 (2d Cir. 1966) (discovery during trial of a juror's illness), Thompson, 528 F.3d at 121 (a juror's "nerves [being] shot"), family issues, see, e.g., United States v. Millar, 79 F.3d 338, 342 (2d Cir. 1996) (the sudden death of a juror's father), and general conduct, see, e.g., United States v. Gambino, 951 F.2d 498, 503 (2d Cir. 1991) (a juror's lateness, sleeping, and a feeling of being in "over her head").

at 14.) None of this suggests a juror who was not paying attention. On the contrary, Juror 2's tweets confirm the Court's impression of Juror 2 as an individual who took her civic duty seriously.[9]

## IV. CONCLUSION

When the embrace of social media is ubiquitous, it cannot be surprising that examples of jurors using platforms like Facebook and Twitter "are legion." United States v. Fumo, 655 F.3d 288, 332 (3d Cir. 2011) (Nygaard, J., concurring). And because of the risks inherent in such activity, "vigilance on the part of trial judges is warranted." Ganias, 755 F.3d at 132. On this record, however, Defendants' claim must fail. Juror 2 was an attentive juror who, while engaging in banter with fellow Twitter users about her experience, was nonetheless careful never to discuss the substance of the case, as instructed by the Court. The record is devoid of any evidence that she was either dishonest or biased, or that Defendants were prejudiced by her tweets in any way. Accordingly, and for these reasons provided herein, Defendants' Rule 33 motion is DENIED. The Clerk of Court is respectfully requested to close the motion at Dkt. 291.

SO ORDERED.

Dated:  November 14, 2014
        New York, New York

Ronnie Abrams
United States District Judge

---

[9] Defendants do not allege that Juror 2 engaged in any inappropriate communication other than the tweets. Because the record as supplied by Defendants provides a sufficient basis on which to adjudicate their Sixth Amendment claim, the Court accordingly finds it unnecessary to hold a further hearing. As a general rule, "courts are, and should be, hesitant to haul jurors in after they have reached a verdict in order to probe for potential instances of bias, misconduct or extraneous influences." United States v. Moon, 718 F.2d 1210, 1234 (2d Cir. 1983). Thus, "a trial court is required to hold a post-trial jury hearing only when reasonable grounds for investigation exist." Id.

18