UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 07/20/2015

UNITED STATES OF AMERICA,

v.

FENG LING LIU
a/k/a "Karen,"

Defendant.

No. 12-CR-934-01 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

On April 14, 2014, following a three-week trial, a jury convicted Defendant Feng Ling Liu (also known as Karen) and her co-defendants of one count of conspiracy to commit immigration fraud pursuant to 18 U.S.C. § 371. The indictment charged that Defendant was part of a multi-year conspiracy to submit fraudulent asylum applications to federal immigration authorities. Defendant, now proceeding *pro se*, renews her motion for a judgment of acquittal under Fed. R. Crim. P. 29 and, in the alternative, moves to set aside the jury's verdict pursuant to Fed. R. Crim. P. 33.

Defendant makes numerous claims in her exhaustive 85-page, single-spaced brief that, broadly speaking, fall into two categories. First, Defendant challenges the Government's actions both prior to and at trial. She contends that the Government engaged in various forms of misconduct in the investigation and prosecution of her case—including selective prosecution, Sixth Amendment violations, and *Brady* violations—and that the Government's jury addresses and direct examinations of witnesses were improper. Although framed as allegations of prosecutorial misconduct, many of these arguments amount to little more than attempts to dispute witness credibility and relitigate evidentiary rulings. Second, Defendant challenges her counsel's performance, arguing that he and his team were constitutionally ineffective. These arguments largely repeat

Defendant's allegations with respect to the Government's alleged improprieties, faulting her counsel for overlooking them.

The Court has considered each of Defendant's claims and finds none of them availing.[1] Accordingly, as the Court stated at Defendant's sentencing, *see* Sent. Tr. 2, and for the reasons that follow, Defendant's motions are therefore denied.

## BACKGROUND[2]

### A.     The Conspiracy

Defendant was one of nine individuals named in an indictment that alleged her participation in a widespread conspiracy to defraud U.S. immigration authorities by submitting hundreds of fraudulent asylum applications on behalf of ineligible applicants.  Dkt. 152.[3]  Three defendants—including Liu, one of the conspiracy's architects—proceeded to and were found guilty after a three-week trial.  In making their case, prosecutors relied chiefly on the testimony of two former

---

[1] Defendant also joined the separate Rule 33 motion of her co-defendant Rachel Yang, which sought a new trial based on alleged juror misconduct.  The Court has previously denied that motion.  *See United States v. Feng Ling Liu*, No. 12-CR-934 (RA), 2014 WL 6076571 (S.D.N.Y. Nov. 14, 2014).

[2] The following account is drawn from the record established at trial.  As explained in the course of discussing the Rule 29 motion, the Court "draw[s] all permissible inferences in favor of the government and resolve[s] all issues of credibility in favor of the jury verdict."  *United States v. Kozeny*, 667 F.3d 122, 139 (2d Cir. 2011).

[3] While the indictment spoke of "at least two hundred" applications, Dkt. 152 at 3, at trial the Government introduced evidence that the law firms associated with the conspiracy were responsible for filing approximately 1,800 applications, Tr. 154–55, and that substantially all of these applications were false, Tr. 510, 552, 1206–07.  The Government has since argued that the number is significantly higher.  Specifically, the Government suggests that between 2006 and 2012 (a period that goes beyond the conspiracy alleged in the indictment) "approximately 3,000 individuals represented by a Feng Ling Liu/Moslemi or Bandrich lawyer were granted asylum, including approximately 900 individuals on whose cases Feng Ling Liu personally appeared."  *See* Gov't Letter of October 31, 2014 at 4, Dkt. 383.  (The Government did not provide the number of applications *filed*, but the number of *granted* applications, which is, of course, at least equivalent to the number filed.)  The Court declined to act on the Government's revised figure at sentencing, *see* Sent. Tr. 5–7, and for the purposes of this motion the Court relies only on the evidence admitted at trial.  Although the jury did not have to make a finding as to the number of false applications for the purpose of reaching its verdict, the Court conservatively determined, for the purpose of imposing forfeiture at sentencing, that at least 1,449 fraudulent applications filed by the firms were, in fact, granted.  *See* Sent. Tr. 76.  For forfeiture purposes, the Court focused on the number of applications granted, as opposed to those merely filed, because the quantum of the law firms' proceeds depended, in part, on the success of an individual application.

employees, Victor You and Meng Fei Yu, along with several undercover informants who posed as asylum applicants. There was also significant documentary evidence, including transcripts of recordings made by Yu and by Lin Chen, one of the informants.

The initial locus of the conspiracy was Defendant's namesake law firm in Manhattan's Chinatown. Under her leadership, the Feng Ling Liu Law Firm established itself as among the city's most productive immigration firms, filing some 900 asylum applications on behalf of Chinese nationals between 2007 and 2009. Tr. 154. The evidence at trial, however, established that little, if anything, about these hundreds of claims of persecution was grounded in fact. Indeed, by 2007, the firm had essentially become a well-oiled fraud machine.

At initial interviews with applicants, the firm's employees would not inquire whether the applicants actually had a viable claim of persecution. Tr. 550, 552, 1225–26. Rather, claims were fabricated based on what employees determined was most likely to be successful in light of the applicant's background. Tr. 545–46, 976, 1225–26, GX 40T at 21. For example, a claim of persecution based on Christianity, which would likely require familiarity with the finer points of the faith, might make most sense for an educated client, while a family planning claim might be better suited to a female client. Tr. 546, 1228, 976, 1225; GX 40T at 21–22.

Once employees had settled on a particular claim, it would fall to paralegals, or "storywriters," to craft a narrative to persuade immigration officials that a grant of asylum was appropriate. Tr. 552, 1229. These stories were often based either on ready-made templates maintained by the firm or on previous narratives that had been crafted for the same type of claim. Tr. 558–60, 1236. Virtually none of them, however, was based on actual persecution suffered by the applicant. Tr. 557, 1234. Applicants were coached by employees to pretend during their asylum interviews that they were "actor[s]" in "a movie." GX 141T at 55, GX 112T at 19. The results of this systematic

effort were lucrative: The firm's most popular payment plan involved charging $1,000 upfront, followed by an additional $9,000 once an individual's application was granted. Tr. 548–49.

While the conspiracy involved dozens of individuals of varying levels of responsibility and culpability, including willing customers, many of them, including all of the leaders,[4] were members of Defendant's family, related either by blood or marriage. At the apex were Defendant, who was in charge of her namesake firm, and her husband, David Miao,[5] who served primarily as the firm's office manager, overseeing day-to-day operations and conducting intake interviews with prospective clients. Tr. 492, 539–41, 1196, 1208, 1223. Both Defendant and David shared leadership responsibilities, such as conducting employee interviews together, Tr. 491, 495–96, 1196–97, and were regarded by employees as the "boss[es]," Tr. 609, 1196. Indeed, Defendant once told an employee that she should not worry because if the Government ever came after the firms, it would be Defendant and David who would be in trouble. Tr. 1268, GX 154.

Below Defendant and David Miao in the hierarchy, Defendant's brother, Harry Liu, was ultimately put in charge of the conspiracy's activities at a second firm set up under the conspiracy's auspices, as further discussed below. Tr. 605–06, 1271–72. Other family members known to be involved with the conspiracy included Lillian Miao (David's sister), Kevin Xia (Defendant's brother in law), Lucy Liu (Defendant's sister), Yolanda Gao (Harry's wife), Andy (Defendant's nephew), and Ann (David's sister).[6] Those individuals collectively had a variety of responsibilities, including conducting the intake interviews and coaching clients for appearances in front of immigration officials. Tr. 539, 559–60, 590, 1256, 1275.

---

[4] Sent Tr. 47–48; David Miao Sent. Tr. 17–20, Dkt. 485; Harry Liu Sent. Tr. 42–43, Dkt. 358.

[5] The parties are referred to by the names used during trial. Accordingly, the Court refers to Yuchang Miao as David, Shuran Liu as Harry, Guo Qin Miao as Lillian, and Shu Feng Xia as Kevin.

[6] The record does not include Andy's or Ann's last name.

There were also non-family members who played instrumental, if not as significant, roles in the conspiracy. Vanessa Bandrich, one of Liu's co-defendants at trial, would eventually be elevated to become the face of a second law firm set up as part of the conspiracy. Tr. 603, 1262, 1271. Many others, including Feng Li, Victor Yu, Meng Fei Yu, Rui Yang, and Wen Ting Zheng would occupy a variety of other roles, ranging from attorneys to paralegals to office managers.

By 2009, Defendant had become concerned that the high volume of applications filed by her firm might attract unwarranted scrutiny from federal authorities. Tr. 605–06, 1272. An out-of-town lawyer by the name of Troy Moslemi, who has never been charged in connection with this conspiracy, joined the firm that year and shortly thereafter its name changed to Moslemi & Associates. Tr. 600, 1262, 1271–72. The new name on the door notwithstanding, the firm operated as it had in the past, with Defendant and David Miao in charge. Tr. 609, 1347. Employees regarded the name change as little more than a superficial effort to draw attention away from Defendant. Tr. 602–03, 1271–72.

At the same time, Defendant also tasked her brother Harry with opening a new firm across the street, hoping that the creation of a separate firm—with a separate name—might draw less attention to the conspiracy's activities. Tr. 605–06, 1271–72. Bandrich, who until that point had been a lawyer at Moslemi, was transferred to the new firm, which would be known as Bandrich & Associates. Tr. 603, 605. The Bandrich firm operated in essentially the same way as the Liu/Moslemi firm. *See, e.g.*, GX 40, 44, 57, 110; Tr. 578; GX 302A–K. Indeed, at its inception, roughly 100 files were transferred from the Liu/Moslemi firm to the Bandrich firm. Tr. 606. The Bandrich firm filed some 480 asylum applications in its three years of operation. Tr. 155.

Between 2007 and the time the firms were raided by the FBI in December 2012, Defendant and her co-conspirators were responsible for filing approximately 1,800 applications. Tr. 155.

## B. Defendant's Representation by Counsel

Before trial, Defendant was represented by Paul Schectman and James Sottile of Zucker-man Spaeder LLP, who filed pre-trial motions on her behalf. *See* Dkt. 78. Those motions were ultimately denied. *See United States v. Feng Ling Liu*, No. 12-CR-934 (RA), 2014 WL 101672 (S.D.N.Y. Jan. 10, 2014). These attorneys' effectiveness is not now the subject of any challenge. Roughly a month after Defendant's pre-trial motions were decided, on February 28, 2014, Defendant sought and received permission to substitute Schechtman and Sottile with Ronald Fischetti, Eric Franz, and Phyllis Malgieri. 02/28/14 Tr. 2–3, Dkt. 155. This team was assisted by two more attorneys, Alex Kovacs and Maryam Jahedi, at various times throughout the trial. Tr. 1697–98. The trial began roughly three weeks later, on March 19, 2014.

Although represented by seasoned defense counsel at trial, Defendant was an active par-ticipant in her own defense. *See infra* at 36–40. These efforts culminated in a motion by Defendant on April 7, 2014 to be appointed co-counsel. Her request was motivated, at least in part, by a desire to recall Victor You and Meng Fei Yu, two principal Government witnesses, so that she could cross-examine them herself and a desire, potentially, to deliver her own summation. Tr. 1783–84, 1787, 1803. The questions Defendant proposed to ask of the two witnesses amounted to 88 pages. *See* Dkt. 488, Ex. 2 & 3. After submissions from the parties—including Defendant speaking for herself—the Court denied Defendant's motion for hybrid counsel for the reasons stated on the record. *See* Tr. 1803–04.

After the jury reached its verdict on April 14, Fischetti asked to be relieved as counsel. *See* Tr. 2499–51. Defendant indicated she had no objection to counsel and his team's withdrawal and that she was considering representing herself going forward. Tr. 2499. After conducting an in-quiry pursuant to *Faretta v. California*, 422 U.S. 806 (1975), the Court concluded that Defendant

was competent to make that decision and relieved Fischetti and his colleagues. 04/14/14 Tr. 10, Dkt. 459 ("Withdrawal Tr."). In so concluding, the Court "note[d] for the record that [Defendant is] an attorney … [and has] been very active in [her] own defense." Withdrawal Tr. 10.

Notwithstanding counsel's withdrawal and the Court's determination that Defendant satisfied *Faretta*, the Court invited CJA duty counsel, Arnold J. Levine, to consult with Defendant the same day to determine whether she preferred to substitute counsel instead. Following that consultation, Defendant advised the Court that "after hearing the Court and Levine's advice, I think it's in my best interest to have a lawyer to represent me." 04/14/14 Tr. 3, Dkt. 461. The Court then appointed Levine as Defendant's counsel. 04/14/14 Tr. 4.

On August 25, however, as Defendant's sentencing date approached, Levine advised the Court that Defendant sought to be appointed as co-counsel or, in the alternative, to proceed *pro se* either with or without him acting as standby counsel. Dkt. 278. At a conference to discuss the matter on September 8, Levine and Defendant advised the Court that Defendant no longer wished to proceed as co-counsel but instead preferred to proceed *pro se*. 09/08/2014 Tr. 3, Dkt. 343. After conducting a second *Faretta* hearing, *see* 09/08/2014 Tr. 3, 5–14, 18, the Court granted Defendant's motion to proceed *pro se* with Levine acting as standby counsel. *See* Dkt. 300. No further changes to Defendant's representation status were made following that hearing.

## THE MOTION FOR A JUDGMENT OF ACQUITTAL

### A.     Legal Standard

Rule 29 provides that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29. "A defendant challenging the sufficiency of the evidence [supporting a jury's verdict] bears

a heavy burden, because the reviewing court is required to draw all permissible inferences in favor of the government and resolve all issues of credibility in favor of the jury verdict." *United States v. Kozeny*, 667 F.3d 122, 139 (2d Cir. 2011). This is an "exceedingly deferential standard of review." *United States v. Hassan*, 578 F.3d 108, 126 (2d Cir. 2008). "The question is not whether this Court believes that the evidence at trial established guilt beyond a reasonable doubt, but rather, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Mi Sun Cho*, 713 F.3d 716, 720 (2d Cir. 2013) (*per curiam*) (quotations omitted). The evidence must be viewed "in its totality, not in isolation," *United States v. Huezo*, 546 F.3d 174, 178 (2d Cir. 2008), "as each fact may gain color from others," *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999). Even in a close case, where "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter." *United States v. Temple*, 447 F.3d 130, 137 (2d Cir. 2006) (internal quotation marks and alteration omitted).

**B.     Discussion**

Applying the governing standard, Defendant's challenge to the sufficiency of the evidence fails. Her argument ultimately rests on assertions that cooperating witnesses "Meng Fei [Yu] and Victor [You] are professional liars," Def.'s Mem. at 25, and that "[n]ot a single piece of evidence is produced against Karen," *id.* at 38–39. The record establishes otherwise and Defendant's renewed motion to dismiss is accordingly denied.[7]

At the outset, this motion presents no occasion for relitigating witness credibility. "It is the province of the jury and not of the court to determine whether a witness who may have been

---

[7] Defendant initially moved for a judgment of acquittal at the close of the Government's case. Tr. 2020. A decision on the motion was reserved until the close of evidence, Tr. 2020, 2104, and was ultimately denied, Tr. 2108. The Court takes this opportunity to articulate its reasons.

inaccurate, contradictory and even untruthful in some respects was nonetheless entirely credible in the essentials of his testimony." *United States v. O'Connor*, 650 F.3d 839, 855 (2d Cir. 2011) (quotation omitted). The veracity of the Government's witnesses was thoroughly canvassed by both sides at trial, including during opening statements and summations. *See, e.g.*, Tr. 79 (defense counsel asserting in his opening statement that "[e]very one of [the Government witnesses] who will testify will tell you, and you will believe, that they're trading their crime to get freedom by lying about my client"); Tr. 2211 (defense counsel arguing that "[Yu] lied. … She's sitting with three people and she's lying right to their faces, and now she gets on the stand and tells you that she's telling the truth about my client. And you have to believe that?"); Tr. 2230 (defense counsel in summation stating, "You don't think that Victor is lying[?]"); Tr. 2373 (prosecution remarking in rebuttal that defense counsel "spent a lot of time on [the cooperating witnesses]. They made sure they called them liars."). At this juncture, this Court must accept—and does accept—the testimony of the Government's witnesses as credible. Such reliance is well-founded, moreover, because their testimony was consistent in all material respects and was corroborated by ample other evidence, including the recordings made by Lin Chen between May 2011 and January 2012, *see* GX 40, 44, 57, 110, and the blank receipts, health records, and church stationery used to create fake "one-year letters" found at the Bandrich firm's office in December 2012, *see* Tr. 578; GX 302A–K.

In any event, there is no question on this record that a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Mi Sun Cho*, 713 F.3d at 720 (quotation omitted). "The essence of conspiracy is, of course, agreement, and in order to establish a conspiracy, the government must show that two or more persons entered into a joint enterprise with consciousness of its general nature and extent." *United States v. Chavez*, 549 F.3d

119, 125 (2d Cir. 2008). To prove an individual's membership in the conspiracy, the prosecution must present "proof of [her] purposeful behavior aimed at furthering the goals of the conspiracy." *United States v. Diaz*, 176 F.3d 52, 97 (2d Cir. 1999) (internal quotation marks omitted). "[T]he government need not show that [a conspirator] knew all of the details of the conspiracy, so long as [s]he knew its general nature and extent." *United States v. Rosa*, 17 F.3d 1531, 1543 (2d Cir. 1994). "Both the existence of a conspiracy and a given defendant's participation in it with the requisite knowledge and criminal intent may be established through circumstantial evidence." *United States v. Stewart*, 485 F.3d 666, 671 (2d Cir. 2007). Indeed, that is "more often than not" the case. *United States v. Lorenzo*, 534 F.3d 153, 161 (2d Cir. 2008) (quotation omitted). Where there is direct evidence of membership, "a conviction may be sustained on the basis of the testimony of a single accomplice, so long as that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt." *Diaz*, 176 F.3d at 92 (quotation and alteration omitted).

Here, there was overwhelming evidence regarding the existence of the conspiracy. Indeed, at times Defendant appears to concede as much, instead stressing her purported ignorance of the rampant fraud at the Liu/Moslemi and Bandrich firms. *See, e.g.*, Def.'s Mem. at 27 ("[The Government's strategy was] to introduce a lot of evidence on the fraud committed by other defendants in the two firms"); *id.* at 31 ("Lin Chen's recordings indeed show the existence of fraud but the prosecutor clearly exaggerated the degree of the fraud."); *id.* at 37 ("Karen did not deny that the two cooperating witnesses indeed committed immigration fraud … but it happened after Karen left the firm …"); *id.* at 40 ("all the outrageous evidence of fraud … [has] no connection whatsoever to Karen"). On other occasions, however, Defendant appears to deny there was any fraud or conspiracy at all. *See e.g.*, *id.* at 41 ("Karen's defense is that … there is no fraud in her office as

far as she knew"); *id.* at 43 ("No one was engaged in fraud contrary to the prosecutor's claim."); *id.* at 47 ("The truth is there was no crime going on in the firm."). In any event, as described in detail above, *see supra* at 2–5, the evidence at trial laid bare the existence of a highly organized, widespread, multi-year conspiracy to commit immigration fraud.

Nor can there be any question about Defendant's membership in that conspiracy. Indeed, Defendant was one of the recognized leaders of this criminal enterprise. The record established that Defendant initially opened the firm that bore her name, that she was the "boss," and that she recruited Troy Moslemi but remained in charge when the firm took his name. Tr. 492, 601–03, 609, 1196. She was responsible for hiring employees, training them, and assigning them work. Tr. 491, 1196, 1233, 1235–36, GX 154-BT. She met with clients and discussed the types of claims they could make. Tr. 539–41, 1208–09, 1225–28. She reviewed storywriter's drafts and made substantive edits. Tr. 567–68, 1242–45. She signed applications before they were submitted to government officials. Tr. 593, 1252–53. She instructed Victor You to attend asylum interviews and then report back so that paralegals could be better trained and clients better prepared. Tr. 590-93, 1258–59. She instructed her brother Harry to set up the Bandrich firm across the street to take the heat off Moslemi. Tr. 605-06, 1271–72.

In the end, Defendant's claims concerning the non-existence of the conspiracy and her lack of a role in it amount to little more than rearguing points that were made to, and rejected by, the jury. Thus, they cannot succeed at this juncture.

## THE MOTION FOR A NEW TRIAL

**A.      Legal Standard**

Rule 33 provides that "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. As compared with Rule 29, Rule 33 by its plain terms confers "broader discretion to grant a new trial." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001). In exercising that discretion, "[t]he district court must strike a balance between weighing the evidence and credibility of witnesses and not 'wholly usurp[ing]' the role of the jury." *Id.* at 133 (*quoting United States v. Autuori*, 212 F.3d 105, 120 (2d Cir. 2000)) (alteration in original). "It is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment." *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992). The "strict" Rule 33 standard, *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995), requires that a trial judge "must harbor a real concern that an innocent person may have been convicted," *United States v. Guang*, 511 F.3d 110, 119 (2d Cir. 2007).

Because it is not tethered to any particular deficiency, Rule 33 is also an appropriate procedural vehicle for bringing to the attention of the trial court claims, for example, of *Brady* violations and ineffective assistance of counsel. *See, e.g.*, *United States v. Rivas*, 377 F.3d 195, 199 (2d Cir. 2004) (*Brady* violation); *United States v. Owen*, 553 F.3d 161, 163 (2d Cir. 2009) (prosecutorial misconduct and ineffective assistance of counsel). Although claims of specific deficiencies have specific tests, each of which the Court will discuss in the course of its analysis, "[t]he ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." *Ferguson*, 246 F.3d at 134 (*citing Sanchez*, 969 F.2d at 1414). In this case, it would not.

**B.** **Alleged Defects with the Government's Jury Addresses**

Defendant first asserts that the Government's jury addresses were improper and prejudiced her because prosecutors (1) discussed purported facts never proven at trial; (2) mischaracterized the evidence; and (3) improperly vouched for Government witnesses. *See* Def.'s Mem. at 11–13, 27–35. None of these assertions are supported by the record.

**1.** **References to Facts Not in Evidence**

Defendant offers a litany of facts she claims the Government never proved at trial. For example, Defendant contends that there was no evidence that the firms were part of the same conspiracy. *See* Def.'s Mem. at 11; *see also* Tr. 71. But the evidence at trial clearly established that Defendant instructed her brother Harry to set up a new firm, Tr. 605–06, 1271–72, that roughly 100 files were transferred from the Liu/Moslemi firm to the Bandrich firm, Tr. 606, that on at least one occasion a Liu/Moslemi employee went across the street—literally[8]—to train a Bandrich employee, Tr. 605, 607, and that the two firms handled client intake the same way, charged the same fees, and used the same preparation materials, GX 44; GX 112; GX 407; Tr. 578, 1270. Defendant also claims there was no evidence to support assertions concerning, among other things, the proceeds of the conspiracy, *see* Def.'s Mem. at 28, her leadership role in the conspiracy, *id.* at 30, and the motive for creating the Bandrich firm, *id.* at 32. As the Government notes, the record proves otherwise. *See* Gov't Mem. at 28–31.

At bottom, Defendant's contentions, albeit framed as allegations of prosecutorial misconduct, are nothing more than a challenge to the credibility of the Government's witnesses and the

---

[8] The Liu/Moslemi firm was located at 2 East Broadway in Manhattan and the Bandrich firm at 11 East Broadway. Tr. 423, 605, 859.

inferences that may reasonably be drawn from the evidence. As discussed with respect to Defendant's Rule 29 motion, *supra* at 8–11, and taking account of the Court's own assessment of the credibility of the Government's witnesses, there was ample basis in the record to support each of the prosecution's addresses to the jury. Accordingly, Defendant's claims must be rejected.

### 2. Mischaracterization of the Evidence and Improper Speculation

In a similar vein, Defendant argues that the Government mischaracterized the evidence in its jury addresses. For example, she claims that the Government "speculated [in its summation] that [the maps found on the walls of the Liu/Moslemi firm] are used to coach the applicants about their travel to the United States." Def.'s Mem. at 28; *see also* Tr. 2062. The law is clear, however, that "[b]oth prosecution and defense are entitled to broad latitude in the inferences they may suggest to the jury during closing arguments." *United States v. Suarez*, 588 F.2d 352, 354 (2d Cir. 1978); *accord United States v. Zackson*, 12 F.3d 1178, 1183 (2d Cir. 1993). And the law is equally clear that it is up to the jury, not this Court, to determine which of the permissible inferences it will, in fact, draw from that evidence. *Kozeny*, 667 F.3d at 139.[9]

### 3. Improper Vouching and the Prosecutors' Personal Views

Defendant next argues that prosecutors improperly injected their personal views and vouched for the Government witnesses by (i) calling defense arguments "ridiculous"; (ii) arguing that it was difficult to obtain recordings of Defendant because she was careful; and (iii) making arguments about the truthfulness of the cooperating witnesses. Each of these arguments fails.

---

[9] Specifically with regard to the maps, although there was no direct evidence concerning their usage, Victor You testified that clients of the firm were directed to memorize the route by which they had purportedly entered the United States. Tr. 589–90. The Government also admitted a recording of Lillian Miao coaching a client to memorize the route by which the applicant purportedly entered the country. GX 40; Tr. 971. In view of that testimony—indeed, even without that testimony—it was permissible for the Government to ask the jury to infer that the maps were used to coach clients in memorizing their supposed travel routes.

First, "[a] prosecutor is not precluded from vigorous advocacy, or the use of colorful adjectives, in summation." *United States v. Rivera*, 971 F.2d 876, 884 (2d Cir. 1992). Thus, closing remarks that characterized defense arguments as "grasp[ing] at straws," *United States v. Williams*, 690 F.3d 70, 75 (2d Cir. 2012), "desperate," *United States v. Perry*, 643 F.2d 38, 51 (2d Cir. 1981), "hog wash," *United States v. Millar*, 79 F.3d 338, 343 (2d Cir. 1996), and, indeed, "ridiculous," *Rivera*, 971 F.2d at 884, have all been held permissible. That said, the issue is not adjectival excess itself, but rather whether "[t]he prosecutor interjected his beliefs and made an issue of his own credibility." *United States v. Drummond*, 481 F.2d 62, 64 (2d Cir. 1973).

Here, the impugned adjective—"ridiculous"—was used with respect to three defense claims in the course of the Government's rebuttal argument, after a co-defendant's counsel had used the word on four separate occasions to describe the prosecution's case.[10] First, the Government urged the jury to recognize that Defendant's argument that "she had no idea that a fraud was going on in her own firm, that the majority of her family members worked in, is beyond ridiculous." Tr. 2368.[11] Second, the Government argued that Defendant's contention that the single recording of her "is not important is ridiculous." Tr. 2371. Finally, the Government argued that Bandrich's counsel's attempt to impugn the veracity of the transcripts was "ridiculous." Tr. 2385. Recognizing that rebuttals are not "detached expositions with every word carefully constructed before the event," *United States v. Farhane*, 634 F.3d 127, 167 (2d Cir. 2011) (internal citations, alterations, and quotation marks omitted), and in light of other characterizations that have been found permissible, the Court cannot say that the Government's remarks were improper.

---

[10] In his summation, Bandrich's lawyer urged the jury to recognize that "[t]he government's arguments are ridiculous." Tr. 2243; *see also* Tr. 2275, 2287, 2295.

[11] This particular point was reiterated on two other occasions in close proximity to the first. *See* Tr. 2368–69.

Second, it was not improper for the Government to comment on the difficulty of obtaining recordings of Defendant. In making this argument during its rebuttal remarks, the Government was explicitly responding to an assertion made by Defendant's counsel, who argued that "there is not one conversation, not one" clearly establishing Defendant's participation in the conspiracy. Tr. 2201–02; *see also* Tr. 2095, 2205–06; 2220. In response, the prosecution argued that the FBI had, in fact, attempted to secure recordings of Defendant but that "she tried very hard not to get on the phone, and the fact that we got one phone call is nothing short of a miracle." *See* Tr. 2371. There is thus no basis to conclude that the prosecutor injected his personal opinion of the matter. Rather, this argument was made in direct response to a defense argument and with specific reference to the record.

Third, it was not inappropriate for the Government in its rebuttal to argue to the jury that if the cooperating witnesses "really wanted to pin the blame on one of these defendants, they could have done a much better job." Tr. 2375–76; *see also* Def.'s Mem. at 34–35. Although "it is well established that prosecutors may not personally vouch for their witnesses' truthfulness," *United States v. Certified Envtl. Servs., Inc.*, 753 F.3d 72, 86 (2d Cir. 2014) (internal quotation marks, citations, and alterations omitted), it is equally clear that "when the defense counsel have attacked the prosecutor's credibility or the credibility of the government agents, the prosecutor is entitled to reply with 'rebutting language suitable to the occasion,'" *United States v. Praetorius*, 622 F.2d 1054, 1060–61 (2d Cir. 1979) (*quoting United States v. LaSorsa*, 480 F.2d 522, 526 (2d Cir. 1973)). Here, as already discussed, *see supra* at 8–9, defense counsel had made vigorous arguments to the jury urging them to conclude that cooperating witnesses were not telling the truth. In that context, it was not inappropriate for the prosecutor to offer a reasoned basis for why they were.

*See, e.g.*, *United States v. Carr*, 424 F.3d 213, 226–229 (2d Cir. 2005) (recognizing that prosecution could assert that cooperating witnesses had no incentive to lie and every incentive to tell the truth in order to earn benefits of cooperation agreement).

### 4. Prejudice Standard

Even assuming that there were improprieties in the Government's jury addresses, Defendant bears "a substantial burden" in seeking a new trial based on inappropriate prosecutorial remarks. *United States v. Caracappa*, 614 F.3d 30, 41 (2d Cir. 2010). "[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's [improper] comments standing alone." *United States v. Young*, 470 U.S. 1, 11 (1985). Rather, "a new trial [is required] only in the rare case in which improper statements—viewed against the entire argument to the jury—can be said to have deprived the defendant of a fair trial." *Caracappa*, 614 F.3d at 41; *see also United States v. Locascio*, 6 F.3d 924, 945 (2d Cir. 1993). In undertaking that evaluation, a court looks to "the severity of the misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the misconduct." *United States v. Spinelli*, 551 F.3d 159, 170 (2d Cir. 2008).

This is not one of those rare cases. Not only has Defendant failed to identify any misconduct in the prosecution's summation, she has failed to establish prejudice warranting a new trial. The Court advised the jury that the arguments of lawyers were not evidence, Tr. 2422, that it was their recollection of the evidence that controlled, *id.*, that they alone were responsible for deciding what inferences to draw from the evidence, Tr. 2424, and that they were the sole judges of a witnesses' credibility, *id.* Indeed, Defendant does not allege any deficiency with the jury instructions and she has not offered any argument to displace the "almost invariable assumption of the law that jurors follow their instructions." *Richardson v. Marsh*, 481 U.S. 200, 206 (1987); *accord United States v. Salameh*, 152 F.3d 88, 116 (2d Cir. 1998). In any event, the Court is satisfied that the

evidence of Defendant's guilt properly before the jury was overwhelming. *See supra* at 2–5. Because it cannot be said that any misconduct deprived Defendant of her right to a fair trial, this argument cannot succeed.

## C.  Alleged Evidentiary Errors

Defendant next argues that there were a number of evidentiary errors at trial as a result of prosecutorial misconduct. Specifically, she argues that (1) five recordings containing hearsay were improperly admitted; (2) the Government improperly offered a photograph of a computer screen inside the Liu/Moslemi firm; (3) the Government violated the Federal Rules of Evidence in conducting its direct examination of two cooperating witnesses; (4) the Government introduced evidence of the bad acts of others not on trial; and (5) the Government allowed Meng Fei Yu to "create" evidence that it then introduced at trial. Whether viewed as purported prosecutorial misconduct or more properly as alleged evidentiary errors committed by the Court in its rulings, none of these arguments has merit.[12]

### 1.  Transcripts of Recorded Conversations

Defendant challenges the introduction of transcripts of five recordings that included "a lot of hearsay[]." Def.'s Mem. at 10. More specifically, she alleges that "half of the contents of each tape [is] hearsay[] with each involving more than a dozen different unknown males and females who are clearly not co-conspirators." *Id.* at 10–11. This argument is not persuasive.

---

[12] The Court notes that no timely objection was made with respect to the majority of the purported evidentiary errors, as generally required by Fed. R. Evid. 103, and Defendant's arguments are thus not properly before the Court absent plain error. *See also United States v. Yu-Leung*, 51 F.3d 1116, 1120 (2d Cir. 1995) ("Generally, in order to preserve an evidentiary claim for appeal, a party must make a 'timely objection' at trial."). The Court nevertheless considers each of these arguments in light of their overlap with Defendant's ineffective assistance claims.

With respect to the recordings transcribed as GX 40, 44, 110, and 134—which were not challenged at trial, *see* Tr. 512–15—these recordings consist primarily of conversations with various co-defendants, including David and Lillian Miao, and clients of the firm. For example, during a conversation between Lillian, who served as an "office manager" at the Bandrich firm, and an unidentified male, who from the context of the conversation is a client, Lillian discusses how "every client" goes to a certain local priest to seek confirmation of their church-going habits and how "[y]esterday, a client of ours could not get a statement from the priest until he gave the priest $1,000." *See* GX 44T at 15–16. Defendant appears to confine her objection to those statements made by unidentified individuals—that is the "half" of the conversations not involving her co-defendants. But the fact that a co-conspirator is unidentified is, on its own, of no moment. There is no requirement that a co-conspirator be identified for the hearsay exclusion to apply. *See United States v. Boothe*, 994 F.2d 63, 69 (2d Cir. 1993) (*citing United States v. Cruz*, 910 F.2d 1072, 1081 n. 10 (3d Cir. 1990)). Rather, the only requirements relevant for present purposes are that there be sufficient evidence of the declarant's membership and that the statements have been made during and in furtherance of the conspiracy. *United States v. Tracy*, 12 F.3d 1186, 1196 (2d Cir. 1993). In making that determination, the Court may consider the challenged statements if supported by some independent corroborating evidence. *United States v. Tellier*, 83 F.3d 578, 580 (2d Cir. 1996). Here, considering the statements themselves and the balance of the record, *see, e.g.*, Tr. 552, 1206, the Court was—and is—satisfied that the Government met its burden of showing that these recordings involved knowing participants in the fraud and, as such, co-conspirators. Accordingly, there is no basis to conclude these recordings were improperly admitted at trial.

Defendant's challenge to GX 57 fails for the same reason. That exhibit consisted of a conversation between Lin Chen and a document forger in China whom Lillian Miao had recommended to Chen. Defendant does not offer any specific argument other than her general claim concerning unidentified co-conspirators.[13] But beyond the statements the forger made suggesting his familiarity with Liu/Moslemi firm and the fact that he was prepared to send documents directly to the firm, *see* GX 57T at 1–2, 4, there is also evidence in the record that Lillian referred Chen to the forger, Tr. 1009; *see also* GX 134T at 28, and that David Miao appeared familiar with the forger and remarked that the price was "not bad," Tr. 1009; *see also* GX 134T at 28–29. In any event, given the abundance of other evidence indicating that the firms routinely assisted with procuring forged documents, *see, e.g.*, Tr. 575–76, GX 302A–K, the Court cannot conclude that Defendant was substantially prejudiced by the admission of GX 57.

### 2. Photographs of Computers in the Liu/Moslemi Office

Defendant also contends that certain photographs were improperly admitted at trial. Specifically, she challenges several images of computer screens taken by the FBI in the course of their executing a valid search warrant at the Liu/Moslemi firm. These images include, for example, a picture of a Microsoft Word document in Mandarin that is an attestation letter concerning an applicant's family planning claim with blank spaces—"XXX"—left for the date, the author's name, and a boyfriend's name. *See* GX 677; GX 677T. The text of the letter describes how the asylum applicant had to "hide herself in a rental house in order to give birth to her baby in secret," among other things. GX 677T. Victor You testified that he would draft such letters—with their false attestations—for clients. Tr. 565–67. Defendant now challenges GX 677, which the Government

---

[13] Although counsel initially objected to the admission of this exhibit, see Tr. 517, counsel withdrew that objection after receiving additional material pursuant to 18 U.S.C. § 3500. Tr. 534; *see also* Tr. 956.

discussed in its summation, *see* Tr. 2066, and the other photographs admitted into evidence because "[i]t is not clear at all which of the windows [on the computer] was open at the time of the FBI raid," Def.'s Mem. 10. Thus, she contends, GX 677 "may very likely not be the current active screen of the computer … and may be obtained illegally or at least improperly and should not be admitted into evidence." *Id.* This argument is meritless. Even accepting the dubious logic of Defendant's argument, not only did she stipulate to the admission of these exhibits, *see* Tr. 423–24, her previous motion challenging the validity of the search was denied, *see Feng Ling Liu*, 2014 WL 101672, at *2–10, and any claim regarding the origin and presentation of the photographs should have been made at trial.

### 3. Prosecutors' Questioning of Victor You and Meng Fei Yu

Defendant also challenges the Government's questioning of Victor You and Meng Fei Yu—the vast majority of which proceeded without objection at trial—on the basis that prosecutors asked leading questions, mischaracterized witness testimony in follow-up questions, lacked foundation, repeated questions that had been asked and answered, and asked questions in a manner that amounted to testimony by the prosecutor. Indeed, Defendant challenges essentially everything of substance that was said by these two witnesses in a question-by-question account that spans some 15 single-spaced pages of her brief. *See* Def.'s Mem. at 13–27. To offer just one example, Defendant contends that the Government's examination of You with respect to GX 677, the photograph of the false attestation letter discussed above, asked for "straightforward speculation" and was thus improper. *See* Def.'s Mem. at 21. In particular, she argues that You "had no personal knowledge of it whatsoever because it was created around December 2012 and he left the firm in November 2010." *Id.* You, however, was employed as a "storywriter," "coach," and interpreter by the Liu/Moslemi firm from July 2008 through November 2010, during which time he worked

on "hundreds" of false asylum applications. Tr. 497, 509–10. During his direct examination, You testified to writing a letter like the exhibit Defendant now challenges and specifically explained why the firm would leave "XXX" blanks in such documents. *See* Tr. 564–66. Given that You responded that he had written such a letter, it was entirely appropriate for the Government to ask him to interpret GX 677T, including the significance of the blank spaces. Defendant's contention to the contrary cannot succeed. Nor do any of her other claims concerning the Government's examination of these two witnesses. Mindful of the "wide latitude" afforded to a trial judge "in controlling 'the mode and order' of its presentation to promote the effective ascertainment of the truth," *Manley v. AmBase Corp.*, 337 F.3d 237, 247 (2d Cir. 2003) (*quoting* Fed. R. Evid. 611(a)), the Court is satisfied that the Government's questioning was permissible.[14]

### 4. Fraudulent Activities of Co-Conspirators

Defendant further contends that "the prosecutors introduced a lot of evidence during trial about other people's fraud and never established any connection or relevance to Karen." *See* Def.'s Mem. at 11. In her view, these individuals were "not on trial and strictly speaking evidence regarding their fraud is not relevant to the three defendants who are on trial." *Id.* at 27. Thus, Defendant claims, prosecutors employed a "strategy" to "overwhelm[] [the jury] with [details of] the rampant fraud in these two firms … [such] that they got so angry about the massive fraud that they were willing to find the defendants [guilty] as scapegoat[s] and [to] ignore the missing link that connects this evidence of fraud to [Defendant]." *Id.* This claim is meritless.

---

[14] Defendant's objection to what she says were a series of leading questions also fails. As an initial matter, Defendant is wrong that most of the questions the Government asked of these two witnesses were leading. In any event, Fed. R. Evid. 611(c) allows for leading questions when they "may be necessary to develop the witness' testimony." Then, as now, the Court was satisfied the Government's questioning of Victor You and Meng Fei Yu was permissible, and where the Government's questioning was improper, the Court intervened. *See, e.g.*, Tr. 1332.

In attempting to prove the existence of a conspiracy, the Government reasonably offered proof of actions and statements by Defendant's co-conspirators. That evidence was plainly relevant to the extent it established the existence of the conspiracy or Defendant's knowing participation or both. At trial, Defendant's counsel forcefully disputed that this evidence was capable of establishing her guilt. *See, e.g.*, Tr. 2096 ("Well, let me tell you something, the law firm is not on trial; my client's on trial. Let's hear what the evidence is against my client."), Tr. 2196 ("I want to talk to you about the lack of evidence"), Tr. 2202 ("there is not one scintilla of evidence, not one, that implicates my client"); Tr. 2234 ("If she's not [on a] recording, ladies and gentlemen, that is an absence of evidence.").

The Court also cautioned the jury in its charge that "before you may consider the acts or statements of a co-conspirator in deciding the guilt of the defendants, you must first determine that the acts were committed, or statements were made, during the existence and in furtherance of the unlawful scheme" and whether "the acts were done or the statements were made by someone who you … find to have been a member of the conspiracy." Tr. 2452. As such, to the extent the jury concluded that any of the evidence Defendant now challenges did not so qualify, they were properly instructed to ignore it. *See Richardson*, 481 U.S. at 206; *Salameh*, 152 F.3d at 116.

### 5. Cooperating Witnesses' Recorded Statements

Defendant also asserts that the Government directed the "creation" of evidence against Defendant by letting Meng Fei Yu "make incriminating statements against Karen" in the course of recorded conversations with co-defendant Vanessa Bandrich that it then introduced at trial in the course of Yu's direct examination. *See* Def.'s Mem. at 6. As such, Defendant's objection appears to be two-fold: First, "whatever Meng Fei has said in the recording should deserve little weight and should never be presented to the jury in the first place … because she is the one making

the recording and she has deliberately made those incriminating statements against Karen to be used to convict Karen." *Id.* Second, "[b]y no means should [Yu] be given the opportunity to elaborate on what she has said in the recordings because that means she is given the opportunity to create more evidence through her elaboration, not just eliciting evidence." *Id.* This argument is unavailing.

As a preliminary mater, Defendant did not object at trial to the introduction of the two exhibits, GX 127 and GX 133, that she now challenges. Tr. 1289. Even if she had, her arguments would not have persuaded the Court. First, and with respect to what may be construed as a prosecutorial misconduct claim, Defendant has failed to articulate a legal theory for why the Government's direction to a cooperator to assist in what she characterizes as the "creation" of evidence amounts to prosecutorial misconduct. Cooperating witnesses play a crucial role in furthering the public interest in effective law enforcement. That role may include recording communications with alleged members of a conspiracy at the direction of the Government. *See, e.g.*, *United States v. Hamilton*, 597 F.Supp.2d 407, 410 (S.D.N.Y. 2009). Nothing about the facts of this investigation as they are now known suggest that the Government's investigative techniques were improper.

Second, and with respect to what appears to be an evidentiary claim, even if Yu's statements in the recordings were not admissible for their truth,[15] they were admissible as non-hearsay to provide context for the statements of Defendant's co-conspirator, Bandrich. *See, e.g., United*

---

[15] Although "[m]embership in a criminal conspiracy and rendering services to the government as an informant are not necessarily mutually exclusive roles," *United States v. Monteleone*, 257 F.3d 210, 221 (2d Cir. 2001), the Government does not contend that Meng Fei Yu was a co-conspirator at the time of the relevant statements. Accordingly, her statements in the recordings would not be admissible for their truth under Fed. R. Evid. 801(d)(2)(E).

*States v. Sorrentino*, 72 F.3d 294, 298 (2d Cir. 1995) (holding that recorded statements of an informant offered to render defendant's recorded statements intelligible were not hearsay); *United States v. Perez*, No. 05-CR-441 (PKL), 2005 WL 2709160, at *2 (S.D.N.Y. Oct. 20, 2005) (holding that recorded statements of an informant were not hearsay because offered as context for co-conspirator's statements).

Finally, Defendant's claim about Yu's "creat[ing] more evidence" through her live testimony is meritless. This claim is essentially a categorical objection to *any* testimony by Yu because, in Defendant's view, she is a "professional liar[]," Def.'s Mem. 25, who was "used by FBI to convict Karen," *id.* at 3. These are arguments about witness credibility, which should have been made—and were, in fact, made—to the jury. *See supra* at 8–9. In any event, the Court finds no reasonable basis to impugn the credibility of Yu, and, accordingly, this claim fails.

## D.     Additional Purported Prosecutorial Misconduct

Defendant further argues that the Government engaged in various other forms of prosecutorial misconduct, including (1) selective prosecution; (2) differential treatment of her and her family in plea bargaining; (3) inappropriate communications with counseled defendants; (4) *Brady* violations; (5) directing cooperating witnesses not to record conversations with Defendant so that no exculpatory evidence would be obtained; and (6) misrepresenting evidence concerning blank documents found at the firm. The Court addresses each of these claims in turn and, ultimately, finds that none of them has merit.

### 1.     Selective Prosecution of Defendant

In Defendant's view, "[p]rosecutorial misconduct started from the very beginning … of this case." Def.'s Mem. at 2. "After doing their homework and learning about the Chinese immigration field, [the Government] locked Fengling Liu … as their target. Why? Because Karen is

famous in this field and enjoys a good reputation in the Chinese community." *Id.* To the extent this argument can be construed as a claim of selective prosecution, it fails at the outset because it was waived. The law is clear that Defendant was obliged to—but did not—bring her claim before trial. *See United States v. Sun Myung Moon*, 718 F.2d 1210, 1229 (2d Cir. 1983) ("a defendant who advances a claim of selective prosecution must do so in pretrial proceedings"); *Foy v. United States*, 838 F.Supp. 38, 41 n. 3 (E.D.N.Y. 1993) ("a defendant waives his defense of selective prosecution unless he properly raises it before trial").

Even assuming that Defendant's claim is properly before the Court, it fails. "To make out a claim of selective prosecution, a defendant confronts a deliberately 'rigorous standard'; [s]he must provide 'clear evidence' that the prosecutorial decision or policy in question had both 'a discriminatory effect and ... was motivated by a discriminatory purpose.'" *United States v. Alameh*, 341 F.3d 167, 173 (2d Cir. 2003) (*quoting United States v. Armstrong*, 517 U.S. 456, 468, 465 (1996)); *see also United States v. Sanchez*, 517 F.3d 651, 671 (2d Cir. 2008). Thus, "[a] defendant seeking to show discriminatory purpose must [prove] 'that the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group.'" *Alameh*, 341 F.3d at 173 (*quoting Wayte v. United States*, 470 U.S. 598, 610 (1985)).

Here, nothing Defendant has offered could plausibly qualify as "clear evidence" of the Government's harboring a "discriminatory purpose" in electing to prosecute her. Indeed, properly understood, her claim is that prosecutors targeted her based on her *success*, not "an unjustifiable standard such as race, religion, or other arbitrary classification." *Armstrong*, 517 U.S. at 464 (*quoting Oyler v. Boles*, 368 U.S. 448, 456 (1962)). Accordingly, the claim of selective prosecution fails.

### 2. Differential Treatment of Defendant and her Family

Defendant's related claim of differential treatment also fails. Pointing to certain plea agreements offered to defendants in companion criminal cases, Defendant argues that prosecutors gave "all other defendant[s] except Karen and her family members … a reasonable deal" while "Karen and her family members got no deal from the prosecutors and faced the highest forfeitures." Def.'s Mem. at 7. Thus, she claims, "[i]t is clear that the prosecutors enforced the law selectively and discriminated [against] Karen and her family members in the prosecution of the case." *Id.* at 8.

The difficulty with this argument is that "there is no constitutional right to plea bargain; the prosecutor need not do so if he prefers to go to trial." *Murph v. United States*, 12 F.Supp.3d 557, 572 (E.D.N.Y. 2014) (*quoting Weatherford v. Bursey*, 429 U.S. 545, 561 (1977)). "Indeed, a prosecutor is expected to tailor plea agreements to the circumstances presented by each defendant in a particular case." *United States v. Fernandez-Dilone*, 668 F.Supp. 245, 249 (S.D.N.Y. 1987). Here, Defendant offers no "clear evidence" that prosecutors applied an unjustifiable standard in their plea bargaining. In fact, her own brief offers just one potential—and proper—explanation for any differential treatment that did exist between the defendants under this indictment and those in other cases that were part of the same FBI investigation—namely, that "the FBI has two insiders from the Moslemi firm and there is no insider for any of the other firms." Def.'s Mem. at 8; *see also* Gov't Mem. 60 ("the Government made plea offers [to the various defendants] based on ... the strength of its evidence and the facts it believed it could prove at any trial."). Accordingly, the claim of differential treatment must fail.

### 3. Inappropriate Communications with Counseled Defendants

Defendant next contends that prosecutors ran afoul of *United States v. Hammad*, 858 F.2d 834 (2d Cir. 1988), by directing Meng Fei Yu to make recordings of co-defendants Feng Li and

Wen Ting Zheng even though prosecutors knew those defendants were represented by counsel. *See* Def.'s Mem. at 4. As the Government correctly notes, because the allegedly improper communications took place after the defendants had been indicted and arraigned, and because the communications involved the same offense, this claim is more properly raised under the Sixth Amendment. *See* Gov't Mem. at 55 n. 13; *see also Montejo v. Louisiana*, 556 U.S. 778, 786 (2009) (Sixth Amendment attaches at all "critical" stages of criminal proceedings, including interrogation by the state); *McNeil v. Wisc.*, 501 U.S. 171, 175 (1991) (Sixth Amendment is offense-specific).[16]

Even assuming that the impugned communications with counseled defendants were improper, this claim fails. "[P]ersons not themselves the victims of illegal government conduct typically lack standing to assert the constitutional rights of others." *LaFrance v. Bohlinger*, 499 F.2d 29, 34 (1st Cir. 1974) (citing *Alderman v. United States*, 394 U.S. 165, 174 (1969)); *see also Texas v. Cobb*, 532 U.S. 162, 172, n. 2 (2001) ("The Sixth Amendment right to counsel is personal to the defendant"). Here, Defendant asserts that she has standing because her interest "was harmed due to the prosecutor's violation of the rules" and because the prosecutors are "simply obstructing justice." Def.'s Reply at 4. This conclusory assertion does not explain why Defendant should be able to assert a third party's rights.

More significantly, however, the Government never sought to admit the allegedly improper communications at trial. Simply put, there is nothing to suppress. Defendant nevertheless contends that because "the government's misconduct goes far beyond" this one claim, suppression "is clearly not sufficient to rectify the harm caused to the defendant." *Id.* at 4–5. Defendant is correct

---

[16] By contrast, *Hammad* extended traditional Sixth Amendment protections by holding that, in some circumstances, a prosecutor's ethical obligations "restrict[ed] the use of informants … prior to indictment, but after a suspect has retained counsel in connection with the subject matter of a criminal investigation." *Id.* at 839. Where an ethical breach is found, "suppression may be ordered in the district court's discretion" considering traditional exclusionary principles. *Id.* (*citing Elkins v. United States*, 364 U.S. 206, 216 (1960)).

that the remedy on a Rule 33 motion should take a holistic account of all factors that deprived a defendant of her right to a fair trial. But as the Court explains in the balance of this Opinion, it finds no such factors present to justify the drastic remedy Defendant seeks.

### 4. Failure to Disclose *Brady* Materials

Defendant also alleges that prosecutors failed to disclose exculpatory material to her in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). In particular, she contends that the Government failed to disclose interview notes "where clients affirmed that their asylum applications were truthful" and where "Mr. Moslemi denied any involvement in [the] fraud or any awareness of fraud during his work in the Moslemi firm." Def.'s Mem. at 5. This claim fails because, even assuming such notes exist,[17] Defendant's allegations do not amount to a *Brady* violation.

Under *Brady* and its progeny, "the Government has a constitutional duty to disclose favorable evidence to the accused where such evidence is 'material' either to guilt or to punishment." *United States v. Coppa*, 267 F.3d 132, 139 (2d Cir. 2001) (*quoting Brady*, 373 U.S. at 87). "This disclosure obligation extends to information that, if suppressed [by prosecutors], would deprive the defendant of a fair trial." *United States v. Rittweger*, 524 F.3d 171, 180 (2d Cir. 2008) (internal quotation marks and citations omitted). "[S]uch a deprivation occurs only where there is a reasonable probability that the suppression affected the outcome of the case, or would have put the whole case in such a different light as to undermine confidence in the verdict." *Id.* (internal quotation marks and citations omitted). As such, "[t]here are three components of a true *Brady* violation:

---

[17] The Government represents that no notes exist with respect to the interview of Moslemi. *See* Gov't Mem 57–58 & n. 14; *see also United States v. Rodriguez*, 496 F.3d 221, 224 (2d Cir. 2007) ("We reject [the] contention that *Brady* or the Confrontation Clause requires the Government to take notes during witness interviews."). Nevertheless, the issue is not whether such notes themselves exist, but rather whether the information in the possession of the Government—in the form of notes or otherwise—was favorable within the meaning of *Brady*. *See id.* at 225 ("From the fact that the Government is not required to make notes of a witness's statements, it does not follow that the Government has no obligation to inform the accused of information [pursuant to *Brady*].").

(1) The evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching; (2) that evidence must have been suppressed by the [Government], either willfully or inadvertently; and (3) prejudice must have ensued." *United States v. Jackson*, 345 F.3d 59, 71 (2d Cir. 2003) (*quoting Strickler v. Greene*, 527 U.S. 263, 281–82 (1999)).

Even assuming that the alleged notes satisfy the first element, Defendant's argument nonetheless fails. First, Defendant cannot seriously contend that the materials were "suppressed" within the meaning of *Brady*. It has long been clear that *Brady* is not triggered if a defendant or his attorney "'either knew, or should have known, of the essential facts permitting him to take advantage of [that] evidence.'" *Zackson*, 6 F.3d at 918 (*quoting United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir. 1982)). Indeed, "[t]he government is not required to make a witness' statement known to a defendant who is on notice of the essential facts which would enable him to call the witness and thus take advantage of any exculpatory testimony that he might furnish." *United States v. Stewart*, 513 F.2d 957, 960 (2d Cir. 1975). That proposition "takes on a particular significance with regard to alleged co-conspirators." *Harris v. United States*, 9 F.Supp.2d 246, 276 (S.D.N.Y. 1998). "If a defendant denies the existence of the conspiracy alleged by the government, or [her] participation in it, the alleged co-conspirators would obviously be desirable defense witnesses (assuming, of course, that the defendant's denial is the truth)." *Id.* Here, Defendant's claim is essentially that the Government suppressed evidence of statements by alleged co-conspirators who denied their membership in the conspiracy or, more generously, the non-existence of the conspiracy.[18] But Defendant does not claim she did not know the identities any of the asylum

---

[18] As noted at Defendant's sentencing, the asylum applicants here, as knowing participants in the fraud, may properly be considered her co-conspirators. Sent. Tr. 47; *see also United States v. Archer*, 671 F.3d 149, 165–66 (2d Cir. 2011).

applicants.  Indeed, the record indicates the opposite.[19]  And any claim about her ignorance of Moslemi, if made, would strain credulity.  Thus it cannot be said that the Government violated its *Brady* obligations by failing to provide Defendant with such materials.

Second, even assuming the Government should have informed Defendant that Moslemi and some asylum applicants denied involvement or participation in the conspiracy, there was no prejudice.  "A *Brady* violation occurs only where there is a 'reasonable probability' that a different verdict would have resulted from disclosure of the information that the defendant claims was suppressed."  *United States v. Rodriguez*, 496 F.3d 221, 227 (2d Cir. 2007) (*quoting Strickler*, 527 U.S. at 281).  There is no basis to think, nor does Defendant argue, that the information gave rise to such a probability here.  *See* Def.'s Mem. at 4–5, Def.'s Reply at 5–7.  In any event, Defendant's claims about the Government's ability (or lack thereof) to produce asylum applicants who admitted their applications were fraudulent was, in fact, argued to the jury.  *See, e.g.*, Tr. 2100 (defense counsel observing, "Do you know how many applications they had?  900.  Do you think they could find one that will testify to that?  I challenged them to do it.  They put in applications, but they didn't call one witness at all, and they couldn't, because no witness would testify to that simply because it's not true.").  Finally, to the extent that Defendant might have argued that Moslemi's purported ignorance of the fraud supported her claim that she too was unaware of it, there is no reasonable basis to infer such a claim would have succeeded in changing the verdict in the face of overwhelming evidence of her knowledge and participation in the conspiracy.[20]

---

[19] Even if Defendant had asserted ignorance of the clients' identities, such a claim would be untenable.  As part of her brief in support of the instant motions, Defendant provided the Court with a detailed list identifying Moslemi firm clients.  *See* Dkt. 299, Ex. 3.

[20] Defendant also makes two further disclosure-related claims, neither of which can succeed.  First, Defendant asserts that the Government failed to disclose "four tapes … containing very important information to the defense."  Def.'s Mem. at 8.  She does not describe the alleged contents of the tapes.  The Government represents that these tapes were not produced because "they do not relate to the defendant's case."  Gov't Mem. at 62.  As the Government notes, this indictment arose as part of a wider investigation into asylum fraud by various law firms in New York City and,

### 5. Directing Cooperators Not to Record Conversations with Defendant

Defendant also claims that the FBI forbade Victor You and Meng Fei Yu from recording their conversations with her because such recordings would have produced exculpatory evidence that would have undermined their "true purpose": "to convict Karen regardless of whether she has committed a crime or not." Def.'s Mem. at 5. That claim fails because the Government is not required to record a criminal defendant or utilize any other particular investigative technique. In any event, it is undisputed that at least one recording of Defendant was, in fact, made. *See* Def.'s Mem. at 6. Indeed, both parties referenced this recording in argument, with the Government seizing on it during closing arguments to assert that Defendant knew of the conspiracy. *See* Tr. 2077–78 (arguing that Defendant "knew exactly what Meng Fei Yu" was talking about when she discussed stresses of a client potentially admitting to fabrication); *see also* Tr. 2371 (characterizing defense argument that the single phone call was insignificant as "ridiculous"). Instead of shying away from utilizing this recording, the Government described "the fact that we got one phone call involving Feng Ling Liu is nothing short of a miracle." Tr. 2370.

Defense counsel, meanwhile, vigorously—and repeatedly—asserted that the dearth of recordings of Defendant was proof that she knew nothing about the fraud. For example, counsel urged the jury as follows:

---

as such, "numerous recordings exist which are wholly unrelated to this defendant or to her codefendants." *Id.* at 62 n. 16. In any event, Defendant has not attempted to explain the importance of these tapes to her defense. *See United States v. Maniktala*, 934 F.2d 25, 28 (2d Cir. 1991). Nor has she attempted to make any showing of substantial prejudice. *See United States v. Stevens*, 985 F.2d 1175, 1181 (2d Cir. 1993).

 Second, Defendant asserts that prosecutors "t[a]mpered" with "Tape 48." Def.'s Mem. at 8–9. The Government acknowledges that due a clerical error a recording related to a draft transcript labeled "48" was not produced until after trial, but challenges Defendant's allegation of tampering. Defendant appears to argue that had an "untampered" version of "Tape 48" been available before trial, she would have been able to use it to effectively oppose the admission of GX 57, which, as noted, is the transcript of a conversation between Lin Chen and a document forger in China whom Lillian Miao had recommended to Chen. *See supra* at 20. Even assuming that GX 57 had never been admitted, however, there is simply no basis to conclude that upholding Defendant's conviction would result in a manifest injustice. This challenge thus fails.

> These are the recordings in the case, ladies and gentlemen, and you can listen to all of them. Lin Chen, 37 recordings with regard to my client. How many of my client? Zero. Victor, recordings, worked there, spoke to her every day, nine recordings. Recordings of my client, zero. Meng Fei Yu, who I'm talking about now, 14 recordings. Recordings of my client, one. Total recordings, 60. Okay? One of my client. One.

Tr. 2220; *see also* Tr. 2095; Tr. 2201. Accordingly, not only is Defendant's argument entirely without merit, if anything, the lack of recordings was a fact that was helpful to Defendant at trial.

### 6. Misrepresenting Evidence of Blank Documents

Defendant also claims prosecutorial misconduct on the basis that the Government "twisted the evidence" concerning blank documents found at the Bandrich firm. Def.'s Mem. at 10. This claim too is meritless. Defendant's argument concerns GX 302K, which is part of a larger set of documents, GX 302A through GX 302K, that the Government established were used by the firms to assist in preparing fraudulent asylum applications. Victor You testified, for example, that GX 302J was a blank medical record that could be completed by the firm to establish that a particular applicant had "been to this hospital on [a] certain day … to prove [the] one-year issue." Tr. 576.[21] Defendant argues, however, that the Government mischaracterized the GX 302 series as facilitating the preparation of fraudulent applications even though all of the documents, in fact, belonged to a particular client. In her view, GX 302K, a collection of receipts from a food seller that includes two non-blank pages purporting to be orders from a Zhou Boqing[22] establishes as much. But this argument was for the jury, not this Court. The entirety of GX 302K was in evidence, including

---

[21] As a general rule, an individual may not apply for asylum "unless [he] demonstrates by clear and convincing evidence that the application has been filed within 1 year after the date of [his] arrival in the United States." 8 U.S.C. § 1158(a)(2)(B); *see also* 8 C.F.R. § 208.4(2).

[22] Defendant transliterates this name as Zhu. Def.'s Mem. at 10. For ease of reference, the Court uses the transliteration in GX 302K.

the English translation of the two non-blank pages. *See* Tr. 471, 431; GX 302K-T. Defendant's objection seems to be that the prosecution did not explicitly draw the jury's attention to the two non-blank pages in the course of its direct examinations of Special Agent Mark Person or Victor You. Def.'s Mem. at 10; *see also* Tr. 437, 574–78. The prosecution was not obliged to do so, and Defendant points to no authority suggesting otherwise.

## E.    Alleged Ineffective Assistance of Counsel

Finally, Defendant asserts that she suffered from "severe inadequate legal representation" that resulted in her "wrongful convict[ion]." Def.'s Mem. at 35. In support of this claim, Defendant devotes a substantial portion of her brief to arguing that, among other things, (1) her counsel had no theory of the case and made ineffective opening and closing arguments; (2) ineffectively cross-examined prosecution witnesses; (3) failed to make evidentiary objections; and (4) failed to call defense witnesses. To the contrary, over a period of some two months, the Court had a thorough opportunity to observe counsel and his team before, during, and after trial. And the Court also had occasion to participate in several *ex parte* meetings with Defendant and her counsel concerning the adequacy of his representation, as discussed at some length below. In view of what the Court observed first-hand, and the record now before the Court, there is simply no basis to conclude that Defendant was deprived of her constitutional right to the effective assistance of counsel. As a result, Defendant's claim must fail.[23]

---

[23] Although the preferred course is to pursue an ineffectiveness claim through a collateral habeas proceeding under 28 U.S.C. § 2255, *see United States v. Doe*, 365 F.3d 150, 152 (2d Cir. 2004), where an ineffectiveness claim is raised prior to judgment, "the district court may, and at times should, consider the claim at that point in the proceeding," *United States v. Brown*, 623 F.3d 104, 113 (2d Cir. 2010). Here, the Court is satisfied that there are no "competing considerations" that would weigh against Defendant's claim being addressed at this juncture. *See id.* Significantly, the attorneys against whom she directs her claim were relieved after trial. *See supra* at 6–7. Although mindful that an evidentiary hearing could have been held prior to judgment, neither side has sought one, nor does the Court find one necessary in light of the extensive record now available. *See also* Order of February 11, 2015, Dkt. 489 (unsealing materials submitted by Defendant and transcripts of various conversations between defense counsel, Defendant, and the Court).

To establish a violation of her Sixth Amendment right to effective assistance, it is the defendant's burden to "(1) demonstrate that [her] counsel's performance 'fell below an objective standard of reasonableness' in light of 'prevailing professional norms'; and (2) 'affirmatively prove prejudice' arising from counsel's allegedly deficient representation." *United States v. Cohen*, 427 F.3d 164, 167 (2d Cir. 2005) (*quoting Strickland v. Washington*, 466 U.S. 668, 688, 693 (1984)). More specifically, the Second Circuit has explained that:

> To satisfy the first prong—the performance prong—the record must demonstrate that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Such errors include omissions that cannot be explained convincingly as resulting from a sound trial strategy, but instead arose from oversight, carelessness, ineptitude, or laziness. Under the second prong—the prejudice prong—a reasonable probability of a different result is a probability sufficient to undermine confidence in the outcome. The prejudice prong can be satisfied even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.

*Wilson v. Mazzuca*, 570 F.3d 490, 502 (2d Cir. 2009) (internal quotation marks, brackets, and citations omitted). Thus a defense attorney's "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," *Strickland*, 466 U.S. at 690, and "even strategic choices made after less than complete investigation do not amount to ineffective assistance—so long as the known facts made it reasonable to believe that further investigation was unnecessary," *Henry v. Poole*, 409 F.3d 48, 63 (2d Cir. 2005). Indeed, counsel are "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Burt v. Titlow*, 134 S. Ct. 10, 17 (2013) (*quoting Strickland*, 466 U.S. at 690).

Against that legal backdrop, the Court first reviews some of the extensive record in this case that documents the nature and extent of Defendant's dissatisfaction with her counsel. The

Court will then address the principal arguments made by Defendant.  In light of the record, it is clear that the decisions that Defendant now seeks to impugn reflect the reasonable exercise, not the wholesale abdication, of her counsel's professional judgment.  Because Defendant has not shown error under the performance prong, the Court does not address the question of prejudice. *See Strickland*, 466 U.S. at 697 ("there is no reason ... to address both components of the inquiry if the defendant makes an insufficient showing on one").

### 1.     Facts

In her submissions on the present motions, Defendant claims that she is the victim of unscrupulous prosecutors and federal agents who set out to frame her using falsified testimony by former employees with vendettas against her.  *See, e.g.*, Def.'s Mem. at 2–3 ("Prosecutorial misconduct started from the very beginning of the investigation of this case … [W]ith [the] goal of convicting Karen, [the] FBI then started to look for evidence and even create evidence to achieve that goal. … Victor and Meng Fei … were actually looking forward to cooperation with [the] FBI to accomplish their own goals by utilizing [the] FBI's power.").  Her counsel, while not adopting Defendant's charged language, did make that argument in part, asserting that the Government's cooperators had ample motive to lie and that there was a lack of other evidence linking Defendant to the fraudulent activities of the firm.  That strategy appears to have been the product of collaboration with counsel to the two other co-defendants.[24]  As described below, Defendant benefited from this coordinated strategy because her co-defendants' lawyers did not seek to pin responsibility for the conspiracy on her as its mastermind—as the Government claimed she was—although they indicated they would have considered doing so had Defendant represented herself.  Indeed,

---

[24] A court may take into account the tactics of a co-defendant's counsel in evaluating the performance of the defendant's counsel.  *See Eze v. Senkowski*, 321 F.3d 110, 126 (2d Cir. 2003).

as the trial went on, all defense counsel believed the collaborative strategy was proving effective for their clients.

Defendant, her counsel, and the other members of his team interacted extensively throughout the trial. Defendant did not shy away from sharing her views on how the defense should proceed. Counsel accepted some of Defendant's ideas, while he rejected others. Eventually, some disagreements emerged. Nonetheless, the facts that follow illustrate that Defendant, who was then a practicing member of the New York bar, recognized when communicating with the Court that the disagreements involved differences of "opinion," "strategy," and "philosophy." Those disagreements related in the main to cross-examination, opening remarks, and closing arguments to the jury, as well as whether to object to the prosecution's questioning—essentially the same issues now raised on her Rule 33 motion.

The scope of the disagreement between Defendant and her counsel was first brought to the Court's attention when Defendant called chambers on Friday, April 4—in the second week of trial, near the close of the Government's case, and after Victor You and Meng Fei Yu had testified. Tr. 1686. At the time, Defendant was directed to put whatever she wished to say in writing. *Id.* In her letter, received the same day, Defendant stated that "I have [a] severe difference in opinion [with my attorney] on how to defend my case" and that "[w]e had totally different strategies." *See* Dkt. 488, Ex. 4 at 1. In particular, Defendant expressed her dissatisfaction with counsel's cross-examination of certain witnesses. *Id.* The letter was shared with Defendant's counsel the same day.

The following Monday, April 7, the Court met *ex parte* with Defendant and her counsel prior to the resumption of trial. At that conference, Defendant explained again that "I have some difference [of opinion] with my lawyer from the very beginning." Tr. 1687. With respect to the

cross-examination of Victor You, she remarked: "My lawyer did a good job, I know that, but it's not perfect. … [I]t's mainly because we have a difference in defense strategy. My lawyer philosophy is anything you don't know the answer, don't touch. … But I think differently. Anything Victor said, I want to face him. I want to confront him." Tr. 1690. As the conference continued, Defendant ultimately requested that she be allowed to recall You and Meng Fei Yu to the stand to re-cross them, and that she be appointed co-counsel. Tr. 1696. She explained, however, that "I will still rely on Fischetti to cover like jury charge, summation, and all that." *Id.* Counsel "vigorously support[ed]" her application, but also explained in detail his reasons for not pursuing the cross-examination strategy that Defendant had sought. *See* Tr. 1696–1700. In the course of the conference, three documents containing Defendant's proposed questions for the two cooperating witnesses were made part of the record for purposes of appeal, Tr. 1702, as were relevant transcript portions and excerpts of later communications between Defendant and her counsel that were subsequently provided to the Court. Those documents have now been unsealed upon the request of Defendant. *See* Dkt. 488.

Later the same day, Defendant's request to recall You and Yu was disclosed to the Government and her co-defendants. Her co-defendants' counsel were provided, with Defendant's consent, with the list of questions that she hoped to ask if she had been permitted to act as co-counsel and recall You and Yu to the stand. In the course of the *ex parte* conference involving all defense counsel, her co-defendants' attorneys strongly objected to Liu's participation as co-counsel. Stan Gérman, counsel to Yang, explained that all defense counsel had been coordinating their approaches with each other and that "there is a real strategy and advantage to not standing up and … hav[ing] the lawyer say, no, she did it, no, she did it, and everybody pointing at themselves." Tr. 1798. Gérman further noted that had he known that Defendant would be representing herself,

"I would have dumped the whole case on her. I would portray her as a lunatic lawyer who is out of control, who is running this horrendous law practice ..." Tr. 1799. Sean Maher, counsel to Bandrich, echoed the same position: "This is a trial where this could have started off with three co[-]counsel here just jumping into a circular firing squad with each other. We didn't do that, and I think it has benefited all of our clients at this point in doing that." Tr. 1800. He added that there was "no way any lawyer who practices criminal law" would ask the questions that Defendant proposed for cross-examination. Tr. 1802. For the reasons stated on the record later that day, Defendant's requests to be appointed co-counsel and to re-call You and Yu were denied. *See* Tr. 1803–04. The Court's decision on those motions is not now challenged.

On April 8, the day closing arguments began, the issue of Defendant's satisfaction with counsel and his team's performance was raised again when counsel requested a sidebar with the Court. He explained that around 9:30 or 10 p.m. the previous night, Defendant contacted him with suggestions for his closing. As he said, "I read all of it. I put some of it in it." Tr. 2040; *see also* Dkt. 488, Ex. 9. Defendant then expressed her frustration that counsel had not incorporated enough of her ideas and that they had a "differen[ce] [of] opinion as to what to cover." Tr. 2044. The Court refused to adjourn proceedings and directed counsel to proceed. Tr. 2045. The Government's summation began shortly thereafter, followed by Defendant's closing, which began that afternoon and was scheduled to be completed the next day, April 9. However, the parties' attention on April 9 turned to certain allegations of juror misconduct, *see United States v. Feng Ling Liu*, No. 12-CR-934 (RA), 2014 WL 6076571 (S.D.N.Y. Nov. 14, 2014), and counsel's closing did not resume until April 10. *See* Tr. 2195–2239. In the intervening time, Defendant sent counsel and his team at least three additional sets of documents for their consideration. *See* Dkt. 488, Ex. 7

(sent 04/09/15 at 1:02 a.m., 18 pages), Ex. 8 (sent 04/09/15 at 11:30 a.m., 27 pages), Ex. 6 (sent 04/09/15 at 7:04 p.m., 12 pages).[25]

The Court again met *ex parte* with Defendant and counsel on April 11, after summations had been completed and before the jury was charged. At that time, Defendant said, among other things, that her counsel had "[chosen] to cover [arguments in his closing] because of his philosophy of defense and his strategy" but that "I don't agree with him regarding the strategy and regarding the philosophy of defense." Tr. 2403. Accordingly, she asked that closing arguments be reopened so that her counsel could address the "nine or ten issues" that she believed he should have. Tr. 2408. The Court denied Defendant's request, Tr. 2408, and that decision is not now challenged. Counsel also spoke to his reasons for not addressing the arguments Defendant had urged. *See* Tr. 2408–11. At the conclusion of the conference, the Court charged the jury. As previously noted, after the guilty verdict was returned on April 14, counsel sought permission to withdraw as counsel, without objection from Defendant. *See* Tr. 2499–51. His motion was granted. Withdrawal Tr. 10.

### 2. Counsel's Opening Statement and Summation

Defendant's first contention with respect to ineffectiveness is that her counsel's opening statement was "random and superficial." Def.'s Mem. at 37. She alleges many specific flaws, including, for example, that counsel "failed to state clearly … Karen's role in [the] Moslemi firm" and "failed to state the two cooperating witnesses' strong motive to lie." *Id.* Thus, with respect to those issues, she argues that counsel should have told the jury that any fraud "happened after Karen left the firm" and that "Victor [You] and Meng Fei [Yu] had a strong motive to lie not only to save

---

[25] Another 30-page document was also sent, presumably around the same time. *See* Dkt. 488, Ex. 10.

themselves but also to accomplish their own goals in addition to taking revenge against Karen due to jealously and hatred." *Id.* at 38. Similarly, Defendant argues that her counsel's closing was "very poor and ineffective" because, among other things, counsel did not adequately draw the jury's attention to the "severe lack of evidence in this case." *Id.* at 84. These assertions fail as factual matters but, in any event, do not render her counsel's assistance ineffective.

Both in his opening and closing remarks, counsel made essentially all the points Defendant faults him for failing to make. *See* Def.'s Mem. at 37–40, 84–85. In his opening, counsel portrayed Defendant as a young woman who "left China because of the oppression," Tr. 77, and later founded her immigration law practice not only to support her family but "because she wanted to help," Tr. 78. He also argued that, after ten years of hard work at the firm, Defendant wanted to step back. Thus "she turned the firm over to [Moslemi] and it became the Moslemi firm." *Id.* He acknowledged then, as she now does, that Defendant did not entirely withdraw from the firm—"she [still] got calls from China, from family members, where she helped one person to get another person in," Tr. 78—but she was no longer in charge and had no knowledge of its day-to-day operations. In this regard, counsel specifically pointed to Lin Chen's recordings, on which the Government placed significant emphasis at trial: "You will see that she never even met my client. Never mind talk to her, never mind record her. Never even met her. And that's the evidence the government wants you to believe." Tr. 81. He reiterated this point at length during his summation. Tr. 2095–96, 2201–06.

Counsel also sought to undermine the cooperating witnesses, asserting that the Government built its case with witnesses "who are attempting to save their own lives" and are "trading their crime to get freedom by lying about my client." Tr. 79. He singled out Victor You and Meng Fei Yu in particular. With respect to You, counsel pointed to a conversation where he is heard saying

that "everybody will push the responsibilities on [Defendant] because she is the boss." Tr. 81; *see also* Tr. 688–89. He also noted the recording made by Yu, which he characterized as showing that Yu trying was to "entrap [Defendant] into saying certain things" but that "[s]he never says anything about [the fraud]." Tr. 82. During his closing, counsel discussed the testimony of both witnesses at length, and specifically pointed to their motive to lie and particular statements he identified as false. *See* Tr. 2206–2231.

Finally, counsel repeatedly pointed to the purported lack of specific evidence regarding Defendant's membership in the conspiracy. In his opening, counsel said, "You will hear transcripts, read them, hundreds of conversations. See how many you find, as the government's told you, where my client admits she was in a fraud. I tell you[,] you will hear none. None." Tr. 80–81. During his closing, counsel reacted to the Government's argument as to why more recordings of Defendant were lacking by asserting that "[i]t can't be if she's not record[ed] she's guilty and if she is record[ed] she's guilty." Tr. 2234. In his opening, counsel also challenged the Government "to put one person on the stand, one" who would say that he or she submitted a fraudulent application. Tr. 82–83. The same point was reiterated during closing. Tr. 2100, 2199–2200. Finally, counsel argued in his summation that, after discrediting the testimony of the cooperating witnesses, "there is not one scintilla of evidence, not one, that implicates my client." Tr. 2202.

Defendant has further failed to show how her attorney's decisions were unreasonable exercises of professional judgment. The law is clear that opening statement and closing arguments are "ordinarily a matter of trial tactics and strategy which will not constitute the incompetence basis for a claim of ineffective assistance of counsel." *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987); *see also Suarez*, 588 F.2d at 354. "When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than

through sheer neglect." *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003). Beyond the strength of the presumption, as evident from the lengthy excerpts quoted above, the record here readily supports the conclusion that counsel's decisions were, indeed, exercises of professional judgment. Because nothing Defendant has argued suggests otherwise, this argument cannot succeed.

### 3.    Cross-Examination of Witnesses

Defendant also faults her counsel for ineffectively cross-examining the Government's witnesses, in particular, Victor You and Meng Fei Yu. She argues, for example, that although her counsel's cross-examination of You was "relevant," it was "far from enough because it leaves most of his testimony untouched and uses very little of the 3500 materials to impeach him." Def.'s Mem. at 45. In so arguing, Defendant resurrects essentially the same points she raised during trial. *See* Dkt. 488, Ex. 1–3. As the record here demonstrates, counsel considered these points and ultimately rejected them. *See, e.g.*, Tr. 1698 ("I looked at it. And in my opinion, it was not worthy of cross-examination. It is just a narrative."). That decision, like all "[d]ecisions whether to engage in cross-examination and, if so to what extent and in what manner, [was] ... strategic in nature," *Nersesian*, 824 F.2d at 1321 (internal citations omitted), and, as such, is "virtually unchallengeable," *Strickland*, 466 U.S. at 690. Given that counsel's cross examinations were well within "the wide range of professionally competent assistance," *id.*, Defendant's argument must fail.[26]

---

[26] Defendant also appears to fault counsel for not objecting to leading and other improper questions. *See, e.g.*, Def.'s Mem. at 70 ("Defense should ask Meng Fei to see how many times she has … been asked leading questions, how many times she is not responsive, how many times she has gone off the script."), *id.* at 83 ("Defense should object to the prosecutor's questions regarding what Meng Fei said … because it amounts to creation of evidence by her, as argued earlier."). As a threshold matter, the Court notes counsel's recollection that during trial Defendant urged counsel "a number of times" to object to the Government's leading questions. Tr. 1699. Counsel did not because "in [his] judgment, it wasn't leading at all, so [he] didn't object." *Id.* As the Court has already noted, it agrees with that assessment. *See* n. 14, *supra*. In any event, even accepting that certain questions may have been leading, counsel's failure to object does not amount to ineffectiveness because such a decision is tactical and may be pursued for a variety of reasonable reasons including, for example, the desire not to appear obstructionist in front of the jury. *Flores v. Keane*, 211 F.Supp.2d 426, 441 (S.D.N.Y. 2001). With respect to the balance of Defendant's arguments concerning failures to object to improper questioning, these arguments reiterate claims already discussed and rejected

### 4. Failure to Make Evidentiary Objections

Defendant also takes issue with what she says was counsel's failure to make objections to the improper admission of evidence, including, for example, admission of what she says was hearsay involving a dozen unknown individuals not proven to be co-conspirators. *See* Def.'s Mem. at 40–41. In fact, counsel did object to the admission of some of this evidence. *See supra* at 18–20. In any event, none of the evidence to which Defendant now objects was improperly admitted at trial. *See id.* And because there were sound evidentiary bases for the admission of the challenged co-conspirator statements, her counsel was not ineffective for failing to object. *See United States v. Brooks*, 82 F.3d 50, 53–54 (2d Cir. 1996) (finding that trial counsel acted properly in not objecting to testimony that was admissible against his client as an admission by a co-conspirator); *United States v. Boothe*, 994 F.2d 63, 68–69 (2d Cir. 1993) (holding that trial counsel did not render ineffective assistance of counsel by failing to object to co-conspirator statements as hearsay when such statements were admissible as non-hearsay under Fed. R. Evid. 801(d)(2)(E)). More broadly, "[a]s with trial decisions to offer or stipulate to certain evidence, decisions such as when to object and on what grounds are primarily matters of 'trial strategy and tactics.'" *Cohen*, 427 F.3d at 170–71 (*quoting Brown v. Artuz*, 124 F.3d 73, 77 (2d Cir. 1997)). As such, counsel's performance is subject to the "strong presumption that [his] conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Nothing Defendant has proffered serves to defeat that presumption.

---

on the merits. *See supra* at 21–22. Plainly, "the failure to make a meritless argument does not rise to the level of ineffective assistance." *United States v. Kirsh*, 54 F.3d 1062, 1071 (2d Cir. 1995).

### 5. Failure to Call Defense Witnesses

Finally, Defendant faults her counsel for failing to call any defense witnesses. Def.'s Mem. at 36. Defendant, however, does not name a single witness whom she believes should have been called on her behalf. At any rate, "the tactical decision of whether to call specific witnesses—even ones that might offer exculpatory evidence—is ordinarily not viewed as a lapse in professional representation." *United States v. Schmidt*, 105 F.3d 82, 90 (2d Cir. 1997); *accord United States v. Luciano*, 158 F.3d 655, 660 (2d Cir.1998) ("[t]he decision not to call a particular witness is typically a question of trial strategy"). Courts in this Circuit recognize a variety of reasonable bases for counsel's electing not to call particular witnesses on behalf of the defense. *See United States v. Thornhill*, 34 F.Supp.3d 334, 367–69 (S.D.N.Y. 2014) (collecting cases). In the absence of any information whatsoever suggesting why the decision not to call any defense witnesses was unreasonable, this claim cannot succeed.

### CONCLUSION

The fundamental question presented by these motions is "whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," *Mi Sun Cho*, 713 F.3d at 720, and "whether letting [the] guilty verdict stand would be a manifest injustice," *Ferguson*, 246 F.3d at 134. Having heard the witnesses, reviewed the physical evidence, and observed the performance of her counsel over a multi-week trial, the Court has no basis to conclude the jury erred or an injustice resulted. Defendant received a fair trial and was afforded effective assistance of counsel, and nothing in her present motions persuades the Court otherwise. Far from having any question about the integrity or correctness of the jury's verdict, the Court itself is fully persuaded that Defendant is guilty beyond a reasonable doubt of the crime for which she has been

convicted. For the reasons herein, Defendant's motions pursuant to Rules 29 and 33 are therefore denied. The Clerk of Court is respectfully requested to close the motion at Dkt. 294.

Dated:  July 20, 2015
        New York, New York

Ronnie Abrams
United States District Judge